# EXHIBIT L



## Section II
## Completion of the Cuban Claims Program Under Title V of the International Claims Settlement Act of 1949

Foreign Claims Settlement
Commission of the United States

## SUMMARY

On October 16, 1964, the President signed into law, H.R. 12259, which became Public Law 88–666, title V of the International Claims Settlement Act of 1949, as amended (78 Stat. 1110), under which the Commission is authorized to determine the amount and validity of certain claims of nationals of the United States against the Government of Cuba based upon: (1) debts for merchandise furnished or services rendered by nationals of the United States; (2) losses arising since January 1, 1959, as a result of the nationalization or other taking of property belonging to United States nationals; and (3) disability or death of nationals of the United States resulting from actions taken by, or under the authority of the Government of Cuba since January 1, 1959. The full text of the statute appears as Exhibit 11, and the implementing regulations appear as Exhibit 12.

This legislation stemmed, in part, from various actions and enactments in 1959 and 1960 by the Government of Cuba after the Castro regime came into power by which the Government of Cuba effectively seized and took into state ownership most of the property in that country owned by the United States and its nationals, with the exception of the United States Naval Base at Guantanamo Bay. No provision was made by the Cuban Government for the payment of compensation for such property as required under the generally accepted rules of international law.

Subsequently, the Government of the United States terminated relations with the Government of Cuba after all attempts to negotiate failed.

In signing H.R. 12259 into law, the President said:

> The basic purpose of this bill is to authorize the Foreign Claims Settlement Commission to determine the amount and validity of claims of United States nationals against the Government of Cuba.

> The Castro regime has appropriated over $1 billion worth of property of United States nationals in total disregard for their rights. These unlawful seizures violated every standard by which the nationals of the free world conduct their affairs.

> I am confident that the Cuban people will not always be compelled to suffer under Communist rule—that one day they

will achieve freedom and democracy. I am also confident that it will be possible to settle claims of American nationals whose property has been wrongfully taken from them.

This will provide for the adjudication of these claims of American nationals. I have signed it because of the importance of making such a permanent record while evidence and witnesses are still available." [51 Dept. of State Bull. 674 (1964).]

Title V of the International Claims Settlement Act of 1949, as amended does not provide for the payment of these losses of American nationals in claims against the Government of Cuba. The statute provides only for the determination by the Commission of the validity and amounts of such claims and the certification of the findings to the Secretary of State. The stated purpose of the Congress in directing that the amounts of these losses be certified to the Secretary of State is to provide him with appropriate information which would be useful in future negotiation of a claims settlement agreement with a friendly government in Cuba when diplomatic relations are resumed.

The matter of payment of losses sustained by Americans was considered by the Congress as well as the Executive Branch of our Government when this legisaltion was examined prior to enactment. Initially, the proposal included a section which would have provided for the liquidation of Cuban assets in the United States and made available the proceeds for payments on the losses determined by the Commission. However, after a study was made by the Treasury Department and the Department of State, upon the direction of the President, it was concluded that Cuban Government assets in the United States were not of sufficient magnitude to warrant such action. Thereafter, this section was deleted from the legislation by the Congress.

Thus, in effect, this program may be classified as a presettlement adjudication of claims to determine the extent of American losses and provide a tool for our Government in dealing with the Government of Cuba in the future on this important international issue.

The program was officially commenced on November 1, 1965 by the issuance of a press release announcing that the filing period had opened and that the deadline for filing such claims was May 1, 1967. Notice of this action was published in the Federal Register pursuant to a statutory requirement. At that time, the Commission mailed claim forms and instructions for filing claims to all persons who had registered an interest in filing such claims with

the Commission as well as the Department of State and other agencies. The instruction sheets and form for filing claims against the Government of Cuba appear as Exhibit 13.

The Cuban Claims Program was the most complex and challenging assignment ever delegated to the Commission, both from a legal and administrative point of view, and it was the most interesting one as well. Over the many years during which Cuba was under the close influence of the United States, Americans were encouraged to and did invest heavily in Cuba's economy. Many of Cuba's industries were developed with American capital and ingenuity, including some of the largest industrial and financial grants in the United States. As a result, Cuba became a progressive industrial country with a great potential for further development.

These conditions changed radically after Fidel Castro came into power on January 1, 1959. By a series of actions taken shortly thereafter, Cuba confiscated, expropriated, intervened, nationalized, and by various means took the properties of American nationals without compensation. Some of the actions were subtle, commencing in one instance with costly and time-consuming requirements, which were clearly deliberate administrative obstacles, that Americans owning mineral and mining rights in Cuba reregister their concessions under conditions that made it almost impossible for anyone to comply. Under Law No. 635 of November 23, 1959, all pending applications for further exploration of American-owned ore concessions were cancelled arbitrarily, and new applications were ignored or disapproved. One such case is illustrated by the *Claim of Felix Heyman,* Claim No. CU–0412, 1968 FCSC Ann. Rep. 51.

American exporters of merchandise and other goods to Cuba came under attack upon the enactment of a foreign exchange law by Cuba. This action had the color of legitimacy since foreign exchange is universally recognized as being within the inherent jurisdiction of a sovereign state. However, an examination of the law and its implementation revealed that Cuba had imposed such unreasonable restrictions upon Cuban debtors that they were precluded from making payments to their American suppliers. The Commission concluded that these actions constituted an intervention into the contractual rights of the American suppliers within the meaning of title V of the Act. Two outstanding cases in this respect are the *Claim of Schwarzenbach Huber Company,* Claim No. CU–0109, 25 FCSC Semiann. Rep. 58 (July-Dec. 1966), and the *Claim of Etna Pozzolana Corporation,* Claim No. CU–0049,

1967 FCSC Ann. Rep. 46. In another case, the Commission concluded that the cumulative effect of a number of restrictions by the Cuban Government on the maritime industry constituted a constructive taking of American-owned properties engaged in that industry. (See the *Claim of Garcia & Diaz, Inc.*, Claim No. CU–0940, 1970 FCSC Ann. Rep. 30.)

Since the statute is remedial in nature, it warrants a liberal interpretation in accordance with established rules of construction; and the Commission so construed the statute whenever the circumstances justified such action. Thus, while the statute provided for a filing deadline of May 1, 1967, which could have been extended to May 31, 1967 under certain conditions, the Commission decided that claims filed after the deadline could also be determined on their merits if it did not interfere with the orderly processing of the timely filed claims. That decision was in concert with the legislative intent of the Act that all American claims against Cuba be compiled at a time when evidence and witnesses were still available. Such a complete record would also be of assistance in the event of any future negotiations with Cuba. (See the *Claim of John Korenda*, Claim No. CU–8255, reported herein.)

Similarly, the Commission considered a number of claims involving a section of the statute that required, as a prerequisite for favorable action, that the claims be owned by nationals of the United States continuously from the dates of loss until the dates of filing with the Commission. (See Section 504(a).) A claim was filed on the basis of certain losses with respect to certain Cuban bonds. It was noted by the Commission that the bonds had been owned and traded almost entirely by firms and persons in the United States. Applying a liberal interpretation to that section of the statute, the Commission concluded that the circumstances justified an inference that the bonds and the claims based thereon were so owned continuously by nationals of the United States, and appropriate Certifications of Loss were entered. (See the *Claim of Samuel J. Winkler, et al.*, Claim No. CU–2571, 1968 FCSC Ann. Rep. 47.)

However, when the circumstances concerned an American corporation which clearly was excluded by the express provisions of the statute, the Commission found no basis for applying a liberal interpretation so as to render the claim valid under the Act. Two claims were filed by an American corporation for certain losses sustained as a result of Cuban Government actions, to which claims the American corporation had succeeded. The statute provided that a corporation is a national of the United States if it

was organized *domestically* and if at least 50% of its outstanding capital stock is owned by nationals of the United States. (See Section 502(1)(B).)

One of the claims arose in favor of an American corporation, but from 1960 to 1962 the claim had been owned by a corporation that was organized in Canada. The second claim arose in favor of this Canadian corporation. Claimant urged that since more than 50% of the outstanding capital stock of the Canadian corporation was owned by nationals of the United States, claimant satisfied the nationality prerequisites of the statute.

The Commission was constrained to reject claimant's contentions. Since the first claim had been owned by a Canadian corporation for two years before the date of filing with the Commission, claimant could not show that the claim was owned continuously by nationals of the United States from the date of loss until the date of filing. The second claim arose in favor of the Canadian corporation (organized under the laws of Canada) and, therefore, was invalid *ab initio* because it was not owned by a national of the United States on the date of loss. The fact that the claimant, which presented the claim, itself qualified as a United States national and that more than 50% of the Canadian corporation's outstanding capital stock was owned by nationals of the United States was insufficient to cure the inherent defects in the claims, and both claims were denied. (See the *Claims of AOFC, Inc.*, Claim Nos. CU–3671 and CU–3672, reported herein.)

As indicated in the decision on these two claims, had the second claim which arose in favor of the Canadian corporation been held by that foreign corporation continuously until the date of filing with the Commission, all American stockholders thereof could have filed claims for their proportionate stock interests therein pursuant to Section 505(b) of the Act. Another leading case in which this latter issue is involved is the *Claim of Ruth Anna Haskew,* Claim No. CU–0849, 1968 FCSC Ann. Rep. 31.

It may be noted at this point that there were a number of less difficult, but nonetheless important, cases that were encountered in the Cuban Claims Program. The following is a summary of some of those cases:

(a) The Commission held that all properties, goods, chattels, and bank accounts of persons who had left Cuba were taken by virtue of Cuban Law 989 of December 6, 1961. (See the *Claim of Floyd W. Auld,* Claim No. CU–0020, 25 FCSC Semiann. Rep. 55 (July–Dec. 1966).)

(b) The Commission held that claims based on indirect owner-

ship of stock interests in nationalized Cuban corporations through stock interests in other foreign entities were within the purview of title V of the Act, if at least 25% of the entire ownership interests in the Cuban corporations were vested in United States nationals on the dates of loss. (See the *Claim of Avon Products, Inc.*, Claim No. CU–0772, 1967 FCSC Ann. Rep. 35.)

(c) The Government of Cuba enacted Law 963 of August 4, 1961 which annulled all "old currency" and established a new currency. Old currency was required to be turned in at certain designated centers and only limited amounts of the new currency were authorized in exchange therefor. Amounts in excess thereof were deposited in special accounts. Claimant in this case possessed old currency in the United States. The Commission held that the annulment of such old currency outside of Cuba and the failure to provide the right to exchange it for new currency constituted a taking of property within the meaning of title V of the Act. (See the *Claim of Betty G. Boyle*, Claim No. CU–3473, 1968 FCSC Ann. Rep. 81).

(d) Based upon a study of the legislative history of title V of the Act, the Commission held that the Government of the United States was not an eligible claimant. (See the *Claims of the United States of America*, Claim Nos. CU–2522 and CU–2618, 1967 FCSC Ann. Rep. 50.)

(e) In accordance with the provisions of Section 506 of the Act, the Commission held that amounts received on account of the same loss from whatever source must be deducted in determining the certifiable amount of loss. (See the *Claim of Richard G. Milk, et. al.*, Claim No. CU–0923, 1967 FCSC Ann. Rep.63.)

(f) A question arose in a case concerning taxes which the claimant owed to the Government of Cuba. The Commission applied the theory of set-off and held that such unpaid taxes must be deducted in determining the amount of loss under title V of the Act. (See the *Claim of Simmons Company*, Claim No. CU–2303, 1968 FCSC Ann. Rep. 77.)

(g) The Commission held that expenses incurred in moving personnel and records from Cuba to another country after an enterprise had been nationalized by Cuba, and expenses of establishing a new office are losses outside the purview of title V of the Act. It was concluded that such losses were too remote and indirect to attribute them to the act of nationalization for the purposes of the statute, and claims for such losses were denied. However, the Commission held in one such case, that the value of improvements made by a lessee to leased premises that were taken by Cuba constituted losses certifiable under the statute. (See the *Claim of PPG*

*Industries, Inc.,* Claim No. CU–1530, 1970 FCSC Ann. Rep. 51. See also *Claim of Cuban Electric Company,* Claim No. CU–2578, reported herein, and the *Claim of American Brands, Inc.,* Claim No. CU–2354, 1970 FCSC Ann. Rep. 36.) In the *Claim of Frederick Snare Corporation, et. al.,* Claim No. CU–2035, reported herein, the Commission held that improvements to leased premises that were taken by Cuba were allowable losses under title V of the Act if such improvements enhanced the value of the property in question. This was the rationale for allowing the leasehold improvements in the said *Claim of PPG Industries, Inc.*

(h) Another example of indirect losses was presented in a claim for expenses incurred in preparing a claim under title V of the Act. The Commission held that such expenses do not constitute losses within the meaning of the statute. (See the *Claim of Mary Pauline Seal,* Claim No. CU–0059, 1967 FCSC Ann. Rep. 57.)

(i) In one case, claimant asserted that it had made certain guarantees in the event certain conditions ever arose, and designated this portion of the claim as a "provisional claim." The evidence failed to establish that claimant ever became liable under those guarantees or that it sustained any loss in this respect. The Commission held that contingent losses or losses which were never sustained do not form the basis for a valid claim under title V of the Act. (See the *Claim of Ford Motor Company,* Claim No. CU–3072, reported herein.)

(j) The Commission held that the settlement of an attachment suit against a Cuban bank in the New York courts for an amount less than the full amount of the loss in question did not extinguish any claim for the balance of the loss under title V of the Act in the absence of evidence that the stipulation between the parties to the suit included a general release, a covenant not to sue, or a statement that the settlement was agreed upon with prejudice. (See the *Claim of Deak and Co., Inc.,* Claim No. CU–0381, 1968 FCSC Ann. Rep. 27.)

(k) The statute provides for certain claims "arising since January 1, 1959." A study of the legislative history of title V of the Act, however, led to the conclusion that debts owed to American nationals by the Government of Cuba which arose prior to January 1, 1959 are within the purview of the statute if the refusal to pay occurred for the first time after January 1, 1959. (See the *Claim of United Fruit Sugar Company,* Claim No. CU–2776, 1969 FCSC Ann. Rep. 42, and the *Claim of Clemens R. Maise,* Claim No. CU–3191, 1967 FCSC Ann. Rep. 68.)

(l) The Commission held that a trustee under a bond indenture owns no proprietary interest in claims based on the failure

of the Cuban Government to meet its obligations with respect to the bonds. Any losses in these respects were found to have been suffered by the individual bondholders in whose favor Certifications of Loss were entered under title V of the Act. (See the *Claim of Morgan Guaranty and Trust Company of New York, as Trustee,* Claim No. CU–1594, 1967 FCSC Ann. Rep. 44.)

(m) Under the laws of Cuba, children are "obligatory heirs." A case was presented involving American children of a Cuban parent who was alive and owned the claimed property on the date of loss. Counsel for the children, the claimants, urged that claimants owned interests in the property on the date of loss as "obligatory heirs." The Commission, however, held that such rights do not vest until the moment of death. Since it was clear that the claims were not owned by nationals of the United States on the date of loss, the claims were denied. (See the *Claims of Robert M. Gonzalez, et al.,* Claim Nos. CU–3685 and CU–3687, 1971 FCSC Ann. Rep. 82.)

(n) A case involved a life insurance policy issued by an American company doing business in Cuba. The Commission held that the claim was not valid under title V of the Act unless Cuba took the proceeds of the policy. (See the *Claim of Estrella Vaughn, et al.,* Claim No. CU–1213, 1971 FCSC Ann. Rep. 76.)

(o) The Commission held that the failure of the Government of Cuba to honor and transfer benefits due American nationals on account of earned retirement benefits constituted a taking of property within the meaning of title V of the Act. (See the *Claim of A. M. Joy de Pardo,* Claim No. CU–1906, 1969 FCSC Ann. Rep. 71.)

(p) The Commission concluded that in determining the amount of loss sustained under title V of the Act, it is not bound by the amount asserted by claimant, and the Certification of Loss may be in a greater amount than claimed if warranted by the evidence of record. (See the *Claim of King Ranch, Inc.,* Claim No. CU–1507, 1970 FCSC Ann. Rep. 59.)

(q) Although title V of the Act did not expressly provide for the inclusion of interest on the amount allowed, the Commission concluded that interest should be added in a certifiable loss in conformity with principles of international law, justice and equity, and should be computed from the date of loss to the date of any future settlement. (See the *Claim of American Cast Iron Pipe Company,* Claim No. CU–0249, 25 FCSC Semiann. Rep. 49 (July–Dec. 1966.) Subsequently, the Commission cited another case as authority for this principle as a mere matter of expediency, known

as *Claim of Lisle Corporation,* Claim No. CU–0644, but there was no change in the effect of this holding.

(r) Giving effect to the Community Property Laws of Cuba, which was a recognition of the rule that the law of the situs governs ownership of property, the Commission held that properties in Cuba were owned equally by both spouses (1) if acquired by either one during coverture with funds of the marriage partnership; (2) if acquired by work or industry of either spouse during coverture; or (3) if the fruits, income or interests were received or accrued during coverture from the common or private properties of the spouses. (See the *Claim of Robert L. Cheaney, et al.,* Claim No. CU–0915, reported herein.)

(s) Under the act of state doctrine, the courts of the United States could not generally sit in judgment on the acts of another government committed within its territory. However, that rule was amended by the Hickenlooper Amendment to the Foreign Assistance Act of 1964. Thus, in a claim based on a judgment against the Government of Cuba entered by a Pennsylvania court, the Commission held that the failure of Cuba to satisfy the judgment constituted a loss within the meaning of title V of the Act. (See the *Claim of James Keys,* Claim No. CU–0991, 1968 FCSC Ann. Rep. 75.)

(t) The Commission held that nonstock corporations organized in the United States, the members and trustees of which are citizens of the United States, qualify as nationals of the United States within the meaning of title V of the Act. (See the *Claim of Brothers of the Order of Hermits of St. Augustine (Inc.),* Claim No. CU–3503, reported herein. This decision followed the holding in the *Claim of Independence Foundation,* Claim No. CU–2152, 1969 FCSC Ann. Rep. 38.)

(u) An American insurance company asserted a claim based, in part, on loans made to Cuban insureds. The evidence showed that the loans were secured by the cash surrender values of the policies, which amounts were in the possession of claimant. In the absence of evidence establishing that claimant had not already been compensated for these asserted losses from the collateral funds in its possession, the Commission held that claimant had not met the burden of proof with respect to this portion of the claim. (See the *Claim of Occidental Insurance Company of North Carolina,* Claim No. CU–2353, reported herein.)

(v) In accordance with the express provisions of Section 505 (a) of the Act, the Commission held that a claim based on a debt of an American corporation may not be allowed unless the debt was a charge on property taken by the Government of Cuba.

(See the *Claim of Anaconda American Brass Company,* Claim No. CU–0112, 1967 FCSC Ann. Rep. 60; and the *Claim of Ebasco Industries, Inc.,* Claim No. CU–3548, reported herein.) It should be noted, however that in another case in which the American debtor corporation became defunct after the date of loss, the Commission allowed claims on behalf of such creditors. (See the *Claim of International Telephone and Telegraph Corporation,* Claim No. CU–2615, which is discussed *infra,* and reported herein.)

(w) Cuba nationalized, intervened and otherwise took American properties by means of a number of laws specifically enacted for that purpose. Thus, improved real property was taken pursuant to the Urban Reform Law of October 14, 1960. (See the *Claim of Henry Lewis Slade,* Claim No. CU–0183, 1967 FCSC Ann. Rep. 39.) The Urban Reform Law of October 14, 1960 also effected a cancellation of all mortgages on properties in Cuba, and gave rise to claims on account of such losses. (See the citation to the *Claim of the Estate of Marita Dearing de Lattre, Deceased,* Claim No. CU–0116, in the *Claim of Occidental Insurance Company of North Carolina, supra,* reported herein.)

Private commercial enterprises in Cuba were taken pursuant to Law 1076 of December 5, 1962. (See the *Claim of Perkins Marine Lamp and Hardware Corporation,* Claim No. CU–0323, 1967 FCSC Ann. Rep. 42.)

Pursuant to Law 78 of February 19, 1959, and Law 715 of January 26, 1960, the Government of Cuba directed the confiscation of goods or its proceeds representing what it considered "unjust enrichment." (See the *Claim of United Merchants & Manufacturers, Inc.,* Claim No. CU–0759, 1967 FCSC Ann. Rep. 52.)

Resolution No. 1, issued pursuant to Law 851 of July 6, 1960, authorized the nationalization of Cuban concerns in which Americans owned majority interests. (See the *Claim of American Cast Iron Pipe Company,* Claim No. CU–0249, 25 FCSC Semiann. Rep. 49 (July–Dec. 1966).)

Resolution No. 2, issued pursuant to Law 851 of July 6, 1960, listed certain American banks as nationalized. (See Proposed Decision on the *Claim of First National Bank of Boston,* Claim No. CU–2268, discussed *infra* in connection with an important question of valuation, and reported herein.)

Many other Cuban entities owned or controlled by Americans were listed as nationalized by Resolution No. 3, issued pursuant to Law 851 of July 6, 1960. (See the *Claim of Simmons Company,* Claim No. CU–2303, 1968 FCSC Ann. Rep. 77.)

Law No. 647 of November 25, 1959 authorized the Cuban Minister of Labor to order the intervention of such enterprises as he

deemed necessary, and he was empowered to extend the date of intervention. (See the *Claim of Parke, Davis & Company,* Claim No. CU–0180, 1967 FCSC Ann. Rep. 32.)

A large number of Cuban enterprises were listed as nationalized pursuant to Law 890 of October 13, 1960. (See the *Claim of Kramer, Marx, Greenlee and Backus,* Claim No. CU–0105, 25 FCSC Semiann. Rep. 62 (July–Dec. 1966) ; the *Claim of Bartlett-Collins Company,* Claim No. CU–2192, 1968 FCSC Ann. Rep. 39; and the *Claim of Samuel J. Winkler, et al., id.* at 47.)

Owners of mining concessions in Cuba, as distinguished from oil concessions, lost their properties on various dates by intervention by the Minister of Agriculture pursuant to Law No. 617 of October 7, 1959. (See the *Claim of John El Koury,* Claim No. CU–0384, and the *Claim of Archibald S. Abbey,* Claim No. CU–0352, both discussed *infra* in connection with an important question of valuation, and reported herein.)

Cuba expropriated farms and rural properties pursuant to the Agrarian Reform Law of May 17, 1959, implemented by the regulations of October 7, 1959. (See the *Claim of the Estate of Grenville M. Dodge, Deceased,* Claim No. CU–1290, reported herein.)

(x) The Commission held that the values of life estates and remainder interests in property that was taken by Cuba may be determined on the basis of the Makehamized Mortality Tables as prescribed by the United States Treasury Department regulations governing the collection of gift and estate taxes. (See the *Claim of Richard Franchi Alfaro, et al.,* Claim No. CU–0048, 1967 FCSC Ann. Rep. 71.)

The complexity of the Cuban Claims Program and the interest it engendered on the part of all concerned is further illustrated by the following cases :

1. There were instances in which Americans whose properties were taken by Cuba were unable to leave Cuba and, therefore, could not file claims for their losses. On its own motion, the Commission opened claims on behalf of such claimants and left them open until their return to the United States or the end of the program, July 6, 1972. Whenever any such claimant had a member of his family in the United States who had filed a claim, all interests in the properties in question were considered. If the claims of the absent Americans were found to be valid under the statute, appropriate Certifications of Loss were entered in their favor. (See the *Claim of Placido Navas Costa, et al.,* Claim No. CU–3344, reported herein.) In those instances in which it could not be determined whether the claims of such absent Americans

were valid under the Act due to the lack of evidence, the claims were held open as long as possible and were dismissed at the statutory end of the program.

2. A very complex case involved several American and Cuban entities, as well as individuals, who owned direct or indirect interests in the entities. There were conflicting claims concerning ownership of certain large quantities of sugar that had been taken by the Government of Cuba. These claims were supported by a brief submitted by counsel for claimants who suggested findings of ownership in the alternative and agreed to any decision the Commission would reach in this respect. A second important issue in this case centered around ownership of certain stock interests by two non-United States nationals who were two of four beneficiaries under an irrevocable trust. Here, counsel urged that the trustees, nationals of the United States, owned the stock interests and that these two non-United States nationals never owned either a legal or equitable interest in the stock. Upon careful consideration of the evidence of record, the Commission held that the trustees were merely nominal holders, and that the beneficiaries were the real parties in interest who must satisfy the United States nationality prerequisites of the statute. (See the *Claim of Efim Golodetz, et al.,* Claim Nos. CU–1816, CU–1818, CU–1819 and CU–1820, reported herein.)

3. The statute provides that a claim based on an interest in an entity which qualifies as a national of the United States shall not be considered because the entity itself is the proper party claimant. (See Section 505(a) of the Act.) However, in an unusual set of circumstances the Commission held that covered losses of an American corporation which became defunct after the dates of loss may be the basis for certifying such losses in favor of a majority stockholder of the defunct entity as trustee for the benefit of non-claimant stockholders and creditors. The Commission further held that the distribution is to be made in accordance with the laws of Delaware, where the defunct corporation had been organized, and with the provisions of title V of the Act, preference to be given to creditors, preferred stockholders and common stockholders in that order, and the qualifications as to nationality to be observed. Further, it was held that the distribution is to be made on the same pro rata basis as employed in determining any payment made to successful claimants against the Government of Cuba. (See the *Claim of International Telephone and Telegraph Corporation, Individually and as Trustee,* Claim No. CU–2615, reported herein.)

4. A claim was presented by an American insurance company

doing business in Cuba. One of its Cuban insureds suffered a covered loss in Cuba, and before he could recover from claimant, the Government of Cuba confiscated the Cuban's properties, including his claim against claimant. When claimant failed to pay Cuba for the insured's loss to which Cuba asserted title, Cuba confiscated assets of claimant on deposit in Cuba. In the meantime, the Cuban insured, who had fled to the United States, instituted suit against claimant in an American court. Claimant alleged in that suit that its liability to the insured had been satisfied when Cuba, as successor in interest, seized sufficient assets of claimant to pay the insured loss.

Initially, the Cuban's suit was dismissed, and appealed ultimately to the United States Supreme Court. Subsequently, the suit was remanded to the United States Court of Appeals and, in turn, to the United States District Court. Finally, the court ruled in favor of the Cuban on the ground that the suit was transitory in nature and that acts of Cuba expropriating the insured's properties could not be given extraterritorial effect. The court, therefore, held that Cuba had not taken the insured's claim against claimant, but only claimant's properties. The Commission found accordingly. (See the *Claim of Aetna Insurance Company*, Claim No. CU–2363, reported herein.)

5. The Commission held that the value of the life of an American who had been executed by a Cuban firing squad in violation of international law is measured by the contributions the deceased would have made to his dependents. (See the *Claim of Jennie M. Fuller, et al.*, Claim No. CU–2803, reported herein.)

This determination as to the value of human life is to be distinguished from the Commission's holding in a case under the General War Claims Program authorized by the War Claims Act of 1948. Based upon a different legislative intent than that in the International Claims Settlement Act of 1949, the Commission held that the value of a human life should not be measured by age, status in life, ability to earn, or dependents; and that each life should be considered equal under the statute. Accordingly, the Commission initially fixed the award for a death claim at $10,-000.00 based upon allowances under other Federal statutes. Subsequently, upon reconsideration, the Commission allowed $25,-000.00 for the loss of each life. (See *Claim of Edward T. Wilkes, et al.*, Claim Nos. W–10922, W–10923, W–10924, 23 FCSC Semiann. Rep. 77 (July–Dec. 1965).)

6. A very interesting case concerned a contract to build a low cost housing project in Cuba. As a result of certain negotiations with officials in Cuba, claimant, a corporation, was organized in

Delaware, and ultimately this entity entered into a contract with the Government of Cuba to build a $10 million housing development. One day later, claimant entered into a subcontract with a Cuban corporation that was wholly owned by one of the stockholders of claimant, pursuant to which the Cuban entity agreed to build the housing project for $8.5 million. A week later, the same stockholders of claimant formed a Cuban corporation, and claimant assigned its original contract to the newly formed Cuban corporation. The Cuban subcontractor commenced work late in December 1958, and in January 1959, after Castro came into power, construction was halted and no work was performed thereafter, which actions constituted a taking of property within the meaning of title V of the Act. Claimant requested $1.5 million as the profit it would have earned had there been no interference from Cuba.

The Commission noted that the contract and the subcontract included "cost plus" provisions not to exceed $10 million and $8.5 million, respectively. There was no evidence to establish what the final costs would aggregate. The Commission, therefore, concluded that any finding that an amount certain would be earned as profit was purely speculative and without foundation. Accordingly, the claims were denied. (See the *Claims of Berlanti Construction Company, Inc., et al.,* Claim Nos. CU–0871 and CU–0657, reported herein.) On the other hand, the losses actually sustained by the subcontractor for supplies and other related costs in commencing work under the subcontract were found to be allowable under the Act on the basis of a 100% stock interest in the subcontractor by an American national. (See the *Claim of Angel Pagliuca,* Claim No. CU–0632, reported herein.)

The Pagliuca case also illustrates how the Commission evaluated items of personal property. Generally, such items were depreciated to arrive at their values on the dates of loss. Depreciation rates were, usually, those applied by the Internal Revenue Service in the collection of income taxes.

7. A claim was presented by a claimant who asserted the loss of certain properties and personal injuries as a result of actions by the Cuban Government. It appeared from the record that claimant had been convicted of counter-revolutionary activities and imprisoned. The sentence also included the confiscation of all her properties in Cuba. Since the evidence failed to establish that claimant had been denied due process of law or that there was a denial of justice as that term is understood under international law, the Commission found no basis for allowing the claim for property losses. The Commission held that a state has the inherent

sovereign right to impose penalties for the violations of its laws. With respect to the claim for personal injuries, the evidence failed to establish that claimant's personal injuries or disability resulted from action by the Cuban Government in violation of international law. Accordingly, the claim was denied in its entirety. (See the *Claim of Isabella Shamma,* Claim No. CU–2593, reported herein.)

8. A case involved a contract between a Cuban corporation and an American entity. Pursuant to the agreement, the American entity shipped certain machinery to the Cuban entity for use in manufacturing certain products. The contract provided that the machinery was to remain the property of the American entity until paid for by the Cuban entity. In addition, the Cuban entity agreed to pay the American entity certain royalties based upon the amount of products manufactured by the machines. Since the record showed that the Government of Cuba had purchased the machines from the Cuban entity, the Commission held that Cuba had assumed the obligations of the Cuban entity under the contract. (See the *Claim of Pilgrim Plastics Corporation,* Claim No. CU–1979, reported herein. See also the *Claim of Jantzen, Inc.,* Claim No. CU–1531, 1968 FCSC Ann. Rep. 66; and the *Claim of Schiaparelli, Inc.,* Claim No. CU–2112, 1970 FCSC Ann. Rep. 55.)

9. Some of the cases were complicated because they involved interests in many Cuban corporations and other items of property. The values of each stock interest and each item of property had to be determined separately at the expense of much time, effort and research. Moreover, it was necessary to find a date of loss with respect to each such stock interest or other item of property. (See the *Claim of William A. Powe,* Claim No. CU–0502, reported herein.)

10. Many claims involved the issue of valuation which proved to be a most difficult one to resolve. The statute provides that the Commission shall consider "the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement." (See Section 503(a) of the Act.) Several cases have been selected to illustrate that this issue was resolved by determining each such case on its own merits and thereby applying the valuation "most appropriate" and "most equitable."

(A) Where warranted, the Commission held that the value of a Cuban corporation may be determined by considering its book value and adjusting the values of its assets on the basis of competent appraisals. In this case, the Cuban corporation owned sugar cane plantations and refineries which were the subjects of the ap-

praisals. (See the *Claim of Ruth Anna Haskew,* Claim No. CU–0849, 1968 FCSC Ann. Rep. 31.)

(B) In a claim based on a mining concession, it appeared that the mines in question were never operated because it was not considered commercially profitable to do so. Claimant contended that the concessions were valuable and that in the future there may be improved processes and conditions that would allow the mines to be exploited for commercial purposes. The Commission held that the values of the concessions must be determined on the basis of conditions existing as of the date of loss, and not on the basis of conditions that may arise in the future. Since the evidence failed to show that the concessions had any measurable value on the date of loss, the claim was denied. (See the *Claim of Freeport Sulphur Company,* Claim No. CU–2625, reported herein.)

(C) The values of mining concessions were issues in a number of claims. In one case, it appeared that the concessions were commercially exploitable, but the evidence was insufficient to support claimant's assertions as to their values. The record showed that some assays had been taken which indicated good values for some of the samples. The principal mining concession was under lease to a Cuban corporation providing for a 10% gross royalty. The Commission concluded that the evidence justified some finding of value because the property had a commercial worth in the market place. On the basis of the entire record and by the application of sound reasoning, the Commission entered an appropriate Certification of Loss in favor of claimant. (See the *Claim of John El Koury,* Claim No. CU–0384, reported herein.)

Difficulties concerning valuation were also encountered in another case involving mining concessions. These difficulties and the lack of evidence in other respects led to a denial of the claim originally. Upon appeal, sufficient evidence was submitted to justify a favorable decision. The record included copies of documents submitted to the Internal Revenue Service and a deposition from a mining engineer who had personal knowledge of the facts. Based upon this record, the Commission determined the value of the ores in the mines as of the date of loss by applying appropriate annual discount rates. (See the *Claim of Archibald S. Abbey,* Claim No. CU–0352, reported herein.)

The two above cases should be distinguished from two other instances in which the evidence established substantial ore reserves by clear and convincing proof. In one of these cases, it was shown that the concessions in question contained proven ore re-

serves of nickel and cobalt that would take 22 years to exhaust based upon the production capacity of the plant and equipment. The Commission determined the values of the ores and the liquidated future values of the plant and equipment by the application of appropriate annual discount rates. In effect, the plant and equipment were depreciated to find their value after 22 years of operation and that amount was subjected to a discount rate to find the value on the date of loss. (See the *Claim of Moa Bay Mining Company, et al.,* Claim Nos. CU–2619 and CU–2573, reported herein.)

The other case involved claims for the loss of mining concessions containing proven reserves of ore, probable reserves and possible reserves. Originally in its Proposed Decision, the Commission denied the portions of the claims for probable and possible ores, citing the *Moa Bay Mining Company* case, *supra,* in which only proven or measured ores were involved.

Claimant appealed and submitted additional supporting evidence, including a report from a firm of mining, geological and metallurgical consultants. It further appeared that actual experience in exploiting the concessions showed that much of what was considered probable ore was found to be proven, and that much of what was considered possible was found to be probable. Considering the entire record, the Commission concluded that the values of the proven ore, the probable ore, and the possible ore should be determined by the application of annual discount rates of 8%, 12%, and 15%, respectively. (See the *Claim of Nicaro Nickel Company,* Claim No. CU–2624, reported herein.)

(D) In a claim involving Cuban branches of an American bank, the Commission concluded that the application of the book value method would be inequitable to the claimant. On the basis of the evidence of record, the Commission held that the fair market value of the branches was the proper method of evaluation. Using the market price of the American bank's stock at the time of loss, the Commission allotted to the branches the portion of that market value of the entire enterprise, including all domestic and foreign operations, which the net income of the branches bore to the net income of the whole. Initially, the Commission found that the book value of the branches was most appropriate and issued its Proposed Decision on that basis. New evidence submitted thereafter was found to warrant the use of the fair market value. (See the *Claim of The First National Bank of Boston,* Claim No. CU–2268, reported herein.)

(E) However, in another case of Cuban branches of an American bank, the Commission applied a different method of

valuation, primarily because evidence as to the market value and percentages of profit were not of record, unlike the *Claim of The First National Bank of Boston*. In this case, the Commission considered several methods of valuation suggested by claimant. It was clear that the book value method would be inequitable since the record included appraisals indicating that some of the properties in question had greater values than shown by the books. The Commission concluded that the most appropriate and equitable method was the result obtained by capitalizing the branches' average annual net earnings at 10%. (See the *Claim of the First National City Bank*, Claim No. CU-2628, reported herein.)

(F) The value of a Cuban corporation which operated a very large hotel in Cuba was also determined by capitalizing its average annual net earnings at 10%. However, this amount was augmented by the value of certain improvements the Cuban corporation had made shortly before intervention by the Government of Cuba, which method the Commission found most appropriate and equitable under the circumstances. (See the *Claim of Intercontinental Hotels Corporation*, Claim No. CU-2521, reported herein.)

(G) As indicated above, the Commission had concluded in a number of cases that the most appropriate and equitable basis for evaluating certain Cuban enterprises was capitalizing their average annual net earnings at 10%, or applying a multiple of 10 to such earnings. In some instances where justified, these resulting amounts representing the "going concern" values, were augmented by the values of any liquid assets, such as cash and the excess of current accounts receivable over current accounts payable.

That method of augmenting the "going concern" values of two Cuban enterprises was applied in a particular case, and an appropriate Certification of Loss was entered. The claimant appealed, and at the oral hearing before the Commission it offered in evidence the testimony of one of its officers who had personal knowledge of the facts; of an expert who had prepared a valuation report already of record; and of an economist who had conducted an independent study of a number of American entities including claimant.

The evidence indicated that as a result of a vigorous sales campaign in Cuba, the two Cuban enterprises were showing a high growth potential substantiated by progressively increasing net earnings. It further appeared that the net earnings leveled off in 1959. Accordingly, the Commission held that the average annual net earnings of the two Cuban enterprises were represented by their net earnings in 1959. Considering the unusual rate at which these net earnings were rising, the Commission held that the most

appropriate and equitable valuation in this case was the result obtained from applying a multiple of 15 to such net earnings. (See the *Claim of Colgate-Palmolive Company,* Claim No. CU–0730, reported herein. It should be noted that an inadvertent error had been made in the Proposed Decision on this claim, which was corrected in the Final Decision which is also included herein.)

(H)  The Commission held that the value of a nationalized Cuban corporation may be determined on the basis of its balance sheet as of a date closest to the date of loss for the purposes of title V of the Act. However, items in such a balance sheet, such as good will and organization expenses, were not allowed as assets unless they enhanced the value of the Cuban enterprise, or unless Cuba benefited therefrom by continuing the business after taking it. (See the *Claim of Bartlett-Collins Company,* Claim No. CU–2192, 1968 FCSC Ann. Rep. 39, and the *Claim of Libby Holman Reynolds,* Claim No. CU–1384, 1969 FCSC Ann. Rep. 24. See also the *Claim of William A. Powe,* Claim No. CU–0502, reported herein, in which organization expense was included as an asset by claimant in each of two of the several Cuban corporations in question. In one instance, $1,907.90 was shown for such expenses upon the formation of the Cuban entity in 1945, and in the other instance, it appeared in the amount of $6,618.51 upon the formation of that Cuban entity in 1951. Considering the fact that both Cuban entities had been nationalized in October 1960, the Commission held that such items should have been written off completely prior to the date of loss, and disregarded these items as assets in determining the values of the Cuban entities.)

(I)  Items in a balance sheet, such as intangibles and licenses, were held not allowable as assets in the absence of evidence establishing the nature thereof and the fact that the items had values on the date of loss. (See the *Claim of Union Light and Power Company of Cuba,* Claim No. CU–0330, reported herein.)

(J)  In another case, the Commission held that items appearing in a balance sheet as liabilities may be shown by competent evidence not to be, in fact, liabilities and therefore not deductible in arriving at the net worth of a corporation that was nationalized by Cuba. (See the *Claim of International Harvester Company,* Claim Nos. CU–2458 and CU–2459, 1970 FCSC Ann. Rep. 71.)

(K)  The Commission held that the value an insurance company's good will may, where circumstances warrant, be determined by applying a multiple of 2 to the average annual gross income from commissions for the five-year period immediately preceding the year in which the loss occurred, for the purpose of

title V of the Act. (See the *Claim of Johnson & Higgins*, Claim No. CU–0769, 1971 FCSC Ann. Rep. 40.)

(L) In another claim of an American insurance company, a question arose concerning the value of claimant's equity in its issued Cuban insurance policies on October 24, 1960 when the Government of Cuba seized all of claimant's properties and prevented it from continuing its business. On the basis of competent evidence, including a detailed analysis of claimant's Cuban operations, the Commission found claimant's gross equity in the policies, and its net equity on the date of loss by the application of appropriate discount rates. (See the *Claim of Pan-American Life Insurance Company*, Claim No. CU–3651, reported herein.)

(M) The Commission held that evidence indicating the values of claimant's stock interests in nationalized Cuban corporations as of dates too far removed from the dates of loss provides an insufficient basis to justify an allowance under title V of the Act. (See the *Claims of Warren and Arthur Smadbeck, Inc., et al.*, Claim No. CU–2465, reported herein.)

(N) A claim was presented involving the value of an enterprise manufacturing and selling a soft drink that was made from a secret formula, which enterprise produced substantial profits in the Cuban market. The Commission originally allowed a minimal amount on account of the intangible asset represented by the use of that formula. Upon the submission of further evidence, the Commission held that this intangible asset may be evaluated by capitalizing the enteprise's average annual net earnings. (See the *Claim of Coca-Cola Company*, Claim No. CU–1743, reported herein.)

(O) A claim was presented involving heavy machinery, barges, a dredge, and related pile-driving equipment, supplies and accessories. Claimants asserted losses based upon the costs of replacing their properties with new ones. In rejecting this method of valuation, the Commission held that the statutory term "cost of replacement" means replacement in kind, taking into consideration the age and condition of the properties on the date of loss; and that it does not mean replacing the properties with new ones. (See the *Claim of M & M Dredging & Construction Co., et al.*, Claim No. CU–0219, reported herein.)

(P) In a case in which the loss of rare paintings was asserted, the Commission was constrained to reject certain appraisals submitted by claimant. Upon consideration of the entire record, the Commission held that the valuation most appropriate to the property and equitable to the claimant was the appraisal of an official art curator for the French Government who had selected

the paintings for purchase by claimant's father, her predecessor in interest. (See the *Claim of Olga Lengyel,* Claim No. CU–3669, reported herein.)

(Q) The Commission held that the nationalization of a wholly owned Cuban subsidiary of an American corporation did not justify a Certification of Loss because the Cuban entity was insolvent on the date of loss. (See the *Claim of the Goodyear Tire & Rubber Company,* Claim No. CU–0887, reported herein.)

(R) The Commission held that the value of films and film products may be best determined by considering the costs of manufacturing and shipment, as well as depreciation incident to shipment, exhibition and storage of the properties in Cuba. (See the *Claim of Twentieth Century-Fox Film Corporation,* Claim No. CU–2114, reported herein.)

(S) The Commission took administrative notice that land and improved real property values increased substantially in value between 1954 and 1959 when Castro came into power. Appropriate Certifications of Loss were entered on this basis. (See the *Claim of Mac Gache,* Claim No. CU–0050, reported herein.)

11. The Commission's regulations provide that after the entry of a final decision a claim may be reopened upon the timely submission of newly discovered evidence which warrants a change in that final decision. (See Section 531.5(1).) There were a number of instances in which petitions to reopen were granted. Generally, in the cases that were allowed, the amounts previously granted were increased, or a claim that had been denied in whole or in part was allowed, on the basis of the newly discovered evidence. These regulations further provide that no such petition shall be entertained unless it appears that the newly discovered evidence came to the knowledge of the party filing the petition subsequent to the date of entry of the final decision, that it was not for want of due diligence that such evidence was not discovered sooner, that the evidence is material, and that reconsideration of the matter on the basis of such evidence would produce a different decision.

Several of these cases have been selected as examples of how such matters were handled, and they are reported herein as follows:

(a) *Claim of Sperry Rand Corporation,* Claim No. CU–0278. This claim was based on the nationalization of claimant's wholly owned Cuban subsidiary. The evidence showed that the subsidiary had been nationalized on October 24, 1960. The record included a certified balance sheet for the subsidiary for the year ending March 31, 1960, prepared by an independent firm of accountants.

According to that balance sheet, the subsidiary was insolvent. Another balance sheet of record, although uncertified, showed that as of September 30, 1960, the net deficit of the subsidiary had increased. On the basis of the precedent in the *Claim of Goodyear Tire & Rubber Company, supra,* reported herein, the claim was denied.

The new evidence consisted of a valuation report for the subsidiary as of November 17, 1960, and supporting schedules prepared by claimant's chief executive officer on the basis of an examination of the subsidiary's books and records. Upon consideration of the entire record in light of the newly discovered evidence, the Commission found that the actual values of the subsidiary's assets had been understated in the said balance sheets, and that the net worth of the subsidiary on the date of loss was substantial. An appropriate Certification of Loss was therefore entered. The Amended Final Decision and the original Proposed Decision, which was affirmed as the Commission's Final Decision, are reported herein.

(b) *Claims of Harry Schrage, et al.,* Claim Nos. CU–1433 and CU–1434. Originally, these claims were denied for lack of proof. Subsequently, upon appeal and the submission of some supporting evidence, the claims were allowed in part. Portions of the claims were denied in the Final Decision on the ground that claims for certain inherited stock interests had not been established as having been owned by nationals of the United States continuously from the dates of loss to the date of filing with the Commission.

The newly discovered evidence established compliance with the nationality prerequisites of the statute. Since neither the values of the Cuban corporations in question, nor the debts owed by these entities to the claimants, which were already of record, had not been challenged, the Commission amended the Final Decision by the addition of new party claimants, the heirs, and by entering Certifications of Loss on the basis of their established interests in the claims.

(c) *Claim of Carter H. Ogden, et al.,* Claim No. CU–2339. This claim also was denied in its entirety for lack of proof. It had been filed by Carter H. Ogden alone. Subsequently, he submitted competent evidence establishing losses certifiable under the statute. However, the evidence also showed that his first wife had acquired one-half interests in the properties in question under the Community Property Laws of Cuba. (See *Claim of Robert L. Cheaney, et al., supra,* reported herein.) Accordingly, the Commission entered a Final Decision certifying equal losses in favor of Carter H. Ogden and his first wife.

The newly discovered evidence established that Carter H. Ogden was divorced from his first wife in 1957, and that by a settlement agreement that was approved by a Cuban court of competent jurisdiction his first wife waived her community property rights in consideration of a lump sum payment and a monthly alimony for the rest of her life. Claimant also attempted to have his second wife, whom he married in 1960, be recognized as part owner of the claim. Applying the laws of Cuba, the Commission found that neither the first nor the second wife owned any interests in the properties. The Commission therefore entered a Certification of Loss for the full amount in favor fo Carter H. Ogden.

(d) *Claim of Maria Vinas*, Claim No. CU–3216. Originally, this claim was allowed in part, one portion thereof having been denied for lack of proof, and a third portion having been allowed on the basis of a 1/10 interest therein. These findings were made in the Proposed Decision which was entered as the Commission's Final Decision on this claim.

The newly discovered evidence consisted of evidence obtained from abroad; and it established that the portion of the claim that had been denied should now be allowed. It further appeared from the new evidence that claimant was the sole owner of the property in which the Commission had found a 1/10 interest. An appropriate Certification of Loss in favor of claimant was entered.

(e) *Claim of Frank Steinhart, Jr., et al.*, Claim No. CU–0231. This claim had been filed by Frank Steinhart, Jr. on his own behalf based on certain purchased and inherited properties. A Certification of Loss in his favor was entered by the Commission in its Final Decision.

The petition to reopen requested that claimant's sister, a national of the United States at all pertinent times, be permitted to join the claim for her inherited interests in some of the properties in question. It was also requested that she be allowed to claim other items of property in which her brother owned no interests. These requests were supported by competent evidence. The Commission granted the petition and entered appropriate Certifications of Loss in favor of both claimants. Here again, is an example of the Commission exercising its discretion in order to compile as complete a record as possible of all claims of nationals of the United States against the Government of Cuba.

(f) *Claim of Sweet Paper Sales Corporation*, Claim No. CU–1874. This claim was denied originally in its entirety for lack of proof. The principal reason for denial was the failure of proof establishing that claimant qualified as a national of the United States within the meaning of title V of the Act.

The newly discovered evidence showed that claimant satisfied the nationality prerequisites of the statute. It further appeared from the new evidence that claimant owned a controlling stock interest in a Cuban corporation that was nationalized on October 24, 1960. The evidence was also sufficient to establish an equitable value for claimant's stock interest on the date of loss, and a Certification of Loss was entered in favor of claimant by an Amended Final Decision.

(g) *Claim of Frederic Samuels,* Claim No. CU–0263. Originally this claim was allowed in part, and a portion thereof based on a stock interest in a nationalized Cuban corporation was denied, because it appeared from the record that all stockholders of the corporation, including this claimant, had recovered amounts on account of this loss which exceeded the apparent net worth of the corporation. (See Section 506 of the Act.)

In a related claim by another stockholder of that Cuban corporation, the evidence established that the corporation owned an asset, good will, which was not recorded on its books and records and was, therefore, not considered in determining the value of this claimant's stock interest. The Commission found a greater value per share of stock in that related claim than it found in the *Claim of Frederic Samuels.*

Accordingly, the Commission reopened this claim on its own motion and increased the Certification of Loss in favor of Frederic Samuels appropriately.

(h) *Claim of Howard E. Holtzman, et al.,* Claim No. CU–2168. This is another instance in which the Commission reopened a claim on its own motion, but there is an important distinction between the two cases.

The record shows that claimants owned stock interests in a Cuban corporation which had leased certain mines in Cuba from another Cuban entity. The taking of the mines by Cuba gave rise to a claim under title V of the Act. Pursuant to the lease, which ran for one year and was renewable from year to year for a maximum of 30 years, the lessee was required to pay the lessor a royalty of 10% of the sales price for each long ton (2,240 pounds) mined, less certain expenses, and a minimum royalty was also included. Since the evidence indicated that all royalties had been paid by the lessee, the Commission determined the value of the lessee corporation's losses by reducing the value of its assets by its liabilities on the date of loss, and no deduction was made for any royalty due the lessor. On this basis, the Commission entered Certifications of Loss in favor of the claimants in accordance with their proportionate stock interests in the lessee.

The newly discovered evidence was found in another case which was determined long after the Final Decision was entered on the *Holtzman* claim. The case in point is the *Claim of Matthew A. Fryer,* Claim No. CU–1617 reported herein. In the *Fryer* case, it was first disclosed to the Commission that Mr. Fryer was the sole owner of the Cuban corporation which had leased the mines to the lessee in the *Holtzman* case.

Mr. Fryer claimed, inter alia, a loss of $35,000.00 for unpaid royalties due from the lessee. Upon examination of the *Holtzman* file, which was already closed, in light of the evidence then of record in the *Fryer* case, the Commission concluded that all royalties due from the lessee had been paid. Accordingly, this portion of the *Fryer* claim was denied initially.

At an oral hearing before the Commission, new documentary evidence was introduced, including testimony from Mr. Fryer and a mining engineer who had personal knowledge of the facts. It then appeared that said royalties of $35,000.00 had not been paid by the lessee. In order to extend to the claimants in the *Holtzman* case due process of law, the Commission set aside the Final Decision in that claim, issued an Amended Proposed Decision by which it proposed to reduce the amount of losses found in the *Holtzman* case by $35,000.00, and fully advised these claimants by letter of their rights to submit evidence supporting their claim in this respect. When no objections or evidence was filed by these claimants within the allotted period of time, the Commission allowed the royalty claim in the *Fryer* case and reduced the Certifications of Loss in the *Holtzman* case.

(i) *Claim of Matthew A. Fryer,* Claim No. CU–1617. In entering a Final Decision on this claim, the Commission allowed a portion thereof based on unpaid royalties, as already noted above, in the *Holtzman* case. Another portion of the claim was based on a mining concession with respect to the Antonio Mine in Cuba which Mr. Fryer had leased to a Cuban corporation. Here again, claim was made for royalties due from this lessee. It may be noted that no claim was filed by any stockholder of this Cuban lessee corporation because apparently none was a national of the United States. The portion of the claim for said royalties was denied for lack of proof.

The newly discovered evidence consisted of certain contemporary correspondence and affidavits from individuals with personal knowledge of the facts. Based on said evidence and the record already on file, the Commission determined the amount of ore in the mine, the length of time it would take to exhaust the ores therein, and the value of claimant's equity in the concession

on the date of loss by the application of an appropriate discount rate. The Proposed Decision, the Final Decision, and the Amended Final Decision issued upon reopening are published herein.

(j) *Claim of Intercontinental Hotels Corporation,* Claim No. CU–2521. This is another case in which the Commission reopened the claim on its own motion. Here, the Commission determined the value of claimant's stock interest in a nationalized Cuban corporation. Subsequently, the Commission had occasion to consider another claim in which a stock interest in the same Cuban entity was involved. Initially, the value of the stock of the Cuban entity was found to be the same in both claims. However, convincing evidence submitted in support of objections in the other related case resulted in a stock valuation greater than originally found. Accordingly, the Commission reopened this claim and increased the Certification of Loss appropriately. The Amended Final Decision by which this was accomplished may be found herein following the initial decision on this claim.

Exhibit 15 of this report includes final statistics with respect to the Cuban Claims Program; a breakdown of the allowances made according to amounts and whether the awardees were corporations or individuals; and a list of the ten largest Certifications of Loss.

EXHIBIT 14

# TITLE V OF THE INTERNATIONAL CLAIMS
## SETTLEMENT ACT OF 1949 [1]

### PURPOSE OF TITLE

SEC. 501.[2] It is the purpose of this title to provide for the determination of the amount and validity of claims against the Government of Cuba, or the Chinese Communist regime,[3] which have arisen since January 1, 1959, in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communist regime,[4] out of nationalization, expropriation, intervention, or other takings of, or special measures directed against, property of nationals of the United States, and claims for disability or death of nationals of the United States arising out of violations of international law by the Government of Cuba or the Chinese Communist regime,[5] in order to obtain information concerning the total amount of such claims against the Government of Cuba, or the Chinese Communist regime,[6] on behalf of nationals of the United States. This title shall not be construed as authorizing an appropriation or as any intention to authorize an appropriation for the purpose of paying such claims.

### DEFINITIONS

SEC. 502. For the purposes of this title:

(1) The term "national of the United States," means (A) a natural person who is a citizen of the United States, or (B) a corporation or other legal entity which is organized under the laws of the United States, or of any States, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity. The term does not include aliens.

(2) The term "Commission" means the Foreign Claims Settlement Commission of the United States.

(3) The term "property" means any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba or the Chinese Communist regime [7] or by enterprises which have been nationalized,

---

[1] Title V was added by Public Law 88–666 (78 Stat. 1110), approved October 16, 1964. Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, amended Title V to provide for the determination of the amounts of claims of nationals of the United States against the Chinese Communist regime.

[2] This section was amended by sec. 1 of Public Law 89–262 (79 Stat. 988), approved October 19, 1965, by striking out "which have arisen out of debts for merchandise furnished or services rendered by nationals of the United States without regard to the data on which such merchandise was furnished or services were rendered or".

[3] This section was amended by sec. 1 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting ", or the Chinese Communist regime," after "the Government of Cuba" at each place it appears in such section.

[4] This section was amended by sec. 1 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communist regime," after "since January 1, 1959,".

[5] This section was amended by sec. 1 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting ", or the Chinese Communist regime," after "the Government of Cuba" at each place it appears in such section.

[6] Ibid.

[7] This section was amended by sec. 2 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "or the Chinese Communist regime" after "the Government of Cuba" at each place it appears in such section.

expropriated, intervened, or taken by the Government of Cuba or the Chinese Communist regime [8] and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba or the Chinese Communist regime.[9]

(4) The term "Government of Cuba" includes the government of any political subdivision, agency, or instrumentality thereof.

(5) The term "Chinese Communist regime" means the so-called Peoples Republic of China, including any political subdivision, agency, or instrumentality thereof.[10]

RECEIPT OF CLIAMS

SEC. 503.(a) [11] The Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba, or the Chinese Communist regime,[12] arising since January 1, 1959, in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communists regime,[13] for losses resulting from the nationalization, expropriation, intervention, or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States, if such claims are submitted to the Commission within such period specified by the Commission by notice published in the Federal Register (which period shall not be more than eighteen months after such publication) within sixty days after the enactment of this title or sixty days after the enactment of the amendments made thereto with respect to claims against the Chinese Communist regime,[14] or of legislation making appropriations to the Commission for payment of administrative expenses incurred in carrying out its functions with respect to each respective claims program authorized,[15] under this title, whichever date is later. In making the determination with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account

---

[8] Ibid.

[9] Ibid.

[10] This paragraph was added by sec. 2 of Public Law 89–790 (80 Stat. 1365), approved November 6, 1966.

[11] This section was amended by sec. 2 of Public Law 89–262 (79 Stat. 988), approved October 19, 1965, by striking out "arising out of debts for merchandise furnished or services rendered by nationals of the Utined States without regard to the date on which such merchandise was furnished or services were rendered or".

[12] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting ", or the Chinese Communist regime," after "the Government of Cuba" at each place it appears in such section.

[13] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "in the cese of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communist regime," after "since January 1, 1959,".

[14] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "or sixty days after the enactment of the amendments made thereto with respect to claims against the Chinese Communist regime," after "within sixty days after the enactment of this title".

[15] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "with respect to each respective claims program authorized," after "carrying out its functions".

the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to, (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement.

(b) The Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba, or the Chinese Communist regime,[16] arising since January 1, 1959, in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese regime,[17] for disability or death resulting from actions taken by or under the authority of the Government of Cuba, or the Chinese Communist regime,[18] if such claims are submitted to the Commission within the period established by the Commission under subsection (a), or within six months after the date the claims first arose (as determined by the Commission), whichever date last occurs.

## OWNERSHIP OF CLAIMS

SEC. 504. (a) A claim shall not be considered under section 503(a) of this title unless the property on which the claim was based was owned wholly or partially, directly or indirectly by a national of the United States on the date of the loss and if considered shall be considered only to the extent the claim has been held by one or more nationals of the United States continuously thereafter until the date of filing with the Commission.

(b) A claim for disability under section 503(b) may be considered if it is filed by the disabled person or by this successors in interest; and a claim for death under section 503(b) may be considered if filed by the personal representative of decedent's estate or by a person or persons for pecuniary losses and damage sustained on account of such death. A claim shall not be considered under this section unless the disabled or deceased person was a national of the United States at the time of injury or death and if considered, shall be considered only to the extent the claim has been held by a national or nationals of the United States continuously until the date of filing with the Commission.

## CORPORATE CLAIMS

SEC. 505. (a) A claim under section 503(a) of this title based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered. A claim under section 503(a) of this title based upon a debt or other obligation by any corporation, association, or other entity organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico shall be considered, only when such debt or other obligation is a

---

[16] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting ", or the Chinese Communist regime," after "the Government of Cuba" at each place it appears in such section.

[17] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "in the case of claims against the Government of Cuba, or since October 1, 1949, in the case of claims against the Chinese Communist regime," after "since January 1, 1959,".

[18] This section was amended by sec. 3 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting ", or the Chinese Communist regime," after "the Government of Cuba" at each place it appears in such section.

charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba, or the Chinese Communist regime.[19]

(b) A claim under section 503(a) of this title based upon a direct ownership interest in a corporation, association, or other entity for loss shall be considered, subject to the other provisions of this title, if such corporation, association, or other entity on the date of the loss was not a national of the United States, without regard to the per centum of ownership vested in the claimant.

(c) A claim under section 503(a) of this title based upon an indirect ownership interest in a corporation, association, or other entity for loss shall be considered, subject to the other provisions of this title, only if at least 25 per centum of the entire ownership interest thereof at the time of such loss was vested in nationals of the United States.

(d) The amount of any claim covered by subsection (b) or (c) of this section shall be calculated on the basis of the total loss suffered by such corporation, association, or other entity, and shall bear the same proportion to such loss as the ownership interest of the claimant at the time of loss bears to the entire ownership interest thereof.

## OFFSETS

SEC. 506.[20] In determining the amount of any claim, the Commission shall deduct all amounts the claimant has received from any source on account of the same loss or losses.

## ACTION OF COMMISSION WITH RESPECT TO CLAIMS

SEC. 507. (a) The Commission shall certify to each individual who has filed a claim under this title the amount determined by the Commission to be the loss or damage suffered by the claimant which is covered by this title. The Commission shall certify to the Secretary of State such amount and the basic information underlying that amount, together with a statement of the evidence relied upon and the reasoning employed in reaching its decision.

(b) The amount determined to be due on any claim of an assignee who acquires the same by purchase shall not exceed (or, in the case of any such acquisition subsequent to the date of the determination, shall not be deemed to have exceeded) the amount of the actual consideration paid by such assignee, or in case of successive assignments of a claim by any assignee.

## TRANSFER OF RECORDS

SEC. 508. The Secretary of State shall transfer or otherwise make available to the Commission such records and documents relating to claims authorized by this title as may be required by the Commission in carrying out its functions under this title.

---

[19] This sentence was added by sec. 3 of Public Law 89–262 (79 Stat. 988), approved October 19, 1965. The sentence was amended by sec. 4 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by adding to the end thereof a comma and the following: "or the Chinese Communist regime."

[20] This section was amended by sec. 4 of Public Law 89–262 (79 Stat. 988), approved October 19, 1965, by striking out ": *Provided*, That the deduction of such amounts shall not be construed as divesting the United States of any rights against the Government of Cuba for the amounts so deducted".

APPLICATION OF OTHER LAWS

SEC. 509. To the extent they are not inconsistent with the provisions of this title, the following provisions of title I of this Act shall be applicable to this title: Subsections (b), (c), (d), (e), (h), and (j) of section 4; subsection (f) of section 7.

SETTLEMENT PERIOD

SEC. 510. The Commission shall complete its affairs in connection with the settlement of claims pursuant to this title not later than three years following the final date for the filing of claims as provided in section 503(a) of this title or following enactment of legislation making appropriations to the Commission for payment of administrative expenses incurred in carrying out its functions with respect to each respective claims program authorized under this title, whichever date is later.[21]

APPROPRIATIONS

SEC. 511.[22] There are hereby authorized to be appropriated such sums as may be necessary to enable the Commission to pay its administrative expenses incurred in carrying out its functions under this title.

FEES FOR SERVICES

SEC. 512. No remuneration on account of any services rendered on behalf of any claimant in connection with any claim filed with the Commission under this title shall exceed 10 per centum of so much of the total amount of such claim, as determined under this title, as does not exceed $20,000, plus 5 per centum of so much of such amount, if any, as exceeds $20,000. Any agreement to the contrary shall be unlawful and void. Whoever, in the United States or elsewhere, demands or receives on account of services so rendered, any remuneration in excess of the maximum permitted by this section, shall be fined not more than $5,000 or imprisoned not more than twelve months, or both.

SEPARABILITY

SEC. 513. If any provision of this Act, or the application thereof to any person or circumstances, shall be held invalid, the remainder of the Act, or the application of such provision to other persons or circumstances, shall not be affected.

---

[21] This section was amended by sec. 5 of Public Law 89–780 (80 Stat. 1365), approved November 6, 1966, by inserting "with respect to each respective claims program authorized" after "carrying out its functions".

[22] Sec. 511 (22 U.S.C. 1643j) of this Act, as added by Public Law 88–666, 78 Stat. 1113, October 16, 1964, was amended by sec. 5 of Public Law 89–262, 79 Stat. 988, approved October 19, 1965.

REGULATIONS GOVERNING THE RECEIPT AND SETTLEMENT OF CLAIMS UNDER THE INTERNATIONAL CLAIMS SETTLEMENT ACT OF 1949, AS AMENDED

Code of Federal Regulations

TITLE 45—PUBLIC WELFARE

Chapter V—Foreign Claims Settlement Commission of the United States

Subchapter A—Rules of Practice

PART 500—APPEARANCE AND PRACTICE BEFORE THE COMMISSION

Sec.
500.1  Appearance and practice.
500.2  Notice of entry or withdrawal of counsel in claims.
500.3  Fees.
500.4  Petition for fee exceeding ten per centum of amount paid on account of claim.
500.5  Order allowing fee in excess of ten per centum of amount paid on account of claim.
500.6  Suspension of attorneys.
500.7  Restrictions on former employees.

AUTHORITY: §§ 500.1 to 500.7 issued under sec. 2, 62 Stat. 1240, as amended, sec. 3, 64 Stat. 13, as amended; 50 U.S.C. App. 2001, 22 U.S.C. 1622

§ 500.1  Appearance and practice.

(a) An individual may appear in his own behalf; a member of a partnership may represent the partnership; a bona fide officer of a corporation, trust or association may represent the corporation, trust or association; any officer or employee of the United States Department of Justice, when designated by the Attorney General of the United States, may represent the United States in a claim proceeding.

(b) A person may be represented by an attorney at law admitted to practice in any State or Territory of the United States, or the District of Columbia. With respect to Philippine war damage claims under the provisions of Public Law 87–616 (76 Stat. 411), a person may also be represented by an attorney at law in good standing with the Philippine Bar Association or the Philippine Supreme Court. However, such attorney may be required to furnish a certificate to this effect.

(c) In cases falling within the purview of Subchapter B of this chapter, persons designated by veterans' service, and other organizations to appear before the Commission in a representative capacity on behalf of claimants shall be deemed duly authorized to practice before the Commission when the designating organization shall have been issued a letter of accreditation by the Commission. Petitions for accreditation shall be in writing, executed by duly authorized officer or officers, addressed to the Foreign Claims Settlement Commission of the United States, Washington, D.C. Upon receipt of a petition setting forth pertinent facts as to the organization's history, purpose, number of posts or chapters and their locations, approximate number of paid-up membership, statements that the organization will not charge any fee for services rendered by its designees in behalf of claimants and that it will not

100

refuse on the grounds of non-membership to represent any claimant who applies for such representation if he has an apparently valid claim, accompanied by a copy of the organization's constitution, or charter, by-laws, and its latest financial statement, the Commission in its discretion will consider and in appropriate cases issue or deny letters of accreditation.

(d) A person may not be represented before the Commission except as authorized in paragraph (a), (b) or (c) of this section.

## § 500.2  Notice of entry or withdrawal of counsel in claims.

(a) Counsel entering an appearance in a claim originally filed by claimant in his own behalf or requesting a substitution of attorneys, and counsel filing a claim on behalf of a claimant under Public Law 87–616, shall be required to file an authorization by claimant.

(b) When counsel seeks to withdraw from the prosecution of a claim, it must appear that he had duly notified his client (claimant).

(c) When a claimant advises the Commission that counsel no longer represents him, a copy of the Commission's acknowledgement shall be forwarded to such counsel.

## § 500.3  Fees.

(a) No remuneration on account of services rendered or to be rendered to or on behalf of any claimant in connection with any claim falling within the purview of Subchapter B and Subchapter F of this chapter shall exceed ten per centum of the amount allowed on account of such claim, except that the Commission in its discretion may fix a lesser per centum with respect to any claim filed thereunder.

(b) The total remuneration on account of services rendered or to be rendered to or on behalf of any claimant in connection with any claim falling within the purview of Title III of the Act shall not exceed ten per centum of the total amount paid on account of such claim, except that the Commission may upon petition, as prescribed in § 500.4, in its discretion enter an order authorizing such remuneration in an amount which exceeds the maximum otherwise permitted.

(c) The total remuneration on account of services rendered or to be rendered to or on behalf of any claimant in connection with any claim falling within Title I and Title IV of the Act shall not exceed ten per centum of the total amount paid on account of such claim.

(d) No remuneration on account of any services rendered on behalf of any claimant in connection with any claim filed with the Commission under Title V of the International Claims Settlement Act of 1949, as amended (claims against the Government of Cuba and the Chinese Communist regime), shall exceed 10 per centum of so much of the total amount of such claim, as determined by the Commission under Title V of the Act, as does not exceed $20,000, plus 5 per centum of so much of such amount, if any, as exceeds $20,000.

(e) The total remuneration on account of services rendered or to be rendered to or on behalf of any applicant in connection with any application filed under Public Law 87–616 (76 Stat. 411) shall not exceed five per centum of the amount paid by the Commission on account of such application.

## § 500.4  Petitions for additional remuneration pursuant to section 317(b) of Title III of the Act.

A petition under section 317(b) of the Act for an order authorizing the payment of remuneration in excess of the maximum prescribed by section

317(a) of the Act shall be in writing and verified by the petitioner. It shall include (a) a fully itemized statement of all services at any time rendered by the petitioner on behalf of the claimant in connection with the claim with respect to which the petition is filed, whether rendered before or after the filing of the claim with the Commission, (b) a statement of all remuneration theretofore received by the petitioner on account of such services, and (c) an itemized statement to the best of petitioner's knowledge, information and belief, of all services theretofore at any time rendered by any other person or persons on behalf of the claimant in connection with such claim and of all remuneration paid on account of such services; shall state in detail such special circumstances of unusual hardship as, in the opinion of the petitioner, justify payment in excess of the maximum remuneration otherwise permitted by section 317(a); shall be accompanied, as exhibits, by all documents including agreements relating to remuneration, available to petitioner evidencing the allegations of his petition; and shall state the total amount of remuneration which it is believed should be authorized.

### § 500.5 Order allowing fees in excess of ten per centum of amount paid on account of claims under Title III of the International Claims Settlement Act of 1949, as amended.

The Commission may, upon the petition described in § 500.4 and supporting affidavit, after consultation with the claimant and consideration of the evidence, in its sole discretion, upon a finding that there exist special circumstances of unusual hardship which require the payment of a fee in excess of the maximum amount otherwise allowable, issue an order authorizing such excess, the said order to specify the amount of such excess.

### § 500.6 Suspension of attorneys.

(a) The Commission may disqualify, or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found after a hearing in the matter—

(1) Not to possess the requisite qualifications to represent others before the Commission; or

(2) To be lacking in character or integrity or to have engaged in unethical or improper professional conduct; or

(3) To have violated sections 10 and 214 of the War Claims Act of 1948, as amended, or sections 4(f), 317(a), 414, and 512 of the International Claims Settlement Act of 1949, as amended, or § 500.3 of Part 500 of the regulations.

(b) Contemptuous or contumacious conduct at any hearing shall be ground for exclusion from said hearing and for summary suspension without a hearing for the duration of the hearing.

### § 500.7 Restrictions on former employees.

(a) No former officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, shall act in any way as agent or attorney for anyone other than the United States in connection with any matter before the Commission if he participated in the matter personally and substantially through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, while so employed.

(b) No former officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the

District of Columbia, shall, for a period of one year following such service, appear personally before the Commission as agent or attorney for anyone other than the United States with respect to a matter which was within the boundaries of his official responsibility during the last year of his service as an officer or employee of the Government.

## PART 501—SUBPOENAS, DEPOSITIONS, AND OATHS

Sec.
501.1   Extent of authority.
501.2   Subpoenas.
501.3   Service of process.
501.4   Witnesses.
501.5   Depositions.
501.6   Documentary evidence.
501.7   Time.

AUTHORITY: §§ 501.1 to 501.7 issued under sec. 2, 62 Stat. 1240, as amended, sec. 3, 64 Stat. 13, as amended; 50 U.S.C. App. 2001, 22 U.S.C. 1622.

### § 501.1   Extent of authority.

(a) Subpoenas, oaths and affirmations. The Commission or any member thereof may issue subpoenas, administer oaths and affirmations, take affidavits, conduct investigations and examine witnesses in connection with any hearing, examination, or investigation within its jurisdiction.

(b) Certification. The Commission or any mamber thereof may, for the purpose of any such hearing, examination, or investigation, certify the correctness of any papers, documents, and other matters pertaining to the administration of any laws relating to the functions of the Commission.

### § 501.2   Subpoenas.

(a) Issuance. A member of the Commission or a designated employee may, on his own volition or upon written application by any party and upon a showing of general relevance and reasonable scope of the evidence sought, issue subpoenas requiring persons to appear and testify or to appear and produce documents. Applications for the issuance of subpoenas duces tecum shall specify the books, records, correspondence, or other documents sought. The subpoena shall show on its face the name and address of the party at whose request the subpoena was issued.

(b) Deposit for costs. The Commission or designated employee, before issuing any subpoena in response to any application by an interested party, may require a deposit in an amount adequate to cover the fees and mileage involved.

(c) Motion to quash. If any person subpoenaed does not intend to comply with the subpoena, he shall, within 15 days after the date of service of the subpoena upon him, petition in writing to quash the subpoena. The basis for the motion must be stated in detail. Any party desiring to file an answer to a motion to quash must file such answer not later than 15 days after the filing of the motion. The Commission shall rule on the motion to quash, duly recognizing any answer thereto filed. The motion, answer, and any ruling thereon shall become part of the official record.

(d) Appeal from interlocutory order. An appeal may be taken to the Commission by the interested parties from the denial of a motion to quash or

from the refusal to issue a subpoena for the production of documentary evidence.

(e) Order of court upon failure to comply. Upon the failure or refusal of any person to comply with a subpoena, the Commission may invoke the aid of the United States District Court within the jurisdiction of which the hearing, examination or investigation is being conducted, or wherein such person resides or transacts business. Such court, pursuant to the provisions of Public Law 696, 81st Congress, approved August 16, 1950, 50 U.S.C. App. 2001(d), may issue an order requiring such person to appear at the designated place of hearing, examination of investigation, then and there to give or produce testimony or documentary evidence concerning the matter in question. Any failure to obey such an order may be punished by the court as a contempt thereof. All processes in any such case may be served in the judicial district wherein such person resides or transacts business or wherever such person may be found.

### § 501.3  Service of Process.

(a) By whom served. The Commission shall serve all orders, notices and other papers issued by it, together with any other papers which it is required by law to serve.

(b) Kinds of service. Subpoenas, orders, rulings, and other processes of the Commission may be served by delivering in person, by first class or registered mail, or by telegraph or by publications.

(c) Personal service. Service by delivering in person may be accompanied by:

(1) Delivering a copy of the document to the person to be served, to a member of the partnership to be served, to an executive officer, or a director of the corporation to be served or to a person competent to accept service; or

(2) By leaving a copy thereof at the residence, principal office or place of business of such person, partnership, or corporation.

(3) Proof of service. The return receipt for said order, other process or supporting papers, or the verification by the person serving, setting forth the manner of said service, shall be proof of the service of the document.

(4) Service upon attorney or agent. When any party has appeared by an authorized attorney or agent, service upon such attorney or agent shall be deemed service upon the party.

(d) Service by first class mail. Service by first class mail shall be regarded as complete, upon deposit in the United States mail properly stamped and addressed.

(e) Service by registered mail. Service by registered mail shall be regarded as complete on the date the return post office registered receipt for said orders, notices and other papers, is received by the Commission.

(f) Service by telegraph. Service by telegraph shall be regarded as complete when deposited with a telegraph company properly addressed and with charges prepaid.

(g) Service by publication. Service by publication is complete when due notice shall have been given in the publication for the time and in the manner provided by law or rule.

(h) Date of service. The date of service shall be the day upon which the document is deposited in the United States mail or delivered in person, as the case may be.

(i) Filing with Commission. Papers required to be filed with the agency

shall be deemed filed upon actual receipt by the Commission accompanied by proof of service upon parties required to be served. Upon such actual receipt the filing shall be deemed complete as of the date of deposit in the mail or with the telegraph company as provided in paragraph (e) and (f) of this section.

## § 501.4 Witnesses.

(a) Examination of witnesses. Witnesses shall appear in person and be examined orally under oath, except that for good cause shown, testimony may be taken by deposition.

(b) Witnesses fees and mileage. Witnesses summoned by the Commission on its own behalf or on behalf of a claimant or interested party shall be paid the same fees and mileage that are allowed and paid witnesses in the District Courts of the United States. Witness fees and mileage shall be paid by the Commission or by the party at whose request the witness appears.

(c) Transcript of testimony. Every person required to attend and testify or to submit documents or other evidence shall be entitled to retain or, on payment of prescribed costs, procure a copy or transcript of his testimony or the documents produced.

## § 501.5 Depositions.

(a) Application to take. (1) An application to take a deposition shall be in writing setting forth the reason why such deposition should be taken, the name and address of the witness, the matters concerning which it is expected the witness will testify, and the time and place proposed for the taking of the deposition, together with the name and address of the person before whom it is desired that the deposition be taken. If such deposition is being offered in connection with a hearing or examination, the application for deposition shall be made to the Commission at least 15 days prior to the proposed date of such hearing or examination.

(2) Application to take a deposition may be made during a hearing or examination, or subsequent to a hearing or examination only where it is shown for good cause that such testimony is essential and that the facts as set forth in the application to take the deposition were not within the knowledge of the person signing the application prior to the time of the hearing or examination.

(3) The Commission or its representative shall, upon receipt of the application and a showing of good cause, make and cause to be served upon the parties an order which will specify the name of the witness whose deposition is to be taken, the time, the place, and where practicable the designation of the officer before whom the witness is to testify. Such officer may or may not be the one specified in the application. The order shall be served upon all parties at least 10 days prior to the date of the taking of the deposition.

(b) Who may take. Such deposition may be taken before the designated officer or, if none is designated, before any officer authorized to administer oaths by the laws of the United States. If the examination is held in a foreign country, it may be taken before a secretary of an embassy or legation, consul general, consul, vice consul, or consular agent of the United States.

(c) Examination and certification of testimony. At the time and place specified in said order the officer taking such deposition shall permit the witness to be examined and cross-examined under oath by all parties appearing, and his testimony shall be reduced to writing by, or under the direction

of, the presiding officer. All objections to questions or evidence shall be deemed waived unless made in accordance with paragraph (d) of this section. The officer shall not have power to rule upon any objections but he shall note them upon the deposition. The testimony shall be subscribed by the witness in the presence of the officer who shall attach his certificate stating that the witness was duly sworn by him, that the deposition is a true record of the testimony and exhibits given by the witness and that said officer is not counsel or attorney to any of the interested parties. The officer shall immediately seal and deliver an original and two copies of said transcript, together with his certificate, by registered mail to the Foreign Claims Settlement Commission, Washington, D.C. 20579, or to the field office designated.

(d) Admissibility in evidence. The deposition shall be admissible in evidence, subject to such objections to the questions and answers as were noted at the time of taking the deposition, or within ten (10) days after the return thereof, and would be valid were the witness personally present at the hearing.

(e) Errors and irregularities. All errors or irregularities occurring shall be deemed waived unless a motion to suppress the deposition or some part thereof is made with reasonable promptness after such defect is, or with due diligence might have been, ascertained.

(f) Scope of use. The deposition of a witness, if relevant, may be used if the Commission finds: (1) That the witness has died since the deposition was taken; or (2) that the witness is beyond a distance greater than 100 miles radius of Washington, D.C., the designated field office or the designated place of the hearing; or (3) that the witness is unable to attend because of other good cause shown.

(g) Interrogatories and cross-interrogatories. Depositions may also be taken and submitted on written interrogatories in substantially the same manner as depositions taken by oral examinations. When a deposition is taken upon interrogatories and cross-interrogatories, none of the parties shall be present or represented, and no person, other than the witness, and his representative or attorney, a stenographic reporter and the presiding officer, shall be present at the examination of the witness, which fact shall be certified by such officer, who shall propound the interrogatories and cross-interrogatories to the witness in their order and reduce the testimony to writing in the witness' own words.

(h) Fees. A witness whose deposition is taken pursuant to the regulations in this part and the officer taking the deposition, shall be entitled to the same fees and mileage allowed and paid for like service in the United States District Court for the district in which the deposition is taken. Such fees shall be paid by the Commission or by the party at whose request the deposition is being taken.

§ 501.6 Documentary evidence.

Documentary evidence may consist of books, records, correspondence or other documents pertinent to any hearing, examination, or investigation within the jurisdiction of the Commission. The application for the issuance of subpoenas duces tecum shall specify the books, records, correspondence or other documents sought. The production of documentary evidence shall not be required at any place other than the witness' place of business. The production of such documents shall not be required at any place if, prior to the return date specified in the subpoena, such person either has furnished the

issuer of the subpoena with a properly certified copy of such documents or has entered into a stipulation as to the information contained in such documents.

## § 501.7  Time.

(a) Computation. In computing any period of time prescribed or allowed by the regulations by order of the Commission, or by any applicable statute, the day of the act, event, or default after which the designated period of time begins to run is not to be included. The last day of the period so computed is to be included, unless it is a Saturday, Sunday or legal holiday, in which event the period runs until the end of the next day which is neither a Saturday, Sunday nor a holiday. When the period of time prescribed or allowed is less than 7 days, intermediate Saturdays, Sundays and holidays shall be excluded in the computation.

(b) Enlargement. When by the regulations in this chapter or by a notice given thereunder or by order of the Commission an act is required or allowed to be done at or within a specific time, the Commission for good cause shown may, at any time in its discretion (1) with or without motion or notice, previous order or (2) upon motion permit the act to be done after the expiration of the specified period.

## Part 503—Public Information

Sec.
503.1   Organization and authority—Foreign Claims Settlement Commission.
503.2   Material to be published in the Federal Register pursuant to Public Law 89–487.
503.3   Effect of nonpublication.
503.4   Incorporation by reference.
503.5   Public records.
503.6   Current index.
503.7   Effect of noncompliance.
503.8   Documents and records generally available for inspection.
503.9   Other records available upon written request.
503.10  Identification of records.
503.11  Appeal.
503.12  Exemptions.
503.13  Fees—policy and services available.
503.14  Fees for services.
503.15  Payment of fees and charges.

Authority: The provisions of Part 503 issued under sec. 3, Administrative Procedure Act, 5 U.S.C. 552, as amended by Public Law 90–23 (81 Stat. 54).

## § 503.1  Organization and authority—Foreign Claims Settlement Commission.

(a) The Foreign Claims Settlement Commission of the United States is an independent agency of the Federal Government created by Reorganization Plan No. 1 of 1954 (68 Stat. 1279), effective July 1, 1954. Its duties and authority are defined in the International Claims Settlement Act of 1949, as amended (64 Stat. 12; 22 U.S.C. 1621–1642) and the War Claims Act of 1948 (62 Stat. 1240; 50 U.S.C. 2001–2016).

(b) The Commission has jurisdiction to determine claims of U.S. nationals against foreign governments for compensation for losses and injuries sustained by such nationals, pursuant to programs which may be authorized

under either of said Acts. Available funds have their sources in international settlements or liquidation of foreign assets in this country by the Department of Justice or Treasury, and from public funds when provided by the Congress.

(c) The three members of the Commission are appointed by the President with the advice and consent of the Senate to serve for 3-year terms of office as provided by the Act of October 22, 1962 (76 Stat. 1107; 50 U.S.C. 2001). The President designates the Chairman.

(d) All functions of the Commission are vested in the Chairman with respect to the internal management of the affairs of the Commission, including but not limited to: (1) The appointment of personnel employed under the Commission; (2) the direction of employees of the Commission and the supervision of their official duties; (3) the distribution of business among employees and organizational units under the Commission; (4) the preparation of budget estimates; and (5) the use and expenditures of funds of the Commission available for expenses of administration.

(e) The Chairman pursuant to his responsibility hereby directs that every effort be expended to facilitate the maximum service to the public with respect to the obtaining of information and records in the spirit and the letter of the provisions of Public Law 87–487 amending section 3 of the Administrative Procedures Act, effective July 4, 1967.

(f) Requests for information, decisions, or records may be made in person or in writing to the Clerk, Foreign Claims Settlement Commission.

(g) The offices of the Commission are located at 1111 20th Street NW. (Vanguard Building), Washington, D.C. An information center for the convenience of the public is located on the fourth floor.

## § 503.2  Materials to be published in the *Federal Register* pursuant to Public Law 89-487.

The Commission shall separately state and concurrently publish the following materials in the FEDERAL REGISTER for the guidance of the public:

(a) Description of its central and field organization and the established places at which, the offices from whom, and the methods whereby, the public may secure information, make submittals or requests, or obtain decisions.

(b) Statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available.

(c) Rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations.

(d) Substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency.

(e) Every amendment, revision, or repeal of the foregoing.

## § 503.3  Effect of nonpublication.

Except to the extent that a person has actual and timely notice of the terms thereof, no person shall in any manner be required to resort to, or be adversely affected by, any matter required to be published in the FEDERAL REGISTER and not so published.

## § 503.4  Incorporation by reference.

For purposes of this part, matter which is reasonably available to the class

of persons affected thereby shall be deemed published in the FEDERAL REGISTER when incorporated by reference therein with the approval of the Director of the Federal Register.

### § 503.5  Public records.

The Commission shall, in accordance with this part, make the following materials available for public inspection and copying:

(a) Proposed and Final Decisions (including dissenting opinions) and all orders made with respect thereto.

(b). Those statements of policy and interpretations which have been adopted by the Commission.

To prevent unwarranted invasion of personal privacy, the Commission may delete identifying details when it makes available or publishes a decision, statement of policy, interpretation, or staff manual or instruction, and shall, in each such case, explain in writing the justification for the deletion.

### § 503.6  Current index.

The Commission shall maintain and make available for public inspection and copying a current index providing identifying information for the public as to any matter which is issued, adopted, or promulgated after July 4, 1967, and which is required by § 503.2 of this part to be made available or published. The index shall be available at the information center of the Commission, fourth floor, Vanguard Building, 1111 20th Street, NW., Washington, D.C. 20579.

### § 503.7  Effect of noncompliance.

No decision, statement of policy, interpretation, or staff manual or instruction that affects any member of the public will be relied upon, used, or cited, as precedent by the Commission against any private party unless it has been indexed and either made available or published as provided by this subpart, or unless that private party shall have actual and timely notice of the terms thereof.

### § 503.8  Documents and records generally available for inspection.

The following kinds of documents are available for inspection and copying at the public information center of the Commission.

(a) Rules of practice and procedure.

(b) Semiannual reports of the Commission.

(c) Bound volumes of Commission decisions.

(d) International Claims Settlement Act of 1949, with amendments, the War Claims Act of 1948, with amendments, and related Acts.

(e) Claims Agreements with foreign governments within the jurisdiction of the Commission.

(f) Press releases, biographies, and other miscellaneous information of general interest to the public.

### § 503.9  Other records available upon written request.

Any written request to the Clerk, Foreign Claims Settlement Commission, 1111 20th Street NW., Washington, D.C. 20579, for records listed in paragraphs (a) through (g) inclusive, of this section, shall identify the record as provided in § 503.10. The Clerk shall evaluate each request in conjunction with the official having responsibility for the subject matter area, the General Counsel and the Executive Director, and shall make the record available

unless the Clerk shall notify the person making the request that no such record can be found; that the record is needed by the staff; or that the record falls within a specific exception. The following records are subject to this provision:

(a) General correspondence.

(b) Correspondence regarding interpretation or applicability of a statute or rule.

(c) Correspondence and reports on legislaion if made public by the Bureau of the Budget and Congressional Committee.

(d) Filing and docketing of claims.

(e) Records regarding final disposition of claims.

(f) Claims applications of individuals.

(g) Claims applications of legal entities.

### § 503.10  Identification of records.

A member of the public who requests permission to inspect or copy a record must identify the record sought in sufficient detail to enable the Commission staff to locate the record.

### § 503.11  Appeal.

Upon refusal of the Clerk to furnish a record, which has been requested in writing under § 503.9, the requesting person or entity may appeal in writing to the Chairman from the Clerk's action or failure to act.

### § 503.12  Exemptions.

The following records shall not be available: *Provided, however,* That nothing in this section authorizes withholding of information or limiting the availability of records to the public except as specifically stated in this part, nor shall this part be authority to withhold information from Congress. Moreover, nothing in this paragraph shall preclude the consideration of any request received by the Commission to release information with respect to matters which may come within the exemptions.

(a) Records specifically required by Executive Order to be kept secret in the interest of the national defense or foreign policy. This exception may apply to records in the custody of the Commission which have been transmitted to the Commission by another agency which has designated the record as nonpublic under Executive Order.

(b) Records related solely to the internal personnel rules and practices of the Commission.

(c) Records specifically exempted from disclosure by statute.

(d) Information given in confidence. This includes information obtained by or given to the Commission which constitutes confidential commercial or financial information, privileged information, or other information which was given to the Commission in confidence or would not customarily be released by the person from whom it was obtained.

(e) Interagency or intraagency memoranda or letters which would not be available by law to a private party in litigation with the Commission. Such communications include interagency memoranda, drafts, staff memoranda transmitted to the Commission, written communications between the Commission, the Executive Director, and the General Counsel, regarding the preparation of Commission decisions, other documents received or generated in the process of issuing a decision, or regulation, and reports and other work papers of staff attorneys, accountants, and investigators.

(f) Personnel and medical files and similar files, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

(g) Investigatory files compiled for law enforcement purposes except to the extent available by law to a private party.

## § 503.13 Fees—policy and services available.

Pursuant to policies established by the Congress, the Government's costs for special services furnished to individuals or firms who request such service are to be recovered by the payment of fees (Act of Aug. 31, 1951—5 U.S.C. 140). Upon written request directed to and within the discretion of the Foreign Claims Settlement Commission, there are available upon payment of the fees hereinafter prescribed, with respect to documents subject to inspection, services as follows:

(a) Copying records/documents.

(b) Certification of copies of documents.

(c) Records search.

(d) Transcripts of hearings when requested by claimants.

## § 503.14  Fees for services.

The basic fees set forth below provide for documents to be mailed with ordinary first-class postage prepaid. If copy is to be transmitted by registered, certified, air, or special delivery mail, postage therefor will be added to the basic fee. Also, if special handling or packaging is required, costs thereof will be added to the basic fee.

(a) The copying of records and documents will be available at the rate of 25 cents per page (one side).

(b) The certification and validation of documents filed with or issued by the Commission will be available at $1 for each such certification.

(c) To the extent that time can be made available, records and information search will be performed for reimbursement at the following rates:

(1) By clerical personnel at a rate of $4 per person per hour.

(2) By professional personnel at an actual hourly cost basis to be established prior to search.

(3) Minimum charge, $2.

(d) Exceptions: No charge will be made by the Commission for notices, decisions, orders, etc., required by law to be served on a party to any proceeding or matter before the Commission. No charge will be made for single copies of Commission publications individually requested in person or by mail. In addition a subscription to Commission mailing lists will be entered without charge when one of the following conditons is present:

(1) The furnishing of the service wihout charge is an appropriate courtesy to a foreign country or international organization.

(2) The recipient is another governmental agency, Federal, State, or local, concerned with claims of nationals of the United States against foreign governments or having a legitimate interest in the proceedings and activities of the Commission.

(3) The recipient is a college or university.

(4) The recipient does not fall into subdivision (1), (2), or (3) of this subparagraph, but is determined by the Commission to be an appropriate recipient in the interest of its program.

(e) Transcripts of testimony and of oral argument taken by a private firm may be purchased directly from the reporting firm.

## § 503.15  Payment of fees and charges.

The fees charged for special services may be paid by check, draft, or postal money order, payable to the Foreign Claims Settlement Commission, except for charges for transcript of hearings. Fees for transcripts of hearings are payable to the firm providing the services.

[*Effective date.* Part 503 became effective July 4, 1967.]

Subchapter C—Receipt, Administration and Payment of Claims Under the International Claims Settlement Act of 1949, as amended

### PART 531—FILING OF CLAIMS AND PROCEDURES THEREFORE

Sec.
531.1  Time for filing.
531.2  Form and content.
531.3  Exhibits and documents in support of claim.
531.4  Acknowledgment and numbering.
531.5  Procedure for determination of claims.
531.6  Hearings.
531.7  Presettlement conference.

AUTHORITY: §§ 531.1 to 531.7 issued under sec. 3, 64 Stat. 13, as amended; 22 U.S.C. 1622.

### § 531.1  Time for filing.

(a) Claims under Title III of the Act shall be filed with Commission on or before September 30, 1956, except that claims pursuant to section 305 (Soviet Claims) shall be filed on or before March 31, 1956.

(b) Claims under Title IV (Czechoslovakian claims) of the Act shall be filed with the Commission on or before September 15, 1959.

(c) Claims under Title I of the Act (Polish claims) shall be filed with the Commission on or before March 31, 1962.

(d) Claims under Title V of the Act (Cuban claims) shall be filed with the Commission on or before May 1, 1967.

(e) Claims under Title I of the Act pursuant to the Yugoslav Claims Agreement of November 5, 1964, shall be filed with the Commission on or before January 15, 1968.

(f) Claims under Title V of the Act against the Chinese Communist regime shall be filed with the Commission on or before July 6, 1969.

### § 531.2  Form, content and filing of claims.

(a) Claims shall be filed on official forms provided by the Commission upon request in writing addressed to the Commission at its principal office at Washington, D.C., shall include all of the information called for in the appropriate form indicated below, and shall be completed and signed in accordance with the instructions accompanying the form.

(b) FCSC Form 285—Statement of Claim Against the Government of (Bulgaria, Hungary, Rumania, Italy, Soviet Union).

(c) FCSC Form 604—Claims against the Government of Czechoslovakia.

(d) FCSC Form 709—Claim against the Government of the Polish People's Republic.

(e) FCSC Form 666—Claims against the Government of Cuba.

(f) FCSC Form 701—Claims against the Government of Yugoslavia under the Yugoslav Claims Agreement of November 5, 1964.

(g) FCSC Form 780—Claims against the Chinese Communist regime.

(h) Notice to the Foreign Claims Settlement Commission, the Department of State, or any other governmental office or agency, prior to the enactment of the statute authorizing a claims program or the effective date of a lump-sum claims settlement agreement, or an intention to file a claim against a foreign country, shall not be considered as a timely filing of a claim under the statute or agreement.

(i) Any initial written indication of an intention to file a claim received within 30 days prior to the expiration of the filing period thereof shall be considered as a timely filing of a claim if formalized within 30 days after the expiration of the filing period.

## § 531.3  Exhibits and documents in support of claim.

(a) If available, all exhibits and documents shall be filed with and at the same time as the claim, and shall, wherever possible, be in the form of original documents, or copies of originals certified as such by their public or other official custodian.

(b) Documents in foreign language. Each copy of a document, exhibit or paper filed, which is written or printed in a language other than English, shall be accompanied by an English translation thereof duly verified under oath by its translator to be a true and accurate translation thereof, together with the name and address of the translator.

(c) Preparation of papers. All claims, briefs, and memoranda filed shall be typewritten or printed and, if typewritten, shall be on legal size paper.

## § 531.4  Acknowledgment and numbering.

The Commission will acknowledge the receipt of a claim in writing and will notify the claimant of the claim number assigned to it, which number shall be used on all further correspondence and papers filed with regard to the claim.

## § 531.5  Procedure for determination of claims.

(a) The Commission may on its own motion order a hearing upon any claim, specifying the questions to which the hearing shall be limited.

(b) Without previous hearing, the Commission may issue a proposed decision in determination of a claim.

(c) Such proposed decision shall be delivered to the claimant or his attorney of record in person or by mail. Delivery by mail shall be deemed completed 5 days after the mailing of such proposed decision addressed to the last known address of the claimant or his attorney of record. One copy of the proposed decision shall be available for public inspection at the office of the Commission. Notice of proposed decision shall be posted on the bulletin board at the office of the Commission on the day of its issuance and for 20 days thereafter.

(d) It shall be the policy of the Commission to post on said bulletin board other information of general interest to the claimants before the Commission.

(e) Where such proposed decision denies the claim in whole or in part, claimant may within 15 days of service thereof file objections to such denial assigning the errors relied upon, with accompanying brief in support thereof, and may request a hearing on the claim, specifying whether for the taking of evidence or only for the hearing of oral argument upon the errors assigned.

(f) Public notice shall be promptly posted on said bulletin board of the

filing of any objection to, or request for a hearing on any proposed decision.

(g) Upon the expiration of 30 days after such service or receipt of notice, if no objection under this section has in the meantime been filed, such proposed decision shall, without further order or decision of the Commission, become the Commission's final determination and decision on the claim.

(h) If any such objections have in the meantime been filed, but no hearing requested, the Commission may, after due consideration thereof, (1) issue its final decision affirming or modifying its proposed decision, (2) issue a further proposed decision, or (3) on its own motion order hearing thereon, indicating whether for the taking of evidence on specified questions or only for the hearing of oral argument.

(i) After the conclusion of a hearing, upon the expiration of any time allowed by the Commission for further submissions, the Commission may proceed to final decision and determination of the claim.

(j) (1) In case an individual claimant dies prior to the issuance of a final decision his legal representative shall be substituted as party claimant. However, upon failure to comply with the foregoing, the Commission may issue its decision in the name of the estate and, in case of an award, certify the award to the Secretary of the Treasury for payment, if the payment of such award is provided for by statute.

(2) Notice of the Commission's action under this subparagraph shall be forwarded to the claimant's attorney of record, or if claimant is not represented by an attorney, such notice shall be addressed to the estate of the claimant at the last known place of residence.

(3) The term "legal representative" as applied in this subparagraph means, in general, the administrator or executor, heir(s), next of kin, or descendant(s).

(k) After the date of filing with the Commission no claim shall be amended to reflect the assignment thereof by the claimant to any other person or entity except as otherwise provided by statute.

(l) At any time after a final decision has been issued on a claim, or a proposed decision has become the final decision on a claim, but not later than 60 days before the completion date of the Commission's affairs in connection with the program under which such claim is filed, a petition to reopen on the ground of newly discovered evidence may be filed. No such petition shall be entertained unless it appears therein that the newly discovered evidence came to the knowledge of the party filing the petition subsequent to the date of issuance of the final decision or the date on which the proposed decision became the final decision; that it was not for want of due diligence that such evidence did not come sooner to his knowledge; and that the evidence is material, and not merely cumulative, and that reconsideration of the matter on the basis of such evidence would produce a different decision. Such petition shall include a statement of the facts which the petitioner expects to prove, the name and address of each witness, the identity of documents, and the reasons for failure to make earlier submission of the evidence.

## § 531.6 Hearings.

(a) Hearings, whether upon the Commission's own motion or upon request of claimant, shall be held upon not less than fifteen days' notice of the time and place thereof.

(b) Such hearings shall be open to the public unless otherwise requested by claimant and ordered by the Commission.

(c) Such hearings shall be conducted by the Commission, its designee or designees. Oral testimony and documentary evidence, including depositions that may have been taken as provided by statute and the rules of practice, may be offered in evidence on claimant's behalf or by counsel for the Commission designated by it to represent the public interest opposed to the allowance of any unjust or unfounded claim or portion thereof; and either may cross-examine as to evidence offered through witnesses on behalf of the other. Objections to the admission of any such evidence shall be ruled upon by the presiding officer.

(d) The claimant shall be the moving party, and shall have the burden of proof on all issues involved in the determination of his claim.

(e) Hearings may be stenographically reported either at the request of the claimant or upon the discretion of the Commission. Claimants making such a request shall notify the Commission at the least ten (10) days prior to the hearing date. When a stenographic record of a hearing is ordered at the claimant's request, the cost of such reporting and transcription may be charged to him.

### § 531.7  Presettlement conference.

The Commission on its own initiative or upon the application of a claimant for good cause shown, may direct that a presettlement conference be held with respect to any issue involved in a claim.

## INSTRUCTION SHEETS AND FORMS

### FOR PREPARING AND FILING CLAIMS AGAINST THE GOVERNMENT OF CUBA

## GENERAL STATEMENT

#### READ CAREFULLY BEFORE COMPLETING CLAIM FORM

Public Law 88–666, approved October 16, 1964, amends the International Claims Settlement Act of 1949 (64 Stat. 12 (1950), 22 U.S.C. §§ 1621–1627 (1950)), as amended, by adding at the end thereof, Title V which authorizes the Foreign Claims Settlement Commission to receive and determine the amount and validity of claims by nationals of the United States against the Government of Cuba for (a) debts for merchandise furnished or services rendered by nationals of the United States; (b) losses arising since January 1, 1959 as a result of the nationalization, expropriation, intervention, or other taking thereof, or special measures directed against property including any rights or interests therein owned at the time by nationals of the United States; and (c) disability or death of nationals of the United States, including pecuniary losses and damages (e.g. loss of support, medical and funeral expenses, or other expenses), resulting from actions taken by, or under the authority of, the Government of Cuba since January 1, 1959.

*Eligible Claimants.*—A claim may not be considered under categories (a) and (b) above unless the property on which the claim is based was owned wholly or partially, directly or indirectly, by a national of the United States on the date of loss and unless the claim has been owned continuously thereafter by one or more nationals of the United States until the date of filing with the Commission. With respect to claims under category (c) above, Public Law 88–666 provides that in order to receive consideration, such claim must be filed by the disabled person or by his successors in interest, and in case of death of a United States national, claims may be filed by the personal representative of decedent's estate or by a person or persons for pecuniary losses and damages (e.g., loss of support, medical and funeral expenses, or other expenses) on account of such death.

The statute further provides that no claim be considered under this section unless the property upon which it is based was owned by, or in the case of disability or death, the disabled or deceased person was, a national of the United States at the time of loss, injury or death, and if considered, such claims shall be considered only to the extent that it has been held by a national or nationals of the United States continuously until the date of filing with the Commission.

*National of United States Defined.*—The term "National of the United States" is defined as (1) a natural person who is a citizen of the United States or (2) a corporation or other legal entity which was organized under the laws of the United States, or of any State, the District of Columbia, or Commonwealth of Puerto Rico, if 50 percent or more of the outstanding stock or other beneficial interests of such corporation or entity is owned by citizens of the United States.

*Stockholders.*—Claims of nationals based on ownership interests in corporations or other legal entities—(1) which are nationals of the United States will not be considered (inasmuch as such corporation or other legal entities are eligible claimants in their own right); (2) which are not nationals of the United States may be considered depending on the nature and extent of the interests therein. The amounts of any claim will reflect the proportion that

116

such interests bear to the entire ownership interests in the corporation or other legal entity.

*Commission Action.*—Public Law 88–666 provides that the Commission certify to each individual who has filed a claim the amount determined by the Commission to be the loss or damage suffered by the claimant which is covered by the Act. The Commission is also required to certify to the Secretary of State its determination with respect to each claim filed.

*Assignments.*—In case of assignment of a claim, the amount determined to be due on such claim shall not exceed the actual consideration paid by the assignee or assignees. It should be noted that the nationality requirements apply equally to both the assignor and assignee.

*Offsets.*—The Commission, in reaching a determination with respect to the the amount of loss suffered by each claimant is required to deduct all amounts the claimant has received from any source on account of the same loss or losses.

*Attorney Fees.*—No remuneration on account of any services rendered on behalf of any claimant in connection with any claim filed with the Commission under this law shall exceed 10 percent on the first $20,000 of the award as determined by the Commission, plus 5 percent on any amount which is in excess of $20,000.

*Application of Other Laws.*—To the extent they are not inconsistent with the provisions of this Act, subsection (b), (c), (d), (e), (h), and (j) of section 4 subsection (f) of section 7 of title I of the International Claims Settlement Act of 1949, as amended, are applicable to claims authorized under Public Law 88–666. These subsections pertain to procedural matters and are implemented under the Commission's Regulations (45 CFR 500.1 (1964)).

*Payment of Claims.*—It should be noted that Public Law 88–666 does not provide for the payment of any claim. In this connection, reference is made to the Senate Report (S. Rept. 1521, 88th Congress, 2d Session) with respect to this legislation (H.R. 12259) which reads, in part, as follows:

> The Committee on Foreign Relations wishes to reiterate its position that the enactment of this legislation is not to be construed as any intention to authorize an appropriation now or in the future of Federal funds for the purpose of paying the claims of U.S. nationals against the Government of Cuba. The payment of such claims is not the responsibility of the U.S. Government. On the contrary, it is the responsibility of the Cuban Government, and under no circumstances should the American taxpayer be required to foot the bill for the payment of any part of these claims. It was with this specific understanding that the Committee on Foreign Relations decided to report H.R. 12259, which provides only for the receipt and determination by the Foreign Claims Settlement Commission of the amount and validity of claims of U.S. nationals against the Government of Cuba.

*Claim Filing Period.*—Within 60 days after the enactment of legislation making appropriations to the Foreign Claims Settlement Commission for the payment of administrative expenses in carrying out its functions under the Act, the Commission is required to give public notice by publication in the Federal Register of the time within which claims may be filed with the Commission. The time limit may not be more than 18 months after such publication. The Commission is required to complete its affairs not later than 3 years following the final filing date.

*Penalty.*—Any claimant, or person filing any claim on behalf of a claimant, who knowingly and willfully conceals a material fact or makes a false statement or representation with respect to any matter before the Commission shall, under law, forfeit all rights to any award or payment on account of this claim and in addition shall be subject to the criminal penalties provided in title 18, United States Code, section 1001.

All statements by persons other than the claimant which may be submitted in support of this claim shall include the following:

> "The undersigned is aware that this statement is to be submitted to the Foreign Claims Settlement Commission of the United States in connection with the claim of _____ (Name of claimant) _____ and that any willfully false statement herein may subject the undersigned to criminal penalties provided by law in such cases."

*Certain Awards Prohibited.*—Section 208 of the Act prohibits an award to or for the benefit of any person who has been convicted of a violation of any provision of chapter 115, title 18, of the United States Code, or of any other crime involving disloyalty to the United States.

IMPORTANT.—All questions included in the statement of claim form must be answered where applicable. The statement of claim must be signed.

### Instructions for Completing FCSC Form No. 666

The items listed below are numbered to correspond to the items or questions on the application form.

*Item No. 1.*—If claimant is an individual, give name in full (last, first, middle) indicating any other names heretofore used; if claimant is a corporation or other legal entity, give the entity's full name, indicating any other names it has used. If claimant is other than an individual or corporation (e.g., partnership, association, trust, decedent's estate, minor's estate, etc.), state its character and attach a copy of the partnership agreement, articles of association, trust indenture, letters of administration or letters testamentary, together with a certified copy of probated will, etc., whichever is appropriate. If the claimant is asserting a claim in a fiduciary capacity, describe the capacity of the claimant and the names, addresses, and the nature and extent of the interest of all beneficiaries, indicating the nationality of each such beneficiary on a separate sheet.

*Item No. 2.*—If claimant is an individual, give present residence; if claimant is a corporation, other legal entity, or partnership, etc., give principal place of business.

NOTE.—It is important that the Commission be notified immediately of any change in claimant's address, or his status (i.e., death, marriage, etc.). The same holds true as to dissolution, reorganization, or other changes in the status of corporations or entities filing claims or having any interest in a claim.

*Item No. 3.*—A person may be represented by an atorney at law admitted to practice before the courts of any State of the United States, the District of Columbia or the Commonwealth of Puerto Rico; however, claimants are not required to be represented by counsel.

*Item No. 4.*—Give the dollar amount claimed for (*a*) all unimproved land and (*b*) all improved real estate in the first column with the total amount for these two categories in the column marked "Total claimed."

*Item No. 5.*—Give total dollar amount claimed for all personal property except stock shares, securities, and notes.

*Item No. 6.*—Give total dollar amount claimed for stock share interests in assets of corporations or other entities. Give names of such corporations or entities on a separate sheet if space is not sufficient. State dollar amount claimed for other securities and identify.

*Item No. 7.*—Give dollar amount claimed for (*a*) debts for goods and services owed by nationalized enterprises or Cuban Government, and (*b*) mortgages, liens and other charges upon property taken, in the first column with the total of the two in the column marked "Total claimed." The term "property" as defined by paragraph (3) of section 502 of the Act, includes debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

*Item No. 8.*—This includes claims by successors in interest to a disabled person who may have died from causes other than those which resulted from wrongful acts of the Cuban Government or authorities. Successors in interest (including widows, widowers, children, parents, brothers and sisters, and other near relatives) may have a claim also for loss of support and for medical, funeral, and other expenses paid by the decedent himself or his estate. Such claims may be in addition to the amount claimed for death or disablement of the American citizen.

*Item No. 9.*—Show the total of items 4, 5, 6, 7, and 8 as the total amount of the claim in dollars.

*Item No. 10.*—A native-born American citizen should submit a birth certificate or, if such certificate is not obtainable, a baptismal certificate, a certified copy of the record of baptism, passports, etc. A naturalized person, or a person who acquired U.S. citizenship by marriage, or through his parent(s) must complete, in duplicate, and return to this Commission the enclosed "Request for Confirmation of Naturalizaztion," Form DSP-13. Do NOT send this form to the Immigration and Naturalization Service.

*Item No. 11.*—In case of claims by corporations or other legal entities, proof of 50 percent or more ownership by natural persons who were U.S. citizens will, wherever feasible, be established as indicated in item 10 above. Where stockholders are many in number, the Commission will consider a sworn statement by the secretary or other principal officers of the corporation (or other legal entity) certifying, for claims based upon direct ownership by juridical persons, as to the percentages of the outstanding capital stock or proprietary interests owned by nationals of the United States at the date of loss and continuously until the date of filing this claim.

*Item No. 12.*—If the claimant has at any time lost his U.S. nationality, a detailed statement should be attached indicating when and how such nationality was lost, and when and how it was reacquired, together with all pertinent documentary evidence.

*Item No. 13.*—Describe in detail the cause of action upon which the loss of property, or the death, injury, or physical disability of an American citizen may be attributable. Indicate the exact location in which such loss, death, or physical injury occurred. A certified copy of any specific decree or order taking or interfering with claimant's ownership of the property should be supplied together with affidavits of persons having personal knowledge of wrongful action with respect to the property, setting out fully the nature and date of such acts and by whom taken. Any other documenary evidence

to establish action taken, such as laws, resolutions, requisition order, receipts for property taken, etc., should be included.

*Item No. 14.*—Describe in detail the property involved, including the exact location of the property at the time of its nationalization or other taking, original cost, subsequent improvements, amount of income derived from the property during the year immediately preceding the loss, value of property at time of loss, including appraisals, insured and tax valuations, extent to which depreciation has been taken into account in arriving at actual value. Proof of the foregoing may be in the nature of contracts, deeds, vouchers, etc., photographs of property duly authenticated, itemizezd list of personal property reflecting original cost, depreciation and value at time of loss, and affidavits of persons having personal knowledge of the property, the nature and amount of damages sustained, and who are qualified to express reliable opinions as to the extent of damage.

*Item No. 15.*—Complete chronology of medical histories should be given in case of personal injuries or disabilities, medical costs, etc. Claims based upon the death of an American citizen should contain a statement of particuars including date and place of birth of deceased, citizenship status at time of death, realtionship to claimant, names and addresses of heirs; and the basis of which the amount of the claim is computed.

*Item No. 16.*—Certified copy of deeds, extracts from property registers contract of purchase or other evidence of claimant's ownership of property should be furnished. In the event the property was inherited from a decedent who died intestate and no proceedings have been instituted in connection with his estate, give name in full, relationship to the claimant, and submit a certified copy of decedent's death certificate or, if none is available, other documentary proof on which you rely to establish his death and the date thereof. In such event submit, also, claimant's affidavit and the affidavits of two others who are familiar with the facts, reciting the name, age address, and nationality of all relatives surviving.

*Item No. 17.*—Section 505(a) of the act precludes claims based upon an ownership interest in any entity, such as a stockholder, an association member, etc., if the entity itself qualifies as an eligible claimant. In other words, if the entity comes within the definition of the term "national of the United States," a stockholder or member would not be an eligible claimant for his proportionate share of any compensable loss sustained by the entity.

Where any corporation or other entity does not qualify as an eligible claimant in its own right, section 505(b) of the act permits a stockholder to file a claim for his proportionate share of the loss. This would be a claim based upon the loss of direct proprietary interest in such entity.

Section 505(c) provides for claims based upon an indirect ownership of a proprietary or similar interest in a corporation or other entity which does not qualify as an eligible claimant in its own right. Such a claim would arise, for example, where the claimant owned stock in a foreign corporation which, in turn, owned stock in another foreign corporation which suffered a loss. In such a case a claim may be filed provided that at least 25 percent of the entire ownership interest in the corporation which directly suffered the was owned by nationals of the United States at the time of the loss.

*Item No. 18.*—State value of property at time of loss. If any item entering into computation of the loss, such as original purchase price, cost of improvements, etc., entered into these calculations, the equivalent thereof

in terms of U.S. currency should be stated based upon the rate of exchange in effect at the time the loss occurred.

*Item No. 19.*—If claimant has recovered through insurance or otherwise for property losses as indicated under subparagraph (*b*) of item 19, proof as to the amount received or the amount expected to be received should be submitted.

*Item No. 20.*—No special instructions.

*Item No. 21.*—Chapter 115 of title 18 of the United States Code pertains to such crimes as treason, rebellion or insurrection, seditious conspiracy, advocating overthrow of the U.S. Government, failure to register as an organization which advocates the overthrow or control by force of the Government of the United States, affecting the Armed Forces of the United States during war, recruiting for service against the United States, and enlistments to serve against the United States.

*Items Nos. 22 and 23.*—No special instructions. Section 7(f) of the International Claims Settlement Act of 1949, as amended, which is incorporated by reference under section 509 is quoted as follows: "Nothing in this title shall be construed as the assumption of any liability by the United States for the payment or satisfaction, in whole or in part, of any claim on behalf of any national of the United States against any foreign government."

FCSC Form 666

FOREIGN CLAIMS SETTLEMENT COMMISSION OF THE UNITED STATES
WASHINGTON, D.C. 20579

| In the Matter of the Claim of | Claim No. CU _____ |
|---|---|
| Against the Government of Cuba under Title V of the International Claims Settlement Act of 1949, as amended by Public Law 88–666, approved October 16, 1964. | (DO NOT WRITE IN THIS SPACE) |

An original and *one* copy of this form and each supporting exhibit must be filed. Each document in a foreign language must be accompanied by a verified English translation. Answers should be typed or printed. Attach additional sheets needed for any items where space on the form is insufficient. The information and instruction sheet attached hereto, with directions for each numbered item on the claim form, was prepared for the purpose of assisting you in the preparation of your claim. It is suggested that you read it thoroughly before completing this claim form.

———————

IMPORTANT—ALL QUESTIONS CONTAINED IN THIS FORM MUST BE ANSWERED. If claimant does not know the answer to a question or the question is not applicable to his claim, claimant should write "UNKNOWN" or "INAPPLICABLE" in the proper space.

1. Name of claimant _____
                        (Last)        (First)        (Middle)

2. Address of claimant _____

3. Name and address of attorney (if any) _____

   _____

122    FOREIGN CLAIMS SETTLEMENT COMMISSION

### SUMMARY OF LOSSES CLAIMED

|  | Amount in dollars | Total claimed |
|---|---|---|
| 4. Real estate: | | |
| (a) Land _____ | $____ | |
| (b) Buildings _____ | ____ | $____ |
| 5. Personal property, furniture, equipment, merchandise, etc. | | ____ |
| 6. Securities (name of corporation entity _____) | | ____ |
| 7. Debts: | | |
| (a) Owed by nationalized enterprises or Cuban Government | $____ | |
| (b) Charges upon property nationalized or taken | ____ | ____ |
| 8. Death, injury, or permanent disability | | ____ |
| 9. Total amount of claim | | $____ |
| | | $____ |

10. If claimant is an individual, indicate how United States nationality was acquired (check one), and submit supporting documentary evidence.

☐ Birth           Date_____   Place _____
☐ Naturalization  Date_____   Place _____ Cert. No. _____
☐ Marriage        Date_____   Name of spouse_____
☐ Through parents Date_____   Name of parent(s)_____
☐ Reacquired      Date_____

(This information must be followed with respect to a deceased person. If claim is being filed by the heir or survivor of a deceased person, this information must also be furnished with respect to such person.)

11. If claimant is a corporation or other legal entity, complete following:

(a) At all times between _____ and the presentation of this claim, more than 50 percent of the outstanding capital stock of all classes or of other beneficial interest in the claimant has been owned, directly or indirectly, by persons who were then United States nationals. (Indicate in blank space the date on which such continuous ownership commenced.)

(b) On the date of loss, the claimant has outstanding _____ shares of capital stock of all classes or other evidence of beneficial interest, which were then held by _____ persons.
(Number)

(c) On the date of the presentation of this claim, the claimant had outstanding _____ shares of capital stock of all classes or other evidence of beneficial interest, which were then held by _____
(Number)
persons.

Attach a statement by the secretary or other principal officer of the corporation (or other entity) certifying above.

12. Have here been any changes in nationality status of claimant since the date of loss? _____ (Yes or No). If so, explain _____ _____

### NATURE OF CLAIM

13. The claim arose on _____ at _____
(Date of loss)                          (Location)
_____ as a result of the following action
_____
_____

FOREIGN CLAIMS SETTLEMENT COMMISSION 123

14. If the claim is based upon real or personal property, please furnish description of property, location at time of loss or damage, and nature of claimant's interest.

-------------------------------------------------------------------------

15. If this claim is based on losses or injuries other than real or personal property covered under the preceding questions, please furnish description of such losses or injury.

-------------------------------------------------------------------------

16. If this claim is based on loss of property, state when and how such property was acquired:
   (a) If purchased, give date of purchase _____, and consideration paid _____
   (b) If inherited, give date of inheritance _____, and from whom _____ Value at time inherited _____ What was nationality of the previous owner?

   -------------------------------------------------------------------------

   (c) Cost of improvements, if any, made since acquisition _____
   (d) Do you know of any other person, firm, corporation, or other legal entity, now or since the date of loss who had or who has any interest in the property above described or in the claim hereby asserted? (Indicate the names and present addresses of all such parties.)

   -------------------------------------------------------------------------
   -------------------------------------------------------------------------

17. If the claim is based on the ownership of securities in a corporation, association, or other entity, indicate below the name, address, place of incorporation of such corporation, association or entity, and the number of shares outstanding.

| --------------- | -- | --------------- | --------------- | -------- |
| (Name) | -- | (Address) | (Place of incorporation) | (Number shares) |
| --------------- | -- | --------------- | --------------- | -------- |
| (Name) | -- | (Address) | (Place of incorporation) | (Number shares) |
| --------------- | -- | --------------- | --------------- | -------- |
| (Name) | -- | (Address) | (Place of incorporation) | (Number shares) |

AMOUNT OF CLAIM

18. This claim is asserted for the total amount of $_____. It is computed as follows: _____
   -------------------------------------------------------------------------

19. (a) Has claimant filed or asserted any claim with respect to the subject matter of this claim or any related matter with or against any other agency of the United States Government or any other place? _____ (Yes or No). If the answer is "Yes," give date of filing, agency or other place with which claim was filed, amount claimed, disposition of claim and amont of award, if any _____
   (b) Apart from this claim, has claimant or any predecessor in interest received, or has he any reason to expect to receive, any benefits, pecuniary or otherwise, on account of the loss resulting from the action for which this claim is filed? (If so, explain.) _____
   -------------------------------------------------------------------------

(c) Has a tax deduction ever been asserted by claimant or any other pre-
decessor with respect to losses described in this claim? _____ (Yes or
No). If answer is "Yes," give year such claim was asserted, amount
of loss claimed, whether loss was allowed, and name of person claim-
ing such tax deduction _____

_____

20. Set forth any additional facts pertinent to this claim.

_____

### GENERAL

21. Has the claimant or any person for whose benefit any award upon this
claim may inure, been convicted of a violation of any provision of Chapter
115 of Title 18 of the United States Code, or any other crime involving
loyalty to the United States? _____ (Yes or No). If answer is "Yes,"
specify _____

_____

22. (In the case of an individual claimant.) The undersigned states that he is
the claimant herein; that he has read the foregoing statement of claim
and each statement and exhibit attached thereto and knows the contents
thereof; that the same is true to his own knowledge, except as to matters
therein stated to be alleged on information and belief, and that as to those
matters he believes them to be true.

Dated _____, 196__        _____

                                                          (Signature or mark)

                                                  _____

                                                  _____

If by mark, two witnesses:                Address_____

Name _____        Address_____

Name _____        _____

23. (For use in the case of a corporate or other entity claimant.) The under-
signed states that he is the ____ (Title or Office) ____ of the claimant
herein; that he is duly authorized to sign and file this claim on behalf of
the claimant; that he has read the foregoing statement of claimant and
each statement and exhibit attached thereto and knows the contents
thereof; that the same is true to his own knowledge, except as to matters
therein stated to be alleged on information and belief, and that as to those
matters he believes them to be true.

Dated _____, 196__        _____

                                                          (Signature)

SEAL (If any; if none, so state).

SELECTED DECISIONS

CUBAN CLAIMS PROGRAM

## IN THE MATTER OF THE CLAIM OF JOHN KORENDA

Claim No. CU–8255—Decision No. CU–3580

*Late filed claims may be considered provided the determination of timely filed claims is not impeded thereby.*

PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented by JOHN KORENDA on June 25, 1968 on behalf of the survivors of Peter Korenda, for $100,000.00, being the amount of an admitted debt of the Republic of Cuba. Claimant and all members of the Korenda family have been nationals of the United States at all times pertinent to this claim.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States, if such claims are submitted to the Commission within such period specified by the Commission by notice published in the Federal Register (which period shall not be more than eighteen months after such publication) within sixty days after the enactment of this title or of legislation making appropriations to the Commission for payment of administrative expenses incurred in carrying out its functions under this title, whichever date is later.

On November 1, 1965, the Commission filed notice with the Federal Register that it would receive, during the period ending at midnight, May 1, 1967, claims against the Government of Cuba.

Under the Commission's regulations, any initial written indication of an intention to file a claim received within 30 days prior to the expiration of the filing period thereof shall be considered as a timely filing of a claim if formalized within 30 days after the expiration of the filing period. (FCSC Reg., 45 C.F.R. § 531.1(g) (Supp. 1967).)

This claim was presented to the Commission on June 25, 1968. There is no record of a prior communication to this Commission from claimant herein.

The first question for consideration is whether the Commission may properly consider this claim on its merits inasmuch as it was presented subsequent to the closing of the formal filing period.

---

* This decision was entered as the Commission's Final Decision on April 25, 1969.

125

Claimant, JOHN KORENDA, acting on behalf of the interested members of the Korenda family, that is, the survivors of Peter Korenda, and of Anna Korenda, both now deceased, has informed the Commission that he is a merchant seaman, and that in the course of following this occupation he received no notice of the inauguration of this claims program, nor of the filing period.

The declared purpose of the Congress in enacting this legislation was to provide a vehicle for American nationals to have the validity and amounts of their losses decided by the Commission and reported to the Secretary of State for possible use in future negotiations of a claims settlement agreement with a friendly Government in Cuba.

In view of this purpose, the Commission holds that it will accept for consideration on their merits claims filed after the deadline so long as the consideration thereof does not impede the determination of those claims which were timely filed. The Commission further holds that the losses determined in the claims filed after the deadline shall be separately certified to the Secretary of State.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Evidence of record in this case discloses that one Peter Korenda, an American tourist in Habana, was shot and killed on March 13, 1957, by Cuban authorities who were at that time suppressing an attack of insurrectionists upon the Presidential Palace of Habana.

The claim was first presented to the Government of Cuba by the American Embassy at Habana on behalf of Mrs. Anna Korenda, mother of Peter Korenda, for damages sustained as a result of the death of her son. The Cuban Ministry of State acknowledged the receipt of the claim on June 11, 1958. On September 7, 1959, discusions were held in Habana between an Embassy official, a representative of the Cuban Government and JOHN KORENDA, acting for himself and other members of the Korenda family (Mrs. Korenda being then deceased). During these discussions the Cuban Government admitted its liability in the matter and offered to pay Mr. Korenda $100,000 in full settlement of the claim. Mr. Korenda accepted the offer and agreed to be paid in two equal installments, the first of which was to be made on October 9, 1959. He returned to Cuba on that date, with appropriate powers of attorney and other documentation to effect collection of the first installment. An appointment for October 10, 1959 was not kept by Cuban authorities. It has been said that the failure to make payment was due to a stringency in the Cuban Government's dollar exchange position at that time. All attempts to effect collection of the debt have been unsuccessful.

The Commission has carefully considered all the evidence of record and finds that inasmuch as this debt of the Government of Cuba has not been paid claimant has succeeded to and suffered a loss within the scope of Title V of the Act, in the amount of $100,000 as of October 10, 1959. (See *Claim of Clemens R. Maise*, Claim No. CU–3191, 1967 FCSC Ann. Rep. 68.)

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that JOHN KORENDA succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Thousand Dollars ($100,000.00) with interest thereon at 6% per annum from October 10, 1959 to the date of settlement.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission March 26, 1969.

## IN THE MATTER OF THE CLAIMS OF AOFC, INC.

### Claim Nos. CU–3671 and 3672—Decision No. CU–5894

*The claim of a legal entity, such as a corporation, is owned by the entity and not its stockholders. The corporate veil may be pierced and the American stockholders may claim their stock interests only if (1) the claim arose in favor of a non-U.S. national corporation, and (2) that corporation continued to own that claim until the date of filing with the Commission.*

### PROPOSED DECISION

These claims against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, were presented by AOFC, INC. Claim No. CU–3671 in the amount of $711,044.98 is based upon debts due from a Cuban corporation. Claim No. CU–3672 in the amount of $250,250.00 is based upon a stock interest in another Cuban corporation.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge

on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 percentum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

An authorized officer of claimant has certified that claimant was organized under the laws of New York on December 20, 1962, and that at all times from that date until the date of filing claims all of claimant's outstanding capital stock was owned by the International Basic Economy Corporation, also organized under the laws of New York. That officer, who is also an officer of the parent corporation, has certified that at all pertinent times more than 50% of the parent's (IBEC) outstanding capital stock was owned by nationals of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The facts in both of these claims are undisputed. It appears from the record (CU-3671) that a loan was made in 1956 by an American corporation, AOF Corp., to a Cuban corporation, Acetafil, S.A. In 1957 the AOF Corp. dissolved and all its rights under the loan agreement were transferred to AOF Co., a corporation that qualifies as a national of the United States under Section 502(1)(B) of the Act.

Apparently regular payments on account of the loan were made by the Cuban corporation until December 1, 1959 when an amount on account of principal and interest became due. The Cuban corporation took appropriate steps to send the funds to the United States through the National Bank of Cuba. However, the Cuban authorities barred the transfer pursuant to the foreign exchange laws of Cuba. As a result the funds were never sent to AOF Co., and no further payments on account of the loan were ever made. The record contains a copy of a letter, dated November 26, 1959, from an officer of the Cuban corporation to AOF Co. indicating that the Cuban corporation had sufficient funds to make the payment due on December 1, 1959. It further appears from claimant's statements that the Cuban Corporation was intervened by the Government of Cuba in October 1960.

The record (CU-3672) shows that on April 5, 1957, Transoceanic Development Corp., Ltd., a corporation organized under the laws of Canada, acquired 2,500 Class B shares of common stock in Cia. Antillana de Acero, S.A., a corporation organized under the laws of Cuba. The evidence includes a copy of Resolution No. 1, issued by the Cuban Ministry of the Treasury on March 25, 1960, pursuant to which Cia. Antillana de Acero, S.A. was intervened. The Commission so found in *Claim of Independence* and the said rights under the loan agreement, which constitute the *Foundation*, Claim No. CU-2152.

On January 20, 1960, AOF Co. dissolved and merged into the Canadian corporation, and all its rights under the said loan agreement were transferred to the Canadian corporation. Therefore as of January 20, 1960, the Canadian corporation owned 2,500 shares of stock in Cia. Antillana de Acero, S.A. and the said rights under the loan agreement, which constitute the

properties upon which both of the claims herein are based. It further appears from claimant's statements that on December 20, 1962, IBEC acquired all the outstanding shares of stock of the Canadian corporation, and caused its wholly-owned subsidiary, AOFC, Inc., claimant to be organized. On December 31, 1962, IBEC caused the Canadian corporation to transfer all of its assets, including the subject matters of these claims to the claimant.

With respect to Claim No. CU–3671, the Commission has held that the Cuban Government's implementation of Law 568 of September 29, 1959, concerning foreign exchange, was not in reality a legitimate exercise of sovereign authority, but constituted an intervention by the Government of Cuba in the contractual rights of those who, like AOF Co., were thus adversely affected, and resulted in a taking of property within the meaning of Section 503(a) of the Act. (See *Claim of The Schwarzenbach Huber Company*, Claim No. CU–0019, 25 FCSC Semiann. Rep. 58 [July–Dec. 1966]; and *Claim of Etna Pozzolana Corporation*, Claim No. CU–0049, 1967 FCSC Ann. Rep. 46) Accordingly, the Commission finds that on or about December 1, 1959 property belonging to AOF Co. was lost as a result of intervention by the Government of Cuba in the contract with Acetafil.

In March 1960, a loss of property was sustained by the Canadian corporation by intervention of Antillana. On December 31, 1962, claimant succeeded to both losses.

The sole issue presented by these claims involves the meanings of Sections 504(a) and 505 of the Act.

Section 504 of the Act provides, as to ownership of claims, that

> (a) A claim shall not be considered under section 503(a) of this title unless the property on which the claim was based was owned wholly or partially, directly or indirectly by a national of the United States on the date of the loss and if considered shall be considered only to the extent the claim has been held by one or more nationals of the United States continuously thereafter until the date of filing with the Commission.

In other words, a claim filed under Section 503(a) of the Act "shall" not be considered unless it was owned, in whole or in part, directly or indirectly, by a national of the United States on the date of loss, and unless it was so owned continuously thereafter until the date of filing with the Commission. The test applied in this respect is whether each owner of the claim from the time it arose until filing with the Commission qualifies as a national of the United States, as defined by Section 502 of the Act. Accordingly, the Commission has held consistently that if there is any break in the chain of United States nationality at any time between the date of loss and the date of filing, the claim must be denied. (See *Claim of F. L. Smidth & Co.*, Claim No. CU–0104, 25 FCSC Semiann. Rep. 44 [July–Dec, 1966] and *Claim of Sigridur Einarsdottir*, Claim No. CU–0728, id. at 45.)

Section 505 provides, as to Corporate Claims, as follows:

> (a) A claim under Section 503(a) of this title based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered. A claim under section 503(a) of this title based upon a debt or other obligation owing by any corporation, association, or other entity organized under the laws of the United States, or of any State, the District of Columbia,

or the Commonwealth of Puerto Rico shall be considered, only when such debt or other obligation is a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba, or the Chinese Communist regime.

(b) A claim under section 503(a) of this title based upon a direct ownership interest in a corporation, association, or other entity for loss shall be considered, subject to the other provisions of this title, if such corporation, association or other entity on the date of the loss was not a national of the United States, without regard to the per centum of ownership vested in the claimant.

(c) A claim under section 503(a) of this title based upon an indirect ownership interest in a corporation, association, or other entity for loss shall be considered, subject to the other provisions of this title, only if at least 25 per centum of the entire ownership interests thereof at the time of such loss was vested in nationals of the United States.

(d) The amount of any claim covered by subsection (b) or (c) of this section shall be calculated on the basis of the total loss suffered by such corporation, association, or other entity, and shall bear the same proportion to such loss as the ownership interest of the claimant at the time of loss bears to the entire ownership interest thereof.

As indicated by its heading, "Corporate Claims," Section 505 governs claims filed under Section 503(a) based on stock interests in corporations. In the absence of Section 505, no valid claim based on a stock interest could be filed under Section 503(a) because all property of a corporation belongs to the corporation, not its stockholders. Section 505, in effect, pierces the corporate veil and permits certain claims based on stock interests in corporations to be considered.

Claimant availed itself of the provisions of Section 505 when it filed Claim No. CU–3672, based on a stock interest in Cia. Antillana de Acero, S.A., a Cuban corporation. Since the asserted stock interest in this Cuban corporation was owned directly by claimant's predecessor in interest, claimant has filed its claim under Section 505(b) of the Act.

Claimant contends, in effect, that its claims satisfy the nationality requirements of Section 504(a) of the Act. With respect to Claim No. CU–3671, claimant states that on December 1, 1959 the claim arose in favor of AOF Co., a national of the United States within the meaning of Section 502(1)(B). Although the claim was owned by a Canadian corporation from January 20, 1960 to December 31, 1962, claimant states that the claim is valid because more than 50% of the outstanding capital stock of the Canadian corporation was owned by nationals of the United States. The same contention is urged with respect to Claim No. CU–3672 which was owned by the Canadian corporation on March 25, 1960, the date of loss.

Upon consideration of this entire matter, the Commission finds that it is constrained to reject claimant's contentions. Claimant has fallen into error by confusing the provisions of Section 504(a) with those of Section 505. As indicated above, Section 504(a) governs all claims under Section 503(a), whether or not based on stock interests in corporations.

When the test of Section 504(a) is applied to each owner of the claims herein, it is clear that there were breaks in the chains of United States nationality between the respective dates of loss and the date of filing. On January 20, 1960 when Claim No. CU–3671 was transferred to the Canadian

corporation, the claim was not then owned by a national of the United States within the meaning of Section 502(1)(B) of the Act. The Canadian corporation was organized under the laws of Canada, not "under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico." The Commission therefore finds that the Canadian corporation does not qualify as a national of the United States within the meaning of Section 502(1)(B). (See *Claim of Cia. Ganadera Becerra, S.A.,* Claim No. CU-0726, 25 FCSC Semiann. Rep. 47 [July–Dec. 1966].) The Commission further finds that insofar as Claim No. CU-3671 is concerned, any claim that arose on December 1, 1959 by virtue of the intervention in the Acetafil, S.A. contract, arose in favor of a national of the United States but passed into the hands of a non-United States national. Similarly, with respect to Claim No. CU-3672 this was owned by the Canadian corporation on March 25, 1960, the date of loss.

The fact that more than 50% of the outstanding capital stock of the Canadian corporation was owned by nationals of the United States is immaterial because these claims were not filed by the stockholders of the Canadian corporation, but by its successor in interest. Since Canadian corporation had assigned its claims to claimant herein on December 31, 1962, prior to the date of filing with the Commission, the stockholders of the Canadian corporation could no longer file valid claims under Section 503(a) of the Act. The Commission holds that Section 505 applies only when a claim is filed under Section 503(a) based on a stock interest in a corporation. Accordingly, the Commission finds that Section 505 is inapplicable to these claims.

The Commission finds that these claims were not owned by nationals of the United States continuously from the dates they arose until the date of filing with the Commission. Accordingly, these claims are denied. The Commission deems it unnecessary to consider other elements of these claims.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission October 14, 1970.

### Final Decision

Under date of October 14, 1970, the Commission issued its Proposed Decision denying these claims for the reason that the claims failed to meet the nationality prerequisites of Section 504(a) of the Act.

The undisputed facts are as follows: Claim No. CU-3671 arose in favor of a United States national corporation, and was thereafter transferred to a non-United States national corporation, a Canadian entity, while Claim No. CU-3672 arose in favor of that Canadian corporation. Prior to the date of filing with the Commission, the claims were transferred to a United States national corporation, the claimant in both cases.

On the basis of these facts the Commission held that the claims were not owned by nationals of the United States continuously from the dates they arose until the date of filing, and the claims were denied pursuant to the express provisions of Section 504(a) of the Act.

Council for claimant objected to the Proposed Decision, submitted a supporting brief, and requested an oral hearing which was held on March 17, 1971.

At that hearing counsel submitted a supplementary brief and argued before the Commission on behalf of claimant. The burden of the argument

was that about 75 percent of the outstanding capital stock of the Canadian corporation was owned by United States nationals at all pertinent times, thereby assertedly satisfying the prerequisites of Section 504(a) of the Act. On that basis counsel contended that the claims are valid to that extent, and urged that they be allowed *pro tanto*. In effect, counsel argued that the claims were owned by the stockholders of the Canadian corporation, which stockholders transferred their claims to the United States national corporation that filed the claims with the Commission.

Upon consideration of the entire record, the Commission finds no merit in counsel's contentions. The Commission has, over the years, administered several claims programs authorized pursuant to other titles of the same Act here under consideration, in which there were identical provisions insofar as the nationality prerequisites and claims for stock interests in corporations are concerned.

In a claim directly in point filed under Title III of the Act, it appeared that an American individual directly suffered the loss in question, and his claim was later acquired by a domestically organized corporation that filed the claim with the Commission. The record showed that, *except for the period between 1944 and 1949*, more than 50 percent of that claimants outstanding capital stock was owned by United States nationals from the date of acquisition of the claim by claimant until the date of filing with the Commission. In that period of about five years, more than 50 percent of the stock was owned by Mexican nationals.

The Commission held that the claim was not owned by nationals of the United States continuously from the date it arose until the date of filing with the Commission, and the claim was denied. (See *Claim of American Trust Company*, Claim No. SOV–42,528, cited as a precedent of the Commission with respect to nationality prerequisites, at FCSC Semiann. Rep. 21 [Jan.–June 1957].)

The Commission has consistently adhered to that principle in determining claims under the Act. The Commission reaffirms its holding that the claim of a legal entity, such as a corporation, is owned by the corporation like any other of its assets and not by its stockholders. Under Title V of the Act, when a claim has arisen in favor of a corporation, the corporate veil may be pierced and its American stockholders may claim their proportionate direct stock interests *only if* (1) the claim arose in favor of a non-United States national corporation, and (2) that corporation continued to own the claim until the date of filing.

In the instant case, Claim No. CU–3671 arose in favor of a United States national corporation, but subsequently was acquired by a Canadian corporation. The Commission finds that that claim then ceased to have the requisite character to serve as a basis for a certification under Title V and this is so irrespective of whether a small percentage or all of the Canadian corporation's outstanding capital stock was owned by nationals of the United States. The stockholders of the Canadian corporation owned no claim which they could validly assign to the American corporation that filed the claim. Claimant, having thus acquired from the Canadian corporation a claim which could not be certified under Title V, can occupy no better position than its predecessor in interest.

Claim No. CU–3672 arose in favor of a non-United States national corporation but that corporation did not retain the claim until the date of filing, but transferred it to a United States national corporation that filed

the claim. Since that claim arose in favor of a nonnational of the United States, the claimant acquired another claim which was invalid, so far as Title V is concerned, on the date of loss. The claim was not retained by the Canadian corporation until the date of filing, and therefore its American stockholders could neither file a claim based upon their proportionate interests as permitted by Title V, nor assign a valid claim to the American claimant.

Therefore, the Commission finds no basis for altering the decision previously entered. Accordingly, the Proposed Decision of October 14, 1970 is affirmed in all respects.

Dated at Washington, D.C. and entered as the Final Decision of the Commission April 21, 1971.

## IN THE MATTER OF THE CLAIM OF CUBAN ELECTRIC COMPANY

Claim No. CU–2578—Decision No. CU–4122

*Claims for sums of money expended for resettlement of employees and separation payments made to employees are not covered by Title V of the Act because such losses are not the direct result of the nationalization of property.*

*Losses resulting indirectly from action by the Government of Cuba other than the taking of property are not within the purview of Title V of the Act.*

### FINAL DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, for an amount in excess of $323,000,000.00 was presented by CUBAN ELECTRIC COMPANY based upon asserted losses resulting from the nationalization of its assets in Cuba.

By Proposed Decision dated October 21, 1969, the Commission found that claimant qualified as a national of the United States, that its assets in Cuba were nationalized by the Government of Cuba on August 6, 1960, and that claimant had sustained a loss under Title V of the Act in the amount of $266,513,667.40. Portions of the claim for the following items were denied:

| | |
|---|---:|
| Debt of Cuban Government | $ 700,000.00 |
| Liability to Suppliers | 499,186.69 |
| Loss on equipment and supplies | 2,138,614.39 |
| Preservation of assets | 185,297.00 |
| Resettlement of employees | 314,866.90 |
| Funding retirement plan | 599,663.00 |

In addition, a deduction from the total value of claimant's Cuban assets ($319,367,165.95) for taxes ($2,865,397.00), liabilities under Labor Laws for Employees Sickness Fund ($322,142.00), debt to Financiera Nacional de Cuba ($37,920,000.00), and mortgage bonds ($11,745,959.55) was made to determine claimant's actual losses.

Claimant filed objections to the Proposed Decision, objecting specifically to the denial of the items set forth above and to the deductions and set-offs applied to the total value of its assets. At an oral hearing on June 4, 1970, argument was made by counsel for claimant and further written argument submitted after the hearing.

On the basis of the oral argument, the Commission now finds that claimant

sustained an additional loss in the amount of $1,054,746.22 for equipment and supplies as the result of the nationalization of its assets by the Government of Cuba on August 6, 1960.

Concerning the debt of the Cuban Government which claimant had listed under "Investments in Cuba," claimant has not established that this debt was an enforceable debt on January 1, 1959 although listed as an asset on claimant's records. It appears that this amount had been owed since prior to 1948 and claim therefor must be denied. As for the losses claimed for equipment unsold and not nationalized, since it was in the United States, and the preservation of same, the Commission is not persuaded that such items are within the scope of Title V of the Act and the denial of these items is affirmed. As for the payments to former employees and the funding of the pension acount, although commendable, the Commission finds that they are not compensable or certifiable as a loss within the purview of Title V of the Act.

Claimant also argued against the deduction from the value of its Cuban assets of liabilities to Cuban governmental agencies, taxes, and mortgage bonds certified as losses to other claimants unded Title V. It is contended that the Commission should restrict itself to determining only the value of the assets lost and leave the application of set-offs or deductions to such time as a fund is available for payment of claims. However, the Commission has a mandate to determine the losses of United States nationals as a result of the actions of the Government of Cuba, and since the actions of the Government of Cuba concerning claimant took place on August 6, 1960, the value of the claim against Cuba is determined as of that date. To determine the value of a claim, any set-offs and deductions must be applied now, not reserved for future consideration. Further, set-offs have been consistently deducted by this Commission on claims for nationalized property, when applicable, since the Yugoslav Claims Agreement of 1948. (See *Claim of Helen Devich*, Claim No. Y–697, Decision No. Y–800.)

Claimant based further argument against deductions on computations illustrating the recovery for stockholders and creditors with and without deductions if Cuba should pay 50% or 75% of the total losses. Again, however, the Commission's determination concerns the amount of loss sustained as of August 6, 1960, the date of nationalization, which amount is definite and not subject to adjustment on the basis of any subsequent agreement.

Accordingly, the Commission concludes that claimant sustained the additional loss of $1,054,746.22 for a total loss of $267,568,413.62, on August 6, 1960 within the meaning of Title V of the Act.

The certification of loss as restated below, will be entered, and in all other respects the Proposed Decision is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that Cuban ELECTRIC COMPANY sustained a loss, as a result of actions by the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949 as amended, in the amount of Two Hundred Sixty-seven Million Five Hundred Sixty-eight Thousand Four Hundred Thirteen Dollars and Sixty-two cents ($267,568,413.62) with interest at 6% per annum from August 6, 1960 to date of settlement. Dated at Washington, D.C., Aug. 19, 1970

PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the Interna-

tional Claims Settlement Act of 1949, as amended, was presented by CUBAN ELECTRIC COMPANY for $323,570,419.38.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that Cuban Electric was organized under the laws of the State of Florida in 1927, and that in 1960 there were 3,600,011 shares of common stock outstanding, of which 3,158,806 were owned by American & Foreign Power Company Inc. and 291,261 were owned by other persons whose addresses were in the United States. The record further shows that American & Foreign Power Company Inc. (since merged into Ebasco Industries Inc. and subsequently into Boise Cascade Corporation) had 7,312,526 shares outstanding on August 6, 1960 of which 0.17% was sold by non-residents of the United States and 50.3% by the Electric Bond and Share Company which was owned at least 97% by United States nationals at all times. The Commission holds that CUBAN ELECTRIC COMPANY qualifies as a national of the United States within the meaning of Section 502(1)(B) of the Act.

Evidence establishes that claimant, beginning in 1928, acquired properties of small utility companies in Cuba. In 1960 it provided more than 90% of all electricity sold in Cuba and furnished manufactured gas in the City of Havana. The company had expanded its services in the period from 1950 to 1959 and spent a total amount of $189,192,603.00 during that time for construction of additional facilities and improvements. A total of 6,619 miles of power lines of all voltages was in service throughout the Island at the end of 1959.

The claimant operated two electrical systems in Cuba, the Western System and the Eastern System. The Western System was the larger and included the City of Havana. Its generating stations were:

Consolidated Steam Electric Station on Havana Bay in Havana,

> Regla Steam Electric Station in the Community of Regla,
> Rincon de Melones Steam-Diesel Electric Station on Havana Bay,
> Matanzas Steam Electric Station on Matanzas Bay,
> O'Bourke Steam Electric Station on Cienfuegos Bay,
> Cienfuegos Steam Electric Station in the City of Cienfuegos,
> Ciego de Avila Diesel Electric Station, sixty miles west of Camaguey,
> Vicente Steam Electric Station, six miles east of Ciego de Avila, and
> Camaguey Steam Electric Station at Camaguey.

The Western System also had substations at Naranjito, Colon, Diezmero, Principe, Rincon, San Augustin, Santa Clara, and Tropical.

The Eastern System was centered around Santiago and its generating stations were:

> Santiago Steam Electric Station on Santiago Bay,
> Manzanilla Diesel Electric Station, 100 miles west of Santiago, and
> Guaso Hydro Electric Station, 50 miles northeast of Santiago.

On the outskirts of Havana, on Rancho Boyeros Highway, claimant owned the Capdevila Service Center, which contained the general offices of the claimant, a garage, electric meter shop, gas meter shop ,transformer, mechanical and carpentry shops, central warehouse and stores. It also owned nine mobile power units and approximately 425 trucks and jeeps.

The Havana Gas System which sold manufactured gas in the City of Havana consisted of a generating plan, storage capacity, street boosters and a distribution system. The distribution system had 230 miles of mains and served approximately 55,000 customers.

On August 6, 1960, the Government of Cuba issued Resolution No. 1 which listed as nationalized the CUBAN ELECTRIC COMPANY (Compania Cubana de Electricidad), pursuant to Law 851 of July 6, 1960. The Commission therefore finds that claimant's properties in Cuba were nationalized on August 6, 1960, as a result of which claimant sustained a loss within the meaning of Title V of the Act.

Claim is made herein for losses sustained by CUBAN ELECTRIC COMPANY as follows:

| | | |
|---|---|---|
| 1. | Utility Plant | $285,266,482.00 |
| 2. | Investments in Cuba | 1,957,756.40 |
| 3. | Current Assets | 30,244,140.00 |
| 4. | Deferred Debits | 2,364,413.00 |
| 5. | Liability to Suppliers | 499,186.69 |
| 6. | Loss on Sale of Equipment & Supplies | 1,054,746.22 |
| 7. | Unsold Equipment | 1,083,868.17 |
| 8. | Preservation of Assets | 185,297.00 |
| 9. | Resettlement of Employees | 314,866.90 |
| 10. | Funding Retirement Plan | 599,663.00 |
| | Total | $323,570,419.38 |

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which,

under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

In support of the claim, claimant has submitted a copy of its Annual Report for the year ending December 31, 1959, a Financial Report with a balance sheet for February 29, 1960, copies of records concerning inventories of equipment purchases, sales, investments and supplies, and affidavits of former employees of claimant and the American & Foreign Power Company Inc. The record also contains copies of balance sheets for 1957 and 1958, a report of the Cuban Rate Investigation Commission, and claimant's memorandum concerning the 1959 rates and report of that Commission.

### 1. UTILITY PLANT

Under the heading "Utility Plant", claimant makes claim for all land, buildings, machinery, vehicles, equipment and construction work in progress. The amount claimed, $285,266,482.00, is the adjusted book value of the plant for August 6, 1960, the date of nationalization. According to the latest balance sheet submitted, the value of the plant on February 29, 1960, was $345,687,423.00. In order to arrive at the claimed amount of $285,266,482.00, a depreciation reserve of $52,337,238.00 was deducted and further adjustments were made for charges incurred and credits taken in the period from February 29, 1960 to August 6, 1960. The Commission finds that this method of arriving at the total claimed is fair and equitable and is supported by a preponderance of the evidence in the record, even though there is included in the evidence a report of the Cuban Rate Investigation Commission which had been appointed by the Castro Government in Cuba to determine electric and gas rates for CUBAN ELECTRIC COMPANY. That body made a finding as to the value of claimant's property for a rate base. This, however, is not a determination of the market value of the company but was an attempt to put as low a value as possible on the assets as a basis for lowering utility rates.

The Commission therefore finds that the value of the Utility Plant on August 6, 1960 is the adjusted book value of $285,266,482.00.

### 2. INTANGIBLES

Claimant asserts a loss in the amount of $1,957,756.00 for "investments in Cuba." This item, comprising certain debts and advances as well as investments, is carried at book value in the balance sheet of February 29, 1960 in the amount of 2,173,290.70. The claim as presented is for the asserted value of the items, as follows:

| | | |
|---|---|---:|
| 1. | Vedado Tennis Club Mortgage Bonds | $    5,000.00 |
| 2. | Country Club de Santiago Stock | 500.00 |
| 3. | Camaguey Country Club Bonds | 500.00 |
| 4. | Compania de Publicacion "El Dia" Bonds | 5,000.00 |
| 5. | City of Matanzas—8% Gold Bonds | 3,226.82 |
| | "   "   "   "   "   "   " | 727.73 |
| 6. | Julio Cesar Hidalgo & Cia. Stock | 100.00 |
| 7. | Havana Biltmore Yacht & Country Club Series A Stock | 1,000.00 |
| | "        "        "   "   "   "   "   "   " | 1,000.00 |
| 8. | Gremio de Obreros y Mareantes—Advances | 10.00 |

| | | |
|---|---|---|
| 9. | Acueducto de Santa Maria—Debt | 371.84 |
| 10. | Autobuses Modelo, S.A.—Preferred Shares | 72,000.00 |
| 11. | Cooperativa de Repartos Electricos—Advances | 122,094.26 |
| 12. | Ministerio de Communicaciones—Bandes Bonds | 1,000.00 |
| 13. | Advances to Employees | 789,519.00 |
| 14. | Financiera Nacional de Cuba Stock | 2,000.00 |
| 15. | Ferrocarriles Occidentales de Cuba Stock Series B | 102,400.00 |
| 16. | Debt of Cuban Government | 1,721,395.70 |
| 17. | Land, "La Puntilla" | 100,101.45 |
| 18. | Cia. Inmobiliaria "La Torre, S.A." Stock | 4,000.00 |
| 19. | Ministerio de Eduacion, Bonds | 12,500.00 |
| 20. | Veteranos, Tribunales y Obras 4% Bonds | 89,500.00 |
| 21. | Bandes 4%, Total Bonds | 112,500.00 |
| 22. | Compania Financiera de Transporte—Debt | 144,000.00 |
| | Total | $3,290,446.80 |

Claimant states that the Cuban Government obtained physical possession of all the securities and evidences of title for the above listed item. The Commission finds that claimant was the owner of these assets, and, on the basis of the evidence of record and other evidence available to the Commission, that the loss suffered by claimant in this regard is the amount set forth above with the following exceptions:

(a) Havana Biltmore Yacht and Country Club Series A stock which has been determined to have the value of $3,500.00 per share in the *Claim of Arman E. Becker, Jr.*, Claim No. CU-1094. Thus the loss for two shares of such stock is $7,000.00.

(b) Ferrocarriles Occidentales de Cuba Series B stock which is determined to have a value of $20,479.85. This was the amount stated by claimant in its balance sheet of February 29, 1960 to have been the market value of such securities. This figure is adopted by the Commission rather than the $102,400.00 set forth above. This company was a mixed-economy corporation whose shares were owned by the Cuban Government as well as private interests. Certain taxes were forgiven its shareholders.

(c) Debt of the Cuban Government in the amount of $1,721,395.70 which represents a sum due prior to 1948 is deducted. Inasmuch as this debt did not arise after January 1, 1959, claim for this item must be denied.

The Commission has previously determined the values for Financiera Nacional de Cuba stock, Bandes Bonds, Veteranos, Tribunales y Obras 4% Bonds and Cia. Inmobiliaria "La Torre, S.A." stock, to be the same as those claimed herein. Compania Financiera de Transporte which owed $144,000.00 to the claimant was nationalized on August 29, 1960 and that sum would therefore be certified as a debt of a nationalized enterprise. The remaining items are determined by the Commission to have the values stated above.

Accordingly, the Commission finds that the aggregate value of the loss sustained by claimant for these intangibles on August 6, 1960 was $1,492,130.95.

### 3. Current Assets

According to the February 29, 1960 Balance Sheet, Current Assets amounted to $31,839,173.00. Since claimant operated its business until August 6, 1960, the date of loss, it is necessary that the amount be adjusted to reflect the subsequent activity.

On the basis of the record the Commission finds the Current Assets on August 6, 1960 to have been as follows:

| | | |
|---|---:|---:|
| Cash | | $ 1,075,757.00 |
| Special Deposits | | 7,348.00 |
| Working Funds | | 593,914.00 |
| Accounts Receivable | | |
| General | $ 7,425,270.00 | |
| Municipal & Other Government | 15,252,197.00 | |
| Miscellaneous | 1,812,197.00 | 24,489,721.00 |
| Interest & Dividends Receivable | | 2,530.00 |
| Materials & Supplies | | 3,545,473.00 |
| Prepayments | | 529,397.00 |
| | Total | $30,244,140.00 |

### 4. Deferred Debits

Claim is made for the amount of $2,364,413.00 for deferred debits, comprising unamortized expenses incurred in connection with debt and stock issues for the printing of indentures, engraving, notarial and registration fees in Cuba and Cuban revenue stamps.

On the basis of the record, the Commission finds that claimant sustained a loss in the amount of $2,364,413.00 for deferred debits.

### 5. Other Asserted Losses

Claimant has further asserted claim in the aggregate amount of $3,737,-627.98 for losses entitled Liability to Suppliers, Loss on Sale of Equipment and Supplies, Unsold Equipment, Preservation of Assets, Resettlement of Employees, and Funding Retirement Plan. The record shows that at the time of the taking of its properties in Cuba, claimant had in hand in the United States or on order certain types of equipment built specifically for use in Cuba. Because of the taking, claimant cancelled many orders and continued to hold those items which had been completed in storage in the United States. Claimant has continuously tried to dispose of the new equipment but because of the particular design and engineering several of the pieces are still in claimant's possession. One sale was made as late as September, 1968 in claimant's endeavor to reduce its losses. In addition to the monetary loss for the equipment purchased, claimant incurred and continues to incur the expense of warehousing, shipping, and insuring the equipment in its possession in the United States.

Concerning the resettlement of employees and the retirement plan, claimant asserts that it was required to make payment to its former employees in 1960, 1961, 1962 and 1963 in the form of severance payments and other forms of assistance and to make annual payments in the form of supplemental pensions to retired employees and dependents. The amount of pension was increased also because the pensioners were not paid any benefits formerly received from the Cuban Government for Social Security and claimant made up the difference. Claimant borrowed the necessary funds for these auxiliary payment from its parent company. There is no evidence of record that any of the payments to employees was for property taken or losses sustained as a result of actions by the Government of Cuba.

In considering these portions of the claim, the Commission must determine whether such losses are certifiable under Title V of the Act.

Section 501 of the Act states:

> It is the purpose of this title to provide for the determination of the amount and validity of claims against the Government of Cuba which have arisen since January 1, 1959, out of nationalization, expropriation, intervention, or other takings of, or special measures directed against, property of nationals of the United States, . . .

This Section and Section 503(a) of the Act, *supra*, both refer to losses from the taking of property. The record is clear that claimant has sustained these losses for machinery and equipment ordered but not delivered to its Cuban locations and for the treatment of its employees by the Cuban Government. The basis, however, of these two parts of the claim is not for property taken by the Government of Cuba but for losses resulting indirectly from other actions of the Government. The Commission, therefore, finds that these losses are not within the purview of Title V of the Act. Accordingly these portions of the claim are denied.

The Commission consequently finds that the value of the nationalized assets of CUBAN ELECTRIC COMPANY on August 6, 1960 were:

| | |
|---|---:|
| Plant | $285,266,482.00 |
| Intangibles | 1,492,130.95 |
| Current Assets | 30,244,140.00 |
| Deferred Debits | 2,364,413.00 |
| Total | $319,367,165.95 |

### 6. DEDUCTIONS

The record shows that claimant was indebted to the Cuban Government and its agencies for taxes in the amount of $2,865,397.00 and for liabilities under the Labor Laws for Employees Sickness Fund in the amount of $322,142.00. According to the balance sheets, claimant was also indebted to the Financiera Nacional de Cuba in the amount of $37,920,000.00.

The Commission has held in the *Claim of Phoenix Insurance Company*, Claim No. CU–1913, that Financiera Nacional de Cuba was a semi-public entity controlled by the National Bank of Cuba, an agency of the Government of Cuba. Inasmuch as the debt to the Financiera Nacional de Cuba is actually a debt to the Government of Cuba, claimant's liability for taxes and the above-mentioned debt in the total amount of $41,107,539.00 must be decided under the theory of set-off. (See *Claim of Simmons Company*. Claim No. CU–2303.)

The Commission has previously certified a loss in the amount of $11,745,-959.55 to the Boise Cascade Corporation, formerly Ebasco Industries, Claim No. CU–3548, for the loss of certain bonds secured by mortgages on properties of the CUBAN ELECTRIC COMPANY in Cuba. Consequently, $11,745,-959.55 must also be deducted from the asserted loss claimed herein.

Accordingly, the Commission finds that the losses sustained by CUBAN ELECTRIC COMPANY as a result of the nationalization of its assets by the Government of Cuba on August 6, 1960 amounted to $266,513,667.40.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant claim it is so ordered.

CERTIFICATION OF LOSS

The Commission certifies that CUBAN ELECTRIC COMPANY sustained a loss as a result of actions by the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Sixty-six Million Five Hundred Thirteen Thousand Six Hundred Seventy-seven Dollars and Forty Cents ($266,513,667.40) with interest at 6% per annum from August 6, 1960 to the date of settlement. Dated at Washington D.C., October 21, 1969

## IN THE MATTER OF THE CLAIM OF FREDERICK SNARE CORPORATION, ET AL.

Claim No. CU–2035—Decision No. CU–3602

*Losses based on improvements to leaseholds taken by Cuba, which leaseholds enhanced the value of the business operations in Cuba, are within the purview of Title V of the Act.*

### PROPOSED DECISION*

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $1,972,487.26, was presented by FREDERICK SNARE CORORATION, based upon asserted losses in connection with its branch office in Havana, Cuba and two wholly-owned subsidiaries, FREDERICK SNARE OVERSEAS CORPORATION and Constructora Snare, S.A.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commision is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the

---

* This decision was entered as the Commission's Final Decision on May 14, 1969.

United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that FREDERICK SNARE CORPORATION, hereafter referred to as the parent, was organized under the laws of New York, and owned all of the outstanding capital stock of FREDERICK SNARE OVERSEAS CORPORATION, hereafter referred to as OVERSEAS, which was organized under the laws of Delaware, as well as all of the outstanding capital stock of Constructora Snare, S.A., hereafter referred to as the Cuban subsidiary, which was organized under the laws of Cuba. An authorized officer of the parent has certified that more than 50% of the parent's outstanding capital stock was owned by nationals of the United States at all pertinent times, and that as of August 10, 1967, 1.63% of the parent's outstanding capital stock was owned by nonnationals of the United States. The Commission holds that the parent and OVERSEAS are nationals of the United States within the meaning of Section 502(1)(B) of the Act.

Section 505(a) of the Act provides, *inter alia*, that a claim under Section 503(a) of the Act based upon an ownership interest in a corporation which is a national of the United States shall not be considered. Since the parent's claim is based in part upon its 100% ownership interest in OVERSEAS, a national of the United States, that part of its claim is denied. (See *Claim of Mary F. Sonnenberg*, Claim No. CU-0014, 25 FCSC Semiann. Rep. 48 (July-Dec. 1966).) OVERSEAS, however, has been added as party claimant with respect to that part of the original claim.

The Commission finds on the basis of the evidence of record that the parent owned a branch office and a Cuban subsidiary; that OVERSEAS owned a branch office in Cuba; and that claimants owned at said branches and Cuban subsidiary various items of personal property, discussed in detail below, which were used in construction work in Cuba.

The record shows and the Commission finds that the branch offices of the parent and OVERSEAS, as well as the Cuban subsidiary owned by the parent, were all intervened on October 7, 1960 by Resolution 21632 of the Cuban Ministry of Labor, issued pursuant to Law 647 of November 24, 1959. The Commission, therefore, concludes that the parent and OVERSEAS sustained losses of property on October 7, 1960, except as noted below, within the meaning of Title V of the Act.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". The Commission has concluded that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider; i.e., fair market value, book value, going concern value, or cost of replacement.

The evidence includes copies of the general ledger trial balance sheets for the branch office of the parent as of August 31, 1960, for the branch office

of OVERSEAS as of May 31, 1960, and a copy of the trial balance sheet of the Cuban subsidiary as of December 31, 1959, which were the latest statements received by the parent from Cuba; balance sheets as of December 31, 1960 and supporting schedules for the parents and OVERSEAS, showing *inter alia*, their respective properties in Cuba, including the Cuban subsidiary; copies of invoices, evidencing the purchase of some of the machinery and equipment involved in the parent's claim; statements from employees and officials showing the dates of acquisition of some of the other items of machinery and equipment for which claim was made; copies of pertinent parts of the parent's consolidated Federal tax return for 1960; copies of extracts from the parent's books and records relating to this claim; as well as detailed appraisals for all of the machinery and equipment maintained at the two branch offices and the Cuban subsidiary, supported by detailed schedules and current invoices showing replacement costs for new machinery and equipment. The appraisals, prepared by an expert who had personal knowledge of the facts on the basis of his position as Manager of the parent's operations in Cuba, indicate that appropriate reductions were made for depreciation to arrive at values on the date of loss.

On the basis of the foregoing, claimants have computed their claim as follows as of October 7, 1960 (it is noted that the Cuban peso was on a par with the United States dollar) :

### CONSTRUCTORA SNARE, S.A. (CUBAN SUBSIDIARY)

*Assets*

| | | |
|---|---:|---:|
| One 180′ Steel Boom | $ | 250.00 |
| One 40′ Steel A-Frame | | 500.00 |
| One 3 Drum Hoist | | 500.00 |
| One 2 Drum Hoist | | 250.00 |
| One 70 H.P. Boiler | | 250.00 |
| One 4″ Duplex Pump | | 250.00 |
| One 1″ Duplex Pump Boiler Feed | | 50.00 |
| Launch "Amelia" | | 2,000.00 |
| Boat Queen Mary | | 260.00 |
| Derrick Boat F.S.C. #41 | | 40,000.00 |
| Total | $ | 44,322.00 |

### PARENT'S BRANCH OFFICE

*Assets*

| | |
|---|---:|
| Cash in Banks | $ 286,359.43 |
| Petty Cash Fund | 1,000.00 |
| Accounts Receivable | 208,023.46 |
| Deposits | 2,810.39 |
| Securities | 87,360.00 |
| Prepaid and Deferred Charges | 3,327.27 |
| Improvements to leaseholds | 14,232.49 |
| Construction equipment | 1,071,486.00 |
| Furniture & Fixtures | 47,048.22 |
| Materials | 13,613.71 |
| Steel Sheet Piling | 4,508.00 |
| Total Assets | $1,739,768.97 |

FOREIGN CLAIMS SETTLEMENT COMMISSION

*Liabilities*

| | | |
|---|---|---:|
| Accounts Payable | $ | 2,631.96 |
| Compulsory Vacations Payable | | 9,388.79 |
| Unclaimed Wages | | 2,205.99 |
| Income Taxes Payable—Withheld from Employees | | 2,059.04 |
| Taxes Payable—Withheld from Subcontractors | | 1,311.42 |
| Social Benefits Taxes Payable | | 584.13 |
| Total Liabilities | $ | 18,181.33 |
| Net Worth | | $1,721,587.64 |

Consequently, the parent's claim is in the aggregate amount of $1,765,909.64.

## OVERSEAS BRANCH OFFICE

*Assets*

| | | |
|---|---:|---:|
| Cash in Banks | $128,778.02 | |
| Accounts Receivable | 78,865.35 | |
| Organization Expenses | 1,307.97 | |
| Total Assets | | $208,951.34 |

*Liabilities*

| | | |
|---|---:|---:|
| Accounts Payable | 265.52 | |
| Compulsory Vacations Payable | 709.92 | |
| Unclaimed Wages | 1,398.28 | |
| Total Liabilities | | 2,373.72 |
| Net Worth | | $206,507.62 |

The foregoing amount, $206,507.62, therefore, represents the amount claimed by OVERSEAS.

Upon careful consideration of the entire record, the Commission finds that the valuation most appropriate to the machinery and equipment and equitable to the claimant is that shown in the expert appraisals with certain adjustments discussed below in detail together with the valuations for the other items in this claim.

It is noted that apart from the Cuban subsidiary, the parent and OVERSEAS merely carried on their construction business through branch offices. Thus with respect to these two branch offices, we are not dealing with the nationalization of Cuban corporations, in which case all liabilities thereof would have to be considered. Accordingly, the Commission consistently has not reduced the value of a corporate claimant's branch in Cuba by any liabilities in its determinations under Title V of the Act, except for taxes owing to the Republic of Cuba which the Commission concluded was appropriate on the theory of set-off. (See *Claim of Simmons Company*, Claim No. CU–2303.)

For the foregoing reasons, the Commission finds no valid ground for reducing the values of the assets of either of the branch offices by any liabilities except for taxes payable to Cuba. On the other hand, the value or net worth of the Cuban subsidiary must include consideration of all its liabilities on the date of loss, because it was a Cuban corporation.

### VALUATION OF THE CUBAN SUBSIDIARY

A copy of the Cuban subsidiary's balance sheet as of December 31, 1959 was included in a statement of August 17, 1967 by an authorized officer of the

parent, who stated in his letter of August 9, 1968 that it was the latest state-ment received from Cuba. That balance sheet shows the following:

### Assets

| | | |
|---|---:|---:|
| Construction Equipment | $19,195.52 | |
| Less depreciation | 5,017.82 | |
| Net Construction Equipment | | $14,177.70 |
| FREDERICK SNARE CORPORATION (Account Receivable) | | 12,495.17 |
| Deferred Charges | | 7.38 |
| Total Assets | | $26,680.25 |

### Liabilities and Capital

| | |
|---|---:|
| Dividend Tax Payable | $    346.33 |
| Capital Stock—Common | 25,000.00 |
| Surplus | 1,333.92 |
| | $26,680.25 |

As stated above, the Commission found that the appraisals of the machinery and equipment best reflected the values thereof on the date of loss. It is noted that the parent has eliminated from the assets of the Cuban subsidiary the account receivable which it owed its Cuban subsidiary in the amount of $12,495.17. It has also excluded deferred charges (prepaid expenses) in the amount of $7.38, apparently because it was deemed to have been used up as of the date of loss which was more than 9 months later than the date of the balance sheet. The Commission finds the elimination of the debt the parent owed its Cuban subsidiary a proper deduction and agrees that the deferred charges in the negligible amount of $7.38 should likewise be eliminated. On the other hand, however, the Commission finds that the Cuban subsidiary's liability in the amount of $346.33, for taxes payable to Cuba, the only liability of the Cuban subsidiary, should be deducted in the absence of evidence that it was paid to Cuba. (See *Simmons* claim, *supra*.)

Accordingly, the Commission finds that the value or net worth of the Cuban subsidiary on the date of loss was as follows:

| | |
|---|---:|
| *Assets* | |
| Construction Equipment (appraised value) | $44,322.00 |
| *Liabilities* | |
| Dividend Tax Payable | 346.33 |
| Net Worth | $43,975.67 |

### VALUATION OF THE PARENT'S BRANCH OFFICE

The evidence establishes that the asset, Cash in Banks, was shown in the bank statements of August 31, 1960 as $301,509.25. The parent's records, however, disclose transactions and adjustments between September 1, 1960 and October 6, 1960, so that the cash in the bank as of October 7, 1960 was reduced to $286,359.43. The Commission, therefore, finds that on October 7, 1960, the date of loss, the balance of the bank deposits in favor of the branch was $286,359.43.

The Commission finds that on October 7, 1960, the date of loss, the

amount of cash on hand at the branch office was $1,000.00, as evidenced by the record.

With respect to the schedule of accounts receivable of the branch office in the amount of $208,023.46, the record shows that some of the debtors were American nationals. Pursuant to Section 505 (a) of the Act, debts due from American concerns may not be allowed unless they constituted charges on property nationalized, expropriated, intervened, or taken by the Government of Cuba. (See *Claim of Anaconda American Brass Company*, Claim No. CU–0112, 1967 FCSC Ann. 60.) The Commission finds, in the absence of evidence to the contrary, that the following debts due the branch office from American concerns or the United States Government were not charges upon property within the meaning of Section 505 (a) of the Act and, accordingly, must be deducted in determining the amount of the branch's accounts receivable on October 7, 1960:

| | |
|---|---:|
| Compania Cubana de Electricidad (Cuban Electric Company) | $ 8,961.67 |
| DuPont Interamerica Chemical Co. | 1,120.71 |
| Freeport Sulphur Co. | 3,952.86 |
| General Services Administration (United States Government) | 896.80 |
| University of Chicago | 2,133.26 |
| Merritt-Chapman & Scott Co. | 474.09 |
| Total debts for Americans | $17,539.39 |

The Commission, therefore, finds that on October 7, 1960, the date of loss, the aggregate amount of accounts receivable owned by the branch, which constituted a loss within the meaning of Title V of the Act was $190,484.07.

With respect to the schedule of deposits of the branch office, the Commission finds that the amount of $60.00 constituted an unsecured debt of the Cuban Electric Company, which must be deducted for the reasons stated in connection with the accounts receivable. (See *Anaconda* claim, *supra*.) Accordingly, the Commission finds that on October 7, 1960, the branch office owned deposits in the amount of $2,750.39.

On the basis of the evidence of record, the Commission finds that on October 7, 1960, the date of loss, the aggregate values of the branch office's deferred charges, furniture and fixtures, materials, and steel sheet piling were the amounts of $3,327.27, $47,048.22, $13,613.71, and $4,508.00, respectively.

The Commission finds that the item Improvements to Leaseholds, constituted investments which enhanced the value of the branch's business in Cuba. Accordingly, the Commision finds that on October 7, 1960, the value of the improvements to leaseholds was $14,232.49.

As stated above, the Commission has found that the value of the construction equipment at the branch office should be measured by the expert appraisals. The Commission, therefore, finds that the aggregate value of such construction equipment on October 7, 1960 was $1,071,486.00.

The only remaining asset of the branch office was securities for which the amount of $87,360.00 is being claimed. The record shows that these securities included $25,900.00 for 5% First Mortgage Bonds of the Cuban Electric Company, due 1980; $2,500.00 for 5% First Mortgage Bonds of the Cuban Electric Company, due 1987; $1,960.00 for 5% Republic of Cuba Internal Debt Bonds of 1905, for which the face amount was $2,000.00; $50,000.00 for 4½% Cuban Government Bonds of the Tunnel of Havana, due 1980; $5,000.00 for 50 shares of stock of Financiera Nacional de Cuba with a face value of

$100.00 for each share; $1,000.00 for a bond of the issue known as 4% Republic of Cuba Veterans, Courts and Public Works Bonds, 1953–1958; and $1,000.00 for the par value of one share of stock of Compania Inmobiliaria La Torre, a Cuban corporation.

This is the first claim involving 5% Mortgage Bonds of the Cuban Electric Company. The Commission notes that other calims have been filed by other holders of such bonds; thus this decision may, where applicable, serve as a precedent in the determination of those other claims.

Upon consideration of the entire record and in the absence of evidence to the contrary, the Commission finds that on October 7, 1960, the date of loss, the aggregate value of the 5% Mortgage Bonds of the Cuban Electric Company was $28,400.00, the face amount of the bonds.

With respect to the Republic of Cuba 5% Internal Debt Bonds of 1905, and the 4½% Cuban Government Bonds of the Tunnel of Havana, the Commission finds, in the absence of evidence to the contrary, that on October 7, 1960, the Government of Cuba was indebted to the parent's branch in the amounts of $2,000.00 and $50,000.00, respectively.

The Commission has found that Financiera Nacional de Cuba was a semi-public entity, controlled by the National Bank of Cuba, an agency of the Government of Cuba; and that Cuba had guaranteed the investment of stockholders of this entity. The Commission further found that pursuant to Law 865 of August 17, 1960, Financiera Nacional de Cuba was liquidated; that all of its liabilities were assumed by the Government of Cuba; and that a claim for such loss arose on August 17, 1960, the date of liquidation, within the meaning of Title V of the Act. (See *Claim of Phoenix Insurance Company*, Claim No. CU–1913.) The Commission finds that on August 17, 1960, the amount of the unpaid indebtedness of the Government of Cuba with respect to the said 50 shares of stock of Financiera Nacional de Cuba was $5,000.00.

The Commission has found, with respect to the $1,000.00 bond of the issue known as 4% Republic of Cuba Veterans, Courts and Public Works Bonds, 1953–1983, that the Government of Cuba first defaulted on the payment of interest on May 1, 1961, Cuba having paid the interest due as of November 1, 1960. (See *Claim of Westchester Fire Insurance Company*, Claim No. CU–1703.) Consequently, the Commission finds that on October 7, 1960, the date of loss, the Government of Cuba was indebted to the parent's branch in the amount of $1,000.00.

It has been noticed above that since this was a branch office and not a legal entity in Cuba, no deductions would be made for any of the branch's liabilities except for taxes due to Government of Cuba. The records of the parent disclose that as of October 7, 1960, the branch was indebted to Cuba for taxes in the aggregate amount of $3,954.59. Accordingly, the Commission concludes that the losses sustained at the branch office should be reduced to that extent.

The losses sustained by the parent may be summarized as follows:

| Item | Date of loss | Amount |
|------|-------------|--------|
| Subsidiary | October 7, 1960 | $ 43,975.67 |
| Branch Office: | | |
| Cash in banks | October 7, 1960 | 286,359.43 |
| Cash on hand | October 7, 1960 | 1,000.00 |
| Accounts receivable | October 7, 1960 | 190,484.07 |

| Item | Date of loss | Amount |
|------|-------------|--------|
| Deposits | October 7, 1960 | 2,750.39 |
| Deferred charges | October 7, 1960 | 3,327.27 |
| Furniture and fixtures | October 7, 1960 | 47,048.22 |
| Materials | October 7, 1960 | 13,613.71 |
| Steel sheet piling | October 7, 1960 | 4,508.00 |
| Improvements to leaseholds | October 7, 1960 | 14,232.49 |
| Construction equipment | October 7, 1960 | 1,071,486.00 |
| Mortgage bonds of Cuban Electric Company | October 7, 1970 | 28,400.00 |
| Cuban Government 5% Internal Debt Bonds of 1905 | October 7, 1960 | 2,000.00 |
| Cuban Government 4½% Bonds of the Tunnel of Havana | October 7, 1960 | 50,000.00 |
| Financiera Nacional de Cuba | August 17, 1960 | 5,000.00 |
| Cuban Government 4% Veterans, Courts and Public Works Bonds, 1953–1983 | October 7, 1960 | 1,000.00 |
| One share of stock of Compania Inmobiliaria La Torre | October 7, 1960 | 1,000.00 |
| Total losses of parent | | $1,766,185.25 |
| Less taxes payable to Cuba | | 3,954.59 |
| Net loss of the parent | | $1,762,230.66 |

### VALUATION OF OVERSEAS' BRANCH OFFICE

The evidence establishes that the asset, Cash in Banks, was shown in the bank statements of May 31, 1960 as $153,538.07. The records of OVERSEAS, however, disclose transactions and adjustments between June 1, 1960 and October 7, 1960, so that the cash in the bank as of October 7, 1960 was $128,778.02. The Commission, therefore, finds that on October 7, 1960, the date of loss, the balance of the bank deposits in favor of the branch was $128,778.02.

The record shows that all of the accounts receivable of the branch office of OVERSEAS were due from Moa Bay Mining Company, a national of the United States within the meaning of Section 502(1)(B) of the Act, as stated by an authorized officer of the parent in an affidavit, dated August 9, 1968. It does not appear from the evidence of record that this debt was a charge on property taken by Cuba within the meaning of Section 505(a) of the Act. For the reasons stated with respect to the accounts receivable and deposits of the parent's branch office, this portion of the claim in the amount of $78,865.35 must be and hereby is denied. (See *Anaconda* claim, *supra*.)

The Commission finds that the item, Organization Expenses, constituted investments which enhanced the branch's business in Cuba. Accordingly, the Commission finds that on October 7, 1960, the date of loss, this item was an asset, having a value of $1,307.97.

Inasmuch as it does not appear from the evidence of record that the branch office owed any debt to Cuba, no deductions are being made for the liabilities of the branch, as in the case of the parent's branch office.

The Commission, therefore, finds that the value of the branch office of OVERSEAS on October 7, 1960, the date of loss, was $130,085.99.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949 as amended, interest should be included at the rate of 6% per annum from the respective dates of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered as follows:

### FREDERICK SNARE CORPORATION

| From | | On |
|---|---|---|
| August 17, 1960 | $ | 5,000.00 |
| October 7, 1960 | | 1,757,230.66 |
| | Total | $1,762,230.66 |

### FREDERICK SNARE OVERSEAS CORPORATION

| From | | On |
|---|---|---|
| October 7, 1960 | $ | 130,085.99 |

#### CERTIFICATION OF LOSS

The Commission certifies that FREDERICK SNARE CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claim Settlement Act of 1949, as amended, in the amount of One Million Seven Hundred Sixty-Two Thousand Two Hundred Thirty Dollars and Sixty-six Cents ($1,762,230.66) with interest at 6% per annum from the respective dates of loss to the date of settlement; and,

The Commission certifies that FREDERICK SNARE OVERSEAS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Thirty Thousand Eighty-five Dollars and Ninety-nine Cents ($130,085.99) with interest at 6% per annum from October 7, 1960 to the date of settlement.

Dated at Washington, D.C. Apr. 16, 1969

### IN THE MATTER OF THE CLAIM OF FORD MOTOR COMPANY

Claim No. CU–3072—Decision No. CU–4015

*Claims based on contingent losses which were not actually sustained are outside the purview of Title V of the Act.*

#### PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $2,138,024.42, was presented by FORD MOTOR COMPANY, based upon the asserted loss of a stock interest in Creditos y Descuentos Mercantiles, S.A., a Cuban corporation, unrealized profits, loss of personal property and a contingent loss under guarantees extended to banks in connection with loans made by such banks to the Cuban corporation mentioned.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat.

1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest, including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has bene nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

An officer of the claimant corporation has certified that the claimant was organized in the State of Delaware. The record shows that at all times pertinent to this claim, more than 50% of the outstanding capital stock of the claimant has been owned by United States nationals.

Claimant states that 1 (one) percent of its stockholder interest is presumed to be owned by non-nationals of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

### STOCK OF INTEREST IN CREDESCO

The evidence establishes and the Commission finds that claimant, the FORD MOTOR COMPANY, owned a 100% stock interest in Creditos y Descuentos Mercantiles, S.A., hereafter referred to as CREDESCO, a corporation organized under the laws of Cuba.

On October 24, 1960 the Government of Cuba published in its Official Gazette Resolution 3 (pursuant to Law 851), which listed CREDESCO as nationalized, and the Commission finds that it was nationalized on that date within the meaning of Title V of the Act.

Since CREDESCO was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder owning an interest in such a corporation may file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights,

or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant'. This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The record includes copies of a balance sheet and profit and loss statement for CREDESCO as of August 31, 1960, detailed schedules for the individual items included in such financial statements, and a copy of an insurance policy under which CREDESCO's office furniture and equipment was insured on September 3, 1959.

Upon consideration of the entire record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is that shown in the balance sheet of August 31, 1960, which reflects the following, the peso being on a par with the United States dollar:

### ASSETS

| | | |
|---|---:|---:|
| Cash | | $ 13,281.41 |
| Notes Receivable | | 2,378,088.06 |
| Accounts Receivable: | | |
| Wholesale Interest and Insurance Charges | $177,643.49 | |
| Other Dealer Receivable | 70,699.90 | |
| Other Sundry | (3,616.43) | |
| Branches and Affiliated Companies | 47,287.70 | |
| Total Accounts Receivable | $292,014.66 | |
| Less: Reserve for Doubtful Notes and Accounts | 228,600.03 | |
| Net Accounts Receivable | | 63,414.63 |
| Inventories: | | |
| Company Cars Less Reserve for Depreciation | | 22,325.13 |
| Prepaid Expenses | | 1,686.86 |
| Total Current Assets | | $2,478.796.09 |
| Investments: Banco National de Cuba | | 12,500.00 |
| Real Estate, Plant and Equipment | $ 29,628.88 | |
| Less Reserves for Depreciation | 15,406.81 | |
| Net Fixed Assets | | 14,222.07 |
| Total Assets | | $2,505,518.16 |

### LIABILITIES

| | | |
|---|---:|---:|
| Bank Liabilities | | 1,850,000.00 |
| Total Accounts Payable | | 233,254.50 |
| Accrued Liabilities: | | |
| Vacations and Holidays | 10,214.19 | |
| Sundry | 600.00 | |
| Deferred Income, Unearned Charges (Retail) | 195,115,35 | |
| | | 205,929.54 |
| Total Current Liabilities | | $2,289,184.04 |

Capital:

| | | |
|---|---:|---:|
| Capital Stock | $250,000.00 | |
| Earnings Retained | 15,621.36 | |
| Loss, Current Year | (49,287.24) | |
| Total Capital | | 216,334.12 |
| Total Liabilities and Capital | | $2,505,518.16 |

The balance sheet of August 31, 1960 indicates that the net worth of CREDESCO or the excess of its assets over its liabilities on such date was $216,334.12.

The CREDESCO balance sheet of August 31, 1960, however, also reflects that one of the assets was an account receivable due from claimant (Ford International Division) in the amount of $47,287.70. Since such unpaid debt does not represent a loss for the claimant, the Commission finds that the amount of the debt or $47,287.70 should be deducted from the net worth of CREDESCO, resulting in an adjusted net worth of $169,046.42. Accordingly, the Commission finds that on October 24, 1960 claimant sustained a loss within the meaning of Title V of the Act in connection with its ownership of CREDESCO in the amount of $169,046.42.

## Loss of Profit

A portion of the claim is based upon estimated lost profit of CREDESCO for the period from January 1, 1959 to September 30, 1960. The amount of $39,274.58 claimed for lost profit was calculated upon the average profits assertedly realized by CREDESCO for the calendar years of 1956, 1957 and 1958.

The authority of the Commission in these cases is limited by Section 503(a) Title V to claims which arose after January 1, 1959, "resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property . . . by the Government of Cuba".

A claim for the loss of profits under the statute therefore must be supported by evidence which brings it within the above-quoted provision. The nationalization of CREDESCO on October 24, 1960, in and of itself is not proof of loss of profits for the period prior to the date of nationalization. No other evidence to support a finding that the loss of profits was caused by any action by the Government of Cuba within the purview of the statute was submitted.

The claim for loss of profits may be construed as a claim for the going-concern value of the corporation CREDESCO. However, CREDESCO was mainly a finance corporation closely affiliated with the financing of the sale of claimant's products only. For that reason it does not appear that CREDESCO had an independent going-concern value distinct and separate from the claimant's sales operation in Cuba. In view of the foregoing, the portion of the claim which is based upon the loss of profits must be and is hereby denied.

## Contingent Loss Under Guarantee

It is stated by claimant that it guaranteed the repayment of loans granted to CREDESCO in the total amount of 1,775,000 pesos by six financial institutions, which were The First National City Bank of New York; Banco Gelats (Havana); First National Bank of Boston; The Chase Manhattan Bank; The Royal Bank of Canada; and the Bank of Nova Scotia. A portion

of the claim, entitled "provisional claim", is based upon such guarantee and is predicated upon the assumption that in the event payment should be made by claimant under the guarantee, CREDESCO would become indebted to claimant. Claimant explicitly denies liability for any obligation under the guarantee in question and states that it has, as yet, sustained no loss.

Section 501 of Title V of the Act makes it clear that the purpose of that title is to provide for the determination of amount and validity of claims which "have arisen since January 1, 1959." The Act does not provide for the determination of contingent losses or losses which were not sustained by the claimant. Moreover, in view of the nine years which elapsed since the taking of CREDESCO by the Government of Cuba, it appears that any action under the guarantee would be barred by the statute of limitations. In view of the foregoing, the portion of the claim which is based upon a contingent loss in the amount of $1,775,000.00 must be and it is, hereby denied.

### OTHER PERSONAL PROPERTY OWNED BY CLAIMANT

A contemporary memorandum and other official statements of claimant show, and the Commission finds that claimant (specifically, its Ford International Overseas Distributors and Export Supply Operations) owned machinery and office equipment and a 1959 Edsel passenger car. The Commission also find that such personal property was taken by the Government of Cuba on October 24, 1960 in connection with the nationalization of claimant's wholly owned subsidiary, CREDESCO. Accordingly, the Commission finds that claimant sustained an additional loss in this respect within the meaning of Title V of the Act in the aggregate amount of $4,897.00.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case, it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that the FORD MOTOR COMPANY sustained a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Seventy-three Thousand Nine Hundred Forty-three Dollars and Forty-two Cents ($173,943.42) with interest thereon at 6% per annum from October 24, 1960 to the date of settlement.
Dated at Washington, D.C., Oct. 8, 1969.

### FINAL DECISION

Under date of October 8, 1969, the Commission issued its Proposed Decision certifying a loss in favor of claimant in the amount of $173,943.42, representing $169,046.42 for a wholly owned Cuban subsidiary called Credesco, and $4,897.00 for other personal property. Portion of the claim based upon the asserted loss of profit and a contingent loss were denied because the record did not establish that the asserted losses were within the purview of the Act. Claimant objected only to the denial of the claim for loss of profit, and submitted a memorandum in support of the objections.

Claimant contends that during the period January 1, 1959 when Castro came into power to September 30, 1960 Cuba's nationalization policies caused

economic hardships to Credesco's customers thereby resulting in a loss of profit to Credesco. The asserted amount of loss is $39,274.58, computed on the basis of Credesco's average net earnings for the calendar years 1956, 1957 and 1958. It is stated that the loss in this respect is evidenced by a sharp decline in Credesco's net worth after January 1, 1959, and losses from operations.

Upon consideration of claimants objections in light of the entire record, the Commission is constrained to reject claimant's contentions. While it may be that Cuba's actions adversely affected Credesco and its customers, they also affected other persons and concerns in Cuba.

The Commission finds that claimant's losses, if any, in this respect were the indirect result of Cuba's actions directly affecting other persons and concerns. The Commission has consistently held that claims for indirect or incidental losses are not within the purview of Title V of the Act. (See *Claim of Cuban Electric Company,* Claim No. CU–2578; and *Claims of Texaco Incorporated, et al;* Claim Nos. CU–1331, CU–1332 and CU–1333.)

Accordingly, the Commission finds no valid basis for altering the decision previously entered. Therefore the Proposed Decision of October 8, 1969 is affirmed in all respects.

Dated at Washington, D.C., Sep. 8, 1971

## IN THE MATTER OF THE CLAIM OF ROBERT L. CHEANEY, ET AL.

### Claim No. CU–0915—Decision No. CU–4120

*In accordance with the rule of the situs governing title to property, the Community Property Laws of Cuba were given effect under Title V of the Act.*

#### PROPOSED DECISION*

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented by ROBERT L. CHEANEY, for $232,467.33, based upon personal property, an interest in a business, experimental seed samples, a debt owed by a nationalized Cuban enterprise and cash. Subsequently, MARJORIE L. CHEANEY petitioned to join as a co-claimant. This matter having been considered, it is so ordered, and MARJORIE L. CHEANEY is joined as claimant herein. Claimants have been nationals of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

---

* This decision was entered as the Commission's Final Decision on November 21, 1969.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

### PERSONAL PROPERTY

Claimants state that they lost personal property consisting of household furnishings and appliances, clothes, fishing equipment, photographic equipment, tools and equipment, records, books and toys. In support of this item claimants submitted itemized lists and indicated that the items were purchased in 1953 and 1954 with the exception of the dining room table and chairs which were purchased in 1958 and an RCA record player which was purchased in 1959. In addition claimants also submitted receipts and bill of lading check lists from the Bekins Van Lines dated June 7, 1956.

According to the Community Property Law of Cuba, those properties which belong in equal parts to both spouses include (1) those acquired by one or both spouses during the marriage with money of the marriage partnership; (2) property acquired by the industry, salary or work of either or both spouses, and (3) the fruits, income or interests received or accrued during the marriage from the common or private properties of the spouses or spouse.

Based upon the entire record, the Commission finds that the claimants owned the above-mentioned personal property, in equal parts.

Law 989, published in the Official Gazette on December 6, 1961, by its terms nationalized by confiscation all goods and chattels, rights, shares, stocks, bonds and other securities of persons who left the country of Cuba. Accordingly, this law applies to these claimants, who had left Cuba prior to that date; and the Commission finds that this property was taken by the Government of Cuba on December 6, 1961, pursuant to Law 989.

In arriving at the value of the personal property consideration was given to claimants' itemization and approximate dates of purchase. Each item was depreciated 5% for each year from the approximate dates of purchase with the exception of the books which principally were technical in nature. The Commission finds that at the time of loss the aggregate value of the personal property amounted to $7,542.00 and that claimants suffered a loss in that amount within the meaning of Title V of the Act, as the result of the taking of the personal property by the Government of Cuba as of December 6, 1961.

### BUSINESS

Claimants also state that they lost a one-half partnership interest in a rice farming operation in Mayajigua, Las Villas, Cuba, which partnership claimant, ROBERT L. CHEANEY, and Rafael Capo Lemus entered into in 1959. Claimant, ROBERT L. CHEANEY, asserts that he financed 75% of the venture but that Rafael Capo Lemus was in charge of the operation since claimant was fully employed by the enterprise Agricola Cayamas. Claimants further states the partners went to considerable expense to level the land, build canals and install pumps and motors; and that in 1960 rice was planted

on 165 acres, which acreage was leased by the partners on a basis of 10% of the production. Claimants state that the business was nationalized on or about January 15, 1961.

Based upon the entire record the Commission finds that the claimants jointly owned a one-half interest in this rice farming operation in Mayajigua, Las Villas which, in the absence of evidence to the contrary, is found to have been nationalized on January 15, 1961.

In arriving at the value of the machinery and equipment purchased by the partnership for use in the rice farming operation, consideration was given to an itemized list submitted by the claimants. Each item was depreciated 5% for each year from the date of purchase with the exception of the 1954 Chevrolet sedan which was depreciated in accordance with the National Automobile Dealers Used Car Guide. The Commission finds that at the time of loss the value of the machinery and equipment including the 1954 Chevrolet sedan was $15,883.66, one-half of which belongs to claimants.

The claimants assert that there were 165 acres of rice that were planted and ready for harvesting at the time of loss on January 15, 1961. In arriving at the value of the rice harvest, consideration was given to the joint affidavit of owners and stockholders of the enterprise Agricola Cayamas wherein they state that the normal production of such farm as Mayajigua, Las Villas, was approximately 3,000 pounds per acre and the wholesale market value of seed rice in Cuba was from $10.00 to $14.00 per 100 pounds depending upon certain factors. The Commission finds, based upon such evidence, that the value of the rice to be harvested was $59,400.00. This value was arrived at by taking the total rice harvest for 165 acres which is 495,000 pounds or 4,950 bags of 100 pounds each and multiplying the number of bags by $12.00 (the average between $10.00 and $14.00 as stated above by the owners and stockholders of Agricola Cayamas, S.A.). Ten percent of the $59,400.00 is deducted for the use of the land or $5,940.00 and another ten percent is deducted for the estimated cost of harvesting, leaving a balance of $47,520.00, one-half of which belongs to claimants. The Commission therefore finds that claimants suffered a loss in the amount of $31,701.83 (which includes their interest in the machinery and equipment and the rice) within the meaning of Title V of the Act, as the result of the taking of the machinery, equipment, and rice by the Government of Cuba as of January 15, 1961.

### EXPERIMENTAL RICE SAMPLES

Claimant, ROBERT L. CHEANEY, contends that he lost three sets of experimental rice samples, representative of his time, effort, and expertise in the value of $150,000.00. In support of this item claimant submitted his own statement dated August 25, 1967, a joint affidavit from owners and stockholders of Agricola Cayamas, S.A. dated September 15, 1967, and a formula for arriving at the amount of loss. Claimant states that he was an expert in the maintenance of seed quality rice and in the development of new seed stocks through selective processes. This is substantiated by the statement of G. M. Watkins, Program Director, Dominican Republic Program, of the Texas A & M University System and the joint affidavit of stockholders and owners of Agricola Cayamas, S.A., a Cuban enterprise which operated a large rice farm at Cayamas, Oriente, Cuba. The evidence is that Agricola Cayamas, S.A. had hired claimant, ROBERT L. CHEANEY, in 1957, at a salary of $24,000.00 per year plus a 15% interest in any profits from seed sales to outside growers. It further appears that he had personally developed for the company

strains of rice of established great marketable value which were ideal from a planting, cultivating and harvesting standpoint; and that his duties with Agricola Cayamas, S.A. were to give over-all technical assistance in the whole operation; maintain the seed quality; and develop new seed stocks through selective processes. In 1956 there were two rice diseases prevalent in Cuba called "Hoja Blanca" and "Blast," which were chiefly responsible for heavy losses in production. All Cuban rice varieties were susceptible to these two diseases except one which had considerable resistance to the two-mentioned diseases but which also had many undesirable characteristics. On a trip to Surinam in 1947, the claimant noticed a seed variety known as Paquita which possessed good table quality and produced good field and mill yields. In 1956 a rice breeding program was initiated and crosses were made between the "Alba" and "Paquita" varieties and the Surinam variety "Dima." This material was selected and replanted twice each year. By the end of 1960 several of the many selections were ready to put into a multiplication program prior to making sales to farmers. These selections had not yet been given a name when confiscated. They represented, however, 5 years of intensive work in the development of highly productive types of rice which had resistance to serious diseases, processed good milling and table quality and could be harvested by mechanical harvesters. It is these samples which he developed that the claimant values at $150,000.00.

Based upon the entire record, the Commission finds that Agricola Cayamas, S.A. owned three sets of experimental rice samples developed by ROBERT L. CHEANEY which samples were nationalized on December 6, 1961, pursuant to Law 989. The Commission finds that Mr. CHEANEY did not own said samples personally and that any value of same to him would arise only from his 15% interest in profits made from seed sales to outside growers. No such sales appearing in this record no allowance can be made to him on account of the nationalization of such property. The Commission expressly rejects this claimant's contention that he is entitled to claim a loss of $150,000.00 on projected future sales. His losses, in this regard, if any, would arise out of a breach of this contract of employment and not out of any property right and is not one of the types of losses covered by the Act.

### DEBT

Claimant, ROBERT L. CHEANEY, further states that he was employed by the enterprise Agricola Cayamas at $24,000.00 per annum; that in January 1960 while he was on vacation, Agricola was intervened by the Government of Cuba; and that although the company maintained some control, the Government of Cuba would not continue to pay his salary of $24,000.00 per annum. The company then asked Mr. CHEANEY to continue for one more year at $15,000.00 per annum in the hope that its problems could be worked out. This he did. The claimant though thereafter left Cuba in December 1960 without collecting his December salary. He thus contends he is entitled to the difference in salary from $24,000.00 to $15,000.00 per annum for the year 1960 and for the loss of his salary for the month of December 1960.

With respect to the portion of the claim that is based upon the loss of the difference in salary between $24,000.00 and $15,000.00 for the year 1960, the claimant has submitted no evidence to establish any taking by the Government of Cuba. His acceptance of the reduced salary was a voluntary act on his part and is the opposite of a taking. Accordingly, the Commission denies that portion of the claim.

The record, however, shows, and the Commission finds, that Agricola Cayamas owed claimant $1,250.00 as salary for the month of December 1960 and that Agricola Cayamas was nationalized on April 17, 1961 while owing this sum. The Commission has held that debts of nationalized Cuban enterprises are within the purview of Title V of the Act. (See *Claim of Kramer, Marx, Greenlee and Backus*, Claim No. CU–0105, 25 FCSC Semiann. Rep. 62 [July–Dec. 1966].) The Commission therefore finds that claimant, ROBERT L. CHEANEY, suffered a loss of $1,250.00 for loss of salary within the meaning of Title V of the Act.

### CASH

Claimant, ROBERT L. CHEANEY, states that $305.00 was confiscated from his person at the airport of Camaguey on November 22, 1959 prior to his leaving Cuba on a trip. Although the Cuban Government asserted it would return the money, it did not do so. In support of this claim, the claimant submitted a receipt from the Minister of Texas for the $305.00.

The Commision finds on the basis of the evidence of record that the claimants jointly owned cash that was taken on November 22, 1959, and that the amount taken at the time of loss was $305.00, within the meaning of Title V of the Act.

Claimants' losses may be summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| Personal Property | December  6, 1961 | $ 7,542.00 |
| Business | January 15, 1961 | 31,701.83 |
| Debt owed to claimants | April 17, 1961 | 1,250.00 |
| Cash | November 22, 1959 | 305.00 |
| | Total | $40,798.83 |

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that ROBERT L. CHEANEY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty Thousand Three Hundred Ninety-nine Dollars and Forty-one Cents ($20,399.41) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission cerifies that MARJORIE L. CHEANEY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty Thousand Three Hundred Ninety-nine Dollars and Forty-two Cents ($20,399.42) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., Oct. 21, 1969.

## IN THE MATTER OF THE CLAIM OF THE BROTHERS OF THE ORDER OF HERMITS OF ST. AUGUSTINE (INC.)

Claim No. CU–3503—Decision No. CU–6812

*Nonstock corporation organized in the United States, the members of trustees of which are citizens of the United States, qualify as nationals of the United States within the meaning of Title V of the Act.*

PROPOSED DECISION*

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, is asserted by the BROTHERS OF THE ORDER OF HERMITS OF ST. AUGUSTINE (INC.) in the amended amount of $7,976,728.68 based upon the ownership and loss of real and personal property in Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partialliy, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

An officer of the claimant corporation has certified that the claimant was organized as a non-profit organization under the laws of the State of Pennsylvania for educational, religious and charitable purposes and no shares of stock were issued. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act. (See *Claim of Independence Foundation*, Claim No. CU–2152.)

---

* This decision was entered as the Commission's Final Decision on October 8, 1971.

160         FOREIGN CLAIMS SETTLEMENT COMMISSION

Claim has been asserted for the following losses:

| | | |
|---|---:|---:|
| *University of St. Thomas of Villanueva* | | |
| Land | $2,240,360.00 | |
| Buildings | 1,753,113.17 | |
| Furnishings, equipment et al | 1,110,117.25 | $5,103,590.42 |
| *El Cristo Property* | | |
| El Cristo Church | $ 598,811.25 | |
| Colegio San Agustin | 138,259.68 | |
| Parochial School | 194,577.73 | |
| Dispensary | 8,000.00 | |
| Ricla Street, land & building | 25,000.00 | 964,648.66 |
| *St. Augustine Property* | | |
| Land use | $ 53,680.00 | |
| Monastery & Church | 185,759.60 | |
| Furnishings & Equipment | 142,083.00 | |
| Youth Center | 61,000.00 | 442,522.60 |
| *St. Rita's Property* | | |
| Land | $ 57,375.00 | |
| Buildings | 280,000.00 | |
| Furnishings & Equipment | 158,249.00 | 495,624.00 |
| *St. Helen Property* | | |
| Land | $ 15,000.00 | |
| Buildings | 40,000.00 | |
| Furnishings & Equipment | 15,383.00 | 70,383.00 |
| *San Lorenzo Property* | | |
| Land | $ 200,000.00 | |
| Buildings | 495,000.00 | |
| Furnishings & Equipment | 30,760.00 | 725,760.00 |
| *Santa Monica Property* | | |
| Land | $ 33,500.00 | |
| Buildings | 45,100.00 | |
| Trees | 75,000.00 | |
| Furnishings & Equipment | 20,600.00 | 174,200.00 |
| Total | | $7,976,728.68 |

The Commission finds, on the basis of the record which will be discussed further with the particular properties, that claimant owned directly and indirectly through wholly owned Cuban entities, certain real and personal property in Cuba such as land, churches, university, clinic, school dispensaries and related furnishings and equipment.

The Commission further finds that these properties were intervened by the Government of Cuba on May 3, 1961 (see *Claim of Gustavus Basch*, Claim No. CU–0972). According to the record, all members of the claimant's Order in Cuba were expelled with one exception. That priest was permitted to remain but left in 1968 for reasons of health and has been unable to return. Since May 3, 1961, claimant has had no control or use of any of its Cuban properties. The Commission holds that claimant suffered losses within the meaning of Title V of the Act as a result of the intervention of all of its Cuban properties by the Government of Cuba on May 3, 1961. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

### UNIVERSITY OF ST. THOMAS OF VILLANUEVA

In 1944, claimant purchased land on which to build the University. Construction of buildings was commenced and, in 1946, a Cuban corporation known as the "Society of Brothers of the Order of Hermits of St. Augustine" was established to operate the University. The authorized capital was $100,000.00 consisting of 1,000 shares with a par value of $100.00 per share of which only 10 shares were issued. After the formation of the Cuban corporation, a lease was entered into between claimant and the Cuban subsidiary wherein the subsidiary leased the land and buildings owned by claimant and the tenant was permitted to erect buildings on the leased land. Additional land was subsequently purchased by the Cuban corporation.

The record includes a balance sheet for the Cuban corporation as of July 31, 1960. However, this balance sheet does not appear to be appropriate to the property claimed and is not the basis for values determined herein by the Commission. Other evidence of record consists of appraisals by a real estate broker, an architect and engineer, the former librarian of the University now employed by the Pan American Union in Washington, D.C., a contractor whose firm constructed one of the University's buildings, and affidavits by former University officials as well as photos, deeds, copies of Cuban Government decrees and maps.

On the basis of the appraisals and affidavits, the Commission finds that the values of the properties owned by calimant or its subsidiary and occupied by the University on May 3, 1961 were:

| | |
|---|---|
| Land (112,018 square meters) | $2,240,360.00 |
| Buildings, Chapel | 150,000.00 |
| Hickey | 300,000.00 |
| Library | 210,000.00 |
| Monastery | 250,000.00 |
| Talleres | 237,000.00 |
| Tarafa & Revilla | 591,050.91 |
| Athletic Field | 15,062.26 |
| Furnishings & Equipment | 521,942.71 |
| Library | 161,000.00 |
| Automobiles | 8,474.54 |
| Bank Account | 67,000.00 |
| Book Store | 7,700.00 |
| Cuban bond with interest to May 3, 1961 | 312,000.00 |
| Total | $5,071,590.42 |

Accordingly, the Commission concludes that claimant suffered a loss in the amount of $5,071,590.42 for the taking of the University of St. Thomas of Villanueva.

A loss had been asserted in the amount of $26,000.00 for accounts receivable as shown on the July 31, 1960 balance sheet. However there is no exact record of the accounts receivable and the accounts payable on May 3, 1961. Inasmuch as the accounts payable, including local taxes and deposits due students, on the 1960 balance sheet are approximately equal, the Commission finds that the accounts payable on May 3 1961 would offset any accounts receivable of that date and no loss is determined therefor.

## 2. EL CRISTO PROPERTY

The El Cristo property consisted of a church, parochial school, preparatory school, dispensary and the land located at Villegas and Lamparilla Streets and the rental property at 76 Ricla Street, Havana. The original plot was awarded claimant by decision in 1902 which divided church property seized by the Spanish Governor in 1842. The property was located three blocks from the Capitol of the Cuban Government. Additional purchases of land were made until the El Cristo complex covered almost the entire city block bounded by Villegas, Lamparilla, Amagura and Bernaza Streets and contained 2,869.42 square meters. The church was built in about 1640 but was enlarged in 1926, the original walls being moved to the outside and the church widened 18 feet on each side. Other structural improvements were made at an estimated cost of over $200,000.00.

The parochial school was established about 1948. The old buildings used for the school were replaced in 1950 by a new building. The school was founded by a separate entity, an association known as "Escuela Gratuita de Niños de la Iglesia del Cristo." However, the school was operated by claimant which controlled the association. Therefore the Commission finds that claimant was the owner and suffered a loss by the taking of the El Cristo properties on May 3, 1961.

Colegio San Agustin was the preparatory school established by claimant in 1912. It was operated by Corporacion San Agustin, a Cuban corporation organized by claimant. Title to the school property was later transferred to the Asociacion de la Iglesia del Cristo y Colegio de la Orden de San Agustin, through which claimant operated the school until July 1, 1953. After that date the school was operated directly by the Order of St. Augustine. Thus the Commission finds that claimant was the owner of the Colegio property taken by the Government of Cuba on May 3, 1961.

The remaining property owned by claimant through the El Cristo church consisted of a dispensary built on Villegas Street between the parochial school and the church in 1957, and rental property at 76 Murallo Street (formerly Ricla Street). According to the record, the dispensary was built at a cost of about $8,000.00. There is no information of record of the cost of the rental property but it is described as a two-story building of brick construction and about 25 feet by 100 feet having a monthly rental of at least $70.00. Claim is also made for the loss of bank accounts and accounts receivable for the Colegio and the parochial school in the total amount of $6,500.00 which appears fair and reasonable, and securities issued by the Cuban Telephone Company in the amount of $50,000.00.

The records of the Cuban Telephone establish that the El Cristo Parochial

School was the owner of 500 shares of Cuban Telephone Company preferred stock. The Commission has held that a claim based upon a stock of that company is within the purview of Title V of the Act because, although Cuban Telephone Company was a national of the United States at all pertinent times, it is now defunct. (See *Claim of International Telephone and Telegraph Company*, Claim No. CU–2615.) In that claim, the Commission found that the assets of the company were taken by the Government of Cuba on August 6, 1960 and that the value per share of preferred stock was $104.50 including accrued dividends. Therefore, the Commission finds that claimant suffered a loss with respect to the preferred stock in the amount of $52,250.00 on August 6, 1960.

On the basis of all the evidence of record including the photographs, financial records, deeds, and affidavits the Commission finds that the values of the El Cristo properties were:

| | |
|---|---:|
| Land | $358,677.50 |
| El Cristo Church, buildings & furnishings | 389,095.00 |
| Parochial School, buildings & furnishings | 82,077.73 |
| Cuban Telephone Securities | 52,250.00 |
| Colegio San Austin building & equipment | 45,298.43 |
| Dispensary | 8,000.00 |
| 76 Ricla | 16,800.00 |
| Cash & Accounts Receivable | 6,500.00 |
| Total | $958,698.66 |

The Commission concludes that claimant suffered a loss in the amount of $52,250.00 on August 6, 1960 when the Cuban Telephone Company's assets were nationalized and $906,448.66 on May 3, 1961 when the El Cristo properties were taken.

### 3. ST. AUGUSTINE PROPERTY

Claimant asserts a loss in the amount of $442,522.60 for the taking of its property in St. Augustine parish in La Sierra, Havana. In 1926, the first building was erected on land belonging to the Diocese of Havana. No claim is made for the taking of the land but for the loss of the use of the land, such loss being valued by claimant at $53,680.00. The original building was a monastery which was also used as the parish chapel until the church was built between 1937 and 1941. Additional property including land and two buildings was purchased about 1953 for a Youth Center. The lot was approximately 100 feet by 120 feet. One building was a three-story house of brick containing 14 rooms the other being a garage with living quarters for the caretaker and his family. In support of the values claimed for the lost property, claimant has submitted complete descriptions of the buildings with pictures of the church and an itemized listing of the equipment and furnishing of the church and monastery.

On the basis of the evidence of record, the Commission finds that the values of the St. Augustine properties were:

| | |
|---|---:|
| Monastery | $ 40,000.00 |
| Church | 145,759.60 |
| Furnishings & Equipment | 142,083.00 |
| Youth Center | 61,000.00 |
| Total | $388,842.60 |

The Commission concludes that claimant suffered a loss in the amount of $388,842.60 for the taking of the St. Augustine properties on May 3, 1961.

No determination of loss is made for the land on which the monastery and church were located inasmuch as it did not belong to claimant.

### 4. St. Rita Property

The property claimed for St. Rita's parish consisted of land, chapel, church and monastery. The land was purchased in 1941 and 1942 and contained 3,825 square meters, and was located at 5th Avenue and 26th Street, Reparto Miramar, Marianao. Initially the chapel was built and then, in 1942, construction commenced on the church which was completed in 1954. The adjacent monastery was built gradually during the years after 1942, having two separate sections joined by a long covered outside corridor. In support of the claimed values, claimant has submitted a statement by the architect, an affidavit listing the equipment and furnishings of the chapel, church and monastery and pictures of the church.

The Commission finds the values of St. Rita's property on May 3, 1961 to have been

| | |
|---|---|
| Land | $ 57,375.00 |
| Chapel & Church | 250,000.00 |
| Monastery | 30,000.00 |
| Furnishings & Equipment | 158,249.00 |
| Total | $495,624.00 |

The Commission concludes that claimant suffered a loss in the amount of $495,624.00 for the taking of St. Rita's property on May 3, 1961.

### 5. St. Helen Property

In 1946, claimant purchased 3,618 square meters of land in Tarara, Guanabacoa, Cuba with the condition that a church be built upon that land within five years. The church was built the following year at a cost of $40,000.00 according to an affidavit of an architect whose firm designed and inspected the construction of the building. Evidence in support of the values asserted include the aforesaid affidavit, an affidavit listing the equipment and furnishings of the church and attached living quarters and a photocopy of the original deed.

On the basis of all the evidence of record, the Commission finds that the values of St. Helen's parish property on May 3, 1961 were:

| | |
|---|---|
| Land | $15,000.00 |
| Church building | 40,000.00 |
| Equipment & furnishings | 15,383.00 |
| Total | $70,383.00 |

The Commission concludes that claimant sustained a loss in the amount of $70,383.00 by taking of the St. Helen's parish property on May 3, 1961.

### 6. San Lorenzo Property

The property belonging to the San Lorenzo complex consisted of a church, convent, school, dispensary and a day nursery located on Galbis Street, Reparto Buenavista Marianao, Cuba. To provide an income for the operation of the dispensary and nursery, two apartment buildings were built on land pur-

chased by claimant in the block bounded by Avenida Novena, Calle Quinta, Solar 24 and Solareo 2–11 in Marianao. Construction of the church, convent, school and dispensary was started in 1947. The building housing the school and convent originally contained a clinic but it proved to be too small and another wing was added to become the dispensary. The day nursery was built in 1956 as were the two apartment buildings.

Claimant asserts a value of $725,760.00 for the loss of these properties and in support thereof has submitted photos of the dispensary and day nursery, newspaper accounts of the day nursery, affidavits of the former principal of the school and former Administrator of the dispensary and nursery which list the equipment and furnishings of the buildings, a statement of the rental income from the apartment houses, and an affidavit appraising the values for the items claimed.

Based upon the record, the Commission finds that the value of the San Lorenzo properties taken by the Government of Cuba on May 3, 1961 were:

| | | |
|---|---:|---:|
| Land | | |
| Dispensary complex | $ 80,000.00 | |
| Apartment lot | 120,000.00 | $200,000.00 |
| Buildings | | |
| Church, convent, school dispensary & day nursery | 255,000.00 | |
| Apartment houses | 240,000.00 | 495,000.00 |
| Furnishings & Equipment | | |
| Church, school & convent | 27,408.00 | |
| Day nursery | 3,352.00 | 30,760.00 |
| Total | | $725,760.00 |

The Commission concludes that claimant suffered a loss in the amount of $725,760.00 for the taking of the San Lorenzo properties on May 3, 1961.

### 7. SANTA MONICA PROPERTY

In 1958, claimant purchased property located near San Antonio de los Banos, Province of Havana for construction of a seminary. The property consisted of approximately 33½ acres of land most of it cultivated as an orchard with more than 1,500 trees of a variety of fruits, the main house, a garage with large living quarters attached, a caretaker's house, storehouse, stable equipment shed, pump house, and a small fuel storage building. The farm had a complete irrigation system electric cables, 1,500 feet of two-inch pipe for its water service, and a macadam road about 500 meters in length.

In support of the amount claimed for the loss of this property, claimant has submitted photos of the main building, an inventory of the property and an affidavit setting forth the values for the land and personal property as well as the buildings.

Based on the complete record, the Commission finds that the value of the Santa Monica property taken by the Government of Cuba on May 3, 1961 was:

| | |
|---|---:|
| Land | $ 33,500.00 |
| Buildings | 45,100.00 |
| Trees | 75,000.00 |
| Road, furnishings & equipment | 20,600.00 |
| Total | $174,200.00 |

The Commission concludes that claimant suffered a loss in the amount of $174,200.00 as a result of the actions of the Government of Cuba on May 3, 1961.

### RECAPITULATION

Claimant's losses within the scope of Title V of the International Claims Settlement Act of 1949, as amended, are summarized as follows:

| | |
|---|---|
| University of St. Thomas | $5,071,590.42 |
| El Cristo | 958,698.66 |
| St. Augustine | 388,842.60 |
| St. Rita | 495,624.00 |
| St. Helen | 70,383.00 |
| San Lorenzo | 725,760.00 |
| Santa Monica | 174,200.00 |
| Total | $7,885,098.68 |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644) and in the instant claim it is so ordered as follows:

| FROM | ON |
|---|---|
| August 6, 1960 | $ 52,250.00 |
| May 3, 1961 | 7,832,848.68 |

### CERTIFICATION OF LOSS

The Commission certifies that BROTHERS OF THE ORDER OF HERMITS OF ST. AUGUSTINE (INC.) suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seven Million Eight Hundred Eighty-five Thousand Ninety-eight Dollars and Sixty-eight Cents ($7,885,098.68) with interest at 6% per annum from the aforesaid dates of loss to the date of settlement.

Dated at Washington, D.C., Sep. 8, 1971.

## IN THE MATTER OF THE CLAIM OF OCCIDENTAL INSURANCE COMPANY OF NORTH CAROLINA

Claim No. CU–2353—Decision No. CU–3794

*Claims based on loans to insureds of an American insurance company secured by the cash surrender values of the policies, which were in the possession of the insurance company, do not constitute losses under Title V of the Act.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $835,902.09, was presented by OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA, based upon the nationalization of its assets in Cuba.

---

\* This decision was entered as the Commission's Final Decision on September 2, 1969.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity. The record shows that claimant was organized under the laws of North Carolina. An authorized officer of claimant has certified that at all pertinent times 100% of claimant's outstanding capital stock was owned by nationals of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

It appears from the evidence of record that claimant had been authorized to conduct an insurance business in Cuba since 1947. In connection with these operations, claimant owned certain assets in Cuba; namely, bank deposits, stock interests, certain bonds, and mortgages against properties owned by Cubans held as security for loans made to said Cubans. The record contains extracts from claimant's books and records, certified to be accurate by claimant's Assistant Treasurer who has custody and control over claimant's financial books and records; receipts from The National City Bank of New York, Havana Branch, and from authorities of Cuba indicating the deposit of securities by claimant; copies of stock certificates; as well as bank statements and statements from officials of claimant concerning this claim.

On October 24, 1960, the Government of Cuba published in its official Gazette Resolution 3, pursuant to Law 851, which listed as nationalized the OCCIDENTAL LIFE INSURANCE COMPANY. The Commission finds that claimant's property in Cuba was nationalized on October 24, 1960, within the meaning of Title V of the Act, except as noted below.

Claimant has computed its claim as follows:

| | |
|---|---|
| Bank Deposits | $302,501.63 |
| Stock interests | 12,300.00 |

| | |
|---|---|
| Bonds | 209,055.42 |
| Mortgages | 184,401.86 |
| Policy Loans | 127,643.18 |
| | $835,902.09 |

### BANK DEPOSITS

Claimant's Assistant Treasurer has certified under date of August 17, 1967 that claimant's books and records at Raleigh, North Carolina show the following bank balances in Cuban banks as of October 24, 1960 the date of loss (with the peso being on a par with the United States dollar):

| | | |
|---|---|---|
| National City Bank of New York | | $292,552.13 |
| Banco Agricola E. Mercantil | | 1,449.50 |
| Banco Agricola E. Industrial | | 8,500.00 |
| | Total | $302,501.63 |

On the basis of the foregoing evidence, the Commission finds that on October 24, 1960, the date of loss, claimant owned bank deposits maintained in banks in Cuba with balances in claimant's favor aggregating the amount of $302,501.63

### STOCK INTERESTS

The record establishes and the Commission finds that claimant owned 23 shares of stock in Financiera Nacional de Cuba with a par value of 100 pesos per share, equivalent to $100.00 per share. These shares had been purchased by claimant at par, and were carried on its books at that value.

The Commission has found that Financiera Nacional de Cuba was a semi-public entity, controlled by the National Bank of Cuba, an agency of the Government of Cuba, and that Cuba had guaranteed the investments of stock-holders of this entity. The Commission held that pursuant to Law 865 of August 17, 1960, Financera Nacional de Cuba was liquidated and all its assets were assumed by Cuba, and that a claim for the loss of a debt of the Government of Cuba arose under Title V of the Act on August 17, 1960, the date of liquidation. (See *Claim of Phoenix Insurance Company*, Claim No. CU–1913.) The Commission finds that the unpaid debt of Cuba to claimant on August 17, 1960 on account of claimant's interests in Financiera Nacional de Cuba was $2,300.00, representing the face amount of these securities.

The record further shows that claimant owned 1,000 shares of preferred stock in the Anglo-American Insurance Company, S.A., with a par value of $10.00 per share. These shares, likewise, had been purchased by claimant, and were carried on its books, at par value i.e. at $10.00 per share. Evidence available to the Commission indicates that this corporation was nationalized by the Government of Cuba on April 28, 1964 pursuant to Resolution 1032 under Law 890. The Commission, however, finds that claimant sustained a loss with respect to these shares of stock on October 24, 1960 when all of its assets in Cuba were nationalized. In the absence of evidence to the contrary, the Commission finds that the value of these shares of stock on October 24, 1960 was $10,000.00, the face amount of these securities, as indicated by claimant's books and records.

Accordingly, the Commission holds that the aggregate loss sustained by claimant with respect to its stock interests was $12,300.00.

## BONDS

The evidence establishes that claimant had on deposit with the First National City Bank of New York, Havana Branch, the following bonds:

1. Bonds in the face amount of $19,000.00, of the issue known as 4% Republic of Cuba Veterans, Courts and Public Work Bonds, 1953–1983;

2. Bonds in the face amount of $64,000.00, of the issue known as 4% Bonds of the Public Debt of Cuba, 1950–1980. It further appears that claimant had on deposit with Cuban authorities bonds of the same issue in the face amount of $25,000.00; and,

3. Bonds in the face amount of $100,000.00, of the issue known as 5¼% Bonds of Fondo de Inversiones, F.H.A., due June 30, 1965.

The evidence establishes that the Government of Cuba defaulted on the payment of interest on the 4% Veterans, Court and Public Works bonds of 1953–1983 on May 1, 1961, the last payment of interest having been made for the period ending November 1, 1960. (See *Claim of Westchester Fire Insurance Company*, Claim No. CU–1703.) The Commission, therefore, finds that on October 24, 1960, the date loss, Cuba owed claimant $19,000.00 with respect to these 4% bonds.

Evidence available to the Commission establishes that the 4% bonds of the Public Debt of Cuba 1950–1980 had attached interest coupons in the amount of $20.00 each, payable semiannually on June 30 and December 31, with respect to each $1,000.00 bond, until maturity on June 30, 1980. (See *Claim of Hartford Fire Insurance Company*, Claim No. CU–0021.) Extracts from claimant's records show that interest on these bonds was last paid for the semiannual period ending June 30, 1960. Accordingly, the Commission finds that on October 24, 1960, the date of loss, Cuba owed claimant $90,124.96, representing $89,000.00 in principal and interest in the amount of 1,124.96.

Evidence available to the Commission shows that the 5¼% Fondo de Inversiones bonds due June 30, 1965 had been issued by a Cuban Government agency, equivalent to our Federal Housing Administration. [Lanzas, *A Statement of the Laws of Cuba in Matters Affecting Business* 322–323 (2d ed. 1958).] Extracts from claimant's records show that interest on these bonds was last paid for the period ending June 30, 1960. Accordingly, the Commission finds that on October 24, 1960, the date of loss, Cuba owed claimant $101,662.42, representing $100,000.00 in principal and interest in the amount of $1,662.42.

Therefore, the aggregate loss sustained by claimant with respect to the foregoing bonds was $210,787.38.

## MORTGAGES

The Commission finds on the basis of the evidence of record, including applications for mortgage loans and extracts from claimant's records that claimant had granted 15 loans to certain Cubans secured by mortgages on the real properties of the debtors. The Commission has held that all Cuban mortgages were cancelled on October 14, 1960 pursuant to the Urban Reform Law. (See *Claim of the Estate of Marita Dearing de Lattre, Deceased*, Claim No. CU–0116.) The following, obtained from the evidence of record, shows with respect to each mortgage as of October 14, 1960, the date of loss, the

unpaid principal amount, the rate of interest set forth in the mortgage agreement, the period of time for which interest was last paid and the amount of unpaid interest due:

| | Unpaid Principal | Rate of Interest | Period Last Paid | Interest Due |
|---|---|---|---|---|
| 1. | $ 14,698.98 | 5% | July 1, 1960 | $ 211.86 |
| 2. | 12,446.06 | 6% | July 1, 1960 | 216.31 |
| 3. | 1,893.95 | 4% | Sept. 1, 1960 | 9.25 |
| 4. | 16,784.27 | 6% | Nov. 1, 1959 | 960.70 |
| 5. | 11,371.16 | 6% | Oct. 1, 1960 | 27.06 |
| 6. | 11,653.79 | 6% | July 1, 1960 | 202.54 |
| 7. | 4,689.69 | 6% | Feb. 1, 1959 | 480.13 |
| 8. | 19,662.85 | 6% | Dec. 25, 1959 | 951.68 |
| 9. | 29,446.96 | 4% | Jan. 26, 1960 | 942.29 |
| 10. | 13,792.72 | 5% | July 1, 1960 | 199.29 |
| 11. | 16,766.53 | 4% | Nov. 1, 1959 | 640.83 |
| 12. | 2,911.61 | 6% | Nov. 1, 1960 | — |
| 13. | 16,876.24 | 5% | Sept. 1, 1960 | 103.08 |
| 14. | 6,592.94 | 6% | Oct. 1, 1960 | 15.69 |
| 15. | 4,794.11 | 6% | June 1, 1960 | 107.29 |
| | $184,401.86 | | | $5,068.00 |

The Commission holds that the aggregate loss sustained by claimant on October 14, 1960 with respect to its mortgages was $189,469.86.

### POLICY LOANS

Claimant has asserted a loss in the amount of $127,643.18, representing approximately 200 loans made to Cubans "secured by the cash surrender value of policies."

Inasmuch as these loans were secured by funds in the hands of claimant, the Commission suggested under date of February 18, 1969 the submission of evidence establishing that this portion of the claim is based upon a nationalization, expropriation, intervention or other taking of claimant's property by Cuba within the purview of Title V of the Act, and for which asserted loss claimant had not already been compensated from the collateral funds in its possession. No reply was received from counsel or claimant either to this inquiry or to a "follow-up" letter of the Commission, dated April 17, 1969.

Upon consideration of this matter, the Commission finds that claimant has failed to sustain the burden of proof with respect to this portion of its claim. Accordingly, this portion of the claim is denied.

Claimant's losses may be summarized as follows:

| Property | Date of Loss | Amount |
|---|---|---|
| Bank deposits | October 24, 1960 | $302,501.63 |
| 23 shares of Financiera Nacional de Cuba | August 17, 1960 | 2,300.00 |
| 1,000 shares of Anglo-American Insurance Company, S.A. | October 24, 1960 | 10,000.00 |
| 4% Bonds (1953–1983) | October 24, 1960 | 19,000.00 |

FOREIGN CLAIMS SETTLEMENT COMMISSION     171

| Property | Date of Loss | Amount |
|---|---|---|
| 4% Bonds (1950–1980) | October 24, 1960 | 90,124.96 |
| 5¼% Bonds due June 30, 1965 | October 24, 1960 | 101,662.42 |
| Mortgages | October 14, 1960 | 189,469.86 |
| Total | | $715,058.87 |

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the respective dates of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered as follows:

| FROM | ON |
|---|---|
| August 17, 1960 | $   2,300.00 |
| October 14, 1960 | 189,469.86 |
| October 24, 1960 | 523,289.01 |
| Total | $715,058.87 |

### CERTIFICATION OF LOSS

The Commission certifies that OCCIDENTAL LIFE INSURANCE COMPANY OF NORTH CAROLINA suffered a loss, as a result of actions of the Government of Cuba within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seven Hundred Fifteen Thousand Fifty-eight Dollars and Eighty-seven Cents ($715,058.87) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., July 30, 1969.

## IN THE MATTER OF THE CLAIM OF EBASCO INDUSTRIES INC.

### Claim No. CU–3548—Decision No. CU–3866

*Claims based upon debts owing by a United States national corporation are not covered by Title V of the Act unless such debts are a charge against property which has been nationalized or otherwise taken by the Government of Cuba.*

*Contractual right to receive bonds which would be secured by a mortgage on property of a United States national corporation in Cuba does not constitute a debt which is a charge against nationalized property unless such right has been exercised.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $42,714,767.55 plus interest was orignally presented by American & Foreign Power Company, Inc., predecessor in interest to EBASCO INDUS-

---

* A Final Decision was entered on this claim on Nov. 3, 1969, to reflect that claimant had merged with an into the Boise Cascade Corporation.

TRIES INC., based upon the asserted loss of certain real property in Cuba and bonds issued by the Cuban Electric Company.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964 as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States", as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that American & Foreign Power Company, Inc., was merged with and into Electric Bond & Share Company on December 31, 1967, and the name subsequently changed to EBASCO INDUSTRIES INC., which is substituted as claimant herein. The American & Foreign Power Company, Inc., was organized under the laws of the State of Maine and an officer of that corporation has certified that at all times more than 50% of its outstanding capital stock has been owned by nationals of the United States and that as of May 25, 1966, holders of 0.0017% of its outstanding capital stock had addresses outside the United States. An officer of Electric Bond & Share Company has certified that at all pertinent times the number of shares of its outstanding capital stock owned by non-residents of the United States has never exceeded 3%. The Commission holds that American & Foreign Power Company Inc., Electric Bond and Share Company, and EBASCO INDUSTRIES INC. qualify as nationals of the United States within the meaning of Section 502(1)(B) of the Act.

Claim is made herein for losses assertedly sustained by the American & Foreign Power Company, Inc. for the following:

> 1. A 53.22362% interest in real property known as "La Puntilla" located in Marianao, Havana Province, Cuba;
>
> 2. First and Refunding Mortgage bonds 4¼% Peso Series, due 1980; First Mortgage bonds, 4¼% Dollar series, due 1980; First Mortgage

bonds 4¼% Dollar Series B, due 1980; First Mortgage bonds, 5% Peso Series C, due 1980; and First Mortgage bonds, 5% Peso Series D due 1987, issued by the Cuban Electric Company, and having a total principal amount of $11,330,300;

3. A contractual right to receive bonds in the amount of $26,135.00 issued by the Cuban Electric Company; and

4. A contractual right to receive an additional amount of bonds in the principal amount of $3,800,000 in return for cancelling a demand note of the Cuban Electric Company.

*1. Real property*

Claimant asserts a loss in the amount of $113,898.55 for a 53.22362% interest in land in Marianao, Havana Province, Cuba. In support of this portion of the claim, a copy of the deed to Edward L. Kanter dated October 7, 1954, and an affidavit of Mr. Kanter have been submitted. By the terms of the deed, the Havana & Insular Real Estate Company conveyed a parcel of land having an area of 6,160.90 square meters to Edward L. Kanter for the sum of $214,000.00, which land was located in Marianao, Cuba. According to the affidavit of Edward L. Kanter, the land was conveyed to him for the benefit of Cuban Electric Company and American & Foreign Power Company, Inc. Cuban Electric Company has also filed its separate claim, No. CU–2578, in the amount of $100,101.45 for the remaining interest in the land which both companies valued at the purchase price of $214,000.00 The Commission finds that the purchase price represented the value of the property at the time it was confiscated.

The record also contains the affidavit of Armando Leret, an attorney who formerly practiced in Cuba. This instrument shows that he was acquainted with the interests of the two companies in the Marianao property; that he frequently went past the property; and that in February 1960 it was occupied by an organization of the Cuban Government which had started some construction thereon.

The Commission finds that claimant owned a 53.22362% interest in 6,160.90 square meters of land in Marianao, Cuba, and that it was taken by the Government of Cuba on February 1, 1960. As a result of the actions of the Government of Cuba, the Commission concludes that claimant sustained a loss by the confiscation of said land in the amount of $113,898.55 within the meaning of Title V of the Act.

*2. Mortgage bonds of the Cuban Electric Company*

Claim is made for the principal and unpaid interest due on August 6, 1960 on the following bonds issued by the Cuban Electric Company:

| Bonds | Principal | Interest |
|---|---|---|
| First and Refunding Mortgage bonds: | | |
| 4¼% Peso Series, 1980 _____ | $615,500.00 | $24,923.00 |
| 4¼% Dollar Series, 1980 _____ | 8,500,000.00 | 216,750.00 |
| First Mortgage bonds, 4¼% Dollar Series B, 1980 _____ | 1,965,000.00 | 50,108.00 |
| First Mortgage bonds, 5% Peso Series C, 1980 _____ | 35,800.00 | 1,045.00 |

| Bonds | Principal | Interest |
|---|---|---|
| First Mortgage bonds 5% Peso Series D, 1987 _____ | 214,000.00 | 8,935.00 |
| Total _____ | $11,330,300.00 | $301,761.00 |

On the basis of evidence of record, the Commission finds that claimant is and since prior to August 6, 1960, has been the owner of the above described bonds issued pursuant to a Mortgage and Deed of Trust dated as of January 1, 1950, as supplemented, with the First National City Bank of New York as trustee. By that indenture and the supplements thereto, the bonds issued thereunder were secured by the property in Cuba of the Cuban Electric Company, a corporation organized under the laws of the State of Florida which qualifies as a national of the United States. The properties of the Cuban Electric Company were listed as nationalized by Resolution No. 1 (pursuant to Law 851 of July 6, 1960) of the Government of Cuba effective August 6, 1960. Claimant's bonds therefore represented a debt which was a charge upon nationlized property as defined in Section 502(3) of the Act. The Commission concludes that as a result of the nationalization of the properties of the Cuban Electric Company in Cuba, claimant suffered a loss in connection with its bonds within the meaning of Title V of the Act.

The Commission finds that the total amount of the unpaid indebtedness on claimant's bonds including the principal amounts and interest due to August 6, 1960, is as follows:

| Bonds | Principal | Interest |
|---|---|---|
| First and Refunding Mortgage bonds: | | |
| 4¼% Peso Series, 1980 _____ | $615,500.00 | $ 24,923.00 |
| 4¼% Dollar Series, 1980 _____ | 8,500,000.00 | 216,750.00 |
| First Mortgage bonds, 4¼% Dollar Series B, 1980 _____ | 1,965,000.00 | 50,108.00 |
| First Mortgage bonds, 5% Peso Series C, 1980 _____ | 35,800.00 | 1,045.00 |
| First Mortgage bonds 5% Peso Series D, 1987 _____ | 214,000.000 | 8,935.00 |
| Total _____ | $11,330,300.00 | $301,761.00 |

for a total loss of $11,632,061.00.

3. *Contractual right to receive bonds of $26,135,000.00 value*

Claimant asserts a loss in the amount of $26,135,000.00 on the basis of Dollar-Peso Bond Agreements with the Cuban Electric Company. During the period 1952-1957, it became necessary for the Cuban Electric Company to borrow funds from the Export-Import Bank in Washington and Financiera Nacional de Cuba in Havana. To provide the required collateral for loans, Dollar and Peso Mortgage Bonds issued by Cuban Electric Company and held by claimant were borrowed from claimant by the company. Under the Dollar-Peso Agreements, claimant was to be repaid by bonds or in cash semi-annually beginning December 31, 1957. Under the terms of the agreements, claimant would receive interest on the principal at the rate of three-fourths or of 1% per annum, and at the maturity of the coupons attached to the borrowed Dollar Bonds and Peso Bonds, such coupons would become the property of claimant. On August 6, 1960, when Cuban Electric Company's assets were nationalized, the principal amount still due and owing to claimant was $26,135.000.00.

Section 505(a) of the Act provides:

> . . . A claim under Section 503(a) of this title based upon a debt or other obligation owing by any corporation, association, or other entity organized under the laws of the United States, or any State, the District of Columbia, or the Commonwealth of Puerto Rico shall be considered only when such debt or other obligation is a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimant contends that, since it was entitled to receive mortgage bonds of the Cuban Electric Company in payment of the borrowed bonds, the obligation was a charge on its property. The terms of the agreements, however, gave the debtor the option of paying the specified semiannual payment in cash or in mortgage bonds. Additionally, the amounts unpaid were listed in the 1959 Annual Report of the Cuban Electric Company on page 14, Schedule of Long-Term Debt, as Loans Payable to American & Foreign Power Company, Inc. (claimant's predecessor in interest) and in Note A to that schedule reference is made that these loans may be satisfied either by delivery of mortgage bonds or payment of cash.

Claimant, therefore, by terms of the agreements had surrendered the secured obligations of Cuban Electric Company in exchange for the right to receive similar secured obligations or cash at a future date, neither of which it received. Even though the obligor was the wholly owned subsidiary of claimant and the exchange was not an arms-length transaction, the failure to receive secured bonds is not a basis for determining a loss in its favor under the Act. It would appear that the Export-Import Bank of Washington, which holds the collateral, is the proper party claimant for these bonds. Unfortunately, however, that bank cannot join in this claim because it is an agency of the U.S. Government and is not an eligible claimant under Title V of the Act. (See *Claims of the United States of America,* Claim No. CU–2522 and Claim No. CU–2618, 1967 FCSC Ann. Rep. 50.) That does not mean, though, that at some time in the future the bank, or the American Government, will not have a claim for this loss under a new statute or in direct negotiations with Cuba.

On basis of the evidence of record, the Commission concludes that the obligation to pay claimant the amount of $26,135.000.00 under the terms of the Dollar-Peso Agreements for the mortgage bonds borrowed and used as collateral for subsequent loans was not a charge upon property as specified in Section 505(a) of the Act. Accordingly, this portion of the claim is denied.

*4. Contractual right to receive bonds of $3,800,000.00 value*

By agreement dated December 30, 1954, Cuban Electric Company agreed to authorize the issuance of mortgage bonds to claimant's predecessor in an amount of not less than $3,800,000.00 in exchange for the cancellation of a note in the principal amount of $3,800,000.00. The bonds to be issued were to be secured by a mortgage on the Cuban property of the Cuban Electric Company. The debtor was to pay interest at the rate of 5% per annum from the date of the agreement to the date of issuance of the bonds. No bonds, however, were issued by Cuban Electric Company in performance of its obligations under the agreement.

In order that the amount of $3,800,000.00 plus interest be certifiable as a loss under the Act, it must be established that the amount was in fact, a

charge on property which had been nationalized, expropriated, intervened, or taken by the Government of Cuba (Section 505(a), supra).

The only evidence of record here, however, establishes that claimant had an unsecured demand note for the amount of $3,800,000.00 which it agreed to cancel in exchange for secured bonds of the Cuban Electric Company. Cuban Electric Company entered into the agreement with claimant in 1954 but did not perform its part of the agreement since the bonds were never issued. Inasmuch as claimant did not receive the secured bonds but merely has a contract which has not been specifically performed, the Commission concludes that the debt is not a charge on property which has been taken by the Government of Cuba. Accordingly, this portion of the claim is denied.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the respective dates of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered as follows:

| *From* | | *On* |
|--------|---|------|
| Feb. 1, 1960 | _____ | $   113,985.55 |
| Aug. 6, 1960 | _____ | 11,632,061.00 |
| | | $11,745,959.55 |

CERTIFICATION OF LOSS

The Commission certifies that EBASCO INDUSTRIES INC. suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949 as amended, in the amount of Eleven Million Seven Hundred Forty-Five Thousand Nine Hundred Fifty-Nine Dollars and Fifty-Five Cents ($11,745,959.55) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., Sep. 11, 1969.

## IN THE MATTER OF THE CLAIM OF ESTATE OF GRENVILLE M. DODGE, DECEASED

Claim No. CU–1290—Decision No. CU–1143

*Farms and rural properties were expropriated pursuant to the Agrarian Reform Law of May 17, 1959, implemented by regulations of October 7, 1959.*

PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented by the COUNCIL BLUFFS SAVINGS BANK, as TRUSTEE, for the ESTATE OF GRENVILLE M. DODGE, DECEASED, in the amount of $40,000.00, based upon the asserted loss of 38 caballerias of land situated in the Barrio Jatibonico, Province of Camaguey, Cuba. The beneficiaries of the state of Grenville M. Dodge, Deceased, have all been nationals of the United States since birth.

* This decision was entered as the Commission's Final Decision on March 13, 1968.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Based upon a copy of a decree of the Court of Constitutional and Social Rights, entered November 24, 1960, on appeal from a decree issued on June 21, 1960, by the Justice of the Court of First Instance of Ciego de Avila, the Commission finds that the heirs of Grenville M. Dodge, Deceased, owned certain land in the province of Camaguey, Cuba. Other evidence of record establishes that this consisted of thirty-eight caballerias of land in the Barrio Jatibonico, and was known as "Finca Rollete." The aforesaid decree of June 21, 1960 decreed expropriation of the estate by right of eminent domain, to become the property of the National Institute of Agrarian Reform, for disposal by the said Institute under the Act of Agrarian Reform; and further provided for indemnity to be paid in cash in Agrarian Reform Bonds or by a certificate thereof by the Institute to the heirs.

The Agrarian Reform Law of May 17, 1959, published in the Cuban Official Gazette on June 3, 1959, established the National Agrarian Reform Institute and provided for the expropriation of rural properties and distribution among peasants and agricultural workers. The Fifth Transitory Provision provided that until regulations for the Law were promulgated, it should be applied through resolutions of the National Agrarian Reform Institute. The regulations for carrying out the expropriation of such rural property were contained in Law 588, published in the Official Gazette (No. 191) on October 7, 1959.

Article 31 of the Agrarian Reform Law provided that indemnity should be paid in redeemable bonds; and set out that to that end an issue of Republic of Cuba bonds should be floated in such amount, and under such terms and conditions, as might be fixed in due time, the bonds to be called "Agrarian Reform Bonds" and to be considered public securities. Claimant avers that no compensation of any kind has been received in respect to the expropriation of said real estate and that there are no credits or off-sets to this claim. The Commission finds that the thirty-eight caballerias of land belonging to the Estate of Grenville M. Dodge, Deceased, were taken by the Government of Cuba on June 21, 1960, pursuant to the provisions of the Agrarian Reform Law.

The record contains an affidavit of Laverne Tollinger setting out his lengthy association with the Trustee, his familiarity with the property of the Estate, and stating that it was under the active management of Compania Cubana, a sugar mill operation; and two affidavits of H. J. Schreiber, former Manager of the Ingenio Jatibonico of Compania Cubana, in Jatibonico, in which he states that the Compania Cubana leased the land to various tenants on behalf of the Grenville M. Dodge Trust Estate, and purchased the sugar cane grown thereon, remitting the net proceeds to the Trustees. Further, Mr. Schreiber states that the asserted value of $40,000 is based on an approximate net annual income derived from the rent after taxes, and represents a return of 5 per cent, and that while the rental varied from year to year, it would not be less than $2,000.00. On the basis of the entire record, including these affidavits, the Commission finds that at the time of loss, the aggregate value of the 38 caballerias of land was $40,000.00, and concludes that the claimant suffered a loss in that amount, within the meaning of Title V of the Act.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement.

Accordingly, the Commission concludes that the amount of the loss sustained by claimant as trustee shall be increased by interest thereon at the rate of 6% per annum from the date on which the loss occurred, to the date on which provisions are made for the settlement thereof.

CERTIFICATION OF LOSS

The Commission certifies that the COUNCIL BLUFFS SAVINGS BANK, as TRUSTEE of the ESTATE OF GRENVILLE M. DODGE, DECEASED, suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Forty Thousand Dollars ($40,000.00) with interest thereon at the rate of 6% per annum from June 21, 1960, to the date of settlement.

Dated at Washington, D.C., Feb. 7, 1968.

## IN THE MATTER OF THE CLAIM OF PLACIDO NAVAS COSTA, ET AL.

Claim No. CU–3344—Decision No. CU–6016

*Upon finding that the claim of an American, who is still in Cuba, is valid under the Act, the Commission may enter a Certification of Loss in his favor.*

PROPOSED DECISION [*]

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented on May 2, 1967 after due notice on behalf of Placido Navas Marquez (now deceased) for $406,500 based upon the asserted ownership and loss of certain real properties and a business in Cuba.

Placido Navas Marquez was last married to Francisca Costa Garcia, a

[*] This decision was entered as the Commission's Final Decision on February 19, 1971.

United States national from birth who died intestate on May 27, 1966. Placido Navas Marquez, also a United States national from birth, died intestate on March 22, 1969, survived by six children who are substituted as claimants herein. Two of these heirs are outside the United States and need not be identified in this decision.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The aggregate losses, subject of this claim, were described as follows:

|  |  |  |
|---|---|---:|
| 1) | 563 Goicuria, Havana | $ 17,500 |
| 2) | 561 Goicuria | 17,500 |
| 3) | 565 Goicuria | 60,000 |
| 4) | Freyre de Andrade, No. 114 | 9,000 |
| 5) | Freyre de Andrade, No. 112 | 9,000 |
| 6) | 4th between C and D, Playa Hermosa | 22,500 |
| 7) | C and 4th, Playa Hermosa | 20,000 |
| 8) | Lot (related to item (5)) | 10,000 |
| 9) | Patrocinio 412 | 20,000 |
| 10) | Trocadero 75 | 16,000 |
| 11) | 72.72% of P. Navas & Co. | 80,000 |
| 12) | Inventory of P. Navas & Co. | 125,000 |
|  |  | $406,500 |

### REAL PROPERTY

Based upon the entire record, including an adjudication of the estate of claimants' uncle, a widower, as well as a listing of deeds, and reports from abroad, the Commission finds that Placido Navas Marquez (now deceased) owned fractional interests in certain realties in Cuba, further discussed below, and upon his death, on March 22, 1969, his six children succeeded to his interests.

On October 14, 1960, the Government of Cuba published in its Official Gazette, Special Eddition, its Urban Reform Law. Under this law the renting of urban properties, and all other transactions or contracts involving

transfer of the total or partial use of urban properties were outlawed (Article 2). The law covered residential, commercial, industrial and business office properties (Article 15).

On the basis of the foregoing, the Commission finds that the real property interests of Placido Navas Marquez in Cuba were taken by the Government of Cuba pursuant to the provisions of the Urban Reform Law; and, in the absence of evidence to the contrary, that the taking occurred on October 14, 1960, the date on which the law was published in the Cuban Gazette. (See *Claim of Henry Lewis Slade*, Claim No. CU–0183, 1967 FCSC Ann. Rep. 39.)

The Commission finds that Placido Navas Marquez owned the following real property interests:

  (2)  All of the improved realty at 561 Goicuria
  (3)  ½ of the improved realty at 565 Goicuria
  (4)  ½ of Freyre de Andrade 114, improved
  (5)  ½ of Freyre de Andrade 112, improved
  (6)  ½ of property on 4th Street, between C and D, Playa Hermosa
  (7)  ½ of property at C and 4th, Playa Hermosa
  (8)  ½ of the lot in Deed 202 (related to item (5))
  (9)  All of Patrocinio 412
 (10)  All of Trocadero 75

With respect to the property at 563 Goicuria (Item 1), the Commission finds that this house and lot belonged to Carmen Navas Franquiz and Monserrate Navas Franquiz (Claim No. CU–3013), cousins of claimants, and that claimants herein had no interest therein. Accordingly, this part of the claim is denied.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

The record includes, in addition to asserted values, those values recited in the Document of Adjudication of the Estate of Francisco Navas y Marquez, uncle of claimants; descriptions of the properties; rental figures, said to be depressed by Cuban legislation "freezing" rentals, and values in reports obtained from abroad. On the basis of this record, the Commission finds that the interests of Placido Navas Marquez (now deceased) in the real properties had the following values:

| Item | | Value |
|------|--|------:|
| (2) | Goicuria | $ 8,000.00 |
| (3) | 565 Goicuria | 15,000.00 |
| (4) | 114 Freyre de Andrade | 1,300.00 |
| (5) | 112 Freyre de Andrade | 1,800.00 |
| (6) | 4th between C and D | 2,500.00 |
| (7) | C and 4th | 3,700.00 |
| (8) | Lot (related to (5)) | 110.00 |
| (9) | Patrocino 412 (equity) | 9,500.00 |
| (10) | Trocadero 75 (equity) | 3,620.00 |
| | | $45,530.00 |

Accordingly, the Commission concludes that these six claimants succeeded to and suffered a loss in the aggregate amount of $45.530.00 within the meaning of Title V of the Act, as the result of the taking of these real properties by the Government of Cuba on October 14, 1960.

## P. NAVAS & CO.

According to the record this entity, engaged in the import-wholesale business, particularly bicycles and parts, since at least the early 1950s when one Francisco Navas Marquez (brother of the decedent in this matter) owned an interest in it, and when it was known as F. Navas & Co. Upon the death of said Francisco Navas Marquez on December 2, 1952 his interest was devised to his daughters (claimants in CU–3013) and in the settlement of this estate it was valued at $58,795.49.

Thereafter in about 1952 or 1953, Placido Navas Marquez (now deceased) and his son PLACIDO NAVAS COSTA, (one of the claimants herein) purchased the interest of the sisters. A notarial document, No. 213, of May 29, 1959 sets out that the father and son were partners, the name of the entity having been changed, that the capital had been increased to $110,000 in which the interest of the father was $80,000 and the interest of his son was $30,000, and that profits and losses were to be divided equally. Claim is made here only for the interest of Placido Navas Marquez (now deceased) specifically his capital of $80,000 and one-half of an asserted inventory of $125,000.

The Commission finds that in fact Placido Navas Marquez (now deceased) was the owner of P. Navas & Co. to the extent of 72.727 per cent.

The data accumulated by the Commission does not disclose a date of nationalization of this entity by the Government of Cuba. The record in this case variously asserts taking on January 1, 1959, when the communist regime took over the country of Cuba; that it was taken over in 1965; and that it was seized during the period 1961 to 1965. On the basis of this record, and in the absence of evidence to the contrary, the Commission finds that the entity P. Navas & Co. was nationalized by the Government of Cuba on June 30, 1965.

In addition to the capital investment, it is said that there was a warehouse inventory of $125,000 and that yearly sales amounted to $650,000. In support there has been submitted various excerpts from the records of companies who shipped materials to the company in Cuba, in 1958 and 1959, reflecting shipments of $78,060.47, $92,012.90, $24,221, $43,397.80 and the like. It is said that no balance sheets are available. Also, the record includes an affidavit from a former commercial loan officer with title of Assistant Manager of the First National Bank of Boston in Havana from 1940 to 1960, who states that to his recollection the company had a credit line with that bank of $100,000 and their inventory was in the neighborhood of $200/250,000. Further, the record includes the affidavit of a former accountant in Cuba who numbered the company among his clients, and who states that Placido Navas Marquez (now deceased) was a partner with an investment of $80,00 of the total $110,000 invested; that the book value of his investment at 1959–1960 was more than $90,000 approximately; and that the partnership was taken in 1965.

The Commission has considered this record and finds that the asset value of P. Navas & Co., on the date of loss, was $110,000 from which must be deducted a debt of $68,301.15 (which has been certified as a loss to another

claimant in Claim No. CU–0126). Accordingly, the net value of P. Navas & Co. is found to have been $41,698.85, and the interest therein of Placido Navas Marquez (now deceased) was $30,326.32, to which these six claimants have succeeded in equal parts.

### RECAPITULATION

The losses within the scope of Title V of the Act to which these claimants have succeeded are summarized below:

|  | Realty | Business |
|---|---|---|
| PLACIDO NAVAS COSTA | $7,588.33 | $5,054.39 |
| MERCEDES ARBONA | 7,588.33 | 5,054.39 |
| DOLORES GAUDIER | 7,588.33 | 5,054.38 |
| MYLES T. NAVAS | 7,588.33 | 5,054.38 |
| FIFTH SIBLING | 7,588.34 | 5,054.38 |
| SIXTH SIBLING | 7,588.34 | 5,054.38 |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlment (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered, as follows:

|  | From | On |
|---|---|---|
| PLACIDO NAVAS COSTA | Oct. 14, 1960 | $7,588.33 |
|  | June 30, 1965 | 5,054.39 |
| MERCEDES ARBONA | Oct. 14, 1960 | 7,588.33 |
|  | June 30, 1965 | 5,054.39 |
| DOLORES GAUDIER | Oct. 14, 1960 | 7,588.33 |
|  | June 30, 1965 | 5,054.38 |
| MYLES T. NAVAS | Oct. 14, 1960 | 7,588.33 |
|  | June 30, 1965 | 5,054.38 |
| FIFTH SIBLING | Oct. 14, 1960 | 7,588.34 |
|  | June 30, 1965 | 5,054.38 |
| SIXTH SIBLING | Oct. 14, 1960 | 7,588.34 |
|  | June 30, 1965 | 5,054.38 |

### CERTIFICATION OF LOSS

The Commission certifies that PLACIDO NAVAS COSTA suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Six Hundred Forty-two Dollars and Seventy-two Cents ($12,642.72) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement;

The Commission certifies that MERCEDES ARBONA suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Six Hundred Forty-Two Dollars and Seventy-two Cents ($12,642.72) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement;

The Commission certifies that DOLORES GAUDIER suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount

of Twelve Thousand Six Hundred Forty-two Dollars and Seventy-one Cents ($12,642.71) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement;

The Commission certifies that MYLES T. NAVAS suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Six Hundred Forty-two Dollars and Seventy-one Cents ($12,642.71) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

The Commission certifies that A Fifth Sibling suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Six Hundred Forty-two Dollars and Seventy-two Cents ($12,642.72) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission certifies that A Sixth Sibling suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Six Hundred Forty-two Dollars and Seventy-two Cents ($12,642.72) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission January 6, 1971.

## IN THE MATTER OF THE CLAIMS OF EFIM GOLODETZ, ET AL.

Claim Nos. CU–1816, 1818, 1819 and 1820—Decision No. CU–6763

*The beneficial owner of a claim and not a trustee or nominal holder is the real party in interest who must meet the U.S. nationality prerequisites of Title V of the Act.*

### PROPOSED DECISION *

These claims against the Government of Cuba were filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amounts of $12,868.58 (EFIM GOLODETZ, Claim No. CU–1816), $192,584.90 (LEO ELIASH, Claim No. CU–1818), $604,379.33 (Intercontinental Affiliates, Claim No. CU–1819), and $887,488.00 (M. GOLODETZ & CO., Claim No. CU–1820), are based upon asserted losses of certain personal property in Cuba, including stock interests in West Indies Trading Company, a Cuban corporation hereafter called Wintrade.

Under Title V of the International Claims Settlement Act of 1959 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property in-

___
* This decision was entered as the Commission's Final Decision on September 15, 1971.

cluding any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened or taken by the Government of Cuba.

Section 504 of the Act provides, as to ownership of claims, that

(a) A claim shall not be considered under section 503(a) of this title unless the property on which the claim was based was owned wholly or partially, directly or indirectly by a national of the United States on the date of the loss and if considered shall be considered only to the extent the claim has been held by one or more nationals of the United States continuously thereafter until the date of filing with the Commission.

With respect to the nationality of claimants, the record shows the following:

EFIM GOLODETZ (Claim No. CU–1816) has been a national of the United States since January 28, 1946.

Claim No. CU–1818 was filed by Trust #1 (claimants' designation) which was created as an irrevocable trust pursuant to an agreement of October 3, 1950 with Simon Golodetz, a copy of which is of record. The agreement named four beneficiaries, two of whom were British nationals and two American nationals. By indenture of March 7, 1966, the trustees duly transferred title to 900 shares of stock in Wintrade to LEO ELIASH, one of the beneficiaries, who has been a national of the United States since February 3, 1943. (See *Claim of Namarib Company*, Claim No. CU–1817.) Those 900 shares of stock constitute the sole basis of Claim No. CU–1818. Pursuant to paragraph "THIRD" of the trust agreement, that transfer of March 7, 1966 effectively terminated the trust insofar as the 900 shares of stock are concerned. Accordingly, LEO ELIASH has been substituted as claimant in place of Trust #1. This claim presents an issue involving the provisions of Section 504(a) of the Act, which issue is discussed in detail below.

INTERCONTINENTAL AFFILIATES (Claim No. CU–1819) is a partnership organized under the laws of New York. In addition to LEO ELIASH and EFIM GOLODETZ its partners are: JOACHIM GINZBERG, MARC L. GINZBERG, OSCAR GOLODETZ, DAVID GINZBERG and ISAAC SUDER, nationals of the United States since April 4, 1927, September 9, 1929, January 28, 1946, April 13, 1934 and August 12, 1924, respectively. On the date of loss in 1960, as indicated hereafter, the partners of INTERCONTINENTAL AFFILIATES were LEO ELIASH, JOACHIM GINZBERG, EFIM GOLODETZ, and Simon Golodetz, the last named person having been a national of the United States from June 19, 1944 until his death on October 19, 1963.

In 1963, MARC L. GINZBERG, OSCAR GOLODETZ, DAVID GINZBERG and ISAAC SUDER were admitted as new partners of INTERCONTINENTAL AFFILIATES. The estate of Simon Golodetz, deceased, was

reimbursed by the partnership for the deceased's interest in the partner-ship. Simon Golodetz's sole heirs were his nephews, Oscar Golodetz and Arnold Golodetz, the sons of EFIM GOLODETZ, and nationals of the United States since January 28, 1946. The transfers of interests in the partnership and ownership of interests in the 2,820 shares of stock in Wintrade, the sole basis of Claim No. CU–1819, were at all pertinent times among nationals of the United States. The Commission holds that INTERCONTINENTAL AFFILIATES is a national of the United States within the meaning of Title V of the Act. (See *Claim of The Cuban Plantation Company*, Claim No. CU–0093.)

The status of the partnership, M. GOLODETZ & CO. (Claim No. CU–1820), is discussed hereafter.

Claimants assert the following losses:

### Claim No. CU–1816—EFIM GOLODETZ
60 shares of stock in Wintrade _____ $12,868.58

### Claim No. CU–1818—LEO ELIASH
900 shares of stock in Wintrade _____ $192,584.90

### Claim No. CU–1819—INTERCONTINENTAL AFFILIATES
2,820 shares of stock in Wintrade _____ $604,379.33

The above three claimants have computed their claims on the basis of one asset of Wintrade, certain raw sugar as follows:

| | |
|---|---|
| 377,943 bags of sugar (250 lbs. each bag) at $0.0325 per pound _____ | $3,070,787.00 |
| Less a bank loan for which the sugar was security ___ | 2,183,299.00 |
| Net equity _____ | $ 887,488.00 |

These claimants then determined the amounts of their claims on the basis of their proportionate interests in Wintrade which had 4,140 shares of out-standing capital stock on the date of loss. The fourth claimant, M. GOLO-DETZ & CO., bases its claim on the asserted ownership of the 377,943 bags of sugar, and therefore claims the total equity therein, $887,488.00.

### OWNERSHIP OF THE SUGAR

The first issue presented by these claims is whether the 377,943 bags of sugar were owned by Wintrade or by M. GOLODETZ & CO. Obviously, if Wintrade owned the sugar on the date of loss, it follows that the *Claim of M. GOLODETZ & CO.* must be denied and if the reverse is true, the other three claims must be denied. Counsel for claimants agrees with the fore-going but offers no assistance in resolving the issue beyond stating that the claimants will abide by any decision of the Commission in this respect. However, it is noted that the record contains correspondence from counsel and claimants from which it is clear that Wintrade was at all times re-garded as the owner of the sugar.

This issue can be better understood in the light of certain background in-formation. Customarily Wintrade would purchase sugar from various mills in Cuba. The sugar would be stored in warehouses and would be pledged as

security for loans obtained generally from the Chase Manhattan Bank, Cuban Branch. The amounts thus borrowed by Wintrade would be used to pay for the sugar. Subsequently the sugar would be sold to M. GOLODETZ & CO. After delivery of the sugar to M. GOLODETZ & CO. payment would be made to Wintrade which, in turn, would pay the creditor bank and liquidate its debt.

In the instant case, Wintrade acquired title to 377,943 bags of sugar in Cuba. As stated by counsel in his letter of May 11, 1971, Wintrade borrowed $2,350,000.00 on April 6, 1960 from Chase Manhattan Bank, Cuban Branch, and pledged the sugar as security for the loan. It appears from JOACHIM GINZBERG's affidavit of November 24, 1965, that early in 1960 Cuba commenced interfering with Wintrade's sugar operations. As a result, Wintrade was unable either to sell the sugar to M. GOLODETZ & CO. or otherwise dispose of it.

On September 17, 1960, the Government of Cuba nationalized the Cuban Branch of the Chase Manhattan Bank by the issuance of Resolution No. 2 pursuant to Law 851. The record shows that on October 14, 1960 Wintrade was required by Cuban authorities and actually did pay $2,350,000.00 to the National Bank of Cuba, an agency of the Government of Cuba, to liquidate the loan of April 6, 1960, from the Chase Manhattan Bank. On the same date, October 14, 1960, Wintrade secured a loan from the National Bank of Cuba in the amount of $2,183,299.25 and pledged the 377,943 bags of sugar as security.

The record includes an unsigned copy of a loan and pledge agreement to that effect. The agreement with the National Bank of Cuba, which was actually executed and contained identical provisions as in the proposed agreements, is not available. However, the record contains a copy of a letter of January 17, 1962 from the National Bank of Cuba to Wintrade advising it of the following: As of January 11, 1962 the balance of the October 14, 1960 loan secured by the sugar was reduced to $349,731.00; and on January 12, 1962 the Cuban Ministry of Industry Consolidated Sugar Enterprise paid that balance to the National Bank of Cuba as final liquidation of the loan.

Upon consideration of the entire record, the Commission finds that the 377,943 bags of sugar belonged to Wintrade on the date of loss, and that M. GOLODETZ & CO. had no interest therein. Accordingly, the claim of M. GOLODETZ & CO., Claim No. CU–1820, based upon the asserted ownership and loss of the 377,943 bags of sugar is denied in its entirety.

### NATIONALIZATION

As already noted, Cuba commenced interfering with Wintrade's sugar operations early in 1960. On October 14, 1960 the Cuban Government compelled Wintrade to liquidate its debt to Chase Manhattan Bank and to secure a loan from the National Bank of Cuba, pledging the sugar as security. From that date until 1962, Cuba sold the sugar. The said letter of January 17, 1962, from the National Bank of Cuba, indicates not only that the debt secured by the sugar had been reduced to $349,731.00, but also that only 77,718 bags of sugar remained as security for that reduced balance of the loan. It is clear that the rest of the original 377,943 bags of sugar had been sold by Cuba, and by January 12, 1962 all of the sugar had been sold. Claimants state that Cuba took the sugar between October 14, 1960 and January 12, 1962.

On the basis of the entire record and in the absence of evidence to the

contrary, the Commission finds that Wintrade's 377,943 bags of sugar were taken by the Government of Cuba on October 14, 1960.

Since Wintrade was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" defined under Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation it has been held than an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

## Stock Interests in Wintrade

The evidence establishes and the Commission finds that Claimants owned the following stock interests in Wintrade:

EFIM GOLODETZ (Claim No. CU–1816)—60 shares of stock at all pertinent times.

LEO ELIASH (Claim No. CU–1818)—900 shares of stock since March 7, 1966.

INTERCONTINENTAL AFFILIATES (Claim No. CU–1819)— 2,820 shares of stock at all pertinent times.

It appears from the record that all stock certificates remained in Cuba and are unavailable.

As quoted above, the express provisions of Section 504(a) of the Act limits the allowance of any claim against Cuba to the extent only that the claim has been owned by a national or nationals of the United States from the date it arose until the date of filing with the Commission.

The foregoing provisions of Section 504(a) of the Act present an issue with respect to Claim No. CU–1818, *Claim of LEO ELIASH*.

Pursuant to an agreement of October 3, 1950, an irrevocable trust was created by the late Simon Golodetz. Insofar as Claim No. CU–1818 is concerned, the trust *res* consisted of 900 shares of stock in Wintrade. Four beneficiaries were named by the grantor, two of whom being American nationals and two being British nationals.

Paragraph "THIRD" of the agreement conferred upon the Trustees authority to pay the net profit and income from the trust property "for the benefit of such of the Beneficiaries and in such proportions as the Trustees in their absolute discretion shall determine, in at least annual installments." The trust was to terminate on the death of the survivor of DAVID GINZBERG and OSCAR GOLODETZ. However, if all of the beneficiaries predeceased said survivor, the trust was to terminate, and the balance of all income and principal was to be paid "in equal shares per stirpes to the issue of the Beneficiaries named herein surviving the Survivor."

On the other hand, if the survivor predeceased any surviving beneficiary, the trust was to terminate and the balance of all income and principal was to be paid by the Trustees "to and among such of the Beneficiaries and in such proportions as the Trustees in their absolute discretion shall duly nominate, direct and appoint by deed." The agreement further provided that if the Trustees failed to make such payment within 120 days after the death of the survivor, the Trustees were to pay the balance "in equal shares per

stirpes to such of the Beneficiaries as shall survive the Survivor and to the issue surviving the Survivor of such of the Beneficiaries as shall not survive the Survivor."

The Trustees were further authorized "to pay to or use and apply for the benefit of any Beneficiary such portion or portions of the principal as the Trustees in their absolute discretion may deem proper." Upon doing so, the trust was to terminate *pro tanto*, but was to apply only to the remaining principal and income. Provision was also made for the replacement of any Trustee due to death, resignation or incapacity.

The record shows that no part of the trust principal (900 shares of stock in Wintrade) was ever distributed prior to March 7, 1966 when all of the 900 shares were duly transferred to LEO ELIASH, a national of the United States. The question thus presented is the identity of the owner or owners of the 900 shares of stock from October 14, 1960, the date of loss, to March 7, 1966, so that it is clear whether the 900 shares of stock or any part thereof were owned by nationals of the United States at all pertinent times in conformity with the prerequisites of Section 504(a) of the Act.

This issue was discussed with counsel for claimants who contended that the trust property at all times was owned by nationals of the United States. Accordingly, the Commission suggested the submission of evidence in support of counsel's contention. Counsel's response was in the form of a detailed letter of May 11, 1971.

Counsel proceeds with his argument by reciting that the Trustees—EFIM GOLODETZ, JOACHIM GINZBERG and Alexander Golodetz—have been United States nationals at all pertinent times. He states that pursuant to the trust agreement the Trustees had "absolute and unfettered discretion" to distribute the income and the corpus to any one or more of the four beneficiaries. Counsel adds that the only beneficiary to whom the income was ever distributed is LEO ELIASH, an American, and that as of March 7, 1966 LEO ELIASH became the owner of the 900 shares of stock in Wintrade.

Based upon the foregoing, counsel contends that the two British beneficiaries never owned either a legal or equitable interest in the 900 shares of stock at any time. In effect, counsel contends that from October 14, 1960 until March 7, 1966 the 900 shares were owned by the Trustees.

In support of his contentions, counsel states that paragraph "Tenth" of the trust provides that the trust shall be construed according to the law of New York and cites a New York case as controlling in resolving the issue, namely, *Hamilton v, Drogo*, 241 N.Y. 401,404, 150 N.E. 496 (1926).

According to counsel, the trust involved in that New York case conferred upon the trustees absolute discretion to pay income from the trust to any one of several named beneficiaries to the exclusion of any other. The case thus involved the question "whether the Court could interfer with the trustees' discretion and compel them to allot income to a 'beneficiary' to whom they had decided not to make such an allotment." Counsel states that the court held unequivocally that the decision of the trustees was final and could not be changed by the courts. Counsel construes the decision to mean that the "beneficiary" in question had no legal or equitable interest in the income unless and until the trustees made an allotment to him.

On the basis of that decision, counsel contends that the 900 shares of stock in Wintrade were owned by nationals of the United States at all pertinent times. He states that the Trustees herein in their discretion had alloted income from the trust only to LEO ELIASH, an American, and that prior

to the date of filing with the Commission the Trustees had distributed the 900 shares to LEO ELIASH. Accordingly, counsel concludes that the two British beneficiaries never owned any legal or equitable interest in the shares of stock. He therefore urges the Commission to find that the 900 shares were at all pertinent times owned by nationals of the United States.

Upon consideration of the entire record, the Commission is constrained to reject counsel's contentions. The Commission finds that the *Hamilton v. Drogo* case stands for the proposition that a court may not substitute its discretion for that of trustees in whom absolute discretion is vested; nor may the court compel such trustees to exercise their discretion in a certain manner. However, that case does not support counsel's contention that the two British beneficiaries had no legal or equitable interest in the 900 shares of stock.

As noted above, the agreement of October 3, 1950 provided that the Trustees in their sole discretion could distribute the income and corpus to any one or more of the beneficiaries. There is nothing in that agreement to authorize the Trustees to distribute any part of the income or the corpus to themselves under any conditions. It is therefore clear beyond peradventure of doubt that none of the Trustees owned any interest, legal or equitable, in any income or principal of the trust property, and the Commission so finds. The Trustees merely held the bare legal title to the 900 shares of stock, and their sole interest therein was to distribute the income and the principal of the trust property to one or more of the beneficiaries pursuant to the provisions of the agreement.

The Commission notes the statements of claimants and counsel that the only person to whom income from the trust was ever allotted is LEO ELIASH. The record in Claim No. CU–1818 includes copies of accounting reports concerning the trust for the fiscal period October 1, 1959 to September 30, 1960.

However, and in any event, the status of the income from the trust has no bearing on ownership of the corpus of the trust. The Commission has held consistently that the beneficial owner of the claim, and not the ostensible or nominal holder, is the proper party claimant in a proceeding under the International Claims Settlement Act of 1949, as amended. (See the *Claim of Florida National Bank and Trust Co. at Miami, Adm. c.t.a. of the Estate of Francisco Hidalgo Gato, Deceased.* Claim No. CU–0587; and see also Settlement of Claims by FCSC 45 (September 14, 1949 to March 31, 1955) ; FCSC Dec. & Ann. 312, 389, 589–593 (1968).)

Upon full consideration of this matter, the Commission finds that on October 14, 1960, the date of loss, and from that date until March 7, 1966, the equitable interest in the 900 shares of stock in Wintrade was owned by the beneficiaries in equal shares. Since there were four beneficiaries, including two British nationals—Michael Golodetz and Lionel Golodetz—the Commission finds that a 50% interest in the trust property was beneficially owned by nonnationals of the United States.

Accordingly, the Commission finds that 450 of the 900 shares of stock in Wintrade, upon which LEO ELIASH's claim is based, were beneficially owned by nonnationals of the United States on October 14, 1960, the date of loss. Pursuant to the express provisions of Section 504(a) of the Act, the portion of LEO ELIASH's claim based upon said 450 shares of stock in Wintrade cannot be considered. Therefore, this portion of his claim is denied.

(See *Claim of Sigridur Einarsdottir*, Claim No. CU–0728, 25 FCSC Semiann. Rep. 45 [July-Dec. 1966].)

## VALUATION

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of a valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

It is noted that no claim is being made for any other asset of Wintrade, except the 377,943 bags of sugar. Counsel's memorandum accompanying his letter of May 12, 1971, and statements from the claimants, indicate that Wintrade owned other assets in Cuba. It appears, however, that claimants have no evidence to establish either the precise nature of such property or its value, and therefore have made no claim for such other assets of Wintrade. The record shows that Wintrade owned certain assets in the United States, which could not have been taken by the Government of Cuba. In connection with such assets, the record indicates that application was made by claimants to the Foreign Assets Control, United States Treasury Department, to unblock such assets which was granted in part.

It further appears from the evidence of record that Wintrade owned a 100% stock interest in Atlantic Warehouse & Transportation Co., a Cuban corporation; and that INTERCONTINENTAL AFFILIATES (Claim No. CU–1819) owned a 100% stock interest in West Indies Commercial Co., S.A., also a Cuban corporation, both of which corporations were assertedly taken by the Government of Cuba. However, no claims are being made for these stock interests due to the lack of evidence.

Accordingly, the only asset of Wintrade to be considered in reaching its net worth is the sugar.

The record shows that each of the 377,943 bags of sugar contained 250 pounds. The evidence also establishes that the Cuban authorities had fixed the price of sugar intended for foreign consumption at $0.0325 per pound which is the amount being claimed.

On the basis of the evidence of record, the Commission finds that each bag of sugar had a value of $8.125 and that the aggregate value of the 377,943 bags on October 14, 1960 was $3,070,786.88. However, as already indicated, Wintrade owed a debt of $2,183,299.25 in connection with the sugar. Therefore, Wintrade's equity in the sugar amounted to $887,487.63. Since Wintrade had 4,140 shares of outstanding capital stock on the date of loss, each share had a value of $214.369. Accordingly, claimants sustained the following losses:

EFIM GOLODETZ—Claim No. CU–1816
60 shares _____$12,862.14

FOREIGN CLAIMS SETTLEMENT COMMISSION          191

LEO ELIASH—Claim No. CU–1818

450 shares ------------------------------------------$96,466.05

INTERCONTINENTAL AFFILIATES—Claim No. CU–1819

2,820 shares ---------------------------------------$604,520.58

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case, it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that EFIM GOLODETZ suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twelve Thousand Eight Hundred Sixty-two Dollars and Fourteen Cents ($12,862.14) with interest thereon at 6% per annum from October 14, 1960 to the date of settlement.

The Commission certifies that LEO ELIASH suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Ninety-six Thousand Four Hundred Sixty-six Dollars and Five Cents ($96,466.05) with interest thereon at 6% per annum from October 14, 1960 to the date of settlement; and

The Commission, certifies that LEO ELIASH, JOACHIM GINZBERG, EFIM GOLODETZ, MARC L. GINZBERG, OSCAR GINZBERG, DAVID GINZBERG, and ISAAC SUDER d.b.a. INTERCONTINENTAL AFFILIATES suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Six Hundred Four Thousand Five Hundred Twenty Dollars and Fifty-eight Cents ($604,520.58) with interest thereon at 6% per annum from October 14, 1960 to the date of settlement.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission August 11, 1971.

## IN THE MATTER OF THE CLAIM OF INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, INDIVIDUALLY AND AS TRUSTEE

Claim No. CU–2615—Decision No. CU–5013

*Losses sustained by a United States corporation which became defunct after the loss, may be certified to a majority stockholder as trustee for the benefit of non-claimant stockholders and creditors.*

### PROPOSED DECISION*

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $61,089,234.00, was presented by INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, based upon asserted losses resulting from the nationalization of the Cuban Telephone Company and properties of its

---

* This decision was entered as the Commission's Final Decision on July 27, 1970.

subsidiaries as well as debts of nationalized enterprises. Subsequently separate claims were opened for five United States subsidiaries of the INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION for their losses which originally had been included in this claim. The remainder now represented by this claim amounts to $57,306,561.00.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, hereafter referred to as ITT, was organized under the laws of the State of Maryland. An officer of claimant corporation has certified that at all pertinent times more than 50% of claimant's outstanding capital stock was owned by nationals of the United States and on August 6, 1970, 7.319% of the shares of ITT stock outstanding was held by or for the account of aliens. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The claim as originally filed was for $61,089,234.00 as follows:

| | |
|---|---|
| Nationalization of Cuban Telephone Company (hereinafter called "Cutelco") | $53,309,525.00 |
| Nationalization of Equipos Telefonicos Standard de Cuba | 1,042,000.00 |
| Expropriation of Havana and Santiago Properties of All American Cables & Radio, Inc. | 254,235.00 |
| Loss of Obligations Owed to ITT and Subsidiaries | 6,475,960.00 |
| Loss of Cuban Patents | 7,514,00 |
| | $61,089,234.00 |

Inasmuch as Section 505(a) of the Act provides, *inter alia*, that a claim under Section 503(a) of the Act based upon an ownership interest in a corporation which is a national of the United States shall not be considered, five of the ITT subsidiaries which are nationals of the United States subsequently filed separate claims for their losses, Claim Nos. CU–8290 through CU–8294. Consequently, this claim is for the following losses:

| | | |
|---|---|---:|
| A. | Nationalization of Cutelco | $53,309,525.00 |
| B. | Obligations owed by Cutelco | 3,347,022.00 |
| C. | Obligations owed to the Kellogg Division of ITT by Equipos | 642,500.00 |
| D. | Loss of Patent Rights | 7,514.00 |
| | Total | $57,306,561.00 |

### NATIONALIZATION OF CUTELCO

Claimant, which as above noted is a United States corporation, owned on August 6, 1960, the date of its nationalization, 258,685 shares of the common stock out of 482,805 shares of the total outstanding capital stock of Cutelco. Claimant's asserted losses in this connection now total somewhat less than the above figure computed by the Commission of $57,306,561.00, i.e., $56,656,547.00.

The record establishes that Cuban Telephone Company (Cutelco) was organized under the laws of the State of Delaware in 1908 and that it is no longer in good standing, having been declared inoperative and void by the Secretary of State for the State of Delaware. Accordingly, the Commission holds that claimant may file a claim based upon its ownership interest in the enterprise.

Evidence presented to the Commission reveals that Cutelco was granted a concession to establish a telephone system in Cuba which concession was later incorporated into a contract between Cutelco and the Cuban Government for providing telephone service throughout the Republic of Cuba. On March 14, 1957 a new concession agreement was entered into which required a large expansion of telephone facilities and an increased investment of nearly $66,000,000.00. By March 1, 1959 Cutelco had 171,434 telephones installed and operating with 4,929 employees and $17,298,000.00 worth of construction work in progress and materials on hand. Telephone service was conducted from 162 central offices interconnected by a distribution system having approximately 326,463 miles of wire in underground cable, 159,109 miles in aerial cable, 31,900 miles of open wire and 3,795 miles of pole lines.

On August 6, 1960, the Government of Cuba announced its Resolution No. 1, pursuant to Law 851 of July 6, 1960, which listed as nationalized the Cuban Telephone Company and its affiliated enterprises. Accordingly, the Commission finds that its property in Cuba was nationalized on August 6, 1960 by the Government of Cuba.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights or interests taken, the Comission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of placement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and

equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

Evidence available to the Commission includes an appraisal of the tangible property of Cutelco, balance sheets as of December 31, 1957, 1958 and 1959, and a balance sheet as of May 31, 1960 using adjusted values for assets on the basis of the appraisal.

The appraisal gives the following values for Cutelco's tangible assets as of May 31, 1960:

| Property | Replacement Cost |
|---|---|
| Land and Land Improvements | $ 3,327,227.00 |
| Buildings | 9,532,547.00 |
| Central Office Equipment | 49,607,446.00 |
| Station Telephone Apparatus | 7,886,615.00 |
| Station Installation | 6,171,542.00 |
| Special Station Equipment | 394,886.00 |
| Private Branch Exchanges | 3,983,128.00 |
| Booths and Special Fittings | 121,683.00 |
| Exchange Pole Lines | 4,623,501.00 |
| Exchange Aerial Cable | 8,406,356.00 |
| Exchange Aerial Wire | 1,125,007.00 |
| Exchange Conduit | 10,070,888.00 |
| Exchange Underground Cable | 17,924,710.00 |
| Exchange Submarine Cable | 3,932.00 |
| Exchange Right of Way | 137,402.00 |
| Toll Pole Lines | 13,201,854.00 |
| Toll Aerial Cable | 118,207.00 |
| Toll Aerial Wire | 9,451,958.00 |
| Toll Conduit | 301,982.00 |
| Toll Underground Cable | 1,005,482.00 |
| Toll Submarine Cable | 22,125.00 |
| Toll Right of Way | 457,395.00 |
| Furniture & Office Equipment | 1,150,373.00 |
| Shop Equipment | 46,027.00 |
| Storeroom Equipment | 65,802.00 |
| Transportation Equipment | 994,717.00 |
| General Tools | 663,275.00 |
| Construction Work in Progress | 8,010,097.00 |
| Total Plant | $158,716,164.00 |
| Depreciation to be deducted | 34,347,466.00 |
| Total Replacement Cost Less Depreciation | $124,368,698.00 |

The May 31, 1960 balance sheet, including the appraised valuations and certain other adjustments explained below, is as follows:

### ASSETS

| | | |
|---|---|---|
| Plant, Property & Equipment | $158,716,164.00 | |
| Reserve for Depreciation | 34,347,467.00 | $124,368,697.00 |
| Construction Materials | | 2,214,185.00 |

Current Assets
| | | |
|---|---:|---:|
| Cash | $    230,580.00 | |
| Accounts Receivable | 3,346,747.00 | |
| Material & Supplies | 3,051,201.00 | 6,628,528.00 |

| | |
|---|---:|
| Receivables from Cuban Federal, Provincial and Municipal Governments | 1,117,026.00 |
| Deferred Charges | 1,095,938.00 |
| Total | $135,424,374.00 |

## CAPITAL AND LIABILITIES

| | | |
|---|---:|---:|
| Preferred Stock—6% cuml. par value $100 | | |
| Issued and outstanding—87,805 shares | | $  8,780,500.00 |
| Common Stock—par value $100 per share | | |
| Issued and outstanding—395,000 shares | | 39,500,000.00 |
| Earned Surplus | | 2,293,274.00 |
| Appraisal Surplus | | 31,284,099.00 |
| | | $ 81,857,873.00 |
| Long Term Debt | | |
| 4% Debentures, Series A, due 1965 | $  6,000,000.00 | |
| 4% Debentures, Series B, due 1973 | 9,000,000.00 | |
| 6% Notes | 17,058,200.00 | |
| | | $ 32,058,200.00 |
| Current Liabilities | | |
| 6% Notes | $  8,836,700.00 | |
| Notes Payable | 4,225,100.00 | |
| Accounts and Wages Payable | 1,411,187.00 | |
| Accrued Taxes, interest, unpaid dividends on preferred stock | 3,331,559.00 | |
| Amounts owing to ITT and subsidiaries | 3,215,198.00 | |
| Advance Billings | 488,557.00 | |
| Total | | $135,424,374.00 |

The Commission finds that the valuation most appropriate to the property and equitable to the claimant is that shown in Cutelco's May 31, 1960 balance sheet, subject to the adjustments noted below. This claimant, in listing certain of its current assets and current liabilities, had converted pesos into dollars at the rate of 3:1. The Commission, however, has consistently held that the peso was on a par with the dollar on January 1, 1959, when the Castro regime came into power, and this conversion factor has been retained throughout the Cuban claims program, irrespective of day-to-day currency fluctuations. Consequently, appropriate adjustments have been made in the dollar amounts set forth above for "Current Assets" and "Current Liabilities" and an offsetting entry called "Revaluation Surplus $8,323,643.00" has been deleted. On that basis, the net worth of Cutelco on August 6, 1960 is determined to have been $81,857,873.00.

In addition, to arrive at a proper value for the common stock it is necessary to deduct the fair value of the outstanding preferred stock which the Commission finds had a value of $9,175,622.50, consisting of the par value

plus $395,122.50 for unpaid dividends. Thus, the loss sustained by the common stockholders for their equity in the net worth amounted to $72,682,250.50 and the loss per share for each of the 395,000 shares of common stock outstanding on August 6, 1960 was $184.0057.

The Commission concludes that claimant, as a holder of 258,685 shares of common stock of Cutelco, sustained a loss as a result of the taking of the assets of that Company by the Government of Cuba on August 6, 1960 in the amount of $47,599,514.50 within the meaning of Title V of the Act.

### Debts Owed by Cutelco

Claimant asserts a claim herein also for the amount of $3,347,022.00 for obligations owed it by Cutelco.

The statute precludes the assertion of unsecured claims against a United States corporation. However, Cutelco, being defunct, is no longer in that category. It would obviously be inequitable to deprive creditors of their remedy where the debtor is a corporation organized in the United States but is no longer in existence. Inasmuch as Cutelco's assets have been nationalized and are being used by the Government of Cuba, creditors should be entitled to file claims herein and the Commission so holds.

The obligations claimed are as follows:

| | | |
|---|---:|---:|
| Billed Receivables | | $ 583,077.00 |
| Amounts Due, Unbilled | | 640,498.00 |
| Underbilling due to clerical errors | | 234,545.00 |
| Engineering Charges Unbilled | | 69,316.00 |
| Obsolete & Excess Inventory Scrapped | | |
|    Existing orders | $ 69,686.00 | |
|    Inventories stocked | 610,000.00 | |
|    Canceled orders for Parts | 112,067.00 | 791,753.00 |
| 1959 Management Service Contract | | 900,000.00 |
| Payment of Salaries, Expenses, etc. | | |
|    for Cutelco Employees | | 102,833.00 |
| Compensation to Former Cutelco | | |
|    Employees for Loss of Personal Effects | | 25,000.00 |
| | Total | $3,347,022.00 |

Claimant has submitted copies of its accounting records, inter-office memoranda and copies of agreements with Cutelco regarding management services. On the basis of the evidence of record, the Commission holds that claimant sustained a loss in the amount of $2,427,436.00 for debts owed by Cutelco on August 6, 1960 for materials, engineering charges and management services as a result of the nationalization of the assets of Cutelco.

A finding of loss for the obsolete and excess inventory as a result of the nationalization of Cutelco's assets is not warranted by evidence of record. A portion of the inventory resulted from the cancellation of a contract by Cutelco because of nondelivery of the contracted items due to a strike at the factory; some inventory was added because of expected orders from the company in Cuba; and an indeterminate amount was sold as scrap by claimant. Accordingly, this portion of the claim is denied.

Claimant also asserts the loss of a total amount of $127,833.00 for payment of salaries, expenses and compensation for personal losses of Cutelco employees. No documentation has been submitted of the nationality or assign-

FOREIGN CLAIMS SETTLEMENT COMMISSION   **197**

ment of claim of the Cutelco employees to whom compensation was assertedly made. Therefore, this part of the claim must also be denied.

The Commission concludes that claimant sustained an additional loss in the amount of $2,427,436.00 for debts owed as a result of the nationalization of the assets of Cutelco on August 6, 1960 within the meaning of Title V of the Act.

### DEBTS OF EQUIPOS TELEFONICOS STANDARD DE CUBA

A portion of the claim in the amount of $624,500.00 is based upon certain debts owed to the Kellogg Division of claimant for electrical equipment shipped and services rendered to Equipos Telefonicos Standard de Cuba, a Cuban enterprise in Havana, Cuba. The record shows that Equipos Telefonicos Standard de Cuba was nationalized by the Government of Cuba on August 6, 1960 by Resolution 1, pursuant to Law 851 of July 6, 1960.

The record contains a balance sheet of Equipos as of December 31, 1960, copies of the accounting records of the Kellogg Division of ITT, and affidavits of officials of ITT which reflect a debt owed to claimant by Equipos on August 6, 1960 of $642,499.38 for electrical equipment and engineering services.

Based upon all the evidence of record, the Commission finds that ITT sustained a loss in the amount of $642,499.38 within the meaning of Title V of the Act as a result of the nationalization of Equipos Telefonicos Standard de Cuba by the Government of Cuba on August 6, 1960.

### PATENTS

Claim is also asserted for the loss of 34 patents valued at $7,514.00. The record contains an affidavit by the Director of Licensing of ITT stating that there were 34 patents active in Cuba relating to telephone switching apparatus and equipment which cost an average of $221.00 each for filing and other expenses. Claimant contends that the right to exploit these patents in Cuba through its subsidiaries has been lost through the actions of the Cuban Government in its nationalization of the Cuban Telephone Company and its associated companies on August 6, 1960. It has submitted no evidence, however, concerning the value of the said patents, or the right to exploit the same, and has confined its claim solely to its filing costs.

The Commission finds that ITT sustained a loss in the amount of $7,514.00, the fair value of the above-mentioned patents, within the meaning of Title V of the International Claims Settlement Act of 1949, as amended, as a result of the said nationalization on August 6, 1960.

### CERTIFICATION FOR UNCLAIMED ASSETS

As previously set forth, the total assets of Cutelco amounted to $135,424,374.00 at the time they were nationalized by the Cuban Government. From the record, it is determined that claims, other than the instant claim, have been filed which involve the interests of other creditors, preferred stockholders and common stockholders in the amount of $5,394,629.36. This amount with the total amount herein certified as lost by ITT through the nationalization of Cutelco's assets totals $55,421,579.86, leaving a balance of the assets not claimed before this Commission in the amount of $80,002,794.14.

Accordingly, a certification of loss in the amount of $80,002,794.14 is made to ITT, in trust for the benefit of non-claimant shareholders and creditors of

198        FOREIGN CLAIMS SETTLEMENT COMMISSION

Cutelco. The distribution of such a trust is to be made in accordance with the laws of the State of Delaware and Title V of the International Claims Settlement Act of 1949, as amended, preference to be given to creditors, preferred stockholders and common stockholders in that order, and the qualifications as to nationality to be observed. The distribution is to be made on the same pro rata basis as employed in determining any payment made to successful claimants against the Government of Cuba.

### INTEREST

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Fifty Million Six Hundred Seventy-six Thousand Nine Hundred Sixty-three Dollars and Eighty-eight Cents ($50,676,963.88) with interest thereon at 6% per annum from August 6. 1960 to the date of settlement; and

The Commission certifies that INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION AS TRUSTEE for the benefit of non-claimant shareholders and creditors of Cutelco suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Eighty Million Two Hundred Seven Hundred Ninety-four Dollars and Fourteen Cents ($80,002,794.14) with interest thereon at 6% per annum from August 6, 1960 to the date of settlement.

Dated at Washington, D.C., June 17, 1970.

## IN THE MATTER OF THE CLAIM OF AETNA INSURANCE COMPANY

Claim No. CU–2363—Decision No. CU–6804

*Under international law, decrees of Cuba may not be given extraterritorial effect.*

### PROPOSED DECISION *

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $173,040.27, was presented by AETNA INSURANCE COMPANY based upon the asserted loss of certain personal property in Cuba.

Under Title V of the international Claims Settlement Act of 1949 [78 State. 1110 (1964), 22 U.S.C. §§ 1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with

---

* This decision was entered as the Commission's Final Decision on September 30, 1971.

applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 503(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any States, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of Connecticut and that at all pertinent times more than 50% of its outstanding capital stock was owned by nationals of the United States. An officer of claimant has certified that on or about April 25, 1967, 90 shares of its outstanding capital stock of one million shares, or .009%, were owned by nonresidents of the United States and that 99.991% was owned by United States residents (Exhibit P). The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

Claimant asserts the following losses:

| | |
|---|---:|
| 4% bonds of the Republic of Cuba, 1953–1983 | $95,000.00 |
| 4% bonds of the Republic of Cuba, Bank Consolidation, 1960–1990 | 5,100.00 |
| Cash deposited with Cuban Treasury Department ($13,182.55 plus $4,592.10) | 17,774.65 |
| Bank account | 55,165.62 |
| Total | $173,040.27 |

The record shows that claimant conducted an insurance business in Cuba through a Cuban entity which acted as its agent. In order to qualify for a license to do business in Cuba, claimant was required to deposit with the Cuban authorities collateral as a guarantee that it would meet its obligations. Claimant made the following deposits in 1959 for which it was given official receipts by the Cuban Ministry of the Treasury:

1. 19 bonds of the issue known as 4% Republic of Cuba Veterans, Courts and Public Works, 1953–1983, each in the amount of $1,000.00; 50 shares of stock in Financiera Nacional of Cuba in the amount of $100.00 each; and $1,000.00 in cash, for an aggregate deposit of $25,000.00—Receipt No. 23347 (Exhibit F).

2. 56 bonds of the same issue as above, each in the amount of $100.00; and $19,000.00 in cash, for an aggregate deposit of $75,000.00—Receipt No. 23348 (Exhibit G).

3. 20 bonds of the same issue as above, each in the amount of $1,000.00; and cash in the amount of $5,000.00, for an aggregate deposit of $25,000.00—Receipt No. 23349 (Exhibit H).

Pursuant to Law No. 685 of August 17, 1960, Financiera Nacional de Cuba was liquidated and all obligations thereof were assumed by the Government of Cuba. (See *Claim of Phoenix Insurance Company*, Claim No. CU–1913.) Subsequently, the stockholders of the liquidated entity were offered the opportunity to exchange their shares of stock for 4% bonds of an issue known as Republic of Cuba Consolidated and Guaranteed Debt of the Bandes, 1960–1990 (Exhibit L). Claimant accepted the offer and received Certificate No. M–564, dated February 21, 1961, representing a bond of that issue in the face amount of $5,000.00 as well as Certificate No. C–342, dated February 21, 1961, representing a bond of the same new issue in the face amount of $100.00 (Exhibits M and N), the latter apparently on account of dividends due on the 50 shares of stock that were exchanged.

Claimant's Cuban agent deposited the new $5,000.00 bond with the Cuban Treasury Department, and in lieu of Receipt No. 23347, he was given Receipt No. 89 of March 10, 1961 (Exhibit I) which was identical with the earlier one except that it showed $5,000.00 of bonds of the new issue instead of 50 shares of stock. The new bond for $100.00 was retained by the Cuban agent.

As a result of these transactions, claimant had on deposit bonds of the 1953–1983 issue aggregating $95,000.00; cash in the amount of $25,000.00; and a bond of the 1960–1990 issue in the amount of $5,000.00. In addition, claimant's Cuban agent held a bond of $100.00 of the 1960–1990 issue; and further claimant owned a bank account at the Trust Company of Cuba which was later transferred to the National Bank of Cuba, discussed below.

It appears from the evidence of record that claimant had issued two insurance policies covering property of Pedro Menendez, a Cuban national, in Cuba. Menendez suffered certain losses in 1958 and 1959 apparently within the scope of the insurance policies. Subsequently, Menendez came to the United States and sued claimant for his losses, which suit is discussed hereafter.

On April 7, 1959, the Cuban Government published in its Official Gazette an announcement that Menendez's properties had been confiscated and now belong to Cuba (Exhibit D). The record includes a copy of part of claimant's answer to the Menendez suit, showing claimant's principal grounds of defense (Exhibit C). By letter of October 14, 1959, the Cuban Government served notice on claimant's Cuban agent of said confiscation and demanded payment for the losses of Menendez under the insurance policies (Exhibit C, p. 18). On January 8, 1960, the Cuban Government notified claimant's Cuban agent that in view of claimant's failure to pay Cuba for the said losses of Menendez in the amount of $65,420.90, it had ordered the seizure of $75,000.00 of claimant's bonds; and had suspended claimant's license to do business in Cuban until claimant restored its deposits to status quo (Exhibit C, pp. 19–22).

Claimant states that on March 30, 1960 Cuba seized the bonds, sold them and kept the proceeds (Exhibit B). The record shows, however, that the Cuban Treasury Department issued Receipt No. 23742 on February 2, 1960 indicating a deposit of $7,182.55 in favor of claimant (Exhibit 0). In analyz-

ing these circumstances, claimant states under date of October 20, 1967, that Cuba took the 56 bonds and the $19,000.00, represented by Receipt No. 23348, and returned $7,182.55 thereof. On the basis of that assumption by claimant, it asserts in part, a loss of cash in the amount of $13,182.55, representing $1,000.00 (Receipt No. 89), 5,000.00 (Receipt No. 23349), and $7,182.55 (Receipt No. 23742). Another amount of cash assertedly on deposit with Cuban authorities in the amount of $4,592.10 is discussed below.

The record shows that Menendez, the insured, instituted suit in the Federal courts against claimant, seeking to recover for his losses pursuant to the insurance policies issued by claimant. The principal defenses pleaded by claimant are: that Cuba owns the insurance claim as a result of the confiscation of Menendez's properties (Exhibit D); and that Cuba's claim in this respect has been fully satisfied and discharged as evidenced by a release executed by the Cuban Government (Exhibit C, pp. 13–17).

It appears from Exhibit Q that Menedez suffered two losses, one on November 20, 1958 in the amount of $60,592.10, and the other on January 20, 1959 in the amount of $4,828.80, aggregating $65,420.90, the amount taken by Cuba from the proceeds of claimant's seized bonds. It further appears that while both losses were covered by policies issued by claimant, Menendez is suing only for the loss of $60,592.10. On the basis of the foregoing, claimant has augmented its claim by that amount. Claimant states that Cuba took 56 bonds with a value of $56,000.00, plus $4,592.10 in cash, aggregating $60,592.10. Since the $56,000.00, in bonds is already included in its claim for 95 bonds of $1,000.00 each, claimant asserts the loss of $4,592.10 in cash. Claimant states that if it is successful in defending the suit by Menendez, its claim will be reduced by $60,592.10 (Exhibit B).

It appears to be undisputed that Menendez suffered losses in the aggregate amount of $65,420.90. This fact is confirmed by claimant's Exhibit Q. Therein claimant lists the two policies issued in favor of Menendez, the dates when the insured sustained the losses, and the amounts thereof attributable to each policy. Claimant adds: "Mr. Menendez is suing us only for the first listed loss, and that is all we are claiming ($60,592.10)."

The record shows that Menendez's suit against claimant was first dismissed and upon ultimate appeal to the United States Supreme Court, the case was remanded to the United States Court of Appeals (*Aetna Insurance Co.* v. *Menendez*, 376 U.S. 781 (1964).) In turn, the United States Court of Appeals remanded the case to the District Court. (*Menendez* v. *Aetna Insurance Co.*, 340 F. 2d 708 (1965).) The Commission is advised that generally the courts of the United States have held in favor of the Cuban insureds in similar circumstances. (*Blanco* v. *Pan-American Life Ins. Co., et al.*, 221 F. Supp. 219 (S.D. Fla. 1963).) Under date of June 2, 1971, claimant informed the Commission that a decision had been entered in favor of Menendez and that claimant's attorneys were proceeding with an appeal.

A copy of of the decision in favor of Menendez was forwarded to the Commission under date of July 19, 1971. The decision recites that the situs of the insurance claim against claimant was not Cuba; that the court could not give to Cuba's expropriation decree against Menendez's property because that would be tantamount to giving extraterritorial effect to Cuba's decrees; that the "Act of State" doctrine, therefore, did not apply in this ase; and that Menendez was entitled to judgment. It further appears that Pedro Menendez died on September 27, 1969 and that the Administrator, C.T.A. of his estate was substituted as party plaintiff.

A communication of July 13, 1971, from claimant's counsel states that on June 22, 1971 the United States Court of Appeals for the Fifth Circuit affirmed the judgment in favor of Menendez. Counsel further advised that on July 6, 1971 a petition for rehearing was filed with the Appellate Court, which has not yet acted upon it.

Upon consideration of the foregoing in light of the entire record, the Commission finds that on March 30, 1960 the Government of Cuba took claimant's property aggregating $75,000.00 in value. While the earlier deposit by Cuba of $7,182.55 in favor of claimant is not explained, it nevertheless served to reduce claimant's loss of March 30, 1960 *pro tanto*. Therefore, the Commission finds that claimant sustained a loss of $67,817.45 on March 30, 1960.

### Bonds of the 1953–1983 Issue

On the basis of the evidence of record, the Commission finds that claimant originally owned 95 bonds of the 1953–1983 issue in the aggregate face amount of $95,000.00. Records available to the Commission disclose that the Cuban Government first defaulted in the payment of interest on these bonds on May 1, 1961. (See *Claim of Weschester Fire Insurance Company*, Claim No. CU–1703.) The Commission has held that such a default gave rise to a claim under Title V of the Act. (See *Claim of Clemens R. Maise*, Claim No. CU–3191, 1967 FCSC Ann. Rep. 68.)

Based upon the entire record and in the absence of evidence to the contrary, the Commission finds that the bonds in question had a value of $1,000.00 each of May 1, 1961, the date of loss.

The Commission finds that on March 30, 1960 Cuba seized $75,000.00 in bonds, represented by Receipt No. 23348 (56 bonds) and Receipt No. 89 (19 bonds), as noted above. The Commission further finds that on May 1, 1961, the date of loss, claimant owned 20 bonds of the 1953–1983 issue having an aggregate value of $20,000.00.

### Bonds of the 1960–1990 Issue

The evidence establishes and the Commission finds that claimant owned Republic of Cuba bonds of the 1960–1990 issue in the face amount of $5,100.00. As already noted, claimant acquired these bonds in 1961 as a result of an exchange involving 50 shares of stock in Financiera Nacional de Cuba formerly owned by claimant.

Law 989, published in the Cuban Official Gazette on December 6, 1961 by its terms effected the confiscation of all bonds, rights and other property of persons who left Cuba or American firms no longer doing business in Cuba. The Commission finds that this law applied to claimant, and that its rights with respect to the bonds were taken by Cuba on December 6, 1961 pursuant to Law 989. (See *Claim of Wallace Tabor, et al., infra*, and *Claim of Bogar & Crawford, infra*.) Accordingly, the Commission finds that claimant sustained a loss of $5,100.00 on December 6, 1961.

### Cash Deposited with Cuban Treasury Department

Based upon the evidence of record, the Commission finds that claimant had no deposit with the Cuban Treasury Department cash in the amount of $25,000.00 (Receipt Nos. 23348, 23349 and 89). The $7,182.55, as shown by Receipt No. 23742, issued by the Cuban authorities without claimant's knowledge or consent has been accounted for above. The Commission therefore

finds that the Government of Cuba held $25,000.00 in funds belonging to claimant.

In the absence of evidence to the contrary, the Commission finds that claimant's funds were taken by the Government of Cuba on December 6, 1961 pursuant to Law 989 (*supra*; see *Claim of Floyd W. Auld,* Claim No. CU–0020, 25 FCSC Semiann. Rep. 55 [July-Dec. 1966]; *Claim of Wallace Tabor and Catherine Tabor,* Claim No. CU–0109, *id.* at 53; and *Claim of Boger & Crawford,* Claim No. CU–0037). Accordingly, the Commission finds that claimant sustained a loss of cash on December 6, 1961 in the amount of $25,000.00.

### BANK ACCOUNT

The evidence establishes that claimant owned a bank account at The Trust Company of Cuba which had been transferred to the National Bank of Cuba. Claimant asserts a loss of $55,165.62 as shown in a copy of a bank statement as being the balance in its favor as of August 20, 1963 (Exhibit E). The record includes claimant's letter of January 22, 1962 to the State Department, in which claimant complained that it was unable to obtain any information concerning its bonds and cash on deposit with the Cuban Government and its account at a Cuban bank.

On the basis of the entire record, the Commission finds that claimant's bank account was taken by the Government of Cuba on December 6, 1961 pursuant to Law 989. (See *Auld* and *Boger & Crawford, supra.*)

The copy of the bank statement indicates that the account is inactive. The amount of $55,167.37 as of June 17, 1963 appears as the previous balance, and the statement shows two subsequent entries—a bank service charge of $3.00 on June 25, 1963, and a credit of $1.25 as of August 19, 1963. Inasmuch as these two transactions occurred after December 6, 1961, they cannot affect the balance in claimant's favor on the date of loss.

On the basis of the entire record and considering the fact that the account had been inactive for some time, the Commission finds that the valuation most appropriate to the bank account and equitable to the claimant is that shown in the bank statement as the "previous balance" as of June 17, 1963. Accordingly, the Commission finds that the value of claimant's bank account on December 6, 1961 was $55,167.37.

### RECAPITULATION

Claimant's losses are summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| Proceeds of Bonds, 1953–1983 | March 30, 1960 | $67,817.45 |
| Bonds, 1953–1983 | May 1, 1961 | 20,000.00 |
| Bonds, 1960–1990 | December 6, 1961 | 5,100.00 |
| Cash with Cuban Government | December 6, 1961 | 25,000.00 |
| Bank Account | December 6, 1961 | 55,167.37 |
| | Total | $173,084.82 |

The Commission has decided that in certification of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered as follows:

| | |
|---|---:|
| March 30, 1960 | $67,817.45 |
| May 1, 1961 | 20,000.00 |
| December 6, 1961 | 85,267.37 |
| Total | $173,084.82 |

### CERTIFICATION OF LOSS

The Commission certifies that AETNA INSURANCE COMPANY suffered a loss, as a result of action of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Seventy-three Thousand Eighty-four Dollars and Eighty-two Cents ($173,084.82) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission September 1, 1971.

## IN THE MATTER OF THE CLAIM OF JENNIE M. FULLER, ET AL.

Claim No. CU–2803—Decision No. CU–6199

*Discriminatory action by Cuba against an American gave rise to a claim under international law and Title V of the Act. The value of a death claim is measured by the amount of contributions the deceased would have made to his dependents.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $408,982.00, was presented originally by William Otis Fuller and JENNIE M. FULLER, nationals of the United States since birth, based on the loss of certain real and personal property in Cuba. In addition, claim is made for the death of their son. William Otis Fuller died intestate in Florida on December 1, 1969. Upon his death, his property interests were inherited in equal shares by his wife and six children and by his granddaughter, the daughter of his deceased son, Robert Otis Fuller, who died on October 16, 1960. Accordingly, the six children and granddaughter have been substituted as party claimants in the place of the late William Otis Fuller.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the Untied States.

---

\* This decision was entered as the Commission's Final Decision on June 24, 1971.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The following losses are asserted:

| | |
|---|---:|
| Plantation at Holguin, Cuba, consisting of 68.994 caballerias of land and improvements | $358,982.00 |
| Equipment, livestock and other items of personal property | 50,000.00 |
| Total | $408,982.00 |

Claim is also made in an unstated amount for the death of Robert Otis Fuller, son of JENNIE M. FULLER and her late husband, William Otis Fuller.

The record shows that for a number of years prior to World War II JENNIE M. FULLER, her late husband, and other members of her family owned certain land in Holguin, Cuba. The claim of said relatives, Mr. and Mrs. Miles Chester Jewett, Claim No. CU–2804, will be decided on its own merits. The family operated a saw mill, raised cattle and crops and ultimately grew sugar cane.

On July 21, 1940, the family assets in Holguin, Cuba were transferred to a Cuban corporation, Cia. Agricola de Lewiston, S.A., expressly created for the purpose of carrying on the family business in Cuba. Originally, the total outstanding capital stock of the Cuban corporation was 355 shares but this was subsequently reduced to 235, distributed as follows: Mr. and Mrs. William Otis Fuller, 127 shares; and Mr. and Mrs. Miles Chester Jewett, 108 shares.

The Cuban corporation conducted its business until August 1959, when the Cuban National Institute of Agrarian Reform (I.N.R.A.) ordered the dissolution of the corporation. As of September 3, 1959, the Cuban corporation was formally dissolved, and its assets were distributed to its stockholders as follows: Mr. and Mrs. William Otis Fuller, 68.994 caballarias of land (1 caballeria equalling 33.162 acres); and Mr. and Mrs. Miles Chester Jewett, 58.730 caballarias of land. These land areas included improvements as indicated further below.

In December 1959, the late William Otis Fuller left Cuba, Mrs. Fuller remaining behind in Cuba. In February 1960 the I.N.R.A. authorities ordered Mrs. Fuller to exercise no further acts of ownership over the real property. She was permitted to remain at home, but could neither sell nor use any of the livestock without permission from the intervenor. Moreover, Mrs. Fuller was permitted to collect amounts due on behalf of the plantation, but was required to turn over the proceeds to agents of I.N.R.A. In June 1960, Mrs. Fuller could no longer perform even those ministerial acts.

On the basis of the entire record, the Commission finds that the entire plantation, including all of its improvements, as well as the livestock, personal belongings and other items of personal property situated on the plantation, were intervened or taken by the Government of Cuba in February 1960. In the absence of evidence to the contrary, the Commission finds that the taking ocurred on February 15, 1960.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be te determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

PLANTATION

As noted above, the original claimants, William Otis Fuller and JENNIE M. FULLER, each owned a ½ interest in 68.994 caballerias of land and improvements in Holguin, Cuba. Upon his death on December 1, 1969, the late Mr. Fuller's ½ interest was inherited by the eight claimants herein in equal shares. Therefore, on February 15, 1960, the date of loss, Mrs. Fuller owned a 9/16 interest, and each of the other seven claimants owned a 1/16 interest.

Document No. 70, pursuant to which the Cuban corporation was dissolved, sets forth the assessed valuation for the several parcels of land and improvements that were distributed to the original two claimants as follows:

| Parcel No. | Area of Land (caballerias) | Assessed Value |
|---|---|---|
| D | 23.909 | $53,795.25 |
| E | 5.336 | 12,006.00 |
| F | 33.786 | 76,018.50 |
| G | 5.000 | 11,250.00 |
| H | 0.963 | 2,166.75 |
| Totals | 68.994 | $155,236.50 |

The Commission notes that assessed valuations invariably are much lower than fair market values. The evidence in this case includes an inventory filed with I.N.R.A. authorities on September 3, 1959, when the Cuban corporation was dissolved. That inventory sets forth the fair market values of the properties in question. Those valuations are relied upon by claimants.

It further appears that said valuations are supported by affidavits from: Silvestre Pina, former President of the National Executive Committee of the Association of Sugar Cane Owners of Cuba; Benjamin H. Leon, former bookkeeper for the Cuban corporation during the entire period of its existence; Juan Fernando Alvarez, former employee of the Cuban Treasury Department at the branch office at Holguin, Cuba; and Benjamin Santiesteban, former manager of the Holguin, Cuba branch of the Bank of Nunez. Further support for the valuations appearing in the inventory is found in the letter of April 6, 1966 from the late William Otis Fuller to the Internal Revenue Service. The record shows that tax deductions were allowed for the Cuban losses sustained by the deceased and JENNIE M. FULLER.

Based upon the entire record, the Commission finds that the valuations most appropriate to the properties and equitable to the claimants are those

set forth in the inventory that was presented to the I.N.R.A. authorities.

Accordingly, the Commission finds that claimants' valuations are fair and reasonable. The Commission therefore finds that the values of the real properties on February 15, 1960, the date of loss, were as follows:

| | |
|---|---|
| 68.994 caballerias of land | $311,495.00 |
| Improvement on the land | 47,487.00 |
| Total | $358,982.00 |

### EQUIPMENT, LIVESTOCK AND OTHER PERSONAL PROPERTY

On the basis of the entire record, including the inventory filed with I.N.R.A. authorities and detailed lists of the equipment, livestock and other items of personal property, the Commission finds that claimants' valuations are fair and reasonable. The Commission therefore finds that the aggregate value of the equipment, livestock and other items of personal property on February 15, 1960, the date of loss, was $50,000.00.

The losses herein sustained on February 15, 1960 are summarized as follows:

| Item of Property | Amount |
|---|---|
| Plantation | $358,982.00 |
| Personal property | 50,000.00 |
| Total | $408,982.00 |

Since JENNIE M. FULLER owned an 8/16 interest in the properties herein and succeeded to a 1/16 interest, aggregating 9/16, she sustained a loss in the amount of $230,052.37. The other seven claimants succeeded to losses aggregating $178,929.63, as follows:

| | |
|---|---|
| IRENE JEWETT (FULLER) MOSS | $ 25,561.38 |
| FRANCES RUTH FULLER | 25,561.38 |
| JEANETTE OTIS (FULLER) HAUSLER | 25,561.38 |
| ANGELA GRACE (FULLER) LUTES | 25,561.38 |
| JEROME CAVERNO FULLER | 25,561.37 |
| FREDERICK JEWETT FULLER | 25,561.37 |
| LYNITA GAY FULLER | 25,561.37 |
| Total | $178,929.63 |

### DEATH CLAIM

Claim is made for the death of Robert Otis Fuller, son of the late William Otis Fuller and of JENNIE M. FULLER, as a result of his execution on October 16, 1960, by the Government of Cuba. Robert Otis Fuller was also survived by his daughter, LYNITA GAY FULLER. In a detailed narrative accompanying the official claim form, the original claimants stated in pertinent part as follows:

> . . . On October 15, 1960, the son of the undersigned, Robert Otis Fuller, ex-U.S. Marine, was placed on trial in Santiago de Cuba for counter-revolutionary activities, Harvey Summ, State Department Officer being present. He was executed on the following day. Jennie M. Fuller left Cuba on the 17th of October 1960.

The record includes in support of this part of the claim, copy of a Report of the Death of an American citizen dated at Santiago de Cuba, Cuba,

October 19, 1960, and signed by G. H. Summ, American Consul. This document recites that Robert Otis Fuller was executed by a firing squad on October 16, 1960.

Section 503(b) of the Act provides as follows:

> The Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims of nationals of the United States against the Government of Cuba . . . arising since January 1, 1959 . . . for disability or death resulting from actions taken by or under the authority of the Government of Cuba . . .

The Commission has held that in a disability claim under Section 503(b) of the Act, it must be established, *inter alia*, that the disability was the proximate result of actions by the Government of Cuba in violation of international law. (See *Claim of Julio Lopez*, Claim No. CU-3259.) The same considerations apply to a claim for death.

Information available to the Commission shows that Robert Otis Fuller and another American were arrested on October 15, 1960 in Santiago, Cuba. They and two Cuban nationals also captured were charged with promoting an uprising of armed individuals against the powers of State. It further appears that at a trial held at 4:00 P.M. on October 15, 1960 at which the American Consul was present and at which Robert Otis Fuller had legal counsel who is said to have done the best he could, the defendants admitted their guilt. The trial before a Revolutionary Tribunal, which has also been referred to as a court-martial, resulted in findings of guilty.

Thereafter the two Cuban nationals were sentenced to thirty years imprisonment each while both Americans were sentenced to death, although one of the Cubans had reportedly been pointed out as being the group leader. After appeals which were heard immediately after the trial and lasted about five minutes the sentences were upheld. It further appears that the defense counsel both at the trial and during the appeal strongly argued that it was unjust to ask for or mete out greater punishment for the Americans than for the Cubans. The executions of the two Americans were carried out on October 16, 1960.

It is universally recognized that a State has inherent authority to punish persons within its jurisdiction who are convicted of violating its criminal laws. Moreover, it is not unusual for a State to decree death upon conviction of counter-revolutionary activities.

However, it clearly appears, and this is substantiated by the argument of the defense counsel, that the Americans were executed because of their nationality and in the face of evidence that two Cubans were at least equally guilty. The Commission therefore must consider whether the sentence inflicted upon Robert Otis Fuller was in violation of international law.

It is pointed out (V Hackworth, *Digest of International Law* (1943) 606) that "The rule of international law is well settled that an alien who has been taken into custody by the authorities of a state is entitled to receive from those authorities just and humane treatment, regardless of the offense with which he is charged, and that failure to accord such treatment renders the state liable in damages. The Research in International Law, Harvard Law School, in connection with the *Draft Convention on Jurisdiction With Respect to Crime*, stated in Article 12:

In exercising jurisdiction under this Convention, no State shall prosecute an alien who has not been taken into custody by its authorities, prevent communication between an alien held for prosecution or punishment and the diplomatic or consular officers of the State of which he is a national, subject an alien held for prosecution or punishment to other than just and humane treatment, prosecute an alien otherwise than by fair trial before an impartial tribunal and without unreasonable delay, inflict upon an alien any excessive or cruel and unusual punishment, or subject an alien to unfair discrimination. (29 A.J.I.L. Supp. (1935) 596–597.)"

Moreover, Mr. Edwin M. Borchard has discussed this matter in his treatise "Diplomatic Protection of Citizens Abroad." In Section 142 in discussing the civil rights of an alien he states that whereas an alien must submit to proceedings brought in accordance with law on a charge that an offense has been committed, the proceedings must be regular and conducted in good faith and in accordance with law and forms of civilized justice, and "must not be arbitrary or unnecessarily harsh or discriminate against the alien on account of his nationality."

Further, he points out that on various occasions claims have been successfully prosecuted by the Department of State or allowed by international commissions on grounds including "punishment disproportionate in severity to the offense charged."

Mr Borchard continues, in Section 44 of his treatise (f.2), to point out that "Any discrimination against the alien, e.g., a graver punishment than that inflicted upon nationals, prejudicial irregularity in judicial proceedngs, violation of treaties or international law, constitutes a denial of justice and opens the right to diplomatic interposition."

It is noted moreover that the United States protested the trial and senence in a note to the Cuban Foreign Ministry on November 11, 1960 (see Whiteman, *Digest of International Law*, Volume 8 at p. 719). In the note, a protest was made to the conduct of the Fuller trial with the assertion that basic humanitarian standards were not observed and discrimination was clearly evident in the sentences passed. The protest further asserted that defendants in a criminal case are entitled to certain fundamental, humanitarian rights in connection with a trial, particularly when the ultimate penalty, death, may be imposed. In the Fuller trial, there was stated to have been wholly inadequate time to prepare an appeal since the Appeals took place less than one hour after the verdict. Protest was also made to the general manner in which the trial was conducted with long political harangues and a "Roman Circus atmosphere" surrounding the trial.

The Commission has considered this matter in depth and concludes that the imposition of the punishment of death upon the two American nationals, including Robert Otis Fuller, for the same crime for which two Cuban nationals were sentenced to thirty years imprisonment, was clearly a discrimination directed to persons alien to the Republic of Cuba, being disproportionate to the punishment meted out to the Cuban nationals, and constituted a denial of justice and thus a violation of international law for which the Government of Cuba may be held accountable within the scope of Title V of the International Claims Settlement Act of 1949, as amended.

The Commission must now determine to whom the Government of Cuba is accountable in this matter. Miss Marjorie M. Whiteman in her work on

"Damages in International Law" (Vol. I, at p. 640) states that a claim for death by wrongful act is made not for the benefit of the estate, but for the benefit of the surviving dependents. As Miss Whiteman also points out (*supra*, 639), it must be shown not only that the respondent State has committed a wrong, but that the individual claimant has suffered pecuniary loss or injury. The record discloses that whereas Robert Otis Fuller was divorced, he was survived by a daughter, LYNITA GAY FULLER, then almost six years old, to whom the decedent owed the parental obligations of support and education during her minority (and see *supra*, 649). The Commission therefore finds that on October 16, 1960, the said LYNITA GAY FULLER, a national of the United States since birth, suffered a loss within the meaning of Title V of the Act.

Accordingly, so much of the claim of JENNIE M. FULLER, and the heirs of William Otis Fuller, Deceased, as is based on the death of Robert Otis Fuller, is denied.

There remains for determination the extent of the indemnity which LYNITA GAY FULLER is entitled to have certified in her favor.

In recent times, Miss Whiteman states (*supra*, 660), foreign offices and arbitral tribunals have generally estimated the indemnity in death cases on the basis of the worth to the claimant of the expected contributions of the person for whose death an indemnity is claimed. The Commission has considered the prior income of Robert Fuller and his age and finds that the expected contributions for his daughter from the time of his death to the date of her majority would amount to the fair and reasonable amount of $20,000.00. Accordingly, the Commission concludes that LYNITA GAY FULLER suffered a loss in this amount on October 16, 1960, within the meaning of Title V of the Act.

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATIONS OF LOSS

The Commission certifies that JENNIE M. FULLER succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Thirty Thousand Fifty-two Dollars and Thirty-seven Cents ($230,052.37) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that IRENE JEWETT (FULLER) MOSS succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-eight Cents ($25,561.38) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that FRANCES RUTH FULLER succeeded to and suffered a loss as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-eight Cents ($25,561.38) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that JEANNETTE OTIS (FULLER) HAUS-LER succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-eight Cents ($25,561.38) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that ANGELA GRACE (FULLER) LUTES succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-eight Cents ($25,561.38) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that JEROME CAVERNO FULLER succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-seven Cents ($25,561.37) with interest at 6% per annum from February 15, 1960 to the date of settlement;

The Commission certifies that FREDERICK JEWETT FULLER succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-five Thousand Five Hundred Sixty-one Dollars and Thirty-seven Cents ($25,561.37) with interest at 6% per annum from February 15, 1960 to the date of settlement; and

The Commission certifies that LYNITA GAY FULLER succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Forty-five Thousand Five Hundred Sixty-one Dollars and Thirty-seven Cents ($45,561.37) with interest at 6% per annum on $25,561.37 from February 15, 1960 and on $20,000 from October 16, 1960, to the date of settlement.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission May 19, 1971.

## IN MATTER OF THE CLAIMS OF BERLANTI CONSTRUCTION COMPANY, INC., ET AL.

Claim Nos. CU-0871 and 0657—Decision No. CU-5880

*Asserted losses based on the difference between a "cost-plus" contract and a "cost-plus" subcontract to build a housing project in Cuba that was halted shortly after construction commenced are speculative and not allowable under Title V of the Act.*

PROPOSED DECISION *

These claims against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the aggregate amount of $2,696,817.43, were presented by BERLANTI CONSTRUCTION COMPANY, INC. and ILONA GERO RIEGER based upon asserted losses arising out of the asserted breach of a contract by Cuba. It appears that BERLANTI CONSTRUCTION COMPANY, INC., organized under the laws

* This decision was entered as the Commission's Final Decision on November 10, 1970.

of Delaware, is a national of the United States. ILONA GERO RIEGER has been a national of the United States since January 28, 1957.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimants assert the following losses:

Claim No. CU–0871

| | |
|---|---|
| Loss of profit | $1,500,000.00 |
| Premiums for bonds | 17,416.13 |
| Loss of collateral | 67,414.38 |
| Disbursements after breach | 79,486.92 |
| Legal fees | 200,000.00 |
| Total | $1,864,317.43 |

Claim No. CU–0657

| | |
|---|---|
| Loss of profit (37.5 interest) | $ 825,000.00 |
| Shares of stock in Cuban corporation | 7,500.00 |
| Total | 832,500.00 |

The record shows that Angel Pagliuca, a stockholder of BERLANTI CONSTRUCTION COMPANY, INC. (hereafter called claimant), who has filed a claim on his behalf (CU–0632), had been negotiating with the National Housing Commission of Cuba (NHC) concerning a contract to build a low-cost housing development in Cuba. By letter dated November 8, 1958 (Exhibit A), NHC advised Mr. Pagliuca that it would agree to have claimant, which had not yet been organized, construct the development in Cuba.

Pursuant to that arrangement, an agreement was concluded on November 11, 1958 (Exhibit B) between Mr. Pagliuca, ILONA GERO RIEGER, the other claimant herein, and Louis Berlanti to form the claimant corporation. Claimant was duly organized under the laws of Delaware on November 18, 1958 (Exhibit C), and the stock interests therein were distributed as follows: Mr. Berlanti—25%, Mr. Pagliuca and Mrs. Rieger—37.5% each (Exhibit D).

It further appears that NHC had agreed to enter into a contract for an amount not in excess of $10 million as the cost of the housing development and to pay interest and finance charges in an amount not to exceed 7.5%

of the basic contract cost (letters from NHC of November 10, 1958 and November 18, 1958 to Mr. Berlanti). The understanding with NHC was that the three stockholders of claimant, particularly Mr. Berlanti and Mr. Pagliuca, were to find a concern that was willing to loan $10 million to Cuba on account of the development; that the funds were to be deposited in the Bank of Nova Scotia, New York Branch; that the funds were to be loaned to BANDES, a banking agency of the Government of Cuba, for a five-year period at 5% interest per year; and that BANDES was to make the funds available to NHC (letter of November 18, 1958 from NHC). Subsequently, NHC authorized claimant to subcontract any or all of the basic contract (letter of November 28, 1958).

Accordingly, claimant's stockholders agreed to pay a finder's fee of $100,000.00 to a firm which ultimately procured the loan of $10 million (Exhibits E and F). Claimant signed promissory notes covering the finder's fee of $100,000.00, payments to begin on February 18, 1959 and continue for five consecutive months thereafter (Exhibits H and L).

On November 20, 1958, a contract was concluded between NHC and claimant for the construction of a housing development in Cuba (Exhibit A attached to original claim). It was agreed that claimant would construct the development for an amount not in excess of $10 million with the proviso that the specific details as to the units involved would be "fixed in successive contracts according to unit groups and by provinces." The agreement was made on a "cost-plus contract" basis (Exhibit B attached to original claim).

On or about November 27, 1958, BANDES received the $10 million (Exhibit D attached to original claim). Surety bonds were obtained in connection with the loan (Exhibit GG), and claimant was obligated to pay the premiums.

A day after the basic contract was concluded, the claimant executed a subcontract with Constructora Guanahani, S.A. (Guanahani), which was assertedly wholly-owned by Mr. Pagliuca. (See Claim CU–0632.) According to that subcontract, dated January 21, 1958, Guanahani agreed to construct the housing development for $8½ million (Exhibit SS).

On November 28, 1958, the three stockholders of claimant caused Compania Constructora Berlanti, S.A. (Berlanti, S.A.) to be organized as a corporation under the laws of Cuba (Exhibit II). The stockholders' interests therein were the same as their interests in claimant (CU–0871); namely, Mr. Berlanti—25%, Mr. Pagliuca and Mrs. Rieger—37.5% each.

NHC ordered construction to begin about December 1, 1958. The record shows that construction had actually begun by Guanahani as indicated by a letter of December 24, 1958 from NHC to claimant. It further appears from the minutes of a stockholders' meeting of Berlanti, S.A., that claimant (CU–0871) assigned all its rights and interests in the construction agreement to Berlanti, S.A. on December 26, 1958 (Exhibit JJ).

On January 27, 1959, Cuban authorities ordered a halt to the construction of the development, and no further work was performed thereafter (Exhibit I attached to original claim). It is asserted by claimants that this action on the part of the Government of Cuba gave rise to the losses asserted herein.

Claimant notified the finder, to whom it was indebted in the amount of $100,000.00, under date of February 13, 1959 that it would be unable to pay the first note due on February 18, 1959 (Exhibit HH). The evidence includes a copy of a judgment entered in a court of New York on January 3, 1961 against claimant in favor of the finder in the amount of $90,904.46. It does not appear from the record that claimant made any payment on account

of the judgment. Moreover, it does not appear that any such payment could be compelled by legal action since claimant apparently owned only one asset, the contract with NHC which it had assigned to Berlanti, S.A.

Claimant instituted an action against the Government of Cuba in the courts of Florida and obtained a default judgment on July 26, 1961 in the amount of $6,190,382.16 (Exhibit J attached to original claim). Pertinent files of the Department of State disclose that upon action by the Czechoslovak Socialist Republic on behalf of the Government of Cuba pleading sovereign immunity, the judgment was vacated on December 27, 1961.

### Loss of Profit

Claimant asserts a loss of profit of $1.5 million, representing the difference between the underlying basic contract and the subcontract. Mrs. Rieger asserts a loss of profit of $825,000.00, representing her 37.5% share of $6,190,382.16, the amount of the judgment that was vacated. In effect, Mrs. Rieger is claiming a loss as a stockholder of claimant, a national of the United States.

Section 505(a) of the Act provides as follows:

> A claim under section 503(a) of this title based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered. . . .

Inasmuch as Mrs. Rieger's claim (CU-0657) in this respect is barred by the express provisions of Section 505(a) of the Act, it must be and hereby is denied. (See *Claim of Mary F. Sonnenberg*, Claim No. CU-0014, 25 FCSC Semiann. Rep. 48 [July-Dec. 1966].)

With respect to claimant, the record clearly shows that claimant had assigned to Berlanti, S.A. all its rights and interests under the construction contract on December 26, 1958, prior to January 27, 1959 the asserted date of loss when Cuban authorities halted all construction then in progress. In view of the foregoing the Commission inquired as to the basis of the claim filed by claimant, the assignor before the date of loss. Counsel's response of May 1, 1970 was as follows:

> The individual stockholders comprising the claimant are the same stockholders comprising the Cuban corporation, and was organized for the purpose of complying with Cuban law that only Cuban corporations could conduct and transact business in Cuba. However all transactions for the construction contract were had with the Delaware corporation claimant. As far as the claimant corporation is concerned it furnished everything necessary to the Cuban corporation to function, and actually the Cuban corporation was the alter ego of the Delaware corporation for all purposes. All contracts were entered into by and with the Delaware corporation, and the Cuban corporation never acted.

Upon consideration of this matter, the Commission finds that as of December 26, 1958 claimant no longer owned any interest in the construction contract or in any profits that could be derived thereunder despite the fact that claimant asserted Cuban losses as a deduction in its Federal tax returns for the fiscal year, November 1, 1963 to October 31, 1964. A copy of claimant's tax returns submitted in support of this portion of its claim indicates that claimant asserted a tax deduction of $202,716.88 based upon "Preliminary costs and expenses on construction job—project abandoned." However, that tax return shows that claimant earned no profit during that fiscal year. Accordingly, there was no necessity for the Internal Revenue Service to audit

the returns. The Commission therefore concludes that the record does not establish that claimant owned the claim on January 27, 1959 when it arose. For the foregoing reasons, the portion of claimant's claim for the asserted loss of profit of $1.5 million is denied.

When this portion of the claim is considered on behalf of the stockholders of Berlanti, S.A., the same result is reached.

Since Berlanti, S.A. was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" defined under Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No CU–0180, 1967 FCSC Ann. Rep. 33.)

The record indicates that Berlanti, S.A. owned only one asset—the assigned construction contract. According to counsel's letter of May 1, 1970, this Cuban corporation "never acted." It further appears from a copy of a letter of January 19, 1959 from Guanahani, the subcontracting Cuban corporation, that it had expended $256,000.00 in initial construction work with respect to eleven buildings. Since Mr. Pagliuca's claim (CU–0632) is based, in part, on his asserted 100% stock interest in Guanahani, these expenditures by Guanahani will be considered in the course of determining Claim No. CU–0632.

Moreover, the Commission finds no valid basis for concluding that had the "cost-plus" contracts been fully executed Berlanti, S.A. would have earned a profit of $1.5 million. As already noted, it was a "cost-plus" contract in an amount not to exceed $10 million. It could not therefore be concluded with any degree of certainty what the final cost would be. By the same token, the subcontract was likewise subject to the same conditions, and was not to exceed $8.5 million. Inasmuch as construction was halted shortly after it commenced, any conclusion that an amount certain would be earned as profit would be purely speculative and without foundation. (See *Claim of Robert L. Cheaney and Marjorie L. Cheaney*, Claim No. CU–0915, involving the denial of a claim for estimated future profits; *Claim of Ford Motor Company*, Claim No. CU–3072, in which claim for loss of profits and contingent losses was denied; *Claim of Cuban Electric Company*, Claim No CU–2578, in which claim for indirect losses was denied.)

The Commission finds that the evidence of record does not establish that Berlanti, S.A. sustained any loss within the meaning of Title V of the Act as a result of the termination of the construction contract. Considering claimant's assertions in this respect to be on behalf of its stockholders, this portion of the claim is denied. Mrs. Rieger, having based a portion of her claim on her stock interest in Berlanti, S.A., this portion of her claim is denied. Mr. Pagliuca's claim in this respect will be considered on its own merits in CU–0632.

Accordingly, as indicated above, Claim No. CU–0657 is denied in its entirety.

### Balance of Claim No. CU–0871

The balance of this claim of claimant is based upon certain disbursements

and obligations it assertedly incurred on account of the construction contract. The following losses are claimed:

| | | |
|---|---|---:|
| 1. | Insurance premiums for surety and appeal bonds | $ 17,416.13 |
| 2. | Miscellaneous expenses | 96,395.90 |
| 3. | Collateral pledged as security for the issuance of the bonds | 67,414.38 |
| 4. | Payments made by the surety company in connection with the surety bonds | 143,715.33 |
| 5. | Disbursements by Mrs. Rieger | 147,972.88 |
| 6. | Attorney's fees | 200,000.00 |
| | Total | $672,914.62 |

It is noted from the record that items (1), (2) and (3) above represent expenses incurred by the Berlanti Construction Company, Inc. of New York, assertedly on behalf of claimant. The Commission inquired about these asserted losses since they appeared to have been sustained by a New York corporation on behalf of claimant, a Delaware corporation with a similar name. The Commission called attention to the fact that claims based on debts of American corporations are not allowable pursuant to Section 505(a) of the Act unless the debts were charges on property taken by the Government of Cuba. (See *Claim of Anaconda American Brass Co.*, Claim No. CU–0112, 1967 FCSC Ann. Rep. 60.) It does not appear from the *evidence of record* that any of these asserted debts due from claimant were charges on property taken by Cuba and no claim for these losses has been filed by or on behalf of the Berlanti Construction Company, Inc. of New York. Under these circumstances *if such a claim had been filed,* it would have to be denied.

Counsel's response of February 17, 1970 was that the claim for profit of $1.5 million included the asserted losses under item (4) above. He added that Berlanti of New York and Louis Berlanti had contracted to advance certain moneys for the use and benefit of claimant in furthering the construction contract; and that Berlanti of New York and claimant were neither owned by the same stockholders, nor was either a wholly-owend subsidiary of the other.

On the basis of the entire record, the Commission finds that the losses asserted under items (1), (2) and (3) above assertedly were sustained by a New York corporation on behalf of claimant. Inasmuch as the record does not establish that these debts due from claimant, an American corporation, were charges on property taken by Cuba, the portion of the claim based on such asserted losses is denied.

Inasmuch as item (4) is essentially a part of the portion of the claim for profit of $1.5 million which has already been denied, that portion of the claim is also denied.

The portion of the claim for disbursements in the aggregate amount of $79,486.92 apparently is included in part under items (2) and (5) above. Since item (2) has already been denied, the applicable part of the claim in this respect is also denied. Item (5) above relates to expenses incurred by Mrs. Rieger assertedly in furtherance of the contract between claimant and NHC. An examination of the list indicates that it includes hotel, travel and related expenses assertedly paid by Mrs. Rieger in 1957, 1958 and 1959, both before the contract with NHC was concluded and after the assignment of the contract by claimant to Berlanti, S.A. The Commission finds no valid basis for concluding that these expenses constitute losses within the meaning of Title V of the Act. If it were established that these expenses were made

on behalf of claimant, this portion of the claim would have to be denied because the construction contract which assertedly gave rise to these claims was assigned to a Cuban corporation before the date of loss. If it were established that these expenses were made by Mrs. Rieger on behalf of Berlanti, S.A., in which she owned a stock interest, so that it constituted a debt of the Cuban corporation, this portion of the claim would have to be denied because the Cuban corporation, Berlanti, S.A., owned no assets with which to pay such a debt. The loss in such event would not be attributable to any action on the part of the Government of Cuba. (See *Claim of Pepsi Co., Inc.*, Claim No. CU–3596.)

The final portion of the claim of claimant is based on attorneys' fees in the aggregate amount of $200,000.00. The first part thereof in the amount of $100,000.00 represents services rendered in negotiating the original contracts, setting up the corporate structures in Delaware and Cuba, and in vain attempts to reinstate the contracts and defend the actions assertedly resulting from the breach of the contracts by the Government of Cuba. The second part thereof, also in the amount of $100,000.00, involved expenses incurred in actions against the Government of Cuba to recover for the taking of property, in which the judgment in favor of claimant was vacated.

The Commission has held that claims for attorneys' fees and expenses incurred in appealing from an order of Cuba taking that claimant's property does not constitute a claim for a loss of property within the purview of Title V of the Act. (See *Claim of E. R. Squibb & Sons Inter-American Corporation*, Claim No. CU–2469; *Claim of Mathieson Pan-American Chemical Corporation*, Claim No. CU–2470.)

The Commission finds no valid basis for distinguishing the two portions of the claim for attorneys' fees aggregating $200,000.00. Accordingly, these two portions of the claim are denied.

Therefore, as indicated above, Claim No. CU–0871 is denied in its entirety.

Dated -at Washington, D.C., and entered as the Proposed Decision of the Commission October 7, 1970.

## IN THE MATTER OF THE CLAIM OF ANGEL PAGLIUCA

Claim No. CU–0632—Decision No. CU–5879

*Claims of nationals of the United States for actual losses sustained as a result of Cuba's nationalization actions are allowable under Title V of the Act.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $6,660,130.01, was presented by ANGEL PAGLIUCA based upon the asserted loss of certain personal property in Cuba. Claimant has been a national of the United States since February 4, 1957.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and

---

* This decision was entered as the Commission's Final Decision on November 16, 1970.

validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimant asserts the following losses:

| | | | |
|---|---|---|---|
| Personal belongings | $ 84,261.60 | | |
| 6% interest from March 1961 to October 1961 | 3,372.46 | | $ 87,634.06 |
| Debt of Cuban Government (Commissions and expenses) | $ 567,550.00 | | |
| 6% interest from December 1958 to August 1961 | 93,645.75 | | 661,195.75 |
| Constructora Guanahani, S.A. Stock interest, construction materials and equipment | $ 612,086.50 | | |
| 6% interest from January 1959 to August 1962 | 136,659.03 | | 748,745.53 |
| Stock interest in Berlanti Construction Co., S.A. | $ 7,500.00 | | |
| .375 equity in Berlanti-Delaware's estimated profits on contract | 825,000.00 | | |
| Construction equipment | 1,953,996.60 | | |
| | 2,786,496.60 | | |
| 6% interest for 1959, 1960 and 1961 | 361,719.38 | | 3,148,215.98 |
| Stock interest in Copetrol Oil Refining Co., S.A. | $1,100,000.00 | | |
| Loan | 230,292.26 | | |
| | 1,330,292.26 | | |
| 6% interest from January 1959 to August 1961 | 212,846.86 | | 1,543,139.12 |
| Fomento Excelsior Internacional, S.A. Assets | $ 432,292.85 | | |

| | | |
|---|---|---|
| 6% interest from March 1960 to August 1961 | 38,906.72 | 471,199.57 |
| Total | | $6,660.130.01 |

It is noted at the outset that claim is being made for interest with respect to each item of property herein. Claimant has computed interest for specific periods of time. As indicated hereafter, interest is being allowed at 6% per annum from the respective dates of loss of certifiable items to the date of settlement.

### PERSONAL BELONGINGS

Based upon the evidence of record, including affidavits and invoices covering some of the items of jewelry, the Commission finds that claimant owned certain items of furniture, furnishings and other personal belongings maintained at his rented apartment at 58–O Street, Havana, Cuba. Affidavits from individuals having personal knowledge of the facts indicate that on March 10, 1961 Cuban officials took said personal property. Accordingly, the Commission finds that claimant's furniture, furnishings and other personal belongings were taken by the Government of Cuba on March 10, 1961.

Claimant asserts that the personal property in his Havana apartment had a value of $84,261.60. He relies on an itemized list of said property which he states in his letter of March 9, 1970 was prepared by former Cuban officials and others. The Commission had suggested the submission of evidence to show the approximate dates of acquisition of each item of property and the approximate costs thereof. However, no such evidence has been filed.

The Commission notes from claimant's letter of March 9, 1970 that his first trip to Cuba was in March 1947 and that he left Cuba on December 17, 1959. An examination of the list of personal property indicates that many of the items are subject to depreciation at the rate of 5% per year, and that clothing in the amount of $3,500.00 is subject to depreciation at the rate of 20% per year. Other items, however, such as silver, oil paintings, jewelry, cash, liquors and food generally are not subject to depreciation. The items subject to depreciation aggregate $46,930.00, and the other items aggregate $37,331.60.

On the basis of the entire record and in the absence of evidence to the contrary, the Commission finds that the first said group of items should be depreciated by 50%. The Commission therefore finds that the value of such items of property on March 10, 1961, the date of loss, was $23,465.00 Accordingly, the aggregate value of claimant's personal belongings on the date of loss was $60,796.60.

### DEBT OF CUBAN GOVERNMENT

Claimant asserts a loss of $567,550.00 for expenses incurred and commissions due from the Government of Cuba on account of a certain housing contract with Cuba, representing $67,550.00 for expenses and $500,000.00 for commissions. This portion of the claim is closely related to and actually forms part of the claim for a stock interest in Berlanti Construction Co., S.A. and in Berlanti Construction Co., Inc. of Delaware. Accordingly, this portion of the claim will be discussed below in conjunction with the related part hereof.

### CONSTRUCTORA GUANAHANI, S.A.

Based upon the evidence of record, including stock certificates and affidavits, the Commission finds that claimant owned a 100% stock interest in Constructora Guanahani, S.A. (Guanahani), a Cuban corporation.

Since Guanahani was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" defined under Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

It appears from the record and the related *Claim of Berlanti Construction Company, Inc.* (Berlanti of Delaware), Claim No. CU–0871, in which claimant owned a stock interest, that Guanahani was authorized by contract dated November 21, 1958 with Berlanti of Delaware to construct a certain housing development in Cuba as subcontractor. This matter is discussed in detail below under another portion of this claim. In connection with that subcontract, Guanahani purchased certain materials and equipment and commenced construction early in December 1958. The evidence in Claim No. CU–0871 shows that Cuban officials halted all construction on January 27, 1959. Claimant states that Guanahani's assets were taken by Cuba at the same time. On the basis of the entire record and in the absence of evidence to the contrary, the Commission finds that Guanahani's assets were taken by the Government of Cuba on January 27, 1959.

Claimant asserts the loss of $612,086.50 for materials and equipment at the site where construction was in progress. The Commission suggested the submission of balance sheets and other appropriate documentary evidence to establish the nature and value of Guanahani's assets and its liabilities so that its net worth could be determined. Claimant's response of March 9, 1970 was that all such records had remained in Cuba and were unavailable.

The record, however, contains the following pertinent evidence:

(a) A copy of an inventory made on December 30, 1958 of Guanahani's material and equipment at the construction site, aggregating $612,086.50.

(b) A copy of an affidavit, dated November 28, 1966, indicating that Guanahani owned office furniture having a value of $5,646.50.

(c) A copy of a letter, dated January 19, 1959, from the President of Guanahani to Berlanti of Delaware, indicating that Guanahani had commenced construction of the housing development, and that as of that date the value of the construction partially completed aggregated $256,000.00.

(d) Affidavits from suppliers of material indicating that they had delivered to the construction site property aggregating $410,873.00 with respect to which $216,723.00 was still due one of the suppliers and $194,150.00 was due another supplier.

(e) A copy of a statement, dated January 2, 1959, from claimant's account, stating that upon examination of claimant's books and records in Cuba, claimant's assets and liabilities as of December 30, 1958 were as follows, the Cuban peso being on a par with the United States dollar:

### ASSETS

| | |
|---|---:|
| Bank account | $     1,246.96 |
| Cash with private depository | 210,237.00 |
| Accounts receivable | 276,500.00 |
| Copetrol Oil Refining Co., S.A. Receivable | 230,292.26 |
| Copetrol Oil Refining Co., S.A. Shares of stock | 1,100,000.00 |
| Berlanti Construction Co., S.A. Shares of stock | 1,953,996.00 |
| Personal property in Havana residence | 84,311.60 |
| Constructora Guanahani, S.A. Shares of stock | 1,317,086.50 |
| Fomento Excelsior Internacional, S.A. Shares of stock | 250,050.00 |
| Commissions receivable | 500,000.00 |
| Total Assets | $5,923,720.32 |

### LIABILITIES AND CAPITAL

| | |
|---|---:|
| Fomento Excelsior Internacional, S.A. | $     20,010.00 |
| Copetrol Oil Refining Co., S.A. | 25,000.00 |
| Berlanti Construction Co., S.A. | 1,450,000.00 |
| Constructora Guanahani, S.A. | 711,216.00 |
| Various creditors | 380,256.00 |
| Commissions payable | 355,000.00 |
| Reserve for taxes | 186,000.00 |
| Other reserves | 70,000.00 |
| Interest payable on loans | 32,350.00 |
| Angel Pagliuca, capital account | 2,693,888.32 |
| Total Liabilities and Capital | $5,923,720.32 |

Since all of the pertinent books and records relating to claimant's Cuban operations were left in Cuba, the foregoing statement of assets and liabilities cannot be considered conclusive on the issue of valuation. Moreover, the record fails to establish that Guanahani owned assets other than those at the construction site. Upon consideration of the entire record, and in the absence of more compelling evidence, the Commission finds that the values of Guanahani's assets at the construction site on January 27, 1959, the date of loss, were as follows:

| | |
|---|---:|
| Inventory of material and supplies (This is deemed to include in part the supplies indicated under item (d) above.) | $   612,086.50 |
| Office furniture | 5,646.50 |
| Partially completed construction (This is deemed to include in part the supplies indicated under item (d) above.) | 256,000.00 |
| Debt due from claimant | 711,216.00 |
| | $1,584,949.00 |

The Commission finds that the debt due from claimant did not constitute an asset of Guanahani that was taken by the Government of Cuba. It is therefore concluded that the aggregate value of Guanahani's assets on the date of loss was $873,733.00.

As indicated under item (d) above, the record shows that Guanahani was indebted to suppliers in the amounts of $216,723.00 and $194,150.00, aggregating $410,873.00. Accordingly, the Commission finds that the net worth of Guanahani or the excess of its assets over its liabilities on January 27, 1959 was $462,860.00. It is concluded that claimant sustained a loss in that amount with respect to his stock interest in Guanahani.

### Berlanti Construction Co., S.A. and Berlanti Construction Company, Inc. of Delaware

Claimant, in effect, asserts two losses closely related to one another; namely, debts of the Cuban Government in the amount of $567,550.00, and losses in the amount of $2,786,496.60 on account of his stock interests in Berlanti Construction Co., S.A. a Cuban corporation, and in Berlanti Construction Company, Inc. of Delaware, an American corporation.

Section 505(a) of the Act provides as follows:

> A claim under section 503(a) of this title based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered . . .

The record shows that Berlanti Construction Company, Inc. is a national of the United States within the meaning of Section 502(1)(B) of the Act. (See *Claim of Berlanti Construction Company, Inc.,* Claim No. CU–0871.) The Commission finds that the portion of the claim based on a stock interest in Berlanti Construction Company, Inc. is barred by the express provisions of Section 505(a) of the Act. Accordingly, so much of this claim as is based on an interest in Berlanti of Delaware is denied.

In this connection, it further appears that claimant is requesting $500,-000.00 as commissions due with respect to a contract to construct a housing development in Cuba entered into on November 20, 1958 between Berlanti of Delaware and the National Housing Commission (NHC) of Cuba, an agency of the Government of Cuba. In addition, claimant is requesting $67,550.00 for expenses incurred in connection with that contract.

The record, including the evidence submitted in support of Claim No. CU–0871, discloses that claimant had been negotiating with NHC concerning a contract to build a low-cost housing development in Cuba. In the course of these negotiations, the Berlanti Construction Company, Inc. was organized on November 18, 1958 under the laws of Delaware, claimant's interest therein being 37.5%. NHC agreed to enter into a construction contract with Berlanti of Delaware and to pay certain finance and interest charges in an amount not to exceed 7.5% of the basic construction contract.

The construction contract between NHC and Berlanti of Delaware was concluded on November 20, 1958 and provided for a cost not to exceed $10 million. The loan of $10 million to finance the development was obtained through efforts of claimant and as indicated above, construction of the housing project commenced. The record includes a copy of a letter, dated July 11, 1958, from NHC to claimant indicating that claimant is entitled to a commission of 5% on account of arranging for financing the loan to Cuba, as well as compensation for expenses. By letter dated December 3, 1958, NHC stated that claimant was entitled to 5% of $10 million as his fee. It

further appears from an affidavit, dated November 25, 1966, from the former director of NHC that claimant had been authorized to expend funds in the course of obtaining the loan on behalf of the Government of Cuba. The record also includes copies of bills claimant sent to the Government of Cuba in 1959, requesting payment of $567,550.00 for services rendered and expenses incurred in connection therewith. Claimant's requests were ignored by Cuba, and to date claimant has never recovered any amount on account of that debt.

On the basis of the entire record, the Commission finds that the Government of Cuba owed claimant a debt in the aggregate amount of $567,550.00. The Commission further finds in the absence of evidence to the contrary that claimant's loss in this respect occurred on January 27, 1959 when construction was halted by Cuban officials.

Claimant also seeks to recover $825,000.00, representing his 37.5% share of $6,190,382.16, the amount of a default judgment entered in a court of Florida on July 26, 1961 in favor of Berlanti of Delaware against the Government of Cuba (see Claim No. CU–0871). Inasmuch as this portion of the claim is based on a stock interest in an American corporation, it is denied pursuant to the express provisions of Section 505(a), *supra.* Moreover, the record in Claim No. CU–0871 shows that the judgment was vacated on December 27, 1961.

Another portion of the claim is based upon the asserted value of claimant's stock interest in Berlanti Construction Co., S.A. (Berlanti, S.A.) in the amount of $1,953,996.60. Claimant relies upon the said statement of his assets and liabilities as of December 30, 1958, in which his interest in Berlanti, S.A. is shown as $1,953,996.00, and upon another statement, dated January 2, 1959, showing the following as assets of Berlanti, S.A.:

| | |
|---|---:|
| Equipment | $1,360,000.00 |
| Furniture and office equipment | 125,000.00 |
| Remodeling of building and air conditioning system | 116,650.00 |
| Building materials | 352,346.60 |
| Total | $1,953,996.60 |

As noted above, no records are available to support the foregoing statement. Moreover, it is noted from the statement of assets and liabilities of claimant as of December 30, 1958, apparently prepared by the same accountant who set forth the foregoing assets of Berlanti, S.A., that claimant owed debts to Berlanti, S.A. in the amount of $1,450,000.00. Other debts also appear in that statement, but a number of them in the amounts of $380,256.00, $355,000.00, $186,000.00, $70,000.00, and $32,350.00, respectively, are not identified, and it is therefore unknown whether they were debts owing to Berlanti, S.A. or one of the other Cuban corporations involved in this claim. Additionally, it appears from the record in CU–0871 that the only asset owned by Berlanti, S.A. was the contract with NHC which Berlanti of Delaware had assigned to Berlanti, S.A. The record in CU–0871 also indicates that Berlanti, S.A. never acted, which also indicates that it owned no assets other than the assigned contract.

Furthermore, claimant states in his official claim form that the value of his stock interest in Berlanti, S.A. was $7,500.00. Another stockholder of Berlanti, S.A., Ilona Gero Rieger, who also filed a claim against Cuba (CU–0657), likewise asserted a loss of $7,500.00 for her stock interest in Berlanti, S.A. which was equivalent to the interest owned by claimant herein.

Upon consideration of the entire record, the Commission finds that claimant has failed to sustain the burden of proof with respect to the portion of his claim for a stock interest in Berlanti, S.A. It may be noted in this respect that there is no evidence of record in Claim No. CU–0871 or in Claim No. CU–0632 to establish that Berlanti, S.A. sustained any loss as a result of the cancellation of the contract that had been assigned to Berlanti, S.A. from Berlanti of Delaware. Moreover, the record in this claim is found insufficient to support this portion of the claim. Accordingly, this portion of the claim is denied.

### COPETROL OIL REFINING CO., S.A.

Claimant asserts a loss of $1,330,292.26, representing $1,100,000.00 for his stock interest in Copetrol Oil Refining Co., S.A. (Copetrol), a Cuban corporation, and $230,292.26 for a debt due from Copetrol. Claimant relies on the statement of assets and liabilities as of December 30, 1958 which sets forth these amounts as part of his assets.

Based upon a copy of a stock certificate and other evidence of record, the Commission finds that claimant owned 44,000 shares of stock in Copetrol with a par value of $25.00 per share. It further appears from a statement by an officer of Copetrol, dated December 30, 1958, that Copetrol had 57,600 shares of outstanding capital stock.

The record includes a statement, dated January 21, 1959, from the general manager of Copetrol indicating that between January 3 and 7 of 1959 the warehouse of Copetrol was "completely plundered by Fidel Castro's Rebel Army." On the basis of the foregoing, the Commission finds that Copetrol's assets were taken by Cuba on January 5, 1959.

It appears that no balance sheets for Copetrol are available. However, claimant has submitted other evidence concerning the assets and liabilities of Copetrol.

The asserted loss of $1,100,000.00 for claimant's stock interest in Copetrol was computed on the basis of its par value, $25.00 per share for 44,000 shares.

It appears from the evidence of record that Copetrol was organized in Havana, Cuba on June 18, 1958. Its purpose was to refine crude oil into gasoline and other related products.

With respect to Copetrol's assets, the following evidence is included in the record:

1. A statement, dated January 10, 1959, from the warehouse manager of Copetrol, indicating that the value of materials taken from Copetrol's warehouse was $879,066.45. This statement is supported by one, dated January 21, 1959, from the general manager of Copetrol in which he listed the items of property thus taken by Cuba as follows:

| | | |
|---|---|---:|
| 2 Motorlevels Caterpillar A–12 | | $ 26,000.00 |
| 1 Ferguson Petroleum | | 3,650.00 |
| 1 Generator Plant | | 125,000.00 |
| 2 Tornapoul | | 211,366.45 |
| 500 tons deformed bars 3/8 | | 23,750.00 |
| 1 Block Johnson Plant | | 25,000.00 |
| 3 Bulldozers TD18 International | | 91,800.00 |
| 5,000 tons portland cement | | 225,000.00 |
| Assorted material of steel | | 60,000.00 |
| Ingots, etc. | | 87,500.00 |
| | Total | $879,066.45 |

2. A statement, dated January 23, 1959, from the general manager of Copetrol listing the following items as losses:

| | |
|---|---:|
| Legal expenses to form the company | $  163,246.00 |
| Legal fees | 33,000.00 |
| Advertising, etc. | 22,460.00 |
| Blue prints and engineering costs | 95,976.50 |
| Commission to real estate broker | 132,237.00 |
| Salaries, rent and other expenses | 42,740.00 |
| Advances to executive | 25,000.00 |
| Furniture | 6,750.00 |
| Land on Isle of Pines, Cuba | 1,322,370.00 |
| Engineering work and preliminary studies | 170,265.60 |
| Projects on civil work, hydraulics, etc. | 85,976.50 |
| Equipment and material | 879,066.45 |
| Promotional work | 150,000.00 |
| Cash | 16,550.00 |
| Total | $3,145,638.05 |

3. A statement, dated January 23, 1959, from the general manager of Copetrol indicating that out of the $3,145,638.05, the amount of $1,670,292.26 is "presumed unpaid," leaving a net amount of $1,670,292.26. However, the statement fails to indicate which of the items remain unpaid and to what extent.

4. A statement, dated October 9, 1958, from the President of a Cuban corporation which sold the land on the Isle of Pines to Copetrol, indicating that the land has been sold for $1,322,370.00, and that $132,327.00 had been paid by Copetrol on account.

An examination of the list set forth under (2) above indicates that all of the items therein except advances to executives, furniture, land, and cash constitute organization expenses that normally would be amortized over a period of time. The Commission has had occasion to consider whether organization expenses should be deemed to be an asset of a nationalized entity for the purposes of Title V of the Act. The Commission has held that if the earnings of the entity were sufficiently large in relation to the amount of organization expenses, it could be concluded that the organization expenses enhanced the entity's value and therefore constituted a valuable asset of the entity. (See *Claim of Albert J. Parreno*, Claim No. CU–1231.)

The record shows that Copetrol was organized on June 18, 1958, and that it existed only for a few months until January 5, 1959 when it was taken by the Government of Cuba. It does not appear from the evidence of record that Copetrol had any earnings during its existence. Under these circumstances there is no valid basis for considering organization expenses in the amount of $763,664.60, as shown by the record or in any amount, as an asset of Copetrol and the Commission so finds.

Upon consideration of the entire record, the Commission finds that the aggregate value of the assets of Copetrol on January 5, 1959, the date of loss, was as follows:

Land on Isle of Pines
(The Commission finds that Copetrol's equity consisted of the payment of $132,327.00 on account of the purchase of the land plus the commissions of $132,237.00 paid to the real estate broker.)      $  264,564.00

| | |
|---|---:|
| Furniture | 6,750.00 |
| Equipment and material | 879,066.45 |
| Cash | 16,550.00 |
| Advances to executive | |
| (The Commission finds that claimant is the executive in question on the basis of his statement of assets and liabilities which shows that he owed $25,000.00 to Copetrol.) | 25,000.00 |
| Total | $1,191,930.45 |

The Commission finds that the item, advances to executive, did not constitute an asset of Copetrol that was taken by Cuba. Accordingly, the aggregate value of Copetrol's assets that were taken by Cuba was $1,166,930.45. It further appears from the evidence of record that in addition to the debts Copetrol owed on account of the land, which has already been taken into consideration, Copetrol owed claimant a debt in the amount of $230,292.26. The Commission therefore finds that the net worth of Copetrol or the excess of its assets over its liabilities on January 5, 1959, the date of loss, was $936,638.19.

Since Copetrol had 57,600 shares of capital stock outstanding on the date of loss, the Commission finds that each share of stock had a value of $16.261079. Therefore, the value of claimant's 44,000 shares was $713,274.76.

The Commission has held that debts of a nationalized Cuban corporation owed to an American claimant constitute losses occurring on the date of nationalization within the meaning of Title V of the Act. (See *Claim of Kramer, Marx, Greenlee and Backus,* Claim No. CU–0105, 25 FCSC Semiann. Rep. 62 [July–Dec. 1966].)

As noted above, Copetrol owed claimant a debt in the amount of $230,292.26. The Commission therefore finds that claimant's loss in that amount occurred on January 5, 1959 when Copetrol was taken by Cuba.

### FOMENTO EXCELSIOR INTERNACIONAL, S.A.

Based upon affidavits and a stock certificate, the Commission finds that claimant owned 99 shares of stock in Fomento Excelsior Internacional, S.A. (Fomento). This Cuban corporation was organized in Cuba on October 25, 1956 and was engaged in importing, exporting and selling merchandise, primarily tri-dimesional pictures. On the basis of a statement of February 26, 1960 from an officer of Fomento who has personal knowledge of the facts, the Commission finds that Fomento's assets were taken by the Government of Cuba on February 26, 1960. The evidence establishes that Fomento had 100 shares of capital stock outstanding on the date of loss. The remaining share of stock belonged to a nonnational of the United States.

It appears that no balance sheets or other financial statements concerning Fomento are available, all such records having been left in Cuba.

Claimant asserts a loss of $432,292.85 on account of his stock interest in Fomento. It is noted, however, that in claimant's statement of assets and liabilities, his interest in Fomento is shown as having a value of $250,050.00.

With respect to the value of Fomento, the record includes the following evidence:

(A) A statement, dated December 3, 1958, from an officer of Fomento, indicating that Fomento's inventory of merchandise in stock amounted to

$432,292.85, the amount being claimed herein; and that the total assets of Fomento aggregated $627,256.25.

(B) A detailed inventory of said stock, dated February 27, 1960, showing various items of property aggregating $432,292.85. The inventory includes, *inter alia*, furniture valued at $2,450.00, cash in the amount of $6,464.00, and other items of inventory valued at $46,450.00.

(C) Copies of invoices evidencing the purchase of a number of items that are included in the inventory. Those invoices show purchases of 1,170 watch bands on November 21, 1958 costing $11,115.00; 1,280 gross of items of costume jewelry on November 20, 1958 costing $71,744.00; 14,375 optical frames on July 11, 1958 costing $38,237.50; 35,000 screens for tri-dimensional pictures on April 25, 1957 costing $70,925.00; and 62,000 unused films on April 25,1957 costing $117,800.00. The record shows that all of these purchases were paid for in full by Fomento.

It further appears from claimant's statement of assets and liabilities that he owed Fomento a debt in the amount of $20,010.00. The Commission finds, however, that this account receivable did not constitute an asset of Fomento that was taken by Cuba. On the basis of the entire record and in the absence of evidence to the contrary, the Commission finds that Fomento had no liabilities.

Accordingly, the Commission finds that the net worth of Fomento or the excess of its assets over its liabilities on February 26, 1960, the date of loss, was $627,256.25. Therefore, each of the 100 shares of outstanding capital stock had a value of $6,272.5625, and claimant's 99 shares had a value of $620,983.69.

Claimant's losses are summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| Personal belongings | March 10, 1961 | $     60,796.60 |
| Guanahani—stock interest | January 27, 1959 | 462,860.00 |
| Debt of Cuban Government | January 27, 1959 | 567,550.00 |
| Copetrol—stock interest | January 5, 1959 | 713,274.76 |
| Debt due from Copetrol | January 5, 1959 | 230,292.26 |
| Fomento—stock interest | February 26, 1960 | 620,983.69 |
| Total | | $2,655,757.31 |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in this case it is so ordered as follows:

| FROM | ON |
|---|---|
| January 5, 1959 | $     943,567.02 |
| January 27, 1959 | 1,030,410.00 |
| February 26, 1960 | 620,983.69 |
| March 10, 1961 | 60,796.60 |
| Total | $2,655,757.31 |

CERTIFICATION OF LOSS

The Commission certifies that ANGEL PAGLIUCA suffered a loss, as a

result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Million Six Hundred Fifty-five Thousand Seven Hundred Fifty-seven Dollars and Thirty-one Cents ($2,655,757.31) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., Oct. 14, 1970.

### IN THE MATTER OF THE CLAIM OF ISABELLA SHAMMA

#### Claim No. CU-2593—Decision No. CU-3845

*In a claim based on personal injury or disability under section 503(b) of the Act, it must be established that the injury or disability was the proximate result of action by the Government of Cuba in violation of international law.*

*Confiscation of property as a part of a penalty imposed in criminal proceedings under Cuban law does not constitute a valid claim under Title V of the Act, in the absence of a denial of justice within the contemplation of internatonal law.*

#### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $492,306.62, was presented by GERALDINE ISABELLA SHAMMA, a/k/a GERALDINE I. SUAREZ, based upon the asserted ownership and loss of certain real and personal property in Cuba, and upon personal injuries. Claimant has been a national of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Secton 502(3) of the Act provides:

The term "property" means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

#### REAL AND PERSONAL PROPERTY

Claimant asserts a loss of certain improved real property at Miramar and at Marianao, Havana, Cuba, in the aggregate amount of $138,500.00; as well

---

* The denial of this claim was affirmed by a Final Decision of September 8, 1971.

as furniture, furnishings and various household effects maintained at the Miramar residence, in the amount of $129,141.00; automobiles, luggage and sundry personalty in the amount of $29,700.00; various items of jewelry in the amount of $98,850.00; fur coats and other items of clothing in the amount of $35,800.00; and a two-thirds interest in certain Cuban bonds in the amount of $10,315.62. The aggregate amount claimed for this portion of the claim is $442,306.62.

Claimant also states that she "was sentenced to Guanajay Prison in Cuba after being convicted of counter-revolutionary activities (for) acting as a liaison for x x x [a United States Government agency] situated in Cuba and (for) counter-revolutionary forces." The assertion that claimant was convicted of counter-revolutionary activities in violation of the laws of Cuba is corroborated by a substantial amount of evidence in the record, such as claimant's affidavit of April 27, 1967, a copy of an article written by claimant and published in the Saturday Evening Post issue of May 18, 1963, a number of recent newspaper articles, and a certified translation of the court decree, dated at Havana, Cuba, December 16, 1960, pursuant to which claimant was sentenced for allegedly violating the laws of Cuba.

The judgment of the court recites that claimant and a number of other persons, who appear to be Cuban nationals, were found guilty of counter-revolutionary activities for attempting to "overthrow the Powers of the State through violent means." Following trials, various sentences were imposed upon the several defendants, except for three who were acquitted; claimant's sentence was ten years in prison, and "confiscation of all . . . properties."

It is undisputed that claimant's properties in Cuba were confiscated by the Government of Cuba on December 16, 1960 as a result of her conviction for violating the criminal laws of Cuba. The only issue presented in this respect is whether the confiscation is within the purview of Title V of the Act.

It is universally recognized and needs no citations to support the proposition that a State has inherent authority to punish persons convicted of violating its criminal laws by fines, imprisonment and confiscation of their property, or by any one or more of said penalties. The Commission consistently has adhered to this principle in its determinations under the various titles of the International Claims Settlement Act of 1949, as amended. Thus, the Commission has held that it is a *sine qua non* for a claimant to receive favorable action that a violation of international law must be established in a claim for the nationalization or other taking of property. (FCSC Dec. & Ann. 394, 399, 548 (1968).) And, generally speaking, punishment for the internal violation of a country's laws is not such a violation. The last citation (*id.* at 548) involves facts that are similar to those in the claim under consideration. In that case, claimant was convicted of violating the laws of Poland by attempting to smuggle, by means of his yacht, 60,000 zlotys out of Poland. He was sentenced to imprisonment and fine, and his yacht and the 60,000 zlotys were confiscated by Poland. The Commission denied the claim, stating that there had been neither a lack of due process nor unusual or excessive punishment; that Poland had the sovereign right to impose penalties for the violation of its laws, and that in doing so under the circumstances in this case, it incurred no liability under international law and was not required to compensate claimant for its actions. (For the full text of that decision, see *Claim of Walter Peter Milewski*, Claim No. PO–5890, Dec. No. PO–1921, 19 FCSC Semiann. Rep. 42 (July–Dec. 1963).)

There is nothing in this record that establishes or even suggests that claim-

ant was denied due process of law at her trial in Cuba or that there was a denial of justice, as that term is understood under international law, such as an unfair trial. Moreover, it does not appear that the sentence of confiscation of claimant's properties was unusual or excessive punishment. Copies of communications from the United States Department of State to claimant's counsel indicate that claimant was accorded the rights at her trial to which she was entitled under international law. A communication, dated December 5, 1960, informed counsel that a prominent Cuban attorney who "had a great deal of experience in handling counter-revolutionary cases" had been engaged to represent claimant. It appears from another communication that a representative from the United States Embassy was not present at claimant's trial because "she did not want anyone there."

Upon consideration of the entire record, the Commission finds that the Government of Cuba violated no rule of international law by confiscating claimant's properties, and it concludes that the portion of the claim for the loss of the real and personal property confiscated pursuant to the Cuban court judgment of December 16, 1960 is not within the purview of Title V of the Act. Accordingly, this portion of the claim is denied.

The facts involving the loss of claimant's two-thirds interest in certain Cuban bonds warrant further discussion. The record shows that bonds in the face amount of $23,000.00 of the issue known as 6% mortgage bonds of The Centro Asturiano de la Habana, Series A, had been on deposit with the First National City Bank of New York, Havana Branch, since 1947 in favor of claimant's late husband, Carmen V. Suarez, who died on April 19, 1950. In accordance with the duly probated will of Carmen V. Suarez, claimant was bequeathed his entire estate, and by assignment, dated December 2, 1952, she transferred a one-third interest in the bonds to her attorney, Harold C. Apisdorf, Esq. For the record it can be noted that his claim (CU–0626), based upon said one-third interest, *inter alia,* will be decided on its own merits. Accordingly, the Commission finds that claimant owned a two-thirds interest in 23 bonds of the said issue, each bond in the amount of $1,000.00.

On September 17, 1960, the Cuban Government published in its Official Gazette Resolution 2 pursuant to Law 851, which listed as nationalized on that date the First National City Bank of New York. The Commission finds that upon the nationalization of the assets of the First National City Bank of New York, Havana Branch, the bonds in which claimant owned a two-thirds interest, on deposit with that bank, were taken by the Government of Cuba. This gave rise to a claim against the Government of Cuba for the value of the bonds. The Commission holds, however, that the confiscation order of December 16, 1960 against the claimant also effected a confiscation of her claim against Cuba, a chose in action constituting personal property, that had arisen on September 17, 1960. For the reasons stated above with respect to claimant's other personal property and her real property, the portion of the claim for these bonds is also denied.

### PERSONAL INJURIES

Claimant has asserted a claim in the amount of $50,000.00 for personal injuries allegedly sustained while imprisoned in Cuba. She states that prior to her trial in Cuba she was subjected to intensive questioning for three weeks which caused her to experience a heart attack; that women prisoners were beaten with gun butts and during one such occasion she was struck by a gun butt at the side of her head, causing severe injury to her left ear, which will

require surgery to repair the damage and restore her hearing; and that she subsequently suffered a second heart attack while imprisoned in Cuba.

The record includes a statement from Dr. Jose C. Gros, dated January 19, 1968, in which he states that he had examined claimant in a Cuban prison in December 1960, that claimant complained of an earache "after being hit on the left ear by a soldier during a prison riot." The doctor stated that he had examined claimant again in January 1961 and found "bilateral ear infection with pus in both external ear canals, and the tympanic membranes were perforated." The doctor concluded that claimant had suffered a hearing "loss of 75–80% in the left ear, and 38–43% in the right ear."

Section 503(b) of the Act provides as follows:

> The Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims of nationals of the United States against the Government of Cuba . . . arising since January 1, 1959 . . . for disability or death resulting from actions taken by or under the authority of the Government of Cuba . . .

The Commission has held that in a claim under Section 503(b) of the Act, it must be established, *inter alia,* that the claimant suffered a disability and that the disability was the proximate result of actions of the Government of Cuba in violation of international law. (See *Claim of Julio Lopez Lopez,* Claim No. CU–3259.)

The evidence of record does not support claimant's assertions that her injuries and present disability resulted from violations of international law by the Government of Cuba within the purview of Section 503(b) of the Act. A copy of a letter to counsel from the Department of State, dated March 16, 1961, states in part: "I can only report that she was recently visited and that she was found to be well treated and in good health." In another letter to counsel from the Department of State, dated July 24, 1961, it was stated in part: "We have now received a report from the American Embassy at Bern informing us that a representative of the Swiss embassy in Habana visited Mrs. Geraldine Shamma De Carrera at the Guanajay prison on June 15 and that Mrs. Shamma appeared to be in better health. She also confirmed that she was well treated, but complained that the prison food was insufficient."

Another letter to counsel from the Department of State, dated June 1, 1962, stated in part: "Mrs. Shamma declared (at an interview with a Swiss representative on May 2, 1962) she was not subjected to cruelty since she was an American. . . . Mrs. Shamma had no complaint against the prison authorities. . . . During her 18 months imprisonment, Mrs Shamma has never been subjected to propaganda or indoctrination in favor of the present regime." Although claimant did not appear to be as well on the occasion of the visit of May 2, 1962 nor subsequently, according to other Department of State correspondence, it does not appear from such correspondence or any other evidence of record that her deterioration in health was the result of any Cuban action in violation of international law. The record shows that claimant was hospitalized while in prison and given medical attention. The correspondence of record indicates claimant had recovered from her illness, was released from the prison hospital and returned to her cell in August 1962. Swiss representatives spoke with claimant personally after her release from the hospital and "were assured of her well-being."

Additionally, there is nothing to support claimant's contentions that she

sustained a disability from Cuban action in violation of internatonal law from newspaper articles or the article claimant wrote for the Saturday Evening Post. The newspaper articles report that claimant was released from prison in 1963 and that she was working to free other prisoners held by Cuban authorities, but there was not a word about any injuries or disability suffered by claimant. Claimant's article, published in the Saturday Evening Post, discusses a riot at the prison. Claimant wrote: "We started to riot. We broke up furniture and used table legs for clubs. I was right in the thick of it, shouting encouragement to the other women. We chased the guards out of our dormitory and barricaded the door with cots and mattresses. Then we kept them at bay by turning a tremendous fire hose on them. We were only 45 women, and they were several hundred *milicianos*, but we fought like demons. Finally, they turned off the water, and overwhelmed us. They dragged us out—wet, beaten and still screaming—and threw us on a bus. One woman had a broken arm. Another had her head split open. We were all cold and shivering."

Although claimant described her experiences immediately after arrest and after her trial, she made no mention in that article of being beaten with a gun butt or suffering a heart attack from severe intensive questioning. Describing her experiences while under arrest and during questioning by "G-2," claimant stated in that article: "I spent 16 days with G-2. I didn't sleep well, and I didn't eat very much, but they never laid a hand on me except to search me." Claimant described other women as being treated inhumanely, but not herself. At one point claimant did state that she sustained pain from "angina pectoris" but she stated she had refused transfer to the prison hospital.

Upon careful consideration of the portion of the claim for personal injuries, the Commission finds the record insufficient to warrant favorable action. Claimant was arrested and convicted for violating the criminal laws of Cuba. Claimant refused to have an American representative from the United States Embassy present at her trial. The record fails to corroborate claimant's present version as to how her disabilities arose. Although she may have suffered a heart attack and may have been disabled, it does not appear that this was the proximate result of Cuban Government actions in violation of international law.

The Commission finds that claimant has failed to sustain the burden of proof with respect to the portion of her claim for a disability under Section 503(b) of the Act. Accordingly, this portion of the claim is also denied.

Dated at Washington, D.C., Sep. 3, 1969.

## IN THE MATTER OF THE CLAIM OF PILGRIM PLASTICS CORPORATION

### Claim No. CU–1979—Decision No. CU–3870

*Purchase by the Government of Cuba of machines consigned to a Cuban Corporation by American corporation under a contract requiring payment by the consignee of certain royalties for the use thereof, constituted an assumption by the Government of the obligation of the consignee under the contract.*

*Failure by the Government of Cuba to permit Cuban consignee to honor its obligation to American corporation constituted an intervention in the con-*

*tractual rights of the American corporation and gave rise to a valid claim under Title V of the Act.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $570,-505.29, was presented by PILGRIM PLASTICS CORPORATION based upon the asserted loss of payment for merchandise shipped to a consignee in Cuba and royalties due from said consignee.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term "property" means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

An authorized officer of claimant has certified that claimant was organized under the laws of New York, and that at all pertinent times all of the outstanding capital stock of claimant was owned by three persons in equal shares. The record shows that two of these three stockholders were nationals of the United States at all pertinent times. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

### Merchandise shipped to Cuba

The record shows that claimant concluded certain agreements with a Cuban corporation, Industria Sinesio Rojo, S.A., hereafter called the consignee, discussed below in connection with the portion of the claim for royalties. As a result of that relationship, claimant shipped to the consignee in Cuba a "complete mold for machinery to manufacture plastic heels" on August 6, 1959, three "Cavities for the manufacture of plastic heels," each on two occasions,

---

* This decision was entered as the Commission's Final Decision on October 8, 1969.

October 28, 1959, and December 16, 1959, and another "Cavity" on February 26 1960. The record contains copies of invoices, bills of lading and air way-bills, as well as extracts from claimant's records and statements from officials of claimant concerning said shipments. The following indicates the shipment dates, and the amounts thereof, on the basis of the evidence of record:

| Shipment date | Amount |
|---|---|
| Aug. 6, 1959 | $ 9,750.00 |
| Oct. 28, 1959 | 1,650.00 |
| Dec. 16, 1959 | 1,650.00 |
| Feb. 26, 1960 | 550.00 |
| Total | $13,600.00 |

Extracts from claimant's records show that the consignee made a number of payments on account of the foregoing debt in 1959 and 1960, which payments aggregated the amount of $8,100.00. Accordingly, the Commission finds that the net amount due from the consignee was $5,500.00.

The Government of Cuba, on September 29, 1959, published its Law 568, concerning foreign exchange. Thereafter, the Cuban Government effectively precluded not only transfers of funds to creditors abroad, but also payment to creditors within Cuba, by numerous, unreasonable and costly demands upon the consignees, who were thus deterred from complying with the demands of the Cuban Government. The Commission holds that Cuban Law 568 and the Cuban Government's implementation thereof, with respect to the rights of the claimant herein, was not in reality a legitimate exercise of sovereign authority to regulate foreign exchange, but constituted an intervention by the Government of Cuba in the contractual rights of the claimant, which resulted in the taking of American-owned property within the meaning of Section 503(a) of the Act. (See *Claim of The Schwarzenbach Huber Company*, Claim No. CU–0019, 25 FCSC Semiann. Rep. 58 [July–December 1966]; and *Claim of Etna Pazzolana Corporation*, Claim No. CU–0049, 1967 FCSC Ann. Rep. 46.)

Accordingly, the Commission finds that claimants property was lost as a result of intervention by the Government of Cuba. While it is not clear from the record, it appears on the basis of normal business practices that the payments made by the consignee in the amount of $8,100.00 should be credited on account of the first shipment in the amount of $9,750.00, thereby reducing that amount to $1,650.00. In the absence of evidence to the contrary, the Commission finds that claimant's losses occurred 30 days after the shipment dates, except that with respect to losses that would otherwise be found to have occurred prior to September 29, 1959, the effective date of Law 568, the Commission finds that such losses occurred on September 29, 1959. Accordingly, claimant's losses with respect to the shipments to the consignee may be summarized as follows:

| Date of loss | Amount |
|---|---|
| Sept. 29, 1959 | $1,650.00 |
| Nov. 28, 1959 | 1,650.00 |
| Jan. 16, 1960 | 1,650.00 |
| Mar. 26, 1960 | 550.00 |
| Total | $5,500.00 |

*Royalties*

Claimant has computed its claim for royalties due from the consignee in the amount of $565,005.29 on the basis of contracts entered into with the consignee. The basic contract was concluded in Cuba on April 16, 1959, and contained, *inter alia*, the following provisions (copies of the contracts having been submitted by claimant):

1. Claimant agreed to furnish the consignee with certain necessary equipment to be used by the consignee in manufacturing and producing plastic heels, and to give the consignee all technical knowledge, advice and supervision as aids to such production.

2. The consignee agreed to pay claimant 7½ cents for each pair of heels made with the molds, accessories and equipment furnished by claimant, and guaranteed a minimum payment for the duration of the contract based upon a production of at least 375,000 pairs of heels per year at 7½ cents per pair for each machine furnished by claimant.

3. The contract was to remain in force for 10 years.

4. The consignee agreed to submit to claimant monthly reports of production, indicating amounts due claimant.

5. Claimant agreed not to furnish equipment to any other manufacturer in Cuba so long as the consignee satisfied all of its contract obligations.

Another contract between claimant and the consignee was executed on January 28, 1960, for the purpose of clarifying the orignal contract and provided, in pertinent part, as follows:

a. The consignee was obliged to pay claimant royalties only for heels made with claimant's equipment and not on the basis of the number of pairs of heels sold by the consignee.

b. The consignee was required to make monthly payments to claimant for royalties due for the previous month, and to make such payments to a bank designated by claimant.

c. The consignee was authorized to enter into agreements with a subcontractor in Cuba for the manufacture of said plastic heels, but the consignee was to remain bound by the terms of the agreements with claimant.

d. The consignee was authorized to purchase any equipment from claimant and if it did, the royalties due with respect to production from such purchased equipment was to be computed at the rate of 5 cents per pair of heels while production from claimant's equipment was to remain at the 7½ cents per pair rate.

The record contains copies of monthly reports furnished to claimant by the consignee for the period May 11, 1959, to September 17, 1960, showing that the consignee produced 1,130,730 pairs of heels during that period.

Claimant asserts that its claim for royalties amounts to $565,005.29 on the basis of two machines at the guaranteed minimum rates for the duration of the contract according to its express provisions. Accordingly, claimant's computations are as follows:

| | | |
|---|---:|---:|
| April 1959 to Mar. 31, 1960—847,326 pairs of heels were produced—at 7½ cents | | $ 63,549.45 |
| *Less*: Amounts paid by the consignee in 1959 | | 4,794.16 |
| | | 58,755.29 |
| Contract minimum of 375,000 pairs per year for two machines: | | |
| Apr. 1, 1960 to Mar. 31, 1961 | 750,000 pairs | |
| *Less:* Amount above produced during this period | 283,404 pairs | |
| | 466,596 pairs | |
| Consequently, minimum charge applies 750,000 pairs at 7½ cents | | 56,250.00 |
| Minimum charge for 8 more years from Apr. 1, 1961, to Mar. 31, 1969 | | 450,000.00 |
| Total | | $565,005.29 |

The record indicates that the consignee stopped production on September 17, 1960, and the record failed to indicate the reason for the termination of production on that date. The Commission, therefore, communicated with counsel for claimant under date of November 6, 1968, and suggested appropriate explanations as well as evidence to establish that the claim for royalties covering the period ending March 31, 1969, fell within the purview of Title V of the Act. When no response was received either to that letter or a followup letter of January 2, 1969, the Commission communicated with claimant directly to afford it another opportunity to support its claim for royalties. Claimant's response of March 20, 1969, related to the issue of nationality, which was also mentioned in the Commission's letters, although by its terms it purported to include all matters referred to in the Commission's communication of November 6, 1968. No response was made to the Commission's inquiry as to the major portion of the claim based upon royalties.

The Commission holds that the implementation of Law 568 constituted an intervention by the Government of Cuba in the contractual rights of claimant with respect to the royalties. (See *Claim of Jantzen, Inc.*, Claim No. CU–1531.) The record indicates the consignee-company was not actually nationalized but that it sold the equipment furnished to it by claimant to the Cuban Government sometime after the adoption of Law 568. The written contract and its later amendment between the claimant and the consignee, as above mentioned, not only required the payment of one of two different types of royalties depending on whether the machines had been purchased by the Cuban company, but also required the original consignee to remain liable for royalties and other payments when permission was granted it to transfer these assets to a new company. Obviously the consignee could not alter claimant's rights to royalties either by stopping production or by disposing of the equipment in question. The Commission finds that by virtue of the purchase of the equipment, Cuba succeeded to the obligations of the consignee pursuant to the written, contract, as amended, with claimant.

The record shows, as indicated above, that the equipment thus acquired by Cuba included appropriate machinery, etc., for manufacturing plastic heels. In the absence of evidence establishing precisely how many pairs of plastic heels were made with claimant's machinery and how many with the consignee machinery, the Commission finds that claimant is entitled to an allowance

based upon  cents per pair of heels on the minimum basis provided in the contract for the period from April 1, 1969, to March 31, 1969.

Based upon the terms of the contracts and in the absence of evidence to the contrary, the Commission finds that claimant's losses for each month of production occurred on the 15th day of the following month when payment became due, except that with respect to losses that would otherwise be found to have occurred prior to September 29, 1959, the effective date of Law 568, the Commission finds that such losses occurred on September 29, 1959.

The record includes statements made by an officer of claimant to the Department of State under date of May 3, 1962, in which claimant's asserted losses as of March 31, 1962, were set forth. It appears from those statements that the consignee paid claimant on account of royalties due the amounts of $2,675.78 and $2,118.38 in August 1959 and December 1959, respectively. In the absence of evidence to the contrary, the Commission finds that the payment made in August 1959 should be credited against losses found to have occurred on September 29, 1959, and October 15, 1959, respectively. (See *Claim of Richard G. Milk and Juliet C. Milk*, Claim No. CU–0923 1967 FCSC Ann. Rep. 63) Acordingly, claimant's losses of royalties aggregated $396,255.29 which together with the balance due on the purchase of equipment of $5,500.00 total $401,255.29.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the respective dates of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered, as follows:

| From | On |
|---|---|
| Sep. 29, 1959 | $ 28,870.79 |
| Oct. 15, 1959 | 4,824.37 |
| Nov. 15, 1959 | 8,457.30 |
| Nov. 28, 1959 | 1,650.00 |
| Dec. 15, 1959 | 11,081.63 |
| Jan. 15, 1960 | 1,755.00 |
| Jan. 16, 1960 | 1,650.00 |
| Mar. 26, 1960 | 550.00 |
| Apr. 15, 1960 | 5,416.20 |
| | 64,255.29 |
| and from May 15, 1960, through Apr. 15, 1969, at $3,125.00 for each of the 108 months in this period | 337,500.00 |
| Total | $401,755.29 |

### CERTIFICATE OF LOSS

The Commission certifies that PILGRIM PLASTICS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Hundred One Thousand Seven Hundred Fifty-five Dollars and Twenty-nine Cents ($401,755.29) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Date at Washington, D.C., Sept. 3, 1969.

## IN THE MATTER OF THE CLAIM OF WILLIAM A. POWE

Claim No. CU–0502—Decision No. CU–4511

*The values of each item of a claim must be determined separately on its own merits.*

PROPOSED DECISION *

This claim against the Government of Cuba under Title V of the International Claims Settlement Act of 1949, as amended, was presented by WILLIAM A. POWE, in the amended amount of $9,924,315.30 based upon asserted losses in connection with ownership of stock in several nationalized Cuban corporations, liability as guarantor for unpaid debts of nationalized Cuban corporations, a debt of the Cuban Government, and a yacht. Claimant has been a national of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:
> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimant has submitted evidence in the form of stock certificates, financial statements, lists of stockholders, inventories, maps, affidavits, correspondence, excerpts from the Cuban Official Gazette, and documents regarding the nationalization of enterprises and the appointment of administrators therefor. On the basis of such evidence the Commission makes its findings of fact regarding the various items of this claim under separate headings, as set forth further below.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the inter-

---

* This decision was entered as the Commission's Final Decision on March 16, 1970.

national legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

1. *Willys Distributors, S.A.*

Claimant asserts a loss of $611,457.69 as the owner of a stock interest in this enterprise, which was incorporated in Cuba on July 18, 1945 and held the Cuban franchise for the sale of Jeeps and other vehicles manufactured by Willys Overland Motor Company of Ohio. The Commission finds that claimant was the owner of 4,963 shares of stock in the corporation, of a total of 8,532 shares outstanding, on October 24, 1960 when the enterprise was nationalized by the Government of Cuba under Resolution No. 3 issued pursuant to Law No. 851.

Claimant has submitted, as the most recent available financial statement of the corporation, a balance sheet as of June 30, 1959, which reflects the following:

*Assets*

| | | | |
|---|---|---|---|
| Cash on hand and in banks | | $ 55,780.64 | |
| Notes Receivable | $ 55,031.53 | | |
| Less: Discounts | 2,857.14 | 52,174.39 | |
| Accounts Receivable | | | |
| Clients | $434,782.54 | | |
| Agencies | 12,238.04 | | |
| Others | 32,579.41 | 479,599.99 | |
| Inventory | | 348,879.66 | |
| Merchandise in Transit | | 472,053.95 | $1,408,488.63 |
| Piezas y Accesorios, K-W, Inc. | | $225,320.41 | |
| Sociedad Inmobiliaria Raritan | | 11,051.70 | |
| Kaiser Willys Motors of Cuba, Inc. | | 1,008.87 | |
| Importers of Jeeps, Inc. | | 2,056.53 | |
| Vehicle Assembly Co. ACEA, Inc. | | 4,809.42 | |
| Anglo-Cuban Distributors Co. ACO, Inc. | | 41,062.68 | 285,309.61 |
| Properties | | $200,614.40 | |
| Less: Reserve for Depreciation | | 68,578.40 | 132,036.00 |
| Investments | | | 23,908.65 |
| Items in Suspense | | | 58.38 |
| Deferred Assets | | | 10,510.53 |
| | | | $1,860,311.80 |

*Liabilities, Capital and Profits*

| | | |
|---|---|---|
| Current Liabilities | | |
| The First National City Bank of New York | $190,339.89 | |
| Accounts Payable | 141,784.33 | |
| Willys Overland Export Corp. | 267,186.08 | |
| Vacation Tax Payable | 4,749.66 | |
| Taxes Payable | 24,037.23 | $ 628,097.19 |

| | | |
|---|---|---|
| Talleres y Servicio, S.A. | | 15,455.51 |
| Service Guaranteed Deposits | | 16.680.44 |
| Mortgages Payable | | 10,000.00 |
| Dividends Declared but not paid | | 85,320.00 |
| Reserve for Contingencies | | 130,000.00 |
| Provision for Profits Tax and | | |
| Excess Profits Tax | | 8,908.60 |
| | | $  894,461.74 |
| Capital: | | |
| Authorized 20,000 shares of $100 each | | |
| Issued 8,537 shares | $853,700.00 | |
| In Treasury 5 shares | 500.00 | $  853,200.00 |
| Surplus: | | |
| Balance, July 1, 1958 | $183,097.83 | |
| Less Dividends Declared but not paid | | |
| Acta No. 67 of September 29, 1958 | 85,320.00 | |
| | 97,777.83 | |
| Plus Net Profit, July 1, 1958– | | |
| June 30, 1959 | 14,872.23 | 112,650.06 |
| | | $1,860,311.80 |

Deducting the liabilities from the assets as shown in the above balance sheet would indicate a net worth or book value of $965,850.06. However, among the liabilities is an item designated as "Reserve for Contingencies" in the amount of $130,000.00 Since this appears to be a cash reserve which would have been available for distribution among stockholders in the event of liquidation, it will be treated in the calculation of net worth as a part of the surplus. Therefore, the net worth or book value of the corporation is found to have been $1,095,850.06.

The Commission finds that the book value as calculated is the most appropriate measure of the value of the corporation at the time of loss. With 8,532 shares of stock outstanding, the value of each share was $128.44, and the value of claimant's 4,963 shares was $637,447.72. The Commission concludes that by reason of his ownership interest in Willys Distributors, S.A., claimant suffered a loss in that amount on October 24, 1960 when the corporation was nationalized by the Government of Cuba, within the meaning of Title V of the Act.

Claimant suffered an additional loss for his share of the unpaid dividends of $85,320.00 which had been declared, as set forth in the balance sheet. Claimant's share, in the amount of $49,630.00, constituted a debt owed to claimant by a nationalized enterprise and represents an additional loss suffered by claimant on October 24, 1960 within the meaning of Title V of the Act, making a total loss for claimant of $687,077.72.

2. *Piezas y Accesorios, K-W, S.A.*

The claimed loss with respect to the enterprise Piezas y Accesorios, K-W, S.A., which sold parts and accessories for vehicles sold by Willys Distributors, Inc., is $176,260.01. The Commission finds that this corporation was nationalized by the Government of Cuba on October 24, 1960 under Resolution No. 3 issued pursuant to Law No. 851, at which time it had 2,205 shares of stock outstanding and claimant owned 1,281 shares. Claimant has submitted corporation's balance sheet as of June 30, 1959, the most recent available, reproduced below:

FOREIGN CLAIMS SETTLEMENT COMMISSION

### Assets

| | | |
|---|---:|---:|
| Cash on hand and in banks | | $ 48,656.23 |
| Merchandise sold but not collected for | | 5,419.22 |
| Accounts Receivable | | |
| Clients in Havana | $64,834.64 | |
| Clients in Camaguey | 9,283.21 | |
| Agents | 42,254.31 | |
| Others | 15,484.87 | 131,857.03 |
| Inventory | | 331,326.13 |
| Merchandise in Transit | | 25,588.84 | $542,847.45 |
| Talleres y Servicio, S.A. | $ 26,878.56 | |
| Motores Kaiser Willys de Cuba, S.A. | 2,000.00 | |
| Cia. Distribuidora Anglo-Cubana Aco., S.A. | 157.50 | 29,036.06 |
| Real Estate | $ 12,158.95 | |
| Less: Reserve for Depreciation | 4,208.91 | 7,950.04 |
| Investments | | 100.00 |
| Organization Expense | | 1,907.90 |
| Deferred Assets | | 315.73 |
| Time Payments | | 196.95 |
| | | $582,354.13 |

### Liabilities, Capital and Surplus

| | | |
|---|---:|---:|
| Current Liabilities | | |
| Willys Overland Export Corp. | $ 19,884.43 | |
| Accounts Payable | 13,508.58 | |
| Vacation Tax | 1,701.25 | |
| Other Taxes Payable | 6,792.13 | |
| Commissions Payable | 214.47 | $ 42,100.86 |
| Willys Distributors, S.A. | $225,320.41 | |
| Sociedad Inmobiliaria Raritan | 6,354.34 | 231,674.75 |
| Dividends Declared but not paid | | 22,050.00 |
| Provision for Profits Tax | | 5,180.14 |
| | | $301,005.75 |
| Capital: 2,205 shares of $100 par value issued | | $220,500.00 |
| Surplus: | | |
| Balance July 1, 1957 | $ 59,552.40 | |
| Less Dividends Declared | 22,050.00 | |
| | 37,502.40 | |
| Plus Net Profit July 1, 1958 to June 30, 1959 | 23,345.98 | 60,848.38 |
| | | $582,354.13 |

The balance sheet reflects a net worth of $281,348.38. However, the assets include an item of $1,907.90 for "Organization Expense." This corporation was organized shortly after the organization of Willys Distributors, Inc. on July 18, 1945. In view of the amount of declared dividends, the surplus carried over from prior years, and the profit made in the year ending June 30, 1950, it would appear that the expenses of organization should have been written off completely by October, 1960. Accordingly, the amount of $1,907.90 will be considered an item of expense rather than an asset, reducing the net worth of the enterprise to $279,440.48.

From the evidence of record, the Commission finds the book value as thus calculated to be the most appropriate measure of the value of the corporation at the time of loss. Therefore, the value at the time of loss for each of the 2,205 shares of outstanding capital stock was $126.73 and the value of claimant's interest based upon his ownership of 1,281 shares was $162,341.13. The Commission concludes that claimant suffered a loss in that amount on October 24, 1960 when the corporation was nationalized by the Government of Cuba, within the meaning of Title V of the Act.

As in the previous instance, claimant suffered an additional loss for dividends declared but not paid. The amount of dividends declared was $10.00 per share as the owner of 1,281 shares, claimant was owed $12,810.00. This represents a debt of a nationalized enterprise and an additional loss suffered by claimant on October 24, 1960 within the meaning of Title V of the Act, and making a total loss for this enterprise in the amount of $175,151.13.

3. *Sociedad Inmobiliaria Raritan*

Claimant asserts a loss in the amount of $431,213.19 for his ownership interest in Sociedad Inmobiliaria Raritan, a Cuban corporation organized in 1945. The Commission finds that claimant owned 1,023 of the 1,310 shares of stock outstanding of this corporation on September 13, 1961 when it was nationalized by the Government of Cuba under Law 890. Claimant has submitted a balance sheet as of December 31, 1959, the most recent available, which reflects the following:

*Assets*

| | | |
|---|---:|---:|
| **Current Assets** | | |
| Cash in Banks | $ 585.18 | |
| Rents Receivable | 21,140.00 | |
| Other Accounts Receivable | 871.34 | |
| Guaranty Deposits | 450.00 | $ 23,046.52 |
| **Fixed Assets** | | |
| Land Properties | $132,623.38 | |
| Buildings less accrued | | |
| reserve of $56,587.58 | 133,518.63 | |
| Furniture and Fixtures | | |
| less reserve of $1,974.34 | 1.00 | 266,143.01 |
| **Deferred Charges** | | |
| Insurance paid in advance | $ 844.92 | |
| Taxes paid in advance | 310.51 | 1,155.43 |
| | | $290,344.96 |

*Liabilities*

| Current Liabilities | | |
|---|---|---|
| Accounts Payable | $   4,796.26 | |
| Accrued Taxes Payable | 10,910.39 | $  15,706.65 |
| Capital: | | |
| Authorized Capital $500,000.00 | | |
| Capital Issued | $149,800.00 | |
| Less: Shares held on hand | | |
| which have not been paid | 18,800.00 | 131,000.00 |
| Surplus: | | |
| Net Surplus as of December 31, 1959 | | 143,638.31 |
| | | $290,344.96 |

The net worth of the enterprise as calculated from this balance sheet would be $274,638.31. Claimant contends, however, that the fixed assets, reported at cost less depreciation, are greatly undervalued in the balance sheet. The principal assets of the corporation were two commercial buildings, one located at 23rd and O Streets in the Vedado section of Havana, and the other near the Cabaret Sans Souci in the suburban section of Marianao. The area of the land at 23rd and O Streets is 2,964.75 square meters. In an affidavit, claimant states that on the basis of his knowledge of the value of real estate in the vicinity, this land was worth $100.00 per square meter in 1959. Claimant's legal counsel in Cuba states in an affidavit that he was familiar with the property and has direct knowledge of other real estate transactions in that neighborhood, and values the land at $100.00 per square meter. In view of this evidence and considering the location of the property (less than one block from the Hotel Nacional), the Commission finds that the value of the land at 23rd and O Streets was $296,475.00. In their affidavits, claimant and his Cuban counsel value the other land in Marianao, which measured 7,500 square meters, at $15.00 per square meter. This amount appearing reasonable in view of the location and other evidence available to the Commission concerning land values in the vicinity, the Commission finds that the land in Marianao was worth $112,500.00, for a total value for the land properties of $408,975.00.

Claimant also includes a value of $1,500.00 for furniture and fixtures in his calculation of the value of the corporation, but submits no evidence in support thereof. The data submitted by claimant supporting the balance sheet of December 31, 1959 includes Exhibit 31A7, which contains the statement – "At present the Company does not have any furniture." Accordingly, no change is made in the balance sheet figure in this respect. No claim is made for a valuation for the buildings higher than that shown on the balance sheet.

Having found that the land owned by the corporation was worth a total of $408,975.00, an increase of $276,351.62 over the balance sheet figure, the Commission finds that the value of this corporation at the time of taking was $550,989.93, or $420.603 per share of the 1,310 shares of stock outstanding, and that the value of claimant's 1,023 shares was $430,276.87. The Commission concludes that claimant suffered a loss in that amount on September 13, 1961 within the meaning of Title V of the Act.

### 4. *Powe Machinery Company, S.A.*

The Commission finds that claimant was the owner of 2,432 shares of 2,500 outstanding shares of stock in this corporation which represented Caterpillar Tractor Company, Deere & Company, and other American manufacturers in the western half of Cuba. The enterprise was organized in Cuba and was nationalized by the Government of Cuba under Resolution No. 3 issued pursuant to Law No. 851 on October 24, 1960. A loss in the amount of $3,544,323.84 is asserted and in support thereof, a certified balance sheet as of June 30, 1960 was submitted which reflects the following:

<em>Assets</em>

| | | |
|---|---:|---:|
| Current Assets | | |
| Cash (including bank deposit to guarantee Letters of Credit $83,265.00) | $ 378,895.20 | |
| Notes and Accounts Receivable Customers (less allowance of $50,000.00 for doubtful accounts) | 1,283,632.64 | |
| Commissions Receivable on direct sales | 30,327.82 | |
| Officers and Employees | 26,157.64 | |
| Other | 16,112.25 | |
| Due from Powe Equipment Co., S.A. | 12,240.40 | |
| Inventories, at Cost or Less, not in excess of market | | |
|     General Merchandise | 332,267.12 | |
|     Spare Parts | 361,525.78 | |
|     In Transit | 5,612.27 | $2,446,771.12 |
| Loans Receivable from Contratos Mobiliarios Cremo, S.A.—7% Unsecured—Due 2/20/65 | | 173,000.00 |
| Capital Assets, at Cost | | |
| Land and Buildings | $ 581,533.93 | |
| Furniture & Fixtures & Other Equipment | 235,482.07 | |
| | 871,016.00 | |
| Less Accumulated Depreciation | 82,196.60 | 734,819.40 |
| Other Assets & Deferred Charges | | |
| Receivable from Sociedad de Inversiones La Loma | $ 80,692.71 | |
| Prepaid Insurance | 7,898.11 | |
| Advances to Employees for Expenses | 2,734.46 | |
| Miscellaneous | 12,845.45 | 104,170.73 |
| | | $3,458,761.25 |

*Liabilities and Capital*

| | | |
|---|---:|---:|
| Current Liabilities | | |
| Accounts Payable | $   16,647.86 | |
| Officers & Employees | 21,023.91 | |
| Customers' Credit Balances | 17,609.27 | |
| Other | 59,664.04 | $   114,945.08 |
| Accrued Liabilities | | 62,782.28 |
| Accrued Taxes | | 9,904.77 |
| Long Term Debt, Installments due within one year | | 36,000.00 |
| Long Term Debt—6% First Mortgage | $   250,000.00 | |
| Less Installments due within one year | 36,000.00 | 214,000.00 |
| Deferred Gross Profit on Installment Accounts | | 54,498.06 |
| | | $   492,130.19 |
| Capital Stock and Surplus Authorized, 4,500 shares of $1,000 par value each; Issued and Outstanding, 2,500 shares | $2,500,000.00 | |
| Earned Surplus | 466,631.06 | 2,966,631.06 |
| | | $3,458,761.25 |

Claimant urges an upward adjustment of the Earned Surplus figure on the ground that during the year ending June 30, 1960 the accounts receivable total had been reduced by $560,086.25 which was written off as bad debts. In an affidavit, claimant explains that this charge-off would not normally have been made, but was done to reduce exorbitant taxes imposed by the Cuban Government, and because the debtors were enterprises which recently had been nationalized; and the company did not wish to pay taxes on money which was owed to it by the Government of Cuba. From a detailed profit and loss statement for the year ending June 30, 1960, it is apparent that the surplus balance at the beginning of that period was $694,217.60; that operations for the year resulted in a net loss of $227,586.54, which reduced the surplus to the $466,631.06 shown on the balance sheet; and that the reason for the net loss was the writing off of $560,086.55 as bad debts, without which the year's operations would have shown a net profit of $332,500.01, increasing the surplus account to $1,026,717.61.

In addition, the record includes an unaudited balance sheet as of August 31, 1960, which was delivered by an officer of the company to the American Embassy in Havana when nationalization appeared imminent. The only significant difference in the two balance sheets is the addition of $116,704.68 to the July 1, 1960 earned surplus balance of $466,631.06, increasing the surplus to $583,335.74. This increase represented profits earned during the months of July and August 1960, and is supported by a detailed profit and loss statement for that period.

The Commission is of the opinion that the surplus account should be in-

creased to $1,143,422.29, in view of the debt write-off and the profits for July and August of 1960. On the other hand, a downward adjustment will be made in one of the asset items. The June 30, 1960 balance sheet shows the sum of $12,240.40 due from the Powe Equipment Company, S.A. A balance sheet of the same date for Powe Equipment Company (discussed below) shows as a liability the sum of $10,719.05 owed to Powe Machinery Company, S.A. Claimant being unable to reconcile the difference, the Commission will substitute the smaller figure in the balance sheet of Powe Machinery Company for June 30, 1960, reducing the asset total by $1,521.35. This reduces the surplus account to $1,141,900.94 and provides a total net worth of $3,641,900.94, which the Commission determines to have been the value of the corporation at the time of loss. The value for each share of the 2,500 shares outstanding was therefore $1,456.76, and the value of claimant's 2,432 shares was $3,542,840.32. The Commission concludes that claimants suffered a loss in that amount as a result of the nationalization of the corporation by the Government of Cuba on October 24, 1960, within the meaning of Title V of the Act.

5. *Powe Equipment Company, S.A.*

This company was the counterpart of the Powe Machinery Company, S.A. and represented Caterpillar Tractor Company, Deere & Company and other American manufacturers in the eastern half of Cuba. The Commission finds that this corporation was nationalized by the Government of Cuba on October 24, 1960 under Resolution No. 3 pursuant to Law No. 851. Claimant asserts a loss in the amount of $2,658,036.69 based upon his ownership of 1,394 of the 1,450 shares of stock outstanding.

Claimant has submitted a certified balance sheet for the corporation as of June 30, 1960 which shows an asset total (including $6,863.64 for Unamortized Organization Expense) of $2,854,274.56, a liability total of $276,892.76, and a net worth of $2,577,381.80 (capital stock $1,450,000.00, and surplus $1,127,381.80, including $200,000.00 designated as Reserve for Contingencies). In his evaluation of the corporation, claimant relies upon a document dated November 2, 1960, executed when the administrator designated by the Cuban Government took control of the enterprise. According to this document, the firm had an authorized capital of $4,500,000.00 (with $3,050,000.00 not issued), current assets of $2,406,698.40, fixed assets of $497,774.86, other assets of $205,528.54, total assets of $3,110,002.00, liabilities of $345,186.39, a surplus of $1,314,815.81 and a liquid capital of $2,764,815.81. The document further reveals that the outgoing administrator declared the latest balance sheet to be dated September 30, 1960 and to reflect the situation as of October 25, 1960 when the records and files were sealed and the doors of the building sealed to await the appointment of a new administrator.

Material made available to the Commission from the files of the Department of State includes a balance sheet for Powe Equipment Company, S.A. as of September 30, 1960, as follows:

FOREIGN CLAIMS SETTLEMENT COMMISSION

*Assets*

**Current Assets:**

| | | | |
|---|---|---|---|
| Cash | | $369,695.72 | |
| Accounts Receivable, Customers | $356,356.70 | | |
| Less: Reserve for doubtful accounts | 50,000.00 | 306,356.70 | |
| Notes Receivable | | 231,274.44 | |
| Other Receivable: | | | |
| Commissions Receivable | $180,959.23 | | |
| Others | 15,696.64 | 196,655.97 | |
| Foreign Suppliers Debit Balance | | 92.93 | |
| Officers and Employees' Debit Balances | | 67,843.91 | |
| Inventories: | | | |
| Machinery | $434,805.11 | | |
| Parts | 535,391.56 | $970,196.67 | |
| Merchandise in Transit | | 8,643.74 | |
| Foreign Suppliers Purchase Agreement | | 36,690.82 | |
| Merchandise Purchase Orders Guarantees | | 100,810.81 | |
| Banks Guaranty Deposits | | 100,661.63 | |
| Work in Process | | 1,709.47 | |
| Advanced Custom Duties | | 985.02 | |
| Miscellaneous Prepaid | | 15,080.67 | $2,406,698.40 |

| *Fixed Assets:* | Original Value | Depreciation Accrued | Book Value | |
|---|---|---|---|---|
| Land | $ 77,202.30 | $    — | $ 77,202.30 | |
| Buildings | 288,231.20 | 2,161.71 | 286,069.49 | |
| Furniture and Fixtures | 108,233.11 | 40,514.53 | 67,718.58 | |
| Automobile and Trucks | 27,932.22 | 20,013.45 | 7,918.77 | |
| Shop Equipment | 54,662.07 | 13,216.71 | 41,445.36 | |
| Tools | 3,342.64 | — | 3,342.64 | |
| | $559,603.54 | $ 75,906.40 | $483,697.14 | |
| Patents | 20,000.00 | 5,922.28 | 14,077.72 | 497,774.86 |

**Other Assets:**

| | | |
|---|---|---|
| Guaranty Deposits | $  1,050.00 | |
| Cash Surrender Value of Life Insurance | 2,420.00 | |
| Contratos Mobiliarios Cremo, S.A. | 195,000.00 | 198,470.00 |

**Deferred Charges:**

| | | |
|---|---|---|
| Organization Expenses | $  6,618.51 | |
| Traveling Expense Advances | 440.43 | 7,058.94 |
| | | $3,110,002.20 |

*Liabilities*

| Current Liabilities: | | | |
|---|---|---|---|
| Accounts Payable: | | | |
| Foreign Suppliers | $ 23,667.17 | | |
| Local Suppliers | 2,154.33 | $ 25,821.50 | |
| Notes Payable: | | | |
| Promissory Notes | $ 36,690.82 | | |
| Credit Letters | 100,810.81 | 137,501.63 | |
| Other Payable: | | | |
| Powe Machinery Co., S.A. | | | |
| Current Account | $ 15,657.95 | | |
| Others | 6,166.23 | 21,824.18 | |
| Customers' Credit Balances | | 20,886.52 | |
| Officers and Employees' | | | |
| Credit Balances | | 9,200.12 | |
| Accrued Taxes, Insurance, | | | |
| Commissions and others | | 43,743.63 | |
| Profit Tax | | 39,903.03 | $ 298,880.61 |
| *Deferred Credits:* | | | |
| Gross Profits Deferred on Installment Sales | | | $ 46,305.78 |
| *Capital Stock and Surplus:* | | | |
| Capital Stock: | | | |
| Authorized 4,500 shares | | | |
| of $1,000 par value | $4,500,000.00 | | |
| Less: Not Issued | 3,050,000.00 | $1,450,000.00 | |
| Surplus: | | | |
| Reserve for Contingencies | | 200,000.00 | |
| Earned Surplus Balance | | | |
| July 1, 1960 | $ 927,381.80 | | |
| Profit up to | | | |
| September 1, 1960 | 187,434.01 | 1,114,815.81 | 2,764,815.81 |
| | | | $3,110,002.20 |

It will be noted that the balance sheet of September 30, 1960 is in agreement with the document of November 2, 1960 submitted by claimant except for an apparent typographical error in the latter for "other assets" ($205,528.54 instead of $205,528.94), and an arithmetical error in the November document's totalling of assets. With corrections for these items, both documents indicate a net worth for the corporation of $2,764,815.81. The sum of $6,618.51 for Organization Expenses, however, is included among the assets in the balance sheet of September 30, 1960. The corporation was organized on December 12, 1951 and the Commission is of the opinion that the expenses of organization should have been written off by September 30, 1960, in view of the profit, earned surplus, and reserve for contingencies items in the balance sheets. Accordingly, the amount of $6,618.51 will be considered as an item of expense rather than an asset, reducing the net worth to $2,758,197.30.

The Commission finds that the value of the corporation at the time of loss was $2,758,197.30 or $1,902.205 for each of the 1,450 shares of stock outstanding. The Commission concludes that claimant, as the owner of 1,394 shares of this stock suffered a loss in the amount of $2,651,673.77 on October

24, 1960 as a result of the taking of the corporation by the Government of Cuba, within the meaning of the Act.

### 6. *Pioneer Trading, S.A.*

The Commission finds that this corporation was organized on October 31, 1958 for the purpose of acquiring from Powe Equipment Company, S.A. used equipment, which had been traded in for new equipment, and repairing and reselling such equipment. The authorized capital was $1,000,000.00 in 10,000 shares of $100.00 each, but only 1,000 shares were issued. Claimant was the owner of 985 shares which he purchased for $98,500.00. The sum of $100,000.00 received from the sale of the stock was deposited in Banco Continental Cubana to the account of Pioneer Trading, S.A.

Because of the political climate, the enterprise did not commence operations and no part of the bank deposit was used or withdrawn. On February 23, 1961, the enterprise was intervened by Resolution No. 61–262 of the National Institute of Agrarian Reform, and the appointed Intervenor notified Banco Continental Cubana and took over the $100,000.00 deposit.

The Commission finds that the value of claimant's interest in the corporation was $98,500.00 and concludes that he suffered a loss in that amount upon the intervention of the firm by the Government of Cuba on February 23, 1961, within the meaning of Title V of the Act.

### 7. *Cuban American Metals Distributors, Inc.*

The Commission finds that this corporation, organized on March 24, 1950 for the purpose of selling the products of the Aluminum Company of America in Cuba, was intervened by the Government of Cuba on August 16, 1960. Claimant asserts a loss in the amount of $55,943.16 based upon his ownership of 188 shares of the 1,881 outstanding shares of that enterprise.

The record for this enterprise contains material submitted by claimant and files made available to the Commission by the Department of State. The amount of loss asserted by claimant herein is based upon statements by the Chairman of the Board and the Vice-President of the firm who base their assessments upon the total assets including an amount for good will and for profit which the future sale of the inventory would have produced. Balance sheets for the corporation as of December 31, 1959, June 30, 1960 and July 30, 1960 do not contain any entry for good will or prospective profits.

Included in the material from the Department of State files in addition to the balance sheets for June 30, 1960 and July 30, 1960 are a physical inventory of the company's assets made at the time of intervention and a statement of the contents of the company's safe deposit box when opened by the Intervenor. The inventory showed total assets of $309,915.61, compared to $381,571.91 and $304,773.95, the total assets in the June 30, 1960 and July 30, 1960 balance sheets, respectively.

Upon consideration of the entire record, the Commission finds that the most appropriate measure of the value of the corporation at the time of intervention is the asset total of $309,915.61 taken from the inventory made at the time of intervention, minus the liabilities of $82,961.45 shown on the latest balance sheet. Thus the net worth is $226,954.16 or $120.656 for each of the 1,881 outstanding shares of stock. The Commission concludes that claimant, as the owner of 188 shares of such stock, suffered a loss in the amount of $22,683.33 on August 16, 1960 as a result of the intervention of

the enterprise by the Government of Cuba, within the meaning of Title V of the Act.

The Commission further finds that the company was indebted to claimant in the amount of $4,504.36 for dividends declared but unpaid since the uncancelled check for this amount was among the contents of the safe deposit box taken by the Intervenor. The Commission concludes that claimant suffered an additional loss in the amount of $4,504.36 on August 16, 1960, making a total loss of $27,187.69 resulting from the intervention of this enterprise.

### 8. *Contratos Mobiliarios Cremo, S.A.*

The Commission finds that this corporation, which was solely owned by claimant, was organized in December, 1959 to purchase the accounts receivable of another firm and to collect said accounts. Although no evidence has been submitted of action taken by the Government of Cuba with respect to this corporation on a specific date or under a specific law, the record indicates that it was taken about the end of the year 1962. In the absence of evidence to the contrary, the Commission finds that the corporation was taken by the Government of Cuba on December 15, 1962.

As evidence of the value of the enterprise, claimant has submitted a financial statement showing that as of September 30, 1962, the assets of the firm consisted of $12,176.11 in a bank account and $455,624.30 in accounts receivable, for a total of $467,800.41. No liabilities are shown. However, to finance the purchase of the accounts receivable, Contratos Mobiliarios Cremo, S.A. had borrowed money from other enterprises in which claimant had an interest. The balance sheet for Powe Equipment Company, S.A. as of September 30, 1960 reveals that it was owed $195,000.00 by the subject corporation on that date. The balance sheet of June 30, 1960 for the Powe Machinery Company, S.A. also includes an indebtedness of $173,000.00 owed by this company, and there is no evidence of any subsequent reduction of the amounts owed.

On the basis of all the evidence of record, the Commission finds that the value of Contratos Mobiliarios Cremo, S.A. on the date of loss was $99,800.41 ($467,800.41 minus $195,000.00 and $173,000.00) ; and concludes that claimant suffered a loss in that amount on December 15, 1962 within the meaning of Title V of the Act.

### 9. *Sociedad de Inversiones La Loma, S.A.*

The Commission finds that claimant was the sole owner of this corporation which was organized in Cuba on October 8, 1950 for the purpose of acquiring title to lands owned by claimant. No evidence has been submitted to establish specific action by the Government of Cuba concerning this corporation, but the record indicates that certain properties owned by the corporation were nationalized with the properties of Powe Equipment Company, S.A. and Powe Machinery Company, S.A. on October 24, 1960. In the absence of evidence to the contrary, the Commission finds that the corporation was taken by the Government of Cuba on October 24, 1960.

Claimant asserts a loss in the amount of $1,291,118.47 and in support thereof has submitted a financial statement as of September 30, 1960 and supplementing affidavits by the president of Powe Machinery Company, S.A. and three Cuban attorneys. The financial statement lists only assets of the corporation asserting that no liabilities existed since it operated as a land holding company. The statement did not include, however, the value of a

FOREIGN CLAIMS SETTLEMENT COMMISSION          251

stock interest in another real estate corporation which interest was valued by the Cuban secretary of that corporation at $375,000.00. Futhermore, the balance sheet of June 30, 1960 for the Powe Machinery Company, S.A. has an asset entry for a loan due from Sociedad de Inversiones La Loma, S.A. in the amount of $80,692.71.

Accordingly, the Commission determines the assets and liabilities of Sociedad de Inversiones La Loma, S.A. as of October 24, 1960 to be the following:

*Assets*

| | | |
|---|---:|---:|
| Cash | | |
|     On Hand | $300,066.00 | |
|     In First National City Bank | | |
|       of New York | 71,577.21 | $ 371,643.21 |
| Properties | | |
|     Lots, estancia La Loma, Havana | $ 43,225.18 | |
|     Lots, estancia San Martin, Havana | 142,020.99 | |
|     Alamar and Alturas del Olimpo lots | 66,021.34 | |
|     Lot, City of Santa Clara | 24,068.45 | 275,335.96 |
| Investments | | |
|     5 Shares Inversiones Mouruso, S.A. | $ 5,000.00 | |
|     4,375 Shares Territorial Alturas | | |
|       del Olimpo, S.A. | 375,000.00 | 380,000.00 |
| Mortgages to be Collected | | |
|     Powe Machinery Company, S.A. | $144,000.00 | |
|     Inversiones Mouruso, S.A. | 105,139.30 | 249,139.30 |
| Loans to be Collected | | 15,000.00 |
| | Total Assets | $1,291,118.47 |

*Liabilities*

| | | |
|---|---:|---:|
| Loan from Powe Machinery | | |
|     Company, S.A. | | $ 80,692.71 |

The net worth of the corporation, therefore, is $1,210,425.76. The Commission concludes that claimant suffered a loss in that amount on October 24, 1960 within the meaning of Title V of the Act.

10. *Compania Immobiliaria El Mamey, S.A.*

The Commission finds that claimant was the sole owner of all the shares of Compania Inmobiliaria El Mamey, S.A. which was organized in Cuba on July 19, 1957 for the purpose of holding title to farm property previously held by claimant. The only asset of this company was a tract of land of 100,607 square meters located near the intersection of Via Blanca and Carretera Central Highways in Cojimar, Guanabacoa, Province of Havana, Cuba, in an area where subdivisions were being built. No evidence has been submitted of specific action taken by the Government of Cuba concerning this corporation and claimant has filed an affidavit by a Cuban attorney that its property was nationalized about the years 1960 and 1961. In the absence of evidence to the contrary, the Commission finds that the corporation was nationalized by the Government of Cuba on October 24, 1960 when claimant's major corporate interests were nationalized.

Although claimant states the land was worth more, the amount claimed is

the purchase price in 1957 of $300,000.00. This value is also the value stated in documents deposited with the American Embassy in Havana in 1960. The Commission therefore determines the value of this corporation at the time of loss as $300,000.00 and concludes that claimant suffered a loss in that amount on October 24, 1960 within the meaning of Title V of the Act.

### 11. *Compania Petrolera Arabia, S.A.*

The Commission finds that claimant was the owner of 10 shares of the 600 shares outstanding of Compania Petrolera Arabia, S.A., a Cuban corporation organized on October 26, 1948. The company was the owner of an oil concession known as Tirana, covering 2,200 hectares of land located in Matanzas Province, Cuba which was leased jointly to Compania Petrolera Norita, S.A. and Esso Standard (Cuba) Inc. By terms of the lease Compania Petrolera Arabia, S.A. was to share in an annual rent of $25,000.00, its share approximating $1,000.00, and to receive a royalty of 5% of production. There is no evidence to establish that explorations were made or oil extracted in the leased area.

The rights of the corporation in the property which it controlled were substantially curtailed by the Cuban Government under Law No. 635 of November 23, 1959. This law effectively cancelled all applications for exploration and exploitation of concessions, regardless of the status thereof. (See *Claim of Felix Heyman*, Claim No. CU–0412, 1968 FCSC Ann. Rep. 51) Thus the Commission finds that the property of the corporation was taken by the Government of Cuba on November 23, 1959.

Claimant asserts a loss in the amount of $833.30 for his 10 shares and in support of this has submitted the affidavit of the corporation's president. On the basis of the affidavit and other evidence available to the Commission, it is determined that the company had a value of $50,000.00 on November 23, 1959 and the Commission concludes that claimant suffered a loss in the amount of $833.30 for his ownership interest on that date as a result of the actions of the Government of Cuba, within the meaning of Title V of the Act.

### 12. *Payments to Caterpillar Americas Company*

Powe Machinery Company, S.A. and Powe Equipment Company, S.A. were the Cuban representatives for Caterpillar Americas Company although the franchise for Cuba was in claimant's name. Payment for merchandise shipped to Cuba was guranteed by claimant. As a result, when two sight drafts in the amount of $45,807.15 and $44,960.82 due December 1, 1959 and December 7, 1959, respectively, were paid to the collecting bank, the Royal Bank of Canada, by the consignee but no amount was forwarded to the consignor, payment of the past due sums was made to the consignor by the claimant on March 13, 1961. Claimant, therefore, asserts claim herein for the amount of $90,767.97 which he acquired by subrogation.

The Government of Cuba, on September 29, 1959, published its Law 568, concerning foreign exchange. Thereafter the Cuban Government effectively precluded transfers of funds to creditors abroad by numerous, unreasonable and costly demands upon the consignees. The Commission holds that Cuban Law 568 and the Cuban Government's implementation thereof, with respect to the rights of the claimant herein and the subrogor, was not in reality a legitimate exercise of sovereign authority to regulate foreign exchange, but constituted an intervention by the Government of Cuba in the contractual rights of claimant and the subrogor, which resulted in the taking of Ameri-

can-owned property within the meaning of Section 503(a) of the Act. (See *Claim of The Schwarzenbach Huber Company*, Claim No. CU–0019, 25 FCSC Semiann. Rep. 58 [July–Dec. 1966].)

Accordingly, the Commission finds that claimant, as subrogee, succeeded to and suffered a loss in the amount of $90,767.97 on March 13, 1961 within the meaning of Title V of the Act. The Commission has held that with respect to an assignment of a claim the date of assignment shall be used for the purpose of computing interest. (See *Claim of Executors of the Estate of Julius S. Wikler, Deceased*, Claim No. CU–2571, 1968 FCSC Ann. Rep. 47.)

13. *Payments to Deere & Company and John Deere Intercontinental, S.A.*

Claimant asserts a loss of $55,180.53 for payments made to Deere & Company and its subsidiary John Deere Intercontinental, S.A. on behalf of Cuban corporations for merchandise shipped to Cuba. Cuban corporations controlled by claimant held Cuban franchises for products of Deere & Company, and payment for shipments of merchandise to these corporations was guaranteed by claimant. It is asserted that shipments were made to Cuba and payment made on drafts for the shipments to Cuban collecting banks but no funds were remitted to the consignor.

There is no evidence of drafts issued or paid for Deere equipment in the record. However, an affidavit of the Credit Manager of John Deere Intercontinental, S.A. established that claimant as guarantor made payments for the Cuban enterprises to John Deere Intercontinental, S.A. of $46,737.14, to Deere & Company of $3,633.61, and to the Export-Import Bank of Washington of $4,809.78. The payments to the Export-Import Bank, however, were for notes which were paid by claimant on March 19, 1962 and which will be discussed below with other payments to that bank.

The Commission finds that claimant acquired a claim in the amount of $50,370.75 by subrogation as a result of his payment of the debts of nationalized Cuban enterprises which payments were determined to have been made by him on March 19, 1962 in the absence of evidence to the contrary.

Accordingly, the Commission finds that claimant, as subrogee, succeeded to and suffered a loss in the amount of $50,370.75 on March 19, 1962 within the meaning of Title V of the Act. Again interest will be computed from the date of the assignment of this claim to claimant.

14. *Payments to Export-Import Bank of Washington*

Claim is made for the sum of $8,460.42 paid by claimant to the Export-Import Bank of Washington for the account of Powe Machinery Company, S.A. on notes held by that bank. The record reflects and the Commission finds that claimant made payment on March 19, 1962 of $4,809.78 and on July 5, 1962 of $3,650.64 on notes due and owing by the Powe Machinery Company, S.A. which had been nationalized by the Government of Cuba on October 24, 1960. The notes were originally payable to John Deere Intercontinental, S.A. and Caterpillar Americas Company and subsequently endorsed over to the bank. Thus the Commission finds that the amount of $8,460.42 was a debt of a nationalized enterprise to which claimant became subrogated by his payments of March 19, 1962 and July 5, 1962.

Accordingly, the Commission finds that claimant succeeded to and suffered losses in the amounts of $4,809.78 and $3,650.64 on March 19, 1962 and July 5, 1962, respectively, within the meaning of Title V of the Act.

15. *Commission on Sale for John Deere Intercontinental, S.A.*

Claim is made for the amount of $122,419.62 due from the Government of Cuba for a sales commission on equipment sold to the Cuban Government for which a promissory note signed by Fidel Castro was given. The Commission has previously determined the *Claim of Deere & Company*, Claim No. CU-2392 wherein a certification of loss was made to the company based upon the note dated May 1, 1960 which matured May 1, 1961. The note was in the face amount of $389,591.12 and the share of loss for Deere & Company was held to be $267,171.50, the balance representing the sales commission due claimant herein.

Thus the Commission reaffirms its previous decision holding the failure of the Government of Cuba to pay the promissory note on its maturity date, May 1, 1961, constituted a taking of claimant's property. Accordingly, the Commission concludes that claimant suffered a loss in the amount of $122,419.92 within the meaning of Title V of the Act on May 1, 1961.

16. *Chriscraft Yacht*

The Commission finds that claimant was the owner of a 75% interest in a Chriscraft yacht for which claim is made in the amount of $12,000.00. The record contains an affidavit of Mr. Waller Barrett affirming his sale to claimant of a 75% interest in a thirty-nine foot Chriscraft Cabin Cruiser for $12,000.00 during the year 1957, and the cruiser was subsequently taken to Cuba where it was based at the Havana Biltmore Yacht and Country Club. Claimant's income tax records in the file establish the taking of a loss by claimant of $12,000.00 for the seizure of the cruiser early in 1960. In the absence of evidence to the contrary, the Commission finds that the cruiser was taken by the Government of Cuba on March 1, 1960.

On the basis of all the evidence of record, the Commission concludes that claimant suffered a loss in the amount of $12,000.00 on March 1, 1960 within the meaning of Title V of the Act.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU-0644), and in the instant case it is so ordered as follows:

| FROM | ON |
|---|---|
| November 23, 1959 | $      833.30 |
| March 1, 1960 | 12,000.00 |
| August 16, 1960 | 27,187.69 |
| October 24, 1960 | 8,567,168.70 |
| February 23, 1961 | 98,500.00 |
| March 13, 1961 | 90,767.97 |
| May 1, 1961 | 122,419.62 |
| September 13, 1961 | 430,276.87 |
| March 19, 1962 | 55,180.53 |
| July 5, 1962 | 3,650.64 |
| December 15, 1962 | 99,800.41 |
| | $9,507,785.73 |

CERTIFICATE OF LOSS

The Commission certifies that WILLIAM A. POWE suffered a loss, as a results of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Nine Million Five Hundred Seven Thousand Seven Hundred Eighty-five Dollars and Seventy-three Cents ($9,507,785.73) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., Februrary 12, 1970.

## IN THE MATTER OF THE CLAIM OF FREEPORT SULPHUR COMPANY

Claim No. CU–2625—Decision No. CU–6162

*Under Title V of the Act, the value of a mining concession, like any other property, must be determined as of the date of loss. No amount can be allowed on the basis that in the future improved processes and conditions may render the concession suitable for commercial development and therefore valuable.*

PROPOSED DECISION

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $387,000.00, was presented by FREEPORT SULPHUR COMPANY based upon the asserted loss of certain mining concessions in Cuba owned by claimant's Cuban subsidiary.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the

outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of Delaware and that at all pertinent times more than 50 per cent of its outstanding capital stock was owned by nationals of the United States. An authorized officer of claimant has certified that for the period November 16, 1959 through February 15, 1967, over 98.5 per cent of claimant's outstanding capital stock was held by individuals having addresses in the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The evidence esablishes and the Commission finds that at all pertinent times claimant owned 100 per cent of the outstanding capital stock of Cia. Exploradora de la Isla, S.A. (Islexco), a Cuban corporation.

Since Islexco was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that a stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

It is asserted that Islexco's assets consisted of a large number of mining concessions located in Las Villa, Pinar del Rio, and Oriente Province, Cuba. The record include copies of deeds which support claimant's assertions in these respects. It further appears from the evidence of record that the Government of Cuba intervened Islexco's mining concessions pursuant to Resolution 4382, issued by the Ministry of Agriculture, on July 27, 1960, under Law No. 617 of October 27, 1959.

Claimant asserts the following losses:

| | |
|---|---:|
| San Isidro Properties, Las Villas Province | $ 38,564.24 |
| Carlota Properties, Las Villas Province | 103,495.49 |
| Pinar del Rio Properties, Pinar del Rio Province | 42,436.25 |
| Taco Bay Nickel Properties, Oriente Province | 188,792.71 |
| Cristo Manganese Properties, Oriente Province | 13,711.31 |
| Total | $387,000.00 |

The following mining reports have been submitted by claimant:

1. A copy of a report of July 31, 1950 by Richard V. Colligan, president of Islexco, concerning the San Isidro Properties. This report covers an examination of two major areas during the period July 13, 1949 to September 17, 1949, and indicates the presence of manganese in those areas. Commercial exploitation of the ore deposits is recommended in the report only "should a satisfactory method of treating the ores be developed." Moreover, the report suggests the need for an engineering study to determine the adequacy of water for mining and washing plant purposes; it indicates that dock and storage facilities are inadequate; and it suggests that certain "surface rights" would have to be obtained from several large landowners in the area.

2. A copy of an extract from a report of February 1917 by Yeatman & Berry concerning the Carlota Properties. That extract indicates the presence of sulphur, iron and copper in the mines, and recommends "that the required expenditures be made to build the railway, to equip the mine, and to build a sintering or nodulizing plant. . . ."

3. A copy of a report of December 12, 1951 by B. F. Darnell also covering the Carlota Properties, which indicates negative results confirming statements in Mr. Colligan's affidavit of February 19, 1971.

4. A copy of a report of January 1944 by Richard V. Colligan, concerning the Pinar del Rio Properties. In this report, Mr. Colligan "recommended that this property be dropped from consideration" because the reserve is believed to be too small to warrant the large capital expenditure necessary for plant and mine installations."

5. A copy of a report of March 27, 1951 by Richard V. Colligan, concerning the Taco Bay Nickel Properties, in which Mr. Colligan "made a rough calculation of tonnages of nickel ore developed at Taco Bay during our examination in 1945."

6. A copy of a report of October 7, 1956 by H. G. Kristjansen also covering the Taco Bay properties. This report indicates the results of certain drilling operations during the latter part of September and the first half of October 1955, and includes estimates based primarily upon the 1945 project.

The record includes no such reports concerning the Cristo Manganese Properties.

It appears from Mr. Colligan's affidavit of April 24, 1967, that this claim is based on the "capitalized cost of such mining concessions" as shown by Islexco's books and records. With respect to property loss claims, the Commission's functions include determination of the values of properties taken by Cuba on the dates of loss. Therefore, this claim was construed to be based upon the value of any ores in the mines in question on July 27, 1960, the date of loss. Accordingly, the Commission suggested the submission of evidence to establish the value of Islexco's ores and the extent of any mining operations performed by Islexco or claimant.

Mr. Colligan recites in his affidavit of February 19, 1971 that "In each case, the reserves were not considered ripe for commercial development", but claimant awaited "the day when higher metal prices and improved treatment processes would render these deposits suitable for commercial development." Under these circumstances, "No mining was performed" by Islexco or Freeport on any of the properties discussed herein.

The Commission made further inquiries concerning the value of the ores in question. It called claimant's attention to the fact that the Cuban Iron Ore Company, which had leased the Pinar del Rio Properties to Islexco, had asserted a claim for the loss of those mines and royalties under the lease with Islexco (Claim No. CU–3337), and that the claim had been denied for failure to establish that its property had any value.

In an affidavit of March 19, 1971, Mr. Colligan stated as follows: "With respect to the value of the ore reserves which are the subject of this claim, since the deposits were never exploited no definitive estimates of capital and operating costs were made. Hence no profit estimates are available. . . . I am, however, in a position to make a quantative evaluation of the gross value of the ore in the ground." Appended to the affidavit are two schedules. One schedule indicates the gross value of the ore reserves, and the other schedule shows the bases for the calculations. The first schedule sets forth that in 1960 the aggregate gross value of the ore reserves in the ground where the San Isidro, Carlota, Pinar del Rio, and Taco Bay mines were situated was $1,113,093,516.00. Nothing is included in that amount on account of the Cristo mines because "No reserve data are available," as indi-

cated in the second schedule. That schedule also shows that the calculations therein were based upon the reports discussed above.

This entire matter has been carefully considered. It is deemed unnecessary to dwell upon Mr. Colligan's computations indicating a gross value of over $1 billion for the ores in the ground since that fact, in and of itself, is insufficient to establish what value, if any, the ores would have after considering mining and related costs. As already noted, the mines were never operated because "In each case, the reserves were not considered ripe for commercial development"; and the record contains no evidence to show the costs of mining and processing the ores. Moreover, the Pinar del Rio mines are indicated as having a gross value of $437,005,520.00, while Mr. Colligan's recommendation in January 1944 was that "this property be dropped from consideration" and the claim of Islexco's lessor based upon the Pinar del Rio mines was denied for lack of proof.

The Regulations of the Commission provide:

> The claimant shall be the moving party and shall have the burden of proof on all issues involved in the determination of his claim. (FCSC Reg., 45 C.F.R. § 531.6(d) (1970).)

The Commission finds that claimant has failed to sustain the burden of proof. While claimant's investment in the mines has some probative value, it is insufficient to establish the value of the mines on the date of loss. (See *Claim of Warren and Arthur Smadbeck, Inc., et al.*, Claim No. CU–2465.) The Commission finds that claimant has failed to prove that its mining concessions had any value on the date of loss.

Accordingly, this claim is denied in its entirety. The Commission deems it unnecessary to make determinations with respect to other elements of the claim.

Dated at Washington, D.C., and entered as the Proposed Decision of the Commission April 14, 1971.

### FINAL DECISION

Under date of April 14, 1971, the Commission issued its Proposed Decision denying this claim based upon certain mining concessions in Cuba because the record failed to establish that the concessions had any value on June 27, 1960, the date of loss. The claim had been filed by Freeport Sulphur Company which changed its name to FREEPORT MINERALS COMPANY as of April 26, 1971. Claimant's name of record has been changed accordingly.

Claimant filed objections in the form of an affidavit of June 4, 1971 from Mr. Richard V. Colligan, Vice President of claimant. It asserted that the minerals in the mining concessions had great value, but that the value could not be ascertained because the mines were not yet in operation. Claimant therefore urges the Commission to recognize that fact and allow the amount invested in the concessions in lieu of precise information concerning value thereof.

The Commission notes that while minerals in the ground may be valuable intrinsically, the costs of extracting and refining the minerals may render it economically prohibitive to operate the mines in which the minerals exist. Thus, for practical purposes the mining concessions would have no real value.

Upon consideration of the entire record, the Commission finds no basis for altering the Proposed Decision of April 14, 1971. The Commission reaffirms

its finding that the record fails to establish that the mining concessions in question had any value on the date of loss. Accordingly, the Proposed Decision is affirmed in all respects.

Dated at Washington, D.C., and entered as the Final Decision of the Commission September 8, 1971.

## IN THE MATTER OF THE CLAIM OF JOHN EL KOURY

Claim No. CU–0384—Decision No. CU–3796

*Where the evidence justifies a finding of value, but it does not fully support claimant's assertions, the value may be determined by the application of sound reasoning based on the evidence of record.*

### PROPOSED DECISION*

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $2,966,630.67, was presented by JOHN EL KOURY based upon the asserted loss of a 50% interest in a Cuban corporation which owned four mines in Oriente Province, Cuba, and a 100% interest in another mine also situated in Oriente Province, Cuba. Claimant has been a national of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [79 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directed or indirectly at the time by national of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The record discloses that El Koury-Cobty Mining Corporation, S.A., in which claimant asserts a 50% interest, was organized under the laws of Cuba and does not qualify as a corporate "national of the United States" defined by Section 502(1) (B) of the Act as a corporation or other legal entity organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held previously

---

* This decision was entered as the Commission's Final Decision on September 2, 1969.

that a stockholder in such a corporation is entitled to file a claim based upon his ownership interest therein. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Commission finds on the basis of the evidence of record, including a stock certificate and original deeds, that claimant owned a 50% interest in El Koury-Cobty Mining Corporation, S.A., hereafter referred to as the Cuban corporation, which was incorporated in Cuba in 1948; and that claimant was the sole owner of the undeveloped property known as the Isabel Mine, acquired in 1948 for $5,000.00. As to the latter the Commission finds the price paid for that property to be its fair value at the time of nationalization. It further appears from the evidence of record that the Cuban corporation owned four mines in Oriente Province, Cuba; namely, the San Miguel Mine, the St. Joseph Mine, the San Basilio Mine and the Daher Mine; and that the Isabel Mine was also located in Oriente Province, Cuba.

On October 27, 1959, the Cuban Government enacted Law No. 617, which authorized the Minister of Agriculture to order the commercial exploitation of mineral resources in Cuba. Claimant has stated that the mines in question were nationalized by Cuba in 1960. The record shows that under date of February 9, 1960, the Department of State replied to claimant's inquiry of January 25, 1960 concerning said mines and referred to Law No. 617 of October 27, 1959, published November 17, 1959. In the absence of evidence to the contrary, the Commission finds that the four mines owned by the Cuban corporation and the Isabel Mine owned by the claimant were taken by the Government of Cuba on February 15, 1960, as a result of which claimant sustained a loss within the meaning of Title V of the Act.

It should be noted that initially claimant asserted a loss $989,000.00 instead of the $2,966,630.67 now claimed. The former amount was computed as follows:

| | |
|---|---|
| (1) Four mines (above named) | $270,000.00 |
| (2) 50% stock interest in El Koury-Cobty Mining Corp., S.A. | 500,000.00 |
| (3) Loss of lease income | 219,000.00 |
| | $989,000.00 |

Following considerable correspondance asking for a clarification of claimant's figures, it appeared that the four mines had been purchased by the El Koury-Cobty Mining Corporation and so were parts of its assets—thus they were not the subject of a separate claim. Further, it appeared that those mining properties, in fact, had never been tested or surveyed to determine the quantity and quality of purported minerals therein. Claimant in his letter of July 16, 1969 to the Commission has now withdrawn "my claim for those mines" so they will not be considered further herein. As to the asserted loss of lease income, the record shows that the principal asset of the mining company was the St. Miguel Mine which was leased on December 14, 1950 by the Company to the Emily S.A. Mining Corporation for a 10% gross royalty for a 30 year term. It therefore follows that the value of the claimant's interest for the loss in question for both lease value and residual value, if any, is a corporate asset and would be affected by the following factors, viz.:

(1) The type, quantity and quality of the proven ore reserve in the San Miguel Mine;

(2) The time it would take to develop the property and to mine the ore or, phrased another way, the number of days projected operation during the lease term and the amount of ore processed during each of those days;

(3) The prices at which the ore would be sold during the actual operation of the lease, which period, allowing for starting-up operations, would be shorter than the lease term;

(4) The amount of minerable commercial ore, if any, left at the end of the lease term.

Claimant's substantially increased amended claimed amount is based upon various computations he has made primarily as to the asserted ore reserve and his projected production figures now based on a 500 ton a day mill rather than 100 tons per day first used in his claim. Although some evidence has been presented, it does not justify the total now claimed nor the method used by claimant in arriving at it, because the mine has evidently not been in production since the days of its early exploitation by the Spaniards who discovered it shortly after the discovery of Cuba and, because the evidence is inconclusive as to the true value of the total ore reserve. The Commission, therefore, finds that the valuation most equitable to the claimant is one hereinafter described.

Evidence submitted includes a price list of metals, certain assay reports dated August 25 and 26, 1948, and claimant's description as to the measurements made of five mineralized veins. All this gives some idea as to the values of the copper, gold, silver, zinc and the quantities of ore. The primary difficulty, however, is twofold, first (as above mentioned) apparently no production occurred after the execution of the lease in 1950, and secondly, the number of assays for the length of the veins is too small to be taken as fully applying to the large ore bodies claimed. Nevertheless, this evidence does justify some finding of value, for the property would have had a commercial worth in the market place if it had not been expropriated.

As to the reason why the lessee had not yet started actual production, the claimant asserted in his letter of July 17, 1967 to the Commission that this occurred because the lessee ". . . was starting operations at San Miguel Mine when Castro entered Cuba in Oriente Province and made his revolutionary coup on San Miguel Mine, which is located in the Sierra Maestra Mountains in Oriente Province, therefore the one hundred ton mill could not be completed by Emily S.A. Mining Co., and operation ceased." Claimant though asserts that there were six million tons of ore "on site" in that letter, i.e., meaning proven, and a potential of fifty million additional tons—the latter with an estimated value of "one million dollars plus." This does not accord with another one of his statements in his letter of July 16, 1969, that ". . . we had a proven tonnage of 723,330 tons. . . ."

Further difficulty with claimant's position as to the larger claim now asserted is that the lease was entered into in 1950 and Castro, according to historical accounts, did not operate from the Sierra Maestra Mountains until sometimes in 1956. No explanation is made by claimant as to why such allegedly valuable properties were not mined between 1950 and 1956. We can only surmise that it was because for some reason it was not then profitable to do so. But that does not mean that there was no value to the property. Claimant himself states that he invested $250,000 in his one-half interest in the enterprise, and the assays in part show some good values on certain samples. However, as stated earlier, we deem the assays as too few in number

to justify the kind of averaging claimant has projected even if we accept his figure of 723,330 tons of possible commercial ore.

Considering all the evidence, the Commission finds that the most equitable valuation of the claimant's company's 10% gross lease interest is a gross worth of $1,084,995, with claimant's one-half interest being $542,497.50. The latter sum, plus $5,000.00 heretofore found as the value of claimant's interest in the Isabel Mine makes a total loss to claimant of $547,497.50. In holding that claimant suffered a loss of $547,497.50, the Commission has considered the value of claimant's stock in the El Koury-Cobty Mining Corporation, S.A., based on value of the lease itself and the possible residual value at the expiration of the lease in the event the full tonnage were not mined during the lease term.

The Commission has decided that in the certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (See *Claim of Lisle Corporation*, Claim No. CU-0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that JOHN EL KOURY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Five Hundred Forty-Seven Thousand Four Hundred Ninety-Seven Dollars and Fifty Cents ($547,497.50) with interest thereon at 6% per annum from February 15, 1960 to date of settlement.

Dated at Washington, D.C., July 30, 1969.

## IN THE MATTER OF THE CLAIM OF ARCHIBALD S. ABBEY

### Claim No. CU-0352—Decision No. CU-6784

*For the purpose of Title V of the Act, the value of the property in question must be established by competent and convincing evidence.*

### FINAL DECISION

This claim was filed by ARCHIBALD S. ABBEY, as the representative of the Estate of his deceased father, CHESTER E. ABBEY. The claim was submitted on August 16, 1965, prior to the opening of the filing period, and such filing was considered validated as of November 1, 1965, the commencement of the period for filing claims against the Government of Cuba. As it was not shown that any legal representative had been appointed, the claim was considered as that of the Estate of CHESTER E. ABBEY, Deceased.

The efforts of the Commission to assist in the development of this claim are outlined in the Proposed Decision. The claim was denied for failure to establish the identity of persons assertedly having any interest in this claim, that they were United States nationals at all pertinent times, that they owned interests in any of the claimed mining concessions in Cuba, or if they did that the concessions had any value on the asserted date of loss, and that the claim was owned by nationals of the United States continuously from the date of loss to the date of filing the claim.

Objections were filed in this matter by Chester E. Abbey, grandson of Chester E. Abbey, deceased, and nephew of ARCHIBALD S. ABBEY, and

an oral hearing was held in the Offices of the Commission on June 22, 1972, at which time Chester E. Abbey presented argument on behalf of the Estate. No additional documentary evidence was presented at the hearing.

It has been contended that Chester Eli Abbey and Alice Soutar Abbey (both now deceased) had five children, one of whom died in infancy, and that four survived to adulthood. These four have been identified as Franklin G. Abbey, now deceased, Henry C. Abbey, now deceased, Wellington F. Abbey, now deceased, and ARCHIBALD S. ABBEY. The Commission finds that ARCHIBALD S. ABBEY, a national of the United States at all times pertinent to this claim, inherited a one-fourth part of any interest his grandfather, Chester E. Abbey, Deceased, held in the mining concessions subject of this claim and which were not sold by Alice S. Abbey, on behalf of the Estate. Accordingly, ARCHIBALD S. ABBEY is substituted as claimant, in his individual capacity as a successor in interest to a part of the Estate of Chester E. Abbey, Deceased.

The record does not establish with certainty the successors in interest to the remaining part of the Estate of Chester E. Abbey, Deceased, whether they were United States nationals, and their continued ownership (if any) from the date of loss to November 1, 1965.

On November 17, 1959 the Government of Cuba published its Law 617, which authorized the Minister of Agriculture to order the commercial exploitation of mineral resources in Cuba. Accordingly, the Commission finds that any mining concessions held by the Estate of Chester E. Abbey, Deceased, or his heirs, which had not been sold, were taken by the Government of Cuba on November 17, 1959. (See the *Claim of John El Koury*, Claim No. CU-0384.)

As set out in the Proposed Decision, claim was originally made for the mining concessions Providencia, La Union, Minnesota and El Cupey. Thereafter, in letters of February 18, 1968, and September 25, 1971, subsequent to issuance of the Proposed Decision, ARCHIBALD S. ABBEY clarified that only the El Cupey group is claimed. The Commission found in its Proposed Decision that the first three named mining concessions had been sold and were not owned by any of the heirs of Chester E. Abbey, deceased, when they were taken from the purchaser on August 19, 1960. (See *Claims of Mao Bay Mining Company, et al.*, Claim Nos. CU-2619 and CU-2573.)

The record, including a "Memorandum of All property Owned by C. E. Abbey, Deceased" reflects that the interest of the Estate in the El Cupey group was 12 per cent. This is affirmed in a letter of June 27, 1967 of ARCHIBALD S. ABBEY. Chester E. Abbey has contended that he filed claim with the Internal Revenue Department for losses as a result of the Castro regime takeover, that he got 8.5 years income tax returned based on a large evaluation of the total loss insofar as he suffered a loss as a grandson. This is not of record. Chester E. Abbey has never clarified whether the claim, after he commenced addressing the Commission, is intended to cover more than the El Cupey group, although this information was requested. However, he stated at the oral hearing that $200,000 was allowed him by the Internal Revenue as ¼ of 12 per cent, although his interest might be ⅛ of 12 per cent. It is noted that $200,000 is the amount originally asserted by ARCHIBALD S. ABBEY as the value of the 12% interest of the Estate.

Chester E. Abbey has submitted a copy of a Deposition of June 8, 1966, of William A. J. Pitt, in the Matter of Chester E. Abbey, et al, in the United States Court of Claims, Number 367-65. Mr. Pitt, a mining engineer,

was formerly with the Department of Mines, Oriente Province. In his deposition Mr. Pitt set out his recognition of the abovementioned Memorandum of Properties. He also affirmed that part of the properties including Providencia, La Union and Minnesota had been sold to the Moa Bay Company, and Freeport Sulphur (as then known).

The Commission affirms its holding that the Providencia, La Union and Minnesota mining concessions were not owned by any of the heirs of Chester E. Abbey, Deceased, on the date of any taking by the Government of Cuba. Moreover, it is to be noted that even if the Internal Revenue Service made a return to Chester E. Abbey of taxes paid, on the ground that the properties belonged to the Government of Cuba, this does not establish that prior to such taking, the properties had belonged to the heirs of Chester E. Abbey, deceased. The Collector of Taxes historically accepts taxes proffered and his no obligation to research the title of the one making the payment.

Accordingly, the Commission finds that ARCHIBALD S. ABBEY suffered a loss of his inherited interest of three per cent of the El Cupey group, on November 17, 1959, the date of taking by the Government of Cuba.

There remains for determination the value of the loss suffered by ARCHIBALD S. ABBEY. In this connection the Commission has carefully examined the several sketches and maps submitted by ARCHIBALD S. ABBEY, and his various assertions that the Moa and El Cupey properties consisted of 2,365 acres with 84 million tons of ore—manganese, iron, nickel and cobalt. The abovementioned Memorandum of Properties shows that the El Cupey concessions consisted of 957.40 hectares, equivalent to 2,364.78 acres. By letter of June 27, 1967 ARCHIBALD S. ABBEY stated that the El Cupey group held 58 million tons. Thereafter his calculations of value increase while the method remains unclear.

Chester E. Abbey had submitted certain Internal Revenue Service schedules indicating an original loss of $100,000 in 1960 and subsequent carryovers for unused portions, but the papers submitted do not indicate the nature of the loss. Clarification was requested of this point, but was not forthcoming. As shown above, the Commission has also considered the assertion of a tax return to Chester E. Abbey.

ARCHIBALD S. ABBEY stated in his letter of September 25, 1971 that the silver content had a value of from 24 to 26 cents an ounce, lead had a value of 5 cents a pound, and zinc had no value. He continued that the ore in these properties was 28 per cent zinc, that the smelter liquidations of the value metals was almost absorbed by the zinc penalties, so they closed the property in 1935. He continued that it would take many years to exploit and process the property, and that the Russians were using the crude ore for ballast in their ships.

The record includes an accounting for the proceeds of the sale of Providencia, La Union and Minnesota on April 7, 1943 for $21,072. This covered a surface area of 558 hectares, and represented a value of $37.76 per hectare.

The Commission has also examined the abovedescribed deposition of William A. J. Pitt. It is noted that he stated that the El Cupey property had not been mined for iron or nickel. He gave it as his opinion that El Cupey had twenty to forty million tons of ore—a wide allowance which is not shown to be proved. He also indicated that certain properties in the vicinity could be sold for $125 a hectare, and $1.00 royalty per dry ton, but that

El Cupey would be lower, inasmuch as it would take ten years to exploit the Moa properties (sold) but would take about twenty years for El Cupey.

The evidence of record justifies some finding of value inasmuch as the property would have had a commercial worth in the market place, if it had not been taken by the Government of Cuba.

On the basis of the 1943 sale and Mr. Pitt's various statements, the Commission finds that the 957.40 hectares of El Cupey had a surface value averaging $50 per hectare, aggregating $47,870.00. Further the Commission finds that the El Cupey property probably contained 5,000,000 tons of ore and after considering a discount rate of 12 per cent appropriate to the area, over a 15 year period, finds that the value of the El Cupey ores was $950,000 on the date of loss.

Accordingly, the Commission finds that ARCHIBALD S. ABBEY suffered a loss of $29,936.10 when his 3 per cent interest was taken on November 17, 1959.

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

Accordingly the following Certification of Loss will be entered and in all other respects the Proposed Decision is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that ARCHIBALD S. ABBEY, individually, suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-Nine Thousand Nine Hundred Thirty-Six Dollars and Ten Cents ($29,936.10) with interest thereon at 6% per annum from November 17, 1959 to the date of settlement.

Dated at Washington, D.C., June 23, 1972.

## IN THE MATTER OF THE CLAIM OF MOA BAY MINING COMPANY, ET AL.

### Claim Nos. CU–2619 and CU–2573—Decision No. CU–6049

*Valuation of mining concessions may be determined by application of appropriate discount rates. Other items of property may be evaluated by competent and persuasive evidence.*

### PROPOSED DECISION *

These claims against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amounts of $98,005,000.00 and $68,071,000.00, respectively, were presented by MOA BAY MINING COMPANY AND CUBAN AMERICAN NICKEL COMPANY based upon the asserted losses of certain real and personal property in Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat.

---

* This decision was entered as the Commission's Final Decision on March 15, 1971.

988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that MOA BAY MINING COMPANY (MOA) and CUBAN AMERICAN NICKEL COMPANY (CUBAN AMERICAN) were organized under the laws of Delaware (Exhibits B and D), and that at all pertinent times more than 50% of the outstanding capital stock of MOA and CUBAN AMERICAN were owned by nationals of the United States. It further appears that at all times from November 23, 1955, when MOA was incorporated, to the date of filing all of MOA's outstanding capital stock was owned by CUBAN AMERICAN (Exhibit C). In turn, all of CUBAN AMERICAN's outstanding capital stock was owned from August 11, 1955, when CUBAN AMERICAN then known as Freeport Nickel Company was incorporated, to November 8, 1963, by Freeport Sulphur Company (Freeport), a corporation organized under the laws of Delaware (Exhibit E).

Ever since November 8, 1963, all of CUBAN AMERICAN's outstanding capital stock has been owned by the First National City Bank, Bankers Trust Company, Mellon National Bank and Trust Company, Chemical Bank New York Trust Company and The Bank of New York, all of which banks qualify as nationals of the United States within the meaning of Section 502(1)(B) of the Act (Exhibits G and H). An authorized officer of Freeport has certified that from November 16, 1959 to February 15, 1967, over 98.5% of Freeport's outstanding capital stock was owned by persons having addresses in the United States (Exhibit F; also see *Claim of Freeport Sulphur Company*, Claim No. CU-2625). The Commission holds that MOA and CUBAN AMERICAN are nationals of the United States within the meaning of Section 502(1)(B) of the Act.

Claimants assert the following losses:

**MOA (CU–2619)**

| | |
|---|---|
| Loss of earnings, plant and equipment ............................... | $88,349,000.00 |
| Loss of earnings from reinvestment of excess cash ........ | 9,656,000.00 |
| Total ............................................................................... | $98,005,000.00 |

**CUBAN AMERICAN (CU–2573)**

| | |
|---|---|
| Loss of earnings, plant and equipment ............................ | $60,809,000.00 |
| Loss of earnings from reinvestment of excess cash ........ | 7,262,000.00 |
| Total ............................................................................... | $68,071,000.00 |

### STOCKHOLDER AND CREDITOR CLAIMS

MOA and CUBAN AMERICAN state that they filed their claims on their own behalf; on behalf of CUBAN AMERICAN as stockholder and creditor of MOA; on behalf of other creditors of MOA; on behalf of the said five banks in their respective capacities as stockholders and creditors of CUBAN AMERICAN: and on behalf of other creditors of CUBAN AMERICAN.

Section 505(a) of the Act provides that a claim under section 503(a) of the Act, based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered.

The Commission finds that the claim of CUBAN AMERICAN as a stockholder of MOA and the claims of the banks as stockholders of CUBAN AMERICAN are barred by the express provisions of Section 505(a) of the Act because MOA and CUBAN AMERICAN qualify as nationals of the United States. Accordingly, those claims are denied. (See *Claim of Mary F. Sonnenberg,* Claim No. CU–0014, 25 FCSC Semiann. Rep. 48 [July-Dec. 1966].)

The record indicates that the following concerns have joined the claims herein as creditors of CUBAN AMERICAN:

> First National City Bank
> Bankers Trust Company
> Mellon National Bank and Trust Company
> Chemical Bank New York Trust Company
> The Bank of New York
> Republic Steel Corporation
> United States Steel Corporation
> McLouth Steel Corporation
> Jones & Laughlin Steel Corporation
> General Motors Corporation
> Ford Motor Company

Section 505(a) of the Act further provides that a claim under Section 503(a) based upon a debt or other obligation owing by any corporation, association, or other entity organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico shall be considered only when such debt or other obligation is a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The Commission has previously held that a claim based upon a debt of

an entity qualifying as a United States national may not be considered unless the debt was a charge on property taken by the Government of Cuba. (See *Claim of Anaconda American Brass Co.*, Claim No. CU–0112, 1967 FCSC Ann. Rep. 60.)

It is neither alleged nor does the record show that any of the debts upon which the aforesaid creditors base their claims were charges on any properties taken by the Government of Cuba. The Commission is therefore precluded from considering their claims.

However, it is contended by MOA and CUBAN AMERICAN that the legislative history of the Act indicates that it was not intended that Section 505(a) should exclude claims of banks, insurance companies, financial institutions or other entities based upon debts or other obligations.

This issue was considered by the Commission in the course of determining the debt claim of a bank under Title V of the Act. The Commission held as follows:

> Finally, we find no merit in the claimant's contention that the legislative history of the Act exempts banks from the operation of Section 505(a). This was considered previously by the Commission and rejected in the Proposed Decision [1968 FCSC Ann. Rep. at 64] wherein the Commission found that the language of the section itself is quite clear and contains no exception in favor of banks. (See *Claim of The First National Bank of Boston*, Claim No. CU–2268, Final Decision entered February 26, 1969, 1969 FCSC Ann. Rep. 33.)

For all of the foregoing reasons, the claim of CUBAN AMERICAN and the claims of the creditors based upon debts due either from CUBAN AMERICAN or MOA are denied.

### CLAIM No. CU–2573 (CUBAN AMERICAN)

CUBAN AMERICAN asserts a loss of $68,071,000.00 by virtue of a contract dated January 19, 1959 between MOA and CUBAN AMERICAN (Exhibit M) relating to certain mining concessions in Cuba owned by MOA.

The agreement of January 19, 1959 provides for the sale of MOA's ores (nickel-cobalt concentrates) to CUBAN AMERICAN pursuant to certain conditions. The contract was to continue for a period of five years, and MOA was to receive 60% of the net income derived from the sale of MOA's ores after being refined by CUBAN AMERICAN. It appears that CUBAN AMERICAN financed its project by loans from the five banks which, since November 8, 1963, have been CUBAN AMERICAN's sole stockholders.

Upon consideration of the entire record, the Commission finds that CUBAN AMERICAN owned no proprietaary interest in any of MOA's mining concessions or related properties in Cuba. Insofar as those concessions and properties are concerned, the only rights that CUBAN AMERICAN possessed stemmed from the contract of January 19, 1959, and that contract merely provided for the sale of extracted ores to CUBAN AMERICAN.
*Loss of Earnings, Plant and Equipment:*

CUBAN AMERICAN asserts a loss in the aggregate amount of $60,809,000.00, representing the loss of earnings based on the contract of January 19, 1959, and the discounted depreciated value of its plant and equipment in the United States.

It appears that in anticipation of that contract, CUBAN AMERICAN acquired in 1957 from Freeport certain real property in Louisiana (Exhibit L). During 1957, 1958, 1959 and 1960, CUBAN AMERICAN caused to be

constructed on the property in Louisiana certain facilities for refining nickel-cobalt concentrates.

Inasmuch as CUBAN AMERICAN owned no interest in MOA's properties in Cuba, no property belonging to CUBAN AMERICAN was taken by Cuba. Moreover, since CUBAN AMERICAN's plant and equipment were in the United States, the Commission finds that being outside the jurisdiction of Cuba, these assets could not have been taken by Cuba. Accordingly, the portion of CUBAN AMERICAN's claim for the asserted loss of earnings, plant and equipment is denied.

*Loss of Earnings from Reinvestment of Excess Cash:*

CUBAN AMERICAN asserts a loss of $7,262,000.00, representing the estimated earnings it would have derived from the investment of cash available as a result of its operations in the United States pursuant to the contract of January 19, 1959. The Commission finds that this portion of the claim also is not covered by the Act. Moreover, it appears that this portion of the claim is entirely speculative, covering estimated earnings from reinvestments over a 22-year period. (See *Claim of Metro-Goldwyn-Mayer, Inc.,* Claim No. CU–2225.) Accordingly, this portion of the claim is denied.

CLAIM No. CU–2619 (MOA)

The evidence establishes and the Commission finds that pursuant to certain agreements and other instruments executed in 1957 and 1959, MOA acquired certain mining concessions situated in the vicinity of Baracoa, Oriente Province, Cuba, in the northeastern part of Cuba known as Moa Bay (Exhibit I). These concessions were duly recorded with Cuban authorities.

The Commission further finds that MOA caused to be constructed in that area an extensive plant and appurtenant facilities to support its mining operations in Moa Bay. The record includes copies of audited balance sheets and other financial statements for MOA as of various dates in 1959, 1960 and 1961 (Exhibits J and K), which indicate the extent of MOA's investments in such facilities in Cuba.

On the basis of the entire record, the Commission finds that MOA sustained a loss within the meaning of Title V of the Act when its facilities were intervened by the Government of Cuba on August 19, 1960 pursuant to Resolution No. 4579 issued by the Ministry of Labor under Law 647 of November 24, 1959.

*Loss of Earnings, Plant and Equipment:*

The aggregate amount asserted by MOA on account of loss of earnings, plant and equipment is $88,349,000.00. The Commission holds this portion of the claim to be based upon the value of MOA's mining concessions and properties that were intervened by the Government of Cuba on August 19, 1960. (See *Claim of Howard E. Holtzman et al.,* Claim No. CU–2168.)

The evidence includes a detailed, technical report of MOA's mining concessions in Cuba, prepared in May 1956 by Eugene P. Pfleider, Consulting Mining Engineer, on the basis of drilling and exploration, the sampling of extracted ores, and analyses of the samples (Exhibit O). Thereafter another study of the concessions was made by Sanderson & Porter, independent engineers. Their detailed report, dated March 6, 1957 (Exhibit P), concludes with the statement, *inter alia,* that "measured currently economic

ore reserves . . . are sufficient to support an annual production of 50,000,-000 pounds of nickel and 4,400,000 pounds of cobalt for about 22 years." Appended to that report is a letter of February 20, 1957 from Eugene P. Pfleider, revising his May 1956 Ore Reserve Report (Exhibit O) upward on the basis of sampling more ores extracted from 150 new holes.

On the basis of the foregoing evidence, the Commission finds that MOA's proven ore reserves were sufficient to produce 50,000,000 pounds of nickel and 4,400,000 pounds of cobalt annually for 22 years.

The said agreement of January 19, 1959 between MOA and CUBAN AMERICAN (Exhibit M) provided for the sale to CUBAN AMERICAN of all the ores extracted from MOA's mining concessions. CUBAN AMERICAN agreed to refine the ores and sell them to its customers. In consideration thereof, MOA was to receive 60% of the net profits derived from the sale of the refined ores. That contract was to terminate on June 30, 1965. It further appears that MOA had made certain arrangements with the Cuban Treasury Department, pursuant to which its income for Cuban tax purposes was to be 60% of such net profits until June 30, 1965 and 65% of such net profits thereafter.

On the basis of the evidence of record (Exhibits N and R), the Commission finds that the net amounts to be derived from the sale of the refined ores were $0.726 per pound for nickel after sales adjustments, and $2.00 per pound for cobalt until June 30, 1965. Thereafter, the prices would be $0.726 per pound of nickel and $1.50 per pound of cobalt until the end of the 22-year term, June 30, 1982, when the ores would be exhausted.

The Commission therefore finds that the gross value of the refined ores was $45,100,000.00 per year for the period ending June 30, 1965, and thereafter at the rate of $42,900,000.00 for the remaining period. MOA's computations also include the liquidated value of its plant and equipment as of the end of the 22-year term in the amount of $11,600,000.00, which is found to be fair and reasonable. The evidence (Exhibit J) includes copies of audited balance sheets and other financial statements covering MOA's Cuban operations. The balance sheet as of September 30, 1960, closest to the date of loss, shows that MOA owned land in Cuba valued at $5,041,021.38, and plant, equipment and related facilities valued at $59,395,791.97 after depreciation of $1,051,016.72.

MOA had applied to the Internal Revenue Service for a Necessity Certificate to permit it to rapidly depreciate its Cuban assets pursuant to the Internal Revenue Code. A detailed report (Exhibit K) submitted in support of MOA's application to the Internal Revenue Service shows that its actual expenditures for facilities in Cuba aggregated $55,527,455.18.

The record (Exhibit R) shows that the aggregate income to be derived from the sales of the refined ores over the 22-year period plus the liquidated value of MOA's plant and equipment was $622,485,000.00. The Sanderson & Porter report (Exhibit P) shows that the aggregate cost of extracting and refining the ores was $19,700,000.00 per year. Of that amount, MOA's operating costs were $11,857,000.00 per year until 1965 and $12,055,000.00 thereafter, aggregating $264,418,000.00 for the entire 22-year period. Thus MOA's gross income after operating costs aggregated $358,067,000.00.

It further appears that interest on loans to finance MOA's operations would aggregate $9,816,000.00, and that the aggregate amount of Cuban taxes would be $104,012,000.00 for the 22-year period. Accordingly, the net amount MOA would have derived for the entire period would be $244,239,-

000.00. MOA's computations (Exhibit R) also provide for discounting the resulting aggregate net income and the liquidated value of its plant and equipment to arrive at the net worth of its Cuban operations on the date of loss. On this basis, MOA's losses were computed to be $88,349,000.00.

Upon consideration of the entire record, the Commission finds that MOA's valuations are fair and reasonable. The Commission therefore finds that the aggregate value of MOA as an operating company on August 19, 1960, the date of loss, was $88,349,000.00.

*Loss of Earnings from Reinvestment of Excess Cash:*

MOA asserts the loss of $9,656,000.00 for earnings it would have accumulated as a result of investing excess cash derived after payment of all charges and obligations appurtenant to its Cuban operations. In making this computation, MOA estimated the amounts that would become available at the end of each of the 22 years, after payment of all expenses and repayment of the principal amounts of anticipated loans. The results thus obtained were then considered by MOA to be capable of earning 3% per year compounded, and that amount was discounted at a 12% rate to arrive at the amount claimed.

As stated with respect to CUBAN AMERICAN's claim for a similar loss, this item of claim appears to be entirely speculative. The Commission finds no valid basis for estimating over a 22-year period how much, if any, capital would become available for reinvestment. Moreover, there is no sound basis for supposing that such capital would be reinvested and would earn the amount estimated by MOA.

Upon consideration of this portion of MOA's claim, the Commission finds that it is speculative and is not supported by the evidence of record. Accordingly, this portion of the claim is denied.

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that MOA BAY MINING COMPANY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Eighty-eight Million Three Hundred Forty-Nine Thousand Dollars ($88,349,000.00) with interest at 6% per annum from August 19, 1960 to the date of settlement.

Dated at Washington, D.C., Feb. 3, 1971.

## IN THE MATTER OF THE CLAIM OF NICARO NICKEL COMPANY

### Claim No. CU–2624—Decision No. CU–6247

*Where the evidence is clear and convincing, the probable and possible ores in a mine, as well as the proven ores, may justify Certifications of Loss provided appropriate annual discount rates are applied to each category of ore.*

### FINAL DECISION

Under date of June 30, 1971, the Commission issued its Proposed Decision certifying a loss in favor of claimant in the amount of $22,494,708.62 plus interest. The Certification of Loss covered certain mining concessions in Cuba in the amount of $22,297,708.62, and other appurtenant property in the amount of $197,000.00. In determining the value of claimant's mining concessions, the Commission allowed only the established amount of proven ore, and portions of the claim for probable ore and possible ore were denied. The value of the proven ore was determined by the application of a 12% annual discount rate to the yearly valuations of the ore for the period 1961 to 1979 to arrive at the aggregate value of the proven ore on October 24, 1960, the date of loss.

Claimant objected to the denial of the claim for probable ore and possible ore, and to the use of a 12% annual discount rate. In support of the objections, claimant submitted a report of August 1971 from Behre Dolbear & Company, Inc., a firm of mining, geological and metallurgical consultants, which contains the conclusion that an 8% annual discount rate should be applied to determine the values of the proven ore, probable ore and possible ore. An oral hearing was requested which was held on September 16, 1971.

At the oral hearing, Richard V. Colligan, Vice President of claimant, testified as an expert geologist with many years of experience in Cuban mining operations. Counsel offered in evidence an affidavit of September 16, 1971 from William R. Thurston, geologist, concerning the value of claimant's ore in Cuba, and presented oral argument on behalf of claimant. Mr. Colligan testified that actual experience in exploiting claimant's mining concessions in Cuba showed that earlier estimates of proven ore were substantially less than actually found; that it developed that much of what was considered probable ore was found to be proven; and that much of what was considered possible ore was found to be probable.

Upon consideration of the evidence presented at the oral hearing in light of the entire record, the Commission now finds that claimant's proven ore, probable ore and possible ore, as shown by the evidence, should be allowed, and that the values thereof on the date of loss should be determined by the application of annual discount rates of 8%, 12% and 15%, respectively, Accordingly, the Commission finds that the aggregate values of claimant's ores in Cuba on October 24, 1960 were as follows:

| Year | Gross Value | Discount Factor | Net Value |
|------|------------|-----------------|-----------|
| | | *Proven Ore* | |
| 1961 | $2,317,900.00 | .925926 | $2,146,204.00 |
| 1962 | 2,385,500.00 | .857339 | 2,045,182.00 |
| 1963 | 2,358,200.00 | .793832 | 1,872,015.00 |
| 1964 | 2,358,200.00 | .735030 | 1,733,348.00 |
| 1965 | 2,358,200.00 | .680583 | 1,604,951.00 |
| 1966 | 2,394,600.00 | .630170 | 1,509,005.00 |
| 1967 | 2,576,600.00 | .583490 | 1,503,420.00 |
| 1968 | 4,162,200.00 | .540269 | 2,248,708.00 |
| 1969 | 4,162,200.00 | .500249 | 2,082,136.00 |
| 1970 | 4,162,200.00 | .463193 | 1,927,902.00 |
| 1971 | 4,162,200.00 | .428883 | 1,785,097.00 |
| 1972 | 4,162,200.00 | .397114 | 1,652,868.00 |

| Year | Gross Value | Discount Factor | Net Value |
|---|---|---|---|
| 1973 | 4,162,200.00 | .367698 | 1,530,433.00 |
| 1974 | 4,162,200.00 | .340461 | 1,417,067.00 |
| 1975 | 4,162,200.00 | .315242 | 1,312,100.00 |
| 1976 | 4,162,200.00 | .291890 | 1,214,905.00 |
| 1977 | 4,162,200.00 | .270269 | 1,124,914.00 |
| 1978 | 4,162,200.00 | .250249 | 1,041,586.00 |
| 1979 | 2,180,200.00 | .231712 | 505,179.00 |
| Totals | $64,713,600.00 | | $30,257,020.00 |

*Probable Ore*

| Year | Gross Value | Discount Factor | Net Value |
|---|---|---|---|
| 1979 | $2,071,000.00 | .116107 | $240,457.60 |
| 1980 | 4,039,100.00 | .103667 | 418,721.38 |
| 1981 | 4,039,100.00 | .092560 | 373,859.10 |
| 1982 | 4,039,100.00 | .082643 | 333,803.34 |
| 1983 | 4,039,100.00 | .073788 | 298,037.11 |
| 1984 | 4,039,100.00 | .065882 | 266,103.99 |
| Totals | $23,816,500.00 | | $1,930,982.52 |

*Possible Ore*

| Year | Gross Value | Discount Factor | Net Value |
|---|---|---|---|
| 1985 | $4,055,100.00 | .030378 | $123,185.83 |
| 1986 | 4,055,100.00 | .026415 | 107,115.47 |
| 1987 | 4,055,100.00 | .022970 | 93,145.65 |
| 1988 | 4,055,100.00 | .019974 | 80,996.57 |
| 1989 | 4,055,100.00 | .017369 | 70,443.03 |
| 1990 | 4,055,100.00 | .015103 | 61,244.18 |
| 1991 | 4,055,100.00 | .013133 | 53,255.63 |
| 1992 | 3,475,800.00 | .011420 | 39,693.64 |
| Totals | $31,816,500.00 | | $629,080.00 |

Therefore, the aggregate value of claimant's ore was $32,817,082.52, and the total losses sustained by claimant amounted to $33,014,082.52.

Accordingly, the Certification of Loss in the Proposed Decision of June 30, 1971 is set aside and the following Certification of Loss will be entered, and in all other respects the Proposed Decision as amended herein is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that NICARO NICKEL COMPANY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Thirty-Three Million Fourteen Thousand Eighty-Two Dollars and Fifty-Two Cents ($33,014,082.52) with interest at 6% per annum from October 24, 1960 to the date of settlement.

Dated at Washington, D.C., September 28, 1971.

### PROPOSED DECISION

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $42,600,000.00, was presented by NICARO NICKEL COMPANY based upon

the asserted loss of certain mining concessions and other assets in Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of Delaware and that at all pertinent times another Delaware corporation, the Freeport Sulphur Company, now known as Freeport Minerals Company, owned all of claimant's outstanding capital stock. Claimant's Secretary has certified under date of April 24, 1967 that for the period November 16, 1959 to February 15, 1967 over 98.5% of Freeport's outstanding capital stock was owned by residents of the United States and its possessions. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act. (See *Claim of Freeport Sulphur Company,* Claim No. CU–2625.)

Claimant has submitted the affidavit of April 24, 1967 from Richard V. Colligan, its Vice President, in which some pertinent background information is included. As a result of a two-year research program, claimant developed an improved process for the commercial exploitation of nickeliferous ores in Cuba. The United States Government became interested in claimant's activities. Pursuant to agreements in 1942, the United States Government invested in preferred stock issued by claimant, which was redeemed in full in 1954 leaving Freeport as the sole owner of all of claimant's outstanding capital stock. The United States Government had acquired certain nickel deposits in Moa Bay, Cuba through ownership of Cuban Nickel Company, S.A., a Cuban corporation, which deposits are not the subject of this claim. (See *Claims of United States of America,* Claim Nos. CU–2522 and CU–2618, 1967 FCSC Ann. Rep. 50.)

### MINING CONCESSIONS

The evidence establishes and the Commission finds that pursuant to deeds executed in 1940 and other instruments dated 1954 and 1958, claimant acquired mining concessions in Oriente Province, Cuba (Appendices E, F, G, H, I, J and K). Under an agreement of July 2, 1948, which incorporates an earlier one of March 12, 1942, between the United States Government and claimant (Appendix A), the United States Government acquired the right to take ore from claimant's ore properties for a period of twenty years commencing on March 11, 1948 in exchange for a certain expressed consideration. The United States Government purchased ore from claimant from 1952 to 1960.

On October 24, 1960, the Cuban Government published in its Official Gazette Resolution No. 3 pursuant to Law 851, which listed as nationalized NICARO NICKEL COMPANY (Appendix B). The Commission therefore finds that claimant's mining concessions were nationalized by the Government of Cuba on October 24, 1960.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

Claimant asserts that the minimum value of its mining concessions on the date of loss was 42,082,362.00 (Appendix D). In its initial submission, claimant relied upon the affidavit of April 24, 1967 from its Vice President, Richard V. Colligan, a professional geologist who had participated in drilling programs and evaluation studies of claimant's mining concessions. Pursuant to his calculations, claimant's reserves included the following as of June 1960:

| Type of Reserve | Short Dry Tons | % Nickel |
|---|---|---|
| Proven | 33,336,500 | 1.402 |
| Probable | 11,500,000 | 1.465 |
| Possible | 16,500,000 | 1.366 |

Mr. Colligan states that the Nicaro plant in Cuba had an annual capacity of 2,100,000 tons of ore; and that the United States Government's ore reserves in Cuba were sufficient to supply only 800,000 tons per year. Therefore, affiant computed this portion of the claim based upon annual sales of 1,300,000 tons of ore to the United States Government from 1961 to 1968 pursuant to the said agreements (Appendix A), and annual sales of 2,100,-000 tons thereafter until 1992 when claimant's reserves of all types assertedly would be exhausted (Appendix D).

In response to Commission suggestions, claimant made a further submission under date of May 27, 1971. That submission includes another affidavit from Mr. Colligan; a copy of a memorandum of June 21, 1960 to Mr. Colli-

gan together with attached copies of schedules showing the amounts of proven and probable reserves on the basis of a 1955 report; a copy of an unsigned statement of October 31, 1955 showing the proven, probable and possible reserves; and copies of excerpts from two publications. Mr. Colligan states that the October 31, 1955 report was prepared by Forbes Wilson, now a Vice President of Freeport.

Concerning the distinctions between proven, probable and possible reserves, claimant submitted copy of an excerpt from "Examination and Evaluation of Mineral Property" by Baxter and Parks, pages 115–116 (4th ed. 1957) as follows:

C. K. Leith,[1] in preparing estimates of iron ore reserves, has defined terms used to designate respective classes of ore as follows:

> " 'Assured' ore is defined to cover principally the ore blocked out in three dimensions by actual underground mining operations and drill holes, where the geological factors which limit the orebody are definitely known and where the chance of failure of the ore to reach these limits is so remote as not to be a factor in the practical planning of mine operations.

> " 'Prospective' ore covers further extensions near at hand, where the conditions are such that ore will almost certainly be found but where the extent and limiting conditions cannot be so precisely defined.

> "Ore is classed as 'possible' where the relation of the land to adjacent orebodies and to geological structures warrants the presumption that ore will be found but where the lack of exploration and development data precludes anything like certainty of its actual location or extent."

The U.S. Bureau of Mines and the U.S. Geological Survey, in recent estimates of mineral reserves, have agreed upon and defined[2] the following terms to signify relative dependability of information:

> " 'Measured ore' is ore for which tonnage is computed from dimensions revealed in outcrops, trenches, workings, and drill holes and for which the grade is computed from the results of detailed sampling. The sites for inspection, sampling, and measurement are so closely spaced and the geological character is so well defined that the size, shape, and mineral content are well established. The computed tonnage and grade are judged to be accurate within limits which are stated, and no such limit is judged to differ from the computed tonnage or grade by more than 20 per cent.

> " 'Indicated ore' is ore for which tonnage and grade are computed partly from specific measurements, samples, or production data and partly from projection for a reasonable distance on geologic evidence. The sites available for inspection, measurement, and sampling are too widely or otherwise inappropriately spaced to outline the ore completely or to establish its grade throughout.

> " 'Inferred ore' is ore for which quantitative estimates are based largely on broad knowledge of the geologic character of the deposit and for

---

[1] Prospectus, The Cleveland-Cliffs Iron Co., Dec. 10, 1935, Lehman Bros., Field, Glore & Co., Hayden, Stone & Co., p. 9.

[2] "Investigation of National Resources," Subcommittee Hearings, U.S. Senate Committee on Public Lands, May 15–20, 1947; pp. 119–20.

which there are few, if any, samples or measurements. The estimates are based on an assumed continuity or repetition for which there is geologic evidence; this evidence may include comparison with deposits of similar type. Bodies that are completely concealed may be included if there is specific geologic evidence of their presence. Estimates of inferred ore should include a statement of the special limits within which the inferred ore may lie."

The record includes a copy of a report of October 21, 1952 made to the United States Government by a firm of Metallurgists and Chemical Engineers concerning the amount and grade of nickeliferous reserves in Nicaro mines and the neighboring area of Moa Bay, Cuba, in which the United States Government was interested. In discussing the proven, probable and inferred or possible reserves, the report states: "The figures for probable and inferred reserves are little more than educated guesses. Similarly the grade of the reserves is mostly unknown."

The Commission has had occasion to consider other claims based on mining concessions in Moe Bay, Cuba. In those cases, the Commission allowed only the "measured" or "proven ore" reserves. (See *Claims of Moa Bay Mining Company and Cuban American Nickel Company*, Claim Nos. CU-2619 and CU-2573.)

Upon consideration of the entire record, the Commission finds no valid reason for allowing any amount on account of the asserted probable and possible ore reserves. Accordingly, the portion of the claim based upon probable and possible ore reserves is denied.

The Commission finds that on October 24, 1960, the date of loss, claimant's proven ore aggregated 33,300,000 tons. The value thereof must therefore be determined.

The record shows that pursuant to express provisions in contracts to which the United States Government was a party, the United States Government was to bear the expenses of mining, refining and related operations, as well as capital expenses for the term of the contracts, ending on March 10, 1969 (Appendix A). In addition, the contracts set forth the amounts the United States Government was required to pay claimant for the ore, which were the market prices of refined nickel F.O.B Pittsburgh, Pennsylvania, as determined by the United States Government.

Accordingly, claimant has computed its loss with respect to the proven ore reserves on the basis of the contracts. As already noted, claimant's computations cover 1,300,000 tons of ore for the years 1961 through 1967, when the United States Government's supply would have been exhausted, and 2,100,000 tons per year thereafter, representing the annual capacity of claimant's plant. Applying the market prices in effect during the years in question, claimant's computations show the following (Appendix D):

| Year | Tons of Proven Ore | Value | Per Ton Amount |
|------|-----|-----|-----|
| 1961 | 1,300,000 | $1.783 | $ 2,317,900.00 |
| 1962 | 1,300,000 | 1.835 | 2,385,500.00 |
| 1963 | 1,300,000 | 1.814 | 2,358,200.00 |
| 1964 | 1,300,000 | 1.814 | 2,358,200.00 |
| 1965 | 1,300,000 | 1.814 | 2,358,200.00 |
| 1966 | 1,300,000 | 1.842 | 2,394,600.00 |

| 1967 | 1,300,000 | 1.982 | 2,576,600.00 |
| 1968 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1969 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1970 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1971 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1972 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1973 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1974 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1975 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1976 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1977 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1978 | 2,100,000 | 1.982 | 4,162,200.00 |
| 1979 | 1,100,000 | 1.982 | 2,180,200.00 |
| Total | 33,300,000 | | $64,713,600.00 |

The Commission noted that for the entire period of claimant's computations ending in 1979, no amounts were deducted for mining, refining and related expenses, although the contracts with the United States Government were to end early in 1968. Therefore, the Commission inquired concerning the period following the termination of the contracts. Claimant's response was in the form of an affidavit from its Vice President, Richard V. Colligan.

That affiant states that in view of the increased value of nickel, the likely result was "that claimant would sell its ore for use in the Nicaro plant on at least as favorable a basis as provided in the Ore Contract." On this basis, claimant states that it is justified in computing the value of its ore without deducting any amounts for mining, refining and related expenses.

It is noted that the contracts with the United States Government provided that the price of the refined nickel was to be $0.025 per pound, plus $.0008 for each $0.01 increase in market price, as determined by the United States Government, over $.30 per pound delivered in Pittsburgh, Pennsylvania, or minus that amount if there were a decrease in the market price. Claimant has submitted evidence tending to show that the market prices for refined nickel at Pittsburgh, Pennsylvania were approximately as follows: $0.74 per pound from January 1, 1961 to June 30, 1961; $0.82 per pound from July 1, 1961 to May 23, 1962; $0.79 per pound from May 24, 1962 to October 31, 1966; and $0.87 per pound as of November 1, 1966. It further appears that the market price of refined nickel rose after November 1, 1966. Claimant has computed its claim for the period 1968 to 1979 on the basis of the prices in effect as of November 1, 1966.

The said report of October 21, 1952 to the United States Government also sets forth estimated operating costs as of 1952 for the Nicaro plant. Upon consideration thereof in the light of the entire record, the Commission finds that the prices per pound of refined nickel, as computed by claimant, are fair and reasonable. The sole remaining question insofar as the value of claimant's proven ore reserve is concerned is the discount rate applied by claimant to arrive at the value of its ore on the date of loss.

Claimant's Appendix D indicates that it has applied a 6% per annum discount rate for proven ore, a 10% rate for probable ore and a 15% rate for possible ore. The results of claimant's computations are not shown separately for each type of ore but are lumped together. In response to the

Commission's inquiries concerning the discount rate, an affidavit of May 27, 1971 was submitted from claimant's Vice President. Therein he states that he applied the said discount rates on the basis of the risks involved. Therefore, the proven ore valuation was subjected to the lowest discount rate and the possible ore valuation was subjected to the highest rate.

The affidavit was supported by a copy of another excerpt from "Examination and Valuation of Mineral Property", *supra* at 447–465. That publication discusses the valuations of mines in Michigan and states that the "generally accepted figure for interest on capital in a nonspeculative industry is six per cent . . . The Tax Commission adopted the six per cent rate for both the interest on the investment and the return of the capital." Referring to the suggested six per cent rate, the authors state: "This is the procedure under ideal conditions; but in nearly every valuation one or more factors have to be adjusted in view of such expected future conditions as probably will differ from the past five-year record."

There can be no doubt that conditions in the mining industry in Cuba were not ideal. It is equally true that they cannot be compared with those prevailing in the state of Michigan for the purpose of this decision. The Commission therefore holds that claimant's suggested discount rate of 6% per annum is inappropriate. In the *Claims of Moa Bay Mining Company, et al., supra*, the Commission held that the proper discount rate to apply to mining concessions in Cuba in order to arrive at the value of future amounts on the date of loss was 12% per annum.

Accordingly, the Commission finds that the valuation most appropriate in this case and equitable to the claimant is the result obtained from applying a discount rate of 12% per annum to the yearly valuations of the ore for the period 1961 to 1979, as shown in Appendix D and set forth above. Upon applying that discount rate to the foregoing valuations, the Commission finds that claimant's proven ore had the following aggregate valuation on October 24, 1960, the date of loss:

| Year | Gross Value | Net Value |
|------|-------------|-----------|
| 1961 | $2,317,900.00 | $ 2,069,553.24 |
| 1962 | 2,385,500.00 | 1,901,706.29 |
| 1963 | 2,358,200.00 | 1,678,519.60 |
| 1964 | 2,358,200.00 | 1,498,678.55 |
| 1965 | 2,358,200.00 | 1,338,106.35 |
| 1966 | 2,394,600.00 | 1,213,178.59 |
| 1967 | 2,576,600.00 | 1,165,522.43 |
| 1968 | 4,162,200.00 | 1,681,041.82 |
| 1969 | 4,162,200.00 | 1,500,930.94 |
| 1970 | 4,162,200.00 | 1,340,116.02 |
| 1971 | 4,162,200.00 | 1,196,532.61 |
| 1972 | 4,162,200.00 | 1,068,332.69 |
| 1973 | 4,162,200.00 | 953,868.02 |
| 1974 | 4,162,200.00 | 851,669.36 |
| 1975 | 4,162,200.00 | 760,417.29 |
| 1976 | 4,162,200.00 | 678,946.39 |
| 1977 | 4,162,200.00 | 606,199.46 |
| 1978 | 4,162,200.00 | 541,252.49 |
| 1979 | 2,180,200.00 | 253,136.48 |
| Totals | $64,713,600.00 | $22,297,708.62 |

### OTHER ASSETS

On the basis of the evidence of record, the Commission finds that claimant owned property, discussed further below, which was appurtenant to its mining operations in Cuba. The Commission further finds that all such property was taken by the Government of Cuba on October 24, 1960 when claimant's mining concessions were taken.

In the opinion of claimant's Vice President, the overall value of claimant's mining concessions and other assets in Cuba were in excess of $42,600,000.00, of which $42,082,362.00 represents the asserted value of the mining concessions, and $518,000, generally represented the other assets.

Claimant asserts that the value of $518,000.00 included surface rights and timber which claimant had purchased in 1940 and 1956 at a cost of $321,000.00; and furniture and fixtures, drilling and other equipment and vehicles at the Nicaro plant and in Santiago and Havana, Cuba, as well as a residence, warehouse and office buildings at the Nicaro plant, valued at $197,000. Claimant states that in addition to its investment the values of all these properties must be measured in terms of research and efforts to develop the mining properties.

As indicated above, the record shows that claimant had developed an improved process for the commercial exploitation of nickeliferous ores in Cuba. In that program alone, claimant expended two years in research, which undoubtedly required a substantial investment of money. Claimant's program was successful, and the new process inured to the benefit of the United States Government. The Nicaro plant continued to function until nationalization by Cuba on October 24, 1960.

On that date, claimant's organization in Cuba included appropriate real and personal property in order to extract and process the ores. Claimant states that it is unable to supply a complete inventory of each item because many of its records were left in Cuba. However, claimant's books and records disclose that its investments in tangible real and personal property at the Nicaro plant aggregated $197,000.00.

On the basis of the evidence of record, the Commission finds that claimant owned certain items of real and personal property at its Nicaro plant in Cuba which had a value of $197,000.00 on October 24, 1960, the date of loss.

Claimant also asserts the loss of its investment in obtaining the concessions and surface rights, including timber. While it appears from the evidence of record (Appendix J) that claimant had acquired hardwood trees in 1940, there is no evidence to establish that any such trees existed twenty years later on the date of loss, or the value thereof if such trees did exist. No amounts are being allowed for claimant's investments in the mining concessions or surface rights valued by claimant at $321,000 because it is considered that they are not established beyond being covered by the allowance herein for the value of the ore and other investments.

Upon consideration of the entire record, the Commission finds that claimant's valuation of its other physical assets in Cuba is fair and reasonable. Accordingly, the Commission finds that the aggregate value of claimant's physical plant at Nicaro on October 24, 1960, the date of loss, was $197,000.00 as aforesaid.

Claimant has stated that the extent of its investment in the properties herein must not be measured in terms of acquisition costs, but "in terms of the years of research and effort of an experienced and competent orga-

nization to develop an extremely valuable mining property." While the Commission recognizes that claimant did engage in research with respect to the mines in Cuba, the record contains insufficient evidence and information which could be used to determine the value thereof.

The Commission finds that claimant has failed to sustain the burden of proof with respect to this portion of the claim. Accordingly, this portion of the claim is denied.

Claimant's losses on October 24, 1960 are summarized as follows:

| Item of Property | Amount |
|---|---|
| Mining Concessions | $22,297,708.62 |
| Other Assets | 197,000.00 |
| Total | $22,494,708.62 |

The Commission has decided that in certification of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that NICARO NICKEL COMPANY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-Two Million Four Hundred Ninety-Four Thousand Seven Hundred Eight Dollars and Sixty-Two Cents ($22,494,708.62) with interest at 6% per annum from October 24, 1960 to the date of settlement. Dated at Washington, D.C., June 30, 1971.

## IN THE MATTER OF THE CLAIM OF THE FIRST NATIONAL BANK OF BOSTON

### Claim No. CU–2268—Decision No. CU–3071

*Book value rejected as method of valuation where additional evidence indicates that it is not equitable to claimant.*

*Fair market value is proper method of evaluation where available evidence is sufficient to make application thereof.*

### FINAL DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, for $12,496,000.00, was presented by THE FIRST NATIONAL BANK OF BOSTON based upon asserted losses resulting from the nationalization of claimant's six branches in Cuba and upon the nonpayment of certain debts.

By Proposed Decision dated September 11, 1968, the Commission found that claimant qualified as a national of the United States, that its six branches in Cuba were nationalized by the Government of Cuba on September 17, 1960, and that the most appropriate measures of the value of the six

---

* Book value had been applied in the Commission's Proposed Decision. This Final Decision was issued after objections were filed and an oral hearing was held on Dec. 9, 1968.

branches at the time of loss was their book value of $5,651.384.36, from which was deducted the sum of $4,069,114.69 recovered by claimant subsequent to the nationalization, leaving a net loss for the six branches of $1,582,269.67. The Commission further found that claimant had suffered an additional loss of $1,666,845.57 within the meaning of Title V of the Act in connection with certain letters of credit issued by the Cuban branches prior to their nationalization; and certified that claimant had suffered a total loss in the amount of $3,249,115.24. A portion of the claim based upon debts owed to claimant by Cuban Telephone Company and Mid-Century Service, Inc., was denied on the ground that Section 505(a) of the Act precludes consideration of claims based upon debts owed by entities which qualify as United States nationals unless the debts were charges on property which was nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimant filed objections to the Proposed Decision, objecting specifically to the value placed upon its six Cuban branches, and to the denial of the portion of the claim based upon the debt owed by Cuban Telephone Company. A brief *amicus curiae* was filed by counsel for International Telephone and Telegraph Corporation (Claim No. CU–2615). At an oral hearing on December 9, 1968, the testimony of witnesses was presented and argument was made by counsel for claimant and *amicus curiae*. A subsequent brief *amicus curiae* was filed by counsel for Colgate-Palmolive Company (Claim No. CU–0730).

*Value of Cuban Branches at time of loss*

In its objections, claimant urges that its six branches be valued at $12,200,000.00 at the time of loss, as going concerns. Pointing out that Section 503(a) of the Act requires the Commission to "take into account the basis of valuation most appropriate to the property and equitable to the claimant," it argued strongly for the adoption of either the "direct earnings method" of the "rate of return/net worth method" that it had suggested previously as routes to the going concern value of the six branches.

In the "direct earnings method," yearly earnings are multiplied by a multiple determined by various indices of performance (deposit growth, net worth increase, and return on investment equity). Claimant multiplied the 1959 earnings of its branches by 12.7 (obtained from the performance of 46 American banks), by 13.9 (from four American "growth" banks), and by 9.9 (from three Latin-American banks), and multiplied the average earnings for the 5 years of 1955 through 1959 by 12.7 (from the 46 American banks) and 15.9 (from the four "growth" banks). It then took the average of the five results, and arrived at $12,603,096.00 for the value of the six Cuban branches.

In the "rate of return/net worth method," 1959 book value was multiplied by a multiple derived from analysis of the rate of return on invested equity in five groups of banks, and their market value of a percentage of net worth. The Cuban branches earned a 20.6% return on equity in 1959, and a 24.5% return for the 5 years from 1955 through 1959, yielding, by comparison with other banks, multiples of 2.34 and 2.72, respectively, to be applied to 1959 book value. The results of these two averaged $12,222,126.00.

The admitted weaknesses of the suggested methods are the difficulty in determining the proper multiple to be used, and the inability to make a comparison of claimant's Cuban branches with other Cuban banks due

to the unavailability of data concerning such banks. In its Proposed Decision, the Commission resorted to book value, after stating that it was not convinced that the claimant's basis for evaluation, resting on a comparison of the six branches with a number of banks operating in the United States and three other non-Cuban banks, was valid.

In the course of the oral hearing, an expert witness, favoring the capitalization of earnings as a method of valuation, testified that in his opinion a lower multiple should be applied to earnings of the Cuban branches in order to determine their going concern value, than to the earnings of the claimant enterprise as a whole, in view of the inherent risk in conducting a business of this nature in a foreign country, subject to close governmental regulation, currency control, and possible fluctuation in the value of the foreign currency. Even offsetting this by the fact that claimant's Cuban branches yielded a greater return on investment than did claimant bank as a whole, he suggested a multiple of 10 times earnings. This, if applied to the branches' 1959 earnings, would yield a going concern value of $9,948,550.00, or $9,336,810.00 if applied to the average annual earnings for the 5-year period from 1955 through 1959. However, the witness admitted that his reduction of the multiple to 10 represented a crude and arbitrary adjustment, and was entirely a matter of judgment.

As an alternative method of calculating the value of its Cuban branches, claimant suggested in its brief that the fair market value of the branches be determined from the fair market value of the whole enterprise on the share of stock in the corporation for the year of 1959 by the total number of shares outstanding on December 31, 1959, claimant arrived at a market value for the whole enterprise of $249,200,000.00. The 1959 net income of the six branches was $994,855.00 after Cuban taxes, representing 4.62% of the net income of claimant bank as a whole. Applying this percentage to $249,-200,000.00 yielded a value of $11,513,049.00 for the branches. Recognizing that this calculation failed to reflect the effect of 1959 United States income taxes on the net income of the branches, claimant submitted a recalculation in an addendum to its brief, showing a net income of $676,740.00 for the Cuban branches after Cuban and United States taxes. This represented 3.21% of the similarly adjusted net income of the whole enterprise, indicating a fair market value for the six branches of $7,999,320.00.

The Commission has recognized, and indeed Section 503(a) of the Act makes abundantly clear, that book value is not always the most appropriate basis for valuation of nationalized property. Determinations of the Commission must be made on the basis of evidence available to it, however, and at times the available evidence permits only the use of book value. In the instant case, the nature of the business conducted is such that earnings potential reflected in the market price of the stock is of greater significance than asset value in the determination of true value of the enterprise at any given time. The Commission is persuaded that at the time of loss the claimant's six Cuban branches had a value exceeding their book value; and the quantity and quality of evidence submitted places the Commission in a position to determine that the "basis of valuation most appropriate to the property and equitable to the claimant" is that of allotting to the branches the portion of the fair market value of the whole enterprise which the net income of the branches bore to the net income of the whole. Accordingly, the Commission finds that the value of the six branches on September 17, 1960, was, $7,999,320.00 and that, after deduction of the re-

covered $4,069,114.69, claimant suffered a loss in the amount of $3,930,205.31 as a result of the nationalization of the six branches by the Government of Cuba.

In addition, the finding of loss of $1,666,845.57 for payments in connection with letters of credit is affirmed.

### DEBT OF CUBAN TELEPHONE COMPANY a/k/a CUTELCO

The pertinent history of this matter is that Cutelco was organized in the United States but all or nearly all of its assets were located in Cuba. By Cuban Government Resolution No. 1 published August 6, 1960, pursuant to Law No. 851, its assets were nationalized. At that time it owed claimant bank $290,000. This amount was asserted to be compensable in this case but was disallowed by our Proposed Decision because, under Section 505(a) of the Act, it was held to be an unsecured debt of a United States national. The Commission previously determined the nationality issue based on information furnished the State Department in 1960 by the International Telephone and Telegraph Corporation. The United States interest was then found to be 60.75%, whereas anything over 50% would place Cutelso in the category of claimants covered by Section 505(a).

It is now asserted by a new affidavit that in fact Cutelco had slightly less than 50% American ownership on the date of the taking. We, however, find and hold that this evidence does not overcome that previously adduced and already ruled upon by our Commission. Also, *Amicus Curiae* urge that Cutelco was dormant or defunct after its properties were taken, but we fail to see how that could alter the statutory boundaries.

Also, the claimant urges that the Cuban Nationalization Decree should be interpreted as an assumption by the Cuban Government of the debts of Cutelco, including its debts to the claimant. It is not necessary for the Commission to determine whether the claimant's interpretation of the Cuban Decree is correct, for even if the Cuban Government specifically assumed the liability of Cutelco to the claimant, this would not support a certification in its favor.

The statutory function of the Commission is to determine the rights of persons whose property has been nationalized or otherwise taken. When the Cuban Government nationalized the property of Cutelco it did not thereby nationalize any property of the First National Bank of Boston. Therefore, the bank cannot prevail on this issue.

That does not mean, however, that the Bank is without a remedy. Cutelco, as a United States national, has a claim filed on its behalf with the Commission by one of its stockholders (viz. CU–3682) for the nationalization of its assets. The bank can in fact protect itself by obtaining a judgment against Cutelco and levying on any assets it may then have, including any recovery on its claim against the Cuban Government. A Federal court recently reached a similar conclusion as to injurance contracts in the case of *Blanco* v. *Pan-American Life Insurance Company, et al.,* 221 F. Supp. 219.

Finally, we find no merit to the claimant's contention that the legislative history of the Act exempts banks from the operation of Section 505(a). This was considered previously by the Commission and rejected in the Proposed Decision wherein the Commission found that the language of the section itself is quite clear and contains no exception in favor of banks.

For the reasons set forth above, the denial of the portion of the claim based upon a debt owed to claimant by Cuban Telephone Company is affirmed.

*Debt of Mid-Century Service, Inc.*

In its Proposed Decision, the Commission denied a portion of the claim based upon a debt owed to claimant by Mid-Century Service, Inc., on the same grounds as applied to the indebtedness of Cuban Telephone Company. Although no objection was made to this portion of the Proposed Decision, upon reexamination of the record the Commission is moved to reconsider its holding in this respect.

It appears from the record that Mid-Century Service, Inc., was organized in 1950 under the laws of the State of New York, to operate principally as buying agent for Grabiel Sisto y Cia, S.A., a Cuban corporation which operated a large department store in Havana, and which was nationalized by the Government of Cuba on October 13, 1960 pursuant to Law No. 890. The Commission finds that claimant extended a loan to Mid-Century Service, Inc., in the amount of $30,000.00 on September 11, 1959, that it was increased to $40,000.00 on September 18, 1959, that subsequent payments reduced the balance due to $6,000.00 after which Mid-Century Service, Inc. became insolvent, its only asset being an account receivable from Grabiel Sisto y Cia, S.A. The Commission further finds that by an instrument dated September 16, 1959, Grabiel Sisto y Cia, S.A. had guaranteed to claimant the fulfillment of all obligations of Mid-Century Service, Inc., to a maximum of $50,000.00, waiving presentation, protest, and all demands and notices, and assenting to "the addition or release of any other person primarily or secondarily liable."

In view of this guaranty, the Commission finds that the unpaid balance of $6,000.00, as the debt of a nationalized enterprise (Grabiel Sisto y Cia, S.A.), constituted "property" as defined in Section 502(3) of the Act, and that its loss as a result of the nationalization of Grabiel Sisto y Cia, S.A. on October 13, 1960 gives rise to a compensable claim under the Act.

*Conclusion*

The Commission concludes that claimant suffered a total loss within the meaning of Title V of the Act in the amount of $5,603,050.88.

## CERTIFICATION OF LOSS *

The Commission certifies that THE FIRST NATIONAL BANK OF BOSTON suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Five Million Six Hundred Three Thousand Fifty Dollars and Eighty-eight Cents ($5,603,050.88), with interest thereon at 6% per annum on $5,597,050.88 from September 17, 1960, to the date of settlement, and on $6,000.00 from October 13, 1960, to the date of settlement.

Dated at Washington, D.C., Feb. 26, 1969.

------------

* By an Amended Final Decision of August 19, 1970, the Commission increased the Certification of Loss to $5,904,940.88 on the basis that a portion of this claim for debts due from the Cuban Telephone Company were allowable under the Act, following the holding in the *Claim of International Telephone and Telegraph Corporation*, Claim No. CU-2615, reported herein, which decision was entered as the Commission's Final Decision on July 27, 1970.

PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, for $12,496,000.00 was presented by THE FIRST NATIONAL BANK OF BOSTON based upon asserted losses resulting from the nationalization of claimant's six branches in Cuba and upon the non-payment of certain debts.

Under Title V of the International Claims Settlement Act of 1949 [78. Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

An officer of the Bank has certified that claimant is a national banking association organized under the laws of the United States and that at all times between 1903 and April 27, 1967, more than 50 per centum of the outstanding capital stock of the claimant has been owned by United States nationals. An officer of claimant Bank states further than on December 1, 1967, 5,959,830 shares of stock were held by 21,098 shareholders who were residents of the United States and presumed to be nationals of the United States and 40,170 shares were held by 91 non-residents presumed to be nationals of other countries. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The record reflects that claimant Bank maintained six branches in Cuba, including three located in Havana, and one each in Sancti-Spiritus, Santiago de Cuba and Cienfuegos.

On September 17, 1960, the Government of Cuba published in its Official Gazette Resolution No. 2 (pursuant to Law 851 of July 6, 1960). Resolution No. 2 listed as nationalized the branches and agencies in Cuba of THE

FIRST NATIONAL BANK OF BOSTON, substituting the Government of Cuba in place of the Bank with respect to both the assets and liabilities thereof. Accordingly, the Commission finds that the property in Cuba of THE FIRST NATIONAL BANK OF BOSTON was nationalized on September 17, 1960 by the Government of Cuba, which also assumed the liabilities of the branches in Cuba of said Bank.

Claimant has asserted its loss in the amount of $12,496,000.00 as follows:

$12,200,000 incurred by reason of taking of the branches

$296,000 losses incurred by the Boston Office activities unrelated to the branches

Claimant has stated its initial book loss as $6,703,300.26, composed of three parts:

| | | | |
|---|---|---|---|
| Net worth of 6 branches: | | | |
| Capital and reserves | | $3,745,000.00 | |
| Unremitted earnings: | | | |
| 1959 | | 1,196,690.32 | |
| 1960 | | 700,705.38 | |
| Reserve for loan losses | | 8,988.66 | |
| | | | $5,651,384.36 |
| Letter of credit payments by Boston office | | 1,697,386.40 | |
| Havana branch credit | $768,631.97 | | |
| Other receipts | 172,838.53 | | |
| | | 941,470.50 | |
| | | | 755,915.90 |
| Loan to Cuban Telephone Co. | | | 290,000.00 |
| Balance of Loan to Mid-Century, Inc. | | | 6,000.00 |
| Total | | | 6,703,300.26 |

In 1961, it is stated, the Bank received duplicate United States Treasury bonds with a face amount of $3,000,000 to replace bonds seized by the Cuban Government. The bonds were entered on the Bank's books at $2,966,250, the market value on date of reissuance. Net recoveries from 1961 through 1966 from various unspecified sources amounted to $191,705.77. Thus the net book loss was reduced to $3,545,344.49:

| | | |
|---|---|---|
| Initial book loss | | $6,703,300.26 |
| Bonds | $2,966,250.00 | |
| Recoveries | 191,705.77 | |
| | | 3,157,955.77 |
| Total | | 3,545,344.49 |

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." The Commission has concluded

that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider: i.e., fair market value, book value, going concern value, or cost of replacement.

In amplification of the initial asserted loss of the branches, claimant has submitted a Statement of Condition of the branches as of September 16, 1960, as follows:

### ASSETS

| | |
|---|---|
| Cash and due from banks | $29,488,518.44 |
| U.S. Government obligations | 3,001,885.22 |
| Other securities | 16,626,675.00 |
| Loans and discounts | 21,291,950.21 |
| Customers' liability for acceptances | 11,338.85 |
| Furniture and fixtures | 654,140.70 |
| Other assets including accounts receivable, interest receivable, and prepaid expenses | 437,315.91 |
| Total assets | 71,511,824.33 |

### LIABILITIES

| | | |
|---|---|---|
| Capital | | 1,000,000.00 |
| Reserve for contingencies | | 2,745,000.00 |
| Reserve for loans | | 8,988.66 |
| Unremitted earnings—1959 | | 1,196,690.32 |
| Unremitted earnings—1960 | | 700,705.38 |
| Total | | 5,651,384.36 |
| Demand deposits | $44,281,678.24 | |
| Time deposits | 12,563,523.97 | |
| Deposits of banks | 527,938.74 | |
| Other deposits | 8,038,706.35 | |
| Acceptances executed | 11,338.85 | |
| Other liabilities | 437,253.82 | |
| | | 65,860,439.97 |
| Total | | 71,511,824.33 |

In support of the above, claimant submitted certified statements of condition of the six branches, with a consolidated statement reflecting certain adjusting entries, as shown below:

### RESOURCES

| | |
|---|---|
| Bills discounted | $1,698,213.04 |
| Time loans | 4,265,586.44 |
| Time loans secured | 5,035,379.10 |
| Time loans matured secured | 2,974,947.20 |

| | | |
|---|---:|---:|
| Demand and short-term loans | 6,855,261.48 | |
| Overdrafts in current accounts | 5,284.83 | |
| Advances against merchandise | 6,000.00 | |
| Foreign bills purchased | 172,224.00 | |
| Past due obligations | 1,160.43 | |
| Customers' liability acceptance a/c matured | 277,893.69 | |
| **Total loans and investments** | | **$21,291,950.21** |
| Bonds and securities owned (after debit adjustment of $15,375.00) | 16,463,375.00 | |
| U.S. Government bonds owned (after credit adjustment of $3,739.78) | 3,001,885.22 | |
| Stock Banco Nacional de Cuba | 163,300.00 | |
| Due from head office | 606,838.71 | |
| Due from foreign banks | 270,728.99 | |
| Banco Nacional de Cuba special account | 50,000.00 | |
| Cash tellers | 710,456.24 | |
| Cash reserve in vault | 2,288,570.00 | |
| Cash reserve in Banco Nacional de Cuba | 23,406,269.91 | |
| | | 26,405,296.15 |
| Cash items local | 11,588.68 | |
| Cash items in transit (after debit adment of $461,780.47) | 504,722.35 | |
| Clearing items | 1,572,186.89 | |
| Returned checks pending liquidation | 57,233.03 | |
| Revenue and postage stamps | 9,782.32 | |
| Sight and short-time bills purchased | 11.97 | |
| Postal money orders | 129.35 | |
| | | 2,355,654.59 |
| Accounts receivable | 25,784.47 | |
| Collection department revenue stamps | 3,356.20 | |
| | | 29,140.67 |
| Furniture and fixtures (after credit adjustment of $5,269.72) | 135,685.83 | |
| Repairs and alterations (after credit adjustment of $7,990.29) | 518,454.87 | |
| | | 654,140.70 |
| Interest receivable | 393,948.80 | |
| Commissions receivable | 751.96 | |
| Foreign exchange income receivable | 2,289.53 | |
| Service charges receivable | 165.00 | |
| Prepaid insurance and expenses | 10,941.36 | |
| Miscellaneous | 78.59 | |
| **Total other assets** | | 408,175.24 |
| Customers' liability a/c acceptances | | 11,338.85 |
| **Total** | | 71,511,824.33 |

*LIABILITIES*

| | | |
|---|---:|---:|
| Current accounts | $40,066,277.11 | |
| Current accounts inactive | 645,580.02 | |
| Special deposit accounts | 677,318.38 | |
| U.S. Savings deposits | 38,852.74 | |
| | | $41,429,028.25 |
| Certified checks | 2,158,432.69 | |
| Managers checks | 2,790,849.99 | |
| Managers checks—Exchange department | 2,659.17 | |
| Branch checks | 258.15 | |
| Inter-bank transfers | 180,288.95 | |
| Legal deposits (embargoes, etc.) | 68,066.18 | |
| Drafts and payments advised unpaid | 931.31 | |
| Suspense accounts | 212,795.32 | |
| Collection suspense account | 9,604.20 | |
| Bco. Nac. de Cuba—Surcharge Law 566 | 27.00 | |
| Coll. effected pending cover of exchange | 2,534,630.47 | |
| Government taxes | 27,526.82 | |
| Anticipated payments letters of credit | 2,906,217.42 | |
| Time deposits matured | 352,914.72 | |
| Savings bonds matured | 10,500.00 | |
| Time deposits matured and frozen | 19,285.00 | |
| | | 11,274,987.37 |
| Due to foreign banks—their accounts | 1,855.86 | |
| Due to local banks—their accounts | 526,082.88 | |
| | | 527,938.74 |
| Savings deposits | 2,287,442.24 | |
| Savings deposits—Staff | 85,935.04 | |
| Savings deposits—Inactive | 91,757.27 | |
| | | 2,465.134.55 |
| Savings bonds | 113,500.00 | |
| Time deposits | 9,602,189.70 | |
| | | 9,715,689.70 |
| Due to foreign banks our A/cs. O.D. | | 9,974.34 |
| Other liabilities (after adjustments of record) | | 426,348.17 |
| Acceptances by bank | | 11,338.85 |
| Total | | 65,860,439.17 |
| Reserve for loans | 8,988.66 | |
| Due to head office reserve contingencies | 2,745,000.00 | |
| Due to head office capital account | 1,000,000.00 | |
| Unremitted earnings—1959 | 1,085,880.29 | |
| Unremitted earnings—1960 | 491,305.59 | |
| | | 5,651,384.36 |
| Total | | 71,511,824.33 |

Claimant submits that its claim is not based on book loss but on the loss of the branches as valuable going concerns and as integral parts of the Bank, while recognizing the difficulty of making a precise measurement of such value, but contending nevertheless that there can be no doubt the branches had a value far in excess of the book figures.

In support of its contention claimant asserts several methods are available to determing going concern valuation for a particular banking operation: The direct earning method, reaching a valuation figure by multiplying the yearly earnings of the bank by a multiple determined by various indices of bank performance; and the rate of return/net worth method, analyzing the relation between the bank's rate of return on its invested capital and the price of its stock in relation to its net worth.

It is said that both of these methods require a comparison between the bank being evaluated and a representative sampling of other banks and that the best approach would be to make comparisons with other Cuban banks. Claimant states, however, that information concerning stock in Cuban banks in the period under consideration was not available since no stock was publicly traded and it has therefore utilized the statistical relationship existing in the United States and other Latin and South American countries between bank stock prices and other operational data in reaching valuation figures. Claimant has concluded that the application of these two techniques gives a going concern value to the branches of $12,200,000.00.

Claimant has submitted figures to reflect that the direct earnings of the Cuban branches averaged $933,681 for the five-year period 1955 through 1959, and indicates that this amounts to a 24.5% return on the Cuban investment. To select an earnings multiple, claimant considers deposit growth, net worth increase and return on investment equity, and has submitted schedules comparing data in these areas as applied to certain United States banks. In each of the schedules set out by claimant, the results appear higher than for the United States banks with which comparison is made.

The appropriate earnings multiple, according to claimant, may be taken as the price/earnings ratio of the stock of the bank groups with which the Cuban branches are being compared. Claimant then finds that for the period 1956 through 1960, this is 12.7 for a composite of 46 United States banks; it is 15.9 for four so-called "growth" banks in the United States; and appears to be 9.9 for three Latin and South American banks. Claimant then proceeds to average these results, arriving at $12,603,096 as the average value based on price-earnings ratios.

The last three banks appear to be the only ones in which a stock price has in fact been utilized in the computations of claimant.

Proceeding to the rate of return/net worth method of valuation, claimant points out that the greater the return on invested equity capital, that is, net worth, the higher the stock will generally sell in relation to net worth. Tabulations and graphs set out by claimant, based on the same comparison banks, result in value multiples of 234% and 272%, arriving at $12,222,126 as the average computed value.

The Commission has considered all of the evidence and contentions of the claimant with respect to its asserted value of the six branches in Cuba. The Commission is not convinced, however, that the basis for evaluation, resting on a comparison of the six branches with a number of banks operating in the United States, and three non-Cuban banks, affords a valid and equitable

evaluation. Consequently, the Commission rejects the asserted valuation and finds, in the absence of other substantive evidence, that the book value is the most appropriate value.

The net worth of the banks, collectively, may be found in the excess of assets over the contractual liabilities, or by adding the capital investment, appropriate surplus reserves (not including reserves for depreciation, taxes and the like), and any undivided profit, as appropriate, and subtracting any outstanding deficit. Accordingly, in this case the calculation of net worth is seen as follows:

| | |
|---|---:|
| Original capital and reserves | $3,745,000.00 |
| Unremitted earnings, 1959 | 1,196,690.32 |
| Unremitted earnings, 1960 | 700,705.38 |
| Additional loan loss reserve | 8,988.66 |
| Net worth | 5,651,384.36 |

With regard to the loss of the six branch banks, the Commission concludes that claimant sustained a loss in the amount of $5,651,384.36 within the meaning of Title V of the Act as a result of the nationalization of said branch banks by the Government of Cuba on September 17, 1960.

Section 506 of the Act provides:

> In determining the amount of any claim, the Commission shall deduct all amounts the claimant has received from any source on account of the same loss or losses.

The record reflects that the loss sustained has been partially offset by credits and recoveries. In 1960, the Head Office maintained a branch credit balance in the amount of $768,631.97 and it obtained certain recoveries in the amount of $172,838.53. In addition, in 1961, claimant received duplicate United States Treasury bonds with a face amount of $3,000,000.00 to replace the bonds which were taken by the Government of Cuba at the time the branch banks were expropriated. The market value of the bonds on the date of reissuance was $2,966,250.00. Claimant also obtained other recoveries during the years 1961–66 amounting to $161,394.19. Accordingly, the total amount of the offset, $4,069,114.69, must be deducted from the amount of the loss. The Commission therefore finds the net loss sustained for this portion of the claim as $1,582,269.67.

The second portion of the claim is based upon the asserted loss of $1,697,-386.40 for payments made by the Head Office of claimant under irrevocable letters of credit issued by the Bank's branches in Cuba prior to their nationalization. The record contains copies of the 332 Letters of Credit totaling $1,697,157.15, an affidavit of a Vice President of claimant concerning the procedure involved in Letters of Credit transactions and a schedule pertaining to the transactions. The branch banks of claimant, because of their nationalization on September 17, 1960 by the Government of Cuba, were unable to remit to the Head Office the monies set aside for the Letter of Credit transactions. The Commission concludes that with regard to this portion of the claim, claimant sustained a loss within the meaning of Title V of the Act on September 17, 1960.

The record reflects, however, that E. I. Du Pont de Nemours & Co., the parent company of Du Pont Inter-America Chemical Co., Inc., the consignee on several Letter of Credit transactions, remitted $30,311.58 to claimant as

payment for the Letters of Credit obligation owed by Du Pont Inter-America Chemical Co., Inc.

Section 506 of the Act, *supra*, provides that monies received on account of the same loss must be deducted. Accordingly, the sum of $30,311.58 is deducted from the total amount due claimant on the Letters of Credit. The Commission concludes, therefore, that claimant also sustained a loss in the amount of $1,666,845.57 within the meaning of Title V of the Act, as a result of nationalization of its branches in Cuba on September 17, 1960.

The third and remaining portion of the claim is based upon two loans made by the Head Office of claimant Bank to the Cuban Telephone Company and Mid-Century Service, Inc. The record reflects that both of these companies were organized under the laws of the United States. In addition, the record discloses that Cuban Telephone Company is 60.7550 percent owned by United States nationals and therefore qualifies as a United States corporation. Additionally, it appears that Mid-Century, Inc., was a small closely held New York Corporation.

Claimant has submitted a copy of a letter dated May 27, 1958 from the Export-Import Bank to claimant which recites an agreement between the two parties whereby claimant agreed to participate in a $17,500,000.00 loan to the Cuban Telephone Company to the extent of $290,000.00. The record contains copies of seventeen Participation Agreements dated between June 23, 1958 and December 31, 1959, issued by the Export-Import Bank certifying the purchase of beneficial interests in the indebtedness owing by the Cuban Telephone Company, totaling $290,000.00. A copy of the ledger sheet of claimant reflects that a balance of $200,000.00 was owing claimant on December 19, 1960.

The Government of Cuba published Resolution No. 1 dated August 6, 1960 (pursuant to Law No. 851 of July 6, 1960), which listed as nationalized the Cuban Telephone Company. It therefore appears that the Cuban Telephone Company sustained the loss of its assets in Cuba, on August 6, 1960.

Claimant contends (1) that this $290,000.00 is compensable as the debt of a nationalized enterprise under Section 502(3) of the Act; (2) that it is compensable under Section 505(a); and (3) that under the terms of Resolution 1, the Government of Cuba assumed the liabilities of the Cuban Telephone Company.

Inasmuch as the Cuban Telephone Company qualifies as a United States national, its listing in Resolution 1 had the effect of taking of its assets by the Cuban Government. The company remained liable for its debts under the terms of Resolution 1.

There remains for determination the question whether a bank may recover for the non-payment of a debt owed by an entity qualifying as a United States national under Title V of the Act, if the debt owed is not a charge on property which has been nationalized, expropriated, intervened or taken by the Government of Cuba.

Section 505(a) of the Act provides:

A claim under Section 503(a) of this title based upon an ownership interest in any corporation, association, or other entity which is a national of the United States shall not be considered. A claim under Section 503(a) of this title based upon a debt or other obligation owing by any corporation, association, or other entity organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico shall be considered, only when such debt or obligation is a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Claimant contends that Section 505(a) limits recognition of claims for debts owed by United States corporations which were nationalized, but further asserts that the legislative history of Section 505(a) makes it clear that this Section was not intended to apply to the claims of banks for debts arising out of loan activities.

The legislative history reflects the following with respect to Section 503(a):

> The purpose of this provision is to make clear that the Foreign Claims Settlement Commission does not have jurisdiction to consider claims over American nationals arising out of debts or other obligations for merchandise sold or services rendered to any corporation, association, or other entity organized under the laws of the United States or of any State, District of Columbia, or the Commonwealth of Puerto Rico provided, however, that the debt or obligation is not a charge on property taken by the Government of Cuba. It is not intended to exclude claims of banks, insurance companies, financial institutions, or other corporations, associations, or legal entities based upon the taking of assets in Cuba including assets in the form of debts or other obligations. Nor is it the purpose to exclude claims of those whose accounts in Cuban banks were nationalized, expropriated, intervened, or otherwise taken by the Government of Cuba. (Senate Report No. 701, 89th Congress, 1st Session, at page 4.)

Section 503(a) of the Act provides for recognition of claims against the Government of Cuba by United States nationals (such as THE FIRST NATIONAL BANK OF BOSTON) for losses resulting from the taking of property (or rights or interests therein); and Section 502(3) clarifies that such property may include debts of nationalized enterprises. Where there is an unsecured debt and the debtor qualifies as a claimant against Cuba, such claimant, as the Cuba Telephone Co., is entitled to maintain its own claim before this Commission. Whether it recovered, it would be expected to meet its obligations, and, as a United States national, would be answerable in an action brought against it in the appropriate United States Court. Under Section 503(a) a claimant such as THE FIRST NATIONAL BANK may maintain its claim before this Commission for a debt owed by a United States national, such as the Cuban Telephone Co., only if such a debt is a charge upon property which has been taken.

The cited portion of the legislative history confirms that legal entities may recover for the taking of their assets in Cuba, including debts, such as accounts receivable. Section 503(a) is quite clear and contains no exception in favor of banks, as contended. The legislative history was not intended to create any latent exceptions to the express language of the statute in this regard.

The other loan made by claimant was that to Mid-Century Service, Inc. The record reflects that Mid-Century Service, Inc. was the buying agent in the United States for Gabriel Sisto y Cia. S.A. and that it obtained a loan from claimant in the amount of $40,000.00. Gabriel executed a Guaranty in the amount of $50,000.00. The principal assets of Mid-Century Service, Inc. were the accounts receivable of Gabriel Sisto y Cia. S.A. and when Gabriel was nationalized by the Government of Cuba on October 13, 1960 (Law 890), Mid-Century was unable to make further payments to claimant. Claimant states it was unable to proceed against the Guaranty executed by Gabriel Sisto y Cia. S.A. because of its nationalization.

The record contains a copy of the bank's ledger sheet which reflects that

a balance of $6,000.00 on said loan as of November 15, 1961 was owing to claimant.

The Commission holds that claim may not be maintained under Title V of the Act for debts of $290,000.00 and $6,000.00, due from entities qualifying as United States nationals, as the debts owed were not charges on property which was nationalized, expropriated, intervened or taken by the Government of Cuba. (See *Claim of Anaconda American Brass Company*, Claim No. CU–0112, 1967 FCSC Ann. Rep. 60.)

Accordingly, those portions of the claim are denied.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement. (See *Claim of Lisle Corporation*, Claim No. CU–0644.)

Accordingly, the Commission concludes that the amount of the loss sustained by claimant shall be increased by interest thereon at the rate of 6% per annum on $3,249,115.24 from September 17, 1960 to the date on which provisions are made for the settlement thereof.

### CERTIFICATION OF LOSS

The Commission certifies that THE FIRST NATIONAL BANK OF BOSTON suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Three Million Two Hundred Forty-Nine Thousand One Hundred Fifteen Dollars and Twenty-Four Cents ($3,249,-115.24) with interest thereon at 6% per annum from September 17, 1960 to the date of settlement.

Dated at Washington, D.C., September 11, 1968.

## IN THE MATTER OF THE CLAIM OF FIRST NATIONAL CITY BANK

Claim No. CU–2628—Decision No. CU–3835

*Capitalization of net profits to determine the going concern value of a corporation is an appropriate method of determining the loss attributable to the nationalization or other taking of property by the Government of Cuba.*

### PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $7,513,-028.81 plus interest, representing the gross amount of $12,899,132.30 less offsets of $5,386,103.49, was presented by FIRST NATIONAL CITY BANK based upon asserted losses of certain real and personal property at its branch offices in various areas of Cuba, and other asserted losses of personal property.

Under Title V of the International Claims Settlement Act of 1949 [79 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

The term "property" means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The evidence of record, including documentation filed by claimant in its claim against the Chinese Communist regime under Title V of the Act, as amended (Claim No. CN–0440), establishes that claimant was organized under the laws of the United States, and that at all pertinent times more than 50% of claimant's outstanding capital stock was owned by nationals of the United States. An authorized officer of claimant has certified that at all times during the period April 9, 1950 to July 2, 1969 (date of said certification), more than 95% of claimant's outstanding capital stock was owned by persons with addresses in the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

### CUBAN BRANCHES

The record shows that claimant maintained eleven branches in Cuba, including six in Havana, four of which were leased premises, and one each in Santiago de Cuba, Manzanillo, Caibarien, Cardenas and Matanzas. The Commission finds on the basis of the evidence of record that in connection with these operations, claimant owned certain real and personal property at seven of the locations, and owned certain personal property at four of the premises where it had also made substantial improvements to its leaseholds.

On September 17, 1960, the Government of Cuba published in its Official Gazette Resolution No. 2, pursuant to Law 851, which listed as nationalized the First National City Bank of New York, claimant's former name. The Commission, therefore, finds that claimant's real and personal property was nationalized by the Government of Cuba on September 17, 1960, as a result of which claimant sustained a loss within the meaning of Title V of the Act.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the prop-

erty and equitable to the claimant." The Commission has concluded that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider; i.e., fair market value, book value, going concern value, or cost of replacement.

Claimant has computed its claim as follows:

| | | |
|---|---:|---:|
| Net Worth of Cuban branches including unremittted profits, as of August 23, 1960 ........................................................... | | $5,961,037.41 |
| Less net balance due Cuban branches from claimant ......................................... | | 1,491,735.34 |
| Net investment—book value ..................... | | $4,469,302.07 |
| Excess of appraised value of real property, furniture, fixtures, etc. over book value ............................................... | | 1,718,418.83 |
| Net investment adjusted .......................... | | $6,187,720.90 |
| Expenses incurred after August 23, 1960 as result of nationalization: | | |
| Payments to Administrator ................... | $809,641.21 | |
| Legal fees (estimatad) ......................... | 50,000.00 | |
| Assignments from employees .............. | 39,491.09 | 899,132.30 |
| | | $ 7,086,853.20 |
| Goodwill and Going Concern value ........ | $12,000,000.00 | |
| Less net investment adjusted .............. | 6,187,720.90 | 5,812,279.10 |
| Total ................................................ | | $12,899,132.30 |

In effect, claimant is asserting the loss of goodwill and going concern value in the amount of $12,000,000.00, plus $899,132.30 for expenses incurred after August 23, 1960 as a result of the nationalization by Cuba.

The essence of claimant's contentions is that the Commission should apply the going concern value method in determining its losses in Cuba. Claimant states that it has been operating some of its Cuban branches since the 1920's and has built up the intangible asset, goodwill, which under normal accounting procedures and pursuant to bank regulations could not be recorded in its books and records. It adds that the book values for such items as real property, furniture and fixtures, and equipment, etc., reflect only the net cost values after depreciation, whereas expert appraisals indicate much higher values for these items of property on the date of loss. For these reasons, claimant asserts, in effect, that the use of book value would neither be appropriate nor equitable.

The evidence of record sustains claimant's contentions regarding book value. Using 1959 as the typical and representative year because it was the last full year of its Cuban branches' operations, claimant has submitted a substantial amount of supporting documentation. Copies of balance sheets, profit and loss statements, and schedules, as well as analysis sheets prepared on the basis of claimant's books and records for its Cuban branches, establish that claimant's cost of land at seven locations was $496,716.51, and re-

mains recorded at that amount although nearly all of it was purchased in 1923 and 1924, approximately 36 years prior to the date of loss, during which time property values had risen substantially. It further appears that the original aggregate cost of the buildings owned by claimant on these sites was $1,277,871.02, which is recorded in claimant's books at $148,930.44, after depreciation, while the foundations and structures were currently insured in the aggregate amount of $1,314,437.80.

The record includes appraisals (Exhibit 4) by an expert engineer and architect whose appraisals have been found reliable in other claims determined by the Commission under Title V of the Act. This expert has indicated that all of the premises were maintained in good condition, were modernized, and most of the structures, including those rented by claimant, had been improved by the addition of air conditioning systems installed at claimant's expense. The aggregate appraisal of the real property owned by claimant, including the furniture, fixtures and equipment installed by claimant, as well as the improvements made to claimant's leaseholds, is set forth as $2,740,000.00 on the date of loss. We note that this amount is slightly higher than the appraisals of these items of property made by claimant's employees at the eleven sites.

Claimant has suggested several methods for arriving at the going concern value of its eleven Cuban branches. In order to illustrate each method, claimant has submitted the following information concerning its Cuban operations:

(a) The net earnings for the years ending December 23, 1955 through December 23, 1959, and for the period ending August 23, 1960, which show such net earnings (rounded off) as $699,000.00, $1,074,000.00, $950,000.00, $1,021,000.00, $1,011,000.00, and $303,000.00, respectively (Exhibit 2).

(b) The aggregate net worth of the eleven Cuban branches for the same period of time as under (a) above, adjusted to include claimant's internal appraisals of its land, buildings, furniture, fixtures, and equipment, which show such net worth (rounded off) as $5,637,000.00, $5,904,000.00, $6,073,-000.00, $6,221,000.00, $7,196,000.00, and $7,679,000.00, respectively (Exhibit 3).

(c) A schedule indicating the results of a study made by claimant, which show the cost of acquisitions in 1959 and 1960 of Cuban branches by five American banks, from which claimant computed the percentage of book values which such acquisition costs represent, and averaged them to be 179.48% of the book values (Exhibit 5). With information available only as to three of those five American banks, claimant also derived the averaged multiple (14.2) of earnings of those three banks to the costs of the acquisitions (also in Exhibit 5).

(d) A table prepared by claimant which shows, with respect to five other American banks including claimant's, the ratio obtained by averaging the high and low market prices for the stock of these five banks in 1959 and dividing the result by the net earnings per share in 1959, indicating claimant as having the highest ratio, 15.1, and the average ratio as 13.3 (Exhibit 6).

(e) A schedule which shows four suggested methods of arriving at the going concern value of claimant's eleven Cuban branches (Exhibit 7), each one of which results in amounts in excess of the $12,000,000.00 asserted by

claimant as the going concern value of its Cuban branches.

Claimant's Exhibit 7 shows the following methods of valuations:

1. Applying the average percentage of acquisition cost of Cuban branches compared to book value, 179.48 (Exhibit 5), to claimant's adjusted net worth as of August 23, 1960 of $7,679,000.00 (Exhibit 3), the result is $13,782,-000.00.

2. Applying the average multiple (14.2) of earnings of acquired banks to costs of acquisition (Exhibit 5), the results are $14,356,000.00 when using claimant's net earnings in 1959, i.e. $1,011,000.00 (Exhibit 2); and $14,867,-000.00 when using its adjusted net earnings in 1959, asserted to be $1,047,-000.00, including additional earnings attributable to the Cuban operations, which additional earnings are not supported by the evidence of record.

3. Applying the price/earnings ratio of 15.1, asserted to be the appropriate one for claimant (Exhibit 6), to the net earnings and the asserted adjusted net earnings, as in paragraph 2 above, the results are $15,266,000.00 and $15,809,000.00, respectively.

4. Applying the average price/earnings multiple of 13.3 (Exhibit 6), to the same net earnings and asserted adjusted net earnings of claimant, the results are $13,446,000.00 and $13,925,000.00, respectively.

Claimant's suggestions have been carefully considered in the light of the entire record. The Commission finds methods 1 and 2 inappropriate inasmuch as it is clear (see paragraph 14 of affidavit of William T. Loveland, claimant's Vice President, dated May 26, 1967) that the acquisition of Cuban branches by the five American banks were unique and involved factors that are not established as comparable to claimant's Cuban branches. Accordingly, any conclusions drawn from such information would be speculative. In view of this and because here we do not have available percentages of profit of the Cuban branches as compared to the total profit of the entire organization of claimant the rationale of our decision in *The Claim of The First National Bank of Boston*, Claim No. CU-2268, also would not apply to this situation.

The Commission finds that the valuation most appropriate to the property and equitable to the claimant in this case is the going concern value, derived by capitalizing the average net earnings after Cuban taxes of claimant's Cuban branches during the years 1955 through 1959, prior to 1960 when Cuba's nationalization decrees had caused reductions in normal earnings. It is concluded, however, that the capitalization multiples suggested by claimant, 15.1 for claimant or the average, 13.3 (employed in methods 3 and 4), are inappropriate because they were computed from certain statistics relating to the operations of five American banks, whereas this claim involves bank branches in Cuba. From other information available to the Commission, it appears that the average multiple for three Latin-American banks was 9.9 in 1960, there being no data available for Cuban banks. (See *Claim of Julius J. Shepard*, Claim No. CU-0407, Amended Proposed Decision issued on April 30, 1969; reaffirmed in *Claim of General Dynamics*, Claim No. CU-2476.)

Having fully considered this entire matter, the Commission holds that the value of claimant's eleven Cuban branches should be computed on the basis of the branche's average net earnings after Cuban taxes for the period 1955 through 1959, capitalized at 10%.

As indicated above, the net earnings of claimant's eleven Cuban branches were $699,000.00, $1,074,000.00, $950,000.00, $1,021,000.00 and $1,011,000.00, for the years 1955 through 1959, or an average annual net profit after deductions for Cuban taxes of $951,000.00. Accordingly, the Commission finds that the aggregate value of claimant's eleven Cuban branches on September 17, 1960, the date of loss, was $9,510,000.00.

Section 506 of the Act provides:

> In determining the amount of any claim, the Commission shall deduct all amounts the claimant has received from any source on account of the same loss or losses.

The record shows that claimant's loss has been offset partially by recoveries and credits. United States Treasury bonds in the amount of $3,000,000.00 had been held by claimant's branches in Cuba and were included among claimant's assets that were taken by Cuba on September 17, 1960. These bonds were due to mature on September 15, 1961 and bore interest at 2¾%. It appears from the record that subsequent to the maturity date of the bonds, claimant received duplicate bonds in the face amount of $3,000,000.00 plus accrued interest in the amount of $38,111.41, which had been included in the financial statements for claimant's Cuban branches.

The evidence also establishes that Banco Nacional de Cuba, an agency of the Government of Cuba, had on deposit with claimant a credit balance in the amount of $2,293,367.65, and that claimant had recovered other funds in the amount of $54,624.43 which it stated should be applied to offset its claim against Cuba.

Accordingly, the aggregate amount of the offset, $5,386,103.49, must be deducted from the amount of loss. The Commission therefore finds that the net loss sustained on September 17, 1960 with respect to this portion of the claim was $4,123,896.51.

### OTHER LOSSES ASSERTED

#### 1. *Commercial Credits*

The record establishes and the Commission finds that claimant's Cuban branches had authorized with the approval of claimant certain commercial credits, covered by certain funds in Cuba in the amount of $809,641.21. It further appears from the record that the Cuban authorities took these special funds upon nationalization of the Cuban branches. Subsequently, documents evidencing these credits were presented to claimant in New York and claimant was obliged to and did honor them. The Commission, therefore, finds that claimant sustained a loss on September 17, 1960 within the meaning of Title V of the Act in the amount of $809,641.21 on account of the said commercial credits.

#### 2. *Legal Fees*

Claimant states that it suffered a loss of $50,000.00 (estimated) for legal fees, resulting from the nationalization of claimant's Cuban branches.

The Commission has held that claims for attorney's fees and expenses involved in contesting Cuba's taking of American-owned property are not within the purview of Title V of the Act. (See *Claim of E. R. Squibb & Sons Inter-American Corporation*, Claim No. CU–2469, and *Claim of Mathie-*

*son Pan-American Chemical Corporation*, Claim No. CU–2470.) Accordingly, the portion of the claim based upon legal fees is denied.

3. *Assignments From Employees*

The record shows that six of claimant's United States national employees who had been stationed at claimant's Cuban branches, owned certain personal effects, automobiles and other personalty, having an aggregate value of $39,491.09.

Law 989, published in the Cuban Official Gazette on December 6, 1961, by its terms effected a confiscation of all goods, chattels, rights, shares, bonds and other securities of persons who fled from Cuba. The Commission finds that this law applied to claimant's said six employees who had left Cuba before that date, and concludes that all of the properties owned by these employees in Cuba were taken by the Government of Cuba on December 6, 1961 pursuant to Law 989. (See *Claim of Floyd W. Auld*, Claim No. CU–0020, 25 FCSC Semiann. Rep. 55 (July-Dec. 1966).)

The Commission finds on the basis of the evidence of record that claimant compensated these six employees for the full values of their properties, $39,491.09, and received assignments from them in consideration of such payments. The record shows that assignments to claimant in the amount of $27,301.10 were executed prior to December 6, 1961, the date of loss, and that assignments in the aggregate amount of $12,189.99 were executed by three of these employees, after December 6, 1961, the date of loss, as follows:

| Date | Amount |
|---|---|
| December 19, 1961 | $2,624.40 |
| December 22, 1961 | 3,255.50 |
| February 14, 1962 | 6,310.09 |
| Total | $12,189.99 |

Accordingly, the Commission finds that claimant succeeded to and sustained losses within the meaning of Title V of the Act in the aggregate amount of $39,491.09 with respect to this portion of the claim.

RECAPITULATION

The Commission concludes that claimant sustained losses as follows:

| Item of Property | Amount |
|---|---|
| 11 Cuban branches | $4,123,896.51 |
| Commercial credits | 809,641.21 |
| Assignments | 39,491.09 |
| Total | $4,973,028.81 |

The Commission has decided that in the certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

The Commission concludes, however, that with respect to the assignments executed after the date of loss, interest should be allowed only from the

respective dates of the assignments when claimant acquired those interests. (See *Claim of Estate of Julius S. Wikler, Deceased,* Claim No. CU–2571.)

Accordingly, interest will be included as follows:

| From | On |
|------|-----|
| September 17, 1960 | $4,933,537.72 |
| December 6, 1961 | 27,301.10 |
| December 19, 1961 | 2,624.40 |
| December 22, 1961 | 3,255.50 |
| February 14, 1962 | 6,310.09 |
| Total | $4,973,028.81 |

### CERTIFICATION OF LOSS

The Commission certifies that the FIRST NATIONAL CITY BANK succeeded to and suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Million Nine Hundred Seventy-three Thousand Twenty-eight Dollars and Eighty-one Cents ($4,973,028.81) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., September 3, 1969.

### FINAL DECISION

Under date of September 3, 1969, the Commission entered its Proposed Decision certifying a loss in favor of claimant in the amount of $4,973,028.81 plus interest. Subsequently claimant advised the Commission that it had recovered a further amount of $109,297.77 on account of said loss over and above the recoveries already deducted, as set forth in the Proposed Decision. Claimant also indicated that it had no objections to file in this matter.

Upon consideration of the foregoing, it is

ORDERED that a Final Decision be entered as follows:

The Commission now finds that the aggregate amount of claimant's recoveries was $5,495,401.26, which must be deducted from claimant's loss in the amount of $9,510,000.00. Accordingly, the Commission finds that the net loss sustained by claimant on September 17, 1960 with respect to its Cuban branches was $4,014,598.74.

It is further

ORDERED that the certification of loss, as restated below, be entered and that the Proposed Decision be affirmed in all other respects.

### CERTIFICATION OF LOSS

The Commission certifies that the FIRST NATIONAL CITY BANK suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Million Eight Hundred Sixty-three Thousand Seven Hundred Thirty-one Dollars and Four Cents ($4,863,731.04) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., November 14, 1969.

## IN THE MATTER OF THE CLAIM OF INTERCONTINENTAL HOTELS CORPORATION

### Claim No. CU-2521—Decision No. CU-4545

*Value of Cuban corporation may be established by capitalizing its average annual net earnings for a three year period at 10%, supplemented by the value of subsequent improvements to physical properties. The period where losses resulted in consequence of actions of the Government of Cuba, may be disregarded in ascertaining the value of Cuban enterprises.*

#### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $8,-934,370.50, was presented by INTERCONTINENTAL HOTELS CORPORATION, based upon the loss of a stock interest in a Cuban corporation and a debt due from that corporation. The Cuban entity, Intercontinental Hotels Corporation of Cuba, S.A., is hereafter referred to as IHC of Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of Delaware and that at all pertinent times all of claimant's outstanding capital stock was owned by Pan American World Airways, Inc., a corporation organized under the laws of New York. An authorized officer of claimant and parent

---

* This decision was entered as the Commission's Final Decision on April 13, 1970. Subsequently, the Commission found in a related case involving a stock interest in the same Cuban entity that the entity had a greater value than determine in this case. Accordingly, the Commission reopened this claim on its own motion, and increased claimant's Certification of Loss accordingly. The Amended Final Decision is included herein.

has certified that at all pertinent times more than 50% of the parent's outstanding capital stock was owned by nationals of the United States; and that as of April 15,1960, 57,376 shares out of the parent's outstanding capital stock of more than 6,000,000 were owned by nonnationals of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

STOCK INTEREST

The record establishes and the Commission finds that claimant owned 47,167 shares of common stock out of 100,000 shares, and 8,018.33 shares of preferred stock out of 17,000 shares, constituting a 47.167% stock interest in IHC of Cuba. The record further shows that by Resolution No. 4231, issued on June 10, 1960, IHC of Cuba was declared intervened by the Cuban Minister of Labor pursuant to Law 647 of November 24, 1959. The Commission finds that IHC of Cuba was intervened by the Government of Cuba on June 10, 1960.

Since IHC of Cuba was organized under the laws of Cuba, it does not qualify as a "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The sole business of IHC of Cuba was the operation of the Hotel Nacional. IHC of Cuba commenced operations in Cuba on August 1, 1955 when it acquired by purchase from National Cuba Hotel Corporation an assignment of a lease of the National Hotel of Cuba, Havana, which had over 500 rooms. On the same date, IHC of Cuba also acquired by purchase title to all of the personal property constituting the contents of the hotel, including the furniture, fixtures, equipment, linens, drapes, cutlery, china, silverware, generator, air-conditioning appliances, food, supplies, etc. Pursuant to the express terms of the lease, IHC of Cuba acquired the right to operate the entire hotel and all its facilities, rent free, for a period ending November 21, 1989. Thus, on the date of loss, June 10, 1960, the lease had almost 29½ years to run. A copy of the original lease, dated August 16, 1929, and copies of the assignments thereof as well as of sales documents of the various items of personal property situated on the premises of the hotel are included in the record.

Extracts from the books and records of IHC of Cuba disclose that it paid $3,600,000.00 for the hotel lease and the contents of the hotel, the Cuban peso being on a par with the United States dollar. In addition IHC, of

Cuba made substantial improvements to the premises, nearly all of which were completed between 1958 and 1960 as follows:

| | |
|---|---:|
| Building improvements | $294,217.00 |
| Furniture and fixtures | 585,022.00 |
| Air-Conditioning | 485,975.00 |
| Decoration | 28,930.00 |
| Miscellaneous improvements | 60,683.00 |
| **Total** | **$1,454,827.00** |

Accordingly, the total investment made by IHC of Cuba was $5,054,827.00. IHC of Cuba enhanced its business operations by subleasing a part of the hotel premises for gambling and entertainment. Not only did the sublessee physically improve the sublet premises, but the casino and night club brought increased trade to IHC of Cuba and augmented the earnings of IHC of Cuba by its annual rent of $300,000.00.

The evidence establishes that the operations of IHC of Cuba were very profitable. Copies of profit and loss statements, included in the record, show that during the first two full years, 1956 and 1957, IHC of Cuba earned net incomes of $780,209.64 and $880,468.82, respectively. The net worth of IHC of Cuba as shown by balance sheets, rose from $2,601,017.25 in 1956 to $3,157,636.08 in 1957.

In 1958 Castro's revolutionary activities spread to Northern Cuba including the City of Havana. As a result, the business of IHC of Cuba declined sharply. IHC of Cuba showed net losses of $456,488.26 in 1958, $825,367.78 in 1959, and $390,527.00 for the four-months period of January through April 1960.

In view of the foregiong, claimant urges that the value of its stock interest in IHC of Cuba be determined as follows: Compute the going concern value of IHC of Cuba by multiplying its average annual earnings by 8 using the two normal years, 1956 and 1957.

Claimant's computation results in a going concern value of $6,850,000.00, which equals $3,230,939.50 for claimant's 47.167% stock interest.

Upon consideration of the entire record, the Commission concludes that the circumstances herein render it inequitable to determine the value of IHC of Cuba on the basis of its book value, shown in its balance sheets. The Commission finds that the valuation most appropriate to the property and equitable to the claimant is the amount resulting from capitalizing the avererage annual net earnings of IHC of Cuba at 10%. (See *Claim of Julius J. Shepard*, Claim No. CU–0407, Amended Proposed Decision.)

As noted above, Castro's revolutionary activities in 1958 caused a sharp decline in the business operations of IHC of Cuba. After Castro assumed power on January 1, 1959, his regime commenced an extensive program of nationalization, expropriation, confiscation and intervention of property in Cuba. As a result of Castro's actions, IHC of Cuba experienced substantial losses in 1959 and thereafter. What had been a very profitable operation prior to Castro's activities became a business in which losses mounted progressively.

In view of these circumstances, it would be inequitable to compute the average annual net earnings of IHC of Cuba by including the entire period of its operations. On the other hand the elimination of all periods of time subsequent to 1957 merely because they were unprofitable would hardly consti-

tute a sound basis for determining the value of IHC of Cuba under Title V of the Act.

The Commission finds that the fair and reasonable value of IHC of Cuba as a going concern should be based upon the capitalization of its average annual net earnings for the three-year period, 1956 through 1958. The record shows that IHC of Cuba earned net profits of $780,209.64 and $880,468.82 in 1956 and 1957, respectively, and suffered a loss of $456,488.26 in 1958. Therefore, its total earnings for that period were $1,204,190.20, and its average annual net earnings were $401,396.73. Accordingly, the Commission finds that the value of IHC of Cuba as a going concern on June 10, 1960, the date of loss, was $4,013,967.30.

The facts in this case present a further element that warrants consideration. As indicated above, the record shows that IHC of Cuba had expended $1,454,827.00 in improving the hotel premises, practically all of which had occurred shortly before intervention. Under the circumstances in this case, IHC of Cuba was unable to recoup any benefit from that recent investment. The Commission therefore finds it appropriate in this instance and equitable to the claimant to include that investment in determining the overall value of IHC of Cuba on the date of loss. Accordingly, the Commission finds that the overall value of IHC of Cuba on June 10, 1960, the date of loss, was $5,468,794.30. Therefore, claimant's 47.167% stock interest in IHC of Cuba had a value of $2,579,466.21.

### MANAGEMENT COMPENSATION

Claimant asserts a further loss of $3,138,192.00, representing the amount attributable to deprivation of its "management compensation." It is stated that claimant had entered into an agreement with IHC of Cuba, pursuant to which claimant was to receive an annual fixed fee of $25,000.00 plus 25% of the net operating income of the hotel, after certain deductions, in consideration of management and operating services to be performed by claimant. This agreement was terminaed on January 15, 1960 due to losses sustained by IHC of Cuba in 1958 and 1959. Claimant has computed its average annual income for such services, using 1956 and 1957, and has capitalized that amount at 12.5% to arrive at an asserted loss of $3,138,192.00.

The Commission finds no valid basis for allowing this portion of the claim under Title V of the Act. Clearly this portion of the claim is based upon projected future earnings of the hotel, and the record shows that there were no such earnings after 1957. Moreover, the asserted contract was terminated prior to the intervention of IHC of Cuba. The Commission finds that any loss which claimant may have sustained in this respect is not one of the types covered by Title V of the Act. (See *Claim of Robert L. Cheaney and Marjorie L. Cheaney*, Claim No. CU-0915; *Claim of Ford Motor Company*, Claim No. CU-3072.) Accordingly, this portion of the claim is denied.

### DEBT

The balance sheet for IHC of Cuba as of April 30, 1960 shows that it owed claimant a debt of $39,410.01. Extracts from claimant's records, however, disclose that as a result of subsequent adjustments, the amount due claimant from IHC of Cuba was $35,239.00. The Commission, therefore, finds that claimant also sustained a loss of a debt due from an intervened Cuban entity in the amount of $35,239.00. (See *Claim of Kramer, Marx, Greenlee and Backus*, Claim No. CU-0105, 25 FCSC Semiann. Rep. [July-Dec. 1966].)

## CONTINGENT CLAIM

Claimant has also asserted a contingent or "protective" claim in the amount of $2,000,000.00 plus accrued interest. The record shows that IHC of Cuba borrowed $2,000,000.00 on December 20, 1957 from Banco de Fomento Agricola a Industrial de Cuba, an instrumentality of the Government of Cuba. The loan was secured by a mortgage on the hotel premises, and was evidenced by 200 mortgage bonds, each in the amount of $10,000.00, payable annually over a period of 15 years. It further appears that claimant made an agreement with the mortgagee bank on December 20, 1957, pursuant to which claimant agreed to purchase the mortgage bonds in the event of a default under the mortgage indenture. Subsequently, IHC of Cuba entered into agreements by which the time for paying the initial two installments was extended to December 20, 1973 and December 20, 1974, respectively.

It is undisputed that claimant has, as yet, sustained no loss in this respect. Clearly, its contingent claim is intended to guard against any loss in the future should a claim be made against claimant and prove to be successful. The Commission notes that Title V of the Act provides for certain claims against Cuba which "have arisen since January 1, 1959". The statute does not provide for the determination of contingent losses or losses which were not sustained by claimant. (See *Claim of Ford Motor Company*, Claim No. CU–3072.) Moreover, it would appear that any claim by the mortgagee bank or Cuba pursuant to the contract with claimant would not be successful in view of the fact that any default under the mortgage indenture would necessarily be attributable to action by Cuba, and additionally because the security for the loan was taken by Cuba. For the foregoing reasons, the contingent or "protective" claim is denied.

Accordingly, claimant sustained the following losses within the meaning of Title V of the Act:

| ITEM OF PROPERTY | DATE OF LOSS | AMOUNT |
|---|---|---|
| Stock interest in IHC of Cuba | June 10, 1960 | $2,579,466.21 |
| Debt due from IHC of Cuba | June 10, 1960 | 35,239.00 |
| | Total | $2,614,705.21 |

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

## CERTIFICATION OF LOSS

The Commission certifies that INTERCONTINENTAL HOTELS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Million Six Hundred Fourteen Thousand Seven Hundred Five Dollars and Twenty-One Cents ($2,614,705.21) with interest thereon at 6% per annum from June 10, 1960 to the date of settlement.

Dated at Washington, D.C., March 4, 1970.

## AMENDED FINAL DECISION

Under date of April 13, 1970, the Commission entered its Final Decision on this claim without objections from claimant, certifying a loss in favor of claimant in the amount of $2,614,705.21 plus interest. That certification represented the loss of a 47.167% stock interest in a Cuban corporation, Intercontinental Hotels Corporation of Cuba, S.A. (IHC of Cuba) in the amount of $2,579,466.21 and a debt due from IHC of Cuba in the amount of $35,239.00.

In the *Claim of American Securities Corporation*, Claim No. CU–3335, objections were filed with respect to the Commission's valuation of that claimant's 1/3 stock interest in IHC of Cuba. Upon consideration of those objections in the light of the entire record, the Commission found that the total value of all of the outstanding capital stock of IHC of Cuba on June 10, 1960, the date of loss, was $9,758,219.30, and the value of that claimant's stock interest was increased accordingly.

The Commission, therefore, has reopened this claim on its own motion, and now finds that the value of this claimant's 47.167% stock interest in IHC of Cuba on June 10, 1960 was $4,602,659.30.

Accordingly, the Certification of Loss in the Final Decision of April 13, 1970 is set aside and the following Certification of Loss will be entered, and the Final Decision is affirmed in all other respects.

### CERTIFICATION OF LOSS

The Commission certifies that INTERCONTINENTAL HOTELS CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Million Six Hundred Thirty-Seven Thousand Eight Hundred Ninety-Eight Dollars and Thirty Cents ($4,637,898.30) with interest thereon at 6% per annum from June 10, 1960 to the date of settlement.

Dated at Washington, D.C., April 14, 1971.

## IN THE MATTER OF THE CLAIM OF COLGATE-PALMOLIVE COMPANY

### Claim No. CU–0730—Decision No. CU–4547

*Where warranted, the going concern value of a Cuban enterprise may be determined by applying a multiple of 15 to the enterprise's average annual net earnings.*

### FINAL DECISION

Under date of March 4, 1970, the Commission issued its Proposed Decision certifying a loss in favor of claimant in the amount of $5,427,581.84 plus interest. The certification of loss represented losses sustained by claimant in connection with its interest in

| | |
|---|---|
| Crusellas y Cia., S.A. (Crusellas) | $3,529,603.62 |
| Detergentes Cubanos, S.A. (Detergentes) | 1,781,572.82 |
| Debt owed by Detergentes | 116,405.40 |
| **Total** | **$5,427,581.84** |

Claimant's objections were based on two grounds; namely: (1) that the evidence established that claimant owned 35,858 shares of stock in Crusellas and 94,636 shares of stock in Detergentes; and (2) that the Commission erred in evaluating said stock interests by capitalizing the average annual net earnings of the two Cuban corporations for the years 1957 through 1959 at 10%, and should have given more weight to an opinion from Dillon, Reed & Company that the aggregate value of both corporations was $40,000,000.00.

At the oral hearing held on January 12, 1971, testimony was presented by Mr. James Henry Carpenter, an officer of claimant, by Mr. Mortimer Collins who had prepared the opinion for Dillon, Reed & Company; and by Mr. Norman M. Mintz, an economist; and counsel argued on behalf of claimant.

Mr. Carpenter testified that claimant had commenced a vigorous sales campaign in Cuba in 1953, promoting its detergents which were sold to the Cuban public through the two Cuban corporations. He had remained in Cuba until 1957, at which time the results of these efforts were being evidenced by increased earnings of the two corporations.

Mr. Collins testified that his study of the operations of a number of American concerns as compared with claimant's operations led him to the conclusion that the aggregate value of the two corporations should be determined by applying a multiple within the range between 18 and 43 to the average net earnings of the two corporations for the year 1959.

Mr. Mintz testified that he had made an independent study of a number of American concerns, including claimant, which led him to conclude that the two Cuban corporations were showing a high growth potential as shown by progressively increasing earnings, thereby justifying a valuation of 20 times the net earnings for 1959. His testimony was supported by his written opinion introduced in evidence at the oral hearing.

Counsel for claimant urged an increase in the multiple used by the Commission in its Proposed Decision and a resultant increase in the Certification of Loss based on the established extent of claimant's stock interests in the two Cuban corporations.

Upon consideration of the oral testimony and the evidence and arguments presented at the hearing in the light of the entire record, the Commission now finds that claimant owned 35,858 shares of stock in Crusellas and 94,636 shares of stock in Detergentes on October 13, 1960, when both corporations were nationalized by the Government of Cuba.

The evidence shows that the two corporations each had a good growth potential on the date of loss judging from the steady rise in net earnings in the years immediately prior to 1960. Accordingly, it is concluded that the application of a higher multiple than was employed in the Proposed Decision is warranted.

It would appear from the evidence presented that the growth potential of the two corporations would normally level off at or about the rate prevailing in 1959. The Commission therefore finds that the net earnings of the two corporations for 1959 represent, in effect, their average annual net earnings.

Considering the entire record, the Commission finds that the valuations most appropriate in this case and equitable to the claimant are the results obtained from applying a multiple of 15 to the net earnings of the two corporations for 1959 to arrive at the going concern values of the corporations.

Since the record shows that the net earnings of Crusellas and Detergentes in 1959 were $1,105,002.36 and $257,871.36, respectively, the Commission finds that their going concern values were $16,575,035.40 and $3,868,070.40.

Considering the fact that the excess of cash plus current accounts receivable over current accounts payable of the two corporations were $4,475,773.77 for Crusellas and $270,625.73 for Detergentes, the Commission finds that the overall values of the two corporations were $21,050,809.17 and $4,138,-696.13, respectively.

Inasmuch as Crusellas and Detergentes had 63,023 and 162,228 shares of outstanding capital stock, respectively, on the date of loss, the Commission finds that the values of each share of such stock were $334.0179 and $25.-5116, respectively. Therefore, the values of claimant's stock interests were $11,977,213.86 and $2,414,315.78, respectively.

The finding in the Proposed Decision as to the debt of $116,405.40 owed claimant by Detergentes is affirmed.

Accordingly, the Certification of Loss in the Proposed Decision is set aside and the following Certification of Loss will be entered, and the Proposed Decision is affirmed in all other respects.

### CERTIFICATION OF LOSS

The Commission certifies that COLGATE-PALMOLIVE COMPANY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Fourteen Million Five Hundred Seven Thousand Nine Hundred Thirty-Five Dollars and Four Cents ($14,507,935.04) with interest at 6% per annum from October 13, 1960 to the date of settlement.

Dated at Washington, D.C., February 3, 1971.

### PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $29,293,-109.78, was presented by the COLGATE PALMOLIVE COMPANY, based upon the asserted loss of its stockholder interest in the Cuban companies Crusellas y Cia., S.A., and Detergentes Cubanos, S.A. because of the nationalization of these companies by the Goveriment of Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or takn by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation of entity.

The record shows that claimant was organized under the laws of the State of Delaware. Further, the record discloses that at all pertinent times more than 50% of claimant's outstanding capital stock was owned by nationals of the United States. An authorized officer of claimant stated that on January 24, 1966 there were outstanding 15,218,588 shares of claimant's stock, 1.4% of which were registered in the names of stockholders who are presumed to be nonnationals of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The evidence establishes and the Commission finds that claimant herein owned a 100% interest in Norwood International, Inc., which in turn owned 16,355 shares of Crusellas y Cia., S.A. stock, and 114,139 shares of Detergentes Cubanos, S.A. stock, both latter corporations organized under the laws of Cuba. The evidence of record further shows and the Commission finds that Crusellas y Cia., S.A., and Detergentes Cubanos, S.A., were nationalized by the Government of Cuba on October 13, 1960, by virtue of Law No. 890, published in the Cuban Official Gazette on that date. Since the Cuban firms were organized under the laws of Cuba, they do not qualify as corporate "nationals of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke Davis & Company*, Claim No. CU-0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The claimant has submitted balance sheets, profit and loss statements for the years 1955-1959, and other information pertaining to the value of the two Cuban corporations in question. In addition, the Commission has taken into consideration the August 31, 1960, balance sheets of the two Cuban corporations submitted by Frank J. Carbon, Executive Vice President of Crusellas y Cia., S.A. at the time of its nationalization, in connection with his claim (Claim No. CU-0172) which, in part, is based upon stockholder interests in the two Cuban corporations now in question. These two balance sheets are included in the record by reference.

CRUSELLAS Y CIA., S.A.

The balance sheet of August 31, 1960, for Crusellas y Cia., S.A., reflects the following in Cuban pesos, which were on a par with the United States dollar:

*Assets*

**Current Assets**

| | |
|---|---:|
| Cash | $ 2,343,183.29 |
| Accounts Receivable (less Reserve $549,141.00) | 2,561,482.79 |
| Inventories | 3,277,426.11 |
| Total Current Assets | 8,182,092.19 |
| Prepaid Expenses | 148,584.08 |
| Miscellaneous Investments (less Reserve ......$37,597.00) | 2,003.00 |

Property, Plant & Equipment

| | | |
|---|---:|---:|
| Gross | $4,387,541.00 | |
| Less Reserve | 2,444,552.00 | 1,942,989.00 |

| | |
|---|---:|
| Goodwill | 1,260,000.00 |
| Inter-Company Accounts—Net | 396,010.73 |
| Total Assets | $11,931,679.00 |

*Liabilities & Capital*

**Current Liabilities**

| | | |
|---|---:|---:|
| Accounts Payable | $ 428,892.31 | |
| Misc. Accruals & Reserves | 966,033.78 | |
| Total Current Liabilities | | $ 1,394,926.09 |
| Deferred Liabilities & Reserves | | 145,388.84 |
| | | 1,540,314.93 |

**Capital Stock & Surplus**

| | | |
|---|---:|---:|
| Capital Stock (63,023 shares at $100.00) | $6,302,300.00 | |
| Surplus | 3,931,727.90 | 10,234,027.90 |

| | |
|---|---:|
| Inter-Company Account<br>Detergentes Cubanos, S.A. | 157,336.17 |
| Total Liabilities & Capital | $11,931,679.00 |

Additional evidence, submitted by claimant, shows and the Commission finds that the asset "Goodwill" was purchased by Crusellas y Cia., S.A., in the amount stated in the balance sheet above.

The claimant argues that Crusellas y Cia., S.A. had a going concern value in the amount of 40 times the company's earnings in 1959 after Cuban taxes, or $41,560,000.00.

In support of its argument, claimant submitted an opinion dated October 7, 1968, by Dillon, Reed & Co., Inc., in which Crusellas y Cia., S.A. is valued at $40,000,000.00 on the basis of its asserted going concern value.

The record shows that Crusellas y Cia., S.A. had annual earnings after

Cuban taxes in the amounts of 737,500.00, 895,100.00 and 1,105,002.36 pesos for the years ending December 31, 1957, through December 31, 1959, amounting to an annual average of 912,534.12 pesos. Thus the company's profits had been increasing progressively, indicating that the value of the business in Cuba had risen. However, the Commission does not share the view that a prudent buyer would have paid $40,000,000.00 for Crusellas y Cia., S.A. in 1960, when the previous years' profits indicated a return of $1,105,002.36 only. In the Commission's opinion the going concern value of Crusellas y Cia., S.A. in 1960 may be arrived at by capitalizing the average net earnings after Cuban taxes at 10%, instead of 2.25% as suggested by claimant. Inasmuch as the average annual earnings of Crusellas y Cia., S.A. was 912,534.12 pesos, its going concern value would be 10 times that amount, or 9,125,341.20 pesos.

It is noted that Crusellas y Cia., S.A., owned cash and accounts receivable in the amounts of $2,343,183.29 and $2,561,482.79, respectively. Cash and accounts receivable are corporate assets which increase the shareholder's equity but are not the type of assets which create the going concern value or, for such a reason, would be sold to and paid for by a purchaser of the enterprise. Accordingly, the assets of cash and accounts receivable, diminished by the accounts payable, should be added to the going concern value in order to arrive at the amount of loss which the stockholders of Crusellas y Cia., S.A. sustained by the nationalization of the corporation by the Government of Cuba.

The balance sheet of August 31, 1960, includes in its assets an item entitled "Inter-Company Accounts—Net" in the amount of 396,010.73 pesos. A comparison with previous balance sheets shows and the Commission finds that the 396,010.73 pesos in question were due from the parent COLGATE-PALMOLIVE COMPANY, the claimant herein. Inasmuch as it is obvious that no amount due from the claimant corporation was taken by the Government of Cuba in connection with the nationalization of Crusellas y Cia., S.A., this sum should be disregarded in arriving at the amount of loss.

Accordingly, the loss may be calculated as follows:

| | | |
|---|---:|---:|
| Going concern value ............................... | | 9,125,341.20 pesos |
| Cash ............................................................ | 2,343,183.29 | pesos |
| Accounts receivable ............................... | 2,561,482.79 | |
| | 4,904,666.08 | |
| Less: Accounts Payable ........................ | 428,892.31 | 4,475,773.77 |
| | | 13,601,114.97 pesos |

Inasmuch as Crusellas y Cia., S.A. had 63,023 shares of its stock outstanding on the date of its nationalization, a date when the Cuban peso was on par with the United States dollar, the Commission finds that the amount of loss sustained with respect to the ownership of one share of Crusellas y Cia., S.A. stock amounted to $215.8119. Accordingly, the Commission holds that claimant's 16,355 shares of Crusellas y Cia., S.A., had a value of $3,529,603.62 at the time of loss.

In view of the foregoing, the Commission concludes that claimant sustained a loss within the purview of Title V of the Act in connection with its shares of stock in Crusellas y Cia., S.A., in the amount of $3,529,603.62.

## DETERGENTES CUBANOS, S.A.

The balance sheet of August 31, 1960, reflects the following in Cuban pesos, which were on a par with the United States dollar:

### Assets

**Current Assets**

| | | |
|---|---:|---:|
| Cash | | $ 270,469.78 |
| Accounts Receivable | | 19,014.09 |
| Inventories | | 378,403.49 |
|     Total Current Assets | | $ 667,887.36 |
| Prepaid Expenses | | 99,945.00 |
| Miscellaneous Investments | $ 5,400.00 | |
|     Less Reserve | 5,399.00 | 1.00 |
| Property, Plant & Equipment | | |
|     Gross | $2,094,893.40 | |
|     Less Reserve | 1,295,876.56 | 799,016.84 |
| Inter-Company Account | | |
|     Crusellas y Cia., S.A. | | 157,336.17 |
|     Total Assets | | $1,724,186.37 |

### Liabilities & Capital

**Current Liabilities**

| | | |
|---|---:|---:|
| Accounts Payable | $ 176,194.31 | |
| Miscellaneous Accruals & Reserves | 145,409.93 | |
|     Total Current Liabilities | | $ 321,604.24 |
| Deferred Liabilities & Reserves | | 28,588.27 |
| | | 350,192.51 |
| **Capital Stock & Surplus** | | |
| Capital Stock (162,228 shares at $5.00) | 811,140.00 | |
| Surplus | 446,448.46 | 1,257,588.46 |
| | | 116,405.40 |
| Inter-Company Accounts | | $1,724,186.37 |
|     Total Liabilities & Capital | | $1,724,186.37 |

The record shows that Detergentes Cubanos, S.A., had annual earnings after Cuban taxes in the amounts of 193,785.27, 226,813.95 and 257,871.36 pesos for the years ending December 31, 1957, through December 31, 1959, amounting to an annual average of 226,156.86 pesos. The steadily increasing profits show that it was a growth operation.

The Commission has considered the contents of the document entitled "Cuban Plant Evaluation" prepared by the claimant's Central Engineering Department on March 7, 1963. In this appraisal the values of the real property, plant, and equipment, owned by the two corporations in question and taken by the Government of Cuba, is calculated on the basis of the estimated cost of replacement as reduced by depreciation. The properties of the two companies have not been separated in this appraisal. The prop-

erty, plant, and equipment of the two corporations is estimated at $11,-717,493.00, about 80.7% more than the original cost of $6,482,434.40, as shown by the balance sheets above. Even the depreciated value of $8,382,-170.00 is about 29.3% more than the original cost. The Commission is not convinced that use of the appraisal values is appropriate and finds that the value of the property taken by the Government of Cuba may be more correctly and equitably computed by the method stated above than by relying upon the valuation indicated in the document entitled "Cuban Plant Evaluation".

Accordingly, the Commission finds that Detergentes Cubanos, S.A., had a going concern value amounting to 10 times its annual average earnings of 226,156,156.86 pesos or 2,261,568.60. Adding to that amount the cash and accounts receivable, and diminishing it by the accounts payable, the amount of loss sustained by the stockholders of Detergentes Cubanos, S.A., may be calculated as follows:

| | | |
|---|---:|---:|
| Going concern value .................................................. | | 2,261,568.60 pesos |
| Cash .............................................................. | 270,469.78 | |
|    Accounts receivable ........................... | 19,014.09 | |
| Inter-Company account | | |
|    Crusellas y Cia., S.A. .......................... | 157,336.17 | |
| | 446,820.04 | |
| Less: Accounts payable ........................... | 176,194.31 | 270,625.73 |
| | | 2,532,194.33 pesos |

Inasmuch as Detergentes Cubanos, S.A., had 162,228 shares of stock outstanding on the date of its nationalization, a date when the Cuban peso was on par with the United States dollar, the Commission finds that the amount of loss sustained with respect to the ownership of one share of Detergentes Cubanos, S.A., stock amounted to $15.6088.

Accordingly, the value of claimant's 114,139 shares of Detergentes Cubanos, S.A. stock amounted to $1,781,572.82.

It is noted by the Commission that one of the liabilities, identified as "Inter-Company Accounts" in the sum of 116,405.40 pesos was an amount due to the parent COLGATE-PALMOLIVE COMPANY, the claimant herein. Since Section 502(3) defines "property", among other things, as "debts owed by the Government of Cuba or enterprises which have been nationalized, . . . by the Government of Cuba", the Commission finds that claimant is entitled to a certification of loss on such account in the sum of $116,405.40.

### SUMMARY

| | |
|---|---:|
| 16,355 Shares of Crusellas y Cia., S.A. stock at $215.8119 per share ........................ | $3,529,603.62 |
| 114,139 shares of Detergentes Cubanos, S.A. stock at $15.6088 per share ........................ | 1,781,572.82 |
| Debt owed by Detergentes Cubanos, S.A. ..................... | 116,405.40 |
| | $5,427,581.84 |

The Commission concludes that the aggregate amount of claimant's losses,

sustained within the purview of Title V of the Act, amounted to $5,427,581.84.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that COLGATE-PALMOLIVE COMPANY sustained a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Five Million Four Hundred Twenty-seven Thousand Five Hundred Eighty-one Dollars and Eighty-four Cents ($5,427,581.84) with interest thereon at 6% per annum from October 13, 1960, to the date of settlement.

Dated at Washington, D.C., March 4, 1970.

## IN THE MATTER OF THE CLAIM OF UNION LIGHT AND POWER COMPANY OF CUBA

### Claim No. CU–0330—Decision No. CU–0286

*Items, such as intangibles, franchises, and licenses, may not be allowed as assets unless the evidence establishes the nature thereof and the fact that these items had values on the date of loss.*

### AMENDED PROPOSED DECISION *

Under date of September 20, 1967, the Commission issued a Proposed Decision denying this claim on the ground that claimant had failed to sustain the burden of proof. Subsequently, claimant submitted a substantial amount of supporting evidence.

Upon consideration of the entire record, it is

ORDERED that the Proposed Decision be amended to read as follows:

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented by UNION LIGHT AND POWER COMPANY OF CUBA, in the amount of $1,500,000.00, based upon the asserted loss of certain personal property in Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

---

\* This decision was entered as the Commission's Final Decision on March 19, 1969.

FOREIGN CLAIMS SETTLEMENT COMMISSION          317

Section 502(3) of the Act provides:

The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of the State of Delaware. It appears that claimant had borrowed large sums of money in 1929 and had used all of its outstanding stock as collateral. Upon default and foreclosure, the creditor, also a Delaware corporation, acquired title to said stock. In turn, this creditor corporation had pledged the stock of claimant as collateral for its own promissory notes to a certain group of noteholders, referred to as the Committee. In 1933, this Committee acquired title to all of claimant's stock upon default with respect to the said notes, and entries were made in the stock transfer records of claimant to show such ownership by the Committee. The former noteholders who were members of the Committee thus acquired stock interests in claimant in direct proportion to the percentages their creditor interests bore to the total indebtedness of claimant, the principal amount of which was $1,355,000.00 in 1933.

The largest single member of the Committee, the Continental Illinois National Bank and Trust Company of Chicago, owning in excess of 70% of claimant's stock, has certified, through one of its officers, that it was organized under the laws of the United States and that over 75% of its outstanding capital stock was owned by nationals of the United States. Other evidence of record establishes that all of the members of the Committee have been nationals of the United States at all pertinent times. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The evidence of record indicates that claimant operated an electric utility company, not organized as a legal entity, which furnished electric power in Oriente Province, Cuba. In connection with these operations, claimant owned electric generating plants, power transmission lines, meters, materials and supplies, and other necessary equipment, as well as bank accounts, and accounts receivable from Cuban customers and the Government of Cuba who used claimant's electricity.

On October 24, 1960, the Government of Cuba published in its Official Gazette Resolution 3 pursuant to Law 851, which listed as nationalized the UNION LIGHT AND POWER COMPANY OF CUBA. The Commission finds that all of claimant's properties in Cuba were nationalized on October 24, 1960, as a result of which claimant sustained a loss within the meaning of Title V of the Act.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights,

or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". The Commission has concluded that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider; i.e., fair market value, book value, going concern value, or cost of replacement.

Claimant asserts that its assets in Cuba had an aggregate value of $1,500,000.00, and submits the following in support of its assertion:

1. Certain written reports in 1954 and 1956 to the effect that offers had been made to purchase claimant's assets in Cuba for approximately $500,000.00;

2. A written report in January 1960 that claimant's representative in Cuba had offered to sell claimant's assets for approximately $1,000,000.00;

3. An affidavit, dated March 4, 1968, from claimant's former general manager of its business in Cuba, stating that in September 1960, when the nationalization of claimant was being proposed by Cuba, a Cuban Government official offered to compensate claimant for its properties in Cuba in the amount of $1,010,000.00 in the form of 4% per cent bonds.

The record, however, contains no written offer of a definite amount from any prospective purchaser, and it appears that in 1954 the Committee passed a resolution authorizing the sale of the assets for $500,000.00 "or better".

Included in the record are interim statements of income and balance sheet figures for each of the months from July 1959 through February 1960; audited balance sheets for the periods ending June 30, 1957, June 30, 1958, and June 30, 1959, as well as related profit and loss statements. A balance sheet as of February 29, 1960, prepared from these interim figures discloses the value of claimant's assets as follows, which has been certified by an officer of claimant as fairly representing claimant's financial condition at that time:

| | | |
|---|---:|---:|
| Cash | $ 41,431.97 | |
| Less amount maintained in a bank in the United States | 300.43 | |
| Net cash in Cuba | | $ 41,131.54 |
| Accounts receivable (from Cuban nationals) | | 75,504.90 |
| Materials and supplies | | 20,965.73 |
| Debts owed by Cuban Government and Municipalities for electricity supplied | | 78,603.25 |
| Deferred Charges | | 25,321.74 |
| Other assets | | 69,126.19 |
| Investments | | 1.00 |
| Properties, plants and equipment | $1,050,081.55 | |
| Less reserve for depreciation | 529,609.59 | |
| Net properties, plants and equipment | | 520,471.96 |
| Total Assets | | $831,126.31 |

In an affidavit, dated January 16, 1969, an officer of claimant has stated that the amount claimed includes all "intangibles," and that the assets shown in the interim balance sheet of February 29, 1960 did not include any amounts for "franchises and licenses." The record, however, contains nothing that would either indicate the nature of these intangibles, franchises and licenses, or establish their value on the date of loss. Moreover, no such items are included in the audited balance sheets of June 30, 1957, June 30, 1958, or June 30, 1959.

Said three balance sheets were accompanied by explanatory statements, one of which was repeated on each occasion. The auditors stated that they were unable to express an opinion concerning the values appearing in the three balance sheets for the properties, plants and equipment inasmuch as no depreciation had been taken for the transmission lines and certain fully-depreciated items were included. Claimant's explanation with respect to the transmission lines was that depreciation for such property was not allowed as a deductible expense for Cuban income tax purposes, which fact was corroborated by the auditors. It does not appear that the financial picture of claimant as of February 29, 1960 is distorted by the inclusion of fully-depreciated items because such depreciation apparently was part of the reserve for depreciation, which reduced these assets by more than 50% as of February 29, 1960.

Having fully considered all the evidence of record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is that reflected in the interim balance sheet as of February 29, 1960. Although that financial statement was not audited, it appears upon comparison with the three audited balance sheets, and particularly the latest one as of June 30, 1959, that the values set forth in the balance sheet as of February 29, 1960 fairly represent the financial condition of claimant, as stated by an officer of claimant. With respect to claimant's transmission lines located in Cuba, the Commission finds no valid basis for reducing the value thereof on account of depreciation because the laws of Cuba prohibited depreciation of such property for income tax purposes. Inasmuch as the Commission's statutory duty is to determine, *inter alia*, the value of property in Cuba on the date of loss, the Commission holds that any reduction for depreciation of claimant's transmission lines under the circumstances would not be appropriate to the property or equitable to the claimant. Accordingly, no reduction in the value of said property on account of depreciation is made.

There being no evidence to establish the nature of the intangibles, franchises and licenses, or to establish their value on the date of loss, that portion of the claim is denied.

The Commission finds that the aggregate value of claimant's assets in Cuba on October 24, 1960, the date of loss, was $831,126.31. It appears from the balance sheet of February 29, 1960 that claimant was indebted to Cuba for taxes in the amount of $10,155.82. The Commission has held that in a claim against Cuba under Title V of the Act, an amount due the Republic of Cuba for taxes should be applied in reducing the amount of loss sustained, on the theory of set-off. (See *Claim of Simmons Company*, Claim No. CU–2303.)

Accordingly, the Commission finds that the net loss sustained by claimant within the meaning of Title V of the Act was the amount of $820,970.49.

The Commission has decided that in certification of losses on claims

pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that UNION LIGHT AND POWER COMPANY OF CUBA suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Eight Hundred Twenty Thousand Nine Hundred Seventy Dollars and Forty-nine Cents ($820,970.49), with interest thereon at 6% per annum from October 24, 1960 to the date of settlement.

Dated at Washington, D.C., February 19, 1969.

## IN THE MATTER OF THE CLAIM OF PAN-AMERICAN LIFE INSURANCE COMPANY

### Claim No. CU–3651—Decision No. CU–4212

*On the basis of competent evidence, the value of an insurance company's issued policies may be determined by finding its gross equity therein and reducing it by appropriate discount rates.*

### FINAL DECISION

Under date of November 26, 1969, the Commission issued its Proposed Decision on this claim, certifying a loss in the amount of $7,821,638.51 plus interest in favor of claimant, and denying portions of the claim based on bonds of the Cuban Telephone Company, on debts due from claimant's insureds secured by the cash surrender of their policies, and on good will or going concern value. Subsequently, claimant objected, submitted new evidence and requested an oral hearing which was held on June 9, 1971.

At the hearing an actuary, A. Anthony Autin, Jr., testified on behalf of claimant, and counsel presented oral argument.

Upon consideration of the new evidence, including the testimony and arguments offered at the oral hearing, in light of the entire record, the Commission finds as follows:

1. *Bank Accounts*

The Commission finds that on October 24, 1960, the date of loss, claimant owned bank accounts in Cuba having an aggregate value of $406,551.98, rather than $107,248.80 as set out in the Proposed Decision.

2. *Cuban Telephone Company Bonds*

The Commission finds that claimant owned bonds of the Cuban Telephone Company in the fact amount of $500,000.00.

The Commission has held that a claim based upon debts of the Cuban Telephone Company is within the purview of Title V of the Act because, although the Cuban Telephone Company was a national of the United States at all pertinent times, it is now defunct. In the *Claim of International Telephone and Telegraph Company,* (Claim No. CU–2615), the Commission found that the assets of the Cuban Telephone Company had been taken by the Government of Cuba on August 6, 1960. Accordingly, the Commission finds that on August 6, 1960, claimant sustained a loss in the amount of $500,000.00.

3. *Taxes Owed to Cuba*

The Commission finds that on October 24, 1960, the date of loss, claimant was indebted to Cuba in the amount of $6,059.55, which must be deducted in determining claimant's losses under Title V of the Act, rather than $16,850.34, as set out in the Proposed Decision.

4. *Goodwill or Going Concern Value*

The record shows that over the years claimant had built up a viable organization in Cuba through which claimant conducted its insurance business in that country. Claimant had expended time, effort and funds in creating an organization which was producing profits on the date of loss and which would continue to do so in the future.

The Commission therefore finds that on the date of loss claimant owned two assets that were not shown on its books and records. One such asset is claimant's equity in the insurance contracts ·it had issued; the other such asset is not goodwill or going concern value, but rather, is the value of its business organization in Cuba, its "going business" value.

*Equity in Insurance Contracts*

Claimant has submitted a detailed memorandum and supporting schedules prepared following a thorough analysis of its Cuban operations. Employing projections beginning January 1, 1960, the analysis projects profits for the years 1960 through 1975 based on claimant's issued insurance contracts. The resulting amounts each year are then discounted at the rate of 4% per annum to arrive at the values on October 24, 1960, the date of loss, which aggregate $1,498,847.00. These are in effect, reserves.

Upon consideration of the entire record, the Commission finds that claimant's projections are fair and reasonable, except as to the year 1960, for which the Commission cannot agree as to the asserted discount rate. Inasmuch as the date of loss was October 24, 1960, the Commission finds no valid basis for including 1960 in this computation. With respect to the discount rate, the Commission has held in other claims against Cuba in which projected amounts for future years were concerned that a 12% per annum discount rate is appropriate. (See *Claims of Moa Bay Mining Company, et al.,* Claim Nos. CU–2619 and CU–2573.) The Commission finds that a discount rate of 12% per annum should be applied in this case. The Commission therefore finds that claimant's equity in the insurance contracts had the following aggregate value on October 24, 1960:

| Year | Gross Equity | Net Equity |
|------|------|------|
| 1961 | $ 211,075.00 | $188,459.79 |
| 1962 | 189,697.00 | 151,225.31 |
| 1963 | 170,971.00 | 121,693.74 |
| 1964 | 153,874.00 | 97,789.70 |
| 1965 | 138,486.00 | 78,580.70 |
| 1966 | 124,638.00 | 63,145.47 |
| 1967 | 112,174.00 | 50,741.80 |
| 1968 | 100,956.00 | 40,774.41 |
| 1969 | 90,861.00 | 32,765.39 |
| 1970 | 81,775.00 | 26,329.34 |
| 1971 | 73,597.00 | 21,157.37 |
| 1972 | 66,238.00 | 17,001.64 |
| 1973 | 59,614.00 | 13,661.98 |
| 1974 | 53,652.00 | 10,978.27 |
| 1975 | 48,287.00 | 8,821.84 |
|  | $1,675,895.00 | $923,126.75 |

Accordingly, the Commission finds that the aggregate value of claimant's contracts on October 24, 1960 was $923,126.75.

*Going Business Value*

Considering the fact that claimant had 30 trained agents in Cuba operating through a well-developed business organization, the Commission finds that claimant's valuation of its "going business" value is fair and reasonable, particularly since the record shows that its investment in each of the agents was $10,875.00. The Commission therefore finds that claimant's organization in Cuba had a "going business" value of $187,941.00 on October 24, 1960.

Claimant's losses are summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| 4½% Bonds, 1937-1977 | October 24, 1960 | 14,200.34 |
| 4% Bonds, 1953-1983 | October 24, 1960 | $1,457,000.00 |
| 4% Bonds, 1950-1980 | October 24, 1960 | 182,280.00 |
| 2½% U.S. Treasury Bonds | October 24, 1960 | 7,135.00 |
| Cuban Telephone Company Bonds | August 6, 1960 | 500,000.00 |
| Cuban Electric Company Mortgage Bonds | August 6, 1960 | 508,472.22 |
| Financiera Nacional de Cuba | August 17, 1960 | 62,500.00 |
| Mortgages | October 14, 1960 | 5,471,399.16 |
| Bank Accounts | October 24, 1960 | 406,551.98 |
| Agents' Balances | October 24, 1960 | 10,251.98 |
| Receivables | October 24, 1960 | 9,279.79 |
| Furniture and Fixtures | October 24, 1960 | 8,571.60 |
| Petty Cash | October 24, 1960 | 150.00 |
| Equity in Insurance Contracts | October 24, 1960 | 923,126.75 |
| "Going Business" | October 24, 1960 | 187,941.00 |
| | Total | $9,748,859.82 |

The Commission reaffirms its conclusion that the taxes claimant owed to Cuba in the amount of $6,059.55 should be deducted from the losses that occurred on October 24, 1960. Therefore, claimant's losses on October 24, 1960 amounted to $3,200,428.89 ($3,206,488.44 minus $6,059.55).

Claimant is also entitled to interest at the rate of 6% per annum from the respective dates of loss to the date of settlement, as follows:

| FROM | |
|---|---|
| August 6, 1960 | $1,008,472.22 |
| August 17, 1960 | 62,500.00 |
| October 14, 1960 | 5,471,399.16 |
| October 24, 1960 | 3,200,428.89 |
| Total | $9,742,800.27 |

Accordingly, the Certification of Loss in the Proposed Decision is set aside, the following Certification of Loss will be entered, and the remainder of the Proposed Decision as amended herein, is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that PAN-AMERICAN LIFE INSURANCE COMPANY suffered a loss, as a result of actions of the Government of

Cuba within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Nine Million Seven Hundred Forty-Two Thousand Eight Hundred Dollars and Twenty-Seven Cents ($9,742,800.27) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., July 6, 1971.

## IN THE MATTER OF THE CLAIM OF WARREN AND ARTHUR SMADBECK, INC., ET AL.

Claim No. CU–2465—Decision No. CU–967

*Values of stock interests in nationalized Cuban corporations must be established as of the dates of loss. Evidence indicating values thereof several years prior to such dates of loss is insufficient to justify a Certification of Loss.*

### AMENDED PROPOSED DECISION*

Under date of January 17, 1968, the Commission issued a Proposed Decision denying this claim for lack of proof. The claim had been filed originally by WARREN AND ARTHUR SMADBECK, INC. Subsequently, the original claimant submitted evidence in support of this claim, which establishes, *inter alia*, that its wholly-owned Florida subsidiary, ST. AUGUSTINE SOUTH, INC., owned an interest in the property in question.

Upon consideration of the new evidence in light of the entire record, it is ORDERED that ST. AUGUSTINE SOUTH, INC., hereafter referred to as ST. AUGUSTINE, be added as party claimant; and be it further ORDERED that the Proposed Decision be and it is herein amended.

The record shows that WARREN AND ARTHUR SMADBECK, INC., hereafter referred to as SMADBECK, was organized under the laws of New York, and that at all pertinent times more than 50% of SMADBECK'S outstanding capital stock was owned by nationals of the United States. An authorized officers of SMADBECK has certified under date of July 10, 1969 that 100% of SMADBECK'S outstanding capital stock was owned by nationals of the United States. The record further shows that ST. AUGUSTINE was organized under the laws of Florida, and that at all pertinent times 100% of its outstanding capital stock was owned by SMADBECK. The Commission holds that SMADBECK and ST. AUGUSTINE are nationals of the United States within the meaning of Section 502(1)(B) of the Act, which defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

### PRESIDENTE CORPORATION

SMADBECK asserts that it owned a 100% stock interest in Presidente Corporation, a Cuban corporation hereafter referred to as Presidente. In

---

* This decision was entered as the Commission's Final Decision on April 14, 1971 after consideration of claimant's objections.

support thereof, SMADBECK has submitted copies of stock certificates and other evidence establishing that it owned 220 shares of preferred stock and 2,000 shares of common stock in Presidente. It is asserted that SMAD-BECK also owned 60 more shares of preferred stock in Presidente, but that the certificates for these additional 60 shares are not available. According to SMADBECK, Presidente's total outstanding capital stock consisted of 280 shares of preferred stock and 2,000 shares of common stock.

The record includes copies of a comparative balance sheet for Presidente as of March 31, 1957 and March 31, 1958 and supporting schedules (Exhibit MMM). SMADBECK states that no other financial statements or other evidence concerning the value of Presidente is available, all such records having been maintained in Cuba. With respect to President's outstanding capital stock, the comparative balance sheet shows only 2,000 shares of common stock. There is nothing in the record to indicate why the preferred stock does not appear in that balance sheet.

The Commission finds it unnecessary to determine whether SMADBECK owned a 100% stock interest in Presidente since other factors are dispositive of this portion of the claim.

On October 24, 1960, Cuba published in its Official Gazette Resolution 3 pursuant to Law 851, which listed as nationalized the Presidente Corporation. Since Presidente was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

As indicated above, the only available evidence concerning the value of Presidente is its comparative balance sheet as of March 31, 1957 and March 31, 1958. That balance sheet shows that the net worth of Presidente, or the excess of its assets over its liabilities, as of March 31, 1957 was $36,015.25 and as of March 31, 1958 was $14,369.33, the Cuban peso being on a par with the United States dollar. If further appears from the supporting schedules accompanying the balance sheet that Presidente had a deficit as of April 1, 1956 in the amount of $62,082.41; that it earned a profit of $10,097.66 for the year ending March 31, 1957, leaving a net deficit of $51,984.75; and that it had a loss for the year ending March 31, 1958 in the amount of $21,645.92, resulting in a deficit of $73,630.67 as of March 31, 1958. Inasmuch as its capital is shown as $88,000.00 in the comparative balance sheet, the net worth of Presidente as of March 31, 1958 was $14,369.33.

SMADBECK asserts a claim in the amount of $14,000.00 for its stock interest in Presidente. It has submitted a copy of an extract from its records (Exhibit SSS) which indicates that SMADBECK's investment in preferred stock of Presidente was $11,000.00 as of December 31, 1959. SMADBECK has stated that its investment in Presidente was $14,000.00, including $3,000.00 "allotted to the common stock" of Presidente held by stockholders of SMADBECK and later assigned to SMADBECK.

The Regulations of the Commission provide:

> The claimant shall be the moving party and shall have the burden of proof on all issues involved in the determination of his claim. (FCSC Reg., 45 C.F.R. §531.6(d) (Supp. 1967).)

The Commission finds that while the amount of SMADBECK's investment in Presidente has some probative value, it is insufficient to establish the value of Presidente on October 24, 1960, the date of loss. The Commission finds that the comparative balance sheet for Presidente, indicating its value as of March 31, 1958, over 2½ years prior to the date of loss, in likewise an insufficient basis for determining the value of a stock interest in Presidente on the date of loss.

Accordingly, it is concluded that SMADBECK has failed to meet the burden of proof with respect to the portion of its claim for a stock interest in Presidente. This portion of its claim is, therefore, denied.

### GULFVIEW HOTEL, S.A.

SMADBECK asserts that it owned a 100% stock interest in Gulfview Hotel, S.A., a Cuban corporation also known as Hotel Vista del Golfo, S.A., hereafter referred to as Gulfview. It has submitted copies of stock certificates and other evidence establishing ownership of 490 shares out of a total of 670 shares of outstanding capital stock of Gulfview. SMADBECK states that it is unable to locate the other 180 shares of stock.

Here again, the Commission finds it unnecessary to determine the extent of SMADBECK's stock interest in Gulfview.

On the basis of the evidence of record, which indicates that Gulfview was affiliated with Presidente, the Commission finds that Gulfview was nationalized by the Government of Cuba on October 24, 1960.

SMADBECK claims $19,333.34 as the value of its stock interest in Gulfview on the basis of its investment in acquiring assignments of the shares of stock on December 31, 1959. The only evidence which SMADBECK has submitted in support of its asserted value of said stock interest is a copy of a balance sheet for Gulfview as of December 31, 1957 (Exhibit 000). That balance sheet shows that the net worth of Gulfview as of December 31, 1957 was $33,747.91. It further appears that as of January 1, 1957, Gulfview had a deficit of $1,829.10 and earned a profit of $2,077.01 for 1957, resulting in a surplus of $247.91 as of December 31, 1957.

For the reasons stated with respect to the stock interest in Presidents, *mutatis mutandis*, the portion of SMADBECK's claim for a stock interest in Gulfview is denied.

### NORTH SHORE REAL ESTATE CORPORATION

SMADBECK asserts that it owned a 100% stock interest in North Shore Real Estate Corporation, a Cuban corporation hereafter referred as to North Shore. It has submitted copies of stock certificates and other evidence establishing ownership of 30 shares out of an asserted total of 40 shares

of outstanding capital stock of North Shore. SMADBECK states that it is unable to locate the stock certificates for the other 10 shares.

For the reasons stated with respect to Presidente and Gulfview, no determination is being made as to the extent of SMADBECK's stock interest in North Shore.

The Commission finds that North Shore, which was also associated with Presidente, was nationalized by the Government of Cuba on October 24, 1960.

SMADBECK claims $42,400.00 as the value of its stock interest in North Shore based upon its investment in acquiring assignments of the Shares of stock on December 31, 1959.

Inasmuch as the record contained neither a balance sheet for North Shore nor any other evidence upon which to determine the value of a stock interest in North Shore on the date of loss, the Commission suggested the submission of evidence in this respect. SMADBECK's response was that no evidence was available to establish the nature or value of North Shore's assets and liabilities. It submitted a copy of an extract from its books and records (Exhibit SSS), showing that its investment in North Shore as of December 31, 1959 was $42,400.00. SMADBECK further stated that all records were left in Cuba, and that individuals with personal knowledge of the facts are now deceased or unavailable.

For the reasons stated with respect to Presidente and Gulfview, the portion of SMADBECK's claim for a stock interest in North Shore is denied.

### DEBT DUE FROM PRESIDENTE

The Commission has held that debts of nationalized Cuban corporations are within the purview of Title V of the Act. (See *Claim of Kramer, Marx, Greenlee and Backus,* Claim No. CU-0105, 25 FCSC Semiann. Rep. 62 [July-Dec. 1966].)

SMADBECK asserts that it was owed a debt from Presidente in the amount of $13,760.00. The record includes a cancelled check in the amount of $3,000.00, drawn December 9, 1959, by ST. AUGUSTINE in favor of Presidente, and a bank statement establishing that ST. AUGUSTINE's bank account with a Cuban bank had been reduced by $3,000.00 (Exhibit SS).

It is stated by SMADBECK that ST. AUGUSTINE was its agent for this purpose; that the balance of the amount claimed, $10,760.00, was represented by funds in Cuba belonging to ST. AUGUSTINE; and that documents corroborating these statements were left in Cuba. Subsequently, SMADBECK submitted a copy of an abstract from its books and records (Exhibit SSS). That extract shows that as of December 31, 1959 Presidente was indebted to SMADBECK in the amount of $8,000.00.

On the basis of the entire record and in the absence of evidence to the contrary, the Commission finds that on October 24, 1960, the date of loss, Presidente was indebted to ST. AUGUSTINE in the amount of $3,000.00, and to SMADBECK in the amount of $8,000.00. The Commission concludes that claimants sustained losses in those amounts within the meaning of Title V of the Act.

### DEBT DUE FROM GULFVIEW

SMADBECK claims that Gulfview owed it $30,300.00. It states that the debt had been $13,000.00; had been reduced to $12,300.00, and that a

further loan of $18,000.00 to Gulfview had been made by its agent, ST. AUGUSTINE, on February 18, 1960. The record includes a cancelled check for $18,000.00, dated February 18, 1960, drawn by ST. AUGUSTINE in favor of Gulfview, and a bank statement establishing that ST. AUGUSTINE's bank account with a Cuban bank had been reduced by $18,000.00 (Exhibit TT). A copy of an extract from SMADBECK's books and records (Exhibit SSS) shows that as of December 31, 1959 Gulfview owed SMADBECK $12,300.00.

Based upon the entire record and in the absence of evidence to the contrary, the Commission finds that on October 24, 1960, the date of loss, Gulfview was indebted to ST. AUGUSTINE in the amount of $18,000.00, and to SMADBECK in the amount of $12,300.00. It is concluded that claimants sustained losses in those amounts.

### Debt Due From North Shore

SMADBECK claims that North Shore owed it $15,500.00. The record includes a copy of a note in Spanish and a translation thereof (Exhibits VV and WW), showing a debt due SMADBECK by North Shore in the amount of $15,500.00; several letters corroborating this debt (Exhibits YY, ZZ, AAA and BBB); and a copy of an extract from SMADBECK's books and records (Exhibit SSS) as further proof of the debt due from North Shore.

On the basis of the foregoing evidence, the Commission finds that on October 24, 1960, the date of loss, North Shore was indebted to SMADBECK in the amount of $15,500.00. It is concluded that SMADBECK sustained a loss in that amount.

### Real Property

SMADBECK claims the loss of real property consisting of an apartment house in Havana, Cuba, which it values at $31,000.00 and certain other improved and unimproved property in Varadero Beach and Havana, Cuba, which it values at $70,600.00.

The record includes an undated original memorandum prepared in Havana (Exhibit JJJ) and a letter, dated January 11, 1968 to a stockholder of SMADBECK indicating that an officer of SMADBECK had loaned $31,000.00 to North Shore, apparently in April 1960, to enable North Shore to purchase certain real property in Cuba. It further appears that the $31,000.00, which was used to make that loan, belonged to ST. AUGUSTINE.

On the basis of the entire record, the Commission finds that on October 24, 1960, the date of loss, North Shore was indebted to ST. AUGUSTINE in the amount of $31,000.00. It is concluded that ST. AUGUSTINE sustained a loss in that amount.

With respect to the other claimed real property, SMADBECK states that it has been advised that it owned the following items of real property which cost $70,600.00:

1. A swimming pool lot and house adjacent to the Presidente Hotel Hotel in Havana;
2. An apartment house on Presidente Avenue diagonally across the street from the Presidente Hotel;
3. A lot adjacent to the Havana Yacht Club;

4. A square block in Varadero Beach; and
5. A parcel of land with 1,200 feet of frontage on the road which separates it from the Hotel International in Varadero Beach.

However, there is no evidence in the record to corroborate ownership of the above real properties. SMADBECK states that all records concerning said properties were maintained in Cuba and are unavailable. Counsel's statement of January 22, 1970 indicates that the claimed real properties were held by Cuban subsidiaries, and that a former Cuban Ambassador to the United States, presently in Cuba, could attest to the acquisition thereof if he were available. It is noted that the extract from SMADBECK's books and records (Exhibit SSS), which shows its investments in Cuba as of December 31, 1959, fails to refer to said properties either as belonging to SMADBECK or in the form of a debt due from any Cuban corporation.

Upon consideration of the entire record, the Commission finds that SMADBECK has failed to sustain the burden of proof which respect to the portion of the claim for the asserted loss of $70,600.00 based upon the above-described real properties. Accordingly, this portion of SMAD-BECK's claim is denied.

## CASH

SMADBECK asserts the loss of cash in the aggregate amended amount of $46,007.26, representing a bank account with the Trust Company of Cuba in the amount of $22,650.61, and other funds in Cuba in the amount of $23,356.65.

The record includes a bank book and a translation thereof (Exhibits CCC and DDD), establishing that ST. AUGUSTINE had a savings account with the Trust Company of Cuba with a balance in its favor of $15,148.32 as of December 9, 1959. It appears that the original deposit was $15,000.00, and that interest in the aggregate amount of $148.32 was added. SMADBECK has added interest at the rate of 5% compounded annually for the period December 1959 through March 31, 1968 to arrive at its claimed amount, $22,650.61. In counsel's statement of July 17, 1959, it is admitted that the claimed interest has been projected, and that there is no available evidence to establish that such interest had been added to the account.

On the basis of the evidence of record, the Commission finds that all bank accounts belonging to either claimant, as found hereafter, were taken by the Government of Cuba on October 24, 1960.

The Commission finds that the savings account at the Trust Company of Cuba belonged to ST. AUGUSTINE. The Commission further finds that ST. AUGUSTINE's savings account earned no interest after October 24, 1960, the date of loss, since the account then belonged to Cuba. Moreover, on the basis of the evidence presented, the Commission finds no basis for concluding that the value of the savings account was increased by interest between December 9, 1959, the date of the last bank book entry, and the date of loss. A translation of the bank rules applicable to this account (Exhibit DDD) indicates that the bank reserved the right to pay or not pay any interest on this account. Accordingly, the Commission finds that the value of ST. AUGUSTINE's savings account on October 24, 1960 was $15,148.32.

With respect to the claim for other funds in the amount of $23,356.65, SMADBECK states that one of its agents in Cuba had collected $13,009.32 in monies belonging to ST. AUGUSTINE and had not deposited the funds in any bank. In addition, claim is made for two checking accounts at the

Trust Company of Cuba in amounts of $5,530.89 and $4,816.44, respectively.

The evidence establishes and the Commission finds that ST. AUGUS-TINE owned a bank account with the Trust Company of Cuba, having a value of $5,530.89 as of August 31, 1960 (Exhibit EEE), and that SMADBECK owned a bank account with that bank, having a value of $4,816.44 (Exhibit FFF). The Commission finds that claimants sustained losses in those amounts on October 24, 1960.

The record shows (Exhibit QQQ) that ST. AUGUSTINE's agent did collect monies in the amount of $13,009.32, which ST. AUGUSTINE recorded on its records as an account receivable. It appears that the agent was unable to transfer the funds to ST. AUGUSTINE in the United States due to restrictions imposed by the Government of Cuba.

The Government of Cuba, on September 29, 1959, published its Law 568, concerning foreign exchange. Thereafter the Cuban Government effectively precluded not only transfers of funds to creditors abroad, but also payment to creditors within Cuba, by numerous, unreasonable and costly demands upon the consignees, who were thus deterred from complying with the demands of the Cuban Government. The Commission holds that Cuban Law 568 and the Cuban Government's implementation thereof, with respect to the rights of ST. AUGUSTINE, was not in reality a legitimate exercise of sovereign authority to regulate foreign exchange, but constituted an intervention by the Government of Cuba in the contractual rights of this claimant, which resulted in the taking of American-owned property within the meaning of Section 503(a) of the Act. (See *Claim of The Schwarzenbach Huber Company*, Claim No. CU-0019, 25 FCSC Semiann. Rep. 58 [July-Dec. 1966], and *Claim of Etna Pozzolana Corporation*, Claim No. CU-0049, 1967 FCSC Ann. Rep. 46.)

Accordingly, the Commission finds that ST. AUGUSTINE sustained a loss in the amount of $13,009.32 as a result of intervention by the Government of Cuba. In the absence of evidence to the contrary, the Commission finds that the loss occurred on November 30, 1961, 30 days after the last collections were made by ST. AUGUSTINE's agent as shown by correspondence from the agent (Exhibit QQQ).

RECAPITULATION

Claimants' losses within the meaning of Title V of the Act are summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| | *SMADBECK* | |
| Debt due from Presidente | October 24, 1960 | $ 8,000.00 |
| Debt due from Gulfview | October 24, 1960 | 12,300.00 |
| Debt due from North Shore | October 24, 1960 | 15,500.00 |
| Checking account | October 24, 1960 | 4,816.44 |
| | Total | $40,616.44 |

### ST. AUGUSTINE

| | | |
|---|---|---|
| Debt due from Presidente | October 24, 1960 | $ 3,000.00 |
| Debt due from Gulfview | October 24, 1960 | 18,000.00 |
| Debt due from North Shore | October 24, 1960 | 31,000.00 |
| Savings account | October 24, 1960 | 15,148.32 |
| Checking account | October 24, 1960 | 5,530.89 |
| Debt due from Cuban agent | November 30, 1961 | 13,009.32 |
| | Total | $85,688.53 |

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation, Claim* No. CU–0644), and in this case it is so ordered as follows:

*FROM* *ON*

### SMADBECK

October 24, 1960 ................................................................ $40,616.44

### ST. AUGUSTINE

| | |
|---|---|
| October 24, 1960 ................................................................ | $72,679.21 |
| November 30, 1961 ........................................................ | 13,009.32 |
| Total ................................... | $85,688.53 |

#### CERTIFICATION OF LOSS

The Commission certifies that WARREN AND ARTHUR SMADBECK, INC. suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended in the amount of Forty Thousand Six Hundred Sixteen Dollars and Forty-four Cents ($40,616.44) with interest at 6% per annum from October 24, 1960 to the date of settlement; and

The Commission certifies that ST. AUGUSTINE SOUTH, INC. suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Eighty-five Thousand Six Hundred Eighty-eight Dollars and Fifty-three Cents (85,688.53) with interest at 6% per annum on $72,679.21 from October 24, 1960, and on $13,009.32 from November 30, 1961, to the date of settlement.

Dated at Washington, D.C., April 22, 1970.

### IN THE MATTER OF THE CLAIM OF THE COCA-COLA COMPANY

Claim No. CU–1743—Decision No. CU–6818

*The value of an enterprise manufacturing a unique product which produced substantial profits may be determined by augmenting the value of its physical assets by an amount resulting from capitalizing its average annual net earnings.*

FOREIGN CLAIMS SETTLEMENT COMMISSION    331

### FINAL DECISION

The Commission issued its Proposed Decision in this matter on September 22, 1971 certifying a loss to the claimant in the total amount of $17,597,295.16, as follows:

| On October 24, 1960 | Land | $ 2,265,881.00 |
|---|---|---|
| | Buildings | 5,351,681.00 |
| | Machinery & Equipment | 2,148,774.24 |
| | Automotive Vehicles | 302,313.82 |
| | Coolers & Dispensers | 186,557.20 |
| | Containers | 2,005,000.00 |
| | Furniture & Fixtures | 131,696.37 |
| | Inventories | 428,753.55 |
| | Accounts Receivable | 731,083.58 |
| | Bank Accounts & Cash | 981,912.84 |
| | Added Value | 3,500,000.00 |
| | | $18,033,653.60 |
| | Less Taxes | 485,911.96 |
| | Total | $17,547,741.64 |
| On January 30, 1961 | Thomas Assignment | 30,815.05 |
| On February 13, 1961 | Berenguer Assignment | 18,738.47 |
| | Total Loss | $17,597,295.16 |

Claimant objected to several of the findings of the Commission and submitted further supporting evidence with respect thereto. Upon consideration of the entire record, the Commission now makes the following findings.

### AUTOMOTIVE VEHICLES

In arriving at the value of this equipment, the Commission had considered the contention that the vehicles listed with values aggregating $592,700.93 comprised approximately one-half the value of the equipment lost. However, the Commission relied on purchases for years 1956, 1957, 1958 and 1959, as shown by financial statements submitted, depreciated these at the customary rate of 15% a year and added the 1960 purchases. Claimant contends, however, that this method is not suitable for the type of vehicles under consideration, for evaluating the loss as of 1960.

As claimant points out, by 1960 the Cuban Government had imposed restrictions prohibiting the importation of vehicles, and as a result its then subsidiary Cia. Embotelladora Coca Cola, S.A., could not purchase, at any price, the needed vehicles, other than several route trucks acquired locally. Moreover, trucks such as those built for the purpose of transporting cases of Coca Cola are seen to have a useful life of many more years than ordinary vehicles.

The Commission now finds that in fact claimant possessed in Cuba more vehicles than those specifically listed in its available records, and further that the value of these on the date of loss was $1,197,809, as contended by the claimant's officers and as supported by the record.

### CONTAINERS

Claimant had originally asserted claim for 2,000,000 containers (one wooden case and 24 bottles) at a value of $4.01 each for a total of $8,020,000. In its Proposed Decision the Commission found that claimant had in Cuba 500,000 containers and valued these at $2,005,000.

Claimant refers to statements of Mr. David E. Berenguer, former general manager at Camaguey and Havana, who concludes that the figure found is erroneous and adheres to his original estimate of 2,000,000 containers; and to the statement of Mr. Miguel B. Macias, an expert on bottling requirements, now manager of the engineering department of The Coca-Cola Export Corporation, and former manager of the engineering department of Embotelladora in 1960, who after careful analysis has concluded that the minimum requirements for Cuba in 1960 were 1,806,000 containers. Claimant points out that the cost of $4.01 for containers represents $3.41 as a current operating expense, and $0.60 as a capital expense. Using the balance sheet (for September 30, 1960) figure of $478,015.11 for containers, the claimant finds this may represent 796,691 containers.

Claimant points out, however, that considering the containers owned by Embotelladora on the date of loss were scattered in the hands of wholesalers, retailers, customers and in trucks, bottling plants, warehouses, and so forth, over an area of 44,218 square miles, Embotelladora could not ascertain exactly how many containers it owned. Accordingly, claimant now contends that it would be appropriate to use the average of the above three figures, finding 1,534,230 containers, of a value of $4.01 each.

The Commission finds this method fair and reasonable and finds that claimant suffered a loss of $6,152,262 with respect to the containers.

### BANK ACCOUNTS AND CASH

In this connection the Commission found that a total of $981,912.84 had been lost to the claimant in bank accounts and cash. This did not include a Royal Bank account entitled "West Indies Region" in the amount of $6,529.82, as the record did not establish that this was taken by the Government of Cuba. However, claimant has now established that the latter sum was in fact on deposit in Cuba in the Royal Bank of Canada, and was taken by the Government of Cuba. Accordingly, the Commission now finds that claimant's total loss in this connection was $988,442.66.

### GOING BUSINESS VALUE

The claimant originally asserted a loss in the amount of $17,807,042 for the value of its business over and above the value of its tangible assets. This has been discussed in the Proposed Decision. The Commission found the going concern value, on the basis of demonstrated earnings to investment to be minimal, and concluded that claimant suffered a loss in the amount of $3,500,000 over and above the value of its physical assets.

Claimant contends that the figure is wholly inequitable, pointing to the uniqueness of the drink "Coca-Cola" which is based on a secret formula, with a trademark registered worldwide. Claimant also points out that advertising expenses for the years 1956 through 1960 (projected) averaged $3,906,319 —exceeding the value added by the Commission for its going business.

Further, it appears that sales of Coca-Cola in Cuba, from the outset of operations, were highly profitable. The sales for 1956 through 1960 (pro-

FOREIGN CLAIMS SETTLEMENT COMMISSION      333

jected) amounted to an annual average of $7,336,889 and represented an annual increase of almost 20 per cent.

Claimant has also submitted figures for June 15, 1972, reflecting that stock market prices versus 1971 earnings showed price earnings for other soft-drink industries (Dr. Pepper, Coca-Cola, 7-Up, Royal Crown Cola, and Pepsi Cola) as averaging 42.6; and asserts that if this average were multiplied by Embotelladora profits for 1959, the last full year of normal operation, of $1,026,394, the market value would amount to $43,724,384.

The Commission is not persuaded that the above methods appropriately evaluate the going business above the physical assets. However, upon re-examination of the entire record in this respect and considering the net profits for 1958 (the last year before the Castro take-over) of $607,405; for 1959 (the last year of full operation) of $1,026,394; and for 1960 (annualized) of $840,994.66, which average $824,931.22, holds that multiplying this figure by 10 to $8,249,312.20 is an appropriate reflection of the value of the business over and above the physical assets. This is slightly more than one-third the value of the tangible asset figure (as revised) and the Commission holds that this is fair and reasonable.

### UNPAID TAXES

In its Proposed Decision, the Commission held that taxes due the Cuban Government must be deducted from the certifiable amount, under the principle of set-off, and found this amount to be $485,911.96. However, the claimant has since submitted evidence establishing that of this amount $130,344.68 was set up on the books of the Cuban branch as "Income Tax Accruals Due the United States" and the balance of $355,567.29 represented taxes due the Cuban Government. Accordingly, the Commission now holds that only the amount of $355,567.29 should be deducted from the amount certifiable to the claimant.

### SUMMARY

The claimant's losses are restated as follows:

| On October 24, 1960 | | |
|---|---|---|
| | Land | $2,265,881.00 |
| | Buildings | 5,351,681.00 |
| | Machinery & Equipment | 2,148,774.24 |
| | Automotive Vehicles | 1,197,809.00 |
| | Coolers & Dispensers | 186,557.20 |
| | Containers | 6,152,262.00 |
| | Furniture & Fixtures | 131,696.37 |
| | Inventories | 428,753.55 |
| | Accounts Receivable | 731,083.58 |
| | Bank Accounts & Cash | 988,442.66 |
| | Going Business Value | 8,249,312.20 |
| | | $27,832,252.80 |
| | Less Cuban Taxes | 355,567.29 |
| | Total | $27,476,685.51 |
| On January 30, 1961 | Thomas Assignment | 30,815.05 |
| On February 13, 1961 | Berenguer Assignment | 18,738.47 |
| | Total Loss | $27,526,239.03 |

The Commission affirms its holding that interest shall be included in the Certification of Loss from the dates of loss to the date of settlement, as follows:

| FROM | ON |
|---|---|
| October 24, 1960 | $27,476,685.51 |
| January 30, 1961 | 30,815.05 |
| February 13, 1961 | 18,738.47 |
| | $27,526,239.03 |

Accordingly, the Certification of Loss in the Proposed Decision is set aside, the following Certification of Loss will be entered, and the Proposed Decision is affirmed in all other respects.

### CERTIFICATION OF LOSS

The Commission certifies that THE COCA-COLA COMPANY suffered a loss, and succeeded to losses as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Twenty-Seven Million Five Hundred Twenty-Six Thousand Two Hundred Thirty-Nine Dollars and Three Cents ($27,526,239.03) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

### PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $41,037,460.00, was presented by THE COCA-COLA COMPANY based upon asserted losses of its assets in Cuba, going concern value, and assignments of claims of certain employees.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine inaccordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means ny property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of Delaware and that at all pertinent times more than 50% of its outstanding capital stock was owned by nationals of the United States. An officer of claimant has stated that as of September 14, 1960 .2647% of claimant's outstanding capital stock was held by non-residents of the United States; and on April 18, 1967 .327% of its stock was held by non-residents of the United States. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The Commission finds on the basis of the evidence of record that claimant had owned a 100% stock interest in Cia. Embotelladora Coca Cola, S.A., a Delaware corporation, doing business in Cuba, hereafter referred to as Embotelladora. On August 19, 1960 a plan of liquidation of Embotelladora was adopted which transferred all properties of Embotelladora to the parent, which assumed all liabilities of the subsidiary. Embotelladora was dissolved August 22, 1960.

The record includes a report of Embotelladora to the United States Embassy as of June 29, 1960; schedules describing real property; a document transferring realty from Embotelladora to claimant; reports from sources abroad, photographs and drawings; schedules of personality; affidavits of officers and professional employees of claimant and the former subsidiary. On the basis of the entire record, the Commission finds that on October 24, 1960, claimant owned in Cuba certain real and personal property further described below.

On October 24, 1960 the Cuban Government published its Resolution 3 (pursuant to Law 851) listing Embotelladora as nationalized. Accordingly, the Commission finds that the properties of the claimant in Cuba were effectively nationalized or otherwise taken by the Government of Cuba on that date.

The record reflects that on June 29, 1960, Embotelladora reported the value of its assets to the American Embassy as follows:

| | |
|---|---:|
| Land | $   515,915.29 |
| Buildings | 2,030,240.44 |
| Machinery & Equipment | 1,763,642.79 |
| Motor Vehicles | 598,906.61 |
| Coolers | 186,054.48 |
| Building under Construction in Holguin | 37,460.00 |
| Containers | 459,305.92 |
| Furniture & Fixtures | 214,937.04 |
| | $5,806,462.57 |
| Inventories (including cooling equipment) | 1,000,000.00 |
| Bank accounts | 350,000.00 |
| | $7,156,462.57 |

The above values were stated to be as of May 31, 1960. Subsequent to the expropriation of October 24, 1960, Mr. Robert J. Thompson, former Vice President of Embotelladora, addressed a letter of protest to the President of the Republic, which letter set forth the values in Cuban pesos (which are on a par with the United States dollar) of certain items which, as Mr. Thompson states in his affidavit of October 10, 1968, are as remembered by him. The letter, a copy of which is of record, states, in pertinent part, that as of that day the assets which the Company had throughout the Republic were as follows:

|  | *Pesos* |
|---|---:|
| Bank deposits | $ 992,847.93 |
| Accounts receivable | 731,083.58 |
| Sugar | 34,640.69 |
| Ingredients | 79,112.63 |
| Syrup, concentrate and bottled product | 26,302.64 |
| Coolers | 91,335.33 |
| Miscellaneous (including all kinds of spare parts) | 288,697.59 |
| Prepaid expenses | 19,757.64 |
| Miscellaneous accounts receivable | 87,897.78 |
| Land | 515,915.29 |
| Buildings | 2,088,082.42 |
| Machinery & equipment | 2,635,752.42 |
| Coolers on loan | 186,557.20 |
| Containers | 478,015.11 |
|  | $8,255,998.25 |

The claim as filed by claimant's letter of April 18, 1967 was for $38,860,-972.86. By letter of November 20, 1968, claimant reduced its claim for realty by $100,000 for 10,000 square meters of land in Holguin as to which title had not been perfected, and increased the claim by $2,239,027.14 stating it had been ascertained by study and analysis of books and records that the property was worth more in October, 1960, than originally claimed.

By letter of December 24, 1968 claimant increased its claim by $37,460.00 for expenses in connection with a proposed purchase of land in Holguin.

Claimant now describes its losses in a statement of November 11, 1968 as follows:

| | | |
|---|---|---:|
| 1. | Real Property | $ 2,265,881.00 |
| 2. | Buildings and other improvements | 5,351,681.00 |
| 3. | Machinery & Equipment | 2,230,000.00 |
| 4. | Automotive Vehicles | 1,197,809.00 |
| 5. | Coolers and Dispensing Equipment | 1,197,000.00 |
| 6. | Containers | 8,020,000.00 |
| 7. | Furniture & Fixtures | 326,604.00 |
| 8. | Inventories | 720,098.00 |
| 9. | Accounts Receivable | 827,280.00 |
| 10. | Bank accounts and cash on hand | 988,442.00 |
| 11. | Assignment of Claims of three employees | 68,163.00 |
| 12. | Extraordinary Expense (Holguin) | 37,460.00 |
| 13. | Value of Business as a Going Concern, Good Will, Trademarks, Formulas, etc. | 17,807,042.00 |
| | | $41,037,460.00 |

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The items of claim, evidence submitted in support, and the Commission's findings in respect thereto, are set out below.

### 1. *Real Estate*

| | |
|---|---:|
| 1. Land at Alejandro Ramirez 66, City of Havana, 3,755 square meters | $  342,870.00 |
| 2. Land at Santa Catalina 930, City of Havana, 19,615 square meters | 1,078,825.00 |
| 3. Land at 6–8 Paseo de Marti, City of Santiago de Cuba, Oriente, 1,275 square meters | 146,940.00 |
| 4. Land at Carretera al Acueducto, Avenida Marta, City of Santa Clara, 6,705 square meters | 146,300.00 |
| 5. Land at Carretera Central, City of Artemisa, Pinar del Rio, 12,000 square meters | 330,000.00 |
| 6. Land at Carretera Central Este y Ave. B, City of Camaguey, 10,043 square meters | 220,946.00 |
| | $2,265,881.00 |

The land in *1* above is in three parts. Two parts were acquired by claimant in 1920 for $82,000.00 including improvements and were transferred to Embotelladora in 1943; the third part was acquired by Embotelladora in 1950 at a price of $24,500.00 including improvements.

Item *2* above was acquired on June 12, 1956 at a purchase price of $374,262.00, Cuban currency, from the estate known as Calzada de Palatino.

Item *3* above was acquired by claimant in 1921 for $48,000.00 and transferred to Embotelladora in 1943.

Item *4* above was acquired by Embotelladora in 1947 for $20,955.37, and was part of a larger property named "Progreso", formerly known as "Esperanza."

Item *5* above was acquired by Embotelladora in 1948 for $9,505.16 and was originally part of a former coffee plantation "Esperanza."

Item *6* above was acquired by Embotelladora in 1955, having been originally part of a property know as "Santa Mariana de Jayama" and later "La Perla de Jayama." It appears to have been acquired for the sum of $29,017.43.

Claimant has submitted a 1960 affidavit by officers of the now dissolved Cia. Embotelladora Coca Cola, S.A., concerning the transfer of the land to claimant and describing it in detail. Additionally claimant has submitted an

affidavit executed on September 3, 1968 by Amadeo Lopez Castro, an engineer and surveyor who taught for over 30 years at the University of Havana the art and science of real estate appraisal and evaluation. He was also a former Cabinet Minister having held, *inter alia*, the positions of President of the National Industrial Commission, and Minister of Agriculture. The affidavit discusses each item of real property and the affiant ascribes the aforesaid fair market values to them, on the basis of his experience.

The Commission is aware of the appreciation in value of land, such as described, subsequent to these purchase dates and on the basis of the record and other information available as to values of property in Cuba, finds that the aforesaid real properties had the asserted values, aggregating $2,265,881.00, at the time of loss.

### 2. *Buildings and Other Improvements*

| | | |
|---|---|---:|
| 1. | Office and warehouse building at Alejandro Ramirez 66, Havana, and resident building adjacent, known as San Francisco 39 | $  314,312.00 |
| 2. | Bottling plant and general office building at Santa Catalina 930, Havana | 2,327,030.00 |
| 3. | Bottling plant and office building at 6–8 Paseo de Marti, Santiago de Cuba | 157,211.00 |
| 4. | Bottling plant building at Carretera Acueducto, Avenida Marta, Santa Clara | 1,241,234.00 |
| 5. | Bottling plant building at Carretera Central, Artemisa.... | 638,129.00 |
| 6. | Bottling plant building at Carretera Central Este y Ave. B, Camaguey | 673,765.00 |
| | | $5,351,681.00 |

In support of the asserted evaluations of the improvements claimant has submitted affidavits of Miguel B. Macias, a mechanical engineer and former Manager of the Engineering Department of Embotelladora, and of claimant in Havana, whose duties included construction, erection, maintenance and supervision of buildings, plants, warehouses, bottling machinery, and auxiliary and automotive equipment of all kinds. These affidavits, in detail, were based on his knowledge, old drawings and photographs, and are supported by copies of construction plans and photographs. These affidavits are supported by those of Mr. Lopez Castro, David E. Berenguer, former Manager of claimant's Camaguey and Havana plants, and Robert J. Thompson, chief financial officer of Embotelladora, who concur in the opinions of Mr. Macias.

The buildings are generally described as follows:

*Item 1(a)—Alejandro Ramirez 66, Havana*

A 2-story building on two lots, the ground floor used as a bottling room with auxiliary facilities such as washrooms, carpentry shops, machine shop and superintendent's office; the second floor having been devoted originally in one-half part to general office space and one-half was used for a soft drink syrup manufacturing plant and sugar warehouse.

Item 1(b) a one-story steel warehouse fronting on Calle San Francisco, built in 1953 and used as a soft drink bottling plant.

Mr. Macias points out that an old drawing of 1922 shows a plant building

and auxiliary buildings, but that at the time of seizure two buildings covered the entire property. He further states that after construction in 1958 of the plant at Santa Catalina 930 (Item 2), machinery and equipment were removed from the Alejandro Ramirez building and it was thereafter used for warehousing. Mr. Macias further states as of January 14, 1970 that their improvements were appraised at a fair market value in October 1960 of $314,312.

*Item 2—Santa Catalina 930, Havana*

An office building, a syrup manufacturing and bottling facility and garages, constructed in 1957 consisting of (1) a 2-story concrete office building, with a basement for industrial purposes and an underground storage tank of 1,050 cubic meters; (2) a concrete structure with ventilated roof having ground floor used as a bottling facility and related activities, a mezzanine used for a syrup manufacturing plant and similar activities, and a basement used as a garage machine shop; (3) a one-story concrete structure used as a paint shop; (4) two buildings of shed-type construction used for parking trucks under cover; (5) fencing around entire tract of cyclone-type heavy wire mesh.

*Item 3—6–8 Paseo de Marti, Santiago de Cuba*

A two-story reinforced concrete building, of irregular shape apparently built about 1947: Ground floor utilized for bottling room, superintendent's office, refrigeration compressor area, spare parts department, $CO_2$ gas area, stockroom; first floor utilized for concentrate manufacture, sugar storage, advertising material storage, general storage and conference room; mezzanine floor where offices were situated.

Two shed-type annex buildings of reinforced concrete used for truck loading, boiler room, machine shop and carpentry shop.

*Item 4—Santa Clara plant*

Two joined buildings constructed in 1948 as a facility for manufacturing soft drink syrups and beverages: One concrete building of three floors housing bottling facilities, offices, storage areas, manufacturing area, transformer room; one-story steel structure housing warehousing facilities, compressor room, boiler room, checker's office, loading area.

*Item 5—Artemisa Plant*

Two separate steel Quonset type buildings erected in 1953 for manufacturing soft drink syrups and beverages and housing offices, manufacturing process, storage, and loading facilities.

*Item 6—Camaguey Plant*

Two buildings erected in 1955 for use as a soft drink bottling plant: Each a one-story, tile covered, steel structure, housing offices, manufacturing process, storage, and loading areas.

Further in support of the asserted values for buildings and related improvements claimant has submitted Affidavit No. 2 of Sr. Amadeo Lopez Castro, whose qualifications are set out above. In this affidavit, affiant states that he has examined the Macias affidavits and exhibits (being sketches or drawings) and gives his opinion that the buildings and related improvements (air conditioning, electrical installations and the like) had the fair

market values on the date of loss, as asserted by claimant; and further, that except for the improvements at Alejandro Ramirez 66, which was an older type of construction, the building and bottling plants, located on highly desirable first class industrial property, were of new and modern type construction of excellent quality. Moreover, the photographs submitted reflect the type of modern construction used.

The computations by which claimant reached the exact and uneven figures asserted for each plant are not of record. Although requested by the Commission, they have not been adduced. Mr. Macias, in his affidavit of January 14, 1970 reaffirms the appraisals of Mr. Amadeo Lopez Castro, as to the other improvements. Moreover, Mr. Lopez Castro, in his affidavit of January 15, 1970, has reaffirmed his conclusion on the values of the improvements. The Commission finds that the entire record substantiates the asserted values and finds that the improvements had the values asserted, in an aggregate amount of $5,351,681, on the date of loss.

### 3. *Machinery and Equipment*

Claimant has asserted a value of $2,230,000.00 for machinery and equipment at all the locations of its operations in Cuba.

The item in support of this valuation is an affidavit by Rafael C. Laredo, a chemical engineer, engaged in engineering, selling and servicing heavy equipment of all kinds used in connection with the preparing and packaging of carbonated soft drinks; and employed as a Sales Engineer. However, from 1953 to 1960 he was Vice President and General Manager of Liquid Carbonic Corporation of Cuba. During this time his employer supplied much of the equipment used by Embotelladora. His responsibilities included thorough familiarity with equipment used by claimant, regardless of origin.

In his appraisal of the equipment, Mr. Laredo explains that the equipment necessary to properly prepare and bottle a carbonated beverage is known as a "bottling line." He gives his opinion as to the fair market value in October, 1960 of the equipment or bottling lines as follows:

| | | |
|---|---|---|
| 1. | Havana | $1,200,000.00 |
| 2. | Santiago | 240,000.00 |
| 3. | Santa Clara | 325,000.00 |
| 4. | Artemisa | 225,000.00 |
| 5. | Camaguey | 240,000.00 |
| | | $2,230,000.00 |

Also submitted with respect to the value of claimant's machinery and equipment in Cuba is an affidavit of Miguel B. Macias, former Manager of claimant's Engineering Department in Havana, previously mentioned.

Mr. Macias has appended to his affidavit approximately 69 pages listing about 1,107 categories of items, with their accessories, each reciting the value he ascribes as the fair market value in October, 1960. These lists were compiled from records of Embotelladora, transferred to claimant and necessarily incomplete. These values are summarized as follows:

| | | |
|---|---:|---:|
| 1.(a). In General Offices, Havana .......................... | $ 22,281.92 | |
|      Cost of Installation .......................... | 4,456.38 | |
|   (b). Three bottling lines, Havana .................... | 910,890.13 | |
|      Cost of Installation .......................... | 182,198.02 | $1,119,826.45 |
| 2. Two bottling lines, Santiago de Cuba ........... | 201,663.24 | |
|      Cost of Installation .......................... | 40,332.64 | 241,995.88 |
| 3. Two bottling lines, Santa Clara ...................... | 263,498.45 | |
|      Cost of Installation .......................... | 52,699.69 | 316,198.14 |
| 4. Two bottling lines, Artemisa ........................... | 188,871.19 | |
|      Cost of Installation .......................... | 37,774.22 | 226,645.41 |
| 5. Two bottline lines, Camaguey .......................... | 203,423.64 | |
|      Cost of Installation .......................... | 40,684.72 | 244,108.36 |
| | | $2,148,774.24 |

The Commission has considered all of the evidence of record and finds that the machinery and equipment had a value of $2,148,774.24 on the date of loss.

### 4. *Automotive Equipment*

In support of the asserted value of $1,197,809.00 for this item, claimant has submitted several affidavits. The affidavit of Mr. Macias, specifically, includes lists of vehicles at each plant, aggregating $592,700.93, which he declares as approximately one-half the value of the seized equipment. He gives it as his opinion that claimant lost in excess of 250 vehicles. The lists were compiled from original records of the claimant and may be summarized as follows:

| | *Vehicles* | |
|---|---:|---:|
| 1(a). Havana General Office ........................... | 15 | $ 43,325.83 |
|    (b). Havana plant .......................................... | 151 | 350,454.47 |
| 2. Santiago plant ............................................... | 27 | 72,360.97 |
| 3. Santa Clara plant ........................................ | 12 | 29,203.67 |
| 4. Artemisa plans ............................................. | 21 | 66,707.78 |
| 5. Camaguey plant .......................................... | 10 | 31,549.21 |
| | 236 | $592,601.93 |

The lists include vehicle models of the years 1941, 1946, 1948 and later with the values stated apparently being the original purchase prices. The balance sheet dated September 30, 1960 for Embotelladora lists the original cost of the autos and trucks, without depreciation, as $599,206.61. The rate of depreciation employed by claimant was 25% per annum, with the depreciated book value on December 31, 1959 appearing as $156,113.46 in the audited financial statement for 1959 listing of asset accounts (Annex 11E, Exhibit D). The unaudited September 30, 1960 statement does not list the assets with depreciation separately, only the total cost of the assets not previously written off. The undepreciated value shown in September, 1960 of $599,206.61 included $94,295.61 added in the period between December 31, 1959 and September 30, 1960. In his affidavit of January 16, 1970, Mr.

Thompson, the chief financial officer, stated that the amount of $599,206.61 was after deduction of depreciation of 25% per annum. However a close examination of all the financial records reveals that the high figure is before depreciation. He also stated that new trucks costing more than $230,000.00 were acquired during the year 1960 but were not included in the unaudited statement. Such an expenditure is not evident from the Profit and Loss Statement for the period ending on September 30, 1960 nor is this amount included in the sum which Mr. Thompson demanded from the Cuban Government on October 26, 1960 as compensation for the property seized (Exhibit 9, Annex 11A).

The Commission finds that a fair value for the automotive equipment may be determined by depreciating the purchases for the years 1956, 1957, 1958 and 1959 at the rate of 15% per annum and adding such values to the amount paid out in 1960 and to the depreciated value of the equipment owned on December 31, 1955, as reflected in the financial statements for the years 1956—1960. The Commission concludes that the fair value of the auto and truck equipment as of October 24, 1960 was $302,313.82.

### 5. Coolers and Dispensing Equipment

Claimant asserts a loss of $1,197,000.00 for coolers and dispensing equipment at all of its plant locations in Cuba. In support thereof it has submitted the affidavits of Andres Gomez, former manager of its Cooler Department in Cuba; Louis R. Rossell-Castelnau, the purchasing agent of Embotelladora; David E. Berenguer and Juan M. Diaz, formerly chief internal auditor of Embotelladora.

This type of equipment was not manufactured in Cuba, being imported from the United States, and included the following:

> Coin controlled coolers
> Cup vending pre-mix machines
> Beverage tanks
> Fountain dispensers
> Open top refrigerator coolers, and spare parts.

Mr. Gomez listed some of the equipment with their locations, for which he specified a value of $255,574.47, including 40% added for freight, insurance, duty, storage and handling charges. He set forth the specific equipment used in the Havana area having a value of $617,500.00 and asserted that additional equipment valued at 40% of this amount was necessary to serve the remainder of Cuba. Lastly, he stated a value of $332,500.00 for such equipment in storage. The other affidavits supported the statements of Mr. Gomez.

The equipment does not include similar equipment which claimant or its Cuban predecessor sold on conditional sales agreements. Any balances due on such contracts are included in the Accounts Receivable discussed below.

The financial statement for the period from December 31, 1955 to September 30, 1960 do not reflect the purchases asserted. On December 31, 1955, the records indicate coolers having a book value of $8,112.64 on hand. In subsequent years the following additions were made: in 1956—$31,660.76, in 1957—$14,446.72, in 1958—$16,619.53, in 1959—$86,180.38, and in 1960 —$12,062.91, for a total on hand of $169,082.94 without deduction for depreciation for those items added after 1955. Because of the broad discrepancy between the affidavits and the financial statements, the Commission

holds that the balance sheet of September 30, 1960 is the most appropriate measure of the value of the Coolers and Dispensing Equipment.

The Commission therefore finds that the value of this equipment on October 24, 1960 amounted to $186,557.20.

### 6. *Containers*

Claim is made in the amount of $8,020,000 for containers at all locations. Affidavits concerning this item of claim have been submitted from David E. Berenguer, Louis R. Rossell-Castelnau, Juan M. Diaz, all previously mentioned, as well as Jose Joaquin Mestre, a former self-employed Distributor Agent of Embottelladora.

Mr. Berenguer points out that claimant operated its soft drink business in Cuba on the "returnable bottle system" under which it did not sell and convey title to containers such as bottles and cases, but maintained ownership throughout transactions involving sale of contents. Purchasers were required to make a cash deposit against return of bottles and cases. As General Manager he observed that the Havana facility did approximately 50% and Camaguey approximately 13% of the business and he was intimately familiar with the details of that 63% of claimant's business; and knew that similar conditions prevailed in Artemisa, Santa Clara and Santiago, which plants contributed 37% of the claimant's business. The system of distribution in Havana, Artemisa and Santiago was by means of Company-owned route trucks operated by Company employees; and the system of distribution used at Santa Clara and Camaguey and rural communities served by all plants was by means of independent distributors. Each such distributor maintained his own warehouse, route trucks and like equipment, and purchased beverages and made deposits on bottles and cases, delivering them from his warehouse to the retail dealers. Claimant sold goods to 137 such distributors who maintained 137 different warehouses with a stock of full and empty goods. It was not unusual for a distributor to have on hand several thousand cases each containing 24 bottles, either full, or empties to be returned against the deposit. The rural population purchased approximately 40% of claimant's good and it was accordingly necessary for the distributors to maintain an inventory of bottles and cases in excess of the requirements of the urban community served by the other system.

According to Mr. Berenguer, in the year 1959, the Camaguey plant purchased 200,000 new cases to maintain an annual sale of 1,200,000 cases whereas Havana required only 200,000 to maintain annual sales of approximately 6,000,000 cases. Mr. Berenguer is of the opinion that the claimant owned 2,000,000 cases of 24 bottles each on the date of expropriation, values at $4.01 per case.

Mr. Rossell-Costelnau, former purchasing agent, familiar with the methods of distribution, points out that sales and delivery in Havana and other urban cities were generally made three times a week, and in rural interior cities once a week, and in most sparsely populated territories once in about every two or three weeks. This system required a considerable number of bottles and cases. It was his experience that the average case and 24 bottles disappeared after approximately twelve trips. In 1959, he states, claimant sold approximately 12.5 million cases in the Island and that an average 8.5% container loss was not excessive and was customarily expected.

Mr. Rossell-Castelnau has clarified the make-up of the unit price of $4.01 used by claimant as follows: Bottles were purchased from Owens-Illinois Glass Co., f.o.b. its plant at Havana, at a contract price of $2.33 per unit of 24 bottles, stating that this price was an artificial one fixed at about equal to the United States f.o.b. price of similar unit bottles, plus a sum representing freight and related charges, from the United States to Havana; and was calculated to protect the Cuban glass industry. Wooden cases with 24 compartments were purchased under similar conditions from Parada, Hnos, f.o.b. Havana, at 1.17 each. Further, packaging, freight, handling and storage costs were approximately $.51 per case. He recites his opinion that the bottles and cases owned by claimant at date of seizure had a far market value of $4.01 each.

Further, Mr. Rossell-Castelnau opines that claimant had title to more than 2,000,000 cases on October 25–26, 1960, some in its possession in new inventory, more in the "float" between dealers and bottling plants, and even more in the hands (under the deposit system) of its dealers and ultimate consumers.

Under the claimant's accounting system, the initial cost of a case of bottles was written down when it was put into use, from $4.01 to 60 cents, representing a deposit of two cents for each bottle and twelve cents for the case. The difference of $3.41 was charged to expense of sale. The sixty-cent deposit was shown on the asset side of the balance sheet (under Property, Plant and Equipment—Containers) and the 60 cents owed the customer was shown on the liabiity side of the balance sheet (under the item Deposits on Containers).

Juan M. Diaz, former Chief Internal Auditor for Cuban operations, in his affidavit also discusses the accounting practices of the claimants and concludes with his opinion that claimant owned 2,000,000 cases of bottles, worth not less than $4.01 per unit, which were expropriated.

The affidavit of Jose Joaquin Mestre concerns his experiences as a distributor of claimant's products. He engaged in his business at Moron, Camaguey, where he had an office and warehouse; and maintained sub-warehouses at Forencia and Chambas where he employed sub-agents, and warehouses in the commercial departments of Central Patria and Central Moron, which latter was the largest raw sugar mill in the world. He states that he sold an average of 110,000 cases of 24 bottles per year, estimating that all times he had on hand in his and the sub-agent's warehouses, and on trucks 25,550 cases full or empty. In addition he estimates that his dealers had an equal number of cases on hand or in the hands of customers. In his opinion the cases and bottles did not deteriorate or become less valuable with use. Bottles and cases were stated to disappear and must be replaced periodically because of breakage and failure of the customer to return them.

The financial statements, however, indicate that claimant had on hand in December 1955 containers valued at $547,192.81. Additional purchases of containers for the succeeding years were: for 1956—$381,455.53, 1957—$453,126.13, for 1958—$430,324.99, for 1959—$939,313.62, and for 1960—$102,778.94 for a total of $2,791,192.02. During the same period a total of $2,313,176.91 was written off, presumably when the containers were taken from storage and put in circulation and deposits of $.60 per case were received from customers.

On the basis of the evidence of record, considering claimant's estimate

of the useful life of containers and the replacement purchases, the Commission finds that claimant had approximately 500,000 containers on hand for which a loss of $2,005,000.00 was suffered.

### 7. *Furniture and Fixtures*

Claimant has asserted a loss of $326,604.06 for the furniture, office fixtures and equipment at the following locations:

| | |
|---|---:|
| Havana Home Office | $118,157.20 |
| Havana Bottling Plant | 123,927.01 |
| Warehouse and Office | 20,000.00 |
| Santiago de Cuba | 23,629.73 |
| Santa Clara | 18,609.70 |
| Artemisa | 11,813.95 |
| Camaguey | 10,466.47 |
| | $326,604.06 |

The evidence in support of the claimed values consists of an affidavit of Juan M. Diaz and record cards listing each item, its cost and freight and tariffs paid if applicable. The affidavit of Mr. Diaz was accompanied by separate lists evaluating items of the equipment for the general offices and each bottling plant for which a separate record card had been filed. Mr. Diaz totalled the values for the items and added an additional 40% to cover the costs of freight, insurance, handling charges, duty and storage. The values listed for each item, however, are the same amounts as entered on the inventory cards for the total cost. The inventory cards indicate the source of the item, freight and duty paid, when applicable, and date of purchase or manufacture. A thorough review of the inventory cards reveals that most of the items were supplied by local dealers, and that freight and duty costs were included in the total costs. Mr. Diaz therefore has duplicated freight and duty costs in his extra allowance of 40% and the 40% includes freight and duty costs for those items purchased in Cuba for which such charges were not necessary. His appraisal is based also upon the original cost of the items and not on depreciated values although some items were ten, twenty and thirty years old. Accordingly, the Commission finds that the value as set forth in the asset listing for the financial statement of December 31, 1959 ($114,259.18) plus the added purchase for 1960 ($17,437.19) are most equitable for the Furniture and Fixtures.

On the basis of the entire record, the Commission finds that the value of the Furniture and Fixtures lost by claimant in Cuba on October 24, 1960 was $131,696.37.

### 8. *Inventories*

Claimant asserts a loss of $720,098.00 for its inventories of spare parts for machinery and other equipment, crowns, carbon dioxide, fuel, syrup and beverage ingredients, and other items necessary for the operation of a bottling business. The category does not include bottles, cases, coolers and other types of vending machines which were included in the headings "Coolers and Dispensing Equipment" and "Containers". Supporting the valuation are affidavits of Mr. Berenguer and Mr. Diaz which recite the fair market valuation as being $720,098.00 but no records have been submitted in support thereof. Mr. Berenguer states "that the actual market value was considerably in excess of said amount for the reason that many

of the items carried in the inventory were of a class or kind not manufactured in the Republic of Cuba and for which importation permits had been denied for more than one year prior to the seizure and that therefore it is difficult for him to estimate the fair market value of items of which he had an inventory and which were readily saleable to others needing such item but which he was unwilling to sell and thus deprive his Company of the use of same."

The financial statements for the years 1958, 1959 and up to September 30 for the year 1960 record inventories as $435,768.25, $523,284.07 and $320,088.88. These inventories include cooler, dispensers and vending machines for resale which are not included in Mr. Berenguer's calculation. In his demand on the Government of Cuba on October 26, 1960, Mr. Thompson included values for sugar, ingredients, syrup, concentrate and bottled product, and miscellaneous (including all kinds of spare parts) which totalled $428,753.55.

On the basis of the entire record, the Commission finds that the most appropriate value for the inventories on October 24, 1960 is $428,753.55.

### 9. *Accounts Receivable*

Claimant now asserts $827,280.00 as its accounts receivable at the time of loss. In this connection it has submitted an affidavit of Juan M. Diaz, previously mentioned, who sets out that the enterprise's cash business represented about 60% of the approximate 14,000,000 case annual value of business, and credit for goods and container deposits about 40%.

Attached to Mr. Diaz's affidavit are detailed lists of Accounts Receivable as of August 31, 1960 which were the last accounts receivable reports made prior to expropriation. These lists were made by the managers of the Artemisa, Santa Clara, Camaguey and Santiago de Cuba plants, and the Matanzas sub-warehouse. Claimant has not located any similar reports for the Havana plant and General Office in Havana. Mr. Diaz, however, avers that he knows the last consolidated sum of accounts receivable reported by the Havana General Office on September 30, 1960, which included the Havana accounts receivable, so that he believes he can estimate with reasonable accuracy the aggregate of accounts receivable owed to claimant on about September 30.

The figures supplied by Mr. Diaz are as follows:

| *Accounts Receivable at* | | *Total* |
|---|---|---|
| *Artemisa Plant* | | |
| Distributor Agents | $ 17,351.79 | |
| Local Trade Accounts | 4,500.84 | |
| Schools | 217.90 | |
| Sampling | 2.40 | |
| Compliments | 72.96 | |
| Coolers and Dispensing Equipment | $ 54,151.10 | |
| | $ 76,296.99 | |
| Adjustment—Add Salesman Debit | 234.12 | $ 76,531.11 |
| *Matanzas* (Sub-warehouse under Havana Plant) | | |
| Coolers and Dispensing Equipment | $119,230.35 | |
| Adjustment—Deduct Dealer Credit | 41.58 | 119,188.77 |

FOREIGN CLAIMS SETTLEMENT COMMISSION

*Santa Clara Plant*

| | | |
|---|---:|---:|
| Distributor Agents | $ 72,232.72 | |
| Local Trade Accounts | 1,234.46 | |
| Sampling | 288.84 | |
| Coolers and Dispensing Equipment | 46,864.67 | |
| | $120,620.69 | |
| Adjustment—Deduct Dealer Credit | 322.28 | $120,298.41 |

*Camaguey Plant*

| | | |
|---|---:|---:|
| Distributor Agents | $ 64,728.06 | |
| Local Trade Accounts | 18.00 | |
| Sampling | 114.12 | |
| Coolers and Dispensing Equipment | 98,832.74 | 163,692.92 |

*Santiago de Cuba Plant*

| | | |
|---|---:|---:|
| Distributor Agents | $ 49,951.43 | |
| Local Trade Accounts | 2,297.18 | |
| Coolers and Dispensing Equipment | 24,024.14 | 76,272.75 |
| | Sub-total | $555,983.96 |
| Total Havana estimated from Management reports at September 30, 1960 | | 175,099.62 |
| *General Office Havana,* estimated Miscellaneous Accounts Receivable at September 30, 1960 | | 96,196.76 |
| | Total | $827,280.34 |

In his letter of October 26, 1960 to the Cuban Government, Mr. Thompson listed the assets of claimant in Cuba and the amount set out for Accounts Receivable was $731,083.58. The same figure was entered in the unaudited financial statement of September 30, 1960 for these accounts.

The Commission finds that the most appropriate value of the Accounts Receivable is that in the September 30, 1960 financial statement and Mr. Thompson's letter and that claimant suffered a loss of $731,083.58 on October 24, 1960 for the Accounts Receivable.

### 10. *Cash and Bank Accounts*

Claimant asserts $988,442 as its loss in connection with cash and deposits in banks in Cuba. Mr. Diaz has submitted an affidavit in this connection setting out the fact of his audit of claimant's books of accounts compiled by accountants under Mr. Noel Perez, the Controller. These included Mr. Juan Mir, now deceased, who made a daily cash report. His report for October 24, 1960 has been submitted. The bank deposits listed thereon and taken by the Government of Cuba on October 24, 1960 are as follows:

| Acct. No. | Bank | Location | Amount |
|---|---|---|---|
| 101–1P–2035 | The First National City Bank (New York) | Havana | $ 43,321.29 |
| 101–1 | The First National City Bank (New York) | Santiago | 5,858.20 |
| 101–2 | The Royal Bank of Canada | Santa Clara | 903.88 |
| 101–3 | The Bank of Nova Scotia | Camaguey | 6,328.27 |
| 102–1 | The First National City Bank (New York) | Havana | 49,000.00 |
| 102–1 | The First National City Bank (New York) | Santiago | 14,800.00 |
| 102–2 | The Royal Bank of Canada | General Office | 826,101.20 |
| 102–2 | The Royal Bank of Canada | Santa Clara | 14,750.00 |
| 102–3 | The Bank of Nova Scotia | Camaguey | 9,900.00 |
| 102–4 | Banco Continental Cubano | Artemisa | 5,750.00 |
| 102–10 | (Petty Cash) | Cuba | 5,200.00 |
| | | | $981,912.84 |

The above bank accounts are supported by bank statements which are in somewhat different amounts but tend to show the relative consistency and stability of the accounts in comparison with Mr. Mir's statement. One item in the Mir report is slightly higher due to denial of foreign exchange.

On the basis of the entire record, the Commission finds that the claimant's bank accounts, taken by the Government of Cuba on October 24, 1960 were in the aggregate amount of $981,912.84.

No allowance is made for a Royal Bank account entitled "West Indies Region" in the amount of $6,529.82 nor for an account of $2,584.58 in Barclay's Bank D.C.O., Barbados, as it is not shown that these were taken by the Government of Cuba. The latter account in fact was not here claimed.

11. and 12. *Extraordinary Expenses Including Assignments*

Claimant seeks reimbursement in the amount of $105,623 for expenses described by it as extraordinary. These are in two categories:

Assignment of claims for taking of property from:

| | | |
|---|---|---|
| R. M. Thomas (now deceased) .......................... | $30,815.05 | |
| Robert J. Thompson ............................................ | 18,610.00 | |
| David E. Berenguer ............................................. | 18,738.47 | $ 68,163.52 |
| | | |
| Proposed purchase of land .............. | $35,000.00 | |
| Preparation of building plans ........ | 2,460.00 | 37,460.00 |
| | | $105,623.52 |

In connection with the assignment of claims, claimant sets out that in 1960 it entered into agreement with Messrs. Thomas and Berenguer, United States citizens, and Robert J. Thompson, a Canadian citizen, to protect them from any financial loss with respect to their personal property.

On October 25, 1960 Mr. and Mrs. Thomas were absent from Cuba and Mr. Berenguer left on October 29, 1960, taking only hand luggage.

On January 30, 1961 Mr. Thomas made an assignment to claimant of his interest in personalty left in Cuba valued at $30,815.05; and on February 13,

1961 Mr. Berenguer executed a similar assignment as to personalty in Cuba valued at $18,738.47. Each assignment is accompanied by an itemized list of personalty. In an affidavit of November 1, 1968, Charles W. Adams, Vice President of claimant, avers that payment was made to Messrs. Thomas and Berenguer in the specified amounts.

The Commission finds that the personal property of Messrs. Thomas and Berenguer, officers of the claimant, was also taken by the Government of Cuba on October 24, 1960, and the Commission concludes that they suffered losses within the meaning of Title V of the Act as a result of the taking of their property by the Government of Cuba.

Thereafter, and prior to filing of this claim, Messrs. Thomas and Berenguer assigned their claims against the Government of Cuba to claimant. The Commission finds that $30,815.05 and $18,738.47 represents the fair value of the property taken in each instance. Accordingly the Commission finds that claimant succeeded to losses in the aggregate amount of $49,553.52 within the meaning of Title V of the Act.

With respect to claim based on an assignment by Robert J. Thompson in the amount of $18,610.00 the claimant and Mr. Thompson affirm that he is not a national of the United States. Title V provides for determination of claims that have been continuously United States owned from the date such claims arose. Accordingly, the Commission is constrained to and hereby does deny this item of claim.

Regarding the second category of extraordinary expenses, added to the claim on December 24, 1968, claimant states that Embotelladora, apparently in 1959, decided to build a plant in Holguin. A property was selected and an oral agreement was made with the owner, whose exact name is not recollected, to purchase the land for $35,000.00. Thereafter it appears that the Government of Cuba proposed to expropriate the land and deed it to claimant, whereupon claimant states it secretly paid $35,000.00 to the owner who was to deed it to claimant or through the Cuban Government assist Embotelladora to acquire the land.

Thereafter claimant states it expended $2,460.00 for the preparation of preliminary plans for a new plant. It is said that the Cuban Government then precluded further acquisition of realty by American companies. This item was reported as an asset, Building under Construction, by Embotelladora on June 29, 1960, to the United States Embassy.

Nevertheless, the uncertainty surrounding this element of claim, including name of owner, as well as uncertainty as to record title, compels the Commission to conclude that claimant has not established that it suffered a loss in this connection as a result of actions of the Government of Cuba. Accordingly, this item of claim is denied.

### 13. *Going Concern, Good Will, etc.*

Claimant has asserted a loss in the amount of $17,807,042.00 for the value of its business over and above the value of its tangible assets. The asserted value is the difference between the claimed value of the assets ($23,830,418.00) and $41,000,000.00 (at one time the total amount claimed).

Claimant has submitted an appraisal of the Cuban enterprise by Charles N. Battle & Associates which determined the value of the Cuban business by comparison with a Coca-Cola bottling company sold in Miami, Florida in 1963. Although no value is stated for the tangible assets of the Florida company, it appears that $11,500,000.00 was paid for that company which

had several bottling plants in that area. On the basis of the average net income for the Miami company, the purchase price was approximately 60 times its average net income. The purchase price was also approximately $7.00 per person residing in the Miami company's territory, and about $2.00 per case sold in the year prior to the transfer of the company. The values for the Cuban business using the above measures would be—

1. 60 times average annual income ($772,432.00) .............. $46,345,920.00
2. $7.00 per person for 7,000,000 population ....................... $49,000,000.00
3. $2.00 per case, 13,742,000 expected to be sold in 1960 .... $27,484,0000.00

The appraiser averaged the three sums which were rounded to an average value of $41,000,000.00 for the value of the Cuban business. Mr. Battle stated therefore that $41,000,000.00 was a fair and accurate estimate of the Cuban business and affidavits of Coca-Cola company officials state that the business would not have been sold for less.

The use of such methods of determining the value of a Cuban enterprise does not appear a valid one inasmuch as the comparison is between the Miami market, with a per capita income of over $1,900.00 and a predominantly urban population and the Cuban market with a per capita income of approximately $300.00 and a large rural population. Moreover there is no information given as to the assets of the Miami corporation to afford a proper basis for comparison when different localities are considered. Nor does an average annual income of $772,430.00 justify an investment of $41,000,000.00.

The Commission has determined in many cases that the value of a going concern was 10 times the average annual net earnings. (See *Claim of General Dynamics Corporation*, Claim No. CU–2476.) However, in the instant claim, this amount would be $7,724,320.00, using the average annual income computed by claimant, and less than the value of claimant's assets as determined herein. The going concern value on the basis of demonstrated earnings to investment is therefore minimal. Furthermore, without claimant's syrup formulas, the Cuban plants become ordinary bottling plants.

However, the Commission recognizes that claimant had suffered a loss over and above the value of its physical assets since the Cuban branch had been operating over forty years and had organized a Coca-Cola distribution system covering the island of Cuba. Based upon the complete record, the Commission finds that claimant suffered an additional loss therefor in the amount of $3,500,000.00.

Claimant's Cuban losses, other than those to which it succeeded by reason of the assignments from its employees total $18,033,653.60. The Commission has determined, however, that taxes due the Cuban Government in the amount of $485,911.96, as reflected in the September 30, 1960 balance sheet must be deducted (see *Claim of Simmons Company*, Claim No. CU–2303, 1968 FCSC Ann. Rep. 77). The asset loss is reduced therefore to $17,547,741.64.

*Summary*

Claimant's losses within the meaning of Title V of the Act are found to be as follows:

FOREIGN CLAIMS SETTLEMENT COMMISSION    351

| On October 24, 1960 | Land | $ 2,265,881.00 |
|---|---|---|
| | Buildings | 5,351,681.00 |
| | Machinery & Equipment | 2,148,774.24 |
| | Automotive Vehicles | 302,313.82 |
| | Coolers & Dispensers | 186,557.20 |
| | Containers | 2,005,000.00 |
| | Furniture & Fixtures | 131,696.37 |
| | Inventories | 428,753.55 |
| | Accounts Receivable | 731,083.58 |
| | Bank Accounts & Cash | 981,912.84 |
| | Added Value | 3,500,000.00 |
| | | $18,033,653.60 |
| | Less Taxes | 485,911.96 |
| | Total Loss | $17,547,741.64 |
| On January 30, 1961 | Thomas Assignment | 30,815.05 |
| On February 13, 1961 | Berenguer Assignment | 18,738.47 |
| | Total Losses | $17,597,295.16 |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU-0644), and in the instant claim it is so ordered as follows:

| FROM | ON |
|---|---|
| October 24, 1960 ..................................................... | $17,547,741.64 |
| January 30, 1961 ..................................................... | 30,815.05 |
| February 13, 1961 ..................................................... | 18,738.47 |
| Total ............................................. | $17,597,295.16 |

CERTIFICATION OF LOSS

The Commission certifies that THE COCA-COLA COMPANY suffered a loss, and succeeded to losses as a result of actions of the Government of Cuba, within the Scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount Seventeen Million Five Hundred Ninety-seven Thousand Two Hundred Ninety-five Dollars and Sixteen Cents ($17,597,295.16) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., September 22, 1971.

## IN THE MATTER OF THE CLAIM OF M & M DREDGING & CONSTRUCTION CO., ET AL.

Claim No. CU-0219—Decision No. CU-3536

*Cost of replacement as a method of valuation means replacement in kind, taking into consideration the age and condition of properties on the date of loss, it does not mean the cost of replacing properties in question with new properties.*

PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, in the aggregate amount of $1,186,201.00 was presented by M & M DREDGING & CONSTRUCTION CO. and C L O CORPORATION based upon the asserted loss of a dredge, tug, barge, crane, bulldozers, air compressor and related pile driving equipment, supplies and accessories.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened ,or taken by the Government of Cuba.

NATIONALITY

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation of entity.

The record shows that both claimants were organized under the laws of Florida and that at all pertinent times all of both claimants' outstanding capital stock was owned by nationals of the United States. The Commission holds that both claimants are nationals of the United States within the meaning of Section 502(1)(B) of the Act.

OWNERSHIP

It appears from the evidence of record that M & M DREDGING & CONSTRUCTION CO., hereafter referred to as M & M, was engaged in land reclamation operations in the vicinity of Varadero, Cuba, prior to the advent of the Castro Government in Cuba in January 1959. In connection with these activities, M & M employed the various items of personal property for which claim is made. The evidence includes: (a) two

---

* This decision was entered as the Commission's Final Decision on March 26, 1969.

certificates from the U.S. Bureau of Customs, dated August 9, 1961, showing that M & M had been duly registered as the sole owner of a dredge, called the "Cuba," built in 1915, with a gross tonnage of 302, and an "oil screw," called the "Thomas" (identified by claimants as a tug), built in 1942, with a gross tonnage of 16, and that these two vessels were not subject to any mortgages, liens or other encumbrances; (b) a bill of sale registered with the Bureau of Customs showing that C L O CORPORATION, hereafter referred to as C L O, purchased on October 20, 1949 a barge, called the "Atlantis," together with all of its accompanying equipment, being of steel construction and having a length of 230 feet. Neither the age of the vessel nor the consideration paid therefor appear in this document, and it does not appear whether there were any outstanding liens or mortgages against the vessel; (c) a certificate from the U.S. Coast Guard, dated August 9, 1961, showing that the U. S. Dredging Company, of Miami, Florida, had been duly registered as the sole owner of a dredge tender, called the "Ram" (identified by claimants as a steel workboat), built in 1954 of steel construction with a length of 28 feet 2 inches, a diesel rig and a 165 horse power engine. The cost of construction is not shown.

On the basis of the foregoing evidence, the Commission finds that M & M was the sole owner of the dredge "Cuba" and the tug "Thomas," that C L O was the sole owner of the barge "Atlantis," and that the U. S. Dredging Company was the sole owner of the steel workboat "Ram." The record establishes that the U. S. Dredging Company was organized under the laws of Florida and that at all pertinent times all of its outstanding capital stock was owned by nationals of the United States. The Commission therefore holds that the U. S. Dredging Company was a national of the United States within the meaning of Section 502(1)(B) of the Act. It further appears from the record that on August 30, 1963, the U. S. Dredging Company merged with M & M under the name of M & M DREDGING & CONSTRUCTION CO. Accordingly, M & M succeeded to all rights of the U. S. Dredging Company with respect to the steel workboat "Ram."

On the basis of other evidence of record including bills of sale, certified statements from drydock, machinery and engineering companies, a bill of sale dated November 30, 1948, balance sheets, affidavits and statements from officials of claimants, the Commission finds that M & M also owned a plant, supplies and equipment appurtenant to its dredge "Cuba," a steel crane barge with an Osgood crane, a Lima crane acquired in 1948, a D–6 Caterpillar Bulldozer, a D–4 Caterpillar Bulldozer, a diesel air compressor, and miscellaneous pile driving equipment and accessories.

Loss

All of the foregoing property was being used by M & M in its land reclamation operation in Cuba, the barge "Atlantis" and the steel workboat "Ram" being under lease to M & M. The record includes affidavits dated August 15, 1961 and October 28, 1967, from Gregorio Argelio Medina, a Cuban lawyer who had acted on behalf of M & M in Cuba and was present in Varadero, Cuba in November 1959. According to his testimony, Cuban authorities seized all of the property for which claim is made herein and precluded him from boarding the dredge "Cuba". Upon his protest to Cuban authorities on behalf of M & M, he was jailed and subsequently compelled to leave Cuba. These facts are confirmed by an affidavit dated September 18, 1961 by Mr. C. Osment Moody, the then president of M & M

and the U.S. Dredging Company, and secretary-treasurer of C L O, summitted to the Department of State.

In the absence of evidence to the contrary, the Commission finds that all of the property for which claim is made herein, described above, was taken by the Government of Cuba without compensation on November 7, 1959, as stated by claimants. Accordingly, the Commission further finds that claimants sustained losses within the meaning of Title V of the Act as a result of actions of the Government of Cuba.

VALUATION

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". The Commission has concluded that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider; i.e., fair market value, book value, going concern value, or cost of replacement.

Claimants have computed the amounts of their respective losses on the basis of the costs of replacing their properties with new properties, supported by estimates from various shipbuilding, machinery and equipment concerns, dated in October 1962. Accordingly, the claim of M & M was filed in the amount of $1,186,201.00 and the claim of C L O in the amount of $250,000.00. However, the claim filed with the Department of State in October 1961 asserted the aggregate amount of $511,950.00 on account of all losses sustained by M & M, C L O and the U. S. Dredging Company.

As noted above, the Commission consistently has construed the language of Section 503(a) relating to the evaluation of loss to be no different from the international legal standard normally prevailing, which the Commission has applied in claims under the Act. The Commission finds no basis for concluding that the statutory reference to "cost of replacement" means the cost of replacing the properties in question with new properties. Upon careful consideration of this matter, the Commission holds that the term "cost of replacement" means replacement in kind, taking into consideration the age and condition of the properties on the date of loss, and that all of the specific bases mentioned in Section 503(a) are merely standards for determining the value of property on the date of loss.

In the instant case, the Commission has carefully considered the entire record bearing on the question of valuation including balance sheets for the U. S. Dredging Company, M & M and C L O, as of January 31, 1956, February 28, 1957, and June 30, 1956, respectively, as well as affidavits from Harold B. Wells and Charles Schultz, dated September 13, 1968, and a statement from a Cuban insurance concern. Mr. Wells testified that he was General Superintendent of Operations in the Republic of Haiti on construction operations involving the dredge "Cuba" and that in 1953–1954 this dredge was converted from steam power to diesel electric power at a

cost in excess of $250,000.00. Similar statements are contained in the affidavit of Mr. Schultz who was Captain and Master Mechanic on the dredge "Cuba". However, Mr. Schultz stated that he did not have access to cost records but appraised the value of the improvements as being in excess of $250,000.00 on the basis of his experience. Mr. Wells who was an official of the Government of Haiti does not indicate the basis for his statements. The Cuban insurance concern stated in a letter dated October 16, 1968 that the total insurance carried for the property in question was in excess of $500,000.00.

The Commission notes that the balance sheet for M & M, certified to be a true copy and correct by an officer of M & M, is dated February 28, 1957, subsequent to 1953–1954 when the asserted improvements to the dredge "Cuba" were made. That balance sheet shows the fixed assets as follows:

| | |
|---|---:|
| Autos and trucks | $ 6,891.78 |
| Key Largo Property | 15,267.29 |
| Machinery & Equipment | 22,083.00 |
| Office Equipment | 2,277.67 |
| Tugs, Barges & Dredges | 25,410.02 |
| Warehouse | 11,789.29 |
| Total | $83,719.05 |
| Less Reserve for Depreciation | 37,772.82 |
| Net Value of Fixed Assets | $45,996.23 |

The balance sheet of the U. S. Dredging Company of January 31, 1956 shows the following capital assets:

| | |
|---|---:|
| Dredges & Equipment | $149,443.68 |
| Less Reserve for Depreciation | 84,983.77 |
| Total Capital Assets | 64,459.91 |

In neither of the foregoing balance sheets are any of the items identified so that they can be related to the various pieces of personal property involved in this claim. Claimants have stated that they have no other financial statements, and it is clear from claimants' last letter, dated November 21, 1968, that no further evidence is available.

The balance sheet of C L O as of June 30, 1956 shows the following under the heading, "Fixed Assets":

| | |
|---|---:|
| Barge "Atlantis" | $17,088.52 |
| Buildings | 31,562.82 |
| Fence | 1,521.50 |
| Total | $50,172.84 |
| Less Reserve for Depreciation | 16,727.41 |
| | $33,445.43 |
| Land | 51,027.40 |
| Net Value of Fixed Assets | $84,472.83 |

The record also includes copies of two checks, drawn by M & M in December 1950 in the aggregate amount of $14,000.00 with notations that the checks were in payment for the purchase of the steel crane barge. A bill of sale, dated November 30, 1948, shows that M & M purchased a Lima Crane in consideration of $12,000.00 and a used Lorain Crane "traded in". Other evidence indicating other purchases by M & M of property involved in this claim do not show the costs.

Claimants assert that the values of the various items of personal property claimed herein were as follows on the basis of replacement costs for new properties:

| | |
|---|---|
| Dredge "Cuba" | $ 600,000.00 |
| Attendant plant to dredge | 53,000.00 |
| Barge "Atlantis" | 250,000.00 |
| Steel Crane Barge | 25,000.00 |
| Steel Workboat "Ram" | 25,000.00 |
| Tug "Thomas" | 110,000.00 |
| Lima Crane | 37,578.00 |
| D-6 Caterpillar Bulldozer | 22,510.00 |
| D-4 Caterpillar Bulldozer | 15,298.00 |
| Diesel Air Compressor | 20,465.00 |
| Miscellaneous Pile Driving Equipment | 27,350.00 |
| Total claim for both claimants | $1,186,201.00 |

Having carefully considered all the evidence of record, the Commission finds that the valuations most appropriate to the properties herein and equitable to the claimants are those set forth in detail in the said affidavit, dated September 18, 1961, of Mr. C. Osment Moody, which was submitted to the Department of State along with supporting documents.

Accordingly, the Commission finds that the values of the properties taken from M & M and from the U. S. Dredging Company, to which M & M succeeded, and the value of the property taken from C L O were as follows on November 7, 1959, the date of loss:

### M & M DREDGING & CONSTRUCTION CO.

| | |
|---|---|
| Dredge "Cuba" | $225,000.00 |
| Attendant plant and equipment | 45,000.00 |
| Tug "Thomas" | 40,000.00 |
| Steel crane barge | 30,000.00 |
| Lima crane | 10,450.00 |
| Steel workboat "Ram" | 10,000.00 |
| D-6 Caterpillar Bulldozer | 8,000.00 |
| D-4 Caterpillar Bulldozer | 6,500.00 |
| Diesel Air Compressor | 9,650.00 |
| Miscellaneous pile driving equipment and accessories | 27,350.00 |
| Total | $411,950.00 |

### C L O CORPORATION

| | |
|---|---|
| Barge "Atlantis" | $100,000.00 |

Accordingly, the Commission concludes that the M & M DREDGING & CONSTRUCTION CO. suffered a loss in the aggregate amount of $411,950.00 (including the loss suffered by the U. S. Dredging Company, to which this claimant succeeded), and that the C L O CORPORATION suffered a loss in the amount of $100,000.00.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that M & M DREDGING & CONSTRUCTION CO. suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Hundred Eleven Thousand Nine Hundred Fifty Dollars ($411,950.00) (including the loss suffered by the U. S. Dredging Company, to which this claimant succeeded), with interest at 6% per annum from November 7, 1959 to the date of settlement; and

The Commission certifies that C L O CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Thousand Dollars ($100,000.00) with interest at 6% per annum from November 7, 1959 to the date of settlement.
Dated at Washington, D.C., February 26, 1969.

## IN THE MATTER OF THE CLAIM OF OLGA LENGYEL

### Claim No. CU–3669—Decision No. CU–6827

*Value of paintings may be determined by appraisal of an art expert who acted as agent in purchasing them.*

### PROPOSED DECISION *

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $5,274,663.00, was presented by OLGA LENGYEL, based upon the asserted less of certain real and personal property in Cuba, and stock interests in Cuban enterprises. Claimant has been a national of the United States since naturalization in 1951.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

---

* This decision was entered as the Commission's Final Decision on June 30, 1972.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The Regulations of the Commission provide:

> The claimant shall be the moving party and shall have the burden of proof on all issues involved in the determination of his claim. (FCSC Reg., 45 C.F.R. §531.6(d) (1970).)

Claimant asserts the following losses:

| | |
|---|---:|
| 1. Two penthouse apartments in Vedado | $ 108,170.00 |
| 2. Household furnishings, including objects of art | 2,353,318.00 |
| 3. Automobile, golf car and furs | 19,000.00 |
| 4. Paintings | 2,214,000.00 |
| 5. Jewelry and platinum box taken from attorney's office | 375,000.00 |
| 6. Cash also taken from attorney's office | 60,000.00 |
| 7. Cash in safe in apartment | 21,325.00 |
| 8. Cuban currency | 11,750.00 |
| 9. Stock interests in Cuban corporations | 112,100.00 |
| Total | $5,274,663.00 |

On the basis of the evidence of record the Commission finds that claimant owned certain items subject of this claim as further discussed below.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

## PENTHOUSE APARTMENTS

Based upon the evidence of record including copies of the deeds to the two apartments, affidavits of claimant, a pre-nuptial agreement and other documents, the Commission finds that claimant was the sole owner of the two apartments, known as Apartments 15–B and 15–D located at 201 Primera Avenida in Vedado, Havana.

Claimant's Cuban attorney states that claimant and her husband fled Cuba in September 1960.

On October 14, 1960, the Government of Cuba published in its Official

Gazette, Special Edition, its Urban Reform Law. Under this law the renting of urban properties, and all other transactions or contracts involving transfer of the total or partial use of urban properties was outlawed (Article 2). The law covered residential, commercial, industrial and business office properties (Article 15).

Based on the foregoing and the evidence of record, the Commission finds that claimant's apartments in Vedado were taken by the Government of Cuba pursuant to the provisions of the Urban Reform Law; and, in the absence of evidence to the contrary, that the taking occurred on October 14, 1960, the date on which the law was published in the Cuban Gazette. (See *Claim of Henry Lewis Slade*, Claim No. CU–0183, 1967 FCSC Ann. Rep. 39) The Commission further finds that the contents of the two apartments were taken at the same time.

The aforementioned deeds reflect that claimant purchased Apartment 15–B on March 4, 1958 for $38,000 subject to a $16,000 mortgage, and Apartment 15–D on December 18, 1958 for $25,000. The record also reflects that after their purchase claimant made extensive alterations and improvements to both apartments with the result that the total cost of Apartments 15–B and 15–D including legal fees and taxes was $66,870 and $41,800, respectively.

Based on the entire record the Commission finds that the value of Apartments 15–B and 15–D including improvements on the date of loss was $66,870 and $41,800 and that claimant had reduced the mortgage on Apartment 15–B to $13,500. After deduction of the mortgage, the Commission finds that claimant suffered a total loss of $75,170 as the result of the taking by the Government of Cuba of these two apartments.

### Household Furnishings, Appliances, Objects of Art, Automobile and Miscellaneous Items

The record includes detailed listings of the furniture, furnishings, appliances, as well as a 1958 Chrysler Saratoga, golf car, cameras, objects of art, and other miscellaneous items in the two apartments, with their estimated values. There are also affidavits of two officials of the British Commonwealth Insurance Company who had appraised the personalty in Apartment 15–B in 1958; a statement by the president of the American International Insurance Company who stated that he had appraised the personalty in both Apartment 15–B and 15–D, a letter from a former occupant of both apartments, subsequent to claimant's departure, and claimant's affidavit.

Under date of November 28, 1971, claimant submitted an appraisal of the above items of personal property, which are considered art objects, made by Mr. Louis Zara and prepared on the basis of information supplied by claimant. Mr. Zara states that he researched the sales prices of similar art objects, which he listed under the column "Gallery Price Realized", and set forth his opinion under the column "Appraiser's Estimate For 1960". The asserted sales prices are shown as aggregating $4,342,-976.00 and Mr. Zara's estimate is $2,190,200.00.

Based on the entire record, the Commission finds that claimant owned the said items of personal property situated in the two apartments, as well as the automobile, golf equipment, and furs; and that the values on October 14, 1960, the date of loss, were as follows:

| | |
|---|---|
| Furnishings of Apartment 15–D, including items not individually evaluated ............................................ | $ 22,609.00 |
| Furnishings of Apartment 15–B, including items not individually evaluated ............................................ | 140,409.00 |
| Automobile and golf equipment, depreciated ................. | 5,720.00 |
| Furs, depreciated ................................................................ | 11,000.00 |
| Total ....................................................... | $179,738.00 |

### *Paintings*

The portion of the claim for paintings is set forth in claimant's affidavit of May 29, 1967 which accompanied her official claim form. Therein she stated that the paintings had cost $240,000.00 in 1938, but that their aggregate value in 1960 was about 60% higher. In support thereof, claimant submitted a copy of an appraisal of February 15, 1964 from Joseph Schaefer, an official art curator for the French Government. Mr. Schaefer states that claimant's father, Ferdinand Bernard, had commissioned him to find some exceptional rare paintings; and that in 1938 he acquired for Mr. Bernard about 22–23 paintings each within the price range of 38,000 to 65,000 French francs. His best recollection is that the aggregate amount Mr. Bernard paid for all of the paintings was between 900,000 and 1,000,000 French francs. Mr. Schaefer was able to recall the details of only 14 of the paintings which he described as follows:

1. Fragonard—Landscape with Staffage
2. G. Bellini—The Holy Family
3. Gerard Terborch—Portrait of a Lady
4. Salomon Van Ruysdael—River Landscape
5. Adriaen Brouwer—Peasant-Interior
6. H. Avercamp—Snow-Landscape
7. Meindert Hobbema—Paysage with Mill
8. Jan Van Goyen—Sea Landscape
9. Jan Gossaert—Madonna with Angels
10. Quentyn Massys—Portrait of a Senator
11. Joachim Patinir—Paysage
11. Hans Memling—Angel in Paysage
13. Ed. Manet—Portrait of a Painter
14. Maurice Utrillo—View of Montmartre

In the opinion of this very respectable art expert, the 22–23 paintings "today" (i.e., February 15, 1964) had a value of $240,000.00.

At this point it is noted that in 1938 the average value of a French franc was $0.028781 (International Financial Statistics, International Monetary Fund). Therefore, the aggregate price paid for all of the paintings in 1938 was approximately $26,000.00 to $28,750.00. On the basis of Mr. Schaefer's appraisal, the aggregate value of all the paintings had increased about 9 times their original cost between 1938 and 1954.

The record includes a detailed inventory of claimant's personal properties in Cuba, including the paintings. It is asserted that this inventory was prepared by an insurance appraiser in Cuba for the purpose of an insurance policy; and that the valuations were made low in order to induce claimant to apply for insurance coverage for her personal properties. Under date of August 30, 1971, claimant submitted her detailed affidavit

of August 28, 1971 by which she amended her claim for the paintings by increasing the amount to $2,214,000.00. As a preface to that amendment, claimant states that her new valuations are based upon information she obtained from experts. Claimant's list now includes 30 paintings asserted to have been taken by the Government of Cuba.

The evidence also includes a letter of August 31, 1971 from Mr. Louis Zara, setting forth, *inter alia*, his appraisal of the paintings. It appears that Mr. Zara was Editor-in-Chief of a publication known as "Masterpieces" from 1950 to 1951, and a copy of Volume I, published in 1950, has been submitted by claimant. In that publication Louis Zara is shown as Editor-in-Chief, and Herman R. Bollin is indicated as Art Director. Beyond this, no further information is included in the record concerning Mr. Zara's qualifications as an art expert or appraiser. Moreover, it is noted that Mr. Zara's appraisal was not based upon a physical inspection of the paintings, but rather upon a list furnished by claimant.

Mr. Zara begins by attempting to explain away Mr. Schaefer's appraisal, to whom he refers as "the renowned French expert", and it does not appear that he ever spoke with Mr. Schaefer. He states in part as follows:

> It would be presumptuous to attempt to revise the estimate Dr. Schaefer gave except for the fact that on the aforementioned date he was a public official, no longer engaged personally in the art market, and was merely, in giving his statement, carrying out a feeling of obligation to his long deceased client. Furthermore . . . he was, with all good will, providing a perfunctory service . . . .

After citing examples of certain purchases of paintings made by the Mellon Trust, Mr. Zara then estimates the values of 27 paintings as follows:

| | | | |
|---|---|---|---:|
| 1. | DEGAS | "Dancing Figure" | $ 100,000 |
| 2. | DEGAS | "Bending Dancer" | 40,000 |
| 3. | VAN DYCK | "Portrait of the Marchesa" | 200,000 |
| 4. | DAUMIER | unnamed | 75,000 |
| 5. | TOULOUSE-LAUTREC | unnamed | 150,000 |
| 6. | FRANS HALS | "Portrait of a Girl" | 180,000 |
| 7. | DUFY | "At the Horse Races" | 75,000 |
| 8. | PICASSO | "Fruits in Bowl" | 150,000 |
| 9. | VAN GOGH | "Man in Garden" | 200,000 |
| 10. | DAUMIER | "Parisien Scene" | 50,000 |
| 11. | BRAQUE | "Still Life" | 125,000 |
| 12. | CEZANNE | "Still Life" | 150,000 |
| 13. | GOYA | "Three Noblemen" | 250,000 |
| 14. | FRAGONARD | "Landscape with Staffage" | 200,000 |
| 1$. | BELLINI | "Holy Family" | 100,000 |
| 16. | TERBORCH | "Portrait of a Lady" | 100,000 |
| 17. | RUYSDAEL | "River Landscape" | 65,000 |
| 18. | BROUWER | "Peasant Interior" | 40,000 |
| 19. | VAN AVERCAMP | I have no opinion here and leave estimate at | 45,000 |
| 20. | HOBBEMA | "Paysage With Mill" | 150,000 |
| 21. | VAN GOYEN | No special opinion here and leave estimate at | 50,000 |
| 22. | MASSYS | "Portrait of a Senator" | 80,000 |
| 23. | PATINIR | No opinion; leave estimate at | 36,000 |
| 24. | MEMLING | "Angel in Paysage" | 100,000 |

| | | |
|---|---|---:|
| 25. GOSSAERT | "Madonna with Angels" | 35,000 |
| 26. MANET | "Portrait of a Painter"—<br>leave estimate at | 200,000 |
| 27. UTRILLO | "View of Montmartre"—<br>leave estimate at | 85,000 |
| | Estimate total value of above | $3,031,000 |

The following listing includes claimant's amended valuations, using numbers keyed to those employed by Mr. Zara, shown above, except where otherwise indicated, along with appropriate remarks in parenthesis:

1. (The insurance inventory value for this one is $800.00) — $80,000.00
2. (The insurance inventory lists this one as "Painting", artist not shown, valued at $120.00) .............. 25,000.00
3. (The insurance inventory lists this one as "Antique Painting: woman figure" by Anthony Van Dyck, valued at $7,000.00) ....................................... 150,000.00
4. (The insurance inventory lists this one as "Long Painting modern", artist not shown, valued at $100.00) ................................................................. 50,000.00

   (These two are not included in Mr. Zara's list. The insurance inventory lists them at "2 Paintings: Hunter" valued at $500.00) ........................................ 20,000.00
5. (The insurance inventory lists this one as "Woman's figure with lamp above" by Henri de Toulouse, valued at $3,000.00) ................................................. 125,000.00
6. (Claimant states that this one was placed in a space made especially for it between the shelves of the floor-to-ceiling, wall-to-wall bookshelves. In her affidavit of November 30, 1971, claimant states that this is one of the "3 Pictures" appearing in the insurance inventory at $120.00. Artist is not shown) 120,000.00
7. (The insurance inventory lists this one as "Painting: Horse race by Raul Dufey Epsom", valued at $6,000.00) ....................................................... 60,000.00
8. (The insurance inventory lists this one as "Painting" by Picasso, valued at $6,000.00) ..................................... 130,000.00
9. (In her affidavit of November 30, 1971, claimant states this is one of "3 Pictures" appearing in the insurance inventory as $120.00, artist not shown) ............ 100,000.00
10. (The insurance inventory lists this one as "Parisian scene", valued at $250.00, artist not shown) ............ 30,000.00
11. (The insurance inventory lists this one as "Large painting, ultra modern", valued at $230.00, artist not shown) ................................................................. 80,000.00
12. (The insurance inventory lists this one as "Large painting, still life", valued at $260.00, artist not shown) ................................................................. 100,000.00
13. (The insurance inventory lists this one as "Painting—three figures with lamp above", valued at $5,000.00) 150,000.00

(The following 14 paintings are those
appraised by Mr. Schaefer.)

| | | |
|---|---|---:|
| 14. | | 120,000.00 |
| 15. | | 70,000.00 |
| 16. | | 75,000.00 |
| | (The above items—14, 15 and 16—are not included in the insurance inventory) | |
| 17. | (The insurance inventory lists this one as "Painting, Sea scene", valued at $120.00) ...................................... | 45,000.00 |
| 18. | (In her affidavit of November 30, 1971, claimant states this is one of "3 Pictures" appearing in the insurance inventory as $120.00. Artist is not shown) ...... | 30,000.00 |
| 19. | (This one is not included in the insurance inventory) | 45,000.00 |
| 20. | (The insurance inventory lists this one as "Large painting", valued at $280.00, artist not shown) ........ | 100,000.00 |
| 21. | | 50,000.00 |
| 22. | | 50,000.00 |
| 23. | | 36,000.00 |
| 24. | | 85,000.00 |
| 25. | | 3,000.00 |
| | (The above items—21 through 25—are not included in the insurance inventory) | |
| 26. | (The insurance inventory lists this one as "Modern painting", valued at $150.00, artist not shown) ........ | 200,000.00 |
| 27. | (The insurance inventory lists this one as "Painting by Damon", value not indicated. In her affidavit of November 30, 1971, claimant states that "It is actually a painting by Daumier. The insurance appraiser made an error") ............................................................ | 85,000.00 |
| | | $2,214,000.00 |

On the basis of the entire record, the Commission finds the evidence insufficient to support claimant's assertions either as to the number and identities of the paintings or as to the values thereof on the date of loss. The Commission finds that the valuation most appropriate to the property and equitable to the claimant is the appraisal made by Mr. Schaefer, an art expert who had selected them for purchase by claimant's father, and whose opinion was given *ante litam motam*. Accordingly, the Commission finds that the aggregate value of the paintings on October 14, 1960, the date of loss, was $240,000.00.

### JEWELRY

The record includes an affidavit by claimant's Cuban attorney who states that he represented her from 1955 until he left Cuba on October 25, 1960. He states that the jewels which claimant's father had owned were received from France toward the end of 1956 and he at that time checked them against the inventory and then arranged to place them in a safe deposit box of claimant. At claimant's request he sold about one-half to a manager of a jewelry store in Havana for $352,000.00. He also enclosed a list of the jewelry and platinum jewelry box which had been shipped from France, with their appraised value of noted the items

9

that were sold. The aggregate value of the original list is shown as $691,-000.00, and the total value of the items indicated on this list as sold is $316,000.00

The record also includes an appraisal of the jewelry made in Paris in January, 1951 at claimant's request, a list of what appears to be the same jewelry as shipped exclusive of the platinum jewelry box, and copies of correspondence related thereto. The appraised total is shown as 215,300 pound sterling and in a letter to claimant dated January 27, 1964 the appraiser states that they are worth twice the price they were worth in 1950.

In addition there is in the record the aforementioned affidavits of claimant and of the French citizen who shipped the paintings and jewelry to Cuba. The latter affidavit includes a list of the jewelry. In claimant's affidavit of May 29, 1967 she states that she had left the jewelry subject of this claim with her Cuban attorney at the airport when she was leaving Cuba because she was advised that she would be physically searched and that these valuables would be confiscated.

In the aforementioned affidavit of claimant's Cuban attorney he states that Cuban officials opened the safe in his office about 2 weeks after claimant left Cuba in September 1960, and seized claimant's jewels worth $300,000.00, her $60,000.00 in cash, and stocks, documents and cash which his clients left in his custody. Thereafter he says he went into hiding with has family and escaped by plane on October 25, 1960.

Based on the entire record the Commission finds that claimant owned the jewelry subject of this claim, that it was taken by the Government of Cuba on September 15, 1960, and that its aggregate value including the platinum jewelry case was $375,000.00.

### CASH LEFT WITH ATTORNEY

Claimant in her affidavit states that she left $40,000.00 with her Cuban attorney and an additional $20,000.00 in cash to be made available to her old housekeeper and her husband for maintenance and taxes on the apartment. She therefore asserts a claim in the amount of $60,000.00 for this loss. The aforementioned affidavit of her Cuban attorney states that when claimant left Cuba she gave him in trust for safekeeping $40,000.00 in United States currency and an additional $20,000.00 to meet payments required on her apartments and for other purposes designated by her, as well as the jewelry referred to above.

Based on all the evidence of record the Commission finds that claimant owned $60,000.00 in cash left in custody with her Cuban attorney and that it was taken by the Government of Cuba on September 15, 1960 at the same time as the jewelry was taken.

### CASH IN SAFE IN APARTMENT

Claimant asserts the loss of $21,325.00 in United States currency which she had placed in her apartment safe. In support claimant has submitted a letter from an individual who states that she was in the apartment in the evening before claimant's departure and that among other things she saw claimant leave about $21,500.00 in United States currency in claimant's safe.

Based on the evidence of record the Commission finds that claimant suffered a loss of $21,325.00 in United States currency which was taken

from her safe on October 14, 1960 the date on which the Government of Cuba took her apartments.

### CUBAN CURRENCY

A portion of this claim is based on the loss of 11,750 Cuban pesos which claimant has submitted. Claimant left Cuba in September 1960, and the currency was brought to her shortly thereafter. Subsequently, on August 4, 1961 there was published in the Cuban Official Gazette, Law 963 which ordered a currency exchange to be carried out on August 6 and 7, 1961. The law provided that after August 7, 1961, old currency was to be null and of no value. Article XI of Law 963 declared that all currency which, at the time of promulgation, was outside the territory under the jurisdiction of the Cuban State, was null and of no legal force. Accordingly, the Commission holds that claimant's Cuban peso notes became automatically null and of no legal effect on August 4, 1961, the date of the promulgation of Law 963 (see *Claim of Betty G. Boyle,* Claim No. CU–3473, 1968 FCSC Ann. Rep. 81).

In view of the foregoing the Commission finds that claimant suffered a loss of $11,750.00 (the peso being on a par with the United States dollar) on August 4, 1961 based on this portion of her claim.

### STOCK INTERESTS IN CUBAN CORPORATIONS

Based on the entire record including stock certificates in the Cuban corporations concerned, the Commission finds that, pursuant to the Community Property Law of Cuba, claimant owned a ½ interest in 28,560 shares of Minimax Super-Mercados, S.A. (Minimax); 37 shares of common and 4,727 shares of preferred stock of Inversiones Guarina, S.A. (Guarina); 85 shares of common and 2,724 shares of preferred stock of Fibraglass Distributors, Inc. (Fibra); 8,137 shares of common and 100 shares of preferred stock of Cuban Independent Trading Corp. (Cuban); and 276 shares of common and 729 shares of preferred stock of Colon Independent Trading Corp. (Colon).

In our decisions entitled *Claim of Libby Holman Reynolds* (Claim No. CU–1384); *Claim of Helen Brandon and Claudia Muriel Deske* (Claim No. CU–2175); *Claim of Benjamin Kovner* (Claim No. CU–1015); and *Claim of Jack Clareman and Benet Polikoff, Executors of the Estate of Montgomery Clift, Deceased* (Claim No. CU–1385), which we incorporate herein by reference, we held that these companies were intervened or otherwise taken by the Government of Cuba on September 1, 1960; and that this type of claim is compensable to an American national under the facts and conditions set forth therein. We need not again detail here the reasons or the methods used in determining the value of the Minimax stock as $1.0023 per share; the value of Fibra common stock as $5.4913 per share and preferred as $1.00 per share; the value of Cuban common at $.600476 per share and Cuban preferred as $100.00 per share; and the value of Colon common as $4.0418 per share and preferred at $118.00 per share.

On the basis of evidence of record in the instant case, it is found that claimant came within the terms of the *Reynolds, Brandon, Kovner,* and *Clift* decisions, and that she suffered a loss in the aggregate amount of $66,920.03 for the above-described stock interests within the meaning of Title V of the Act.

With regard to the portion of this claim based on the ownership of a

stock interest in Guarina, the record contains no evidence regarding its nationalization or other taking and no balance sheet or other financial statements from which the value of Guarina can be ascertained. Moreover, counsel states claimant is unable to secure any financial statements. Accordingly, the Commission is constrained to and does deny this portion of the claim for lack of proof.

Claimant also claims the loss of a stock interest in Sedanita Textil, S.A. (Sedanita) and in Inversiones Lenkest S.A. (Lenkest). In regard to Sedanita she submitted a certificate in the name of her Cuban attorney and has not explained her interest therein. In regard to Lenkest the record discloses that it was formed to purchase real property in Cuba and to develop it for shopping centers. There is also of record a letter dated June 23, 1959 to its stockholders in which it is stated that the total assets of the corporation consisted of a bank deposit in the Royal Bank of Canada in the amount of $100,000.00, that $48,970.58 of this sum had been transferred to the bank's New York branch, that this sum was being distributed by check to the shareholders proportionately, and that the remaining funds ($51,029.42) could not be transferred from Cuba under present Cuban laws.

Claimant states that at the time of the Cuban Government confiscation Lenkest owned 9 options to purchase land in areas in Havana where Minimax had contracted to purchase land to build stores. In the claim form claimant states that she owned 40 shares of Lenkest but the record contains no share certificates or evidence of the number of shares outstanding. In view of the foregoing the portion of the claim based on the loss of a stock interest in Sedanita and in Lenkest is denied for lack of proof.

RECAPITULATION

Claimant's losses are summarized as follows:

| Item | Date of Loss | Amount |
|---|---|---|
| Apartments | October 14, 1960 | $    95,170.00 |
| Household furnishings, etc. | October 14, 1960 | 179,738.00 |
| Paintings | October 14, 1960 | 240,000.00 |
| Jewelry | September 15, 1960 | 375,000.00 |
| Cash taken from attorney's office | September 15, 1960 | 60,000.00 |
| Cash in apartment safe | October 14, 1960 | 21,325.00 |
| Cuban currency | August 4, 1961 | 11,750.00 |
| Stock interests | September 1, 1960 | 66,920.03 |
| | Total | $1,049,903.03 |

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644) and in the instant claim it is so ordered as follows:

| FROM | ON |
|---|---|
| September 1, 1960 ................................................ | $   66,920.03 |
| September 15, 1960 .............................................. | 435,000.00 |
| October 14, 1960 ................................................. | 536,233.00 |
| August  4, 1961 ................................................... | 11,750.00 |
| | $1,049,903.03 |

### CERTIFICATION OF LOSS

The Commission certifies that OLGA LENGYEL suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Million Forty-nine Thousand Nine Hundred Three Dollars and Three Cents ($1,049,903.03) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., April 28, 1972.

## IN THE MATTER OF THE CLAIM OF THE GOODYEAR TIRE & RUBBER COMPANY

### Claim No. CU–0887—Decision No. CU–887

*The nationalization of a Cuban corporation wholly owned by an American entity does not justify a Certification of Loss under Title V of the Act, if the Cuban entity was insolvent on the date of loss.*

### PROPOSED DECISION *

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, for $6,282,053.85 was presented by THE GOODYEAR TIRE & RUBBER COMPANY based upon debts and loss resulting from the intervention of Goodyear de Cuba, S.A.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened,

---

* This decision was entered as the Commission's Final Decision on February 12, 1968.

or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 502(1) of the Act defines the term "national of the United States" as "(B) a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity."

An officer of the claimant corporation has certified that the claimant was organized in the State of Ohio and that at all times between August 1, 1960 and presentation of this claim on December 1, 1966, more than 50% of the outstanding capital stock of the claimant has been owned by United States nationals. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

Claimant states that 63,575 of its 64,116 stockholders were residents of the United States and assumes that substantially all of them were United States nationals; and that 541 stockholders were residents of foreign countries and assumed to be citizens of those countries.

An officer of THE GOODYEAR TIRE & RUBBER COMPANY has certified, and the Commission finds that claimant was the holder of 980 shares of the 1,000 outstanding shares of Goodyear de Cuba, S.A. and was the beneficial owner of the remaining 20 shares of stock under a Declaration of Trust signed by Edwin J. Thomas on March 26, 1959, and that Goodyear de Cuba, S.A. was organized under the laws of the Republic of Cuba on January 1, 1928.

On November 25, 1959, the Government of Cuba published in its Official Gazette Law No. 647 which authorized the Minister of Labor, in such cases as he deemed it necessary, to order the intervention of enterprises or working centers. Law 843, published in the Official Gazette of July 6, 1960, gave the Labor Ministry unilateral authority to extend the period of its intervention of any establishment beyond the six months period provided in Law 647. Resolution 19045 of August 30, 1960, of the Ministry of Labor, provided for the intervention of Goodyear de Cuba, S.A. and appointed an intervenor who delivered the Resolution to the firm on September 1, 1960. Thereafter, the Company was nationalized by Resolution No. 3 of the President of the Republic of Cuba published in the Cuban Official Gazette on October 24, 1960.

Based on the foregoing the Commission finds that claimant sustained a loss, within the meaning of Title V of the Act on September 1, 1960, when Goodyear de Cuba, S.A. was intervened by the Government of Cuba.

In making determinations with respect to the validity and amount of claims and value of properties, rights and interests taken, the Act provides in Section 503(a) that the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value or cost of replacement.

Claimant has stated its loss in the amount of $6,282,053.85, $4,973,915.26 representing the amount due and owing on account from Goodyear de Cuba, S.A., $144,413.85 the amount due on a sight draft payable by the

Cuban enterprise, and $1,163,724.74 being the value claimed for the stock of Goodyear de Cuba, S.A. as of September 1, 1960.

In support of the valuations claimed, claimant has submitted balance sheets of the Cuban firm for December 31, 1959 and August 30, 1960, a statement of assets of Goodyear de Cuba, S. A. as of September 1, 1960 amounting to $6,473,770.00, a schedule of liabilities as of September 1, 1960, the record of account between claimant and the Cuban company, a listing of the physical assets of the Cuban company with the purchase prices and book values, and a photocopy of an insurance binder on buildings, machinery, fixtures and equipment.

The balance sheet for Goodyear de Cuba as of August 31, 1960 reflects the following:

<em>ASSETS</em>

*Current Assets*

  *Cash*

| | | |
|---|---:|---:|
| Cash in Bank | $ 834,521.00 | |
| Cash on Hand | 2,300.00 | $ 836,821.00 |

  *Receivables*

| | | |
|---|---:|---:|
| Accounts Receivable | 1,464,233.00 | |
| Bills Receivable | 225,562.00 | |
| Suspense Account | 148,548.00 | |
| Less Res. for Cash Disc. | 4,571.00 | |
| Less Res. for Contr Rebate | 36,901.00 | |
| Less Res. for Commissions | 31,262.00 | |
| Less Res. for Bad Debts | 364,377.00 | |
|   Net Total Receivables | | 1,401,232.00 |
| Advances to Employees | 5,369.00 | |
| Guarantee Deposits | 3,154.00 | 8,523.00 |

  *Inventories*

| | | |
|---|---:|---:|
| Duty, Frt. and Clearance Chg. | 24,885.00 | |
| Merchandise on Hand | 546,368.00 | |
| Merchandise in Transit | 1,285.00 | |
| Prepaid Duty etc Raw Mat. | 9,272.00 | |
| Raw Materials | 198,973.00 | |
| Raw Materials in Transit | 63,773.00 | |
|   Total Inventories | | 844,556.00 |
|   Total Current Assets | | $3,091,132.00 |
| *Securities* | | $ 4.00 |

*Fixed Assets*

| | | |
|---|---:|---:|
| Land and Appurtenances | $ 120,179.00 | |
| Buildings | 604,904.00 | |
| Machinery and Equipment | 2,347,037.00 | |
| Furniture and Fixtures | 59,455.00 | |
| Motor Cars and Trucks | 52,042.00 | |
| Less Res. for Depreciation | 1,169,432.00 | |
|   Total Fixed Assets | | $2,014,185.00 |

*Prepaid and Deferred Chgs.*

| | | |
|---|---:|---:|
| Insurance | $ 370.00 | |
| Taxes | 385.00 | |
| Misc. | 1,979.00 | |
|   Total Prepaid and Def. Chgs. | | 2,734.00 |
|          TOTAL ASSETS | | $5,108,055.00 |

*LIABILITIES*

*Current Liabilities*

| | | |
|---|---:|---:|
| Accounts Payable | $ 39,867.00 | |
| Res. for Inc. and Prof. Tax | 7,131.00 | |
| *Miscellaneous Reserves* | | |
| Taxes | 6,638.00 | |
| Audit and Legal | 2,085.00 | |
| Overseas Travel | 11,440.00 | |
| Social Laws Liabilities | 2,731.00 | |
| Other Reserves | 80,514.00 | |
| Total Current Liabilities | | $ 150,406.00 |

*Other Liabilities*

| | | |
|---|---:|---:|
| Goodyear Tire & Rubber Co. | $5,007,890.00 | |
| Goodyear Tyre & Rubber Co. Ltd. | (152.00) | |
| Goodyear S.A. Luxemburgo | 145.00 | |
| Goodyear de Brasil | 2,482.00 | |
| Goodyear T & R Co. Akron | | |
| Draft Acct. 144,874.00 | | |
| Prov. Dep. 140,495.00 | 4,352.00 | |
| Goodyear Export, S.A. | | |
| Draft Acct. 38,250.00 | | |
| Prov. Dep. 40,621.00 | (2,371.00) | |
| Total Liabilities | | $5,012,346.00 |

*CAPITAL*

| | | |
|---|---:|---:|
| Common Stock Authorized | $ 100,000.00 | |
| | | $ 100,000.00 |

*SURPLUS*

| | | |
|---|---:|---:|
| Balance at End of Prev. Year (106,396.00) | | |
| Profit and Loss Year to Date ( 48,301.00) | | |
| Net Surplus | | (154,697.00) |
| TOTAL LIABILITIES | | $5,108,055.00 |

The balance sheet enumerates the assets, tangible and intangible, and the liabilities of the enterprise. The liabilities consist of creditors' claims, which are contractual in nature, and those of the owner, which are residual in nature. The excess of assets over contractual liabilities represents the owners' equity, or net worth. The same result may be reached by adding the capital investment, appropriate surplus reserves (not including reserves for depreciation, taxes and the like), and any undivided profit, as appropriate, and subtracting any outstanding deficit. Accordingly, the calculation of net worth is as follows:

| | | |
|---|---:|---:|
| Total Assets | $5,108,055.00 | |
| Less Contractual Liabilities | 5,162,752.00 | |
| Net Worth Minus— | $ 54,697.00 | |

Claimant has submitted a statement of assets for Goodyear de Cuba for September 1, 1960 in the amount of $6,473,770.00. This statement does not consider any deductions for reserves or depreciation of buildings, machinery, equipment, and fixtures but uses an insured value for these items as set forth on an undated photocopy of an insurance binder. The statement does

consider a depreciation of 15% per annum on motor vehicles, a different rate than used for the balance sheet. The claimant further submits an adjusted statement concerning the amount due from Goodyear de Cuba on September 1, 1960 indicating a debt of $4,973,915.26 instead of the $5,007,890.00 set forth on the balance sheet.

The Commission has considered all of the evidence of record and has determined that the increased value for motor vehicles and the adjusted debt of $4,973,915.26 might be substituted in the balance sheet but such changes would not be sufficient to reflect a net surplus for the Cuban enterprise. The Commission concludes that claimant has not sustained a loss based upon the net worth of Goodyear de Cuba due to the intervention by the Government of Cuba.

However, the Commission does find that Goodyear de Cuba was indebted to claimant in the amount of $4,973,915.26 plus the amount of $144,847.00 for a draft which had not been paid to claimant although the balance sheet indicates a provisional payment of $140,000.00, and concludes that claimant sustained a loss in the total amount of $5,118,762.26 under Section 502(3) of the Act.

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement. (See the *Claim of Lisle Corporation,* FCSC Claim No. CU–0644.)

Accordingly, the Commission concludes that the amount of the loss sustained by claimant shall be increased by interest thereon at the rate of 6% per annum from September 1, 1960, the date on which the loss occurred, to the date on which provisions are made for the settlement thereof.

### CERTIFICATION OF LOSS

The Commission certifies that THE GOODYEAR TIRE & RUBBER COMPANY sustained a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Five Million One Hundred Eighteen Thousand Seven Hundred Sixty-Two Dollars and Twenty-Six Cents ($5,118,762.26), with interest thereon at 6% per annum from September 1, 1960 to the date of settlement.

Dated at Washington, D. C. January 10th 1968.

## IN THE MATTER OF THE CLAIM OF TWENTIETH CENTURY-FOX FILM CORPORATION, ET AL.

### Claim No. CU–2114—Decision No. CU–6050

*The value of films and film products is best determined by considering costs of manufacture and shipment as well as depreciation incident to shipment, exhibition and storage of the films and film products in Cuba.*

### PROPOSED DECISION*

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of

* This decision was entered as the Commission's Final Decision on March 15, 1971.

$873,001.57, was presented by TWENTIETH CENTURY-FOX FILM CORPORATION, TWENTIETH CENTURY-FOX INTERNATIONAL CORPORATION and TWENTIETH CENTURY-FOX INTER-AMERICA, INC., and is based upon the asserted loss of film prints, anticipated film rental, reimbursement for loss of property assigned by a former branch manager in Cuba, and the loss of the assets of a Cuban corporation known as Peliculas Fox de Cuba, S.A.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–143k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:
> The term "property" means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

Section 504 of the Act provides, as to ownership of claims, that
> (a) A claim shall not be considered under section 503(a) of this title unless the property on which the claim was based was owned wholly or partially, directly or indirectly by a national of the United States on the date of the loss and if considered shall be considered only to the extent the claim has been held by one or more nationals of the United States continuously thereafter until the date of filing with the Commission.

The Regulations of the Commission provide:
> The claimant shall be the moving party and shall have the burden of proof on all issues involved in the determination of his claim. (FCSC Re., 45 C.F.R. §531.6(d) (1970).)

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The evidence of record discloses that TWENTIETH CENTURY-FOX FILM CORPORATION, a Delaware corporation, referred to hereinafter as FOX FILMS, owned all of the outstanding stock of TWENTIETH CENTURY-FOX INTERNATIONAL CORPORATION, a New York corporation, hereafter referred to as INTERNATIONAL, and of TWENTIETH

CENTURY-FOX INTER-AMERICA, INC., a New York corporation, hereafter referred to as INTER-AMERICA. Further, the evidence discloses that INTERNATIONAL owned all of the stock of Peliculas Fox de Cuba, S.A., a Cuban corporation formed in 1922, referred to hereinafter as Fox-Cuba.

A corporate official of FOX FILMS, has certified that at all times from the asserted date of loss in May 1961 to the date of filing this claim in April 1967 more than 50% of its outstanding capital stock was owned by nationals of the United States. Further, the official stated that at all times during the aforesaid period more than 90% of the outstanding capital stock of all classes or of any beneficial interest in FOX FILMS has been owned directly or indirectly by nationals of the United States. The Commission finds that FOX FILMS and the other claimants herein are nationals of the United States within the meaning of Section 502(1)(B) of the Act.

For many years prior to the asserted date of loss of the property subject of this claim, FOX FILMS produced and furnished film product to INTERNATIONAL for distribution of Fox product throughout the world, and to INTER-AMERICA for distribution in areas near the United States. INTER-AMERICA utilized the services of Fox-Cuba, with whom distribution agreements were executed. Thereafter, the film product was distributed throughout Cuba as the subject of contracts between Fox-Cuba and the Cuban theatre owners or exhibitors and the product was exhibited to the public in various Cuban theatres in that territory whereby film rentals were earned by the Cuban subsidiary and the claimants.

FOX FILMS has submitted, among other things, company records showing shipment of product to Cuba and other areas and an inventory of film product in Cuba, assertedly taken by the Government of Cuba from Fox-Cuba. The inventory includes the various types of film prints which were the subject of distribution and exhibition contracts and included Fox product or other prints to which rights had been acquired by claimants herein. The inventory included 744 prints, such as 35mm feature presentations and short subjects. Based on the aforesaid evidence of record, as well as affidavits and company records submitted by officials of the claimants, the Commission finds that FOX FILMS was at all times pertinent to this claim the owner of the said film product, further itemized hereafter.

The Commission finds that Fox-Cuba was taken by the Government of Cuba pursuant to Resolution 2868, published by Cuban authorities in the Official Gazette on May 10, 1961, and the Commission further finds that the film inventory of FOX FILMS was taken at that time.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant". This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

The prints shipped to Cuba by INTER-AMERICA were made from negatives of various productions previously produced by FOX FILMS or

other producers, domestic or foreign, from whom FOX FILMS or INTER-AMERICA had secured rights to the prints in question. These prints, apparently shipped to Cuba primarily in the period from 1953 to 1960, had been exhibited or were to be exhibited in various areas or exhibition zones in Havana, other cities in Cuba, or areas throughout the smaller towns and hamlets. Thus, the product was in various stages of the depletion cycle, applicable to such product, at the time of loss, with some prints apparently to be released or in active use in the aforesaid exhibition zones, others in a re-run category, while others were to be junked as no longer having utility for exhibition purposes.

Officials of the claimants have submitted their affidavits and statements, with cost figures from Technicolor, Pathe and other manufacturers of the prints, indicating the cost of manufacturing film product in the years immediately prior to loss, including cost per foot of black and white prints, or those in color, along with incidental charges, such as shipping or custom expenses. Claimants have computed a value of the prints on a replacement or cost when new basis, with incidental charges added thereto; and the total value of the product in Cuba was asserted to be in the amount of $345,588.00 at the time of loss.

Based upon the entire record, including evidence available to the Commission concerning the value of similar property in Cuba, the Commission finds that the most appropriate basis for evaluating the film product at the time of loss is to consider factors relating to cost of manufacture and shipment, as well as depreciation incident to the shipment, exhibition and storage of the product in Cuba. The Commission has considered these factors, including those relating to depreciation of the film products, and finds that the reasonable value of the prints is as follows:

*35mm Features*
| | |
|---|---|
| Black and White, 239 prints, at $150.00 per print | $ 35,850.00 |
| Color, 431 prints, at $300.00 per print | 129,300.00 |
| *Color Shorts* | |
| Color shorts, 74 prints, at $50.00 per print | 3,700.00 |
| Total | $168,850.00 |

The Commission finds that FOX FILMS suffered a loss in the amount of $168,850.00 within the meaning of Title V of the Act when the Government of Cuba seized the film product on May 10, 1961.

As indicated above, INTERNATIONAL also suffered a loss when the Government of Cuba seized its wholly owned subsidiary, Fox-Cuba, on May 10, 1961. Since Fox-Cuba was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of its ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

INTERNATIONAL has submitted evidence pertaining to the value of the Cuban subsidiary, including affidavits, correspondence and a certified balance sheet, dated April 1, 1961, which was prepared immediately before the date of loss; trial balances, notes thereto and profit and loss statements. Claimants have also submitted supplementary information with respect to the assets and liabilities of Fox-Cuba, including banking statements, state-

FOREIGN CLAIMS SETTLEMENT COMMISSION          375

ments of accounts due and payable, showing not only assets but certain debts payable to a claimant herein by the Cuban subsidiary at the time of loss, as more particularly discussed hereafter.

The balance sheet of Fox-Cuba, dated April 1, 1961, reflects the following (the peso being on a par with the dollar):

## *ASSETS*

*Cash*

| | | |
|---|---:|---:|
| Cash in Bank No. 1 | $197,548.69 | |
| Cash in Bank No. 2 | 9,612.15 | |
| Cash in Bank No. 3 | 8,335.17 | |
| Petty Cash | 200.00 | |
| Total Cash | | $215,696.01 |

*Accounts Receivable*

| | | |
|---|---:|---:|
| Exhibitors | $107,760.03 | |
| Others | 29.55 | |
| Total Accounts Receivable | | 107,789.58 |
| *Inventories* | | 11,866.24 |

*Fixed Assets*

| | | |
|---|---:|---:|
| Land | 1,600.00 | |
| Buildings | 39,200.00 | |
| Less—Reserve for Depreciation.. | − 588.00 | 38,612.00 |
| Furniture Equipment, etc. | 24,659.24 | |
| Less—Reserve for Depreciation.. | − 21,164.39 | 3,494.85 |
| Total Fixed Assets | | 43,706.85 |

*Prepaid Expenses*

| | | |
|---|---:|---:|
| Court Stamps | 10.00 | |
| Unexpired Insurance | 640.62 | |
| Advances | 80.00 | |
| Deposits for Rent, Light, etc. | 530.00 | |
| Document Stamps | 50.00 | |
| Postage Stamps | 80.00 | |
| Total Prepaid Expenses | | 1,390.62 |
| Total Assets | | $380,449.30 |

## *LIABILITIES AND CAPITAL*

*Accounts Payable and Accrued Liabilities*

| | | |
|---|---:|---:|
| Accounts Payable | $     456.74 | |
| Accrued Taxes—Local | 5,332.85 | |
| Accrued Taxes—Inter-America | 3,224.27 | |
| Total Accounts Payable and Accrued Liabilities | | 9,013.86 |

*Fixed Liabilities (At Long Term)*

| | |
|---|---:|
| Property to be Paid | 38,760.00 |

*Advance Payments from Exhibitors*

| | |
|---|---:|
| Credit Balances | 792.30 |

*Financial Accounts*
   Twentieth Century-Fox Inter-America, Inc. ............................ 286,843.57

*Capital Stock*
   Authorized 500 Shares at $50.00
   Issued 500 Shares at $50.00 ......................................... 25,000.00

*Surplus or Deficit Account*
   Profit or Loss Prior Years .................................... $ 14,070.47
   Profit or Loss Current Year ................................. 5,969.10    20,039.57

     Total Liabilities and Capital ................................ $380,449.30

The Commission finds that the above balance sheet appropriately reflects the financial status of the Cuban firm on or about May 10, 1961, the date of loss. Since this is a Cuban enterprise, it is necessary to establish the net worth of this subsidiary and the Commission finds that Fox-Cuba had a net worth of $45,039.57 on May 10, 1961, the date of loss. The Commission also finds that INTERNATIONAL suffered a loss in this amount within the meaning of Title V of the Act.

According to the balance sheet, there was an intercompany indebtedness of the Cuban subsidiary payable to INTER-AMERICA, consisting of an account in the amount of $286,843.57. Accordingly, the Commission finds that claimant INTER-AMERICA suffered a loss in the amount of $286,843.57 within the scope of Title V of the Act as a result of the taking of the Cuban corporation by the Government of Cuba on May 10, 1961. (See *Claim of Kramer, Marx, Greenlee and Backus*, Claim No. CU–0105, 25 FCSC Semiann. Rep. 62 [July-Dec. 1966].)

Claimant INTER-AMERICA has submitted an assignment dated April 1, 1961, executed by Thomas E. Sibert, former branch manager of the claimant in Cuba, whereby Mr. Sibert assigned to claimant all of his property which he left in Cuba at or about the time that the Cuban subsidiary was taken by the Government of Cuba. The evidence establishes that Mr. Sibert left Cuba at the time of loss of the Cuban firm and the property, having a value of $10,000.00, was taken by the Government of Cuba after he left Cuba. In the absence of evidence to the contrary, the Commission finds that the property formerly owned by this employee was taken by Cuba on June 15, 1961, and that claimant INTER-AMERICA as the assignee of the property, suffered the loss in the total amount of $10,000.00. (See *Claim of General Motors Corporation and General Motors Acceptance Corporation*, Claim No. CU-3088.)

Product owned by FOX FILMS or others was transferred to INTERNATIONAL, INTER-AMERICA and Fox-Cuba, pursuant to agreements between the parties, for distribution of the product throughout the world, including Cuba. The agreements for exhibition of the product in Cuba were apparently made on "block booking" arrangements with the Cuban exhibitors whereby contracts were made for the film products several weeks in advance. Such agreements assertedly provide for the booking and exhibition by the theatre owners of several feature presentations, with fillers or short subjects, which were to be furnished by the distributors.

The claimants have asserted claim for loss of prospective earnings or film rental income which might have been realized by claimants had not the Government of Cuba seized their property in May 1961. FOX FILMS contends that the prints, aside from the physical attributes, as discussed above,

contained a series of images on the film which not only were unique in nature but were the primary things of value as the subject of the contracts between INTER-AMERICA and the subsidiary, Fox Cuba, and those contracts executed between Fox-Cuba and the exhibitors or theatre owners in Cuba.

The Commission has carefully considered the claim asserted for loss of anticipated film rental income had not the Government of Cuba intervened. However, claims based on the loss of prospective earnings are generally not allowed under international law. Edwin M. Borchard discusses this matter in his recognized treatise entitled "Diplomatic Protection of Citizens Abroad." In Section 172 thereof, Mr. Borchard cites the historic "Alabama Arbitration," and goes on to say:

> "This award (in the Alabama case), including the finding that 'prospective earnings cannot properly be made the subject of compensation, inasmuch as they depend in their nature upon future and uncertain contingencies,' has been regarded as a reliable precedent by numerous othr arbitral tribunals, which have disallowed indirect claims based upon loss of anticipated profits, loss of credit, and similarly consequential elements of loss."

> \*       \*       \*       \*       \*       \*       \*

> "Acts of Congress authorizing domestic commissions to distribute international awards have followed the general rule excluding anticipated profits and indirect losses from consideration as elements of damage. \* \* \* Domestic commissions have reached the same conclusion without specific direction from Congress."

The Commission finds that the portion of the instant claim based on prospective film rentals for the period beginning May 10, 1961, is not compensable under the Act. The profits or earnings of the Cuban enterprise, if any, which may have been realized during the period in question did not belong to the claimants since their title in and to the enterprise and film product was extinguished when the Government of Cuba intervened. However, claimants are being allowed interest on the value of the property taken by the Cuban Government, as discussed hereafter. Accordingly, the portion of the claim based on film rental or profits for the period following intervention on May 10, 1961, is denied for the reason that the record contains no evidence to show that any profits belonging to the claimants were taken by the Government of Cuba. (See *Claim of United Shoe Machinery Corporation*, Claim No. SOV–40,353, 10 FCSC Semiann. Rep. at 238; *Claim of Aris Gloves, Inc.*, Claim No. CZ–1170, 17 FCSC Semiann. Rep. 239 [July–Dec. 1962]; and *Claim of Metro-Goldwyn-Mayer, Inc.*, Claim No. CU–2225.)

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered:

| From | On |
|---|---|
| TWENTIETH CENTURY-FOX FILM CORPORATION | |
| May 10, 1961 ............................................... | $168,850.00 |
| TWENTIETH CENTURY-FOX INTERNATIONAL CORPORATION | |
| May 10, 1961 ............................................... | 45,039.57 |
| TWENTIETH CENTURY-FOX INTER-AMERICA, INC. | |
| May 10, 1961 ............................................... | 286,843.57 |
| June 15, 1961 ............................................... | 10,000.00 |

### CERTIFICATIONS OF LOSS

The Commission certifies that TWENTIETH CENTURY-FOX FILM CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Sixty-Eight Thousand Eight Hundred Fifty Dollars ($168,850.00) with interest thereon at 6% per annum from May 10, 1961 to the date of settlement;

The Commission certifies that TWENTIETH CENTURY-FOX INTERNATIONAL CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Forty-Five Thousand Thirty-Nine Dollars and Fifty-Five Cents ($45,039.55) with interest thereon at 6% per annum from May 10, 1961 to the date of settlement; and

The Commission certifies that TWENTIETH CENTURY-FOX INTER-AMERICA, INC. suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Ninety-Six Thousand Eight Hundred Forty-Three Dollars and Fifty-Seven Cents ($296,843.57) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D. C., February 3, 1971

## IN THE MATTER OF THE CLAIM OF MAC GACHE

Claim No. CU-0050—Decision No. CU-3908

*The Commision took administrative notice that land and improved real property values increased substantially between 1954 and 1959 when Castro came into power.*

### PROPOSED DECISION*

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $2,925,251.16, was presented by MAC GACHE, based upon the asserted loss of certain real and personal property in Cuba. Claimant has been a national of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1946), 22 U.S.C. §§1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act

---

* This decision was entered as the Commission's Final Decision on October 28, 1969.

provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The evidence includes statements and affidavits from claimant to the Department of State and the Commission; stock certificates; as well as a statement, dated August 21, 1961, from claimant's former Cuban counsel and Public Notary who participated in the transactions pursuant to which claimant acquired the properties in question and who caused claimant's ownership to be duly recorded with the appropriate Cuban authorities.

On the basis of all the evidence of record, the Commission finds that claimant owned the following items of property in Cuba:

1. A 100% interest in certain improved real and personal property, known as Hotel Kawama, at Varadero Beach, Cuba, including a main building, cottages and cabanas, which hotel was under lease to the Hotel Kawama Operating Company, S.A., a Cuban corporation wholly owned by claimant.

2. A debt due from Hotel Kawama Operating Company, S.A.

3. A 25% stock interest in a Cuban corporation, Inmobiliaria Gustileana, S.A., hereafter called Gustileana, which owner, in turn, certain real property in Vedado, a suburb of Havana.

4. A 100% stock interest in a Cuban corporation, Inmobiliaria Rodojo, S.A., hereafter called Rodojo, which owned, in turn, certain real property in Havana. Claimant's interest in Rodojo was owned indirectly through a wholly-owned Panamanian corporation, Gache Investment Corporation.

5. A debt due from Rodojo secured by the real property owned by Rodojo.

Claimant's former Cuban attorney, who has personal knowledge of the facts, has stated in a letter to claimant, dated August 5, 1963, that the Hotel Kawama was intervened by the Cuban Labor Department "in the latter part of 1960" and that Rodojo's real property was taken by the Government of Cuba "during the first semester of 1960". In his affidavit of March 18, 1969, he added that the taking of Gustileana by Cuba is evidenced by an extraordinary edition of the Cuban Official Gazette, dated June 10, 1960, which he had examined.

Based upon the foregoing evidence and in the absence of evidence to the contrary, the Commission finds that Hotel Kawama was intervened by the Cuban Minister of Labor on October 15, 1960, and that claimant's ownership interests in Gustileana and Rodojo were taken by Cuba on June 10, 1960 and March 15, 1960, respectively. Consequently, claimant sustained losses within the meaning of Title V of the Act.

Since all of the corporations, mentioned above, were organized either under the laws of Cuba or Panama, none qualifies as a corporate "national of the United States" defined under Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or any State, the District of Columbia or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held previously that a stockholder in such a corporation is entitled to file a claim based upon his ownership interest therein. (See *Claim of Parke, Davis & Company*, Claim No. CU-0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

Upon consideration of the entire record, the Commission finds that the valuations most appropriate to the properties and equitable to the claimant are those set forth hereafter.

### HOTEL KAWAMA

The record shows that claimant acquired the hotel in 1954 at a cost of $400,000.00 when it was subject to a mortagage of $200,000.00. Subsequently, claimant improved the property by adding new cottages and improving the existing structures, at a further cost of $150,000.00. Extracts from claimant's books and records, certified to be accurate by claimant's accountant, disclose that the mortgage was fully satisfied so that claimant owned the hotel free of any liens or encumbrances, including all the furniture, equipment and other personalty contained in the hotel.

Claimant states that he had received an offer of $1,500,000.00 for his hotel, but had rejected it as inadequate. His statement and claim based on that amount is supported in the record by a single nondetailed letter made by the former President of the Real Estate Brokers Association of Havana. Claimant had failed, however, to furnish balance sheets or other supporting data and has failed to furnish a detailed breakdown of the real and personal property comprising the hotel. He has indicated in his reply of August 19, 1969 that no other evidence is available and that he would like the claim determined "on the basis of the material you now have in your file."

The Commission is well aware of the difficulty of securing certain types of evidence left in Cuba when claimants fled that country. Nevertheless, it must have reasonable evidence upon which to base an award. In the instant case it takes administrative notice of the fact that land values and tourist hotels did rise substantially in value after 1954 and until shortly prior to the take over by Castro. From this record, including the offer to purchase and the brochures available on the hotel, and considering the

excellent location of the subject property and the inflationary rise of such hotels, it concludes and holds that the Kawama property had a net value of $1,500,000.00 as claimed.

### DEBT FROM HOTEL KAWAMA OPERATING COMPANY, S.A.

It is asserted by claimant that his wholly-owned Kawama Operating Company, S.A., a Cuban corporation, owed him a debt of $225,251.16.

Claimant's statements to the Department of State contain no reference to any such debt, nor is this asserted debt included in any of the communications from claimant's former Cuban attorney. In response to suggestions from the Commission for supporting evidence in this respect, claimant submitted an affidavit from his accountant accompanied by certified extracts from claimant's books and records. An examination of the extracts discloses that claimant paid debts of his Cuban corporation, which had leased his Hotel Kawama, in the amounts of $70,000.00 on one occasion and $25,000.00 on another, for a total of $95,000.00.

On the basis of the entire record and in the absence of more persuasive evidence, the Commission finds that the Hotel Kawama Operating Company, S.A., which apparently was formed merely to operate the hotel through a corporation, was intervened by Cuba on October 15, 1960 when the hotel itself was intervened. The Commission further finds that on October 15, 1960, the date of loss, the Cuban corporation owed claimant a debt in the amount of $95,000.00, and concludes that claimant sustained a loss in that amount within the meaning of Title V of the Act. (See *Claim of Kramer, Marx, Greenlee and Backus*, Claim No. CU-0105, 25 FCSC Semiann. Rep. 62 [July-Dec. 1966].)

### IMMOBILIARIA GUSTILEANA, S.A.

As indicated above, claimant owned a 25% stock interest in Gustileana. The record shows that this Cuban corporation owned no assets other than certain real property in Vedado, a suburb of Havana.

Claimant now asserts that the total value of Gustileana was $1,400,000.00 making his 25% stock loss $350,000.00. The record shows that Gustileana purchased the real property on November 6, 1957 at a total cost of $879,000.00 which included an encumbrance of $439,000.00 which was still unpaid on June 10, 1960, the date of loss. An affidavit in the file dated January 28, 1969, secured from Cuban sources, shows the appraised value of this property was $879,000.00. Claimant's original claim of June 15, 1965 asserts that his one-fourth interest cost him $223,500.00 and was worth $350,000.00 when confiscated. The property owned by Gustileana evidently consisted of several assembled parcels of land in the Vedado littoral and had a substantial value. Unfortunately, however, as in the case of the Kawama Hotel, there is no detailed or corroborative evidence to support the claimed value. Further, there is no long passage of time in which the Commission could find the property would have substantially increased in value. Here the property was acquired on November 6, 1957 and was confiscated on June 10, 1960, a period of approximately 2 years and 8 months. In the Kawama Hotel case the interval was approximately 7 years. Applying the same principle here as on the hotel the Commission finds that this property cost of $879,000.00 increased in value approximately one-third as much as the Kawama property which we have held had appreciated about three times its original value in the 7 year period. This would place a gross

value of Gustileana of less than double its original cost for a total value of $1,172,000.00, and the Commission finds that is the fair gross value to be applied here.

As noted above, the Commission finds that the value of the property owned by Gustileana was $1,172,000.00 on the date of loss, and that the property was then encumbered by a mortgage in the amount of $439,400.00. Accordingly, the Commission concludes that the next value of the property was $732,600.00 and that claimant's 25% interest in Gustileana on the date of loss was $183,150.00.

### INMOBILIARIA RODOJO, S.A.

The record discloses that the real property owned by Rodojo, its only asset, was acquired on October 17, 1955 at a cost of $485,000.00, encumbered by a mortgage in favor of claimant in the amount of $250,000.00. It further appears from the record that the mortgage in that amount encumbered the property on March 15, 1960, the date of loss.

Claimant has asserted a value of $850,000.00, supported by a similar appraisal as in the hotel case. Based upon the foregoing reasoning and evidence, the Commission finds that the value of the real property was $850,000.00 on the date of loss, and that the property was then encumbered by a mortgage in the amount of $250,000.00. Accordingly, the Commission concludes that the net value of the property was $600,000.00, and that claimant sustained a loss in that amount within the meaning of Title V of the Act.

### DEBT FROM INMOBILIARIA RODOJO, S.A.

As stated above, Rodojo was indebted to claimant in the amount of $250,000.00 on March 15, 1960, the date of loss. Accordingly, the Commission concludes that claimant sustained a loss in that amount within the meaning of Title V of the Act. (See *Claim of Kramer, Marx, Greenlee and Backus, supra.*)

It also appears that claimant has asserted and the United States Internal Revenue Service has allowed an income tax deduction for claimant's losses.

### RECAPITULATION

Claimant's losses may be summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| Hotel Kawama | October 15, 1960 | $1,500,000.00 |
| Debt from Hotel Kawama Operating Company, S.A. | October 15, 1960 | 95,000.00 |
| Gustileana | June 10, 1960 | 183,150.00 |
| Rodojo | March 15, 1960 | 600,000.00 |
| Debt from Rodojo | March 15, 1960 | 250,000.00 |
| | Total | $2,628,150.00 |

The Commission has decided that in certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corpora-*

FOREIGN CLAIMS SETTLEMENT COMMISSION     383

*tion*, Claim No. CU–0644), and in the instant case it is so ordered as follows:

| FROM | ON |
|---|---|
| March 15, 1960 | $ 850,000.00 |
| June 10, 1960 | 183,150.00 |
| October 15, 1960 | 1,595,000.00 |
| Total | $2,628,150.00 |

### CERTIFICATIONS OF LOSS

The Commission certifies that MAC GACHE suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Million Six Hundred Twenty-eight Thousand One Hundred Fifty Dollars ($2,628,150.00) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D. C., September 24, 1969

## IN THE MATTER OF THE CLAIM OF SPERRY RAND CORPORATION

Claim No. CU–0278—Decision No. CU–2965

*Petition to Reopen*

### AMENDED FINAL DECISION

Under date of October 8, 1968, the Commission entered its Final Decision denying this claim because the evidence failed to established that claimant's wholly owned Cuban subsidiary, Remington Rand de Cuba, S.A. (hereafter called Rand of Cuba), had any value on October 24, 1960, the date the Government of Cuba nationalized Rand of Cuba.

Subsequently, claimant petitioned to reopen the claim on the basis of newly discovered evidence pursuant to the governing regulations of the Commission. (FCSC Reg., 45 C.F.R. §531.5(1)(1970).) The new evidence consists of a copy of a valuation report of Rand of Cuba, prepared in Cuba on November 17, 1960 by A. E. Seymour, claimant's chief executive officer. Appended to the report are copies of detailed supporting schedules and copies of trial balances for Rand of Cuba as of September 30, 1960, apparently prepared after an examination of Rand of Cuba's books and records.

Upon consideration of the newly discovered evidence in light of the entire record, the Commission amends the decision in this matter as follows:

The Commission now finds that on October 24, 1960, the date of loss, the fair market values of Rand of Cuba's assets were as follows:

| | |
|---|---|
| Cash | $ 15,126.00 |
| Notes and accounts receivable | 490,476.00 |
| Inventories | 519,908.00 |
| Rental machines | 929,571.00 |
| Physical properties | 58,944.00 |
| Other assets | 29,484.00 |
| Total Assets | $2,043,509.00 |

According to claimant's letter of December 19, 1967, its records show that it was indebted to Rand of Cuba in the amount of $53,076.66 on the date of loss. Since this debt could not have been taken by the Government of Cuba, the Commission finds that on the date of loss the aggregate amount of Rand of Cuba's assets was $1,990,432.34.

The Commission finds that Rand of Cuba's liabilities on the date of loss were as follows:

| | |
|---|---:|
| Accounts payable | $ 254,118.00 |
| Other accrued liabilities | 73,959.00 |
| Accrued taxes | 4,995.00 |
| Inter-company debts | 803,528.56* |
| Total Liabilities | $1,136,600.56 |

*The Commission determined in the *Claim of Remington Rand America Corporation, Claim* No. CU-301, that Rand of Cuba owed this affiliate $803,528.56 on October 24, 1960, the date of loss, and entered a Certification of Loss in that amount in favor of that claimant.

Accordingly, the Commission finds that the net worth of Rand of Cuba on the date of loss was $853,831.78, and concludes that claimant sustained a loss in that amount within the meaning of Title V of the Act.

The Commission has decided that in certification of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1959, as amended, interest should be included at the rate of 6% per annum from the respective dates of loss to the date of settlement (see *Claims of Lisle Corporation,* Claim No. CU-0644), and in the instant case it is so ordered.

Accordingly, the following Certification of Loss will be entered, and in all other respects the Final Decision of October 8, 1968, as amended herein, is affirmed.

## CERTIFICATION OF LOSS

The Commission certifies that SPERRY RAND CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Eight Hundred Fifty-Three Thousand Eight Hundred Thirty-one Dollars and Seventy-Eight Cents ($853,831.78) with interest thereon at 6% per annum from October 24, 1960 to the date of settlement. Dated at Washington, D. C., June 30, 1972

## PROPOSED DECISION**

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, for $500,000.00 was presented by the SPERRY RAND CORPORATION, based upon the nationalization of its wholly owned subsidiary, Remington Rand de Cuba, S.A., by the Government of Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643-1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the

** This decision was entered as the Commission's Final Decision on October 8, 1968.

Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term 'property' means any property, right or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized exproporiated, intervened, or taken by the Government of Cuba.

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

Claimant corporation, by an authorized officer, has certified that the claimant was organized in the State of Delaware and that at all times between the date of loss and presentation of this claim more than 50% of the outstanding capital stock of the claimant has been owned by United States nationals. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The Secretary of THE SPERRY RAND CORPORATION has further certified that as of December 30, 1966 less than 2.5% of its issued and outstanding stock is held by shareholders having registered addresses outside the United States. These stockholders are assumed to be nationals of those respective countries.

The Commission finds on the basis of evidence of record that claimant was the sole shareholder of Remington Rand de Cuba, S.A. a corporation existing under the laws of the Republic of Cuba.

On October 24, 1960, the Government of Cuba published in its Official Gazette Resolution No. 3, which listed as nationalized Remington Rand de Cuba, S.A. Accordingly, the Commission finds that Remington Rand de Cuba, S.A., was nationalized by the Government of Cuba on October 24, 1960.

Based on the foregoing, the Commission finds that claimant sustained a loss of its ownership interest within the meaning of Title V of the Act on October 24, 1960, when Remington Rand de Cuba, S.A. was nationalized and expropriated by the Government of Cuba.

Remington Rand de Cuba, S.A. acted as the representative and distributor for SPERRY RAND CORPORATION and for some of the subsidiaries and affiliates of the SPERRY RAND CORPORATION. Remington Rand de Cuba, S.A. mainly concerned itself with selling and leasing data processing equipment, office equipment, office systems, and electric shavers. Remington

Rand de Cuba, S.A. had outstanding and issued 5000 shares with a par value of $100 each (or 100 pesos).

It is asserted that SPERRY RAND CORPORATION carried the 5000 shares of Remington Rand de Cuba, S.A. on its books at the par value of $500,000. SPERRY RAND CORPORATION has claimed the "going concern" value of the subsidiary corporation on the date of loss. The claimed amount of $446,923.34 was arrived at by deducting for the aforementioned $500,000.00 the amount of $53,076.66, an amount owed to Remington Rand de Cuba, S.A. by the SPERRY RAND CORPORATION. SPERRY RAND CORPORATION additionally asserts that the going concern value of a subsidiary includes the profits realized by the parent corporation from the sales to the subsidiary.

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." The Commission has concluded that this phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property and that it is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider; i.e., fair market value, book value, going concern value, or cost of replacement.

In regard to the financial status of Remington Rand de Cuba, S.A. the record includes *Financial Statements for the Year Ended March 31, 1960 and Auditors Report* made by an independent firm of accountants and auditors. The Balance Sheet, in part summarized, appears as follows:

## ASSETS

Current Assets

| | | |
|---|---:|---:|
| Cash | $ 96,061.98 | |
| Notes and Accounts Receivable | 452,984.99 | |
| Inventory of Merchandise | 336,576.07 | |
| Parent and Affiliate Companies | 54,067.80 | |
| (including $54,052.67 due from | | 939,690.84 |
| SPERRY RAND CORPORATION) | | |
| Non-Current Notes Receivable | | 29,607.76 |
| Rental Machines | | 301,741.59 |
| Investments and Advances | | 32,045.16 |
| Fixed Assets | | 64,539.75 |
| Deferred Charges | | 16,208.57 |
| | | $1,383,833.67 |

## LIABILITIES

Current Liabilities

| | |
|---|---:|
| Notes Payable to Banks | 489,089.12 |
| Accounts Payable | 23,194.45 |
| Taxes Payable and Accrued | 58,037.07 |
| Accruals | 61,669.93 |

Affiliate Companies
  Remington Rand America Corp..... $810,105.48
  Others ................................................ 46,985.26  857,090.74
Other Current Liabilities ................. 12,343.72  1,501,425.03

Deferred Income ................................................................ 9,186.82
Capital Stock
  5000 shares $100 each par value .......................... 500,000.00
Deficit
  Per Profit & Loss Statement ............................... 626,778.18  (126,778.18)

$1,383,833.67

The balance sheet of Remington Rand de Cuba, S.A. enumerates the assets, tangible and intangible, and the liabilities of the enterprise. The liabilities consist of creditors' claims, which are contractual in nature, and those of the owner, which are residual in nature. The excess of assets, if any, over contractual liabilities represents the owners' equity, or net worth. The same result usually may be reached by adding the capital investment, appropriate surplus reserves (not including reserves for depreciation, taxes and the like), and any undivided profit, as appropriate, and subtracting any outstanding deficit. The balance sheet of March 31, 1960 reflects no book value but on the contrary, a deficit of 126,778.18.

SPERRY RAND CORPORATION has also submitted an uncertified balance sheet which assertedly states the financial condition of Remington Rand de Cuba, S.A. as of September 30, 1960. That balance sheet reflects the following:

Total Assets ......................................................... $ 984,890.00
Less Contractual Liabilities .......................................... —1,162,039.00

Deficit ............................................................ ($ 177,149.00)

It would appear therefore that the Cuban corporation was not only operating at a deficit but that the deficit was increasing. While the claimant did sustain the loss of its proprietary interest it has not established that the interest had any value. Moreover, no evidence has been submitted to establish claimant's contention that the profits of the present corporation provide a basis for finding a value of Remington Rand de Cuba.

Therefore the Commission concludes that claimant corporation, SPERRY RAND CORPORATION, has not sustained a loss based upon net worth of Remington Rand de Cuba. (See the *Claim of Goodyear Tire & Rubber Company*, FCSC Claim No. CU–0887).

The claim is accordingly, denied.

Dated at Washington, D.C., August 29, 1968

## IN THE MATTER OF THE CLAIMS OF HARRY SCHRAGE, ET AL.

Claim Nos. CU–1433 and CU–1434—Decision No. CU–0976

*Petition to Reopen*

AMENDED FINAL DECISION

Under date of September 28, 1971, the Commission entered its Final Decision in this claim certifying a loss in favor of HARRY SCHRAGE for his interests in certain Cuban corporations, and further certifying a loss in favor of the Estate of Rasa Schrage, Deceased for the one-half interests of this decedent in the said Cuban corporations and debts thereof. The interests of one Michael Schrage, deceased spouse of the said Rasa Schrage were not certified in the absence of qualifying information.

Additional information and evidence has been received and the Commission finds that the record now establishes that Rasa Schrage and Michael Schrage were naturalized in 1946. Michael Schrage died intestate on June 26, 1960, survived by his spouse and five children, nationals of the United States at all pertinent times, and who inherited his estate. Rase Schrage filed Claim No. CU–1434 on April 12, 1967. Said Rasa Schrage died testate on March 19, 1968. Her Estate has been administered and closed, the said five children receiving distribution of the residue. Accordingly, the Commission holds that the interests of the aforesaid Rasa Schrage and Michael Schrage in the subject matter of the claim filed by the late Rasa Schrage have passed to the five children, namely, HARRY SCHRAGE, MORRIS SCHRAGE, MARTHA MATILDA WIDAWER, ROBERT SCHRAGE and EVA EISENSTEIN, who are substituted as claimants in place of their parents, now deceased.

The property subject of these claims is described as follows:

In *Cia. Industrial Cubana de Goma, S.A.* (Goma)
   (Intervened on December 15, 1959)
   HARRY SCHRAGE, one share of stock—$361.17
   Michael Schrage and Rasa Schrage—499 shares of stock—$180,225.82
   Michael Schrage and Rasa Schrage—debt due from Goma—$42,556.92

In *Cia. Distribuidora del Calzado, S.A.* (Calzado)
   (Intervened on March 15, 1959)
   HARRY SCHRAGE, 150 shares of stock—$56,317.93
   Michael Schrage and Rasa Schrage—100 shares of stock—$37,545.28
   Michael Schrage and Rasa Schrage—debt due from Calzado—$104,082.32

The Commission having found that the interests of Michael Schrage and Rasa Schrage passed to their children in equal shares, the losses of claimants, including the separate interests of HARRY SCHRAGE, are restated as follows:

| Claimant | Item | Amount |
|---|---|---|
| HARRY SCHRAGE | Goma stock | $ 36,406.33 |
| | Goma debt | 8,511.38 |
| | Calzado stock | 63,826.99 |
| | Calzado debt | 20,816.46 |
| | | $129,561.16 |

| MORRIS SCHRAGE | Goma stock | $ 36,045.16 |
| | Goma debt | 8,511.38 |
| | Calzado stock | 7,509.06 |
| | Calzado debt | 20,816.47 |
| | | $72,882.07 |
| MARTHA MATILDA WIDAWER | Goma stock | $ 36,045.16 |
| | Goma debt | 8,511.38 |
| | Calzado stock | 7,509.06 |
| | Calzado debt | 20,816.47 |
| | | $ 72,882.07 |
| ROBERTA SCHRAGE | Goma stock | $ 36,045.17 |
| | Goma debt | 8,511.39 |
| | Calzado stock | 7,509.05 |
| | Calzado debt | 20,816.46 |
| | | $ 72,882.07 |
| EVA EISENSTEIN | Goma stock | $ 36,045.17 |
| | Goma debt | 8,511.39 |
| | Calzado stock | 7,509.05 |
| | Calzado debt | 20,816.46 |
| | | $ 72,882.07 |

The Commission reaffirms its holding that interest shall be allowed, and it is so ordered as follows:

| | *FROM* | *ON* |
|---|---|---|
| HARRY SCHRAGE | March 15, 1959 | $84,643.45 |
| | December 15, 1959 | 44,917.71 |
| MORRIS SCHRAGE | March 15, 1959 | $28,325.53 |
| | December 15, 1959 | 44,556.54 |
| MARTHA MATILDA WIDAWER | March 15, 1959 | $28,325.53 |
| | December 15, 1959 | 44,556.54 |
| ROBERTA SCHRAGE | March 15, 1959 | $28,325.51 |
| | December 15, 1959 | 44,556.56 |
| EVA EISENSTEIN | March 15, 1959 | $28,325.51 |
| | December 15, 1959 | 44,556.56 |

Accordingly, the Certifications of Loss in the aforesaid Final Decision are set aside, the following Certifications of Loss will be entered, and in all other respects the Final Decision is affirmed.

CERTIFICATIONS OF LOSS

The Commission certifies that HARRY SCHRAGE suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V. of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Twenty-Nine Thousand Five Hundred Sixty-One Dollars and Sixteen Cents ($129,561.16) with interest at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission certifies that MORRIS SCHRAGE suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount

of Seventy-Two Thousand Eight Hundred Eighty-Two Dollars and Seven Cents ($72,882.07) with interest at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission certifies that MARTHA MATILDA WIDAWER suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seventy-Two Thousand Eight Hundred Eighty-Two Dollars and Seven Cents ($72,882.07) with interest at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission certifies that ROBERTA SCHRAGE suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seventy-Two Thousand Eight Hundred Eighty-Two Dollars and Seven Cents ($72,882.07) with interest at 6% per annum from the respective dates of loss to the date of settlement; and

The Commission certifies that EVA EISENSTEIN suffered a loss, as a result of action of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seventy-Two Thousand Eight Hundred Eighty-Two Dollars and Seven Cents ($72,882.07) with interest at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., June 30, 1972

## IN THE MATTER OF THE CLAIM OF CARTER H. OGDEN, ET AL.

Claim No. CU–2339—Decision No. CU–1261

*Petition to Reopen*

### AMENDED FINAL DECISION

On February 14, 1968 the Commission issued a Proposed Decision denying the claim of CARTER H. OGDEN for lack of evidence. Subsequently satisfactory evidence was submitted and in the Final Decision of September 22, 1971 the Commission added as claimant ELMA OGDEN, whose correct name is now shown to be Zelma, claimant's first wife, who during her marriage acquired a one-half interest in the property subject of this claim under the community property law of Cuba. The losses of CARTER H. OGDEN and ZELMA OGDEN, were determined as follows:

| Item | Value of Each Claimant's Interest | Date of Loss |
|---|---|---|
| 1. Partnership in Ogden & Ogden | $202,500.00 | December 6, 1961 |
| 2. Improved real property | 30,000.00 | December 6, 1961 |
| 3. Unimproved real property | 5,000.00 | December 6, 1961 |
| 4. Personal property of residence | 5,802.50 | December 6, 1961 |
| 5. Stocks, bonds, concessions: | | |
| (a) Petrolera Aventura | 120,000.00 | November 23, 1959 |
| (b) Petrolera Arabia | 4,458.16 | November 23, 1959 |
| (c) Inversiones Petroleras | 750.00 | November 23, 1959 |
| (d) Republic of Cuba bonds | 4,090.00 | December 31, 1960 |
| (e) and (f) Motembo and Santo Tomas concessions | 1,012.16 | November 23, 1959 |
| 6. Currency | 3,400.00 | August 6, 1961 |
| | $377,012.82 | |

After the issuance of the Final Decision, claimant CARTER H. OGDEN advised the Commission that he was divorced from his first wife Zelma Ogden since August 22, 1957 and that he married his present wife Dorothy M. Moore on April 29, 1960. He also presented evidence that all properties acquired by him during his first marriage to Zelma Ogden remained his exclusive property after the divorce was granted. He submitted evidence that his second wife was a national of the United States since birth and petitioned the Commission to reopen the claim and to change the Certification of Loss from ELMA OGDEN as it then was entered, to Dorothy M. Ogden.

Due consideration having been given to the petition, the Commission finds that under the community property law of Cuba upon dissolution of the marriage the community property comes to an end, but if both spouses agree that the property shall remain in the ownership of one of the spouses, no separation of the property takes place. On the basis of the record in the instant case the Commission further finds that by an agreement submitted to the appropriate court in Cuba in 1957, ZELMA OGDEN received a lump sum of $25,000.00 and an alimony allowance of $500.00 per month during her lifetime or her remarriage, and that she asserted no further claim to the assets of the marriage partnership. The Commission therefore concludes that these assets remains the exclusive property of CARTER H. OGDEN.

All the circumstances surrounding this claim indicate that on April 29, 1960, at the time of the second marriage, certain portions of the property involved in this claim had already been taken by the Government of Cuba and that no additional property in Cuba was acquired by either CARTER H. OGDEN or Dorothy M. Ogden from the date of their marriage to the date of the loss. Consequently, the entire loss, previously determined as having been sustained by CARTER H. OGDEN and ZELMA OGDEN was, in fact, sustained by CARTER H. OGDEN alone, inasmuch as his property owned prior to his second marriage under the provisions of Cuban law did not become community property of his second marriage partnership.

It is therefore concluded that CARTER H. OGDEN suffered the following losses:

| Item | Value | Date of Loss |
|---|---|---|
| 1. Partnership in Ogden & Ogden | $405,000.00 | December 6, 1961 |
| 2. Improved real property | 60,000.00 | December 6, 1961 |
| 3. Unimproved real property | 10,000.00 | December 6, 1961 |
| 4. Personal property at Marianao residence | 11,605.00 | December 6, 1961 |
| 5. Stocks, bonds and concessions: | | |
| (a) Petrolera Adventura | 240,000.00 | November 23, 1959 |
| (b) Petrolera Arabia | 8,916.32 | November 23, 1959 |
| (c) Inversiones Petroleras | 1,500.00 | November 23, 1959 |
| (d) Republic of Cuba bonds | 8,180.00 | December 31, 1960 |
| (e) and (f) mineral concessions | 2,024.32 | November 23, 1959 |
| 6. Currency | 6,800.00 | August 6, 1961 |
| | $754,025.64 | |

The accrued interest is to be computed as follows:

| FROM | | ON |
|---|---|---|
| November 23, 1959 | ....................................................... | $252,440.64 |
| December 31, 1960 | ....................................................... | 8,180.00 |
| August 6, 1961 | ............................................................. | 6,800.00 |
| December 6, 1961 | ....................................................... | 486,605.00 |
| | | $754,025.64 |

Accordingly, the claim of ZELMA OGDEN is hereby dismissed; the Certifications of Loss in the Final Decision of September 22, 1971 are set aside; the following Certification of Loss solely in favor of CARTER H. OGDEN will be entered; and in all other respects the Final Decision, as amended herein, is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that CARTER H. OGDEN suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seven Hundred Fifty-Four Thousand Twenty-Five Dollars and Sixty-Four Cents ($754,025.64) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

### IN THE MATTER OF THE CLAIM OF MARIA VINAS

Claim No. CU–3216—Decision No. CU–6229

*Petition to Reopen*

#### AMENDED FINAL DECISION

The Commission issued a Proposed Decision in this claim on June 16, 1971, certifying that claimant suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of $139,015.00. No objections to the Proposed Decision were submitted and the Proposed Decision was entered as a Final Decision in this claim on July 19, 1971.

The loss determined by the Proposed Decision included claimant's one-tenth (1/10) interest in improved real property located at General Betancourt Street in Matanzas, known as "Villa Maria." Such loss was determined in the amount of $5,000.00.

A portion of the claim relating to claimant's interest in improved real property located at No. 45 San Juan Bautista Street in Matanzas was denied for lack of proof.

Documentation obtained from abroad after the Proposed Decision became final, disclosed that, prior to her marriage in 1946, claimant acquired the sole ownership of the property known as "Villa Maria" and of the property at No. 45 San Juan Bautista Street.

The record shows that "Villa Maria" had a value of $50,000.00, and the realty at No. 45 San Juan Bautista Street a value of $5,000.00.

Accordingly, the determination of claimant's loss for "Villa Maria" previously established in the amount of $5,000.00 is now increased to $50,000.00,

and the claim for the property at No. 45 San Juan Bautista Street, previously denied, is now determined as having arisen on October 14, 1960, the date of taking, in the amount of $5,000.00. Claimant's total amount of the loss and the accrued interest are now restated as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| 37, 39, 41 San Juan Bautista | October 14, 1960 | $ 1,500.00 |
| Villa Maria | October 14, 1960 | 50,000.00 |
| Beach Property | October 14, 1960 | 3,500.00 |
| 45 San Juan Bautista | October 14, 1960 | 5,000.00 |
| Accounts Receivable | January 12, 1961 | 3,300.00 |
| Central Resulta | October 13, 1960 | 25,010.31 |
| Ferrocarril Resulta | October 13, 1960 | 1,250.00 |
| Quemado de Guines | October 13, 1960 | 19,600.00 |
| Azucarera de Sagua | January 12, 1961 | 12,679.69 |
| Defensa | August 8, 1961 | 16,000.00 |
| General de Seguros | December 6, 1961 | 10,255.00 |
| Colonia Reyes | October 13, 1960 | 200.00 |
| Zortzi Anai | October 14, 1960 | 720.00 |
| Beta | October 14, 1960 | 23,000.00 |
| El Infierno | December 6, 1961 | 17,000.00 |
| | Total | $189,015.00 |

The Commission affirms its holding that interest will be included in the Certification and it will be included as follows:

| FROM | ON |
|---|---|
| October 13, 1960 | $ 46,060.31 |
| October 14, 1960 | 83,720.00 |
| January 12, 1961 | 15,979.69 |
| August 8, 1961 | 16,000.00 |
| December 6, 1961 | 27,255.00 |
| Total | $189,015.00 |

Accordingly, the Certification of Loss in the Proposed Decision of June 16, 1971, which became final on July 19, 1971, is set aside, the following Certification will be entered, and in all other respects the Proposed Decision, as amended herein, is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that MARIA VINAS suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Eighty-Nine Thousand Fifteen Dollars ($189,015.00) with interest thereon at 6% per annum from the respective dates of taking to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

IN THE MATTER OF THE CLAIM OF FRANK STEINHART, JR., ET AL.

Claim No. CU–0231—Decision No. CU–6076

*Petition to Reopen*

AMENDED FINAL DECISION

This claim, originally opened by FRANK STEINHART, JR., based on inherited and purchased property, was the subject of Proposed and Final Decisions. Thereafter claimant petitioned that his sister ALICE STEIN-HART DE LA LLAMA be permitted to join in the claim for her interests in the said inherited property, and for her other property.

The petition having been considered, and ALICE STEINHART DE LA LLAMA having been a national of the United States at all times pertinent to this claim, it is granted.

The Commission previously found that FRANK STEINHART inherited a one-fourth interest in a plot of 10,000 square meters in Cojimar, valued at $8.00 per square meter, and now finds that ALICE STEINHART DE LA LLAMA also inherited a one-fourth interest in said plot, which was taken on December 6, 1961, and that she thereby suffered a loss of $20,000. This claimant had no interest in another plot of 1,006.62 square meters owned in one-half part by her brother.

Further the Commission finds that ALICE STEINHART DE LA LLAMA inherited a one-fourth interest in property at 120 Prado, Havana, which was taken on December 6, 1961, and that she thereby suffered a loss of $57,500.

Additionally, based on the record, the Commission finds that pursuant to the community property law of Cuba, claimant ALICE STEINHART DE LA LLAMA owned a one-half interest in a residence at Varadero Beach, with certain personalty therein. The Commission finds that this property was also taken by the Government of Cuba on December 6, 1961.

In arriving at the value thereof, the Commission has considered the claimant's figures indicating a valuation of $60,000 for the land, and $60,000 for the house; her brother's affidavit describing the property as a 4-bedroom house, with usual living facilities, and beach frontage; his assertion that an offer of $90,000 for the property had been refused. Considering this and the values of similar properties in Cuba, the Commission finds that the improved realty had a value of $100,000 and that claimant suffered a loss of $50,000 in this connection.

Further, the Commission finds that claimant's interest in furnishings including kitchen appliances and garden equipment had a value of $2,500, taken on December 6, 1961.

Re-examination of the file discloses that in the Final Decision restating the losses of FRANK STEINHART, JR. there was inadvertently omitted the item of land in Buena Vista having a value of $1,900 which however, was certified in the Proposed Decision.

Accordingly, the claimants' losses, suffered on December 6, 1961, are restated as follows:

**FRANK STEINHART:**

| | | |
|---|---|---|
| (1) | Finca Happy Hollow | $200,000.00 |
| (2) | House at No. 120 Prado, Havana (1/4) | 57,500.00 |
| (3) | Land in San Miguel del Padron | 2,000.00 |
| (4) | Land in Cojimar (1/4) | 20,000.00 |
| (5) | Land in Cojimar (1/2) | 4,026.48 |
| (6) | Land in Marianao | 173,096.10 |
| (7) | Land in Santa Fe | 23,347.92 |
| (8) | "La Cubana" securities | 31,500.00 |
| (9) | Land in Buena Vista | 1,900.00 |
| | | $513,370.50 |

**ALICE STEINHART DE LA LLAMA:**

| | | |
|---|---|---|
| (1) | Land in Cojimar (1/4) | $ 20,000.00 |
| (2) | House at No. 120 Prado (1/4) | 57,500.00 |
| (3) | Varadero residence (1/2) | 50,000.00 |
| (4) | Personalty (1/2) | 2,500.00 |
| | | $130,000.00 |

The Commission affirms its holding that interest shall be included in the Certifications of Loss from the date of loss to the date of settlement.

Accordingly, the Certification of Loss in the Final Decision is set aside and the following Certifications of Loss will be entered.

### CERTIFICATIONS OF LOSS

The Commission certifies that FRANK STEINHART, JR. suffered a loss, as a result of the actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Five Hundred Thirteen Thousand Three Hundred Seventy Dollars and Fifty Cents ($513,370.50) with interest thereon at 6% per annum from December 6, 1961, to the date of settlement; and

The Commission certifies that ALICE STEINHART DE LA LLAMA suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Thirty Thousand ($130,000.00) with interest thereon at 6% per annum from December 6, 1961, to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

## IN THE MATTER OF THE CLAIM OF SWEET PAPER SALES CORPORATION

Claim No. CU–1874—Decision No. CU–1671

*Petition to Reopen*

### AMENDED FINAL DECISION

Under date of October 16, 1968, the Commission entered its Final Decision denying this claim for lack of proof. Subsequently, supporting evidence was submitted on behalf of claimant.

Upon consideration of the new evidence, the Commission amends the decision in this matter as follows:

Section 502(1)(B) of the Act defines the term "national of the United States" as a corporation or other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity.

The record shows that claimant was organized under the laws of New York; and that all pertinent times all of its outstanding capital stock was owned in equal shares by Samuel Scheck and Henrietta Scheck, husband and wife. The evidences establishes that Samuel Scheck was a United States national from birth until his death in 1971. Therefore, 50% of claimant's outstanding capital stock was owned by a United States national at all pertinent times. The Commission holds that claimant is a national of the United States within the meaning of Section 502(1)(B) of the Act.

The Commission finds on the basis of the evidence of record that claimant owned 2,585 shares of stock in Cia. Papalera Flamingo, S.A. (Flamingo), a Cuban corporation, which was nationalized by the Government of Cuba on October 24, 1960 pursuant to Law 851.

Since Flamingo was organized under the laws of Cuba, it does not qualify as a corporate "national of the United States" within the meaning of Section 502(1)(B) of the Act, *supra*. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

Upon consideration of the entire record, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is the balance sheet for Flamingo as of December 31, 1959, a copy of which was submitted.

That balance sheet shows that Flamingo owned assets in Cuba aggregating $341,278.05, after deleting goods in transit in the amount of $11,329.78 because that asset could not have been taken by Cuba. It further appears that its liabilities aggregated $76,860.34. The Commission therefore finds that the net worth of Flamingo on October 24, 1960 was $264,417.71. Since Flamingo had 2,635 shares of outstanding capital stock, each share of stock had a value of $100.3483, and claimant's 2,585 shares of stock had an aggregate value of $259,400.36.

The Commission has decided that in certifications of loss on claims deter-

mined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

Accordingly, the following Certification of Loss will be entered.

### CERTIFICATION OF LOSS

The Commission certifies that SWEET PAPER SALES CORPORATION suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Fifty-Nine Thousand Four Hundred Dollars and Thirty-Six Cents ($259,400.36) with interest at 6% per annum from October 24, 1960 to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

## IN THE MATTER OF THE CLAIM OF FREDERIC SAMUELS

Claim No. CU–0263—Decision No. CU–3761

*Petition to Reopen on Commission's Own Motion*

### AMENDED FINAL DECISION

Under date of June 2, 1971, the Commission entered its Final Decision on this claim certifying a loss in favor of claimant in the amount of $62,242.08 plus interest. That certification included $61,278.08 for claimant's 375 shares of stock in Cia. Tabacalera de Rancho Boyeros, S.A. (Rancho), a Cuban corporation, and $964.00 for certain tangible personal property in Cuba.

A portion of the claim for 150 shares of stock in Rothschild–Samuels–Duignan, S.A. (RSD), a Cuban corporation, was denied as being not certifiable pursuant to Title V of the Act. RSD's balance sheet as of September 30, 1960 showed that its assets and liabilities aggregated $838,528.26 and $101,390.12, respectively, thus indicating an apparent net worth of $737,138.12. It further appeared that RSD's stockholders had recovered $757,451.09 representing certain accounts receivable of RSD.

Section 506 of the Act provides that the Commission shall reduce the amount of any claim by all amounts received by the claimant on account of the same loss or losses. Inasmuch as the amount recovered exceeded the apparent net worth of RSD, the Commission concluded that no amount could be certified with respect to the stock interest in RSD.

In the related *Claim of Cecile C. Samuels, et al;* Claim No. CU–0234, the Commission found that RSD owned an asset in the nature of goodwill which was not recorded on its books and records. The Commission determined that this asset had a value of $473,818.27, and that each share of RSD had a value of $111.6183 on September 15, 1960, the date of loss.

Accordingly, the Commission has reopened this matter on its own motion and amends the decision on this claim as follows:

The Commission finds that claimant's 150 shares of stock in RSD had a value of $16,742.75, and concludes that he sustained a loss in that amount on September 15, 1960.

Claimant's losses are summarized as follows:

| Item of Property | Date of Loss | Amount |
|---|---|---|
| Stock interest in Rancho | October 24, 1960 | $61,278.08 |
| Tangible personal property | September 15, 1960 | 964.00 |
| Stock interest in RSD | September 15, 1960 | 16,742.75 |
| | Total | $78,984.83 |

The Commission reaffirms its holding that interest shall be allowed, and it is so ordered as follows:

| FROM | ON |
|---|---|
| September 15, 1960 | $17,706.75 |
| October 24, 1960 | 61,278.08 |
| Total | $78,984.83 |

Accordingly, the Certification of Loss in the Proposed Decision of July 23, 1969 which was affirmed by the Final Decision of June 2, 1971 is set aside and the following Certification of Loss will be entered, and in all other respects the Final Decision, as amended herein, is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that FREDERIC SAMUELS suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Seventy-Eight Thousand Nine Hundred Eighty-Four Dollars and Eighty-Three Cents ($78,984.83) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C., June 30, 1972.

## IN THE MATTER OF THE CLAIM OF HOWARD E. HOLTZMAN, ET AL.

Claim No. CU–2168—Decision No. CU–3522

*The Commission may, on its own motion, reopen a claim and make adjustments based upon its findings in a related claim.*

### AMENDED PROPOSED DECISION*

Under date of March 19, 1969, the Commission entered its Final Decision certifying losses in favor of claimants as follows:

> HOWARD E. HOLTZMAN—$303,023.72 plus interest;
> MORTON L. PERRY—$202,015.82 plus interest; and
> LOUIS SUKONIK—$303,023.72 plus interest.

These amounts represented claimants' stock interests in Fomento Ball-Brothers, S.A. (Fomento), a Cuban corporation which was operating certain mines in Cuba pursuant to a lease from the Sandy Mining Company, a Cuban corporation. In determining the values of claimants' 30%, 20% and 30% stock interests, respectively, in Fomento, the Commission deducted Fomento's liabilities from its assets to find the net worth of Fomento. Since the record

---

\* This decision was entered as the Commission's Final Decision on November 19, 1971.

indicated that the 10% royalty with respect to ore at the mine site, valued at $350,000.00, had been paid, no deductions were made in this respect.

A claim was presented by Sandy Fryer, sole owner of the Sandy Mining Company, Fomento's lessor, Claim No. CU–1617. In that claim, the Commission found in the basis of the entire record, including the record in this case, that on March 1, 1959, the date of loss, Fomento owed its lessor a royalty of $35,000.00 with respect to the ore at the mine site which had not been taken into consideration in determining this claim.

The valuations of claimants' stock intersts in Fomento were based upon Fomento's assets and liabilities, aggregating $1,061,079.08 and $51,000.00, respectively. The Commission now finds that Fomento's liabilities on the date of loss amounted to $86,000.00. Therefore the net worth of Fomento on March 1, 1959 was $975,079.08, and claimants' 30%, 20% and 30% stock interests, respectively, had values of $292,523.72, $195,015.82 and $292,523.72.

Accordingly, the Final Decision of March 19, 1969 is set aside and the Proposed Decision of February 19, 1969 is amended; the Certifications of Loss in the Proposed Decision are set aside and the following Certifications of Loss will be entered, and in all other respects the Proposed Decision is affirmed.

### CERTIFICATIONS OF LOSS

The Commission certifies that HOWARD E. HOLTZMAN suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Ninety-two Thousand Five Hundred Twenty-Three Dollars and Seventy-Two Cents ($292,523.72) with interest at 6% per annum from March 1, 1959 to the date of settlement;

The Commission certifies that MORTON L. PERRY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Hundred Ninety-Five Thousand Fifteen Dollars and Eighty-Two Cents ($195,015.82) with interest at 6% per annum from March 1, 1959 to the date of settlement; and

The Commission certifies that LOUIS SUKONIK suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Ninety-Two Thousand Five Hundred Twenty-Three Dollars and Seventy-Two Cents ($292,523.72) with interest at 6% per annum from March 1, 1959 to the date of settlement.

Dated at Washington, D.C., October 20, 1971.

### PROPOSED DECISION

This claim against the Government of Cuba, under Title V of the International Claims Settlement Act of 1949, as amended, was presented originally by Fomento Ball–Bro, S.A., based upon the asserted loss of $737,886.57, sustained as a result of the taking of its personal property by the Government of Cuba.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§ 1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the

Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:

> The term "property" means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

The record discloses that the original claimant, Fomento Ball–Bro, S.A., hereafter referred to as Fomento, was organized under the laws of Cuba and does not qualify as a corporate "national of the United States" defined by Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or of any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held previously that a stockholder in such a corporation is entitled to file a claim based upon his ownership interest therein. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

Accordingly, HOWARD E. HOLTZMAN, MORTON L. PERRY and LOUIS SUKONIK, nationals of the United States since birth and stockholders of Fomento, have been substituted as claimants, and as claimants they have increased the amount of their claim to $1,188,516.57.

The record includes the minutes of a meeting of the stockholders of Fomento, affidavits and stock certificates, on the basis of which the Commission finds that HOWARD E. HOLTZMAN, MORTON L. PERRY, and LOUIS SUKONIK owned 30 shares, 20 shares, and 30 shares, respectively, of Fomento, representing 80% of the total outstanding capital stock of Fomento. The remaining 20 shares were owned by a nonnational of the United States.

The evidence establishes that Fomento entered into an agreement on September 5, 1957 with the Sandy Mining Company, a Cuban corporation, pursuant to which Fomento leased two mining sites known as "El Americano" and "Demasia A Josefina" for the purpose of mining and extracting manganese ore deposits. The lease was for one year, and was renewable from year to year at the option of Fomento, the maximum period being 30 years. Fomento was required to pay royalties to the lessor of 10% of the sales price for each long ton (2,240 pounds) mined less certain expenses, and a minimum rental was also included. Other procedural and related matters were set forth in a lease, which was executed between HOWARD E. HOLTZMAN, President of Fomento, and the President of the lessor. It appears that Fomento had acquired the right to exploit the "Josefina" mine from the predecessor in interest of Sandy Mining Company. On the

basis of this right and a preliminary geological report, dated June 29, 1956, Fomento entered into an agreement in February 1957 with a Delaware corporation, E. J. Lavino and Company, referred to as Lavino, providing for the sale of 10,000 tons of manganese dioxide to Lavino during the period ending April 30, 1958. The agreed price was $90.00 per dry ton for the first 5,000 dry tons and the balance at $85.00 per dry ton, with a penalty against Fomento of $2.50 for each percent of manganese dioxide below 84%, and Lavino was authorized to reject any ore with less than 84% manganese dioxide. Lavino was to advance $50,000.00 to Fomento in consideration of which Fomento was to pledge its lease of "Josefina" to Lavino and credit Lavino $10.00 per dry ton on the first 5,000 tons delivered to Lavino in liquidation of said advance.

The record shows that mining operations were begun by Fomento and shipments were made to Lavino. The record contains a copy of a document marked "Final Settlement Statement" from Lavino to Fomento, dated November 19, 1957. That statement indicates the receipt by Lavino at its Philadelphia, Pennsylvania office on October 29, 1957 of 103.4184 dry tons of ore which, upon analysis, was found to contain 81.75% manganese dioxide. Accordingly, the statement indicates that deductions were made pursuant to the penalty clause of the agreement as well as for certain expenses, likewise covered by that agreement.

The evidence also includes affidavits from individuals having personal knowledge of the facts, attesting that on March 1, 1959 Cuban militiamen seized the two mines and offices of Fomento together with all of Fomento's machinery, equipment and other personal property related to the operation of the mines. These affiants also stated that Fomento's offices and employees had been prohibited from entering upon the premises and that they had later observed that the mines continued to be operated on behalf of the Cuban Government.

On the basis of all the evidence of record, the Commission finds that Fomento owned certain personal property appurtenant to its mining operations of the "El Americano" and "Josefina" mines and an inventory of mined ore on March 1, 1959 when all of said property was seized by the Government of Cuba. It is therefore concluded that the three claimants herein sustained losses within the meaning of Title V of the Act.

In determining the value of the personal property thus taken, exclusive of the inventory of mined ore, the Commission considered the nature of Fomento's operations, affidavits from claimants and others having personal knowledge of the facts as well as lists of the various items of personalty present when Cuba seized the property.

One of the itemized lists appears as part of the affidavit of HOWARD E. HOLTZMAN, dated June 13, 1958, which aggregates the sum of $612,516.57. This list, however, includes the amounts of $3,600.00 and $450,000.00, for inventory of ore discussed separately below, thereby reducing this sum to $158,916.57. According to this affidavit, many of the items of machinery and equipment were purchased in 1956, some in 1957 and others were purchased from local concerns or built on the sites, apparently during those dates, and the amounts set forth are the prices paid for these items of property. Considering the nature of the personalty and the use to which it was devoted, the Commission concludes that it would be fair and equitable to apply a depreciation factor of 15% in order to determine the reasonable value of the property on the date of loss. Accordingly, the Commission

finds that the said personal property had a value of $135,079.08 on the date of loss.

A second list of items of property claimed includes the following:

| | |
|---|---:|
| Stoping, mucking and shafting of mines ...................... | $ 60,000.00 |
| Exploration and staking or ore sites ............................. | 22,000.00 |
| Road building ...................................................................... | 18,000.00 |
| | $100,000.00 |

This list also included "Leaseholds" in the amount of $26,000.00, which will be discussed below.

The Commission finds that the items appearing on the foregoing list were necessary appurtenances to the mining operations and enhanced the value of the mines. The Commission finds that the values asserted for these items are fair and reasonable, and that these items of property had an aggregate value of $100,000.00 on the date of loss.

With respect to the inventory of ore, claimants have computed their claim on the basis of $90.00 per ton, asserting in effect that the ore was at least 84% manganese dioxide and applying the price included in Fomento's 1957 agreement with Lavino.

It is noted in this connection that the geologist's report of June 29, 1956 estimated the existence of 125,000 tons which would yield 16,875 tons of 85% ore by the use of conventional methods, and that with special procedures it could yield another 8,125 tons of 85% ore, or 25,000 tons. He stated furthermore that more exploration may yield as much as 50,000 tons, but that there was a "lack of openings into the ore and lack of actual plant tests on the ore." An affidavit of December 5, 1968 from Franz R. Dykstra, a geologist formerly employed by Lavino from 1949 to 1965, states that he recommended the agreement between Lavino and Fomento in 1957. The "Final Settlement Statement" of November 19, 1957 from Lavino to Fomento would appear to indicate an end of relations. Moreover, there is insufficient evidence to establish that the inventory of ore taken by Cuba on March 1, 1959 was 84% or more pure manganese dioxide, or that its market or fair value on that date was $90.00 per dry ton, as asserted by claimants. The Commission also takes note of statements in Mr. HOLTZMAN's affidavit of June 13, 1958 that from January 1956 through July 1956 Fomento sold lower grade ore extracted from its leased mines at $40.00 per ton, and from July 1956 to April 1959, Fomento sold lower grade ore at $60.00 per ton.

Additionally, certain rentals, royalties and other expenses were involved even if sales at $90.00 per ton were made.

The record does not certain any balance sheets or other financial statements concerning Fomento, it appearing that all records are in Cuba and unavailable to claimants. Mr. HOLTZMAN has stated, however, in answer to the Commission's inquiries that on the date of loss the only obligations of Fomento were $45,000.00 to Lavino and salaries payable in the amount of $6,000.00. He further stated that the monthly payroll was about $24,000.00. Even if it could be shown that the value of the inventory were as asserted, other expenses would have to be taken into account as well, such as freight charges, loading and unloading fees, etc.

Upon careful consideration of this matter, the Commission concludes that the evidence does not warrant the finding that the inventory of ore,

amounting to 5,040 tons according to Mr. HOLTZMAN's affidavit, had a value of $90.00 per ton on the date of loss. Taking all of the circumstances into consideration, the Commission finds that the fair and equitable value of the inventory of ore at the mine sites was $350,000.00.

The remaining items for which claim is made are "Leaseholds" in the amount of $26,000.00, and the "fair market value of the company's mining operations as a going business." Considering the fact that the lease granted Fomento the right to mine the two sites for a period of 30 years, less than 2 years of which had expired as of the date of loss, the Commission finds that the fair and reasonable value of the leasehold was $26,000.00, as stated by claimants.

The Commission has carefully considered the claim for the value of the "mining operations as a going business." The geologist's report of June 29, 1956, before operations commenced, indicates a potential of at least 25,000 tons of high grade ore with the possibility of mining another 25,000 tons of high grade ore if certain special procedures were followed. On the basis of all the evidence of record the Commission finds that the fair and reasonable value of the mines as a going business was $450,000.00 on the date of loss.

The Commission further finds that the aggregate amount of losses sustained by Fomento was $1,061,079.08, less liabilities of $51,000.00, as stated by Mr. HOLTZMAN, or a net loss of $1,010,079.08. It therefore concludes that claimants, HOWARD E. HOLTZMAN, MORTON L. PERRY AND LOUIS SUKONIK, sustained losses within the meaning of Title V of the Act in the amounts of $303,023.72, $202,015.82, and $303,023.72, respectively, based upon their stock interests in Fomento.

The Commission has decided that in the certification of losses on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation,* Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that HOWARD E. HOLTZMAN suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Three Hundred Three Thousand Twenty-three Dollars and Seventy-two Cents ($303,023.72), with interest thereon at 6% per annum from March 1, 1959 to the date of settlement;

the Commission certifies that MORTON L. PERRY suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Two Hundred Two Thousand Fifteen Dollars and Eighty-two Cents ($202,015.82), with interest thereon at 6% per annum from March 1, 1959 to the date of settlement; and

the Commission certifies that LOUIS SUKONIK suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Three Hundred Three Thousand Twenty-three Dollars and Seventy-two Cents ($303,023.72), with interest thereon at 6% per annum from March 1, 1959 to the date of settlement.

Dated at Washington, D.C. February 19, 1969.

## IN THE MATTER OF THE CLAIM OF MATTHEW A. FRYER

Claim No. CU–1617—Decision No. CU–6241

*Petition to Reopen*

AMENDED FINAL DECISION

Under date of October 20, 1971, the Commission entered its Final Decision on this claim certifying a loss in favor of claimant in the amount of $435,000.00 plus interest. A portion of the claim based upon a mining concession covering the Antonio Mine was denied for lack of proof.

Subsequently, claimant petitioned to reopen the claim, based upon newly discovered evidence, pursuant to the governing regulations of the Commission. (FCSC Reg., 45 C.F.R. §531.5 (1) (1970).) The new evidence consists of a detailed affidavit of January 26, 1972 from claimant; copies of contemporaneous correspondence indicating that the Antonio Mine contained valuable ores and was in operation; and an affidavit of January 24, 1972 from an individual who had investigated the Antonio Mine.

Upon consideration of the new evidence in light of the entire record, the Commission amends the decision in this matter as follows:

The Commission finds that since January 30, 1954 claimant was the lessee for an indefinite term of a mining concession covering the Antonio Mine at Las Villas Province, Cuba. The Commission further finds that the mine was taken by the Government of Cuba on October 15, 1960.

The record shows that the Antonio Mine contained 2,857,142 tons of ore. Claimant's obligation to his lessors was $0.20 per ton, and pursuant to a sublease in 1958 with a Cuban corporation the sublessee's obligation was to pay claimant $1.00 per ton and $0.20 per ton to claimant's lessors. Accordingly, claimant's equity in the ores was $1.00 per ton.

It further appears that the Antonio Mine was in operation, and that as a result of substantial investments by claimant's lessee the production capacity of the mine was 10,000 tons of ore per month. Therefore, the ores in the mine would be exhausted in almost 24 years.

The Commission finds that the valuation most appropriate to the Antonio Mine and equitable to claimant is the result obtained by the application of a 12% annual discount rate to the yearly valuations of claimant's equity in the ores during the said period of almost 24 years in order to arrive at the aggregate value thereof on October 15, 1960, the date of loss. Accordingly, the Commission finds that claimant's equity in the ores had the following value on October 15, 1960:

| Year | Gross Value | Discount Factor | Net Value |
|------|-------------|-----------------|-----------|
| 1961 | $  120,000.00 | .892857 | $107,142.84 |
| 1962 | 120,000.00 | .797194 | 95,663.28 |
| 1963 | 120,000.00 | .711780 | 85,413.60 |
| 1964 | 120,000.00 | .635518 | 76,262.16 |
| 1965 | 120,000.00 | .567427 | 68,091.24 |
| 1966 | 120,000.00 | .506631 | 60,795.72 |
| 1967 | 120,000.00 | .452349 | 54,281.88 |
| 1968 | 120,000.00 | .403883 | 48,465.96 |
| 1969 | 120,000.00 | .360610 | 43,273.20 |
| 1970 | 120,000.00 | .321973 | 38,636.76 |

| 1971 | 120,000.00 | .287476 | 34,497.12 |
|------|------------|---------|-----------|
| 1972 | 120,000.00 | .256675 | 30,801.00 |
| 1973 | 120,000.00 | .229174 | 27,500.88 |
| 1974 | 120,000.00 | .204620 | 24,554.40 |
| 1975 | 120,000.00 | .182696 | 21,923.52 |
| 1976 | 120,000.00 | .163122 | 19,574.64 |
| 1977 | 120,000.00 | .145644 | 17,477.28 |
| 1978 | 120,000.00 | .130040 | 15,604.80 |
| 1979 | 120,000.00 | .116107 | 13,932.84 |
| 1980 | 120,000.00 | .103667 | 12,440.04 |
| 1981 | 120,000.00 | .092560 | 11,107.20 |
| 1982 | 120,000.00 | .082643 | 9,917.16 |
| 1983 | 120,000.00 | .073788 | 8,854.56 |
| 1984 | 117,142.00 | .065882 | 7,717.55 |

|  | Totals | $2,857,142.00 | | $933,929.63 |

Claimant's total losses are summarized as follows:

| Item of Property | Date of Loss | Amount |
|------------------|--------------|--------|
| Americano Mine .................................... | March 1, 1959 | $ 435,000.00 |
| Antonio Mine ......................................... | October 15, 1960 | 933,929.63 |
|  | Total | $1,368,929.63 |

The Commission reaffirms its holding that interest shall be allowed, and it is so ordered as follows:

| FROM | ON |
|------|-----|
| March 1, 1959 ............................................................ | $ 435,000.00 |
| October 15, 1960 ...................................................... | 933,929.63 |
| Total ........................................................ | $1,368,929.63 |

Accordingly, the Certification of Loss in the Final Decision of October 20, 1971 is set aside and the following Certification of Loss will be entered, and in all other respects the Final Decision, as amended herein, is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that MATTHEW A. FRYER a/k/a SANDY FRYER suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of One Million Three Hundred Sixty-eight Thousand Nine Hundred Twenty-nine Dollars and Sixty-three Cents ($1,-368,929.63) with interest thereon at 6% per annum from the respective dates of loss to the date of settlement.

Dated at Washington, D.C. June 30, 1972.

### FINAL DECISION

Under date of June 23, 1971, the Commission issued its Proposed Decision certifying a loss in favor of claimant in the amount of $400,000.00 plus interest. The amount allowed represented claimant's loss of royalties with respect to the lease of a Cuban mine, El Americano, to a Cuba corporation,

Fomento Ball-Bro, S.A. (Fomento). A portion of the claim based on a 10% royalty for the ore at the mine site in the amount of $35,000.00 was denied because the evidence of record, including the record in the claim of the lessee, *Claim of Howard E. Holtzman, et. al.,* Claim No. CU–2168, indicated that said royalty had been paid. Other portions of the claim were also denied.

Claimant objected to the Proposed Decision insofar as it denied portions of the claim, and requested an oral hearing which was held on October 6, 1971. At that hearing, counsel for claimant offered oral argument and introduced new documentary evidence. Testimony was heard from claimant and Joseph S. Sirgo, a mining engineer.

Upon consideration of the entire record, including the evidence presented at the oral hearing, the Commission finds that Fomento, the lessee, did not pay the said royalty of $35,000.00. It is therefore concluded that claimant's loss in this case should be increased by that amount.

Accordingly, the Certification of Loss in the Proposed Decision of June 23, 1971 is set aside and the following Certification of Loss will be entered, and in all other respects the Proposed Decision is affirmed.

### CERTIFICATION OF LOSS

The Commission certifies that MATTHEW A. FRYER a/k/a SANDY FRYER suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Hundred Thirty-Five Thousand Dollars ($435,000.00) with interest thereon at 6% per annum from March 1, 1959 to the date of settlement.

Dated at Washington, D.C. October 20, 1971.

### PROPOSED DECISION

This claim against the Government of Cuba, filed under Title V of the International Claims Settlement Act of 1949, as amended, in the amended amount of $4,486,942.00, was presented by MATTHEW A. FRYER a/k/a SANDY FRYER based upon the asserted loss of mines in Cuba. Claimant has been a national of the United States since birth.

Under Title V of the International Claims Settlement Act of 1949 [78 Stat. 1110 (1964), 22 U.S.C. §§1643–1643k (1964), as amended, 79 Stat. 988 (1965)], the Commission is given jurisdiction over claims of nationals of the United States against the Government of Cuba. Section 503(a) of the Act provides that the Commission shall receive and determine in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba arising since January 1, 1959 for

> losses resulting from the nationalization, expropriation, intervention or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States.

Section 502(3) of the Act provides:
> The term 'property' means any property, right, or interest including any leasehold interest, and debts owed by the Government of Cuba or by enterprises which have been nationalized, expropriated, intervened, or taken by the Government of Cuba and debts which are a charge on property which has been nationalized, expropriated, intervened, or taken by the Government of Cuba.

FOREIGN CLAIMS SETTLEMENT COMMISSION   407

Claimant asserts the following losses:

El Americano and Demasia a Josefina Mines ............ $1,629,800.00
Antonio Mine ................................................................  2,857,142.00

                                                                           $4,486,942.00

### EL AMERICANO AND DEMASIA A JOSEFINA

According to claimant's statements of December 8, 1969, he went to Cuba in 1949 and later met Mr. Joseph Alloway who owned the El Americano and Demasia a Josefina, two adjoining manganese mines in Bayamo, Oriente Province, Cuba, which mines are hereafter called Americano. Mr. Alloway gave the claimant a power of attorney (dated March 24, 1954) to act on his behalf with respect to his Cuban property (Exhibit 2). Claimant states that in October 1954 he purchased Americano for $5,000.00, and he claims ownership in fee simple. The Commission's records include the *Claim of Howard E. Holtzman, et al.*, Claim No. CU–2168, involving an 80% stock interest in Fomento Ball-Bro, S.A. (Fomento), a Cuban corporation which leased Americano in 1957. That record contains a report from abroad which indicates that the rights with respect to Americano were acquired by the Sandy Mining Company for $500.00.

It further appears that the Sandy Mining Company (Cia. Minera Sandy, S.A.), a Cuban corporation, was wholly owned by claimant, and that Americano was its sole asset. On September 5, 1957, Sandy Mining Company entered into a contract with Fomento pursuant to which Americano was leased to Fomento for one year, renewable from year to year at the option of the lessee, the maximum period being 30 years (Exhibit 10). That lease recites that Sandy Mining Company owns mining concessions with respect to El Americano and Demasia a Josefina in Bayamo, Oriente Province, Cuba. The Commission therefore finds that Sandy Mining Company owned mining concessions with respect to both mines (Americano).

In *Holtzman, supra*, the Commission found that Americano had been taken by the Government of Cuba on March 1, 1959 while Fomento was in possession.

Since Sandy Mining Company was organized under the laws of Cuba it does not qualify as a corporate "national of the United States" defined under Section 502(1)(B) of the Act as a corporation or other legal entity organized under the laws of the United States, or any State, the District of Columbia, or the Commonwealth of Puerto Rico, whose ownership is vested to the extent of 50 per centum or more in natural persons who are citizens of the United States. In this type of situation, it has been held that an American stockholder is entitled to file a claim for the value of his ownership interest. (See *Claim of Parke, Davis & Company*, Claim No. CU–0180, 1967 FCSC Ann. Rep. 33.)

The Act provides in Section 503(a) that in making determinations with respect to the validity and amount of claims and value of properties, rights, or interests taken, the Commission shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to fair market value, book value, going concern value, or cost of replacement.

The question, in all cases, will be to determine the basis of valuation which, under the particular circumstances, is "most appropriate to the property and equitable to the claimant." This phraseology does not differ from

the international legal standard that would normally prevail in the evaluation of nationalized property. It is designed to strengthen that standard by giving specific bases of valuation that the Commission shall consider.

In his affidavit of March 24, 1971, claimant computes the amount of his claim on account of Americano as follows:

| | | |
|---|---|---:|
| 1. | 10% of $350,000.00, the amount found by the Commission as the value of the inventory of mined ore at the mine sites in *Holtzman, supra* | $   35,000.00 |
| 2. | 10% of $450,000.00, the amount found by the Commission as the value of the leased mines as a "going business" in *Holtzman, supra* | 45,000.00 |
| 3. | 10% of the residual value of the ore after expiration of Fomento's lease | 1,549,800.00 |
| | Total | $1,629,800.00 |

## 1 .Ore at the Mine Sites

The Commission found in *Holtzman, supra,* that Fomento's interest in the mined ore at the mine sites had a value of $350,000.00. It was noted that pursuant to the lease from Sandy Mining Company to Fomento, the lessor was to receive 10% of the net sales price for each mined ton of concentrated ore after deduction of any freight and related expenses not to exceed $10.00 per ton for transportation and delivery to the shipping port. Since no such expenses had been incurred by Fomento with respect to the ore at the mine sites, no deductions were made.

Claimant asserts a loss of $35,000.00 based upon 10% of the value of the ore at the mine sites, which he states was due pursuant to the lease with Fomento. The record in *Holtzman, supra,* includes an affidavit of December 23, 1968 from Howard E. Holtzman, in which affiant attests that all royalties on the mined ore at the mine sites had been paid. On that basis, the Commission found that the value of Fomento's equity in the ore at the mine sites was equivalent to the value of said ore.

The Regulation of the Commission provide:

> The claimant shall be the moving party and shall have the burden of proof on all issues involved in the determination of his claim. (FCSC Reg., 45 C.F.R. §531.6(d)(1970).)

Upon consideration of the entire record in this claim and that of *Holtzman, supra,* the Commission finds that claimant herein has failed to sustain the burden of proof with respect to the portion of the claim based upon 10% of the value of the mined ore at the mine sites. Accordingly, this portion of the claim is denied.

### 2. 10% of "Going Business" Value

In *Holtzman, supra,* the Commission found that the value of Fomento's mining operations as a "going business" was $450,000.00. The Commission considered a geologist's report of June 29, 1956 which indicated a potential of 25,000 tons of high grade ore and the possibility of mining another 25,000 tons of such ore if certain procedures were followed.

In finding that the "fair and reasonable value of the mines as a going business was $450,000.00 on the date of loss," the Commission took into consideration all relevant factors in this respect, such as the amount of ore

in the mines, the costs of mining operations, and other expenses involved in refining and selling the ore, as well as the royalties due the lessor. Since the value found by the Commission, $450,000.00, was not the value of the ore in the mines, claimant is not entitled to 10% of that amount. Rather, claimant is entitled, under the terms of the lease, as sole owner of Sandy Mining Company, to an allowance of 10% of the net value of the ore in the mines on the basis that it constituted the lessor's equity in the ore, in the nature of a debt of a nationalized enterprise. (See *Claim of Kramer, Marx, Greenlee & Backus*, Claim No. CU–0105, 25 FCSC Semiann. Rep. 62 [July-Dec. 1966].)

Upon consideration of the entire record in this claim and that of *Holtzman, supra*, the Commission finds that the valuation most appropriate to the property and equitable to the claimant is the result obtained from concluding that Americano contained 50,000 tons of high grade ore valued at $90.00 per ton. The Commission therefore finds that the gross value of said ore on March 1, 1959, the date of loss, was $4,500,000.00. As already noted, the lease provided for the deduction of transportation and delivery expenses not to exceed $10.00 per ton. In the absence of evidence to the contrary, the Commission finds that a deduction of $500,000.00 should be made, resulting in a net value of $4,000,000.00 for the 50,000 tons of high grade ore in Americano. Therefore, the debt due Sandy Mining Company on account of said ore or its equity therein, was 10% thereof of $400,000.00.

3. *10% of Residual Value of Ore After Expiration of Fomento's Lease*

Claimant asserts that Americano contained considerably more ore than the Commission found in *Holtzman, supra*, and claims a loss of $1,549,800.00 as the value of the 10% royalty. Claimant relies entirely upon statements of one Joseph S. Sirgo, formerly employed by Fomento as manager of the mines (Exhibit 6). According to Mr. Sirgo's sworn statements of October 20, 1969 (Exhibit 6) and his report of August 9, 1967 to claimant, Americano contained 189,000 tons of high grade ore which had a gross value of $17,-388,000.00. Claimant computes this portion of his claim by deducting from that amount $1,890,000.00 on account of transportation and delivery expenses and taking 10% of the result.

In claimant's affidavits of December 19, 1969 and March 24, 1971, and in Mr. Sirgo's affidavit of February 10, 1970 (Exhibit 11), it is stated that after Fomento acquired the lease covering Americano, considerable drilling and exploration took place, which led to Mr. Sirgo's report. Upon inquiry, counsel for claimant stated on May 28, 1971 for the record that in 1958 Mr. Sirgo had reported his findings to Fomento. An affidavit of October 13, 1967 from Mr. Holtzman, President of Fomento, stated he had learned that Sirgo had been killed by Castro's men.

It appeared desirable that the record reflect the reason why Mr. Holtzman had never mentioned such a report from Mr. Sirgo, since it would have been to his advantage to do, as Fomento held a long term lease on Americano. The record shows that Mr. Holtzman relied on the geologist's report of June 29, 1956 which indicates that Americano had 50,000 tons of high grade ore, whereas Mr. Sirgo's report indicates the presence of 189,000 tons of such ore. Counsel submitted an affidavit of May 31, 1971 from claimant. Claimant recited therein that Fomento was under-capitalized and was using poor equipment, according to Mr. Sirgo; that Fomento simply exploited the mines and was satisfied with that alone; and that Mr. Sirgo

had advised claimant that he was not aware that Mr. Holtzman was connected with Fomento.

The Commission has fully considered this entire matter. However the sole issue is whether there would be any ore left in Americano after the termination of Fomento's 30-year lease in 1987. As already noted, Sandy Mining Company did not own Americano in fee simple, but owned only mining concessions covering the two mines in question.

When this matter is considered in that light, the following appears. According to Holtzman's affidavit of December 23, 1968, Fomento was extracting crude ore at the rate of 6,000 tons per month, realizing about 1,200 of high grade ore. Whether Americano contained 50,000 tons of high grade ore as indicated in *Holtzman, supra*, or 189,000 tons of concentrated ore as stated by Mr. Sirgo, it is clear that all of the ore would have been exhausted long before the end of Fomento's lease.

The Commission therefore finds that claimant has failed to sustain the burden of proof with respect to this portion of the claim. The record does not establish that after the termination of Fomento's lease there would be any ore remaining in Americano. Therefore this portion of the claim is denied.

### Antonio Mine

Claimant asserts the loss of $2,857,142.00 on account of the Antonio mine situated in Las Villas Province, Cuba. The record includes a copy of a lease, dated January 30, 1954 (Exhibit 7), pursuant to which claimant obtained a concession to exploit the Antonio mine. The lease was to end on January 31, 1956, but was renewable for an indefinite number of two-year terms at the opton of the liessee. Clamant was obliged to pay the lessors a royalty of $.20 for each mined ton that was sold and shipped.

In his affidavit of December 8, 1969, claimant states that a Cuban corporation, Compania Minera Macantonio, S.A., was formed for the purpose of holding the lease for the benefit of claimant. It is further stated that one Alberto Diaz Masvidal, formed another Cuban corporation, Compania Minera Masvidal, S.A., which leased Antonio from claimant's holding corporation. According to claimant's affidavit of March 24, 1971, the holding corporation was to receive a royalty of $1.00 for each ton of ore removed from the Antonio mine.

Claimant has informed the Commission that a copy of the lease from his holding corporation to the Masvidal corporation is not available. In lieu thereof, claimant has submitted the affidavit of November 18, 1969 from Clarence W. Moore, an attorney who had personal knowledge of the facts (Exhibit 8). This affiant states that in 1958 or early 1959 the Masvidal corporation was formed and that it took a lease on the Antonio mine from claimant's holding corporation; and that in 1958 and 1959 the Masvidal corporation installed certain mining equipment on the Antonio mine site through a loan of about $250,000.00.

Claimant computes his asserted loss with respect to the Antonio mine on the basis of an affidavit of October 20, 1969 from Mr. Sirgo (Exhibit 9). That affiant states that the Antonio mine contained a pyrite deposit (generally, a mineral containing ingredients from which primarily sulphuric acid may be manufactured); that at the request of claimant he had prepared on July 7, 1969 a report on the Antonio mine from personal notes; and that the report showed that the mine contained 2,857,142 tons of ore.

Apparently, Mr. Sirgo's personal notes are not available. However, counsel submitted a copy of a report from Mr. Sirgo, dated August 9, 1967 at Nogales, Arizona, which includes the same information.

It is asserted by claimant that the Antonio mine was a going concern and that he had received some royalties from the operation thereof. He states that the mine was taken by Cuba in October 1960. Claimant's assertion concerning the operation of the mine is supported by a general statement from Mr. Moore (Exhibit 8), and a statement from Mr. Sirgo (Exhibit 9) that the mine was worked and that its ore was shipped to Italy.

It is noted that claimant was obliged to pay his lessor a royalty of $.20 for each mined ton sold and shipped. Admittedly claimant never operated the mine directly, or indirectly through his holding corporation. The record contains no evidence to show that claimant ever paid any royalties to his lessor. The sublease from claimant's holding corporation to the Masvidal corporation, purportedly providing for a royalty of $1.00 per mined ton, is not available. Apart from claimant's statement that he received "some royalties" from the mine, there is no evidence that the Masvidal corporation paid any royalties pursuant to the lease with claimant's holding corporation.

Upon consideration of the entire record, the Commission finds that claimant has failed to sustain the burden of proof with respect to the portion of the claim based on royalties from the Antonio mine. The evidence of record does not establish that the mine contained the asserted amount of ore; nor does it establish the extent to which the mine was ever exploited; nor does it establish that even if the mine contained the asserted amount of ore, it was commercially feasible and profitable to operate the mine; nor does the evidence establish that claimant's mining concession had any value on the asserted date of loss. For all of the foregoing reasons, this portion of the claim is denied.

The Commission has decided that in certifications of loss on claims determined pursuant to Title V of the International Claims Settlement Act of 1949, as amended, interest should be included at the rate of 6% per annum from the date of loss to the date of settlement (see *Claim of Lisle Corporation*, Claim No. CU–0644), and in the instant case it is so ordered.

### CERTIFICATION OF LOSS

The Commission certifies that MATTHEW A. FRYER a/k/a SANDY FRYER suffered a loss, as a result of actions of the Government of Cuba, within the scope of Title V of the International Claims Settlement Act of 1949, as amended, in the amount of Four Hundred Thousand Dollars ($400,000.00) with interest at 6% per annum from March 1, 1959 to the date of settlement.

Dated at Washington, D.C., June 23, 1971.

# EXHIBIT 15

## FINAL STATISTICAL REPORT ON CUBAN CLAIMS PROGRAM

| Type | Number Filed | Amount Claimed | Number Denied * | Amount Denied | Number Awarded | Amount Awarded |
|------|------|------|------|------|------|------|
| Corporate | 1,146 | 2,855,993,212.69 | 248 | 1,277,494,373.14 | 898 | 1,578,498,839.55 |
| Individual | 7,670 | 490,413,058.67 | 947 | 269,363,329.53 | 5,013 | 221,049,729.14 |
| Totals | 8,816 | 3,346,406,271.36 | 1,195 | 1,546,857,702.67 | 5,911 | 1,799,548,568.69 |

* Additional claims totaling 1,710 were dismissed without consideration by the Commission or withdrawn by claimants.

## ANALYSIS OF FINAL AWARDS GRANTED UNDER THE CUBAN CLAIMS PROGRAM

### As of July 6, 1972

| Amount of Awards | To Corporations | To Individuals | Total |
|---|---|---|---|
| $1,000 or less ........................ | 63 | 1252 | 1315 |
| 1,001 to 5,000 ..................... | 195 | 1701 | 1896 |
| 5,001 to 10,000 ................... | 100 | 640 | 740 |
| 10,001 to 25,000 ................. | 134 | 593 | 727 |
| 25,001 to 50,000 ................. | 89 | 328 | 417 |
| 50,001 to 100,000 .............. | 51 | 208 | 259 |
| 100,001 to 250,000 ........... | 77 | 145 | 222 |
| 250,001 to 500,000 ........... | 56 | 74 | 130 |
| 500,001 to 1,000,000 ........ | 41 | 33 | 74 |
| Over $1,000,000 ............... | 92 | 39 | 131 |
| TOTAL .................. | 898 | 5013 | 5911 |

## TEN HIGHEST CERTIFICATIONS OF LOSS
## UNDER THE CUBAN CLAIMS PROGRAM

| CLAIM NO. | DEC. NO. | CLAIMANT | | AMOUNT OF AWARD |
|-----------|----------|----------|--|-----------------|
| CU-2578 | CU-4122 | Cuban Electric Company | | $267,568,413.62 |
| CU-2615 | CU-5013 | International Telephone & Telegraph Corporation | $50,676,963.88 | |
| | | International Telephone & Telegraph Corporation as Trustee | 80,002,794.14 | 130,679,758.02 |
| CU-2622 | CU-3578 | North American Sugar Industries, Inc. | $97,373,414.72 | |
| | | Cuban-American Mercantile Corporation | 52,688.46 | |
| | | West India Company | 11,548,959.95 | 108,975,063.13 |
| CU-2619 | CU-6049 | Moa Bay Mining Company | | 88,349,000.00 |
| CU-2573 | | Cuban American Nickel Company | | Denied |
| CU-2776 | CU-3824 | United Fruit Sugar Company | | 85,110,147.09 |
| CU-0665 | CU-5969 | West Indies Sugar Company | | 84,880,957.55 |
| CU-2445 | CU-3969 | American Sugar Company | | 81,011,240.24 |
| CU-0938 | CU-3838 | Standard Oil Company | | 71,611,002.90 |
| CU-2156 | CU-6034 | Bangor Punta Corporation | $39,078,904.64 | |
| | | Baraqua Industrial Corporation | 6,280,722.17 | |
| | | Florida Industrial Corporation of New York | 3,749,751.18 | |
| | | Macareno Industrial Corporation of New York | 4,145,316.01 | |
| | | Bangor Punta Operations | 124,429.06 | 53,379,123.06 |
| CU-1331 | CU-4546 | Texaco Inc. | | 50,081,109.67 |

## TABLE OF CASES REPORTED
## CUBAN CLAIMS PROGRAM

Page

Abbey, Archibald S. ------------------------------------------------ 262
Aetna Insurance Company -------------------------------------------- 198
AOFC, Inc. -------------------------------------------------------- 127

Berlanti Construction Company, Inc., et al. ------------------------ 211
Brothers of the Order of Hermits of St. Augustine (Inc.) ---------- 159

Cheaney, Robert L., et al. ----------------------------------------- 154
Coca-Cola Company -------------------------------------------------- 330
Colgate-Palmolive Company ------------------------------------------ 308
Costa, Placido Navas, et al. --------------------------------------- 178
Cuban Electric Company --------------------------------------------- 133

Dodge, Grenville M., Deceased, Estate of --------------------------- 176

Ebasco Industries, Inc. -------------------------------------------- 171
El Koury, John ----------------------------------------------------- 259

First National Bank of Boston -------------------------------------- 281
First National City Bank ------------------------------------------- 295
Ford Motor Company ------------------------------------------------- 149
Frederick Snare Corporation, et al. -------------------------------- 141
Freeport Sulphur Company ------------------------------------------- 255
Fryer, Matthew A. -------------------------------------------------- 404
Fuller, Jennie M., et al. ------------------------------------------ 204

Gache, Mac --------------------------------------------------------- 378
Goloditz, Efim, et al. --------------------------------------------- 183
Goodyear Tire & Rubber Company ------------------------------------- 367

Holtzman, Howard E., et al. ---------------------------------------- 398

Intercontinental Hotels Corporation -------------------------------- 303
International Telephone & Telegraph Corporation -------------------- 191

Korenda, John ------------------------------------------------------ 125

Lengyel, Olga ------------------------------------------------------ 357

M & M Dredging & Construction Co., et al. -------------------------- 351
Moa Bay Mining Company, et al. ------------------------------------- 265

Nicaro Nickel Company ---------------------------------------------- 271

Occidental Insurance Company of North Carolina -------------------- 166
Ogden, Carter H., et al. ------------------------------------------- 390

Pagliuca, Angel ---------------------------------------------------- 217
Pan-American Life Insurance Company -------------------------------- 320
Pilgrim Plastics Corporation --------------------------------------- 232
Powe, William A. --------------------------------------------------- 238

## TABLE OF CASES REPORTED

### (Continued)

| | Page |
|---|---|
| Samuels, Frederic | 397 |
| Schrage, Harry, et al. | 388 |
| Shamma, Isabella | 228 |
| Sperry Rand Corporation | 383 |
| Steinhart, Frank, Jr., et al. | 394 |
| Sweet Paper Sales Corporation | 395 |
| Twentieth Century-Fox Film Corporation, et al. | 371 |
| Union Light and Power Company of Cuba | 316 |
| Vinas, Maria | 392 |
| Warren and Arthur Smadbeck, Inc., et al. | 323 |

* United States Government Printing Office: 1979--296-707/