# EXHIBIT 11

# Freeport LNG signs 3-year liquefaction sales and purchase agreement with Trafigura

- **Trafigura contracts for the purchase of 0.5 mtpa of LNG**
- **3-year FOB SPA, beginning mid-2020**

**HOUSTON, June 26, 2018** – Freeport LNG Marketing, LLC (Freeport LNG) today announced that it had entered into a binding mid-term sales and purchase agreement (SPA) with Trafigura Pte Ltd (Trafigura) for 0.5 million tons per annum (mtpa), to be supplied from its natural gas liquefaction and LNG loading facility on Quintana Island near Freeport, Texas. The SPA with Trafigura will commence on July 1, 2020, soon after the expected completion of construction of the third liquefaction train.

"We welcome Trafigura's more than 25 years of global commodity trading experience to Freeport LNG's expanding operations.  We view this as the start of a long-term relationship that will be key in growing our future business," said Michael S. Smith, Chief Executive Officer, Freeport LNG.

"Trafigura puts the security of supply for its customers at the heart of our LNG strategy.  We view this agreement as a further proof of our commitment to this and are proud to count Freeport LNG as our partner," said Hadi Hallouche, Head of Oil Asia at Trafigura.

### About Freeport LNG

Freeport LNG Marketing, LLC is a wholly owned subsidiary of Freeport LNG Development, L.P., which owns and operates an LNG terminal on Quintana Island, near Freeport, Texas.  The terminal started import operations in June 2008, and is expected to begin export operations in 2019.  In aggregate, the three natural gas liquefaction trains currently under construction are expected to produce in excess of 15 mtpa of LNG.  Of this amount, 13.4 mtpa of capacity has been contracted to Osaka Gas Trading & Export, LLC, JERA Energy America, LLC, BP Energy Company, Toshiba America LNG Corporation and SK E&S LNG, LLC. A fourth liquefaction train is under development with an expected start date in 2023. Freeport LNG's limited partnership interests are ultimately held by Michael Smith, Global Infrastructure Partners, and Osaka Gas Co., Ltd. Visit: www.freeportlng.com.

For further information contact: Jodi Navaretta: +1 713-980-2888 or Info@FreeportLNG.com

### About Trafigura

Founded in 1993, Trafigura is one of the largest physical commodities trading groups in the world. Trafigura sources, stores, transports and delivers a range of raw materials (including oil and refined products and metals and minerals) to clients around the world. The trading business is supported by industrial and financial assets, including 49.6 percent owned global oil products storage and distribution company Puma Energy; global terminals, warehousing and logistics operator Impala Terminals; Trafigura's Mining Group; and Galena Asset Management. Trafigura is owned by around 600 of its 3,935 employees who work in 62 offices in 35 countries around the world. Trafigura has achieved substantial growth over recent years, growing revenue from USD12 billion in 2003 to USD136.4 billion in 2017. The Group has been connecting its customers to the global economy for more than two decades, growing prosperity by advancing trade. Visit: www.trafigura.com.

Trafigura's Global Press Office: +41 22 592 45 28 or media@trafigura.com

# EXHIBIT 12



# News

### Bowie Resource Partners announces new Utah headquarters and new corporate name



Bituminous coal producer Bowie Resource Partners, LLC, which is majority-owned by the Galena Private Equity Resources Fund, has announced that it has moved its corporate headquarters from Grand Junction, Colorado to Sandy, Utah and has changed its corporate trade name to Wolverine Fuels, LLC ("Wolverine"). Wolverine's new headquarters is located at 9815 South Monroe Street, Suite 203, Sandy, Utah 84070. Wolverine will continue to operate the Sufco, Skyline and Dugout Canyon mines in Utah and the idled Bowie 2 mine in Colorado, and will also maintain a small regional office in Grand Junction, Colorado.

"We are primarily a Utah company, employing Utah citizens and supplying coal to Utah power plants, so it only makes sense that we have our headquarters in Utah," said James Grech, Wolverine's Chief Executive Officer, who was recently appointed in July 2018. "This move will allow the executive team to be closer to our mines, our workforce and our customers. I want to thank everyone in Utah who encouraged and assisted us with this relocation, especially Governor Herbert's office and Senator David Hinkins."

"The Utah economy benefits from low cost, sustainable electricity, generated by its many diverse resources, including the coal-fired power plants located in the State," said Laura Nelson, the Governor's energy advisor and executive director of the Governor's Office of Energy Development. "The Wolverine mines are key suppliers to those plants, providing jobs and energy security locally, regionally, and globally."

Senator David Hinkins added: "The Wolverine Mines have an enormous economic impact in Emery, Carbon, Sevier and Sanpete Counties, and I was honored to assist Jim Grech and his team with the move."

In addressing the name change, Mr. Grech stated: "In conjunction with the recent management changes and recapitalization of the company, we wanted to offer our employees a fresh start and new identity with the name change. Our workforce is tough and resilient, very much like a wolverine, so we think our new namesake will resonate very well with our employees and the communities in which we operate."

Coal company Wolverine Fuels, LLC serves the Western US power generation industry and export markets. The company employs over 950 staff and has an annual productive capacity of approximately 12-14 million tons of thermal coal. Visit www.wolverinefuels.com

Galena Asset Management S.A. is the wholly-owned investment arm of the Trafigura Group and is authorized and regulated by the Swiss Financial Market Supervisory Authority (FINMA). The Galena Private Equity Resources Fund LP is a US$400 million closed end Cayman Islands limited partnership designed to invest in the junior mining sector. The investors are leading global institutional investors, including a US university endowment and one of the biggest European insurance companies and a number of family offices. Trafigura is also a pari-passu limited partner in the fund. As of February 2017 the fund had three investments in its portfolio including in Wolverine Fuels, LLC. The fund is also a majority investor in Mawson West, a copper and silver-focused resource company operating in the Katanga Basin in the Democratic Republic of Congo and in Finland-based zinc and nickel mine Terrafame Ltd. The Galena Private Equity Resources Fund has invested in Wolverine since August 2013, in Mawson West since December 2014 and in Terrafame Ltd since February 2017.

# EXHIBIT 13

# FORM ADV

### UNIFORM APPLICATION FOR INVESTMENT ADVISER REGISTRATION AND REPORT BY EXEMPT REPORTING ADVISERS

| | |
|---|---|
| **Primary Business Name: GALENA ASSET MANAGEMENT SA** | **CRD Number: 171782** |
| Annual Amendment - All Sections | Rev. 10/2021 |
| 11/30/2021 8:37:27 AM | |

**WARNING:** Complete this form truthfully. False statements or omissions may result in denial of your application, revocation of your registration, or criminal prosecution. You must keep this form updated by filing periodic amendments. See Form ADV General Instruction 4.

**Item 1 Identifying Information**

Responses to this Item tell us who you are, where you are doing business, and how we can contact you. If you are filing an *umbrella registration*, the information in Item 1 should be provided for the *filing adviser* only. General Instruction 5 provides information to assist you with filing an *umbrella registration*.

A.  Your full legal name (if you are a sole proprietor, your last, first, and middle names):
**GALENA ASSET MANAGEMENT SA**

B.  (1) Name under which you primarily conduct your advisory business, if different from Item 1.A.
**GALENA ASSET MANAGEMENT SA**

*List on Section 1.B. of Schedule D any additional names under which you conduct your advisory business.*

(2) If you are using this Form ADV to register more than one investment adviser under an *umbrella registration*, check this box ☐

*If you check this box, complete a Schedule R for each relying adviser.*

C.  If this filing is reporting a change in your legal name (Item 1.A.) or primary business name (Item 1.B.(1)), enter the new name and specify whether the name change is of ☐ your legal name or ☐ your primary business name:

D.  (1) If you are registered with the SEC as an investment adviser, your SEC file number:
(2) If you report to the SEC as an *exempt reporting adviser*, your SEC file number: **802-80120**
(3) If you have one or more Central Index Key numbers assigned by the SEC ("CIK Numbers"), all of your CIK numbers:
No Information Filed

E.  (1) If you have a number ("*CRD* Number") assigned by the *FINRA's CRD* system or by the IARD system, your *CRD* number: **171782**

*If your firm does not have a CRD number, skip this Item 1.E. Do not provide the CRD number of one of your officers, employees, or affiliates.*

(2) If you have additional *CRD* Numbers, your additional *CRD* numbers:
No Information Filed

F.  *Principal Office and Place of Business*
(1)  Address (do not use a P.O. Box):
Number and Street 1:                          Number and Street 2:
RUE DE JARGONNANT 1
City:                     State:              Country:              ZIP+4/Postal Code:
GENEVA                                        Switzerland           1207

If this address is a private residence, check this box: ☐

*List on Section 1.F. of Schedule D any office, other than your principal office and place of business, at which you conduct investment advisory business. If you are applying for registration, or are registered, with one or more state securities authorities, you must list all of your offices in the state or states to which you are applying for registration or with whom you are registered. If you are applying for SEC registration, if you are registered only with the SEC, or if you are reporting to the SEC as an exempt reporting adviser, list the largest twenty-five offices in terms of numbers of employees as of the end of your most recently completed fiscal year.*

(2)  Days of week that you normally conduct business at your *principal office and place of business*:
◉ Monday - Friday  ○ Other:

Normal business hours at this location:
09AM TO 06PM
(3)  Telephone number at this location:
00 41 22 594 6900
(4)  Facsimile number at this location, if any:
00 41 22 594 6901
(5)  What is the total number of offices, other than your *principal office and place of business*, at which you conduct investment advisory business as of the end of your most recently completed fiscal year?
0

Number and Street 1:                                    Number and Street 2:

City:                          State:                   Country:                    ZIP+4/Postal Code:

If this address is a private residence, check this box: ☐

H.  If you are a sole proprietor, state your full residence address, if different from your *principal office and place of business* address in Item 1.F.:

Number and Street 1:                                    Number and Street 2:

City:                          State:                   Country:                    ZIP+4/Postal Code:

|  |  | Yes | No |
|---|---|---|---|
| I. | Do you have one or more websites or accounts on publicly available social media platforms (including, but not limited to, Twitter, Facebook and LinkedIn)? | ⦿ | ○ |

*If "yes," list all firm website addresses and the address for each of the firm's accounts on publicly available social media platforms on Section 1.I. of Schedule D. If a website address serves as a portal through which to access other information you have published on the web, you may list the portal without listing addresses for all of the other information. You may need to list more than one portal address. Do not provide the addresses of websites or accounts on publicly available social media platforms where you do not control the content. Do not provide the individual electronic mail (e-mail) addresses of employees or the addresses of employee accounts on publicly available social media platforms.*

J.  Chief Compliance Officer

(1) Provide the name and contact information of your Chief Compliance Officer. If you are an *exempt reporting adviser*, you must provide the contact information for your Chief Compliance Officer, if you have one. If not, you must complete Item 1.K. below.

Name:                                                  Other titles, if any:

Telephone number:                                      Facsimile number, if any:

Number and Street 1:                                   Number and Street 2:

City:                          State:                   Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if Chief Compliance Officer has one:

(2) If your Chief Compliance Officer is compensated or employed by any *person* other than you, a *related person* or an investment company registered under the Investment Company Act of 1940 that you advise for providing chief compliance officer services to you, provide the *person's* name and IRS Employer Identification Number (if any):

Name:

IRS Employer Identification Number:

K.  Additional Regulatory Contact Person: If a person other than the Chief Compliance Officer is authorized to receive information and respond to questions about this Form ADV, you may provide that information here.

Name:                                                  Titles:

Telephone number:                                      Facsimile number, if any:

Number and Street 1:                                   Number and Street 2:

City:                          State:                   Country:                    ZIP+4/Postal Code:

Electronic mail (e-mail) address, if contact person has one:

|  |  | Yes | No |
|---|---|---|---|
| L. | Do you maintain some or all of the books and records you are required to keep under Section 204 of the Advisers Act, or similar state law, somewhere other than your *principal office and place of business*? | ⦿ | ○ |

*If "yes," complete Section 1.L. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|
| M. | Are you registered with a *foreign financial regulatory authority*? | ⦿ | ○ |

*Answer "no" if you are not registered with a foreign financial regulatory authority, even if you have an affiliate that is registered with a foreign financial regulatory authority. If "yes," complete Section 1.M. of Schedule D.*

|  |  | Yes | No |
|---|---|---|---|
| N. | Are you a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934? | ○ | ⦿ |

|  |  | Yes | No |
|---|---|---|---|
| O. | Did you have $1 billion or more in assets on the last day of your most recent fiscal year? | ○ | ⦿ |

If yes, what is the approximate amount of your assets:

○  $1 billion to less than $10 billion

○  $10 billion to less than $50 billion

○  $50 billion or more

*For purposes of Item 1.O. only, "assets" refers to your total assets, rather than the assets you manage on behalf of clients. Determine your total assets using the total assets shown on the balance sheet for your most recent fiscal year end.*

P.    Provide your *Legal Entity Identifier* if you have one:
549300JR1F5URFRFOL55

A *legal entity identifier* is a unique number that companies use to identify each other in the financial marketplace. You may not have a *legal entity identifier.*

---

**SECTION 1.B. Other Business Names**

No Information Filed

---

**SECTION 1.F. Other Offices**

No Information Filed

---

**SECTION 1.I. Website Addresses**

List your website addresses, including addresses for accounts on publicly available social media platforms where you control the content (including, but not limited to, Twitter, Facebook and/or LinkedIn). You must complete a separate Schedule D Section 1.I. for each website or account on a publicly available social media platform.

Address of Website/Account on Publicly Available Social Media Platform:    HTTP://WWW.GALENA-INVEST.COM

Address of Website/Account on Publicly Available Social Media Platform:    HTTPS://WWW.LINKEDIN.COM/COMPANY/2848389/

---

**SECTION 1.L. Location of Books and Records**

Complete the following information for each location at which you keep your books and records, other than your *principal office and place of business.* You must complete a separate Schedule D, Section 1.L. for each location.

Name of entity where books and records are kept:
MAPLES FUND SERVICES (IRELAND) LIMITED

Number and Street 1:                                    Number and Street 2:
32 MOLESWORTH STREET

City:                                State:        Country:                ZIP+4/Postal Code:
DUBLIN 2                                          Ireland                  D02 Y512

If this address is a private residence, check this box: ☐

Telephone Number:                        Facsimile number, if any:
+35316973200

This is (check one):
○ one of your branch offices or affiliates.
◉ a third-party unaffiliated recordkeeper.
○ other.

Briefly describe the books and records kept at this location.
THIRD PARTY ADMINISTRATOR. THE ABOVE NAMED THIRD-PARTY ADMINISTRATOR IS THE PRIMARY BOOKS OF RECORD AND INCLUDES RECORDS IN RELATION TO ANTI-MONEY LAUNDERING IDENTIFICATION VERIFICATION DOCUMENTS CONCERNING THE INVESTORS IN THE FUNDS

---

**SECTION 1.M. Registration with Foreign Financial Regulatory Authorities**

List the name and country, in English, of each *foreign financial regulatory authority* with which you are registered. You must complete a separate Schedule D Section 1.M. for each *foreign financial regulatory authority* with whom you are registered.

Name of Country/*Foreign Financial Regulatory Authority:*
Switzerland - Swiss Financial Market Supervisory Authority

Other:

---

**Item 2 SEC Registration/Reporting**

**SEC Reporting by *Exempt Reporting Advisers***

B.   Complete this Item 2.B. only if you are reporting to the SEC as an *exempt reporting adviser.* Check all that apply. You:

☐ (1)   qualify for the exemption from registration as an adviser solely to one or more venture capital funds, as defined in rule 203(l)-1;

☑ (2)   qualify for the exemption from registration because you act solely as an adviser to *private funds* and have assets under management, as defined in rule 203(m)-1, in the United States of less than $150 million;

☐ (3)   act solely as an adviser to *private funds* but you are no longer eligible to check box 2.B.(2) because you have assets under management, as defined in rule 203(m)-1, in the United States of $150 million or more.

   If you check box (2) or (3), complete Section 2.B. of Schedule D.

---

**SECTION 2.B. *Private Fund* Assets**

If you check Item 2.B.(2) or (3), what is the amount of the *private fund* assets that you manage?    $ 1

NOTE: "*Private fund* assets" has the same meaning here as it has under rule 203(m)-1. If you are an investment adviser with its *principal office and place of business* outside the United States only include *private fund* assets that you manage at a place of business in the United States.

---

**Item 3 Form of Organization**

If you are filing an *umbrella registration*, the information in Item 3 should be provided for the *filing adviser* only.

A.   How are you organized?

● Corporation
○ Sole Proprietorship
○ Limited Liability Partnership (LLP)
○ Partnership
○ Limited Liability Company (LLC)
○ Limited Partnership (LP)
○ Other (specify):

   If you are changing your response to this Item, see Part 1A Instruction 4.

B.   In what month does your fiscal year end each year?
SEPTEMBER

C.   Under the laws of what state or country are you organized?

   State   Country
            Switzerland

   If you are a partnership, provide the name of the state or country under whose laws your partnership was formed. If you are a sole proprietor, provide the name of the state or country where you reside.

   If you are changing your response to this Item, see Part 1A Instruction 4.

---

**Item 6 Other Business Activities**

In this Item, we request information about your firm's other business activities.

A.   You are actively engaged in business as a (check all that apply):

☐ (1)   broker-dealer (registered or unregistered)
☐ (2)   registered representative of a broker-dealer
☑ (3)   commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (4)   futures commission merchant
☐ (5)   real estate broker, dealer, or agent
☐ (6)   insurance broker or agent

☐ (7) bank (including a separately identifiable department or division of a bank)

☐ (8) trust company
☐ (9) registered municipal advisor
☐ (10) registered security-based swap dealer
☐ (11) major security-based swap participant
☐ (12) accountant or accounting firm
☐ (13) lawyer or law firm
☐ (14) other financial product salesperson (specify):

*If you engage in other business using a name that is different from the names reported in Items 1.A. or 1.B.(1), complete Section 6.A. of Schedule D.*

| | | | Yes | No |
|---|---|---|---|---|
| B. | (1) | Are you actively engaged in any other business not listed in Item 6.A. (other than giving investment advice)? | ○ | ◉ |
| | (2) | If yes, is this other business your primary business? | ○ | ○ |

*If "yes," describe this other business on Section 6.B.(2) of Schedule D, and if you engage in this business under a different name, provide that name.*

| | | | Yes | No |
|---|---|---|---|---|
| | (3) | Do you sell products or provide services other than investment advice to your advisory *clients*? | ○ | ◉ |

*If "yes," describe this other business on Section 6.B.(3) of Schedule D, and if you engage in this business under a different name, provide that name.*

---

**SECTION 6.A. Names of Your Other Businesses**

No Information Filed

---

**SECTION 6.B.(2) Description of Primary Business**

Describe your primary business (not your investment advisory business):

If you engage in that business under a different name, provide that name:

---

**SECTION 6.B.(3) Description of Other Products and Services**

Describe other products or services you sell to your *client.* You may omit products and services that you listed in Section 6.B.(2) above.

If you engage in that business under a different name, provide that name:

---

**Item 7 Financial Industry Affiliations**

In this Item, we request information about your financial industry affiliations and activities. This information identifies areas in which conflicts of interest may occur between you and your *clients.*

A. This part of Item 7 requires you to provide information about you and your *related persons*, including foreign affiliates. Your *related persons* are all of your *advisory affiliates* and any *person* that is under common *control* with you.

You have a *related person* that is a (check all that apply):

☐ (1) broker-dealer, municipal securities dealer, or government securities broker or dealer (registered or unregistered)
☑ (2) other investment adviser (including financial planners)
☐ (3) registered municipal advisor
☐ (4) registered security-based swap dealer
☐ (5) major security-based swap participant
☐ (6) commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
☐ (7) futures commission merchant
☐ (8) banking or thrift institution
☐ (9) trust company
☐ (10) accountant or accounting firm
☐ (11) lawyer or law firm
☐ (12) insurance company or agency
☐ (13) pension consultant
☐ (14) real estate broker or dealer
☐ (15) sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
☑ (16) sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

*Note that Item 7.A. should not be used to disclose that some of your employees perform investment advisory functions or are registered representatives of a broker-dealer. The number of your firm's employees who perform investment advisory functions should be disclosed under Item 5.B.(1). The number of your firm's employees who are registered representatives of a broker-dealer should be disclosed under Item 5.B.(2).*

*Note that if you are filing an umbrella registration, you should not check Item 7.A.(2) with respect to your relying advisers, and you do not have to complete Section 7.A. in Schedule D for your relying advisers. You should complete a Schedule R for each relying adviser.*

For each related person, including foreign affiliates that may not be registered or required to be registered in the United States, complete Section 7.A. of Schedule D.

You do not need to complete Section 7.A. of Schedule D for any related person if: (1) you have no business dealings with the related person in connection with advisory services you provide to your clients; (2) you do not conduct shared operations with the related person; (3) you do not refer clients or business to the related person, and the related person does not refer prospective clients or business to you; (4) you do not share supervised persons or premises with the related person; and (5) you have no reason to believe that your relationship with the related person otherwise creates a conflict of interest with your clients.

You must complete Section 7.A. of Schedule D for each related person acting as qualified custodian in connection with advisory services you provide to your clients (other than any mutual fund transfer agent pursuant to rule 206(4)-2(b)(1)), regardless of whether you have determined the related person to be operationally independent under rule 206(4)-2 of the Advisers Act.

---

**SECTION 7.A. Financial Industry Affiliations**

Complete a separate Schedule D Section 7.A. for each *related person* listed in Item 7.A.

1. Legal Name of *Related Person*:
   GALENA PRIVATE EQUITY RESOURCES II LIMITED

2. Primary Business Name of *Related Person*:
   GALENA PRIVATE EQUITY RESOURCES II LIMITED

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
   -
   or
   Other

4. *Related Person's*
   (a) *CRD* Number (if any):

   (b) CIK Number(s) (if any):

   No Information Filed

5. *Related Person* is: (check all that apply)
   (a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b) ☐ other investment adviser (including financial planners)
   (c) ☐ registered municipal advisor
   (d) ☐ registered security-based swap dealer
   (e) ☐ major security-based swap participant
   (f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g) ☐ futures commission merchant
   (h) ☐ banking or thrift institution
   (i) ☐ trust company
   (j) ☐ accountant or accounting firm
   (k) ☐ lawyer or law firm
   (l) ☐ insurance company or agency
   (m) ☐ pension consultant
   (n) ☐ real estate broker or dealer
   (o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do *you* *control* or are you *controlled* by the *related person*? | ○ | ⦿ |
| 7. Are you and the *related person* under common *control*? | ⦿ | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ⦿ |
| (b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

   (c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
   Number and Street 1:                           Number and Street 2:
   City:                      State:              Country:              ZIP+4/Postal Code:
   If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|
| 9. (a) If the *related person* is an investment adviser, is it exempt from registration? | ○ | ⦿ |

   (b) If the answer is yes, under what exemption?

10. (a) Is the *related person* registered with a *foreign financial regulatory authority*?  ○ ◉

(b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.

No Information Filed

11. Do you and the *related person* share any *supervised persons*?  ○ ◉

12. Do you and the *related person* share the same physical location?  ○ ◉

---

1. Legal Name of *Related Person*:
GALENA PRIVATE EQUITY RESOURCES LIMITED

2. Primary Business Name of *Related Person*:
GALENA PRIVATE EQUITY RESOURCES LIMITED

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)
-
or
Other

4. *Related Person's*
(a) *CRD* Number (if any):

(b) CIK Number(s) (if any):

No Information Filed

5. *Related Person* is: (check all that apply)
(a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
(b) ☐ other investment adviser (including financial planners)
(c) ☐ registered municipal advisor
(d) ☐ registered security-based swap dealer
(e) ☐ major security-based swap participant
(f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
(g) ☐ futures commission merchant
(h) ☐ banking or thrift institution
(i) ☐ trust company
(j) ☐ accountant or accounting firm
(k) ☐ lawyer or law firm
(l) ☐ insurance company or agency
(m) ☐ pension consultant
(n) ☐ real estate broker or dealer
(o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
(p) ☑ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  | Yes | No |
|---|---|---|
| 6. Do you *control* or are you *controlled* by the *related person*? | ○ | ◉ |
| 7. Are you and the *related person* under common *control*? | ◉ | ○ |
| 8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ◉ |

(b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?  ○ ◉

(c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:

Number and Street 1:                    Number and Street 2:
City:                State:              Country:              ZIP+4/Postal Code:
If this address is a private residence, check this box: ☐

|  | Yes | No |
|---|---|---|
| 9. (a) If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |

(b) If the answer is yes, under what exemption?

10. (a) Is the *related person* registered with a *foreign financial regulatory authority*?  ○ ○

(b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.

No Information Filed

11. Do you and the *related person* share any *supervised persons*?  ○ ○

12. Do you and the *related person* share the same physical location?

1. Legal Name of *Related Person*:
   GALENA ASSET MANAGEMENT (ASIA) PTE. LTD

2. Primary Business Name of *Related Person*:
   GALENA ASSET MANAGEMENT (ASIA) PTE. LTD

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-):
   802 - 76004
   or
   Other

4. *Related Person's*
   (a) *CRD* Number (if any):
      162528
   (b) CIK Number(s) (if any):

   No Information Filed

5. *Related Person* is: (check all that apply)
   (a) ☐ broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b) ☑ other investment adviser (including financial planners)
   (c) ☐ registered municipal advisor
   (d) ☐ registered security-based swap dealer
   (e) ☐ major security-based swap participant
   (f) ☐ commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g) ☐ futures commission merchant
   (h) ☐ banking or thrift institution
   (i) ☐ trust company
   (j) ☐ accountant or accounting firm
   (k) ☐ lawyer or law firm
   (l) ☐ insurance company or agency
   (m) ☐ pension consultant
   (n) ☐ real estate broker or dealer
   (o) ☐ sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p) ☐ sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ◉ |
| 7. | Are you and the *related person* under common *control*? | ◉ | ○ |

8. (a) Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*?    ○ ◉

   (b) If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*?    ○ ○

   (c) If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
   Number and Street 1:                                    Number and Street 2:
   City:                        State:                    Country:                    ZIP+4/Postal Code:
   If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ◉ | ○ |

   (b) If the answer is yes, under what exemption?
   PRIVATE FUND ADVISER EXEMPTION

10. (a) Is the *related person* registered with a *foreign financial regulatory authority*?    ◉ ○

   (b) If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.

   | Name of Country/English Name of *Foreign Financial Regulatory Authority* |
   |---|
   | Singapore - Monetary Authority of Singapore |

|  |  | Yes | No |
|---|---|---|---|
| 11. | Do you and the *related person* share any *supervised persons*? | ◉ | ○ |
| 12. | Do you and the *related person* share the same physical location? | ○ | ◉ |

1. Legal Name of *Related Person*:

2. Primary Business Name of *Related Person*:
   GALENA PRIVATE EQUITY RESOURCES 3 LIMITED

3. *Related Person's* SEC File Number (if any) (e.g., 801-, 8-, 866-, 802-)

   -

   or
   Other

4. *Related Person's*
   (a)  *CRD* Number (if any):

   (b)  CIK Number(s) (if any):

   No Information Filed

5. *Related Person* is: (check all that apply)
   (a)  ☐  broker-dealer, municipal securities dealer, or government securities broker or dealer
   (b)  ☐  other investment adviser (including financial planners)
   (c)  ☐  registered municipal advisor
   (d)  ☐  registered security-based swap dealer
   (e)  ☐  major security-based swap participant
   (f)  ☐  commodity pool operator or commodity trading advisor (whether registered or exempt from registration)
   (g)  ☐  futures commission merchant
   (h)  ☐  banking or thrift institution
   (i)  ☐  trust company
   (j)  ☐  accountant or accounting firm
   (k)  ☐  lawyer or law firm
   (l)  ☐  insurance company or agency
   (m) ☐  pension consultant
   (n)  ☐  real estate broker or dealer
   (o)  ☐  sponsor or syndicator of limited partnerships (or equivalent), excluding pooled investment vehicles
   (p)  ☑  sponsor, general partner, managing member (or equivalent) of pooled investment vehicles

|  |  | Yes | No |
|---|---|---|---|
| 6. | Do you *control* or are you *controlled* by the *related person*? | ○ | ⦿ |
| 7. | Are you and the *related person* under common *control*? | ⦿ | ○ |
| 8. (a) | Does the *related person* act as a qualified custodian for your *clients* in connection with advisory services you provide to *clients*? | ○ | ⦿ |
| (b) | If you are registering or registered with the SEC and you have answered "yes," to question 8.(a) above, have you overcome the presumption that you are not operationally independent (pursuant to rule 206(4)-2(d)(5)) from the *related person* and thus are not required to obtain a surprise examination for your *clients'* funds or securities that are maintained at the *related person*? | ○ | ○ |

(c)  If you have answered "yes" to question 8.(a) above, provide the location of the *related person's* office responsible for *custody* of your *clients'* assets:
   Number and Street 1:                                   Number and Street 2:
   City:                       State:                     Country:                    ZIP+4/Postal Code:
   If this address is a private residence, check this box: ☐

|  |  | Yes | No |
|---|---|---|---|
| 9. (a) | If the *related person* is an investment adviser, is it exempt from registration? | ○ | ○ |
| (b) | If the answer is yes, under what exemption? | | |
| 10. (a) | Is the *related person* registered with a *foreign financial regulatory authority*? | ○ | ⦿ |

(b)  If the answer is yes, list the name and country, in English of each *foreign financial regulatory authority* with which the *related person* is registered.
   No Information Filed

|  |  | Yes | No |
|---|---|---|---|
| 11. | Do you and the *related person* share any *supervised persons*? | ○ | ○ |
| 12. | Do you and the *related person* share the same physical location? | ○ | ○ |

---

**Item 7 *Private Fund* Reporting**

|  | Yes | No |
|---|---|---|
| B.  Are you an adviser to any *private fund*? | ⦿ | ○ |

*If "yes," then for each private fund that you advise, you must complete a Section 7.B.(1) of Schedule D, except in certain circumstances described in the next sentence and in Instruction 6 of the Instructions to Part 1A. If you are registered or applying for registration with the SEC or reporting as an SEC exempt reporting adviser, and another SEC-registered adviser or SEC exempt reporting adviser reports this information with respect to any such private fund in Section 7.B.(1) of Schedule D of its Form ADV (e.g., if you are a subadviser),*

*do not complete Section 7.B.(1) of Schedule D with respect to that private fund. You must, instead, complete Section 7.B.(2) of Schedule D.*

Case 1:22-cv-00366-GBW   Document 25-2   Filed 10/25/22   Page 17 of 227 PageID #: 2395

*In either case, if you seek to preserve the anonymity of a private fund client by maintaining its identity in your books and records in numerical or alphabetical code, or similar designation, pursuant to rule 204-2(d), you may identify the private fund in Section 7.B.(1) or 7.B.(2) of Schedule D using the same code or designation in place of the fund's name.*

---

**SECTION 7.B.(1)** *Private Fund* **Reporting**

Funds per Page: 15    Total Funds: 10

A. PRIVATE FUND

**Information About the _Private Fund_**

1.  (a) Name of the *private fund*:

      GALENA MULTISTRATEGY FUND LIMITED

    (b) *Private fund* identification number:
      (include the "805-" prefix also)

      805-8462085701

2.  Under the laws of what state or country is the *private fund* organized:

    State:                    Country:

                                      Cayman Islands

3.  (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| DARREN STAINROD |
| MARTIN BYRNE |

    (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.  The *private fund* (check all that apply; you must check at least one):

    ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

    ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                     **Yes  No**

6.  (a) Is this a "master fund" in a master-feeder arrangement?      ⦿   ○

    (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                     **Yes  No**

    (c) Is this a "feeder fund" in a master-feeder arrangement?      ⦿   ○

    (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

        Name of *private fund*:

        GALENA MULTISTRATEGY MASTER FUND LIMITED

        *Private fund* identification number:
        (include the "805-" prefix also)

        805-5873831655

    NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

| | | Yes | No |
|---|---|---|---|
| 8. | (a)  Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

| | | | |
|---|---|---|---|
| | (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

| | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10.  What type of fund is the *private fund*?

● hedge fund  ○ liquidity fund  ○ private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:

$ 90,000,000

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:

$ 100,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

20

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

80%

15.  (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

| | | Yes | No |
|---|---|---|---|
| | (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

99%

**Your Advisory Services**

| | | Yes | No |
|---|---|---|---|
| 17. | (a)  Are you a subadviser to this *private fund*? | ○ | ● |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | | Yes | No |
|---|---|---|---|
| 18. | (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

    0%

### Private Offering

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ⊙ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

## B. SERVICE PROVIDERS

### Auditors

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ⊙ | ○ |
|     (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ⊙ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b) Name of the auditing firm:

    DELOITTE

(c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| GEORGE TOWN |  | Cayman Islands |

|  | Yes | No |
|---|---|---|
| (d) Is the auditing firm an *independent public accountant*? | ⊙ | ○ |
| (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ⊙ |
|     If yes, Public Company Accounting Oversight Board-Assigned Number: | | |
| (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ⊙ | ○ |
| (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions? | | |

    ⊙ Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

### Prime Broker

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ○ | ⊙ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

### Custodian

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ⊙ | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

Case 1:22-cv-00306-GBW   Document 25-2   Filed 10/25/22   Page 20 of 227 PageID #: 2398

**Additional Custodian Information : 1 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b)  Legal name of custodian:
THE NORTHERN TRUST INTERNATIONAL BANKING CORPORATION

(c)  Primary business name of custodian:
THE NORTHERN TRUST INTERNATIONAL BANKING CORPORATION

(d)  The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|---|---|---|
| JERSEY CITY | New Jersey | United States |

|  | Yes | No |
|---|---|---|
| (e)  Is the custodian a *related person* of your firm? | ○ | ◉ |

(f)  If the custodian is a broker-dealer, provide its SEC registration number (if any):
-
CRD Number (if any):

(g)  If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)
54930042DBMRRWU1QM80

---

**Administrator**

|  | Yes | No |
|---|---|---|
| 26.  (a)  Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:
MAPLES FUND SERVICES (IRELAND) LIMITED

(c)  Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DUBLIN |  | Ireland |

|  | Yes | No |
|---|---|---|
| (d)  Is the administrator a *related person* of your firm? | ○ | ◉ |

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?
◉ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

---

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?
100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

Yes  No

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?  ○  ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
| --- |

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

GALENA MULTISTRATEGY MASTER FUND LIMITED

(b)  *Private fund* identification number:
(include the "805-" prefix also)

805-5873831655

2.  Under the laws of what state or country is the *private fund* organized:

State:  Country:
Cayman Islands

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| DARREN STAINROD |
| MARTIN BYRNE |

(b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.  The *private fund* (check all that apply; you must check at least one):

☐  (1)  qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑  (2)  qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

Yes  No

6.  (a)  Is this a "master fund" in a master-feeder arrangement?  ◉  ○

(b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| Name of *private fund* | *Private fund* identification number |
| --- | --- |
| GALENA MULTISTRATEGY FUND LIMITED | 805-8462085701 |

Yes  No

(c)  Is this a "feeder fund" in a master-feeder arrangement?  ○  ◉

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | | Yes | No |
|---|---|---|---|
| 8. | (a)  Is this *private fund* a "fund of funds"? | ○ | ◉ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | | Yes | No |
|---|---|---|---|
|  | (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | | Yes | No |
|---|---|---|---|
| 9. | During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ◉ |

10. What type of fund is the *private fund*?

◉ hedge fund ○ liquidity fund ○ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 90,000,000

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

$ 100,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

20

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

80%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

|  | | Yes | No |
|---|---|---|---|
|  | (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

99%

## Your Advisory Services

|  | | Yes | No |
|---|---|---|---|
| 17. | (a)  Are you a subadviser to this *private fund*? | ○ | ◉ |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | | Yes | No |
|---|---|---|---|
| 18. | (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | | Yes | No |
|---|---|---|---|
| 19. | Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ● |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ● | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ● | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

> **Additional Auditor Information : 1 Record(s) Filed.**
>
> If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.
>
> (b) Name of the auditing firm:
>
> DELOITTE
>
> (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | GEORGE TOWN | | Cayman Islands |
>
> |  | Yes | No |
> |---|---|---|
> | (d) Is the auditing firm an *independent public accountant*? | ● | ○ |
> | (e) Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ● |
>
> If yes, Public Company Accounting Oversight Board-Assigned Number:
>
> |  | Yes | No |
> |---|---|---|
> | (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ● | ○ |

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

● Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|
| 24. (a) Does the *private fund* use one or more prime brokers? | ● | ○ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> **Additional Prime Broker Information : 1 Record(s) Filed.**
>
> If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

(b) Name of the prime broker:

(c) If the prime broker is registered with the SEC, its registration number:

8 - 47257

CRD Number (if any):

36418

(d) Location of prime broker's office used principally by the *private fund* (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| GREENWICH | Connecticut | United States |

|  | Yes | No |
|--|-----|----|
| (e) Does this prime broker act as custodian for some or all of the *private fund's* assets? | ● | ○ |

**Custodian**

|  | Yes | No |
|--|-----|----|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ● | ○ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

**Additional Custodian Information : 2 Record(s) Filed.**

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:

CREDIT SUISSE AG

(c) Primary business name of custodian:

CREDIT SUISSE AG

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| ZURICH | | Switzerland |

|  | Yes | No |
|--|-----|----|
| (e) Is the custodian a *related person* of your firm? | ○ | ● |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

ANGGYXNX0JLX3X63JN86

If the answer to question 25.(a) is "yes," respond to questions (b) through g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

(b) Legal name of custodian:

THE NORTHERN TRUST INTERNATIONAL BANKING CORPORATION

(c) Primary business name of custodian:

THE NORTHERN TRUST INTERNATIONAL BANKING CORPORATION

(d) The location of the custodian's office responsible for *custody* of the *private fund's* assets (city, state and country):

| City: | State: | Country: |
|-------|--------|----------|
| JERSEY CITY | New Jersey | United States |

|  | Yes | No |
|--|-----|----|
| (e) Is the custodian a *related person* of your firm? | ○ | ● |

(f) If the custodian is a broker-dealer, provide its SEC registration number (if any):

-

CRD Number (if any):

(g) If the custodian is not a broker-dealer, or is a broker-dealer but does not have an SEC registration number, provide its *legal entity identifier* (if any)

54930042DBMRRWU1QM80

## Administrator

|  | Yes | No |
|---|---|---|
26. (a) Does the *private fund* use an administrator other than your firm? | ⦿ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:

MAPLES FUND SERVICES (IRELAND) LIMITED

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DUBLIN | | Ireland |

(d) Is the administrator a *related person* of your firm? — Yes ○  No ⦿

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?
⦿ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

## Marketers

|  | Yes | No |
|---|---|---|
28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ⦿ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

A. PRIVATE FUND

### Information About the *Private Fund*

1. (a) Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES CO-INVESTMENT 2 LP

(b) *Private fund* identification number:

(include the "805-" prefix also)

2. Under the laws of what state or country is the *private fund* organized:

    State:                       Country:
                                       Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| GALENA PRIVATE EQUITY RESOURCES LIMITED |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4. The *private fund* (check all that apply; you must check at least one):

   ☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                     Yes  No

6. (a) Is this a "master fund" in a master-feeder arrangement?                              ○   ●

   (b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                     Yes  No

   (c) Is this a "feeder fund" in a master-feeder arrangement?                           ●   ○

   (d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

     Name of *private fund*:

     GALENA PRIVATE EQUITY RESOURCES INVESTMENT 2 LP

     *Private fund* identification number:
     (include the "805-" prefix also)

     805-4220000167

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| |
| --- |
| No Information Filed |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                                       Yes  No

8. (a) Is this *private fund* a "fund of funds"?                                    ○   ●

   NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

   (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*?          ○   ○

                                                                         Yes  No

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?     ○   ●

10. What type of fund is the *private fund*?

   ○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

11. Current gross asset value of the *private fund*:

$ 25,000,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 100,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

86%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

|  | Yes | No |
|---|---|---|
| (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a)  Are you a subadviser to this *private fund*? | ○ | ◉ |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ◉ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a)  (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b)  Name of the auditing firm:

DELOITTE

(c)  The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

City:                                          State:                     Country:
GEORGE TOWN                                                      Cayman Islands

|  | Yes | No |
|---|---|---|
| (d)  Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e)  Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ◉ |
| If yes, Public Company Accounting Oversight Board-Assigned Number: | | |
| (f)  If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| (g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ◉ | ○ |

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

|  | Yes | No |
|---|---|---|
| 24.  (a)  Does the *private fund* use one or more prime brokers? | ○ | ◉ |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

## Custodian

|  | Yes | No |
|---|---|---|
| 25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ○ | ◉ |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

No Information Filed

## Administrator

|  | Yes | No |
|---|---|---|
| 26.  (a)  Does the *private fund* use an administrator other than your firm? | ◉ | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:

(c)  Location of administrator (city, state and country):

City:                                          State:                                          Country:
DUBLIN                                                                                         Ireland

Yes  No

(d)  Is the administrator a *related person* of your firm?                                      ○    ●

(e)  Does the administrator prepare and send investor account statements to the *private fund*'s investors?

● Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund*'s investors? If investor account statements are not sent to the (rest of the) *private fund*'s investors, respond "not applicable."

---

27.  During your last fiscal year, what percentage of the *private fund*'s assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

Yes  No

28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    ○    ●

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES CO-INVESTMENT LP

(b)  *Private fund* identification number:
(include the "805-" prefix also)

805-1364943958

2.  Under the laws of what state or country is the *private fund* organized:

State:                                          Country:
                                                Cayman Islands

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| GALENA PRIVATE EQUITY RESOURCES LIMITED |

(b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):

☐  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

**Yes No**

6. (a) Is this a "master fund" in a master-feeder arrangement? ○ ⊙

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

**Yes No**

(c) Is this a "feeder fund" in a master-feeder arrangement? ⊙ ○

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

GALENA PRIVATE EQUITY RESOURCES INVESTMENT LP

*Private fund* identification number:
(include the "805-" prefix also)

805-6788352286

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**Yes No**

8. (a) Is this *private fund* a "fund of funds"? ○ ⊙

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? ○ ○

**Yes No**

9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? ○ ⊙

10. What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ⊙ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 16,700,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 100,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

3

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

40%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

**Yes No**

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to qualified clients?    ○ ○

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

60%

## Your Advisory Services

                  **Yes   No**

17. (a) Are you a subadviser to this *private fund*?    ○ ◉

    (b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                  **Yes   No**

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*?    ○ ◉

    (b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

                  **Yes   No**

19. Are your *clients* solicited to invest in the *private fund*?    ○ ◉

    *NOTE: For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

## Private Offering

                  **Yes   No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?    ○ ◉

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

## Auditors

                  **Yes   No**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?    ○ ◉

       (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?    ○ ○

    If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| No Information Filed |
|---|

                  **Yes   No**

    (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?    ○ ○

    (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

      ○ Yes  ○ No  ○ Report Not Yet Received

    *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

                  **Yes   No**

24. (a) Does the *private fund* use one or more prime brokers?    ○ ◉

    If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

| No Information Filed |
|---|

**Custodian**

|  | Yes | No |
|---|---|---|
| 25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ○ | ● |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> No Information Filed

**Administrator**

|  | Yes | No |
|---|---|---|
| 26. (a) Does the *private fund* use an administrator other than your firm? | ● | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> **Additional Administrator Information : 1 Record(s) Filed.**
>
> If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.
>
> (b) Name of administrator:
>
> MAPLES FUND SERVICES (IRELAND) LIMITED
>
> (c) Location of administrator (city, state and country):
>
> | City: | State: | Country: |
> |---|---|---|
> | DUBLIN | | Ireland |
>
> |  | Yes | No |
> |---|---|---|
> | (d) Is the administrator a *related person* of your firm? | ○ | ● |
>
> (e) Does the administrator prepare and send investor account statements to the *private fund*'s investors?
>
> ● Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)
>
> (f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund*'s investors? If investor account statements are not sent to the (rest of the) *private fund*'s investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund*'s assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ● |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES FUND LP

(b) *Private fund* identification number:

(include the "805-" prefix also)

2.   Under the laws of what state or country is the *private fund* organized:

   State:                               Country:
                                         Cayman Islands

3.   (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| GALENA PRIVATE EQUITY RESOURCES LIMITED |

   (b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.   The *private fund* (check all that apply; you must check at least one):

   ☐  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

   ☑  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.   List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
| --- |

                                                                                                                Yes   No
6.   (a)  Is this a "master fund" in a master-feeder arrangement?                                                 ○     ◉

   (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                                                                Yes   No
   (c)  Is this a "feeder fund" in a master-feeder arrangement?                                                   ○     ◉

   (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

   Name of *private fund*:

   *Private fund* identification number:
   (include the "805-" prefix also)

   NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.   If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

   NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                                                                                Yes   No
8.   (a)  Is this *private fund* a "fund of funds"?                                                               ○     ◉

   NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

   (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?                  ○     ○

                                                                                                                Yes   No
9.   During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?       ○     ◉

10.   What type of fund is the *private fund*?

   ○ hedge fund   ○ liquidity fund   ◉ private equity fund   ○ real estate fund   ○ securitized asset fund   ○ venture capital fund   ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

Case 1:22-cv-00386-GBW   Document 25-2   Filed 10/25/22   Page 34 of 227 PageID #: 2412

11. Current gross asset value of the *private fund*:

$ 265,000,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 10,000,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

8

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

26%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

|  |  | Yes | No |
|---|---|---|---|
| (b) | If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

74%

**Your Advisory Services**

|  |  | Yes | No |
|---|---|---|---|
| 17. (a) | Are you a subadviser to this *private fund*? | ○ | ● |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund.* If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  |  | Yes | No |
|---|---|---|---|
| 18. (a) | Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ● | ○ |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| Name of Other Adviser to *private fund* | SEC file number | CRD number |
|---|---|---|
| GALENA PRIVATE EQUITY RESOURCES LIMITED | 802-76022 | 162527 |

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ● |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ● |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  |  | Yes | No |
|---|---|---|---|
| 23. (a) | (1) Are the *private fund's* financial statements subject to an annual audit? | ● | ○ |
|  | (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ● | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b)  Name of the auditing firm:

DELOITTE

(c)  The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| GEORGE TOWN | | Cayman Islands |

| | Yes | No |
|---|---|---|
| (d)  Is the auditing firm an *independent public accountant*? | ● | ○ |
| (e)  Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ● |
| If yes, Public Company Accounting Oversight Board-Assigned Number: | | |
| (f)  If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ○ | ○ |

---

| | Yes | No |
|---|---|---|
| (g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ● | ○ |

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

● Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

| | Yes | No |
|---|---|---|
| 24.  (a)  Does the *private fund* use one or more prime brokers? | ○ | ● |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

---

No Information Filed

---

**Custodian**

| | Yes | No |
|---|---|---|
| 25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ○ | ● |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

---

No Information Filed

---

**Administrator**

| | Yes | No |
|---|---|---|
| 26.  (a)  Does the *private fund* use an administrator other than your firm? | ● | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

---

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:

MAPLES FUND SERVICES (IRELAND) LIMITED

(c) Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DUBLIN | | Ireland |

|  | Yes | No |
|---|---|---|
| (d) Is the administrator a *related person* of your firm? | ○ | ⊙ |

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?

⊙ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ⊙ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
|---|

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES INVESTMENT 2 LP

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-4220000167

2. Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| | Cayman Islands |

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| GALENA PRIVATE EQUITY RESOURCES LIMITED |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
|---|

4. The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

**Yes No**

6.  (a)  Is this a "master fund" in a master-feeder arrangement?    ◉  ○

    (b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| Name of *private fund* | *Private fund* identification number |
|---|---|
| GALENA PRIVATE EQUITY RESOURCES CO-INVESTMENT 2 LP | 805-4995872095 |
| GALENA PRIVATE EQUITY RESOURCES FUND LP | 805-1995245505 |

**Yes No**

    (c)  Is this a "feeder fund" in a master-feeder arrangement?    ○  ◉

    (d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

      Name of *private fund*:

      *Private fund* identification number:
      (include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

**Yes No**

8.  (a)  Is this *private fund* a "fund of funds"?    ○  ◉

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

    (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?    ○  ○

**Yes No**

9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?    ○  ◉

10.  What type of fund is the *private fund*?

    ○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:
    $ 179,000,000

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:
    $ 10,000,000
    NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:
    8

14.  What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
    26%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

| | Yes | No |
|---|---|---|
| (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16.  What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

79%

## Your Advisory Services

| | Yes | No |
|---|---|---|
| 17. (a)  Are you a subadviser to this *private fund*? | ○ | ◉ |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund.* If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|
| 18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund.* If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

| | Yes | No |
|---|---|---|
| 19.  Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20.  Approximately what percentage of your *clients* has invested in the *private fund*?

26%

## Private Offering

| | Yes | No |
|---|---|---|
| 21.  Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ◉ |

22.  If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

## B. SERVICE PROVIDERS

## Auditors

| | Yes | No |
|---|---|---|
| 23. (a)  (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ◉ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b)  Name of the auditing firm:

DELOITTE

(c)  The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| GEORGE TOWN | | Cayman Islands |

| | Yes | No |
|---|---|---|
| (d)  Is the auditing firm an *independent public accountant*? | ◉ | ○ |
| (e)  Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ◉ |

If yes, Public Company Accounting Oversight Board-Assigned Number:

(f)  If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?  ○ ○

**Yes  No**

(g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?  ◉ ○

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

◉ Yes ○ No ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

## Prime Broker

**Yes  No**

24.  (a)  Does the *private fund* use one or more prime brokers?  ○ ◉

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

## Custodian

**Yes  No**

25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?  ○ ◉

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> No Information Filed

## Administrator

**Yes  No**

26.  (a)  Does the *private fund* use an administrator other than your firm?  ◉ ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b)  Name of administrator:

MAPLES FUND SERVICES (IRELAND) LIMITED

(c)  Location of administrator (city, state and country):

City:                                     State:                          Country:

DUBLIN                                                               Ireland

**Yes  No**

(d)  Is the administrator a *related person* of your firm?  ○ ◉

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?

◉ Yes (provided to all investors) ○ Some (provided to some but not all investors) ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of such *person's* management of the *private fund's* transactions differs from the valuation determined by such *person*.

### Marketers

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?

      Yes  No
      ○    ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| |
|---|
| No Information Filed |

---

A. PRIVATE FUND

### Information About the *Private Fund*

1. (a) Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES INVESTMENT 3 LP

(b) *Private fund* identification number:
(include the "805-" prefix also)

805-6796415253

2. Under the laws of what state or country is the *private fund* organized:

State:                          Country:

                                   Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| GALENA PRIVATE EQUITY RESOURCES II LIMITED |

(b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund.*

| |
|---|
| No Information Filed |

4. The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| Name of Country/English Name of *Foreign Financial Regulatory Authority* |
|---|
| Cayman Islands - Cayman Islands Monetary Authority |

6. (a) Is this a "master fund" in a master-feeder arrangement?

      Yes  No
      ○    ◉

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| |
|---|
| No Information Filed |

      Yes  No
      ○    ◉

(c) Is this a "feeder fund" in a master-feeder arrangement?

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
| --- | --- | --- |
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
| --- | --- | --- |
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
| --- | --- | --- |
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

○ hedge fund  ○ liquidity fund  ● private equity fund  ○ real estate fund  ○ securitized asset fund  ○ venture capital fund  ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 221,600,000

## Ownership

12. Minimum investment commitment required of an investor in the *private fund*:

$ 150,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

32

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

60%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

|  | Yes | No |
| --- | --- | --- |
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

99%

## Your Advisory Services

|  | Yes | No |
| --- | --- | --- |
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ● |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund.* If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

|  | Yes | No |
| --- | --- | --- |
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ● |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund.* If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
| --- |

19. Are your *clients* solicited to invest in the *private fund*?          Yes ○  No ●

   NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

   0%

**Private Offering**

                                                                           Yes  No

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933?          ○  ●

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
| --- |

B. SERVICE PROVIDERS

**Auditors**

                                                                           Yes  No

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit?          ●  ○

   (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?          ●  ○

   If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

   ---

   **Additional Auditor Information : 1 Record(s) Filed.**

   If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

   (b) Name of the auditing firm:

      DELOITTE

   (c) The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

      City:                          State:               Country:
      GEORGE TOWN                                         Cayman Islands

                                                                           Yes  No

   (d) Is the auditing firm an *independent public accountant*?          ●  ○

   (e) Is the auditing firm registered with the Public Company Accounting Oversight Board?          ○  ●

      If yes, Public Company Accounting Oversight Board-Assigned Number:

   (f) If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules?          ○  ○

   ---

                                                                           Yes  No

   (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors?          ●  ○

   (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

      ● Yes  ○ No  ○ Report Not Yet Received

      *If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

                                                                           Yes  No

24. (a) Does the *private fund* use one or more prime brokers?          ○  ●

   If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

   | No Information Filed |
   | --- |

**Custodian**

Yes  No

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?   ○  ◉

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

| No Information Filed |
| --- |

**Administrator**

Yes  No

26. (a) Does the *private fund* use an administrator other than your firm?   ◉  ○

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

(b) Name of administrator:

MAPLES FUND SERVICES (IRELAND) LIMITED

(c) Location of administrator (city, state and country):

City:          State:          Country:

DUBLIN                       Ireland

Yes  No

(d) Is the administrator a *related person* of your firm?   ○  ◉

(e) Does the administrator prepare and send investor account statements to the *private fund's* investors?

◉ Yes (provided to all investors)  ○ Some (provided to some but not all investors)  ○ No (provided to no investors)

(f) If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

Yes  No

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?   ○  ◉

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
| --- |

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

GALENA PRIVATE EQUITY RESOURCES INVESTMENT 4 LP

(b) *Private fund* identification number:

2.    Under the laws of what state or country is the *private fund* organized:

State:                                          Country:
                                                Cayman Islands

3.    (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
| --- |
| GALENA PRIVATE EQUITY RESOURCES II LIMITED |

(b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
| --- |

4.    The *private fund* (check all that apply; you must check at least one):

☐  (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑  (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.    List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| Name of Country/English Name of *Foreign Financial Regulatory Authority* |
| --- |
| Cayman Islands - Cayman Islands Monetary Authority |

                                                                                                              Yes    No
6.    (a)  Is this a "master fund" in a master-feeder arrangement?                                              ○      ⊙

(b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
| --- |

                                                                                                              Yes    No
(c)  Is this a "feeder fund" in a master-feeder arrangement?                                                    ○      ⊙

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.    If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
| --- |

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

                                                                                                              Yes    No
8.    (a)  Is this *private fund* a "fund of funds"?                                                            ○      ⊙

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

(b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*?                  ○      ○

                                                                                                              Yes    No
9.    During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)?                                               ○      ⊙

10.   What type of fund is the *private fund*?

○ hedge fund ○ liquidity fund ◉ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:

$ 41,500,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:

$ 100,000

NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:

32

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

53%

15. (a)  What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

|  | Yes | No |
|---|---|---|
| (b)  If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

98%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a)  Are you a subadviser to this *private fund*? | ○ | ◉ |

(b)  If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a)  Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ◉ |

(b)  If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ◉ |

NOTE: For purposes of this question, do not consider feeder funds of the private fund.

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ◉ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a)  (1) Are the *private fund's* financial statements subject to an annual audit? | ◉ | ○ |

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP?

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

---

**Additional Auditor Information : 1 Record(s) Filed.**

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

(b)  Name of the auditing firm:

  DELOITTE

(c)  The location of the auditing firm's office responsible for the *private fund's* audit (city, state and country):

| City: | State: | Country: |
|---|---|---|
| GEORGE TOWN | | Cayman Islands |

|  | Yes | No |
|---|---|---|
| (d)  Is the auditing firm an *independent public accountant*? | ● | ○ |
| (e)  Is the auditing firm registered with the Public Company Accounting Oversight Board? | ○ | ● |

  If yes, Public Company Accounting Oversight Board-Assigned Number:

| | Yes | No |
|---|---|---|
| (f)  If "yes" to (e) above, is the auditing firm subject to regular inspection by the Public Company Accounting Oversight Board in accordance with its rules? | ○ | ○ |

---

|  | Yes | No |
|---|---|---|
| (g)  Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ● | ○ |

(h)  Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions?

○ Yes  ○ No  ● Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

|  | Yes | No |
|---|---|---|
| 24.  (a)  Does the *private fund* use one or more prime brokers? | ○ | ● |

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

No Information Filed

**Custodian**

|  | Yes | No |
|---|---|---|
| 25.  (a)  Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets? | ○ | ● |

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

No Information Filed

**Administrator**

|  | Yes | No |
|---|---|---|
| 26.  (a)  Does the *private fund* use an administrator other than your firm? | ● | ○ |

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

---

**Additional Administrator Information : 1 Record(s) Filed.**

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete

questions (b) through (f) separately for each administrator.

(b)  Name of administrator:

MAPLES FUND SERVICES LIMITED

(c)  Location of administrator (city, state and country):

| City: | State: | Country: |
|---|---|---|
| DUBLIN | | Ireland |

|  | Yes | No |
|---|---|---|
| (d)  Is the administrator a *related person* of your firm? | ○ | ◉ |

(e)  Does the administrator prepare and send investor account statements to the *private fund's* investors?

◉ Yes (provided to all investors)   ○ Some (provided to some but not all investors)   ○ No (provided to no investors)

(f)  If the answer to question 26.(e) is "no" or "some," who sends the investor account statements to the (rest of the) *private fund's* investors? If investor account statements are not sent to the (rest of the) *private fund's* investors, respond "not applicable."

---

27.  During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

100%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

|  | Yes | No |
|---|---|---|
| 28.  (a)  Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes? | ○ | ◉ |

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

| No Information Filed |
|---|

---

A. PRIVATE FUND

**Information About the *Private Fund***

1.  (a)  Name of the *private fund*:

GALENA RESOURCE EQUITIES LIMITED

(b)  *Private fund* identification number:
(include the "805-" prefix also)

805-7229061510

2.  Under the laws of what state or country is the *private fund* organized:

| State: | Country: |
|---|---|
| | Cayman Islands |

3.  (a)  Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| DARREN STAINROD |
| MARTIN BYRNE |

(b)  If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

| No Information Filed |
|---|

4.  The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5. List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 6. (a) Is this a "master fund" in a master-feeder arrangement? | ○ | ● |

(b) If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| (c) Is this a "feeder fund" in a master-feeder arrangement? | ○ | ● |

(d) If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7. If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

| No Information Filed |
|---|

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8. (a) Is this *private fund* a "fund of funds"? | ○ | ● |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
|---|---|---|
| (b) If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9. During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ● |

10. What type of fund is the *private fund*?

● hedge fund ○ liquidity fund ○ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11. Current gross asset value of the *private fund*:
$ 11,600,000

**Ownership**

12. Minimum investment commitment required of an investor in the *private fund*:
$ 100,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13. Approximate number of the *private fund's* beneficial owners:
2

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:
51%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

0%

**Yes  No**

(b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales ○  ○
of the fund limited to *qualified clients*?

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

100%

**Your Advisory Services**

**Yes  No**

17. (a) Are you a subadviser to this *private fund*? ○  ◉

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund*. If the answer to question 17.(a) is "no," leave this
question blank.

| No Information Filed |
| --- |

**Yes  No**

18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? ○  ◉

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund*. If the answer to question 18.(a) is "no,"
leave this question blank.

| No Information Filed |
| --- |

**Yes  No**

19. Are your *clients* solicited to invest in the *private fund*? ○  ◉

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

0%

**Private Offering**

**Yes  No**

21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? ○  ◉

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
| --- |

B. SERVICE PROVIDERS

**Auditors**

**Yes  No**

23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? ○  ◉

(2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? ○  ○

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete
questions (b) through (f) separately for each auditing firm.

| No Information Filed |
| --- |

**Yes  No**

(g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? ○  ○

(h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions? ○  ○

○ Yes  ○ No  ○ Report Not Yet Received

If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.

**Prime Broker**

**Yes  No**

24. (a) Does the *private fund* use one or more prime brokers? ○  ◉

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one
prime broker, you must complete questions (b) through (e) separately for each prime broker.

**Custodian**

|  | | Yes | No |
|---|---|---|---|

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?       ○ Yes   ● No

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

No Information Filed

**Administrator**

Yes   No

26. (a) Does the *private fund* use an administrator other than your firm?       ○ Yes   ● No

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

Yes   No

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?       ○ Yes   ● No

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

No Information Filed

---

A. PRIVATE FUND

**Information About the *Private Fund***

1. (a) Name of the *private fund*:

   GALENA SPECIAL SITUATIONS LIMITED

   (b) *Private fund* identification number:
   (include the "805-" prefix also)

   805-6052614872

2. Under the laws of what state or country is the *private fund* organized:

   State:                        Country:

                                 Cayman Islands

3. (a) Name(s) of General Partner, Manager, Trustee, or Directors (or *persons* serving in a similar capacity):

| Name of General Partner, Manager, Trustee, or Director |
|---|
| DARREN STAINROD |
| MARTIN BYRNE |

   (b) If filing an *umbrella registration*, identify the *filing adviser* and/or *relying adviser(s)* that sponsor(s) or manage(s) this *private fund*.

No Information Filed

4.  The *private fund* (check all that apply; you must check at least one):

☐ (1) qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940

☑ (2) qualifies for the exclusion from the definition of investment company under section 3(c)(7) of the Investment Company Act of 1940

5.  List the name and country, in English, of each *foreign financial regulatory authority* with which the *private fund* is registered.

No Information Filed

|  | Yes | No |
|---|---|---|
| 6. (a)  Is this a "master fund" in a master-feeder arrangement? | ○ | ⦿ |

(b)  If yes, what is the name and *private fund* identification number (if any) of the feeder funds investing in this *private fund*?

No Information Filed

|  | Yes | No |
|---|---|---|
| (c)  Is this a "feeder fund" in a master-feeder arrangement? | ○ | ⦿ |

(d)  If yes, what is the name and *private fund* identification number (if any) of the master fund in which this *private fund* invests?

Name of *private fund*:

*Private fund* identification number:
(include the "805-" prefix also)

NOTE: You must complete question 6 for each master-feeder arrangement regardless of whether you are filing a single Schedule D, Section 7.B.(1) for the master-feeder arrangement or reporting on the funds separately.

7.  If you are filing a single Schedule D, Section 7.B.(1) for a master-feeder arrangement according to the instructions to this Section 7.B.(1), for each of the feeder funds answer the following questions:

No Information Filed

NOTE: For purposes of questions 6 and 7, in a master-feeder arrangement, one or more funds ("feeder funds") invest all or substantially all of their assets in a single fund ("master fund"). A fund would also be a "feeder fund" investing in a "master fund" for purposes of this question if it issued multiple classes (or series) of shares or interests, and each class (or series) invests substantially all of its assets in a single master fund.

|  | Yes | No |
|---|---|---|
| 8. (a)  Is this *private fund* a "fund of funds"? | ○ | ⦿ |

NOTE: For purposes of this question only, answer "yes" if the fund invests 10 percent or more of its total assets in other pooled investment vehicles, regardless of whether they are also *private funds* or registered investment companies.

|  | Yes | No |
|---|---|---|
| (b)  If yes, does the *private fund* invest in funds managed by you or by a *related person*? | ○ | ○ |

|  | Yes | No |
|---|---|---|
| 9.  During your last fiscal year, did the *private fund* invest in securities issued by investment companies registered under the Investment Company Act of 1940 (other than "money market funds," to the extent provided in Instruction 6.e.)? | ○ | ⦿ |

10.  What type of fund is the *private fund*?

⦿ hedge fund ○ liquidity fund ○ private equity fund ○ real estate fund ○ securitized asset fund ○ venture capital fund ○ Other *private fund*:

NOTE: For definitions of these fund types, please see Instruction 6 of the Instructions to Part 1A.

11.  Current gross asset value of the *private fund*:
$ 1,050,000

**Ownership**

12.  Minimum investment commitment required of an investor in the *private fund*:
$ 100,000
NOTE: Report the amount routinely required of investors who are not your *related persons* (even if different from the amount set forth in the organizational documents of the fund).

13.  Approximate number of the *private fund's* beneficial owners:

14. What is the approximate percentage of the *private fund* beneficially owned by you and your *related persons*:

46%

15. (a) What is the approximate percentage of the *private fund* beneficially owned (in the aggregate) by funds of funds:

17%

|  | Yes | No |
|---|---|---|
| (b) If the private fund qualifies for the exclusion from the definition of investment company under section 3(c)(1) of the Investment Company Act of 1940, are sales of the fund limited to *qualified clients*? | ○ | ○ |

16. What is the approximate percentage of the *private fund* beneficially owned by non-*United States persons*:

83%

**Your Advisory Services**

|  | Yes | No |
|---|---|---|
| 17. (a) Are you a subadviser to this *private fund*? | ○ | ⊙ |

(b) If the answer to question 17.(a) is "yes," provide the name and SEC file number, if any, of the adviser of the *private fund.* If the answer to question 17.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 18. (a) Do any investment advisers (other than the investment advisers listed in Section 7.B.(1).A.3.(b)) advise the *private fund*? | ○ | ⊙ |

(b) If the answer to question 18.(a) is "yes," provide the name and SEC file number, if any, of the other advisers to the *private fund.* If the answer to question 18.(a) is "no," leave this question blank.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| 19. Are your *clients* solicited to invest in the *private fund*? | ○ | ⊙ |

NOTE: *For purposes of this question, do not consider feeder funds of the private fund.*

20. Approximately what percentage of your *clients* has invested in the *private fund*?

83%

**Private Offering**

|  | Yes | No |
|---|---|---|
| 21. Has the *private fund* ever relied on an exemption from registration of its securities under Regulation D of the Securities Act of 1933? | ○ | ⊙ |

22. If yes, provide the *private fund's* Form D file number (if any):

| No Information Filed |
|---|

B. SERVICE PROVIDERS

**Auditors**

|  | Yes | No |
|---|---|---|
| 23. (a) (1) Are the *private fund's* financial statements subject to an annual audit? | ○ | ⊙ |
| (2) If the answer to question 23.(a)(1) is "yes," are the financial statements prepared in accordance with U.S. GAAP? | ○ | ○ |

If the answer to question 23.(a)(1) is "yes," respond to questions (b) through (h) below. If the *private fund* uses more than one auditing firm, you must complete questions (b) through (f) separately for each auditing firm.

| No Information Filed |
|---|

|  | Yes | No |
|---|---|---|
| (g) Are the *private fund's* audited financial statements for the most recently completed fiscal year distributed to the *private fund's* investors? | ○ | ○ |
| (h) Do all of the reports prepared by the auditing firm for the *private fund* since your last *annual updating amendment* contain unqualified opinions? | | |

○ Yes  ○ No  ○ Report Not Yet Received

*If you check "Report Not Yet Received," you must promptly file an amendment to your Form ADV to update your response when the report is available.*

**Prime Broker**

24. (a) Does the *private fund* use one or more prime brokers?    Yes ○  No ●

If the answer to question 24.(a) is "yes," respond to questions (b) through (e) below for each prime broker the *private fund* uses. If the *private fund* uses more than one prime broker, you must complete questions (b) through (e) separately for each prime broker.

> No Information Filed

**Custodian**

25. (a) Does the *private fund* use any custodians (including the prime brokers listed above) to hold some or all of its assets?    Yes ○  No ●

If the answer to question 25.(a) is "yes," respond to questions (b) through (g) below for each custodian the *private fund* uses. If the *private fund* uses more than one custodian, you must complete questions (b) through (g) separately for each custodian.

> No Information Filed

**Administrator**

26. (a) Does the *private fund* use an administrator other than your firm?    Yes ○  No ●

If the answer to question 26.(a) is "yes," respond to questions (b) through (f) below. If the *private fund* uses more than one administrator, you must complete questions (b) through (f) separately for each administrator.

> No Information Filed

27. During your last fiscal year, what percentage of the *private fund's* assets (by value) was valued by a *person*, such as an administrator, that is not your *related person*?

0%

Include only those assets where (i) such *person* carried out the valuation procedure established for that asset, if any, including obtaining any relevant quotes, and (ii) the valuation used for purposes of investor subscriptions, redemptions or distributions, and fee calculations (including allocations) was the valuation determined by such *person*.

**Marketers**

28. (a) Does the *private fund* use the services of someone other than you or your *employees* for marketing purposes?    Yes ○  No ●

You must answer "yes" whether the *person* acts as a placement agent, consultant, finder, introducer, municipal advisor or other solicitor, or similar *person*. If the answer to question 28.(a) is "yes," respond to questions (b) through (g) below for each such marketer the *private fund* uses. If the *private fund* uses more than one marketer you must complete questions (b) through (g) separately for each marketer.

> No Information Filed

Funds per Page: 15 ▾   Total Funds: 10

---

**SECTION 7.B.(2) *Private Fund* Reporting**

No Information Filed

---

**Item 10 Control Persons**

In this Item, we ask you to identify every *person* that, directly or indirectly, *controls* you. If you are filing an *umbrella registration*, the information in Item 10 should be provided for the *filing adviser* only.

If you are submitting an initial application or report, you must complete Schedule A and Schedule B. Schedule A asks for information about your direct owners and executive officers. Schedule B asks for information about your indirect owners. If this is an amendment and you are updating information you reported on either Schedule A or Schedule B (or both) that you filed with your initial application or report, you must complete Schedule C.

Yes   No

A. Does any *person* not named in Item 1.A. or Schedules A, B, or C, directly or indirectly, *control* your management or policies? ○ ⦿

    *If yes, complete Section 10.A. of Schedule D.*

B. If any *person* named in Schedules A, B, or C or in Section 10.A. of Schedule D is a public reporting company under Sections 12 or 15(d) of the Securities Exchange Act of 1934, please complete Section 10.B. of Schedule D.

---

**SECTION 10.A.** *Control Persons*

No Information Filed

---

**SECTION 10.B.** *Control Person* Public Reporting Companies

No Information Filed

---

**Item 11 Disclosure Information**

In this Item, we ask for information about your disciplinary history and the disciplinary history of all your *advisory affiliates*. We use this information to determine whether to grant your application for registration, to decide whether to revoke your registration or to place limitations on your activities as an investment adviser, and to identify potential problem areas to focus on during our on-site examinations. One event may result in "yes" answers to more than one of the questions below. In accordance with General Instruction 5 to Form ADV, "you" and "your" include the *filing adviser* and all *relying advisers* under an *umbrella registration*.

Your *advisory affiliates* are: (1) all of your current *employees* (other than *employees* performing only clerical, administrative, support or similar functions); (2) all of your officers, partners, or directors (or any *person* performing similar functions); and (3) all *persons* directly or indirectly *controlling* you or *controlled* by you. If you are a "separately identifiable department or division" (SID) of a bank, see the Glossary of Terms to determine who your *advisory affiliates* are.

*If you are registered or registering with the SEC or if you are an exempt reporting adviser, you may limit your disclosure of any event listed in Item 11 to ten years following the date of the event. If you are registered or registering with a state, you must respond to the questions as posed; you may, therefore, limit your disclosure to ten years following the date of an event only in responding to Items 11.A.(1), 11.A.(2), 11.B.(1), 11.B.(2), 11.D.(4), and 11.H.(1)(a). For purposes of calculating this ten-year period, the date of an event is the date the final order, judgment, or decree was entered, or the date any rights of appeal from preliminary orders, judgments, or decrees lapsed.*

You must complete the appropriate Disclosure Reporting Page ("DRP") for "yes" answers to the questions in this Item 11.

| | Yes | No |
|---|---|---|
| Do any of the events below involve you or any of your *supervised persons*? | ○ | ⦿ |

For "yes" answers to the following questions, complete a Criminal Action DRP:

| | Yes | No |
|---|---|---|
| A. In the past ten years, have you or any *advisory affiliate*: | | |
|   (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to any *felony*? | ○ | ⦿ |
|   (2) been *charged* with any *felony*? | ○ | ⦿ |

    *If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.A.(2) to charges that are currently pending.*

| | Yes | No |
|---|---|---|
| B. In the past ten years, have you or any *advisory affiliate*: | | |
|   (1) been convicted of or pled guilty or nolo contendere ("no contest") in a domestic, foreign, or military court to a *misdemeanor* involving: investments or an *investment-related* business, or any fraud, false statements, or omissions, wrongful taking of property, bribery, perjury, forgery, counterfeiting, extortion, or a conspiracy to commit any of these offenses? | ○ | ⦿ |
|   (2) been *charged* with a *misdemeanor* listed in Item 11.B.(1)? | ○ | ⦿ |

    *If you are registered or registering with the SEC, or if you are reporting as an exempt reporting adviser, you may limit your response to Item 11.B.(2) to charges that are currently pending.*

For "yes" answers to the following questions, complete a Regulatory Action DRP:

| | Yes | No |
|---|---|---|
| C. Has the SEC or the Commodity Futures Trading Commission (CFTC) ever: | | |
|   (1) *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ⦿ |
|   (2) *found* you or any *advisory affiliate* to have been *involved* in a violation of SEC or CFTC regulations or statutes? | ○ | ⦿ |
|   (3) *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ⦿ |
|   (4) entered an *order* against you or any *advisory affiliate* in connection with *investment-related* activity? | ○ | ⦿ |
|   (5) imposed a civil money penalty on you or any *advisory affiliate*, or *ordered* you or any *advisory affiliate* to cease and desist from any activity? | ○ | ⦿ |

D. Has any other federal regulatory agency, any state regulatory agency, or any *foreign financial regulatory authority*:

| | | Yes | No |
|---|---|---|---|
| (1) | ever *found* you or any *advisory affiliate* to have made a false statement or omission, or been dishonest, unfair, or unethical? | ○ | ◉ |
| (2) | ever *found* you or any *advisory affiliate* to have been *involved* in a violation of *investment-related* regulations or statutes? | ○ | ◉ |
| (3) | ever *found* you or any *advisory affiliate* to have been a cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) | in the past ten years, entered an *order* against you or any *advisory affiliate* in connection with an *investment-related* activity? | ○ | ◉ |
| (5) | ever denied, suspended, or revoked your or any *advisory affiliate's* registration or license, or otherwise prevented you or any *advisory affiliate*, by *order*, from associating with an *investment-related* business or restricted your or any *advisory affiliate's* activity? | ○ | ◉ |

E. Has any *self-regulatory organization* or commodities exchange ever:

| | | | |
|---|---|---|---|
| (1) | *found* you or any *advisory affiliate* to have made a false statement or omission? | ○ | ◉ |
| (2) | *found* you or any *advisory affiliate* to have been *involved* in a violation of its rules (other than a violation designated as a "*minor rule violation*" under a plan approved by the SEC)? | ○ | ◉ |
| (3) | *found* you or any *advisory affiliate* to have been the cause of an *investment-related* business having its authorization to do business denied, suspended, revoked, or restricted? | ○ | ◉ |
| (4) | disciplined you or any *advisory affiliate* by expelling or suspending you or the *advisory affiliate* from membership, barring or suspending you or the *advisory affiliate* from association with other members, or otherwise restricting your or the *advisory affiliate's* activities? | ○ | ◉ |

| | | | |
|---|---|---|---|
| F. | Has an authorization to act as an attorney, accountant, or federal contractor granted to you or any *advisory affiliate* ever been revoked or suspended? | ○ | ◉ |
| G. | Are you or any *advisory affiliate* now the subject of any regulatory *proceeding* that could result in a "yes" answer to any part of Item 11.C., 11.D., or 11.E.? | ○ | ◉ |

For "yes" answers to the following questions, complete a Civil Judicial Action DRP:

| | | | Yes | No |
|---|---|---|---|---|
| H. | (1) | Has any domestic or foreign court: | | |
| | | (a) in the past ten years, *enjoined* you or any *advisory affiliate* in connection with any *investment-related* activity? | ○ | ◉ |
| | | (b) ever *found* that you or any *advisory affiliate* were *involved* in a violation of *investment-related* statutes or regulations? | ○ | ◉ |
| | | (c) ever dismissed, pursuant to a settlement agreement, an *investment-related* civil action brought against you or any *advisory affiliate* by a state or *foreign financial regulatory authority*? | ○ | ◉ |
| | (2) | Are you or any *advisory affiliate* now the subject of any civil *proceeding* that could result in a "yes" answer to any part of Item 11.H.(1)? | ○ | ◉ |

---

**Schedule A**

**Direct Owners and Executive Officers**

1. Complete Schedule A only if you are submitting an initial application or report. Schedule A asks for information about your direct owners and executive officers. Use Schedule C to amend this information.

2. Direct Owners and Executive Officers. List below the names of:

   (a) each Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, Chief Legal Officer, Chief Compliance Officer(Chief Compliance Officer is required if you are registered or applying for registration and cannot be more than one individual), director, and any other individuals with similar status or functions;

   (b) if you are organized as a corporation, each shareholder that is a direct owner of 5% or more of a class of your voting securities, unless you are a public reporting company (a company subject to Section 12 or 15(d) of the Exchange Act);
   Direct owners include any *person* that owns, beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 5% or more of a class of your voting securities. For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (c) if you are organized as a partnership, all general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 5% or more of your capital;

   (d) in the case of a trust that directly owns 5% or more of a class of your voting securities, or that has the right to receive upon dissolution, or has contributed, 5% or more of your capital, the trust and each trustee; and

   (e) if you are organized as a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 5% or more of your capital, and (ii) managed by elected managers, all elected managers.

3. Do you have any indirect owners to be reported on Schedule B?  ◉ Yes  ○ No

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner or executive officer is an individual.

5. Complete the Title or Status column by entering board/management titles; status as partner, trustee, sole proprietor, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:  NA - less than 5%  B - 10% but less than 25%  D - 50% but less than 75%
   A - 5% but less than 10%  C - 25% but less than 50%  E - 75% or more

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Title or Status | Date Title or Status Acquired MM/YYYY | Ownership Code | Control Person | PR | CRD No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|
| STRATHCLYDE, THOMAS GALLOWAY, DUNLOP DU ROY | I | DIRECTOR | 11/2013 | NA | Y | N | 6271151 |
| ASHLEY, ROBERT | I | DIRECTOR | 02/2013 | NA | Y | N | 6030219 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GALENA ASSET MANAGEMENT BV | FE | GALENA ASSET MANAGEMENT BV | 02/2013 | | Y | N | |
| LYNCH, GERARD | I | CHIEF COMPLIANCE OFFICER | 02/2013 | NA | Y | N | 6030217 |
| WURGLER, RAOUL, OLIVER | I | DIRECTOR | 12/2014 | NA | Y | N | 6429907 |
| Tomei, Maximilian, Gebhard | I | COO/CEO | 05/2015 | NA | Y | N | 6578545 |

## Schedule B

**Indirect Owners**

1. Complete Schedule B only if you are submitting an initial application or report. Schedule B asks for information about your indirect owners; you must first complete Schedule A, which asks for information about your direct owners. Use Schedule C to amend this information.

2. Indirect Owners. With respect to each owner listed on Schedule A (except individual owners), list below:

   (a) in the case of an owner that is a corporation, each of its shareholders that beneficially owns, has the right to vote, or has the power to sell or direct the sale of, 25% or more of a class of a voting security of that corporation;

   For purposes of this Schedule, a *person* beneficially owns any securities: (i) owned by his/her child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, sharing the same residence; or (ii) that he/she has the right to acquire, within 60 days, through the exercise of any option, warrant, or right to purchase the security.

   (b) in the case of an owner that is a partnership, <u>all</u> general partners and those limited and special partners that have the right to receive upon dissolution, or have contributed, 25% or more of the partnership's capital;

   (c) in the case of an owner that is a trust, the trust and each trustee; and

   (d) in the case of an owner that is a limited liability company ("LLC"), (i) those members that have the right to receive upon dissolution, or have contributed, 25% or more of the LLC's capital, and (ii) if managed by elected managers, those elected managers.

3. Continue up the chain of ownership listing all 25% owners at each level. Once a public reporting company (a company subject to Sections 12 or 15(d) of the Exchange Act) is reached, no further ownership information need be given.

4. In the DE/FE/I column below, enter "DE" if the owner is a domestic entity, "FE" if the owner is an entity incorporated or domiciled in a foreign country, or "I" if the owner is an individual.

5. Complete the Status column by entering the owner's status as partner, trustee, elected manager, shareholder, or member; and for shareholders or members, the class of securities owned (if more than one is issued).

6. Ownership codes are:  C - 25% but less than 50%  E - 75% or more
   D - 50% but less than 75%  F - Other (general partner, trustee, or elected manager)

7. (a) In the *Control Person* column, enter "Yes" if the *person* has *control* as defined in the Glossary of Terms to Form ADV, and enter "No" if the *person* does not have *control*. Note that under this definition, most executive officers and all 25% owners, general partners, elected managers, and trustees are *control persons*.

   (b) In the PR column, enter "PR" if the owner is a public reporting company under Sections 12 or 15(d) of the Exchange Act.

   (c) Complete each column.

| FULL LEGAL NAME (Individuals: Last Name, First Name, Middle Name) | DE/FE/I | Entity in Which Interest is Owned | Status | Date Status Acquired MM/YYYY | Ownership Code | *Control Person* | PR | *CRD* No. If None: S.S. No. and Date of Birth, IRS Tax No. or Employer ID No. |
|---|---|---|---|---|---|---|---|---|
| CORTES HOLDING SARL | FE | TRAFIGURA HOLDING GMBH | SHAREHOLDER OF TRAFIGURA HOLDING GMBH | 09/2015 | E | Y | N | |
| TRAFIGURA GROUP PTE. LTD. | FE | TRAFIGURA HOLDINGS PTE LTD | SHAREHOLDER OF TRAFIGURA HOLDINGS PTE. LTD. | 11/2015 | E | Y | N | |
| TRAFIGURA BEHEER B.V. | FE | TRAFIGURA GROUP PTE. LTD. | SHAREHOLDER OF TRAFIGURA GROUP PTE. LTD | 10/2010 | E | Y | N | |
| TRAFIGURA HOLDING GMBH | FE | GALENA ASSET MANAGEMENT BV | SHAREHOLDER OF GALENA ASSET MANAGEMENT BV | 10/2015 | E | Y | N | |
| TRAFIGURA HOLDINGS PTE LTD | FE | CORTES INVESTMENTS S.À R.L. | SHAREHOLDER OF CORTES INVESTMENTS SARL | 11/2015 | E | Y | N | |
| TRAFIGURA CONTROL HOLDINGS PTE. LTD. | FE | TRAFIGURA BEHEER B.V. | SHAREHOLDER OF TRAFIGURA BEHEER BV | 09/2017 | E | Y | N | |
| CORTES INVESTMENTS S.À R.L. | FE | CORTES HOLDING SARL | SHAREHOLDER OF CORTES HOLDING SARL | 12/2018 | E | Y | N | |
| FARRINGFORD FOUNDATION | FE | TRAFIGURA CONTROL HOLDINGS PTE. LTD. | SHAREHOLDER OF TRAFIGURA CONTROL HOLDINGS PTE. LTD. | 12/2019 | E | Y | N | |

## Schedule D - Miscellaneous

You may use the space below to explain a response to an Item or to provide any other information.

## DRP Pages

## CRIMINAL DISCLOSURE REPORTING PAGE (ADV)

No Information Filed

**REGULATORY ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**CIVIL JUDICIAL ACTION DISCLOSURE REPORTING PAGE (ADV)**

No Information Filed

**Execution Pages**

**DOMESTIC INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint the Secretary of State or other legally designated officer, of the state in which you maintain your *principal office and place of business* and any other state in which you are submitting a *notice filing,* as your agents to receive service, and agree that such *persons* may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings,* demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding,* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded,* directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of the state in which you maintain your *principal office and place of business* or of any state in which you are submitting a *notice filing.*

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                                          Date: MM/DD/YYYY

Printed Name:                                                    Title:

Adviser *CRD* Number:
171782

**NON-RESIDENT INVESTMENT ADVISER EXECUTION PAGE**

You must complete the following Execution Page to Form ADV. This execution page must be signed and attached to your initial submission of Form ADV to the SEC and all amendments.

1. Appointment of Agent for Service of Process

By signing this Form ADV Execution Page, you, the undersigned adviser, irrevocably appoint each of the Secretary of the SEC, and the Secretary of State or other legally designated officer, of any other state in which you are submitting a *notice filing,* as your agents to receive service, and agree that such persons may accept service on your behalf, of any notice, subpoena, summons, *order* instituting *proceedings,* demand for arbitration, or other process or papers, and you further agree that such service may be made by registered or certified mail, in any federal or state action, administrative *proceeding* or arbitration brought against you in any place subject to the jurisdiction of the United States, if the action, *proceeding* or arbitration (a) arises out of any activity in connection with your investment advisory business that is subject to the jurisdiction of the United States, and (b) is *founded,* directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Securities Exchange Act of 1934, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these acts, or (ii) the laws of any state in which you are submitting a *notice filing.*

2. Appointment and Consent: Effect on Partnerships

If you are organized as a partnership, this irrevocable power of attorney and consent to service of process will continue in effect if any partner withdraws from or is admitted to the partnership, provided that the admission or withdrawal does not create a new partnership. If the partnership dissolves, this irrevocable power of attorney and consent shall be in effect for any action brought against you or any of your former partners.

3. *Non-Resident* Investment Adviser Undertaking Regarding Books and Records

By signing this Form ADV, you also agree to provide, at your own expense, to the U.S. Securities and Exchange Commission at its principal office in Washington D.C., at any Regional or District Office of the Commission, or at any one of its offices in the United States, as specified by the Commission, correct, current, and complete copies of any or all records that you are required to maintain under Rule 204-2 under the Investment Advisers Act of 1940. This undertaking shall be binding upon you, your heirs, successors and assigns, and any *person* subject to your written irrevocable consents or powers of attorney or any of your general partners and *managing agents.*

Signature

I, the undersigned, sign this Form ADV on behalf of, and with the authority of, the *non-resident* investment adviser. The investment adviser and I both certify, under penalty of perjury under the laws of the United States of America, that the information and statements made in this ADV, including exhibits and any other information submitted, are true and correct, and that I am signing this Form ADV Execution Page as a free and voluntary act.

I certify that the adviser's books and records will be preserved and available for inspection as required by law. Finally, I authorize any *person* having *custody* or possession of these books and records to make them available to federal and state regulatory representatives.

Signature:                                              Date: MM/DD/YYYY
GERARD LYNCH                                      11/10/2021
Printed Name:                                        Title:
GERARD LYNCH                                      CCO
Adviser *CRD* Number:
171782

# EXHIBIT 14

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **4943049** | Incorporation Date / Formation Date: | **2/21/2011** (mm/dd/yyyy) |
| Entity Name: | **IMPALA TERMINALS BURNSIDE LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information

Submit

View Search Results                    New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

# EXHIBIT 15



*impala*

ACCESS ▶
CAPACITY
IMPALA TERMINALS BURNSIDE

# ➤ A STRATEGIC HUB FOR US COAL AND PETROLEUM COKE

*Impala Terminals Burnside in Ascension Parish, Louisiana is Impala's state-of-the-art bulk facility in the US for coal, petroleum coke, bauxite, alumina and other dry commodities.*

Located at mile marker 169 on the Lower Mississippi River, Impala Terminals Burnside is a multi-modal terminal with access to ocean, river, and truck connecting the US coal and petroleum coke producing heartland to domestic and international markets.

This strategic location provides ready access to the entire 25,000 nautical miles of the US Inland river system, immediate access to the US Interstate highway system, all class one railroads and direct access to the Gulf of Mexico via the Mississippi River shipping lanes.

Since acquiring the site in 2011, Impala has invested significantly in the terminal transforming it into one

of the top bulk exporting facilities in the US. To date USD 300+ million has been injected into the project with a further USD 150+ million envisaged for a further phase of redevelopment incorporating a state-of-the-art rail unloading system.

Impala Terminals Burnside not only offers immediate storage on a soil-cement pad and blending facilities but operates a mid-stream berth with both barge-to-ocean vessel and ocean vessel-to-barge transfer capabilities. The mid-stream vessel operation is capable of transfer rates up to 20,000 tons per day of all types of bulk cargoes, including coal, petroleum coke, grain products, ores or alloys and fertilisers.

Impala Terminals Group is delivering on our promise of running a state-of-the-art facility with a focus on quality, efficiency, environmental stewardship and reliability.

## $450M+
**TOTAL ENVISAGED BUDGET**

## 25,000MT
**GUARANTEED MINIMUM LOAD RATE PER DAY VIA MAIN BERTH**



POWDER RIVER BASIN

BNSF, UP, KCS

WESTERN BITUMINOUS

INTERIOR

ILLINOIS BASIN

CN

APPALACHIA NORTHERN

APPALACHIA CENTRAL

CSX, NS

APPALACHIA SOUTHERN

BNSF, KCS

BURNSIDE

Ocean routes to and from Europe, the Mediterranean, Africa, South America, the Caribbean, India, China and the Far East.

■ COAL RESOURCE
--- RAIL ACCESS
— RIVERS

PANAMA CANAL

Impala Terminals Burnside is an essential part of the commodities supply chain to Central and South America, the Caribbean, Western Africa, and the Euro-Mediterranean region. Further expansion of the Panama Canal in 2015 will allow larger vessels to cross-transit, making it possible for exporters from the terminal to reach Asian customers at more competitive rates.

*metric tonnes
All references to Impala Terminals Burnside and Burnside Terminal relate to Impala Terminals Burnside LLC.



CONTINUOUS BARGE UNLOADER ①

② STORAGE

LOADING OCEAN VESSELS ③







### ① CONTINUOUS BARGE UNLOADER

Your product is unloaded via a continuous barge unloader (CBU) with discharge rates of up to 5,000mt per hour to either the soil-cement stockpile or directly to ocean vessel. Unloading to the stockpile alleviates costly barge demurrage and allows some cargoes to reduce moisture content prior to loading the product on to an ocean vessel.

### ② STORAGE

Your product is unloaded onto the soil cement stockpile area, the product is shaped for storage into piles. The stockyard includes the latest technology for eliminating fugitive emissions. All storm water and water runoff is collected, stored and treated on site in line with the latest environmental regulations.

### ③ LOADING OCEAN VESSELS

Your product is collected from the stockyard using a series of dozer traps. It is transported via conveyor to the main berth and is loaded on to ocean going vessels of up to Capesize in class. Materials can be sampled and analysed by your laboratory of choice as it is loaded aboard the vessel.

# 5,000

**MT PER HOUR CONTINUOUS BARGE UNLOADER PEAK CAPACITY**

# 600,000

**MT CONTINUOUS STORAGE SPACE**

# 8,000

**MT PER HOUR SHIP LOADER PEAK CAPACITY**



### BLENDING

Our blending capabilities meet the varied and specific needs of our customers, with quality and reliability as our highest priorities. We manage the entire blending process via a centralised control system to ensure optimal performance. An independent third-party maintains our sampling system to ensure exact specifications are met.

### RAIL UNLOADING

As part of our continual investment and upgrade of the facility, we plan to incorporate the latest rail unloading features into the existing infrastructure. Our facilities will provide for rapid-discharge bottom dump cars to minimize the unloading time for all rail cargoes.



### SAFETY

Impala Terminals Burnside follows the highest standards of health and safety. We take the safety of our employees, suppliers, contractors and partners seriously and we ensure the provision of a safe and healthy workplace. We identify any hazards, risk and unsafe behaviours and implement controls that ensure these risks are minimised to the lowest level practicable.

### COMMUNITY

In keeping with our aim to hire locally, 87 percent of recent new hires are residents of Ascension Parish and or the state of Louisiana. We have also made significant steps to invest in and respond to the needs of the Ascension Parish community. We engage in ongoing dialogue with all local stakeholders including state and local government representatives.

### ENVIRONMENT

We have taken a large range of measures to minimise our potential environmental impact. These measures include designing surface water retention ponds that are four-times greater than the regulatory requirement, implementing system designs that reduce potential emissions and installing modern systems for reclaiming and recycling surface water run-off to eliminate fugitive emissions – reducing water dependency on the area.



### MIDSTREAM LOADING

The terminal operates a barge mounted Gottwald Series 8 crane that is the largest and most efficient midstream transfer crane available today.

# 2,500

**MT PER HOUR LOADING RATE AT MAXIMUM-RATED CAPACITY**



Artistic rendering

# 150

**PROJECTED CAR UNIT TRAIN RAIL CAPACITY (PROJECTED)**

# 6,000

**MT PER HOUR DUMP DISCHARGE RATE (PROJECTED)**

# ➤ OUR GLOBAL
# NETWORK OF TERMINALS



● IMPALA PORT FACILITIES   ● IMPALA TERMINALS & OFFICES

### NORTH AMERICA
**USA**
Burnside

### LATIN AMERICA
**Bolivia**
Oruro
**Brazil**
Porto Sudeste
**Chile**
Copiapó
**Colombia**
Barrancabermeja
Barranquilla
Bogotá*
Tópaga
**Mexico**
Manzanillo
**Peru**
Callao
**Uruguay**
Montevideo*

### EUROPE & THE MIDDLE EAST
**Belgium**
Antwerp
**Spain**
Huelva

**Switzerland**
Geneva*
**United Arab Emirates**
Dubai

### AFRICA
**DRC**
Kolwezi
Lubumbashi
**Mozambique**
Beira
**Namibia**
Walvis Bay
**South Africa**
Durban
Johannesburg*
**Tanzania**
Dar es Salaam
**Zambia**
Ndola

### ASIA
**China**
Guangzhou
Shanghai

*Impala offices

For more information please contact:
enquiries@impalaterminals.com
**www.impalaterminals.com**

ID/0073.3e





In this publication, the terms "Impala", "the company", "the group", "we", "us" and "our" are used for convenience to denote Impala group and/or one of its subsidiaries. These terms are used where no useful purpose is served by identifying a specific company or entity in the Impala group.

# EXHIBIT 16

Case 1:22-cv-00366-GBW   Document 25-3   Filed 10/25/22   Page 69 of 227 PageID #: 2447

The Wayback Machine - https://web.archive.org/web/20200930153152/https://www.jonesday.com/en...

# CASES & DEALS

## Trafigura Funding issues $140 million Senior Guaranteed Notes

MAY 2018

---

**Clients** Trafigura Group Pte. Ltd.

Jones Day represented Trafigura Funding S.A., a subsidiary of Trafigura Group Pte. Ltd., a market leader in the global commodities industry, in its private placement of US$140 million of Senior Guaranteed Notes to institutional investors.

### AREAS OF FOCUS

Financial Markets

### LOCATIONS

London

# EXHIBIT 17

**BASE PROSPECTUS**



# TRAFIGURA FUNDING S.A.

*(incorporated with limited liability in Luxembourg)*

Guaranteed by

## Trafigura Beheer B.V.

*(incorporated with limited liability in the Netherlands)*

## Trafigura Trading LLC

*(incorporated with limited liability in Delaware)*

## Trafigura Pte Ltd

*(incorporated with limited liability in Singapore)*

and

## Trafigura Derivatives Limited

*(incorporated with limited liability in England and Wales)*

## EUR 2,000,000,000
## Euro Medium Term Note Programme

_____

This Base Prospectus has been approved by the Central Bank of Ireland, as competent authority under Directive 2003/71/EC (as amended, *inter alia*, by Directive 2010/73/EU) (the "**Prospectus Directive**"). The Central Bank of Ireland only approves this Base Prospectus as meeting the requirements imposed under Irish and EU law pursuant to the Prospectus Directive. Application has been made to the Irish Stock Exchange (the "**Irish Stock Exchange**") for notes (the "**Notes**") issued under this Euro Medium Term Note Programme (the "**Programme**") within 12 months of this Base Prospectus to be admitted to the Official List (the "**Official List**") and to trading on its regulated market (the "**Main Securities Market**"). The Main Securities Market is a regulated market for the purposes of Directive 2004/39/EC. Such approval relates only to the Notes which are to be admitted to trading on the regulated market of the Irish Stock Exchange or other regulated markets for the purposes of Directive 2004/39/EC or which are to be offered to the public in any Member State of the European Economic Area.

The Programme also permits Notes to be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or that they will be admitted to listing, trading and/or quotation by such other or further competent authorities, stock exchanges and/or quotation systems as may be agreed with the Issuer.

The Notes are issued by Trafigura Funding S.A. (the "**Issuer**") and are unconditionally and irrevocably guaranteed on a joint and several basis by each of Trafigura Beheer B.V., Trafigura Trading LLC, Trafigura Pte Ltd and Trafigura Derivatives Limited (each, a "**Guarantor**" and together, the "**Guarantors**").

The Notes constitute direct, unconditional, unsubordinated and unsecured obligations of the Issuer which will at all times rank *pari passu* among themselves and at least *pari passu* in right of payment with all other present and future unsecured and unsubordinated obligations of the Issuer, save for such obligations as may be preferred by mandatory provisions of law. The Notes are unconditionally and irrevocably guaranteed, jointly and severally, on a senior unsecured basis by each of the Guarantors. The guarantee of the Notes (the "**Guarantee**") will rank at least *pari passu* with all other present and future unsecured and unsubordinated obligations of the Guarantors, save for such obligations as may be preferred by mandatory provisions of law.

*Investing in Notes issued under the Programme involves certain risks. The principal risk factors that may affect the abilities of the Issuer and the Guarantors to fulfil their respective obligations under the Notes and the Guarantee are discussed under "Risk Factors" below.*

**Arranger**

**ING**

**Dealers**

| | | |
|---|---|---|
| **Citigroup** | **Credit Suisse** | **Deutsche Bank** |
| **ING** | **Lloyds Bank** | **Société Générale Corporate & Investment Banking** |

**The Royal Bank of Scotland**

18 March 2015

**IMPORTANT NOTICES**

*Responsibility for this Base Prospectus*

The Issuer and each Guarantor accepts responsibility for the information contained in this Base Prospectus and any Final Terms and declares that, having taken all reasonable care to ensure that such is the case, the information contained in this Base Prospectus is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

*Final Terms/Drawdown Prospectus*

Each Tranche (as defined herein) of Notes will be issued on the terms and subject to the conditions set out herein under "*Terms and Conditions of the Notes*" (the "**Conditions**") as supplemented by a document specific to such Tranche called final terms (the "**Final Terms**") or in a separate prospectus specific to such Tranche (the "**Drawdown Prospectus**") as described under "*Final Terms and Drawdown Prospectuses*" below.

*Other relevant information*

This Base Prospectus must be read and construed together with any supplements hereto and with any information incorporated by reference herein and, in relation to any Tranche of Notes which is the subject of Final Terms, must be read and construed together with the relevant Final Terms.  In the case of a Tranche of Notes which is the subject of a Drawdown Prospectus, each reference in this Base Prospectus to information being specified or identified in the relevant Final Terms shall be read and construed as a reference to such information being specified or identified in the relevant Drawdown Prospectus unless the context requires otherwise.

The Issuer and the Guarantors have confirmed to the Dealers named under "*Subscription and Sale*" below that this Base Prospectus contains all information which is (in the context of the Programme, the issue, offering and sale of the Notes and the Guarantee of the Notes) material; that such information is true and accurate in all material respects and is not misleading in any material respect; that any opinions, predictions or intentions expressed herein are honestly held or made and are not misleading in any material respect; that this Base Prospectus does not omit to state any material fact necessary to make such information, opinions, predictions or intentions (in the context of the Programme, the issue, offering and sale of the Notes and the Guarantee of the Notes) not misleading in any material respect; and that all proper enquiries have been made to verify the foregoing.

Market data and certain industry forecasts used throughout this Base Prospectus have been obtained from internal surveys, market research and publicly available information and industry publications.  Industry publications generally state that the information that they contain has been obtained from sources believed to be reliable but that the accuracy and completeness of that information is not guaranteed. Similarly, internal surveys, industry forecasts and market research, while believed to be reliable, have not been independently verified, and none of the Issuer, the Guarantors or the Dealers make any representation as to the accuracy of that information.

Substantially all the information contained in this Base Prospectus concerning the position of Trafigura Beheer B.V. and its consolidated subsidiaries (together, "**Trafigura**" or the "**Group**") vis-à-vis its competitors is based on internal analysis derived from publicly available information.  The Group believes that these sources and estimates are reliable, but the Group and the Dealers have not independently verified them.  Any discussion of matters in this Base Prospectus relating to competitive position is, therefore, subject to uncertainty due to concerns about the completeness or reliability of available official and public information.

*Unauthorised information*

No person has been authorised to give any information or to make any representation not contained in or not consistent with this Base Prospectus or any other document entered into in relation to the Programme or any information supplied by the Issuer or the Guarantors or such other information as is in the public domain and, if given or made, such information or representation should not be relied upon as having been authorised by the Issuer, the Guarantors or any Dealer.

Neither the Dealers nor any of their respective affiliates have authorised the whole or any part of this Base Prospectus and none of them makes any representation or warranty or accepts any responsibility as to the accuracy or completeness of the information contained in this Base Prospectus. Neither the delivery of this Base Prospectus or any Final Terms nor the offering, sale or delivery of any Note shall, in any circumstances, create any implication that the information contained in this Base Prospectus is true subsequent to the date hereof or the date upon which this Base Prospectus has been most recently amended or supplemented or that there has been no adverse change, or any event reasonably likely to involve any adverse change, in the prospects or financial or trading position of the Issuer or the Guarantors since the date thereof or, if later, the date upon which this Base Prospectus has been most recently amended or supplemented or that any other information supplied in connection with the Programme is correct at any time subsequent to the date on which it is supplied or, if different, the date indicated in the document containing the same.

*Restrictions on distribution*

The distribution of this Base Prospectus and any Final Terms and the offering, sale and delivery of the Notes in certain jurisdictions may be restricted by law. Persons into whose possession this Base Prospectus or any Final Terms comes are required by the Issuer, the Guarantors and the Dealers to inform themselves about and to observe any such restrictions. For a description of certain restrictions on offers, sales and deliveries of Notes and on the distribution of this Base Prospectus or any Final Terms and other offering material relating to the Notes, see "*Subscription and Sale*". In particular, Notes have not been and will not be registered under the United States Securities Act of 1933 (as amended) (the "**Securities Act**") and are subject to U.S. tax law requirements. Subject to certain exceptions, Notes may not be offered, sold or delivered within the United States or to U.S. persons.

Neither this Base Prospectus nor any Final Terms constitutes an offer or an invitation to subscribe for or purchase any Notes and should not be considered as a recommendation by the Issuer, the Guarantors, the Dealers or any of them that any recipient of this Base Prospectus or any Final Terms should subscribe for or purchase any Notes. Each recipient of this Base Prospectus or any Final Terms shall be taken to have made its own investigation and appraisal of the condition (financial or otherwise) of the Issuer and the Guarantors.

*Notes may not be a suitable investment for all investors*

Each of the risks highlighted in the section of this Base Prospectus headed "*Risk Factors*" could adversely affect the trading price of the Notes or the rights of investors under any Notes and, as a result, investors could lose some or all of their investment. Each potential investor in any Notes must determine the suitability of that investment in light of its own circumstances. In particular, each potential investor should:

- have sufficient knowledge and experience to make a meaningful evaluation of the Notes, the merits and risks of investing in the Notes and the information contained or incorporated by reference in this Base Prospectus or any applicable supplement;

- have access to, and knowledge of, appropriate analytical tools to evaluate, in the context of its particular financial situation, an investment in the Notes and the impact such investment will have on its overall investment portfolio;

- have sufficient financial resources and liquidity to bear all of the risks of an investment in the Notes, including where the currency for principal or interest payments is different from the potential investor's currency;

- understand thoroughly the terms of the Notes and be familiar with the behaviour of any relevant indices and financial markets; and

- be able to evaluate (either alone or with the help of a financial adviser) possible scenarios for economic, interest rate and other factors that may affect its investment and its ability to bear the applicable risks.

Some Notes are complex financial instruments and such instruments may be purchased as a way to reduce risk or enhance yield with an understood, measured, appropriate addition of risk to their overall

portfolios.  A potential investor should not invest in the Notes, which are complex financial instruments, unless it has the expertise (either alone or with the help of a financial adviser) to evaluate how the Notes will perform under changing conditions, the resulting effects on the value of such Notes and the impact this investment will have on the potential investor's overall investment portfolio.

*Programme limit*

The maximum aggregate principal amount of Notes outstanding and guaranteed at any one time under the Programme will not exceed EUR 2,000,000,000 (and for this purpose, any Notes denominated in another currency shall be translated into euro at the date of the agreement to issue such Notes (calculated in accordance with the provisions of the Dealer Agreement as defined under "*Subscription and Sale*")).  The maximum aggregate principal amount of Notes which may be outstanding and guaranteed at any one time under the Programme may be increased from time to time, subject to compliance with the relevant provisions of the Dealer Agreement.

*Certain definitions*

In this Base Prospectus, unless otherwise specified, references to a "**Member State**" are references to a Member State of the European Economic Area, references to "**EUR**" and "**euro**" are to the currency introduced at the start of the third stage of European economic and monetary union, and as defined in Article 2 of Council Regulation (EC) No 974/98 of 3 May 1998 on the introduction of the euro, as amended, references to "**U.S.$**", "**U.S. dollars**" and "**dollars**" are to United States dollars and references to "**sterling**", "**Pound Sterling**" and "**£**" are to the lawful currency of the United Kingdom.

Certain figures included in this Base Prospectus have been subject to rounding adjustments; accordingly, figures shown for the same category presented in different tables may vary slightly and figures shown as totals in certain tables may not be an arithmetic aggregation of the figures which precede them.

References herein to "**billions**" are to thousands of millions.

*Stabilisation*

**In connection with the issue of any Tranche of Notes, the Dealer or Dealers (if any) named as the Stabilising Manager(s) (or persons acting on behalf of any Stabilising Manager(s)) in the applicable Final Terms may over allot Notes or effect transactions with a view to supporting the market price of the Notes at a level higher than that which might otherwise prevail.  However, there is no assurance that the Stabilising Manager(s) (or persons acting on behalf of a Stabilising Manager) will undertake stabilisation action.  Any stabilisation action may begin on or after the date on which adequate public disclosure of the terms of the offer of the relevant Tranche of Notes is made and, if begun, may be ended at any time, but it must end no later than the earlier of 30 days after the issue date of the relevant Tranche of Notes and 60 days after the date of the allotment of the relevant Tranche of Notes.  Any stabilisation action or over-allotment must be conducted by the relevant Stabilising Manager(s) (or person(s) acting on behalf of any Stabilising Manager(s)) in accordance with all applicable laws and rules.**

**CONTENTS**

**Page**

OVERVIEW OF THE PROGRAMME ................................................................................................... 1

RISK FACTORS ................................................................................................................................... 5

INFORMATION INCORPORATED BY REFERENCE ........................................................................ 21

FINAL TERMS AND DRAWDOWN PROSPECTUSES .................................................................... 22

FORMS OF THE NOTES ...................................................................................................................... 23

TERMS AND CONDITIONS OF THE NOTES ................................................................................... 26

FORM OF FINAL TERMS .................................................................................................................... 61

SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM ............... 69

USE OF PROCEEDS ............................................................................................................................ 71

DESCRIPTION OF THE COMPANY ................................................................................................... 72

DESCRIPTION OF THE ISSUER ......................................................................................................... 120

DESCRIPTION OF TRAFIGURA TRADING LLC .............................................................................. 121

DESCRIPTION OF TRAFIGURA DERIVATIVES LIMITED ............................................................... 122

DESCRIPTION OF TRAFIGURA PTE LTD ......................................................................................... 123

TAXATION ........................................................................................................................................... 124

SUBSCRIPTION AND SALE .............................................................................................................. 128

GENERAL INFORMATION ................................................................................................................. 133

FINANCIAL STATEMENTS ................................................................................................................. F-1

INDEX OF DEFINED TERMS .............................................................................................................. 138

## OVERVIEW OF THE PROGRAMME

*The following overview is a general description of the Programme, must be read as an introduction to this Base Prospectus, and is qualified in its entirety by, the remainder of this Base Prospectus and in relation to the terms and conditions of any particular Tranche of Notes, the applicable Final Terms. Words and expressions defined elsewhere in this Base Prospectus shall have the same meaning in this overview unless otherwise defined herein.*

| | |
|---|---|
| **Issuer:** | Trafigura Funding S.A. |
| **Guarantors:** | Trafigura Beheer B.V. (**"TBBV"** or the **"Company"**), Trafigura Trading LLC (**"TTL"**), Trafigura Pte Ltd (**"TPTE"**) and Trafigura Derivatives Limited (**"TDL"**). |
| **Arranger:** | ING Bank N.V. |
| **Dealers:** | Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, Deutsche Bank AG, London Branch, ING Bank N.V., Lloyds Bank plc, The Royal Bank of Scotland plc, Société Générale and any other Dealer appointed from time to time by the Issuer and the Guarantors either generally in respect of the Programme or in relation to a particular Tranche of Notes. |
| **Trustee:** | Citicorp Trustee Company Limited. |
| **Principal Paying Agent:** | Citibank N.A., London Branch. |
| **Irish Listing Agent:** | Walkers Listing & Support Services Limited. |
| **Final Terms or Drawdown Prospectus:** | Notes issued under the Programme may be issued either (1) pursuant to this Base Prospectus and associated Final Terms or (2) pursuant to a Drawdown Prospectus. The terms and conditions applicable to any particular Tranche of Notes will be the Conditions as completed by the relevant Final Terms or, as the case may be, as supplemented, amended and/or replaced by the relevant Drawdown Prospectus. |
| **Listing and Trading:** | Application has been made for Notes to be admitted during the period of twelve months after the date hereof to listing on the Official List and to trading on the Main Securities Market. The Programme also permits Notes to be issued on the basis that they will not be admitted to listing, trading and/or quotation by any competent authority, stock exchange and/or quotation system or to be admitted to listing, trading and/or quotation by such other or further competent authorities, stock exchanges and/or quotation systems as may be agreed with the Issuer. |
| **Clearing Systems:** | Euroclear Bank S.A./N.V. (**"Euroclear"**) and/or Clearstream Banking, *société anonyme*, Luxembourg (**"Clearstream, Luxembourg"** and together with Euroclear, the **"ICSDs"**) and/or, in relation to any Tranche of Notes, any other clearing system as may be specified in the relevant Final Terms. |
| **Initial Programme Amount:** | Up to EUR 2,000,000,000 (or its equivalent in other currencies) aggregate principal amount of Notes outstanding and guaranteed at any one time. The Issuer may increase the amount of the Programme in accordance with the terms of the Dealer Agreement. |

| | |
|---|---|
| **Issuance in Series:** | Notes will be issued in Series.  Each Series may comprise one or more Tranches issued on different issue dates.  The Notes of each Series will all be subject to identical terms, except that the issue date and the amount of the first payment of interest may be different in respect of different Tranches.  The Notes of each Tranche will all be subject to identical terms in all respects save that a Tranche may comprise Notes of different denominations. |
| **Forms of Notes:** | Notes may only be issued in bearer form.  Each Tranche of Notes will initially be in the form of either a Temporary Global Note or a Permanent Global Note, in each case as specified in the relevant Final Terms.  Each Global Note will be deposited on or around the relevant issue date with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system.  Each Temporary Global Note will be exchangeable for a Permanent Global Note or, if so specified in the relevant Final Terms, for Definitive Notes.  If the TEFRA D Rules are specified in the relevant Final Terms as applicable, certification as to non-U.S. beneficial ownership will be a condition precedent to any exchange of an interest in a Temporary Global Note or receipt of any payment of interest in respect of a Temporary Global Note.  Each Permanent Global Note will be exchangeable for Definitive Notes in accordance with its terms.  Definitive Notes will, if interest-bearing, have Coupons attached and, if appropriate, a Talon for further Coupons. |
| **Currencies:** | Notes may be denominated in euro, U.S. dollars or in any other currency or currencies, subject to compliance with all applicable legal and/or regulatory and/or central bank requirements. |
| **Status of the Notes:** | Notes will be issued on an unsubordinated basis. |
| **Status of the Guarantee:** | Notes will be unconditionally and irrevocably guaranteed by each Guarantor, on an unsubordinated and joint and several basis. |
| **Issue Price:** | Notes may be issued at any price.  The price and amount of Notes to be issued under the Programme will be determined by the Issuer, the Guarantors and the relevant Dealer(s) at the time of issue in accordance with prevailing market conditions. |
| **Maturities:** | Any maturity, subject, in relation to specific currencies, to compliance with all applicable legal and/or regulatory and/or central bank requirements. |
| | Where Notes have a maturity of less than one year and either (a) the issue proceeds are received by the Issuer in the United Kingdom or (b) the activity of issuing the Notes is carried on from an establishment maintained by the Issuer in the United Kingdom, such Notes must:  (i) have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be issued only to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses; or (ii) be issued in other circumstances which do not constitute a contravention of section 19 of the Financial Services and Markets Act (the "**FSMA**") by the Issuer. |

| | |
|---|---|
| **Redemption:** | Notes will be redeemable at par. |
| **Optional Redemption:** | Notes may be redeemed before their stated maturity at the option of the Issuer (either in whole or in part) and/or the Noteholders to the extent (if at all) specified in the relevant Final Terms. |
| **Early Redemption:** | Except as described in "*Optional Redemption*" above, early redemption will only be permitted for tax reasons, as described in Condition 9(b) (*Redemption and Purchase - Redemption for tax reasons)*, or if the aggregate principal amount of outstanding Notes of the relevant Series is less than 10 per cent. of the aggregate principal amount of such Series, as described in Condition 9(f) (*Redemption and Purchase – Redemption in the case of Minimal Outstanding Amount*). |
| **Interest:** | Notes may be interest-bearing or non-interest bearing.  Interest (if any) may accrue at a fixed rate or a floating rate and the method of calculating interest may vary between the issue date and the maturity date of the relevant Series. |
| **Denominations:** | Notes issued under the Programme which are to be admitted to trading on the Main Securities Market and/or admitted to listing, trading and/or quotation by any other listing authority, stock exchange and/or quotation system which is a regulated market situated or operating in a Member State and/or offered to the public in any Member State, in each case in circumstances which require the publication of a prospectus under the Prospectus Directive and the implementing measures in the relevant Member State, may not have a minimum denomination of less than EUR100,000 (or its equivalent in any other currency).   Subject thereto, Notes will be issued in such denominations as may be specified in the relevant Final Terms, subject to compliance with all applicable legal and/or regulatory and/or central bank requirements. |
| **Negative Pledge:** | The Notes will have the benefit of a negative pledge as described in Condition 5 (*Negative Pledge).* |
| **Cross-Default:** | The Notes will have the benefit of a cross-default as described in Condition 12 (*Events of Default).* |
| **Taxation:** | All payments of principal and interest in respect of Notes by or on behalf of the Issuer or the Guarantors will be made free and clear of withholding taxes of Luxembourg, the Netherlands, the United States, Singapore and the United Kingdom, as the case may be, unless the withholding is required by law.  In that event, the Issuer or (as the case may be) the relevant Guarantor will (subject as provided in Condition 10 (*Payments*) and Condition 11 (*Taxation*)) pay such additional amounts as will result in the Noteholders receiving such amounts as they would have received in respect of such Notes had no such withholding been required. |
| **Substitution:** | The Trustee shall, in certain circumstances without the consent of the Noteholders, agree to the substitution of the Issuer or any Guarantor as described in Condition 16(c) (*Substitution*). |
| **Governing Law:** | English law. |

| | |
|---|---|
| **Selling Restrictions:** | For a description of certain restrictions on offers, sales and deliveries of Notes and on the distribution of offering material in the United States of America, the European Economic Area, the United Kingdom, Luxembourg, the Netherlands, Switzerland, Singapore and Japan, see "*Subscription and Sale*" below. |

## RISK FACTORS

*Any investment in the Notes is subject to a number of risks.  Prior to investing in the Notes, prospective investors should carefully consider risk factors associated with any investment in the Notes, the business of the Issuer and the Guarantors and the industry or industries in which each of them operates together with all other information contained in this Base Prospectus, including, in particular the risk factors described below.  Words and expressions defined in the "Terms and Conditions of the Notes" below or elsewhere in this Base Prospectus have the same meanings in this section.*

*The following is not an exhaustive list or explanation of all risks which investors may face when making an investment in the Notes and should be used as guidance only.  Additional risks and uncertainties relating to the Issuer and the Guarantors that are not currently known to the Issuer or the Guarantors, or that any of them currently deem immaterial, may individually or cumulatively also have a material adverse effect on the business, prospects, results of operations and/or financial position of the Issuer and/or the Guarantors and, if any such risk should occur, the price of the Notes may decline and investors could lose all or part of their investment.  Investors should consider carefully whether an investment in the Notes is suitable for them in light of the information in this Base Prospectus and their personal circumstances.*

**Risks relating to Trafigura**

***Trafigura is exposed to declines in the current and expected volumes of supply or demand for commodities, to commodity prices and to deterioration in economic and financial conditions.***

The current and expected volumes of supply and demand for the commodities in which Trafigura is active vary over time based on changes in resource availability, government policies and regulation, costs of production, global and regional economic conditions, demand in end markets for products in which the commodities are used, technological developments, including commodity substitutions, fluctuations in global production capacity, global and regional weather conditions and natural disasters including, earthquake, tsunami, hurricanes, wildfire, drought, and flooding, all of which impact global markets and demand for commodities.  Furthermore, changes in current and expected supply and demand conditions impact the current and expected future prices (and thus the price curve) of each commodity.

Declines in the volume of each commodity produced or traded by Trafigura, as well as declines in the price of commodities, could materially adversely impact Trafigura's business, results of operations and earnings.  These declines could result in a reduction in the average trading unit margin achieved in respect of the volumes handled by Trafigura's trading activities, or a reduction in the volume and/or margin in respect of commodities produced by Trafigura's industrial assets.

Sustained increases in the price of commodities may require higher levels of working capital to be put in place in order to finance Trafigura's trading activities.  Although Trafigura expects the continued support of financial institutions, there can be no assurance that additional credit or funding will be made available to Trafigura in the abovementioned circumstances or that the cost of such funding will not have a negative impact on the profitability of its trading activities.  See "*Liquidity risk and a failure to obtain funds could limit Trafigura's ability to engage in desired activities and grow its business.*"

In addition, a decline in economic and financial conditions globally or in a specific country, region or sector may have a material adverse effect on Trafigura's business, results of operations or earnings.  For example, although most commodities' fixed pricing periods are relatively short, a significant rapid reduction or increase in commodity prices could result in customers or suppliers, as the case may be, being unwilling or unable to honour their contractual commitments to purchase or sell commodities on pre-agreed pricing terms.  In addition, a tightening of available credit may make it more difficult for Trafigura to obtain, or may increase the cost of obtaining, financing for its trading activities and capital expenditures at its industrial assets.

***Trafigura is exposed to geopolitical risk.***

Trafigura operates and owns assets in a large number of geographic regions and countries and, as a result, is exposed to a wide range of political, regulatory and tax environments.  These environments are subject to change in a manner that may be materially adverse for Trafigura, including changes to government policies and regulations governing industrial production, foreign investments, price controls, export

controls, tariffs, income and other forms of taxation (including policies relating to the granting of advance rulings on taxation matters), nationalisation or expropriation of property, repatriation of income, royalties, the environment and health and safety.

Many of the commodities that Trafigura sources and markets are considered strategic resources for particular countries.  Governments in these countries may decide not to recognise previous arrangements if they regard them as no longer being in the national interest.  Governments may also implement export controls on commodities regarded by them as strategic (such as oil) or place restrictions on foreign ownership of industrial assets.  Renegotiation or nullification of existing agreements, leases, permits or tax rulings, changes in fiscal policies (including new or increased taxes or royalty rates or the implementation of a windfall tax) and currency restrictions imposed by the governments of countries in which Trafigura operates could have a material adverse effect on Trafigura.

Trafigura's operations may also be affected by political and economic instability in some of the countries in which it operates.  Such instability could be caused by, among other things, terrorism, civil war, guerrilla activities, military repression, civil disorder, crime, workforce instability, change in government policy or the ruling party, economic or other sanctions imposed by other countries, extreme fluctuations in currency exchange rates or high inflation.

The geopolitical risks associated with operating in a large number of regions and countries, if realised, could affect Trafigura's ability to manage or retain interests in its industrial activities and could have a material adverse effect on the profitability, ability to finance or, in extreme cases, viability of one or more of its industrial assets.

***Liquidity risk and a failure to obtain funds could limit Trafigura's ability to engage in desired activities and grow its business.***

Liquidity, or ready access to funds, is essential to Trafigura's business.  Liquidity risk is the risk that Trafigura is unable to meet its payment obligations when due, or that it is unable, on an ongoing basis, to borrow funds in the market on an unsecured or secured basis at an acceptable price to fund actual or proposed commitments.  A lack of liquidity may mean that Trafigura will not have funds available to maintain or increase its trading activities, meet margin requirements, grow its industrial activities as planned or take advantage of other opportunities that may arise in its trading or industrial activities.

Trafigura's trading activities employ significant amounts of working capital to fund purchases of commodities for future delivery to Trafigura's end customers, to meet margin requirements under derivative contracts and to fund the acquisition and maintenance of certain transport and storage assets which complement its trading activities.  Continued funding of and access to working capital is critical for Trafigura to maintain its historic levels of trading activity and increase such levels in the future.  Trafigura's industrial activities are also capital intensive and the continued funding of such activities is critical for Trafigura to maintain its ownership interests in its industrial assets, to maintain production levels in periods when net operating cash flow is negative or insufficient to cover capital expenditures, to develop its activities or increase production levels in the future in accordance with its business plan and to grow its industrial activities through the acquisition of new assets.  Prudent liquidity risk management requires Trafigura to maintain sufficient cash and cash equivalents through the accumulation of retained earnings and to have ready sources of committed funding available to meet anticipated and unanticipated funding needs.  While Trafigura adjusts its minimum internal liquidity targets in response to changes in market conditions, its liquidity may be impaired due to circumstances it is unable to control, such as general market disruptions, increases in the prices of commodities or an operational problem that affects its suppliers or customers or Trafigura itself.

In addition to maintaining a cash position, Trafigura relies on two other principal sources of liquidity: borrowings under various short-term and long-term bank and asset-backed facilities and issuance of notes in the debt capital markets.  An inability to raise money in the long-term and short-term debt markets could have a material adverse effect on Trafigura's liquidity.  Trafigura's access to debt in amounts adequate to finance its activities could be impaired by factors that affect Trafigura in particular or the industries or geographies in which it operates.  For example, lenders could develop a negative perception of Trafigura's short-term or long-term financial prospects if Trafigura incurred large losses, if the level of its trading activities were to materially decrease due to a market downturn in the demand for commodities, or if its business was otherwise materially adversely affected.  Although Trafigura expects

the continued support of financial institutions, there can be no assurance that additional credit or funding will be made available in the future.

Future debt financing, if accessible, may result in increased borrowing costs, increased financial leverage, decreased income available to fund further acquisitions and expansions and the imposition of restrictive covenants on Trafigura's businesses and operations.  In addition, future debt financing may limit Trafigura's ability to withstand competitive pressures and render its businesses more vulnerable to economic downturns by exposing it to volatile interest rates, tighter credit markets and potentially reduced access to funding that may be needed to take advantage of future business opportunities.

***Trafigura may face uncertainties associated with its expansion plans.***

Trafigura has undertaken certain expansion initiatives through the acquisition of various companies and the establishment of joint ventures, and as part of its strategy, Trafigura intends to continue pursuing a policy of measured expansion and development through asset acquisition.

Trafigura's expansion initiatives involve numerous risks, including but not limited to, the financial costs of investment in machinery and equipment, construction of new facilities and working capital requirements.

Moreover mergers and acquisitions involve risks, including:  unforeseen contingent risks or latent liabilities relating to these businesses that may only become apparent after the merger or acquisition is finalised, such as potential difficulties in the integration and management of the operations and systems; problems with the retention of select personnel; issues arising from the co-ordination of sales and marketing efforts; and diversion of Trafigura's management's attention from other ongoing business concerns.

The success of Trafigura's acquisition and investment strategy depends on a number of factors, including: Trafigura's ability to identify suitable opportunities for investment or acquisition; whether Trafigura is able to complete an acquisition or investment agreement on terms that are satisfactory; the extent to which Trafigura is able to exercise control over the acquired company or business; the economic, business or other strategic objectives and goals of the acquired company or business compared to those of Trafigura; and Trafigura's ability to successfully integrate the acquired company or business with Trafigura's own business.

In addition, there is no assurance that the initiatives undertaken will result in increased revenues or cost cutting or other synergies commensurate with the investment costs.  If Trafigura is unable to do so or cannot manage its costs, its business and profitability will be adversely affected as Trafigura will not able to recover the costs of its investment.

***Any change to Trafigura's ability to attract, retain and compensate key employees may impact its business.***

Trafigura operates within a private company structure and as an employee-owned company.  Any significant organisational or cultural change could result in certain key employees, whether skilled traders, or otherwise, leaving the Group.  There are a number of other reasons why such personnel may leave, for example, an employee may leave Trafigura to go to a competitor, to start their own business, to retire or for other reasons.

Trafigura seeks to provide competitive compensation arrangements to retain and attract highly skilled personnel that are important to its business, including salaries and bonus and shareholding arrangements. While the Directors believe that Trafigura's current compensation arrangements are competitive and adequate to allow Trafigura to retain and attract the necessary calibre of employees, developments in the market or changes in internal culture may mean that these compensation payments may not be as effective as had been the case before and, as a result, Trafigura may need to change its compensation arrangements to make them more attractive to such employees which could be at an increased cost to Trafigura.  The loss of any senior manager or other key personnel, as well as the inability to retain and/or attract new highly skilled personnel, could have a material adverse effect on Trafigura's business.

***Trafigura is exposed to fluctuations in currency exchange and interest rates.***

The significant majority of transactions undertaken by both Trafigura's trading and industrial activities are denominated in U.S. dollars.  However, Trafigura is exposed to fluctuations in currency exchange rates:

- through its industrial activities, because a large proportion of the operating costs of these assets are denominated in the currency of the country in which each asset is located;

- through the costs of Trafigura's global office network, which are denominated largely in the currency of the country in which each office is located, the largest of such currency exposures being to the Swiss Franc, the Pound Sterling, the Singapore Dollar and the Euro; and

- through its trading activities, although only a small minority of purchase or sale transactions are denominated in currencies other than U.S. dollars.

The reporting currency and the functional currency of the majority of Trafigura's operations is the U.S. dollar, as this is assessed to be the principal currency of the economic environment in which Trafigura operates.  The exchange rates between relevant local currencies and the U.S. dollar have historically fluctuated, and the translation effect of such fluctuations may have a material adverse effect on Trafigura's consolidated results of operations or financial condition.

Trafigura's exposure to changes in interest rates results from investing and borrowing activities undertaken to manage its liquidity and capital requirements.  Substantially all of Trafigura's borrowings, other than its fixed-rate bonds, bear interest at floating rates.  An increase in interest rates would therefore result in a relatively immediate increase in the cost of servicing Trafigura's indebtedness and could adversely affect Trafigura's financial results.  Although borrowing costs are taken into account when setting transaction terms, there is no assurance that increased financing costs can be passed on to customers and/or suppliers.  Trafigura may elect in the future to enter into interest rate swaps to convert some or all of its floating-rate debt to fixed-rate debt or enter into fixed-rate to floating-rate swaps.  There can be no assurance that Trafigura will not be materially adversely affected by interest rate changes in the future.

***The commodities industry is competitive and Trafigura may have difficulty effectively competing with other commodity trading and industrial companies.***

The commodities industry is characterised by strong competition.  Trafigura believes that the majority of its competitors tend to focus on a narrower commodity group or geographic area, or concentrate more heavily on industrial activities such as mining, smelting, processing, and refining.   Nevertheless, Trafigura faces strong competition in each of its business segments.   In addition, some of these competitors or existing producers may, in the future, use their resources to broaden into all of the markets in which Trafigura operates and therefore compete further against Trafigura.  These competitors may also expand and diversify their commodity sourcing, processing or trading operations, or engage in pricing or other financial or operational practices that could increase competitive pressure on Trafigura across each of its business segments.  Increased competition may result in losses of market share for Trafigura and could materially adversely affect Trafigura's business, results of operations and financial condition.

**Risks relating to Trafigura's trading activities**

***The success of Trafigura's trading activities depends in part on its ability to identify and take advantage of arbitrage opportunities.***

Many of the commodity markets in which Trafigura operates are fragmented and periodically volatile.  As a result, discrepancies generally arise in respect of the prices at which the commodities can be bought or sold in different forms, geographic locations or time periods, taking into account the numerous relevant pricing factors, including freight and product quality.  These pricing discrepancies can present Trafigura with arbitrage opportunities whereby Trafigura is able to generate profit by sourcing, transporting, blending, storing or processing the relevant commodities.

Trafigura's profitability is, in large part, dependent on its ability to identify and exploit such arbitrage opportunities.  A lack of such opportunities, for example due to a prolonged period of pricing stability in a particular market, or an inability to take advantage of such opportunities when they present themselves, because of, for example, a shortage of liquidity or an inability to access required logistics assets or other

operational constraints, could adversely impact Trafigura's business, results of operations and financial condition.

***Trafigura's hedging strategy may not always be effective.***

Trafigura's trading activities involve a significant number of purchase and sale transactions across multiple commodities.  In order for Trafigura to mitigate the risks in its trading activities related to commodity price fluctuations and potential losses, Trafigura has a policy, at any given time, of hedging all index price exposure of its trading inventory not already contracted for sale at pre-determined prices through futures and swap commodity derivative contracts, either on commodities' exchanges or in the over the counter ("**OTC**") market.  In the event of disruptions in the commodity exchanges or markets on which Trafigura engages in these hedging transactions, Trafigura's ability to manage commodity price risk may be adversely affected and this could in turn materially adversely affect its business, financial condition and results of operations.

***Trafigura is subject to counterparty risk in its trading activities.***

Trafigura's trading activities are subject to non-performance risk by its suppliers, customers and hedging counterparties.  For example:

- a significant rapid increase in commodity prices could result in suppliers being unwilling to honour their contractual commitments to sell commodities to Trafigura at pre-agreed prices;

- a significant rapid reduction in commodity prices could result in customers being unwilling or unable to honour their contractual commitments to purchase commodities from Trafigura at pre-agreed prices;

- customers may take delivery of commodities from Trafigura and then find themselves unable to honour their payment obligations due to financial distress or any other reasons; and

- hedging counterparties may find themselves unable to honour their contractual commitment due to financial distress or other reason.

Trafigura seeks to reduce the risk of customer non-performance by requiring credit support from creditworthy financial institutions, where appropriate, and by imposing limits on open accounts extended. In addition, mark-to-market exposures in relation to hedging contracts are regularly and substantially collateralised (primarily with cash) pursuant to margining arrangements in place with such hedge counterparts.  However, no assurance can be given that Trafigura's attempts to reduce the risk of customer non-performance will be successful in every instance or that its financial results will not be adversely affected by the failure of a counterparty or counterparties to fulfil their contractual obligations in the future.  Such failure could have an adverse impact on Trafigura's business, results of operations and financial condition, including by creating an unintended, unmatched commodity price exposure.

***Trafigura's risk management policies and procedures may leave it exposed to unidentified or unanticipated risks.***

Trafigura's trading activities are exposed to commodity price, foreign exchange, interest rate, counterparty (including credit), operational, regulatory and other risks.  Trafigura has devoted significant resources to developing and implementing policies and procedures to manage these risks and expects to continue to do so in the future.  Nonetheless, Trafigura's policies and procedures to identify, monitor and manage risks may not be fully effective.

Some of Trafigura's methods of monitoring and managing risk are based on historical market behaviour that may not be an accurate predictor of future market behaviour.  Other risk management methods depend on evaluation of information relating to markets, suppliers, customers and other matters that are publicly available or otherwise accessible by Trafigura.  This information may not in all cases be accurate, complete, up to date or properly evaluated.  Management of operational, legal and regulatory risk requires, among other things, policies and procedures to properly record and verify a large number of transactions and events, and these policies and procedures may not be fully effective in doing so. Trafigura uses, among other techniques, value-at-risk ("**VaR**") as a key risk measurement technique for its trading activities.  VaR does not purport to represent actual gains or losses in fair value on earnings to be incurred by Trafigura, nor does Trafigura expect that VaR results are indicative of future market

movements or representative of any actual impact on its future results. Failure to mitigate all risks associated with Trafigura's business could have a material adverse effect on Trafigura's business, results of operations and financial condition.

***Trafigura is reliant on third parties to source the majority of the commodities purchased by its trading operations.***

Trafigura purchases a minority portion of the physical commodities sold by its trading operations from its controlled industrial operations and associates. The remainder of the commodities sourced by its trading operations are purchased from third party suppliers or entities in which Trafigura may have a minority stake. Trafigura is exposed to both price and supply risks with respect to commodities sourced from third parties and entities in which it holds a minority stake.

Any increases in Trafigura's purchase price relative to the price at which Trafigura trades a commodity could adversely affect Trafigura's margins. Trafigura's business, results of operations, financial condition and prospects could be materially adversely impacted if it is unable to continue to source required volumes of commodities from its suppliers on reasonable terms or at all.

Any disruptions in the supply of such products by factors such as weather and other natural disasters, insolvency or business failure of its third party suppliers, unexpected maintenance problems, damage to production sites, collapse of mines, labour disruptions and changes in laws and regulations could adversely affect Trafigura's margins. Trafigura's business, results of operations, financial condition and prospects could be materially adversely impacted if it is unable to continue to source the required volumes of commodities from its third party suppliers on reasonable terms, without interruption, or at all.

***Trafigura's trading activities require access to significant amounts of freight, storage, infrastructure and logistics support and Trafigura is exposed to increases in the costs thereof.***

Trafigura's trading activities entail shipments of commodities in large quantities, often by ocean-going transport. Trafigura often competes with other producers, purchasers or traders of commodities or other products for limited storage and berthing facilities at ports and freight terminals, which can result in delays in loading or unloading Trafigura's products and expose Trafigura to significant delivery interruptions. Limitations or interruptions in rail, shipping or port capacity could impede Trafigura's ability to deliver its products on time. In addition, increases in the costs of freight could adversely affect Trafigura's business, results of operations or financial condition.

Trafigura also requires significant storage capacity for its commodities, which it sources both through facilities in which Trafigura holds equity stakes and pursuant to rental agreements with, among others, oil terminals and tank farms and metal and other warehouses. Any decrease in Trafigura's ability to access its customary levels of capacity from these storage facilities or an increase in the price at which Trafigura can acquire storage capacity could have an adverse effect on Trafigura's business by forcing Trafigura to use storage facilities in less advantageous locations or at prices that make it less profitable for Trafigura to supply its customers.

**Risks relating to Trafigura's industrial activities**

***Trafigura holds some of its industrial assets through non-controlling stakes or joint ventures and strategic partnership arrangements.***

Trafigura does not fully control some of its industrial investments. Although Trafigura has sought to take steps to protect its industrial activities where it does not exercise control, the boards of these companies may:

- have economic or business interests or goals that are inconsistent with or are opposed to those of Trafigura;

- exercise veto rights or take shareholders' decisions so as to block actions that Trafigura believes to be in its best interests and/or in the best interests of all shareholders;

- take action contrary to Trafigura's policies or objectives with respect to its investments or commercial arrangements; or

- as a result of financial or other difficulties, be unable or unwilling to fulfil their obligations under any joint venture or other agreement, such as contributing capital to expansion or maintenance projects.

Where projects and operations are controlled and managed by Trafigura's co-investors or where control is shared on an equal basis, Trafigura may provide expertise and advice, but it has limited or restricted ability to mandate compliance with Trafigura's policies and/or objectives. Improper management or ineffective policies, procedures or controls of a non-controlled entity could adversely affect the business, results of operations and financial condition of the relevant investment and, therefore, of Trafigura.

***Trafigura's industrial activities involve operating risks and hazards, many of which are outside Trafigura's control.***

Trafigura's business is subject to numerous operating risks and hazards normally associated with the development and operation of natural resource or other industrial projects, many of which are beyond Trafigura's control. These operating risks and hazards include unanticipated variations in grade and other geological problems, seismic activity, climatic conditions such as flooding or drought, metallurgical and other processing problems, technical failures, unavailability of materials and equipment, industrial actions or disputes, industrial accidents, labour force disruptions, unanticipated transportation constraints, tribal action or political protests, environmental hazards, fire, explosions, vandalism and crime and other force majeure factors. These risks and hazards could result in damage to, or destruction of, properties, ships, storage facilities or production facilities, may cause production to be reduced or to cease at properties or production facilities, may result in personal injury or death, environmental damage, business interruption and legal liability, may result in actual production differing from estimates of production or may impede Trafigura's ability to deliver products on time to customers.

The realisation of such operating risks and hazards and the costs associated with them could materially adversely affect Trafigura's business, results of operations and financial condition, including by requiring significant capital and operating expenditures to abate the risk or hazard, restore Trafigura or third party property, compensate third parties for any loss and/or pay fines or damages.

***Trafigura's industrial assets are subject to environmental hazards through their shipping and storage activities, and through their mining activities.***

Where Trafigura holds or has interests in industrial activities, these assets are generally subject to environmental hazards as they involve the storage, disposal and transportation of hazardous materials. In addition, its mining activities are subject to environmental hazards through the processes and chemical used in traditional extraction and production methods, environmental hazards may exist on Trafigura's owned or leased properties or at those of the industrial activities in which it holds an interest, or may be encountered while its products are in transit.

Puma Energy Holdings Pte. Ltd. (together with its subsidiaries, the "**Puma Energy Group**", "**Puma**" and "**Puma Energy**"), Trafigura's oil storage and distribution business in particular is responsible for the storage, transport and retail distribution of large quantities of oil products which by their nature present potential risks. IWL Holding BV (Netherlands) (together with its subsidiaries, the "**Impala Terminals Group**"), Trafigura's bulk commodity warehousing business is responsible for extensive warehousing facilities and blending operations as well as the operation of a major deep water terminal. DT Group has interests in shipping, trucking and recycling and among its other activities is involved in the transport of bitumen.

Damage to refineries, bulk storage depots, offshore mooring systems or vessels carrying oil or to a facility where it is stored could lead to a spill, causing environmental damage with significant clean-up or remediation costs and legal costs.

Trafigura also owns mining assets and the processes and chemicals used in traditional extraction and production methods, are subject to environmental hazards. In addition, the storage of tailings at Trafigura's industrial assets may present a risk to the environment, property and persons. There remains a risk of leakage from or failure of Trafigura's tailings dams, as well as theft and vandalism during the operating life of the assets or after closure. Trafigura may be liable for losses associated with environmental hazards, have its licences and permits withdrawn or suspended or may be forced to undertake extensive remedial clean-up action or to pay for government-ordered remedial clean-up actions,

even in cases where such hazards have been caused by any previous or subsequent owners or operators of the property, by any past or present owners of adjacent properties, by independent third party contractors providing services to Trafigura or by acts of vandalism by trespassers. Any such losses, withdrawals, suspensions, actions or payments may have a material adverse effect on Trafigura's business, results of operations and financial condition.

***Trafigura is exposed to the risk of delays in or failure to develop planned expansions or new projects.***

Trafigura has some significant expansions planned for its existing industrial operations and plans for certain new greenfield projects. Any future upward revisions in estimated project costs, delays in completing planned expansions, cost overruns, suspension of current projects or other operational difficulties after commissioning may have a material adverse effect on Trafigura's business, results of operations and financial condition, in turn requiring Trafigura to consider delaying discretionary expenditures, including capital expenditures, or suspending or altering the scope of one or more of its development projects.

In addition, there can be no assurance that Trafigura will be able to effectively manage the risks arising from expansion of its operations. Trafigura's current systems, procedures and controls may need to be expanded and strengthened to support Trafigura's future operations. Any failure of Trafigura to effectively manage its expansion plans or expanded operations could have a material adverse effect on Trafigura's business and results of operations.

Once complete, the results of these projects could differ materially from those anticipated by Trafigura and Trafigura's significant capital expenditures related to these projects may not be offset by cash flows or other benefits from these projects in the timeframe anticipated by Trafigura or at all.

***Industrial activities are exposed to an increase in operating costs, including as a result of increased energy costs or shortages of equipment, spare parts and labour.***

In relation to Trafigura's industrial activities, Trafigura's main production expenses include transportation costs, personnel expenses, maintenance and repairs, raw materials, energy and contractors. Increased costs could result from a number of factors beyond Trafigura's control, including increased charges for fuel, other consumables, electricity, transport or site contractors or increased processing or storage costs for such commodities.

Shortages of certain equipment, spare parts or specialised labour may increase the costs of Trafigura's mining operations as a result of equipment, spare parts or labour becoming more expensive due to increased demand and tight supply. Such shortages may also cause delays to, and quality issues in respect of, Trafigura's operations either as a result of equipment used in Trafigura's operations being temporarily unavailable or not being available at all or there being insufficient resources to operate equipment or maintain production at the optimum capacity. Any resulting increase in costs or production delays could have a material adverse effect on Trafigura's business, results of operations and financial condition.

**Other risks relating to Trafigura**

***Trafigura may be subject to the laws of various countries imposing sanctions for conducting business with certain persons.***

Certain countries in which Trafigura currently does business, or may consider doing business in the future, are or may become subject to various trade sanctions including, but not limited to sanctions administered by the United States Treasury Department's Office of Foreign Assets Control, and European Union, United Kingdom and United Nations sanctions programmes. While Trafigura employs dedicated resources to ensure that it is in compliance, there can be no assurance that Trafigura will not in the future enter into transactions that breach these sanctions. In the event of any non-compliance with applicable sanctions, Trafigura may be subject to the imposition of significant fines, as well as negative publicity and reputational damage. Any of the foregoing could result in a material adverse effect on Trafigura's business, results of operations and/or financial condition.

***Due to the nature of its business and operations, Trafigura is exposed to the risks of fraud and corruption.***

As a diversified sourcing, trading and distribution company conducting complex transactions globally, Trafigura is exposed to the risks of fraud and corruption.

Trafigura's trading operations are large in scale, which may make fraudulent or accidental transactions difficult to detect.  In addition, some of Trafigura's industrial activities are located in countries where corruption is generally understood to exist.

Trafigura seeks to comply fully with all applicable legislation such as the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and any applicable sanctions and has put in place internal control policies and external diligence and compliance policies.  However, there can be no assurance that such procedures and established internal controls will adequately protect it against fraudulent and/or corrupt activity and such activity could have an adverse effect on Trafigura's business, reputation, results of operations, financial condition and/or prospects.

***Accidents at Trafigura's industrial activities, logistics and storage facilities could result in injuries and fatalities.***

Any accidents or hazardous incidents causing personal injury or death or property or environmental damage at or to Trafigura's logistics and storage facilities, mines, concentrators, refineries or related facilities or surrounding areas may result in significant losses, interruptions in production, expensive litigation, imposition of penalties and sanctions or suspension or revocation of permits and licences.  Risks associated with the Group's logistics and storage operations may include the risk of ruptures and spills from crude oil and other product carriers; spillage, leakage or seepage of solid materials or process water remaining after the extraction of metals and minerals from mined ore (tailings) or other hazardous substances found in storage or disposal facilities; and failure of tailings dams during the operating life of the mines or after closure.

Risks associated with Trafigura's mining operations include flooding, underground fires and explosions (including those caused by flammable gas), cave-ins or ground falls, discharges of gases or toxic chemicals, sinkhole formation and ground subsidence.

If accidents occur in the future, Trafigura's business and results of operations may be adversely impacted.

***Trafigura is subject to risks relating to the processing, storage and transportation of its commodities.***

Trafigura relies on a network of processing, transportation and storage facilities that are subject to numerous risks and hazards.  If any of these risks materialise Trafigura's business, results of operations and financial condition could be materially adversely affected.

Trafigura's processing and storage facilities, which include oil terminals, refineries, tank farms and ore processing plants, are subject to risks and hazards, including accidental environmental damage, technical failure, vandalism and terrorism.  In addition, Trafigura also depends upon seaborne freight, rail, trucking, pipeline, overland conveyor and other systems to deliver its commodities to market.  Disruption of these transport services due to weather-related problems, key equipment or infrastructure failures, strikes, maritime disaster or other events could temporarily impair Trafigura's ability to supply its commodities to its customers and thus could adversely affect Trafigura's operations.

Transportation and storage of crude oil and oil products involves significant hazards that could result in fires, explosions, spills, maritime disaster and other unexpected or dangerous conditions.  The occurrence of any of these events could result in a material adverse effect, either directly or indirectly, through resulting damages, claims and awards, remediation costs or negative publicity on Trafigura's business.

In addition, the vessels Trafigura uses to transport its products may be exposed to a variety of natural calamities during operations, including violent storms, tidal waves, rogue waves and tsunamis.  Any of these natural calamities could result in Trafigura's vessels grounding, sinking, colliding with other vessels or property, or the loss of life.  If one of the vessels suffers damage, in addition to the potential loss of its cargo, it would need to be repaired, and the costs relating to such losses or repairs may not be covered (either in part or in full) by the insurance policies that are in place.  The costs of such repairs are unpredictable and could be substantial.  In addition, vessels will require general repair and maintenance

from time to time.  The loss of earnings while the vessels are being repaired and repositioned, the cost of arranging for alternative transport, as well as the actual cost of such repairs, could adversely affect Trafigura's business and results of operations.  Furthermore, the vessels Trafigura uses to transport its products may be exposed to piracy, terrorist attacks and other events beyond its control.  These events could result in adverse effects to Trafigura's business as a result of seizure of its cargoes and disruption to its customers' or suppliers' business.  While Trafigura has procured insurance for its operations against these types of risks, no insurance can compensate for all potential losses and there can be no assurance that the insurance coverage Trafigura has will be adequate or that its insurers will pay a particular claim. As is the standard for policies of this type, Trafigura's insurance policies do not cover risks arising from damage caused by wear and tear to the vessels that it owns directly or through joint ventures.  In the event of damage to, or the loss of, a vessel or vessels and/or their cargoes, lack of adequate insurance coverage may have a material adverse effect on Trafigura's business and results of operations.

***Trafigura is subject to risks relating to product safety and dangerous goods regulations.***

Products sold by Trafigura are in many cases covered by national and international product safety and dangerous goods regulations.  In some instances, product safety regulations (for example, the European Union ("**EU**") chemicals legislation and EU regulation concerning the Registration, Evaluation, Authorisation & Restriction of Chemicals (REACH)) oblige manufacturers and importers to register their products and to regularly monitor and evaluate the risks and hazards of substances (chemicals, metals, etc.) to protect humans and the environment from harm during handling, storage and use.  Any failure in complying with these obligations could result in a delay of Trafigura's product delivery, a loss of insurance coverage, business interruption on the customer side, administrative or criminal sanctions and, in the extreme, banning (temporarily) from a marketplace.  Such events could have a material impact on the local or global demand, reducing Trafigura's trading opportunities for such a product, or at least increase the handling costs while shipping and placing the product in the market, all of which could have a material adverse effect on Trafigura's reputation, business, results of operations and financial condition.

***Trafigura relies on its financial, accounting, trading and other data processing information systems to conduct its business.***

Trafigura's software applications for areas such as traffic, accounting and finance are primarily based on integrated standard components.  Trafigura's key business processes rely on in-house developed modules and are regularly adapted to suit its business needs.  Trafigura has duplicated data centers on the outskirts of London, with further data centers providing local services in Asia and in North America.  If any of these systems does not operate properly or is disabled, Trafigura could suffer, among other things, financial loss, a disruption of its business, liability to its counterparties, regulatory intervention or reputational damage.

***Trafigura is subject to a significant number of laws and regulations.***

Trafigura's activities are subject to extensive laws and regulations governing various matters.  These include laws and regulations relating to taxation, anti-trust, environmental protection, management and use of hazardous substances and explosives, management of natural resources, licences over resources owned by various governments, exploration, development of projects, production and post-closure reclamation, the employment of expatriates, labour and occupational health and safety standards, and historic and cultural preservation.  Additionally, in many of the developing countries where Trafigura operates, the legal systems may not be mature and legal practice may not be developed, such that, in certain cases, there may be significant uncertainty as to the correct legal position as well as the possibility of laws changing or new laws and regulations being enacted, which has the potential to increase risk and compliance costs.

These laws and regulations may allow governmental authorities and private parties to bring lawsuits based upon damages to property and injury to persons resulting from the environmental, health and safety and other impacts of Trafigura's past and current operations, and could lead to the imposition of substantial fines, penalties, other civil or criminal sanctions, the curtailment or cessation of operations, orders to pay compensation, orders to remedy the effects of violations and/or orders to take preventative steps against possible future violations.  Moreover, the costs associated with compliance with these laws and regulations are substantial.  More stringent enforcement or restrictive interpretation of current laws and regulations by governmental authorities or rulings or clearances obtained from such governmental

authorities could cause additional expenditure (including capital expenditure) to be incurred or impose restrictions on or suspensions of Trafigura's operations and delays in the development of its properties.

Trafigura's subsidiaries and the companies in which Trafigura holds investments are generally required, under applicable laws and regulations, to seek governmental licences, permits, authorisations, concessions and other approvals in connection with their activities.  Obtaining the necessary governmental permits can be a particularly complex and time-consuming process and may involve costly undertakings.   The duration and success of permit applications are contingent on many factors, including those outside Trafigura's control.  Failure to obtain or renew a necessary permit could mean that such companies would be unable to proceed with the development or continued operation of a storage facility, mine or project, which, in turn, may have a material adverse effect on Trafigura's business, results of operations, financial condition and prospects.

In addition, the enactment of new laws and regulations and changes to existing laws and regulations (including, but not restricted to, environmental laws, the imposition of higher licence fees, mining and hydrocarbon royalties or taxes, financial markets), compliance with which could be expensive or onerous, could also have a material adverse impact on Trafigura's ability to operate its business and/or the profitability of its industrial investments.

The methods of transportation used by Trafigura's trading operations in order to deliver commodities to customers around the world depend heavily on fossil fuels.  Increasing regulation of greenhouse gas emissions, including the progressive introduction of carbon emissions trading mechanisms and tighter emission reduction targets in numerous jurisdictions in which Trafigura operates is likely to raise energy costs and costs of production in the future.  Regulation of greenhouse gas emissions in the jurisdictions of Trafigura's major customers and in relation to international shipping could also have a material adverse effect on the demand for Trafigura's products.

***Social, economic and other risks in the markets where Trafigura operates may cause disruptions to its business.***

Through the geographic diversity of its operations, Trafigura is exposed to risks of political unrest, strikes, war and economic and other forms of instability, such as natural disasters, epidemics, widespread transmission or communicable or infectious diseases, acts of God, terrorist attacks and other events beyond its control that may adversely affect local economies, infrastructure and livelihoods.

These events could result in disruption to Trafigura's, its customers' or suppliers' businesses and seizure of, or damage to, any of their cargoes or assets.  Such events could also cause the destruction of key equipment and infrastructure (including infrastructure located at or serving Trafigura's industrial activities as well as the infrastructure that supports the freight and logistics required by Trafigura's trading operations).  These events could also result in the partial or complete closure of particular ports or significant sea passages, such as the Suez or Panama canals or the Straits of Hormuz, potentially resulting in higher costs, congestions of ports or sea passages, vessel delays or cancellations on some trade routes.  Any of these events could adversely impact Trafigura's business and results of operations.

***Trafigura's reputation in the communities in which it operates could deteriorate.***

If it is perceived that Trafigura is not respecting or advancing the economic and social progress and safety of the communities in which it operates, Trafigura's reputation and shareholder value could be damaged, which could have a negative impact on its "licences to operate", its ability to secure new resources and its financial performance.

Some of Trafigura's current and potential industrial activities are located in or near communities that may regard such operations as having a detrimental effect on their safety or environmental, economic or social circumstances.  The consequences of negative community reaction could also have a material adverse impact on the cost, profitability, ability to finance or even the viability of an operation.  Such events could lead to disputes with national or local governments or with local communities or any other stakeholders and give rise to material reputational damage.  If Trafigura's operations are delayed or shut down as a result of political and community instability, its earnings may be constrained and the long-term value of its business could be adversely impacted.  Even in cases where no action adverse to Trafigura is actually taken, the uncertainty associated with such political or community instability could negatively impact the

perceived value of Trafigura's assets and industrial investments and, consequently, have a material adverse effect on Trafigura's financial condition.

**Trafigura may fail to make successful acquisitions or fail to integrate acquisitions effectively.**

From time to time, Trafigura considers the acquisition of complementary and synergistic businesses or assets. Business combinations entail a number of risks, including the ability of Trafigura to integrate effectively the businesses acquired with their existing operations (including the realisation of synergies, significant one-time write-offs or restructuring charges, difficulties in achieving optimal tax structures and unanticipated costs). All of these may be exacerbated by the diversion of the Directors' attention away from other ongoing business concerns. In addition, although Trafigura does not currently have significant shares of the total market for commodities which it trades, further acquisitions to be made by Trafigura may be subject to certain approvals (for example, anti-trust approvals) which may or may not be obtained. Trafigura may also be liable for the past acts, omissions or liabilities of companies or businesses it has acquired, which may be unforeseen or greater than anticipated at the time of the relevant acquisition. In addition, various factors could impact Trafigura's estimated synergies for potential acquisitions and have a material adverse impact on Trafigura's business, results of operations and financial condition.

**The industries in which Trafigura operates are subject to a wide range of risks as described elsewhere in this section, not all of which can be covered, adequately or at all, by Trafigura's insurance programme.**

Trafigura has a broad insurance programme in place which provides coverage for operations at a level believed by the Directors to be appropriate for the associated risks. Such insurance protection is maintained with leading international insurance providers and includes coverage for physical loss and damage to owned vessels and kidnap and ransom, as well as third party liability, including for pollution. However, although Trafigura's insurance is intended to cover the majority of the risks to which Trafigura is exposed, it cannot account for every potential risk associated with its operations. Adequate coverage at reasonable rates is not always commercially available to cover all potential risks and no assurance can be given that, where available, such coverage would be sufficient to cover all loss and liability to which Trafigura may be exposed. The occurrence of a significant adverse event not fully or partially covered by insurance could have a material adverse effect on Trafigura's business, results of operations and financial condition.

**Trafigura is owned by its management and key senior employees.**

Trafigura is exclusively owned by its management and key senior employees. As a private company with no equity listing Trafigura is not subject to the extensive laws and regulations relating to corporate governance and transparency applied to publicly owned companies or by companies with equity listings on major stock exchanges. While Trafigura applies a prudent corporate governance model and believes that it is transparent in its dealings with its investors and other stakeholders, such as its banking group, its obligations in this regard are less onerous than those legal and regulatory regimes associated with public companies.

**Trafigura's profitability may be affected by changes in tax regimes and certain special tax incentives.**

Trafigura's operations in various countries are subject to different tax regimes. Changes in local tax regulations, or the interpretation thereof, might adversely affect Trafigura's business, results of operations and/or financial condition.

**Trafigura is exposed to litigation risk.**

Trafigura conducts its operations globally in a wide variety of jurisdictions and may potentially face litigation in any of them, including governmental or regulatory investigations or class actions. Damages or penalties claimed under any litigation are difficult to predict, and may be material. The legal infrastructure in certain of these jurisdictions may be less developed than in others and the legal process may be more uncertain or subject to extensive delay.

While Trafigura will assess the merits of each lawsuit and defend itself accordingly, it may be required to incur significant expenses or devote significant resources to defending itself against such litigation and the conduct of such defence may be a distraction for senior management from the running of the business.

In addition, adverse publicity surrounding such claims may have a material adverse effect on Trafigura's business, prospects, financial condition and results of operations.  The outcome of such litigation if adversely determined may materially impact Trafigura's business, results of operations or financial condition.

**Factors which are material for the purpose of assessing the market risks associated with the Notes and the Guarantee**

*Risks related to the market generally*

Set out below is a brief description of certain market risks, including liquidity risk, exchange rate risk, interest rate risk and credit risk:

*The secondary market generally*

Notes may have no established trading market when issued, and one may never develop.  If a market does develop, it may not be liquid.  Therefore, investors may not be able to sell their Notes easily or at prices that will provide them with a yield comparable to similar investments that have a developed secondary market.  This is particularly the case for Notes that are especially sensitive to interest rate, currency or market risks, are designed for specific investment objectives or strategies or have been structured to meet the investment requirements of limited categories of investors.  These types of Notes generally would have a more limited secondary market and more price volatility than conventional debt securities.  Illiquidity may have a severely adverse effect on the market value of Notes.

*Exchange rate risks and exchange controls*

The Issuer will pay principal and interest on the Notes in the Specified Currency.  This presents certain risks relating to currency conversions if an investor's financial activities are denominated principally in a currency or currency unit (the "**Investor's Currency**") other than the Specified Currency.  These include the risk that exchange rates may significantly change (including changes due to devaluation of the Specified Currency or revaluation of the Investor's Currency) and the risk that authorities with jurisdiction over the Investor's Currency may impose or modify exchange controls.  An appreciation in the value of the Investor's Currency relative to the Specified Currency would decrease (1) the Investor's Currency-equivalent yield on the Notes, (2) the Investor's Currency-equivalent value of the principal payable on the Notes and (3) the Investor's Currency-equivalent market value of the Notes.

Government and monetary authorities may impose (as some have done in the past) exchange controls that could adversely affect an applicable exchange rate.  As a result, investors may receive less interest or principal than expected, or no interest or principal.

*Interest rate risks*

Investment in Notes bearing interest at a fixed rate involves the risk that subsequent changes in market interest rates may adversely affect the value of such Notes.

*Legal investment considerations may restrict certain investments*

The investment activities of certain investors are subject to legal investment laws and regulations, or review or regulation by certain authorities.  Each potential investor should consult its legal advisers to determine whether and to what extent (1) Notes are legal investments for it, (2) Notes can be used as collateral for various types of borrowing and (3) other restrictions apply to its purchase or pledge of any Notes.  Financial institutions should consult their legal advisers or the appropriate regulators to determine the appropriate treatment of Notes under any applicable risk-based capital or similar rules.

*Risks related to the Notes and the Guarantee generally*

Set out below is a brief description of certain risks relating to the Notes and the Guarantee generally:

*Notes may be redeemed prior to maturity*

In the event that the Issuer or the Guarantors would be obliged to increase the amounts payable in respect of any Notes due to any withholding or deduction for or on account of, any present or future taxes, duties,

assessments or governmental charges of whatever nature imposed, levied, collected, withheld or assessed by or on behalf of (in the case of the Issuer) Luxembourg, (in the case of TBBV) the Netherlands, (in the case of TTL) the State of Delaware, (in the case of TDL) the United Kingdom, or (in the case of TPTE) Singapore or any political subdivision thereof or any authority therein or thereof having power to tax, the Issuer may redeem all outstanding Notes in accordance with the Conditions.

*Modification and Waivers*

The Conditions contain provisions for calling meetings of Noteholders to consider matters affecting their interests generally.  These provisions permit defined majorities to bind all Noteholders including Noteholders who did not attend and vote at the relevant meeting and Noteholders who voted in a manner contrary to the majority.

*EU Savings Directive*

Under EC Council Directive 2003/48/EC (the "**EU Savings Directive**") on the taxation of savings income, each Member State is required to provide to the tax authorities of another Member State details of payments of interest (or other similar income) paid by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in that other Member State.  However, for a transitional period, Austria may instead apply a withholding system in relation to such payments, deducting tax at a rate of 35 per cent. The transitional period is to terminate at the end of the first full fiscal year following agreement by certain non-EU countries to the exchange of information relating to such payments.

On 25 November 2014, Luxembourg finally adopted a law, amending the Luxembourg laws of 21 June 2005, putting an end to the withholding tax regime under the EU Savings Directive as from 1 January 2015 and implementing the automatic exchange of information as from that date.

A number of non-EU countries and certain dependent or associated territories of certain Member States have adopted similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in a Member State.  In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or collected by such a person for, an individual resident or certain limited types of entity established in one of those territories.

The Council of the European Union formally adopted a Council Directive amending the EU Savings Directive on 24 March 2014 (the "**Amending Directive**"). The Amending Directive broadens the scope of the requirements described above. Member States have until 1 January 2016 to adopt the national legislation necessary to comply with the Amending Directive. The changes made under the Amending Directive include extending the scope of the Directive to payments made to, or collected for, certain other entities and legal arrangements. They also broaden the definition of "interest payment" to cover income that is equivalent to interest.

If a payment were to be made by or collected through a Member State which has opted for a withholding system and an amount of, or in respect of, tax were to be withheld from that payment pursuant to the EU Savings Directive, none of the Issuer or any Guarantor or any Paying Agent or any other person would be obliged to pay additional amounts with respect to any Note as a result of the imposition of such withholding tax.  The Issuer is, however, required to maintain a Paying Agent in a Member State that will not be obliged to withhold or deduct tax pursuant to the EU Savings Directive.

Investors who are in any doubt as to their position should consult their professional advisers.

*Change of law*

The Conditions are based on English law in effect as at the date of issue of the relevant Notes.  No assurance can be given as to the impact of any possible judicial decision or change to English law or administrative practice after the date of issue of the relevant Notes.

*Payments on the Notes may be subject to U.S. withholding tax under FATCA*

In certain circumstances payments made on or with respect to the Notes after 31 December 2016 may be subject to U.S. withholding tax under Sections 1471 through 1474 of the U.S. Internal Revenue Code (commonly referred to as "**FATCA**").  This withholding does not apply to payments on Notes that are issued prior to the date that is six months after the date on which the final regulations that define "*foreign passthru payments*" are filed with the Federal Register, unless the Notes are materially modified after that date or characterised as equity for U.S. federal income tax purposes.

Whilst the Notes are in global form and held within the ICSDs, in all but the most remote circumstances, it is not expected that FATCA will affect the amount of any payment received by the ICSDs (see "*Taxation – FATCA Withholding*").  However, FATCA may affect payments made to custodians or intermediaries in the subsequent payment chain leading to the ultimate investor if any such custodian or intermediary generally is unable to receive payments free of FATCA withholding.  It also may affect payment to any ultimate investor that is a financial institution that is not entitled to receive payments free of withholding under FATCA, or an ultimate investor that fails to provide its broker (or other custodian or intermediary from which it receives payment) with any information, forms, other documentation or consents that may be necessary for the payments to be made free of FATCA withholding.  Investors should choose the custodians or intermediaries with care (to ensure each is compliant with FATCA or other laws or agreements related to FATCA), and provide each custodian or intermediary with any information, forms, other documentation or consents that may be necessary for such custodian or intermediary to make a payment free of FATCA withholding.  Investors should consult their own tax adviser to obtain a more detailed explanation of FATCA and how FATCA may affect them.  The Issuer's or, as the case may be, the Guarantor's obligations under the Notes are discharged once it has made payment to, or to the order of, the common depositary for the ICSDs (as bearer of the Notes) and the Issuer or, as the case may be, any Guarantor has therefore no responsibility for any amount thereafter transmitted through hands of the ICSDs and custodians or intermediaries.

*Investors in the Notes must rely on clearing system procedures*

Because the Global Notes are held by or on behalf of Euroclear and/or Clearstream, Luxembourg and/or any other clearing system, investors will have to rely on their procedures for transfer, payment and communication with the Issuer and/or the Guarantors.  The Notes will be represented by the Global Notes except in certain limited circumstances described in the Permanent Global Note.  The Global Notes will be deposited with a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other clearing system.  Except in certain limited circumstances described in the Permanent Global Note, investors will not be entitled to receive definitive Notes.  Euroclear and/or Clearstream, Luxembourg and/or any other clearing system will maintain records of the beneficial interests in the Global Notes.  While the Notes are represented by the Global Notes, investors will be able to trade their beneficial interests only through Euroclear and/or Clearstream, Luxembourg and/or any other clearing system.

The Issuer and the Guarantors will discharge their payment obligations under the Notes by making payments to or to the order of the common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other clearing system for distribution to their account holders.  A holder of a beneficial interest in a Global Note must rely on the procedures of Euroclear and/or Clearstream, Luxembourg and/or any other clearing system to receive payments under the Notes.  The Issuer and the Guarantors have no responsibility or liability for the records relating to, or payments made in respect of, beneficial interests in the Global Notes.

Holders of beneficial interests in the Global Notes will not have a direct right to vote in respect of the Notes.  Instead, such holders will be permitted to act only to the extent that they are enabled by Euroclear and/or Clearstream, Luxembourg and/or any other clearing system to appoint appropriate proxies.

*Denominations*

In relation to any issue of Notes which have a denomination consisting of the minimum Specified Denomination plus an integral multiple of another smaller amount in excess thereof, it is possible that the Notes may be traded in amounts in excess of the minimum Specified Denomination that are not integral multiples of the minimum Specified Denomination (or its equivalent).  In such a case a Noteholder who, as a result of trading such amounts, holds a principal amount of less than the minimum Specified Denomination in its account with the clearing system at the relevant time may not receive a Definitive

Note in respect of such holding (should Definitive Notes be printed) and would need to purchase a principal amount of Notes such that its holding amounts to the minimum Specified Denomination.

If Definitive Notes are issued, Noteholders should be aware that Definitive Notes which have a denomination that is not an integral multiple of the minimum Specified Denomination may be illiquid and difficult to trade.

***Risks related to the structure of a particular issue of Notes***

A wide range of Notes may be issued under the Programme.  A number of these Notes may have features which contain particular risks for potential investors.  Set out below is a description of certain such features:

*Notes subject to optional redemption by the Issuer*

An optional redemption feature is likely to limit the market value of Notes.  During any period when the Issuer may elect to redeem Notes, the market value of those Notes generally will not rise substantially above the price at which they can be redeemed.  This also may be true prior to any redemption period.

The Issuer may be expected to redeem Notes when its cost of borrowing is lower than the interest rate on the Notes.  At those times, an investor generally would not be able to reinvest the redemption proceeds at an effective interest rate as high as the interest rate on the Notes being redeemed and may only be able to do so at a significantly lower rate.  Potential investors should consider reinvestment risk in light of other investments available at that time.

*Notes issued at a substantial discount or premium*

The market values of securities issued at a substantial discount or premium to their nominal amount tend to fluctuate more in relation to general changes in interest rates than do prices for conventional interest-bearing securities.  Generally, the longer the remaining term of the securities, the greater the price volatility as compared to conventional interest-bearing securities with comparable maturities.

*Inverse Floating Rate Notes*

Inverse Floating Rate Notes have an interest rate equal to a fixed rate minus a rate based upon a reference rate such as EURIBOR.  The market values of such Notes are typically more volatile than the market values of other conventional floating rate debt securities based on the same reference rate (and with otherwise comparable terms).  Inverse Floating Rate Notes are more volatile because an increase in the reference rate not only decreases the interest rate of the Notes but may also reflect an increase in prevailing interest rates, which further adversely affects the market value of these Notes.

## INFORMATION INCORPORATED BY REFERENCE

The following documents which have previously been published and have been filed with the Irish Stock Exchange shall be incorporated in, and form part of, this Base Prospectus:

(a)     the audited consolidated financial statements of the Group for the financial years ended 30 September 2014 and 30 September 2013 (together, the "**Group Financial Statements**");

(b)     the audited financial statements of the Issuer for the financial years ended 30 September 2014 and 30 September 2013 (together, the "**Issuer Financial Statements**"); and

(c)     the terms and conditions set out on pages 25 to 58 of the base prospectus dated 14 November 2013 relating to the Programme under the heading "*Terms and Conditions of the Notes*".

Such documents shall be deemed to be incorporated in, and form part of, this Base Prospectus, save that any statement contained in a document which is deemed to be incorporated by reference in this Base Prospectus shall be deemed to be modified or superseded for the purpose of this Base Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Base Prospectus.

The Group Financial Statements and the Issuer Financial Statements are available on the website of the Irish Stock Exchange (in the case of the Group Financial Statements, at http://www.ise.ie/debt_documents/Trafigura%20Beheer%20BV%20Annual%20Report%202014_9d5452 ba-0a0b-48ac-b370-cee16a7301f3.pdf?v=1122015 and http://www.ise.ie/debt_documents/Trafigura_Beheer_BV_Annual_Report_2013.pdf?v=1122015, and in the case of the Issuer Financial Statements, at (http://www.ise.ie/Market-Data-Announcements/Debt/Individual-Debt-Instrument-Data/Dept-Security-Documents/?progID=687&FIELDSORT=docId ).

Copies of the documents incorporated by reference may be inspected, free of charge, during normal business hours at the offices of Trafigura Beheer B.V. at 20th Floor, Ito Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, the Netherlands. To the extent that only part of a document is incorporated by reference in this Base Prospectus, the non-incorporated part of such document is either not relevant to investors or is covered elsewhere in this Base Prospectus.

No websites referred to herein form part of this Base Prospectus.

## FINAL TERMS AND DRAWDOWN PROSPECTUSES

In this section the expression "**necessary information**" means, in relation to any Tranche of Notes, the information necessary to enable investors to make an informed assessment of the assets and liabilities, financial position, profits and losses and prospects of the Issuer and the Guarantors and of the rights attaching to the Notes.  In relation to the different types of Notes which may be issued under the Programme the Issuer and the Guarantors have included in this Base Prospectus all of the necessary information except for information relating to the Notes which is not known at the date of this Base Prospectus and which can only be determined at the time of an individual issue of a Tranche of Notes.

Any information relating to the Notes which is not included in this Base Prospectus and which is required in order to complete the necessary information in relation to a Tranche of Notes will be contained either in the relevant Final Terms or in a Drawdown Prospectus.

For a Tranche of Notes which is the subject of Final Terms, those Final Terms will, for the purposes of that Tranche only, supplement this Base Prospectus and must be read in conjunction with this Base Prospectus.  The terms and conditions applicable to any particular Tranche of Notes which is the subject of Final Terms are the Conditions described in the relevant Final Terms as supplemented to the extent described in the relevant Final Terms.

The terms and conditions applicable to any particular Tranche of Notes which is the subject of a Drawdown Prospectus will be the Conditions as supplemented, amended and/or replaced to the extent described in the relevant Drawdown Prospectus.  In the case of a Tranche of Notes which is the subject of a Drawdown Prospectus, each reference in this Base Prospectus to information being specified or identified in the relevant Final Terms shall be read and construed as a reference to such information being specified or identified in the relevant Drawdown Prospectus unless the context requires otherwise.

Each Drawdown Prospectus will be constituted either (1) by a single document containing the necessary information relating to the Issuer and the Guarantors and the relevant Notes or (2) by a registration document containing the necessary information relating to the Issuer and the Guarantors, a securities note containing the necessary information relating to the relevant Notes and, if necessary, a summary note.

## FORMS OF THE NOTES

Each Tranche of Notes will initially be in the form of either a temporary global note (the "**Temporary Global Note**"), without interest coupons, or a permanent global note (the "**Permanent Global Note**"), without interest coupons, in each case as specified in the relevant Final Terms. Each Temporary Global Note or, as the case may be, Permanent Global Note (each a "**Global Note**"), will be deposited on or around the issue date of the relevant Tranche of the Notes with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system.

The relevant Final Terms will also specify whether United States Treasury Regulation §1.163-5(c)(2)(i)(C) (the "**TEFRA C Rules**") or United States Treasury Regulation §1.163-5(c)(2)(i)(D) (the "**TEFRA D Rules**") are applicable in relation to the Notes or, if the Notes do not have a maturity of more than 365 days, that neither the TEFRA C Rules nor the TEFRA D Rules are applicable.

**Temporary Global Note exchangeable for Permanent Global Notes**

If the relevant Final Terms specifies the form of Notes as being "Temporary Global Note exchangeable for a Permanent Global Note", then the Notes will initially be in the form of a Temporary Global Note which will be exchangeable, in whole or in part, for interests in a Permanent Global Note, without interest coupons, not earlier than 40 days after the issue date of the relevant Tranche of the Notes upon certification as to non-U.S. beneficial ownership. No payments will be made under the Temporary Global Note unless exchange for interests in the Permanent Global Note is improperly withheld or refused. In addition, interest payments in respect of the Notes cannot be collected without such certification of non-U.S. beneficial ownership.

Whenever any interest in the Temporary Global Note is to be exchanged for an interest in a Permanent Global Note, the Issuer shall procure (in the case of first exchange) the delivery of a Permanent Global Note to the bearer of the Temporary Global Note or (in the case of any subsequent exchange) an increase in the principal amount of the Permanent Global Note in accordance with its terms against:

(i)     presentation and (in the case of final exchange) presentation and surrender of the Temporary Global Note to or to the order of the Principal Paying Agent; and

(ii)    receipt by the Principal Paying Agent of a certificate or certificates of non-U.S. beneficial ownership.

The principal amount of Notes represented by the Permanent Global Note shall be equal to the aggregate of the principal amounts specified in the certificates of non-U.S. beneficial ownership **provided**, **however**, **that** in no circumstances shall the principal amount of Notes represented by the Permanent Global Note exceed the initial principal amount of Notes represented by the Temporary Global Note.

The Permanent Global Note will become exchangeable, in whole but not in part only and at the request of the bearer of the Permanent Global Note, for Bearer Notes in definitive form ("**Definitive Notes**") if the Final Terms specifies "in the limited circumstances described in the Permanent Global Note" and either of the following events occurs:

(a)     Euroclear or Clearstream, Luxembourg or any other relevant clearing system is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business; or

(b)     any of the circumstances described in Condition 12 (*Events of Default*) occurs.

For the avoidance of doubt, Notes will only be issued with a minimum Specified Denomination and in integral multiples of another smaller amount in excess thereof if the relevant Final Terms specifies "in the limited circumstances described in the Permanent Global Note" in accordance with the paragraph above.

Whenever the Permanent Global Note is to be exchanged for Definitive Notes, the Issuer shall procure the prompt delivery (free of charge to the bearer) of such Definitive Notes, duly authenticated and with Coupons and Talons attached (if so specified in the Final Terms), in an aggregate principal amount equal to the principal amount of Notes represented by the Permanent Global Note to the bearer of the Permanent Global Note against the surrender of the Permanent Global Note to or to the order of the Principal Paying Agent within 30 days of the bearer requesting such exchange.

**Temporary Global Note exchangeable for Definitive Notes**

If the relevant Final Terms specifies the form of Notes as being "Temporary Global Note exchangeable for Definitive Notes" and also specifies that the TEFRA C Rules are applicable or that neither the TEFRA C Rules or the TEFRA D Rules are applicable, then the Notes will initially be in the form of a Temporary Global Note which will be exchangeable, in whole but not in part, for Definitive Notes on the expiry of such period of notice as is specified in the relevant Final Terms and not earlier than 40 days after the issue date of the relevant Tranche of the Notes.

If the relevant Final Terms specifies the form of Notes as being "Temporary Global Note exchangeable for Definitive Notes" and also specifies that the TEFRA D Rules are applicable, then the Notes will initially be in the form of a Temporary Global Note which will be exchangeable, in whole or in part, for Definitive Notes not earlier than 40 days after the issue date of the relevant Tranche of the Notes upon certification as to non-U.S. beneficial ownership. Interest payments in respect of the Notes cannot be collected without such certification of non-U.S. beneficial ownership.

Whenever the Temporary Global Note is to be exchanged for Definitive Notes, the Issuer shall procure the prompt delivery (free of charge to the bearer) of such Definitive Notes, duly authenticated and with Coupons and Talons attached (if so specified in the relevant Final Terms), in an aggregate principal amount equal to the principal amount of the Temporary Global Note to the bearer of the Temporary Global Note against the surrender of the Temporary Global Note to or to the order of the Principal Paying Agent within 30 days of the bearer requesting such exchange.

In the event that a Temporary Global Note is exchanged for Definitive Notes, such Definitive Notes shall be issued in Specified Denomination(s) only. A Noteholder who holds a principal amount of less than the minimum Specified Denomination will not receive a Definitive Note in respect of such holding and would need to purchase a principal amount of Notes such that it holds an amount equal to one or more Specified Denominations. Such Definitive Notes may only be issued to be held in clearing systems if in denominations equal to EUR 100,000 (or equal to £100,000, as applicable) and integral multiples thereof.

**Permanent Global Note exchangeable for Definitive Notes**

If the relevant Final Terms specifies the form of Notes as being "Permanent Global Note exchangeable for Definitive Notes", then the Notes will initially be in the form of a Permanent Global Note which will be exchangeable in whole, but not in part, for Definitive Notes if the relevant Final Terms specifies "in the limited circumstances described in the Permanent Global Note" and either of the following events occurs:

(a)     Euroclear or Clearstream, Luxembourg or any other relevant clearing system is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business; or

(b)     any of the circumstances described in Condition 12 (*Events of Default*) occurs.

For the avoidance of doubt, Notes will only be issued with a minimum Specified Denomination and in integral multiples of another smaller amount in excess thereof if the relevant Final Terms specifies "in the limited circumstances described in the Permanent Global Note" in accordance with the paragraph above.

Whenever the Permanent Global Note is to be exchanged for Definitive Notes, the Issuer shall procure the prompt delivery (free of charge to the bearer) of such Definitive Notes, duly authenticated and with Coupons and Talons attached (if so specified in the Final Terms), in an aggregate principal amount equal to the principal amount of Notes represented by the Permanent Global Note to the bearer of the Permanent Global Note against the surrender of the Permanent Global Note to or to the order of the Principal Paying Agent within 30 days of the bearer requesting such exchange.

**Terms and conditions applicable to the Notes**

The terms and conditions applicable to any Definitive Note will be endorsed on that Note and will consist of the Conditions and the provisions of the relevant Final Terms which complete those terms and conditions.

- 24 -

The terms and conditions applicable to any Note in global form will differ from those terms and conditions which would apply to the Note were it in definitive form to the extent described under "*Summary of Provisions Relating to the Notes while in Global Form*" below.

**Legend concerning United States persons**

In the case of any Tranche of Notes having a maturity of more than 365 days, the Notes in global form, the Notes in definitive form and any Coupons and Talons appertaining thereto will bear a legend to the following effect:

> "Any United States person who holds this obligation will be subject to limitations under the United States income tax laws, including the limitations provided in Sections 165(j) and 1287(a) of the Internal Revenue Code."

## TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the terms and conditions, save for this paragraph in italics, which, as supplemented, amended and/or replaced by Part A of the relevant Final Terms, will apply to each Tranche of Notes and which will be endorsed on each Note in definitive form issued under the Programme. In the case of any Tranche of Notes which are being (a) offered to the public in a Member State (other than pursuant to one or more of the exemptions set out in Article 3.2 of the Prospectus Directive) or (b) admitted to trading on a regulated market in a Member State, the relevant Final Terms shall not amend or replace any information in this Base Prospectus. Subject to this, to the extent permitted by applicable law and/or regulation, the Final Terms in respect of any Tranche of Notes may supplement, amend or replace any information in this Base Prospectus. The terms and conditions applicable to any Note in global form will differ from those terms and conditions which would apply to the Note were it in definitive form to the extent described under "Summary of Provisions Relating to the Notes while in Global Form" below.*

1.     Introduction

(a)    **Programme**:   Trafigura Funding S.A. (the "**Issuer**") and Trafigura Beheer B.V., Trafigura Trading LLC, Trafigura Pte Ltd and Trafigura Derivatives Limited (each a "**Guarantor**" and together, the "**Guarantors**") have established a Euro Medium Term Note Programme (the "**Programme**") for the issuance of up to EUR 2,000,000,000 in aggregate principal amount of notes (the "**Notes**") unconditionally and irrevocably guaranteed on a joint and several basis by the Guarantors.

(b)    **Final Terms**: Notes issued under the Programme are issued in series (each a "**Series**") and each Series may comprise one or more tranches (each a "**Tranche**") of Notes. Each Tranche is the subject of the applicable final terms (the "**Final Terms**") which supplements these terms and conditions (the "**Conditions**"). The terms and conditions applicable to any particular Tranche of Notes are these Conditions as supplemented, amended and/or replaced by the relevant Final Terms. In the event of any inconsistency between these Conditions and the relevant Final Terms, the relevant Final Terms shall prevail.

(c)    **Trust Deed**: The Notes are subject to and have the benefit of a trust deed dated 14 November 2013 (as amended and restated on or about 18 March 2015 and as further amended and/or supplemented and/or restated from time to time, the "**Trust Deed**") made between the Issuer, each Guarantor and Citicorp Trustee Company Limited (the "**Trustee**", which expression shall include all persons for the time being the trustee or trustees appointed under the Trust Deed).

(d)    **Paying Agency Agreement:** The Notes are the subject of an issue and paying agency agreement dated 14 November 2013 (as amended and restated on or about 18 March 2015 and as further amended and/ or supplemented and/or restated from time to time, the "**Paying Agency Agreement**") between the Issuer, each Guarantor, the Trustee and Citibank N.A., London Branch (the "**Principal Paying Agent**", which expression includes any successor principal paying agent appointed from time to time in accordance with the Paying Agency Agreement in connection with the Notes) and the paying agents named therein (together with the Principal Paying Agent, the "**Paying Agents**", which expression includes any successor or additional paying agents appointed from time to time in accordance with the Paying Agency Agreement in connection with the Notes).

(e)    **The Notes**: All subsequent references in these Conditions to "**Notes**" are to the Notes which are the subject of the relevant Final Terms. Copies of the relevant Final Terms are available for inspection during normal business hours at the Specified Office of the Trustee and the Principal Paying Agent, the initial Specified Offices of which are set out below.

(f)    **Summaries**: Certain provisions of these Conditions are summaries of the Trust Deed, and the Paying Agency Agreement and are subject to their detailed provisions. The holders of the Notes (the "**Noteholders**") and the holders of the related interest coupons, if any, (the "**Couponholders**" and the "**Coupons**", respectively) are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Paying Agency Agreement applicable to them. Copies of the Trust Deed and the Paying Agency Agreement are available for inspection

by Noteholders during normal business hours at the Specified Offices of each of the Paying Agents, the initial Specified Offices of which are set out below.

2.      Interpretation

(a)     *Definitions*: In these Conditions the following expressions have the following meanings:

"**Accrual Yield**" has the meaning given in the relevant Final Terms;

"**Additional Business Centre(s)**" means the city or cities specified as such in the relevant Final Terms;

"**Additional Financial Centre(s)**" means the city or cities specified as such in the relevant Final Terms;

"**Authorised Signatory**" has the meaning given in the Trust Deed;

"**Business Day**" means:

(i)     in relation to any sum payable in euro, a TARGET Settlement Day and a day on which commercial banks and foreign exchange markets settle payments generally in each (if any) Additional Business Centre; and

(ii)    in relation to any sum payable in a currency other than euro, a day on which commercial banks and foreign exchange markets settle payments generally in London and Geneva, in the Principal Financial Centre of the relevant currency and in each (if any) Additional Business Centre;

"**Business Day Convention**", in relation to any particular date, has the meaning given in the relevant Final Terms and, if so specified in the relevant Final Terms, may have different meanings in relation to different dates and, in this context, the following expressions shall have the following meanings:

(i)     "**Following Business Day Convention**" means that the relevant date shall be postponed to the first following day that is a Business Day;

(ii)    "**Modified Following Business Day Convention**" or "**Modified Business Day Convention**" means that the relevant date shall be postponed to the first following day that is a Business Day unless that day falls in the next calendar month in which case that date will be the first preceding day that is a Business Day;

(iii)   "**Preceding Business Day Convention**" means that the relevant date shall be brought forward to the first preceding day that is a Business Day;

(iv)    "**FRN Convention**", "**Floating Rate Convention**" or "**Eurodollar Convention**" means that each relevant date shall be the date which numerically corresponds to the preceding such date in the calendar month which is the number of months specified in the relevant Final Terms as the Specified Period after the calendar month in which the preceding such date occurred **provided**, **however**, **that**:

(A)    if there is no such numerically corresponding day in the calendar month in which any such date should occur, then such date will be the last day which is a Business Day in that calendar month;

(B)    if any such date would otherwise fall on a day which is not a Business Day, then such date will be the first following day which is a Business Day unless that day falls in the next calendar month, in which case it will be the first preceding day which is a Business Day; and

(C)    if the preceding such date occurred on the last day in a calendar month which was a Business Day, then all subsequent such dates will be the last day which is

a Business Day in the calendar month which is the specified number of months after the calendar month in which the preceding such date occurred;

(v)     "**No Adjustment**" means that the relevant date shall not be adjusted in accordance with any Business Day Convention;

"**Calculation Agent**" means the Principal Paying Agent or such other Person specified in the relevant Final Terms as the party responsible for calculating the Rate(s) of Interest and Interest Amount(s) and/or such other amount(s) as may be specified in the relevant Final Terms;

"**Calculation Amount**" has the meaning given in the relevant Final Terms;

"**Clearstream, Luxembourg**" means Clearstream Banking, *société anonyme*;

"**Consolidated Net Earnings**" means, for a Measurement Period, the consolidated net income (or loss) of the Parent and the Subsidiaries for such period (taken as a cumulative whole), all determined in accordance with GAAP (without duplication) on a consolidated basis after deducting portions of income properly attributable to minority interests, if any, in the shares and surplus of Subsidiaries and excluding any net income (or loss) of SPE;

"**Consolidated Net Worth**" means, at any time:

(i)     the total assets of the Parent and its Subsidiaries which are shown as assets on the latest available consolidated balance sheet of the Parent and its Subsidiaries as of such time prepared in accordance with GAAP, after eliminating the assets of any relevant SPE,

        Minus

(ii)    the total liabilities of the Parent and its Subsidiaries which are shown as liabilities on the latest available consolidated balance sheet of the Parent and its Subsidiaries as of such time prepared in accordance with GAAP, after eliminating the liabilities of any relevant SPE;

"**Coupon Sheet**" means, in respect of a Note, a coupon sheet relating to the Note;

"**Day Count Fraction**" means, in respect of the calculation of an amount for any period of time (the "**Calculation Period**"), such day count fraction as may be specified in these Conditions or the relevant Final Terms and:

(i)     when the 2000 ISDA Definitions are specified in the relevant Final Terms as being applicable:

        (A)     if "**Actual/Actual (ICMA)**" is so specified, means:

                (1)     where the Calculation Period is equal to or shorter than the Regular Period during which it falls, the actual number of days in the Calculation Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year; and

                (2)     where the Calculation Period is longer than one Regular Period, the sum of:

                        i.      the actual number of days in such Calculation Period falling in the Regular Period in which it begins divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods in any year; and

                        ii.     the actual number of days in such Calculation Period falling in the next Regular Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year;

(B)     if "**Actual/365**" or "**Actual/Actual (ISDA)**" is so specified, means the actual number of days in the Calculation Period divided by 365 (or, if any portion of the Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365);

(C)     if "**Actual/365 (Fixed)**" is so specified, means the actual number of days in the Calculation Period divided by 365;

(D)     if "**Actual/360**" is so specified, means the actual number of days in the Calculation Period divided by 360;

(E)     if "**30/360**" is so specified, means the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months (unless (i) the last day of the Calculation Period is the 31st day of a month but the first day of the Calculation Period is a day other than the 30th or 31st day of a month, in which case the month that includes that last day shall not be considered to be shortened to a 30-day month, or (ii) the last day of the Calculation Period is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month)); and

(F)     if "**30E/360**" or "**Eurobond Basis**" is so specified means, the number of days in the Calculation Period divided by 360 (the number of days to be calculated on the basis of a year of 360 days with 12 30-day months, without regard to the date of the first day or last day of the Calculation Period unless, in the case of the final Calculation Period, the date of final maturity is the last day of the month of February, in which case the month of February shall not be considered to be lengthened to a 30-day month); or

(ii)    when the 2006 ISDA Definitions are specified in the relevant Final Terms as being applicable:

(A)     if "**Actual/Actual (ICMA)**" is so specified, means:

(1)     where the Calculation Period is equal to or shorter than the Regular Period during which it falls, the actual number of days in the Calculation Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year; and

(2)     where the Calculation Period is longer than one Regular Period, the sum of:

i.      the actual number of days in such Calculation Period falling in the Regular Period in which it begins divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods in any year; and

ii.     the actual number of days in such Calculation Period falling in the next Regular Period divided by the product of (1) the actual number of days in such Regular Period and (2) the number of Regular Periods normally ending in any year;

(B)     if "**Actual/Actual**" or "**Actual/Actual (ISDA)**" is so specified, means the actual number of days in the Calculation Period divided by 365 (or, if any portion of the Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365);

(C)     if "**Actual/365 (Fixed)**" is so specified, means the actual number of days in the Calculation Period divided by 365;

(D)     if "**Actual/360**" is so specified, means the actual number of days in the Calculation Period divided by 360;

(E)     if "**30/360**" is so specified, means the number of days in the Calculation Period divided by 360 calculated on a formula basis as follows:

$$\text{Day Count Faction} = \frac{[360 \; x \; (Y_2 - Y_1)] + [30 \; x \; (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$"             is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$"             is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$"             is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$"             is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$"             is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case $D_1$ will be 30; and

"$D_2$"             is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31 and $D_1$ is greater than 29, in which case $D_2$ will be 30;

(F)     if "**30E/360**" or "**Eurobond Basis**" is so specified, means the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Faction} = \frac{[360 \; x \; (Y_2 - Y_1)] + [30 \; x \; (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$"             is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$"             is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$M_1$"             is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"$M_2$"             is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"$D_1$"             is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case $D_1$ will be 30; and

"$D_2$"             is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless

such number would be 31, in which case $D_2$ will be 30;

(G)    if "**30E/360 (ISDA)**" is so specified, means the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Faction} = \frac{[360 \ x \ (Y_2 - Y_1)] + [30 \ x \ (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

| | |
|---|---|
| "**$Y_1$**" | is the year, expressed as a number, in which the first day of the Calculation Period falls; |
| "**$Y_2$**" | is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls; |
| "**$M_1$**" | is the calendar month, expressed as a number, in which the first day of the Calculation Period falls; |
| "**$M_2$**" | is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls; |
| "**$D_1$**" | is the first calendar day, expressed as a number, of the Calculation Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case $D_1$ will be 30; and |
| "**$D_2$**" | is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case $D_2$ will be 30; |

Provided, however, that in each such case the number of days in the Calculation Period is calculated from and including the first day of the Calculation Period to but excluding the last day of the Calculation Period;

"**Default**" means,

(i)    an Event of Default; or

(ii)    an event or circumstance which would be (with the expiry of a grace period, the giving of notice or the making of any relevant determination) an Event of Default;

"**Early Redemption Amount (Tax)**" means, in respect of any Note, its principal amount or such other amount as may be specified in, or determined in accordance with, the relevant Final Terms;

"**Early Termination Amount**" means, in respect of any Note, its principal amount or such other amount as may be specified in, or determined in accordance with, these Conditions or the relevant Final Terms;

"**Euroclear**" means Euroclear Bank SA/NV;

"**Extraordinary Resolution**" has the meaning given in the Trust Deed;

"**Final Redemption Amount**" means, in respect of any Note, its principal amount or such other amount as may be specified in, or determined in accordance with, the relevant Final Terms;

"**Financial Indebtedness**" means with respect to any person, at any time, without duplication:

(i)    its liabilities for borrowed money and its redemption obligations in respect of any mandatorily redeemable class of shares (or similar equity interests) of such person that is preferred over any other class of shares (or similar equity interests) of such person as to

the payment of dividends or payment of any amount upon liquidation or dissolution of such person;

(ii)    its liabilities for the deferred purchase price of property acquired by such person (excluding accounts payable arising in the ordinary course of business but including all liabilities created or arising under any conditional sale or other title retention agreement with respect to any such property);

(iii)    all liabilities appearing on its balance sheet in accordance with GAAP in respect of capital leases and all liabilities which would appear on its balance sheet in accordance with GAAP in respect of synthetic leases assuming such synthetic leases were accounted for as capital leases;

(iv)    all its liabilities in respect of letters of credit or instruments serving a similar function issued or accepted for its account by banks and other financial institutions (whether or not representing obligations for borrowed money);

(v)    the aggregate swap termination value of all swap contracts of such person; and

(vi)    any Guarantee of such person with respect to liabilities of a type described in any of paragraphs (i) to (v) hereof.

Financial Indebtedness of any person shall include all obligations of such person of the character described in paragraphs (i) through (vi) to the extent such person remains legally liable in respect thereof notwithstanding that any such obligation is deemed to be extinguished under GAAP;

"**Fixed Coupon Amount**" has the meaning given in the relevant Final Terms;

"**GAAP**" means generally accepted accounting principles in the jurisdiction of the Parent from time to time (including, at the Parent's option, IFRS);

"**Group**" means the Parent and its Subsidiaries;

"**Group Member**" means a member of the Group;

"**Guarantee**" means, with respect to any person, any obligation (except the endorsement in the ordinary course of business of negotiable instruments for deposit or collection) of such person guaranteeing or in effect guaranteeing any indebtedness, dividend or other obligation of any other person in any manner, whether directly or indirectly, including (without limitation) obligations incurred through an agreement, contingent or otherwise, by such person:

(i)    to purchase such indebtedness or obligation or any property constituting security therefor;

(ii)    to advance or supply funds:

(A)    for the purchase or payment of such indebtedness or obligation; or

(B)    to maintain any working capital or other balance sheet condition or any income statement condition of any other person or otherwise to advance or make available funds for the purchase or payment of such indebtedness or obligation;

(iii)    to lease properties or to purchase properties or services primarily for the purpose of assuring the owner of such indebtedness or obligation of the ability of any other person to make payment of the indebtedness or obligation; or

(iv)    otherwise to assure the owner of such indebtedness or obligation against loss in respect thereof.

In any computation of the indebtedness or other liabilities of the obligor under any Guarantee, the indebtedness or other obligations that are the subject of such Guarantee shall be assumed to be direct obligations of such obligor;

"**Guarantee of the Notes**" means the guarantee of the Notes given by the Guarantors in the Trust Deed;

"**Holding Company**" of any person, means a company in respect of which that other person is a Subsidiary;

"**IFRS**" means international accounting standards within the meaning of Commission Regulation (EC) 1606/2002 (as amended from time to time) to the extent applicable to the relevant financial statements;

"**Insignificant Subsidiary**" means, at any time, a Subsidiary of the Parent, of which either (or both):

(i)     the net worth is less than two per cent. of Consolidated Net Worth at that time; or

(ii)    the net income for the Measurement Period then most recently ended is less than three per cent. of Consolidated Net Earnings for that Measurement Period,

and, in either case, whose Financial Indebtedness in excess of the greater of US$50,000,000 and three per cent. of Consolidated Net Worth at that time is not guaranteed or supported in a similar manner by any other Group Member, unless that Group Member is also an Insignificant Subsidiary.

For the purposes of this definition, net worth for a Subsidiary will be calculated on the same basis as Consolidated Net Worth (but in this case calculated for an individual Subsidiary), with figures being taken from its latest available financial statements (whether year end or quarterly, and whether audited or otherwise);

"**Interest Amount**" means, in relation to a Note and an Interest Period, the amount of interest payable in respect of that Note for that Interest Period;

"**Interest Commencement Date**" means the Issue Date of the Notes or such other date as may be specified as the Interest Commencement Date in the relevant Final Terms;

"**Interest Determination Date**" has the meaning given in the relevant Final Terms;

"**Interest Payment Date**" means the First Interest Payment Date and any date or dates specified as such in, or determined in accordance with the provisions of, the relevant Final Terms and, if a Business Day Convention is specified in the relevant Final Terms:

(i)     as the same may be adjusted in accordance with the relevant Business Day Convention; or

(ii)    if the Business Day Convention is the FRN Convention, Floating Rate Convention or Eurodollar Convention and an interval of a number of calendar months is specified in the relevant Final Terms as being the Specified Period, each of such dates as may occur in accordance with the FRN Convention, Floating Rate Convention or Eurodollar Convention at such Specified Period of calendar months following the Interest Commencement Date (in the case of the first Interest Payment Date) or the previous Interest Payment Date (in any other case);

"**Interest Period**" means each period beginning on (and including) the Interest Commencement Date or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date;

"**Investment**" means any investment, made in cash or by delivery of property, by the Parent or any of its Subsidiaries:

(i)     in any person, whether by acquisition of stock, Financial Indebtedness or other obligation or security, or by loan, Guarantee, advance, capital contribution or otherwise; or

(ii)    in any property;

"**ISDA Definitions**" means the 2006 ISDA Definitions as further amended and updated as at the Issue Date of the first Tranche of the Notes of the relevant Series (as specified in the relevant Final Terms) as published by the International Swaps and Derivatives Association, Inc. or if so specified in the relevant Final Terms, the 2000 ISDA Definitions as further amended and updated as at the Issue Date of the first Tranche of the Notes of the relevant Series (as specified in the relevant Final Terms) as published by the International Swaps and Derivatives Association, Inc.;

"**Islamic Financing Transaction**" means a sukuk (or Islamic bond) or similar Islamic debt capital markets instrument which complies with Shari'a where:

(i)     an asset of the Parent or any of its Subsidiaries is transferred or otherwise disposed of to a special purpose company;

(ii)    the Parent or a Subsidiary has an obligation to (and will) re-acquire that asset upon maturity of the relevant debt capital market instrument; and

(iii)   the beneficiaries of the special purpose company:

     (A)     have no entitlement or rights to the asset, by way of a Security Interest or otherwise; and

     (B)     have no right to prevent the re-transfer of the asset back to the Parent or Subsidiary;

"**Issue Date**" has the meaning given in the relevant Final Terms;

"**Limited Group Member**" means a member of the Group other than an Insignificant Subsidiary;

"**Limited Recourse Trade Finance Indebtedness**" means Financial Indebtedness:

(i)     incurred by the Parent or any Subsidiary in respect of a commercial transaction pursuant to which the risk of non-performance by a party to such commercial transaction (the "**Third Party**") other than the Parent or such Subsidiary (as the borrower of such Financial Indebtedness) or the lender financing such Financial Indebtedness is apportioned (the amount of such Financial Indebtedness apportioned to the Parent or any Subsidiary herein, the "**Apportioned Amount**") between the Parent or such Subsidiary (as the borrower of such Financial Indebtedness) and the lender; and

(ii)    in respect of which, upon the non-performance of the Third Party of its contractual obligations in respect of such commercial transaction, the Parent or such Subsidiary (as the borrower of such Financial Indebtedness), as the case may be, is liable to the lender solely for the monetary value of its Apportioned Amount;

"**Margin**" has the meaning given in the relevant Final Terms;

"**Material**" means material in relation to the business, operations, affairs, financial condition, assets, properties or prospects of the Parent and its Subsidiaries taken as a whole;

"**Maturity Date**" has the meaning given in the relevant Final Terms;

"**Maximum Redemption Amount**" has the meaning given in the relevant Final Terms;

"**Measurement Period**" means a period of 12 months ending on the last day of a financial quarter-year of Parent;

"**Meeting**" has the meaning given to it in the Trust Deed;

"**Member State**"  means a Member State of the European Economic Area;

"**Minimum Redemption Amount**" has the meaning given in the relevant Final Terms;

"**Non-Recourse Group Member**" means any member of the Group other than (i) any Project Company or (ii) any Holding Company of a Project Company incorporated solely for the purpose of, and whose sole or principal activity consists of, the incurrence of Financial Indebtedness and making that Financial Indebtedness available to that Project Company;

"**Optional Redemption Amount (Call)**" means, in respect of any Note, its principal amount or such other amount as may be specified in, or determined in accordance with, the relevant Final Terms;

"**Optional Redemption Amount (Put)**" means, in respect of any Note, its principal amount or such other amount as may be specified in, or determined in accordance with, the relevant Final Terms;

"**Optional Redemption Date (Call)**" has the meaning given in the relevant Final Terms;

"**Optional Redemption Date (Put)**" has the meaning given in the relevant Final Terms;

"**Parent**" means Trafigura Beheer B.V. or any entity which is substituted for Trafigura Beheer B.V. (or for any previously Substituted Guarantor for Trafigura Beheer B.V.) in accordance with Condition 16(c) (*Substitution*);

"**Payment Business Day**" means:

(i)     if the currency of payment is euro, any day which is:

    (A)     a day on which banks in the relevant place of presentation are open for presentation and payment of bearer debt securities and for dealings in foreign currencies; and

    (B)     in the case of payment by transfer to an account, a TARGET Settlement Day and a day on which dealings in foreign currencies may be carried on in each (if any) Additional Financial Centre; or

(ii)    if the currency of payment is not euro, any day which is:

    (A)     a day on which banks in the relevant place of presentation are open for presentation and payment of bearer debt securities and for dealings in foreign currencies; and

    (B)     in the case of payment by transfer to an account, a day on which dealings in foreign currencies may be carried on in the Principal Financial Centre of the currency of payment and in each (if any) Additional Financial Centre;

"**Permitted Indebtedness**" means any Financial Indebtedness:

(i)     incurred to finance, hedge or execute commodity transactions (including, without limitation, working capital facilities, recourse discounting of receivables, prepayment transactions, storage financing, sale and repurchase transactions and commodity inventory and trade receivable borrowing base financing) entered into in the ordinary course of the Parent's or one of its Subsidiary's business, consistent with past practices;

(ii)    which is non-recourse or limited recourse trade finance Financial Indebtedness incurred in connection with structured transactions entered into in the ordinary course of the Parent's or one of its Subsidiary's trading business;

(iii)   owed by the Parent or any Subsidiary of the Parent to the Parent or any Wholly-Owned Subsidiary;

(iv)    which is Project Finance Indebtedness incurred in connection with the purchase or refinancing of an Investment, provided that the Financial Indebtedness under this paragraph (iv) does not exceed 100 per cent. of the aggregate consideration payable to acquire such Investment; or

(v)     owed by a Subsidiary and which existed and was outstanding at the time such Subsidiary became a member of the Group and any extensions or renewals thereof;

"**Permitted Securitisation**" means the sale of inventory, receivables or other assets of the Group pursuant to which:

(i)     a member of the Group disposes of such inventory, receivables or other assets on a non-recourse basis to SPE; and

(ii)    SPE incurs Financial Indebtedness to finance its acquisition of such inventory, receivables or assets;

"**Permitted Security Interest**" means:

(i)     any Security Interest existing at the issue date of the Notes;

(ii)    Security Interests over any property for taxes or assessments or other governmental charges or levies, either not yet due or payable to the extent that non-payment thereof is permitted;

(iii)   any liens arising by operation of law and in the ordinary course of business, and any rights of set-off arising by operation of law and in the ordinary course of business in each case, which have not been foreclosed or otherwise enforced against the assets to which they apply;

(iv)    Security Interests created by or resulting from any litigation or legal proceedings which are being contested in good faith by appropriate proceedings and with respect to which the relevant member of the Group has established adequate reserves on its books in accordance with applicable accounting principles;

(v)     Security Interests incidental to the normal conduct of business of any member of the Group or the ownership of its property, which are not incurred in connection with the incurrence of Financial Indebtedness and which do not (taken as a whole) materially impair the use of such property in the operation of the business of the Group taken as a whole or the value of such property for the purposes of such business;

(vi)    Security Interests on property or assets of the Parent or any of its Subsidiaries securing Financial Indebtedness owing to the Parent or a Wholly-Owned Subsidiary;

(vii)   Security Interests to secure Permitted Indebtedness, provided that the aggregate fair market value of the assets that are subject to any such Security Interest does not exceed:

(A)    other than in the case of Short-Term Trade Finance and Project Finance Indebtedness, 120 per cent. of the amount of such Permitted Indebtedness incurred by the relevant Subsidiary of the Parent and secured by such assets; or

(B)    in the case of Project Finance Indebtedness, 200 per cent. of the amount of such Project Finance Indebtedness incurred by the relevant Subsidiary of the Parent and secured by such assets;

(viii)  Security Interests granted by SPE over its assets to secure its Financial Indebtedness arising under a Permitted Securitisation;

(ix)    the extension, renewal or replacement of any Security Interest permitted by subparagraph (i) above over the same property, provided that no Default would occur as a result;

(x)     any Security Interest:

(A)    over an asset or any proceeds or revenue derived from that asset to secure any Financial Indebtedness entered into in connection with the provision of all or a part of the purchase price or cost of the construction of such asset, provided that

- 36 -

the Security Interest is created contemporaneously with, or within 120 days (or such longer period as it may take to perfect the Security Interest in the jurisdiction where such asset is located) after, such acquisition or the completion of such construction; or

(B)     over an asset existing at the time of the acquisition of that asset by a member of the Group, whether or not the Financial Indebtedness secured thereby is assumed by that member of the Group; or

(C)     existing over an asset of a company at the time such company is merged into or consolidated with a member of the Group, or at the time of a sale, lease or other disposal of the assets of a company or firm as a whole or substantially as a whole to a member of the Group,

provided in each case that the aggregate principal amount of the Financial Indebtedness secured by any such Security Interest does not exceed 100 per cent. of the fair market value of the relevant asset;

(xi)     any asset transfer undertaken for the purpose of an Islamic Financing Transaction by the Parent or any of its Subsidiaries;

(xii)     any Security Interest over any property required by and as a result granted in favour of governmental authorities in any relevant jurisdiction;

(xiii)     any Security Interest to secure Financial Indebtedness of joint ventures in which a member of the Group has an interest, to the extent such Security Interest is on property or assets of or equity interests in such joint ventures;

(xiv)     Security Interests over any property securing judgments (including judgment liens) not giving rise to an Event of Default, so long as any such Security Interest is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of such judgment have not been finally terminated, or the period within which such proceedings may be initiated has not expired;

(xv)     any Security Interest comprising a netting or set-off arrangement entered into by a member of the Group in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(xvi)     any Security Interest over any property created pursuant to any order of attachment, distraint, garnishee order or injunction restraining disposal of assets or similar legal process arising in connection with court proceedings not giving rise to an Event of Default;

(xvii)     any bonds constituting Security Interests over cash deposits or marketable investment securities to procure the release from judicial arrest of an asset belonging to a member of the Group and not giving rise to an Event of Default;

(xviii)     any Security Interest over any goods to secure liabilities incurred on concessional terms in connection with the supply of those goods, being terms provided by any governmental or other similar export credit agency or official export-import bank or official export-import credit insurer;

(xix)     any Security Interest created in respect of borrowings from any governmental or other similar export credit agency or official export import bank or official export-import credit insurer incurred on concessional terms by any member of the Group made to refinance any amount receivable under any export sales contract where the Security Interest consists only of a pledge or similar Security Interest granted by the member of the Group's claims under the contract against the foreign buyer and of any Security Interests or guarantee of those claims;

(xx)     any Security Interest created in connection with any arrangement entered into between a member of the Group with any person providing for the leasing by any member of the

Group of any property which property has been or is to be sold or transferred by a member of the Group to such person, where such arrangement involves (i) a lease for a term, including renewal rights, of not more than 36 months, (ii) a lease of property within 18 months from the acquisition or, in the case of the construction, alteration or improvement of property, the later of the completion of the construction, alteration or improvement of such property or the commencement of commercial operation of the property, or (iii) leases between or among the Parent and any of its Subsidiaries);

(xxi)   any liens, charges or rights of set-off arising in the ordinary course of business and required by any exchange or settlement system used by a member of the Group in connection with its cash management arrangements and limited to the cash provided by the member of the Group to effect the relevant exchange or settlement; and

(xxii)   any Security Interest securing Financial Indebtedness, provided that the aggregate outstanding amount of Financial Indebtedness secured by Security Interests under this paragraph (xxii) does not exceed 25 per cent. of Consolidated Net Worth, determined as of the last day of the most recently ended fiscal quarter of the Parent;

"**Permitted Transaction**" means:

(i)   an intra-Group re-organisation of a Subsidiary of the Parent on a solvent basis provided however that any such re-organisation does not, subject to the provisions of Condition 16(c) (*Substitution*), extinguish, or result in a Guarantor being unable to perform or comply with, its obligations under the Guarantee; or

(ii)   any other transaction approved by an Extraordinary Resolution of the Noteholders;

"**Person**" means any individual, company, corporation, firm, partnership, joint venture, association, organisation, state or agency of a state or other entity, whether or not having separate legal personality;

"**Principal Financial Centre**" means, in relation to any currency, the principal financial centre for that currency **provided**, **however**, **that**:

(i)   in relation to euro, it means the principal financial centre of such member state of the European Union as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent; and

(ii)   in relation to Australian dollars, it means Sydney and, in relation to New Zealand dollars, it means either Wellington or Auckland, as is selected (in the case of a payment) by the payee or (in the case of a calculation) by the Calculation Agent;

"**Project Company**" means a Subsidiary of the Parent that is incorporated with limited liability and whose sole or principal activity consists in the acquisition, development, operation and/or maintenance of an asset or project;

"**Project Finance Indebtedness**" means Financial Indebtedness incurred in order to finance the acquisition, development, operation and/or maintenance of an asset or project, the creditors of which have no recourse to any Non-Recourse Group Member other than:

(i)   an amount which does not exceed all or part of the revenues generated by the operation of the relevant asset or project;

(ii)   amounts incurred in respect of the enforcement of security over the asset, assets of the project or all or part of the revenues generated by the operation of the relevant asset or project;

(iii)   amounts equal to damages (including liquidated damages) incurred in connection with the breach of a contractual undertaking (other than the undertaking to pay a sum of money not being an amount corresponding to the revenues referred to in paragraph (a) above); or

(iv)    under any guarantee by any Non-Recourse Group Member:

    (A)    of Financial Indebtedness of a Project Company or a Holding Company of a Project Company incorporated solely for the purpose of, and whose sole or principal activity consists of, the incurrence of Financial Indebtedness and making that Financial Indebtedness available to that Project Company; and

    (B)    under which third party lenders or other creditors of the Project Company (x) prior to completion of the relevant project, have recourse against Non-Recourse Group Member, provided the aggregate exposure of all Non-Recourse Group Members in respect of all guarantees under this sub-clause (x) outstanding at any one time shall not exceed 15 per cent. of Consolidated Net Worth and (y) following completion of the relevant project have no recourse against any Non-Recourse Group Member in its capacity as guarantor other than:

        (1)    security granted over the share capital, dividends and other rights relating to such share capital of, or any claim against the Project Company or a Holding Company of the Project Company;

        (2)    undertakings to subscribe for equity, quasi-equity investments or make subordinated debt contributions for the benefit of the Project Company or the Holding Company of the Project Company; and/or

        (3)    any guarantee the exercise of which relates solely to the operational condition of the asset or project or the operation or maintenance of such asset or project of the Project Company or the Holding Company of the Project Company;

"**Prospectus Directive**" means Directive 2003/71/EC (and amendments thereto, including Directive 2010/73/EU, to the extent implemented in any relevant Member State), and includes any relevant implementing measure in such Member State;

"**Put Option Notice**" means a notice which must be delivered to a Paying Agent by any Noteholder wanting to exercise a right to redeem a Note at the option of the Noteholder;

"**Put Option Receipt**" means a receipt issued by a Paying Agent to a depositing Noteholder upon deposit of a Note with such Paying Agent by any Noteholder wanting to exercise a right to redeem a Note at the option of the Noteholder;

"**Rate of Interest**" means the rate or rates (expressed as a percentage per annum) of interest payable in respect of the Notes specified in the relevant Final Terms or calculated or determined in accordance with the provisions of these Conditions and/or the relevant Final Terms;

"**Redemption Amount**" means, as appropriate, the Final Redemption Amount, the Early Redemption Amount (Tax), the Optional Redemption Amount (Call), the Optional Redemption Amount (Put), the Early Termination Amount or such other amount in the nature of a redemption amount as may be specified in, or determined in accordance with the provisions of, the relevant Final Terms;

"**Reference Banks**" has the meaning given in the relevant Final Terms or, if none, four major banks selected by the Calculation Agent in the market that is most closely connected with the Reference Rate;

"**Reference Price**" has the meaning given in the relevant Final Terms;

"**Reference Rate**" means EURIBOR or LIBOR as specified in the relevant Final Terms in respect of the currency and period specified in the relevant Final Terms;

"**Regular Period**" means:

(i)    in the case of Notes where interest is scheduled to be paid only by means of regular payments, each period from and including the Interest Commencement Date to but

excluding the first Interest Payment Date and each successive period from and including one Interest Payment Date to but excluding the next Interest Payment Date;

(ii)    in the case of Notes where, apart from the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "**Regular Date**" means the day and month (but not the year) on which any Interest Payment Date falls; and

(iii)    in the case of Notes where, apart from one Interest Period other than the first Interest Period, interest is scheduled to be paid only by means of regular payments, each period from and including a Regular Date falling in any year to but excluding the next Regular Date, where "**Regular Date**" means the day and month (but not the year) on which any Interest Payment Date falls other than the Interest Payment Date falling at the end of the irregular Interest Period;

"**Relevant Date**" means, in relation to any payment, whichever is the later of (a) the date on which the payment in question first becomes due and (b) if the full amount payable has not been received in the Principal Financial Centre of the currency of payment by the Paying Agent on or prior to such due date, the date on which (the full amount having been so received) notice to that effect has been given to the Noteholders;

"**Relevant Financial Centre**" has the meaning given in the relevant Final Terms;

"**Relevant Screen Page**" means the page, section or other part of a particular information service (including, without limitation, Reuters) specified as the Relevant Screen Page in the relevant Final Terms, or such other page, section or other part as may replace it on that information service or such other information service, in each case, as may be nominated by the Person providing or sponsoring the information appearing there for the purpose of displaying rates or prices comparable to the Reference Rate;

"**Relevant Time**" has the meaning given in the relevant Final Terms;

"**Reserved Matter**" means any proposal:

(i)    to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes or to alter the method of calculating the amount of any payment in respect of the Notes on redemption or maturity or the date for any such payment;

(ii)    to effect the exchange or substitution of the Notes for, or the conversion of the Notes into, shares, bonds or other obligations or securities of the Issuer, any Guarantor or any other person or body corporate formed or to be formed (other than as permitted under Clause 8.3 of the Trust Deed);

(iii)    to change the currency in which amounts due in respect of the Notes are payable;

(iv)    to modify any provision of the guarantee of the Notes (other than as permitted under Clause 8.3 of the Trust Deed);

(v)    to change the quorum required at any Meeting or the majority required to pass an Extraordinary Resolution; or

(vi)    to amend this definition;

"**Security Interest**" means any mortgage, pledge, lien, charge, assignment, hypothecation or security interest or any other agreement or arrangement having a similar effect;

"**Short-Term Trade Finance**" means Financial Indebtedness of a member of the Group having a maturity of 365 days or less and which is related to the purchase or sale (and any associated costs, including costs of any hedging arrangements) of commodities and in respect of which the borrower of such Financial Indebtedness has granted a Security Interest over such commodities or the receivables related thereto;

"**SPE**" means Trafigura Securitisation Finance plc, an Irish public limited company, which is neither a Subsidiary of the Parent nor under the control of the Parent, but which is consolidated in the financial statements of the Parent in accordance with GAAP or any similar vehicle which may or may not be a Subsidiary of the Parent or under its control or consolidated in its financial statements, established for the purposes of a Permitted Securitisation;

"**Specified Currency**" has the meaning given in the relevant Final Terms;

"**Specified Denomination(s)**" has the meaning given in the relevant Final Terms;

"**Specified Office**" has the meaning given in the Paying Agency Agreement or, in relation to the Trustee, has the meaning given to it in the Trust Deed;

"**Specified Period**" has the meaning given in the relevant Final Terms;

"**Subsidiary**" means as to any person, any other person in which such first person or one or more of its Subsidiaries owns more than 50 per cent. beneficial interest in the equity of such person and any partnership or joint venture if more than a 50 per cent. interest in the profits or capital thereof is owned by such first person or one or more of its Subsidiaries (unless such partnership or joint venture can and does ordinarily take major business actions without the prior approval of such person or one or more of its Subsidiaries). Unless the context otherwise requires, any reference to a "Subsidiary" is reference to a Subsidiary of the Parent;

"**Talon**" means a talon for further Coupons;

"**TARGET2**" means the Trans-European Automated Real-Time Gross Settlement Express Transfer system which utilizes a single shared platform and which was launched on November 19, 2007;

"**TARGET Settlement Day**" means any day on which the TARGET2 system is open for settlement of payments in euro;

"**Treaty**" means the Treaty establishing the European Communities, as subsequently amended;

"**Wholly-Owned Subsidiary**" means, at any time, any Subsidiary of which 90 per cent. or more of all of the equity interests (except directors' qualifying shares) and voting interests are owned, directly or indirectly, by the Parent; and

"**Zero Coupon Note**" means a Note specified as such in the relevant Final Terms.

(b)   *Interpretation*: In these Conditions:

(i)     if the Notes are Zero Coupon Notes, references to Coupons and Couponholders are not applicable;

(ii)    if Talons are specified in the relevant Final Terms as being attached to the Notes at the time of issue, references to Coupons shall be deemed to include references to Talons;

(iii)   if Talons are not specified in the relevant Final Terms as being attached to the Notes at the time of issue, references to Talons are not applicable;

(iv)   any reference to principal shall be deemed to include the Redemption Amount, any additional amounts in respect of principal which may be payable under Condition 11 (*Taxation*), any premium payable in respect of a Note and any other amount in the nature of principal payable pursuant to these Conditions or the Guarantee of the Notes;

(v)    any reference to interest shall be deemed to include any additional amounts in respect of interest which may be payable under Condition 11 (*Taxation*) and any other amount in the nature of interest payable pursuant to these Conditions or the Guarantee of the Notes;

(vi)   references to Notes being "**outstanding**" shall be construed in accordance with the Trust Deed;

(vii)    if an expression is stated in Condition 2(a) to have the meaning given in the relevant Final Terms, but the relevant Final Terms gives no such meaning or specifies that such expression is "**not applicable**" then such expression is not applicable to the Notes; and

(viii)    any reference to the Paying Agency Agreement or the Trust Deed shall be construed as a reference to the Paying Agency Agreement or the Trust Deed, as the case may be, as amended and/or supplemented up to and including the Issue Date of the Notes.

3.      Form, Denomination and Title

The Notes are in bearer form in the Specified Denomination(s) with Coupons and, if specified in the relevant Final Terms, Talons attached at the time of issue, **provided that** in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State in circumstances which require the publication of a prospectus under the Prospectus Directive, the minimum Specified Denomination shall be EUR 100,000 (or its equivalent in any other currency as at the Issue Date of the relevant Notes). In the case of a Series of Notes with more than one Specified Denomination, Notes of one Specified Denomination will not be exchangeable for Notes of another Specified Denomination. Title to the Notes and the Coupons will pass by delivery. The holder of any Note or Coupon shall (except as otherwise required by law) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon or any notice of any previous loss or theft thereof) and no Person shall be liable for so treating such holder.

4.      Status and Guarantees

(a)    ***Status of the Notes***: The Notes constitute direct, general and unconditional obligations of the Issuer which will at all times rank *pari passu* among themselves and at least *pari passu* with all other present and future unsecured and unsubordinated obligations of the Issuer, save for such obligations as may be preferred by provisions of law that are both mandatory and of general application.

(b)    ***Guarantees of the Notes***: The Guarantors have in the Trust Deed unconditionally and irrevocably guaranteed, on a joint and several basis, the due and punctual payment of all sums from time to time payable by the Issuer in respect of the Notes and the Trust Deed. The Guarantee of the Notes and amounts payable under the Trust Deed constitutes direct, general and unconditional obligations of each Guarantor which will at all times rank at least *pari passu* with all other present and future unsecured and unsubordinated obligations of such Guarantor, save for such obligations as may be preferred by provisions of law that are both mandatory and of general application.

5.      Negative Pledge

So long as any Note remains outstanding (as defined in the Trust Deed), neither the Issuer nor the Guarantors shall, and the Issuer and Guarantors shall procure that no member of the Group (other than any Insignificant Subsidiary) will, create or allow to exist any Security Interest (other than a Permitted Security Interest) on any of its assets or undertaking without (a) at the same time or prior thereto securing the Notes equally and rateably therewith to the satisfaction of the Trustee or (b) providing such other security or other beneficial arrangement for the Notes as the Trustee may in its absolute discretion deem not to be materially less beneficial to the interests of the Noteholders or as may be approved by an Extraordinary Resolution of Noteholders.

6.      Fixed Rate Note Provisions

(a)    ***Application***: This Condition 6 (*Fixed Rate Note Provisions*) is applicable to the Notes only if the Fixed Rate Note Provisions are specified in the relevant Final Terms as being applicable.

(b)    ***Accrual of interest***: The Notes bear interest from, and including, the Interest Commencement Date at the Rate of Interest payable in arrear on each Interest Payment Date, subject as provided in Condition 10 (*Payments*). Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of the Redemption Amount is improperly withheld or refused, in which case it will continue to bear interest in accordance with this Condition 6 (as well after as before judgment) until whichever is the earlier of (i) the day on

which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying Agent or, as the case may be, the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     **Fixed Coupon Amount**: The amount of interest payable in respect of each Note for any Interest Period shall be the relevant Fixed Coupon Amount and, if the Notes are in more than one Specified Denomination, shall be the relevant Fixed Coupon Amount in respect of the relevant Specified Denomination.

(d)     **Calculation of Interest Amount**: The amount of interest payable per Calculation Amount in respect of each Note for any period for which a Fixed Coupon Amount (or formula for its calculation) is not specified shall be equal to the product of the Rate of Interest, the Calculation Amount and the relevant Day Count Fraction and rounding the resulting figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards). For this purpose a "**sub-unit**" means, in the case of any currency other than euro, the lowest amount of such currency that is available as legal tender in the country of such currency and, in the case of euro, means one cent.

(e)     **Net Interest Amount**: Subject to the terms at Condition 11 (*Taxation*) if any withholding or deduction for or on account of tax is required by law and is imposed by the jurisdiction of the Issuer or, as the case may be, any Guarantor on any payment of principal or interest in respect of the Notes, the Issuer or, as the case may be, the relevant Guarantor shall pay such additional amount as will result in receipt by the Noteholders and Couponholders of such amount as would have been received by them if no such withholding or deduction had been required.

7.     Floating Rate Note Provisions

(a)     **Application**: This Condition 7 (*Floating Rate Note Provisions*) is applicable to the Notes only if the Floating Rate Note Provisions are specified in the relevant Final Terms as being applicable.

(b)     **Accrual of interest**: The Notes bear interest from, and including, the Interest Commencement Date at the Rate of Interest payable in arrear on each Interest Payment Date, subject as provided in Condition 10 (*Payments*). Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of the Redemption Amount is improperly withheld or refused, in which case it will continue to bear interest in accordance with this Condition (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying Agent or, as the case may be, the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     **Screen Rate Determination**:

(i)     If Screen Rate Determination is specified in the relevant Final Terms as the manner in which the Rate(s) of Interest is/are to be determined, the Rate of Interest applicable to the Notes for each Interest Period will, subject as provided below, be:

(A)     the offered quotation; or

(B)     the arithmetic mean of the offered quotations,

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as at either 11.00 a.m. (London time in the case of the London inter-bank offered rate ("**LIBOR**") or Brussels time in the case of the euro-zone inter-bank offered rate ("**EURIBOR**")) on the Interest Determination Date in question as determined by the Calculation Agent plus or minus (as indicated in the applicable Final Terms) the Margin (if any). If five or more of such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if

there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean of such offered quotations.

If the Reference Rate from time to time in respect of Floating Rate Notes is specified in the applicable Final Terms as being other than LIBOR or EURIBOR, the Rate of Interest in respect of such Notes will be determined as provided in the applicable Final Terms.

(ii)    If Linear Interpolation is specified as applicable in respect of an Interest Period in the applicable Final Terms, the Rate of Interest for such Interest Period shall be calculated by the Calculation Agent by straight-line linear interpolation by reference to two rates which appear on the Relevant Screen Page as of the Relevant Time on the relevant Interest Determination Date, where:

    (A)    one rate shall be determined as if the relevant Interest Period were the period of time for which rates are available next shorter than the length of the relevant Interest Period; and

    (B)    the other rate shall be determined as if the relevant Interest Period were the period of time for which rates are available next longer than the length of the relevant Interest Period; **provided, however, that** if no rate is available for a period of time next shorter or, as the case may be, next longer than the length of the relevant Interest Period, then the Calculation Agent shall determine such rate at such time and by reference to such sources as it determines appropriate.

(iii)    If the Relevant Screen Page is not available or if sub-paragraph (i)(A) applies and no such offered quotation appears on the Relevant Screen Page or if sub-paragraph (i)(B) above applies and fewer than three such offered quotations appear on the Relevant Screen Page in each case as at the time specified above, subject as provided below, the Calculation Agent shall request, if the Reference Rate is LIBOR, the principal London office of each of the Reference Banks or, if the Reference Rate is EURIBOR, the principal Euro-zone office of each of the Reference Banks, to provide the Calculation Agent with its offered quotation (expressed as a percentage rate per annum) for the Reference Rate if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time), or if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time) on the Interest Determination Date in question. If two or more of the Reference Banks provide the Calculation Agent with such offered quotations, the Rate of Interest for such Interest Period shall be the arithmetic mean of such offered quotations as determined by the Calculation Agent.

(iv)    If paragraph (iii) above applies and the Calculation Agent determines that fewer than two Reference Banks are providing offered quotations, subject as provided below, the Rate of Interest shall be the offered rate for deposits in the Specified Currency for a period equal to that which would have been used for the Reference Rate, or the arithmetic mean of the offered rates for deposits in the Specified Currency for a period equal to that which would have been used for the Reference Rate, at which, if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time) or, if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time), on the relevant Interest Determination Date, which any one or more banks (which bank or banks is or are in the opinion of the Trustee and the Issuer suitable for such purpose) informs the Calculation Agent it is quoting to leading banks in, if the Reference Rate is LIBOR, the London inter-bank market or, if the Reference Rate is EURIBOR, the Euro-zone inter-bank market, as the case may be, **provided that**, if the Rate of Interest cannot be determined in accordance with the foregoing provisions of this paragraph, the Rate of Interest shall be determined as at the last preceding Interest Determination Date (though substituting, where a different Margin or Maximum or Minimum Rate of Interest is to be applied to the relevant Interest Period from that which applied to the last preceding Interest Period, the Margin or Maximum or Minimum Rate of Interest relating to the relevant Interest Period, in place of the Margin or Maximum or Minimum Rate of Interest relating to that last preceding Interest Period).

(d)   **ISDA Determination**: If ISDA Determination is specified in the relevant Final Terms as the manner in which the Rate(s) of Interest is/are to be determined, the Rate of Interest applicable to the Notes for each Interest Period will be the sum of the Margin and the relevant ISDA Rate where "**ISDA Rate**" in relation to any Interest Period means a rate equal to the Floating Rate (as defined in the ISDA Definitions) that would be determined by the Calculation Agent under an interest rate swap transaction if the Calculation Agent were acting as Calculation Agent for that interest rate swap transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(i)   the Floating Rate Option (as defined in the ISDA Definitions) is as specified in the relevant Final Terms;

(ii)   the Designated Maturity (as defined in the ISDA Definitions) is a period specified in the relevant Final Terms;

(iii)   the relevant Reset Date (as defined in the ISDA Definitions) is either (A) if the relevant Floating Rate Option is based on LIBOR or on EURIBOR for a currency, the first day of that Interest Period or (B) in any other case, as specified in the relevant Final Terms; and

(iv)   if Linear Interpolation is specified as applicable in respect of an Interest Period in the applicable Final Terms, the Rate of Interest for such Interest Period shall be calculated by the Calculation Agent by straight-line linear interpolation by reference to two rates based on the relevant Floating Rate Option, where:

(A)   one rate shall be determined as if the Designated Maturity were the period of time for which rates are available next shorter than the length of the relevant Interest Period; and

(B)   the other rate shall be determined as if the Designated Maturity were the period of time for which rates are available next longer than the length of the relevant Interest Period,

**provided, however, that** if there is no rate available for a period of time next shorter than the length of the relevant Interest Period or, as the case may be, next longer than the length of the relevant Interest Period, then the Calculation Agent shall determine such rate at such time and by reference to such sources as it determines appropriate.

(e)   **Maximum or Minimum Rate of Interest**: If any Maximum Rate of Interest or Minimum Rate of Interest is specified in the relevant Final Terms, then the Rate of Interest shall in no event be greater than the maximum or be less than the minimum so specified.

(f)   **Calculation of Interest Amount**: The Calculation Agent will, as soon as practicable after the time at which the Rate of Interest is to be determined in relation to each Interest Period, calculate the Interest Amount payable in respect of the Calculation Amount for such Interest Period. The Interest Amount will be equal to the product of the Rate of Interest for such Interest Period, the Calculation Amount and the relevant Day Count Fraction, rounding the resulting figure to the nearest sub-unit of the Specified Currency (half a sub-unit being rounded upwards). For this purpose a "**sub-unit**" means, in the case of any currency other than euro, the lowest amount of such currency that is available as legal tender in the country of such currency and, in the case of euro, means one cent.

(g)   **Calculation of other amounts**: If the relevant Final Terms specifies that any other amount is to be calculated by the Calculation Agent, the Calculation Agent will, as soon as practicable after the time or times at which any such amount is to be determined, calculate the relevant amount. The relevant amount will be calculated by the Calculation Agent in the manner specified in the relevant Final Terms.

(h)   **Publication**: The Calculation Agent will cause each Rate of Interest and Interest Amount determined by it, together with the relevant Interest Payment Date, Interest Period and any other amount(s) required to be determined by it together with any relevant payment date(s) to be notified to the Issuer, each Guarantor, the Trustee and the Paying Agents, the Irish Stock Exchange and each stock exchange (if any) on which the Notes are then listed and /or admitted to

trading as soon as practicable after such determination but (in the case of each Rate of Interest, Interest Amount and Interest Payment Date) in any event not later than the first day of the relevant Interest Period. Notice thereof shall also promptly be given to the Noteholders. The Calculation Agent will be entitled to recalculate any Interest Amount (on the basis of the foregoing provisions) without notice in the event of an extension or shortening of the relevant Interest Period. If the Calculation Amount is less than the minimum Specified Denomination the Calculation Agent shall not be obliged to publish each Interest Amount but instead may publish only the Calculation Amount and the Interest Amount in respect of a Note having the minimum Specified Denomination.

(i)     **Notifications etc**: All notifications, opinions, determinations, certificates, calculations, quotations and decisions given, expressed, made or obtained for the purposes of this Condition by the Calculation Agent will (in the absence of manifest error) be binding on the Issuer, the Guarantors, the Trustee, the Paying Agents, the Noteholders and the Couponholders and (subject as aforesaid) no liability to any such Person will attach to the Calculation Agent or the Trustee in connection with the exercise or non- exercise by it of its powers, duties and discretions for such purposes.

(j)     **Determination or Calculation by Trustee**: If the Calculation Agent fails at any time to determine a Rate of Interest or to calculate an Interest Amount, the Trustee will determine such Rate of Interest and make such determination or calculation which shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply all of the provisions of these Conditions with any necessary consequential amendments to the extent that, in its sole opinion and with absolute discretion, it can do so and in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances and will not be liable for any loss, liability, cost, charge or expense which may arise as a result thereof. Any such determination or calculation made by the Trustee shall be binding on the Issuer, each Guarantor, Noteholders, Couponholders, the Calculation Agent and the Paying Agents.

(k)     **Net Interest Amount**: If any withholding or deduction is imposed under Condition 11 (*Taxation*), the Issuer shall increase the payment of principal or interest to such amount as will result in receipt by the Noteholders and Couponholders of such amount as would have been received by them if no such withholding or deduction had been required (except as provided in Condition 11).

8.     Zero Coupon Note Provisions

(a)     **Application**: This Condition 8 (*Zero Coupon Note Provisions*) is applicable to the Notes only if the Zero Coupon Note Provisions are specified in the relevant Final Terms as being applicable.

(b)     **Late payment on Zero Coupon Notes**: If the Redemption Amount payable in respect of any Zero Coupon Note is improperly withheld or refused, the Redemption Amount shall thereafter be an amount equal to the sum of:

(i)     the Reference Price; and

(ii)     the product of the Accrual Yield (compounded annually) being applied to the Reference Price on the basis of the relevant Day Count Fraction from (and including) the Issue Date to (but excluding) whichever is the earlier of (i) the day on which all sums due in respect of such Note up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying Agent or as the case may be the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

9.     Redemption and Purchase

(a)     **Scheduled redemption**: Unless previously redeemed, or purchased and cancelled, the Notes will be redeemed at their Final Redemption Amount on the Maturity Date, subject as provided in Condition 10 (*Payments*).

(b)     **_Redemption for tax reasons_**: The Notes may be redeemed at the option of the Issuer in whole, but not in part:

(i)     at any time (if the Floating Rate Note Provisions are not specified in the relevant Final Terms as being applicable); or

(ii)    on any Interest Payment Date (if the Floating Rate Note Provisions are specified in the relevant Final Terms as being applicable),

on giving not less than 30 nor more than 60 days' notice to the Noteholders (in accordance with Condition 20 (*Notices*)) and the Trustee (which notice shall be irrevocable), at their Early Redemption Amount (Tax), together with interest accrued (if any) to the date fixed for redemption, if immediately before giving such notice, the Issuer satisfies the Trustee that:

(A)     (1) the Issuer has or will become obliged to pay additional amounts as provided or referred to in Condition 11 (*Taxation*) as a result of any change in, or amendment to, the laws or regulations of its jurisdiction of incorporation or any political subdivision or any authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective on or after the Issue Date of the first Tranche of the Notes and (2) such obligation cannot be avoided by the Issuer taking reasonable measures available to it; or

(B)     (1) any Guarantor has or (if a demand were made under the Guarantee of the Notes) would become obliged to pay additional amounts as provided or referred to in Condition 11 (*Taxation*) or the Guarantee of the Notes, as the case may be, or any Guarantor has or will become obliged to make any such withholding or deduction as is referred to in Condition 11 (*Taxation*) or in the Guarantee of the Notes, as the case may be, from any amount paid by it to the Issuer in order to enable the Issuer to make a payment of principal or interest in respect of the Notes, in either case as a result of any change in, or amendment to, the laws or regulations of such Guarantor's jurisdiction of incorporation or any political subdivision or any authority thereof or therein having power to tax, or any change in the application or official interpretation of such laws or regulations (including a holding by a court of competent jurisdiction), which change or amendment becomes effective on or after the Issue Date of the first Tranche of the Notes, and (2) such obligation cannot be avoided by such Guarantor taking reasonable measures available to it,

**provided**, **however**, **that** no such notice of redemption shall be given earlier than:

(i)     where the Notes may be redeemed at any time, 90 days prior to the earliest date on which the Issuer or a Guarantor would be obliged to pay such additional amounts or the relevant Guarantor would be obliged to make such withholding or deduction if a payment in respect of the Notes were then due or (as the case may be) a demand under the Guarantees of the Notes were then made; or

(ii)    where the Notes may be redeemed only on an Interest Payment Date, 60 days prior to the Interest Payment Date occurring immediately before the earliest date on which the Issuer or a Guarantor would be obliged to pay such additional amounts or the relevant Guarantor would be obliged to make such withholding or deduction if a payment in respect of the Notes were then due or (as the case may be) a demand under the Guarantee of the Notes were then made.

Prior to the publication of any notice of redemption pursuant to this paragraph, the Issuer shall deliver or procure that there is delivered to the Trustee (A) a certificate signed by an authorised signatory of the Issuer stating that the circumstances referred to in A(1) and A(2) prevail and setting out the details of such circumstances or (as the case may be) a certificate signed by an authorised signatory of the relevant Guarantor stating that the circumstances referred to in B(1) and B(2) prevail and setting out the details of such circumstances and (B) an opinion satisfactory

to the Trustee of independent legal advisers of recognized standing to the effect that the Issuer or (as the case may be) the relevant Guarantor has or will become obliged to pay such additional amounts or (as the case may be) the Guarantor has or will become obliged to make such withholding or deduction as a result of such change or amendment. The Trustee shall be entitled to accept such certificate and opinion as sufficient evidence of the circumstances set out in A(1) and A(2) above or (as the case may be) B(1) and B(2) above, in which event they shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 9(b), the Issuer shall be bound to redeem the Notes in accordance with this Condition 9(b).

(c)  **Redemption at the option of the Issuer**: If the Call Option is specified in the relevant Final Terms as being applicable, the Notes may be redeemed at the option of the Issuer in whole or, if so specified in the relevant Final Terms, in part on any Optional Redemption Date (Call) at the relevant Optional Redemption Amount (Call) on the Issuer's giving not less than 30 nor more than 60 days' notice to the Noteholders (in accordance with Condition 20 (*Notices*)) and having notified the Trustee prior to the provision of such notice (which notice shall be irrevocable and shall oblige the Issuer to redeem the Notes or, as the case may be, the Notes specified in such notice on the relevant Optional Redemption Date (Call) at the Optional Redemption Amount (Call) plus accrued interest (if any) to such date).

(d)  **Partial redemption**: If the Notes are to be redeemed in part only on any date in accordance with Condition 9(c) (*Redemption at the option of the Issuer*), the Notes to be redeemed shall be selected by the drawing of lots in such place as the Trustee approves and in such manner as the Trustee considers appropriate, subject in each case to compliance with applicable law and the rules of any stock exchange on which the Notes are then listed and/or admitted to trading, and the notice to Noteholders referred to in Condition 9(c) (*Redemption at the option of the Issuer*) shall specify the serial numbers of the Notes so to be redeemed. If any Maximum Redemption Amount or Minimum Redemption Amount is specified in the relevant Final Terms, then the Optional Redemption Amount (Call) shall in no event be greater than the maximum or be less than the minimum so specified.

(e)  **Redemption at the option of Noteholders**: If the Put Option is specified in the relevant Final Terms as being applicable, the Issuer shall, at the option of the holder of any Note, redeem such Note on the Optional Redemption Date (Put) specified in the relevant Put Option Notice at the relevant Optional Redemption Amount (Put) together with interest (if any) accrued to such date. In order to exercise the option contained in this Condition 9(e), the holder of a Note must, not less than 30 nor more than 60 days before the relevant Optional Redemption Date (Put), deposit with any Paying Agent such Note together with all unmatured Coupons relating thereto and a duly completed Put Option Notice in the form obtainable from any Paying Agent. The Paying Agent with which a Note is so deposited shall deliver a duly completed Put Option Receipt to the depositing Noteholder. No Note, once deposited with a duly completed Put Option Notice in accordance with this Condition 9(e), may be withdrawn; **provided**, **however**, **that** if, prior to the relevant Optional Redemption Date (Put), any such Note becomes immediately due and payable or, upon due presentation of any such Note on the relevant Optional Redemption Date (Put), payment of the redemption moneys is improperly withheld or refused, the relevant Paying Agent shall mail notification thereof to the depositing Noteholder at such address as may have been given by such Noteholder in the relevant Put Option Notice and shall hold such Note at its Specified Office for collection by the depositing Noteholder against surrender of the relevant Put Option Receipt. For so long as any outstanding Note is held by a Paying Agent in accordance with this Condition 9(e), the depositor of such Note and not such Paying Agent shall be deemed to be the holder of such Note for all purposes.

(f)  **Redemption in the case of Minimal Outstanding Amount**: The Issuer may, at any time on giving not more than 60 nor less than 30 days' notice to the Noteholders and the Trustee in accordance with Condition 20 (*Notices*) (which notice shall be irrevocable) redeem all but not some only of the Notes of the relevant series at their principal amount, together with interest accrued to the date fixed for redemption if, immediately before giving such notice, the aggregate principal amount of the Notes of such series outstanding is less than 10 per cent. of the aggregate principal amount of such series originally issued (which shall, for the avoidance of doubt, include any further Notes issued pursuant to Condition 19 (*Further Issues*)).

(g)   ***Redemption at the option of the Noteholders in the event of a Change of Control***: A Change of Control Event will be deemed to occur if a Change of Control occurs (a "**Change of Control Event**"). If a Change of Control Event occurs, each Noteholder will have the option (the "**Change of Control Put Option**") (unless, prior to the giving of the relevant Change of Control Put Option Notice (as defined below), the Issuer has given notice to redeem the Notes in accordance with Condition 9(b), (c) or (f)) to require the Issuer to redeem or, at the Issuer's option, purchase (or procure the purchase of) the Notes held by it on the Change of Control Put Date at their principal amount together with (or, where purchased, together with an amount equal to) interest (if any) accrued to but excluding the Change of Control Put Date.

Promptly upon a Change of Control Event having occurred, the Issuer shall give notice (a "**Change of Control Event Notice**" to the Noteholders in accordance with Condition 20 specifying the nature of the Change of Control Event and the circumstances giving rise to it, the procedure for exercising the Change of Control Put Option and the Change of Control Put Date.

In order to exercise the Change of Control Put Option, the holder of the Note must deposit such Note with the Principal Paying Agent at its specified office at any time during normal business hours of the Principal Paying Agent, accompanied by a duly signed and completed Put Option Notice in the form (for the time being current) available from the specified office of the Principal Paying Agent (a "**Change of Control Put Option Notice**") within the period (the "**Change of Control Put Period**") of 45 days after a Change of Control Event Notice is given. No Note so deposited and option so exercised may be revoked or withdrawn.

The Notes should be delivered together with all Coupons, if any, relating to them maturing after the Change of Control Put Date, failing which the amount of any such missing unmatured Coupon will be deducted from the sum due for payment in the manner provided in Condition 10(e). The Principal Paying Agent will issue to the Noteholder concerned a non-transferable Put Option Receipt in respect of the Note so delivered. Payment in respect of any Note so delivered will be made, if the holder duly specified a bank account in the Change of Control Put Option Notice to which payment is to be made, on the Change of Control Put Date, by transfer to that bank account and, in every other case, on or after the Change of Control Put Date against presentation and surrender or (as the case may be) endorsement of such Put Option Receipt at the specified office the Principal Paying Agent.  For the purposes of these Conditions, receipts issued pursuant thereof shall be treated as if they were Notes.

The Issuer shall redeem or purchase (or procure the purchase of) the relevant Notes on the Change of Control Put Date unless previously redeemed (or purchased) and cancelled.

For the purposes of this Condition 9(g):

"**Acting in Concert**" means acting together pursuant to an agreement or understanding (whether formal or informal).

A "**Change of Control**" occurs if any person or group of persons Acting in Concert (other than one or more Qualifying Employee(s) and/or Related Persons) acquires directly or indirectly shares to which attach more than 50 per cent. of the votes attaching to the entire issued share capital of the Parent.

"**Change of Control Put Date**" is the seventh day after the last day of the Change of Control Put Period.

"**Qualifying Employee**" means any director or employee of the Group who, on the date of the potential change of control, is employed by the Group and has been so employed for the previous one year without interruption.

"**Related Persons**" with respect to any Qualifying Employee means:

(i)    in the case of any individual, any spouse, family member or relative of such individual, any trust or partnership for the benefit of one or more of such individual and any such spouse, family member or relative, or the estate, executor, administrator, committee or beneficiaries of any thereof;

(ii)    any trust, corporation, partnership or other person for which one or more of the Qualifying Employees and other Related Persons, directly or indirectly constitute the whole or entire stockholders, beneficiaries, partners or owners thereof, or persons beneficially holding in the aggregate the whole or entire controlling interest therein; or

(iii)   any investment fund or vehicle managed, sponsored or advised by such Qualifying Employee on its behalf or any successor thereto.

(h)    ***No other redemption***: The Issuer shall not be entitled to redeem the Notes otherwise than as provided in paragraphs (a) to (f) above.

(i)    ***Early redemption of Zero Coupon Notes***: Unless otherwise specified in the relevant Final Terms, the Redemption Amount payable on redemption of a Zero Coupon Note at any time before the Maturity Date shall be an amount equal to the sum of:

(i)    the Reference Price; and

(ii)    the product of the Accrual Yield (compounded annually) being applied to the Reference Price from (and including) the Issue Date to (but excluding) the date fixed for redemption or (as the case may be) the date upon which the Note becomes due and payable.

Where such calculation is to be made for a period which is not a whole number of years, the calculation in respect of the period of less than a full year shall be made on the basis of such Day Count Fraction as may be specified in the Final Terms for the purposes of this Condition 9(i) or, if none is so specified, a Day Count Fraction of 30E/360.

(j)    ***Purchase***: The Issuer, each of the Guarantors or any Subsidiary of each of the Guarantors may at any time purchase Notes in the open market or otherwise (including by means of any tender or exchange offer) and at any price, **provided that** all unmatured Coupons are purchased therewith. The Notes so purchased or acquired may be submitted for cancellation, or held or resold, provided that, while held by or on behalf of the Issuer, the Guarantors or any of their respective Subsidiaries, the Notes shall not entitle the Noteholder to vote at any meetings of the Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorums at meetings of the Noteholders or for the purposes of the Trust Deed or the Paying Agency Agreement.

(k)    ***Cancellation***: All Notes so redeemed or purchased by the Issuer, any Guarantor or any Subsidiary of any Guarantor and any unmatured Coupons attached to or surrendered with them may be held by the Issuer, any Guarantor or any Subsidiary of any Guarantor or resold or cancelled at the Issuer's, such Guarantor's, or such Subsidiary's option.

(l)    ***Notice Priority***: In the event of more than one notice being delivered pursuant to this Condition 9, the first in time shall prevail.

10.    Payments

(a)    ***Principal***: Payments of principal shall be made only against presentation and (**provided that** payment is made in full) surrender of Notes at the Specified Office of any Paying Agent outside the United States by cheque drawn in the currency in which the payment is due on, or, by transfer to an account denominated in that currency (or, if that currency is euro, any other account to which euro may be credited or transferred) and maintained by the payee with a bank in the Principal Financial Centre of that currency.

(b)    ***Interest***: Payments of interest shall, subject to paragraph (h) below, be made only against presentation and (**provided that** payment is made in full) surrender of the appropriate Coupons at the Specified Office of any Paying Agent outside the United States in the manner described in paragraph (a) above.

(c)    ***Payments in New York City***: Payments of principal or interest may be made at the Specified Office of a Paying Agent in New York City if (i) the Issuer has appointed Paying Agents outside the United States with the reasonable expectation that such Paying Agents will be able to make payment of the full amount of the interest on the Notes in the currency in which the payment is

due when due, (ii) payment of the full amount of such interest at the offices of all such Paying Agents is illegal or effectively precluded by exchange controls or other similar restrictions and (iii) payment is permitted by applicable United States law.

(d)     ***Payments subject to fiscal laws***: All payments in respect of the Notes are subject in all cases to (i) any applicable fiscal or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 11 (*Taxation*) and (ii) any withholding or deduction required pursuant to an agreement described in Section 1471(b) of the U.S. Internal Revenue Code of 1986 (the "**Code**") or otherwise imposed pursuant to Sections 1471 through 1474 of the Code, any regulations or agreements thereunder, any official interpretations thereof, or (without prejudice to the provisions of Condition 11 (*Taxation*)) any law implementing an intergovernmental approach thereto. No commissions or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

(e)     ***Deductions for unmatured Coupons***: If the relevant Final Terms specify that the Fixed Rate Note Provisions are applicable and a Note is presented without all unmatured Coupons relating thereto:

   (i)     if the aggregate amount of the missing Coupons is less than or equal to the amount of principal due for payment, a sum equal to the aggregate amount of the missing Coupons will be deducted from the amount of principal due for payment; **provided**, **however**, **that** if the gross amount available for payment is less than the amount of principal due for payment, the sum deducted will be that proportion of the aggregate amount of such missing Coupons which the gross amount actually available for payment bears to the amount of principal due for payment;

   (ii)    if the aggregate amount of the missing Coupons is greater than the amount of principal due for payment:

      (A)     so many of such missing Coupons shall become void (in inverse order of maturity) as will result in the aggregate amount of the remainder of such missing Coupons (the "**Relevant Coupons**") being equal to the amount of principal due for payment; **provided**, **however**, **that** where this sub-paragraph would otherwise require a fraction of a missing Coupon to become void, such missing Coupon shall become void in its entirety; and

      (B)     a sum equal to the aggregate amount of the Relevant Coupons (or, if less, the amount of principal due for payment) will be deducted from the amount of principal due for payment; **provided**, **however**, **that**, if the gross amount available for payment is less than the amount of principal due for payment, the sum deducted will be that proportion of the aggregate amount of the Relevant Coupons (or, as the case may be, the amount of principal due for payment) which the gross amount actually available for payment bears to the amount of principal due for payment.

   Each sum of principal so deducted shall be paid in the manner provided in paragraph (a) above against presentation and (**provided that** payment is made in full) surrender of the relevant missing Coupons. No payments will be made in respect of void Coupons.

(f)     ***Unmatured Coupons void***: If the relevant Final Terms specify that this Condition 10(f) is applicable or that the Floating Rate Note Provisions are applicable, on the due date for final redemption of any Note or early redemption in whole of such Note pursuant to Condition 9(b) (*Redemption for tax reasons*), Condition 9(e) (*Redemption at the option of Noteholders*), Condition 9(c) (*Redemption at the option of the Issuer*) or Condition 12 (*Events of Default*), all unmatured Coupons relating thereto (whether or not still attached) shall become void and no payment will be made in respect thereof.

(g)     ***Payments on business days***: If the due date for payment of any amount in respect of any Note or Coupon is not a Payment Business Day in the place of presentation, the holder shall not be entitled to payment in such place of the amount due until the next succeeding Payment Business

Day in such place and shall not be entitled to any further interest or other payment in respect of any such delay.

(h)     ***Payments other than in respect of matured Coupons***: Payments of interest other than in respect of matured Coupons shall be made only against presentation of the relevant Notes at the Specified Office of any Paying Agent outside the United States (or in New York City if permitted by paragraph (c) above).

(i)     ***Partial payments***: If a Paying Agent makes a partial payment in respect of any Note or Coupon presented to it for payment, such Paying Agent will endorse thereon a statement indicating the amount and date of such payment.

(j)     ***Exchange of Talons***: On or after the maturity date of the final Coupon which is (or was at the time of issue) part of a Coupon Sheet relating to the Notes, the Talon forming part of such Coupon Sheet may be exchanged at the Specified Office of the Principal Paying Agent for a further Coupon Sheet (including, if appropriate, a further Talon but excluding any Coupons in respect of which claims have already become void pursuant to Condition 13 (*Prescription*)). Upon the due date for redemption of any Note, any unexchanged Talon relating to such Note shall become void and no Coupon will be delivered in respect of such Talon.

11.    Taxation

(a)     ***Gross up***: All payments of principal and interest in respect of the Notes and the Coupons by or on behalf of the Issuer or the Guarantors shall be made free and clear of, and without withholding or deduction for or on account of, any present or future taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or on behalf of the jurisdiction of incorporation of the Issuer or, as the case may be, any Guarantor or any political subdivision or any authority thereof or therein having power to tax, unless the withholding or deduction of such taxes, duties, assessments or governmental charges is required by law. In that event, the Issuer or (as the case may be) the relevant Guarantor shall pay such additional amounts as will result in the receipt by the Noteholders and the Couponholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note or Coupon presented for payment:

(i)     by or on behalf of the Noteholder or Couponholder which is liable to such taxes, duties, assessments or governmental charges in respect of such Note or Coupon by reason of its having some connection with the jurisdiction by which such taxes, duties, assessments or charges have been imposed, levied, collected, withheld or assessed other than the mere holding of such Note or Coupon; or

(ii)    more than 30 days after the Relevant Date except to the extent that the Noteholder or Couponholder would have been entitled to such additional amounts if it had presented such Note or Coupon on the last day of such period of 30 days; or

(iii)   where such withholding or deduction is imposed on a payment to an individual and is required to be made pursuant to European Council Directive 2003/48/EC on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive; or

(iv)    presented for payment by or on behalf of a Noteholder or Couponholder who would have been able to avoid such withholding or deduction by presenting the relevant Note or Coupon to another Paying Agent in a member state of the European Union.

(b)     ***Taxing jurisdiction***: If the Issuer or any of the Guarantors becomes subject at any time to any taxing jurisdiction other than, its jurisdiction of incorporation references in these Conditions to any jurisdiction shall be construed as references such other jurisdiction.

12.    Events of Default

If any of the following events (each an **"Event of Default"**) occurs and is continuing, the Trustee at its discretion may and, if so requested in writing by holders of at least one quarter in principal amount of the

outstanding Notes or if so directed by an Extraordinary Resolution of the Noteholders, shall (subject to, in the case of the happening of any of the events mentioned in paragraph (b) below and, in relation to Limited Group Members other than the Issuer and the Guarantors only, paragraphs (c), (d), (e) and (f) below, the Trustee having certified in writing that the happening of such events is in its opinion materially prejudicial to the interests of the Noteholders and, in all cases to the Trustee having been indemnified, prefunded or provided with security to its satisfaction) give written notice to the Issuer (with a copy to each of the Guarantors) declaring the Notes to be immediately due and payable, whereupon they shall become immediately due and payable at their principal amount together with accrued interest without further action or formality:

(a)     ***Non-payment:*** the Issuer fails to pay:

   (i)     any amount of principal in respect of the Notes on the due date for payment thereof, unless the non-payment:

      (A)     is caused by technical or administrative error; and

      (B)     is remedied within three Business Days of the due date; or

   (ii)     any amount of interest in respect of the Notes on the due date for payment thereof, unless the non-payment:

      (A)     is caused by technical or administrative error; and

      (B)     is remedied within seven Business Days of the due date; or

(b)     ***Breach of other obligations***:  the Issuer or any of the Guarantors defaults in the performance or observance of any of its other obligations under or in respect of the Notes, the Trust Deed or the Guarantee of the Notes and such default (i) is, in the opinion of the Trustee, incapable of remedy or (ii) being a default which is, in the opinion of the Trustee, capable of remedy, remains unremedied for 30 days after written notice thereof has been delivered by the Trustee to the Issuer and the Guarantors; or

(c)     ***Cross-default***:

   (i)     any Financial Indebtedness (other than (i) Limited Recourse Trade Finance Indebtedness or (ii) any Project Finance Indebtedness) of the Issuer or any Guarantor or any Limited Group Member is not paid when due (after the expiry of any originally applicable grace period);

   (ii)     any Financial Indebtedness (other than (i) Limited Recourse Trade Finance Indebtedness or (ii) any Project Finance Indebtedness) of the Issuer or any Guarantor or any Limited Group Member:

      (A)     becomes prematurely due and payable;

      (B)     is placed on demand; or

      (C)     is capable of being declared by or on behalf of a creditor to be prematurely due and payable or of being placed on demand,

   in each case, as a result of an event of default or any provision having a similar effect (howsoever described);

   (iii)     any commitment for Financial Indebtedness (other than (i) Limited Recourse Trade Finance Indebtedness or (ii) any Project Finance Indebtedness) of the Issuer or any Guarantor or any Limited Group Member is cancelled or suspended as a result of an event of default or any provision having a similar effect (howsoever described); or

   (iv)     the Parent or any of its Subsidiaries is in default in the payment of the Apportioned Amount in respect of any Limited Recourse Trade Finance Indebtedness and that (A) such Apportioned Amount is outstanding in an aggregate principal amount of at least the

greater of (x) US$50,000,000 (or its equivalent in the relevant currency of payment) and (y) three per cent. of Consolidated Net Worth and (B) is not paid by the Parent or such Subsidiary within five days of its appropriate demand by the lender of such Limited Recourse Trade Finance Indebtedness,

unless the aggregate amount of Financial Indebtedness falling within all or any of paragraphs (i) to (iii) above is less than the greater of (x) US$50,000,000 (or its equivalent in any other currency) and (y) three per cent. of Consolidated Net Worth; or

(d) **Insolvency**: any of the following occurs with respect to the Issuer or any Guarantor or any Limited Group Member:

    (i) it is, or is deemed for the purposes of any applicable law to be, unable to pay its debts as they fall due or insolvent;

    (ii) it admits its inability to pay its debts as they fall due;

    (iii) by reason of actual or anticipated financial difficulties, it begins negotiations with any creditor for the rescheduling or restructuring of any of its indebtedness; or

    (iv) a moratorium is declared in respect of any of its indebtedness provided that if a moratorium occurs in respect of the Issuer or any Guarantor or any Limited Group Member, the ending of the moratorium will not remedy any Event of Default caused by the moratorium; or

(e) **Insolvency Proceedings**: any of the following occurs with respect to the Issuer or any Guarantor or any Limited Group Member:

    (i) any step is taken with a view to a moratorium or a composition, assignment or similar arrangement with any of its creditors;

    (ii) a meeting of its shareholders, directors or other officers is convened for the purpose of considering any resolution for, to petition for or to file documents with a court or any registrar for, its winding-up, administration, dissolution or judicial management or any such resolution is passed;

    (iii) any person presents a petition, or files documents with a court or any registrar, for its winding-up, administration, dissolution, judicial management or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise);

    (iv) any Security Interest is enforced over any of its assets having an aggregate book value of the greater of (x) US$50,000,000 (or its equivalent in any other currency) and (y) three per cent. of Consolidated Net Worth or more;

    (v) an order for its winding-up, administration, judicial management or dissolution is made;

    (vi) any liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator, receiver and manager, judicial manager, manager or similar officer is appointed in respect of it or any of its assets;

    (vii) its shareholders, directors or other officers request the appointment of, or give notice of their intention to appoint, a liquidator, trustee in bankruptcy, judicial custodian, compulsory manager, receiver, administrative receiver, administrator, receiver and manager, judicial manager, manager or similar officer; or

    (viii) any other analogous step or procedure is taken in any jurisdiction.

This paragraph (e) (*Insolvency proceedings*) does not apply to:

1. any step or procedure which is part of a Permitted Transaction; or

2. a petition for winding-up presented by a creditor which is (A) being contested in good faith and with due diligence or (B) frivolous or vexatious and, in any such case, is

discharged, struck out or withdrawn within 21 days (in the case of the Issuer or a Guarantor) or 60 days (in the case of any other Limited Group Member); or

(f)  **Creditors' process**: (i) Subject to (ii) below: (A) any attachment or sequestration affects any asset of the Issuer, any Guarantor or a Limited Group Member where the claim relating to such attachment or sequestration is for an amount of at least the greater of (x) US$50,000,000 (or its equivalent in any other currency) and (y) three per cent. of Consolidated Net Worth and is not discharged within 60 days; or (B) any distress, execution or analogous event affects any asset of the Issuer, any Guarantor or a Limited Group Member having an aggregate value of at least the greater of (x) US$50,000,000 (or its equivalent in any other currency) and (y) three per cent. of Consolidated Net Worth, and is not discharged within 21 days; or (ii) a Dutch executory attachment (*executoriaal beslag*) issued by a Dutch court affects any asset of the Issuer, any Guarantor or a Limited Group Member having an aggregate value of at least the greater of (x) US$50,000,000 (or its equivalent in any other currency) and (y) three per cent. of Consolidated Net Worth; or

(g)  **Cessation of business**: the Issuer, any Guarantor or a Limited Group Member ceases, or threatens to cease, to carry on business, except:

(i)  as part of a Permitted Transaction; or

(ii)  as a result of any disposal not prohibited by these Conditions; or

(h)  **Analogous event**:  any event occurs which under the laws of (in the case of the Issuer) Luxembourg, (in the case of Trafigura Beheer B.V.) the Netherlands, (in the case of Trafigura LLC) the State of Delaware, (in the case of Trafigura Derivatives Limited) the United Kingdom or (in the case of Trafigura Pte Ltd) Singapore or the jurisdiction of incorporation of any Substituted Issuer or Substituted Guarantor has an analogous effect to any of the events referred to in paragraphs (d) (*Insolvency*) to (g) (*Cessation of business*) above; or

(i)  **Guarantee not in force**:  the Guarantee of the Notes is not (or is claimed by any of the Guarantors not to be) in full force and effect.

13.  Prescription

Claims for principal shall become void unless the relevant Notes are presented for payment within ten years of the appropriate Relevant Date. Claims for interest shall become void unless the relevant Coupons are presented for payment within five years of the appropriate Relevant Date.

14.  Replacement of Notes and Coupons

If any Note or Coupon is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying Agent (and, if the Notes are then listed and /or admitted to trading on any stock exchange which requires the appointment of a Paying Agent in any particular place, the Paying Agent having its Specified Office in the place required by such stock exchange), subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Issuer and/or the Guarantors may reasonably require. Mutilated or defaced Notes or Coupons must be surrendered before replacements will be issued.

15.  Trustee and Agents

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility, including provisions relieving it from taking proceedings to enforce payment unless indemnified or prefunded or secured to its satisfaction, and to be paid its costs and expenses in priority to the claims of Noteholders. The Trustee is entitled to enter into business transactions with the Issuer and/or the Guarantors and any entity related to the Issuer and/or the Guarantors without accounting for any profit.

The Trustee shall be entitled to rely on reports and certificates of two Authorised Signatories of the Issuer and/or the Guarantors, as applicable, and other persons notwithstanding any limit on liability therein by reference to monetary cap or otherwise. The Issuer has entered into certain covenants in the Trust Deed to

deliver a certificate to the Trustee on a semi-annual basis identifying those Subsidiaries of the Group whose net worth represents 10 per cent. or more of Consolidated Net Worth and whose net income for the relevant period represents 10 per cent. or more of Consolidated Net Earnings for such period (such certificate being referred to herein as the **"10 Percent List"**) and who shall, for all purposes be deemed Limited Group Members. Each Subsidiary that is not on the 10 Percent List (the **"Other Subsidiaries"**) shall be deemed a Limited Group Member unless the Trustee shall have received a certificate of two Authorised Signatories delivered to it by the Issuer within three Business Days of a request by the Trustee confirming that such Subsidiary is or was at such time or during such period an Insignificant Subsidiary.

In the exercise of its powers and discretions under these Conditions and the Trust Deed, the Trustee will have regard to the interests of the Noteholders as a class and will not be responsible for any consequence for individual holders of Notes, Coupons or Talons as a result of such holders being connected in any way with a particular territory or taxing jurisdiction.

In acting under the Paying Agency Agreement and in connection with the Notes and the Coupons, the Paying Agents act solely as agents of the Issuer, each Guarantor or, following the occurrence of a Default, they may act as agents of the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders or Couponholders.

The initial Paying Agent and its initial Specified Office is listed below. The initial Calculation Agent (if any) is specified in the relevant Final Terms. The Issuer and each Guarantor reserve the right (subject to the prior approval of the Trustee) at any time to vary or terminate the appointment of any Paying Agent or the Calculation Agent and to appoint a successor principal paying agent or calculation agent and additional paying agents; **provided**, **however**, **that**:

(a)     the Issuer and the Guarantors shall at all times maintain a Principal Paying Agent;

(b)     if a Calculation Agent is specified in the relevant Final Terms, the Issuer and the Guarantors shall at all times, whilst any relevant Note remains outstanding, maintain a Calculation Agent;

(c)     if and for so long as the Notes are admitted to listing or trading on any stock exchange which requires the appointment of a Paying Agent in any particular place, the Issuer and the Guarantors shall maintain a Paying Agent having its Specified Office in the place required by the rules of such stock exchange; and

(d)     the Issuer will ensure that it maintains a Paying Agent with a specified office in a member state of the European Union that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced in order to conform to, this Directive.

Notice of any changes in any of the Paying Agents and Calculation Agents or in their Specified Offices shall promptly be given by the Issuer to the Noteholders in accordance with Condition 20 (*Notices*).

16.     Meetings of Noteholders; Modification and Waiver; Substitution

(a)     ***Meetings of Noteholders***: The Trust Deed contains provisions for convening meetings of Noteholders to consider matters relating to the Notes, including the modification of any provision of these Conditions or the provisions of the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Issuer and the Guarantors (acting together) or the Trustee and shall be convened by the Trustee upon the request in writing of Noteholders holding not less than one-tenth of the aggregate principal amount of the outstanding Notes and provided it shall have been indemnified and/or secured and/or prefunded to its satisfaction. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more Persons holding or representing more than half of the aggregate principal amount of the outstanding Notes or, at any adjourned meeting, two or more Persons being or representing Noteholders whatever the principal amount of the Notes held or represented; **provided**, **however**, **that** Reserved Matters may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more Persons holding or representing not less than three-quarters or, at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum. Any Extraordinary

Resolution duly passed at any such meeting shall be binding on all the Noteholders and Couponholders, whether present or not.

In addition, a resolution in writing signed by or on behalf of all Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders will take effect as if it were an Extraordinary Resolution. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(b)    *Modification and Waiver*: The Trustee may agree, without the consent of the Noteholders or the Couponholders, to (i) any modification of any provision of these Conditions, the Paying Agency Agreement, or the Trust Deed which is in its opinion of a formal, minor or technical nature or is made to correct a manifest error or to comply with mandatory provisions of the law and (ii) any other modification (except as mentioned in the Trust Deed or in respect of a Reserved Matter) and any waiver or authorization of any breach or proposed breach of any provision of these Conditions, the Paying Agency Agreement, or the Trust Deed (other than a proposed breach or breach relating to the subject of a Reserved Matter) which is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders, provided that it shall not agree any such waiver in contravention of any express direction by an Extraordinary Resolution or of a request in writing by the holders of not less than 25 per cent. of the aggregate principal amount of Notes then outstanding. Any such modification, authorization or waiver shall be binding on the Noteholders and Couponholders. Unless the Trustee agrees otherwise, any such authorisation, waiver or modification shall be notified to the Noteholders as soon as practicable thereafter.

(c)    *Substitution:* The Trust Deed contains provisions whereby the Trustee shall agree, without the consent of the Noteholders, to the substitution of the Issuer or any Guarantor (or any substituted company for the Issuer or a Guarantor), in the case of the Issuer, for itself as principal debtor (a "**Substituted Issuer**") or, in the case of a Guarantor, as unconditional and irrevocable guarantor (a "**Substituted Guarantor**"), as the case may be, with any Subsidiary or Affiliate of the Parent in place of the Issuer or the relevant Guarantor (or any previously Substituted Issuer or Substituted Guarantor under this Condition) as a new principal debtor under the Notes and the Coupons or a new guarantor under the Guarantee of the Notes, provided that (i) the Parent shall have provided to the Trustee a certificate from two Authorised Signatories of the Parent confirming that the proposed substitution will not be materially prejudicial to the interests of the Noteholders, (ii) the Substitution Conditions (as defined below) have been satisfied, and (iii) no payment in respect of the Notes or the Coupons is at the relevant time overdue or in default.

Such substitution may take place only if: (i) the Substituted Issuer or Substituted Guarantor, as the case may be, shall agree to indemnify and hold harmless each Noteholder and the Trustee against any tax, duty, assessment or governmental charge which is or may be imposed on, incurred by or levied on it by (or by any authority in or of) the jurisdiction of the country of the Substituted Issuer's or Substituted Guarantor's residence for tax purposes and, if different, of its incorporation with respect to any Note or Coupon or the Guarantee of the Notes and which would not have been so imposed had the substitution not been made, as well as against any tax, duty, assessment or governmental charge, and any liability, charge, cost or expense, in connection with the substitution; (ii) all action, conditions and things required to be taken, fulfilled and done (including the obtaining of any necessary consents or approvals) to ensure that the Trust Deed, the Notes and Coupons represent valid, legally binding and enforceable obligations of the Substituted Issuer or the Trust Deed and the Guarantee of the Notes represents a valid, legally binding and enforceable obligation of the Substituted Guarantor, as the case may be, have been taken, fulfilled and done and are in full force and effect; (iii) the Substituted Issuer or Substituted Guarantor shall have become party to the Paying Agency Agreement and the Trust Deed with any appropriate consequential amendments, as if it had been an original party to it; (iv) the obligations of any Substituted Issuer under the Notes and the Coupons shall be unconditionally and irrevocably guaranteed by each of the Guarantors (unless a Guarantor has been substituted by another entity pursuant to the terms hereof, in which case, the Substituted Guarantor shall unconditionally and irrevocably guarantee the Notes and Coupons in place of such Guarantor); (v) legal opinions addressed to the Trustee shall have been delivered from independent legal advisers of recognised standing in each jurisdiction referred to in (i) above, the jurisdiction of the Issuer (if different) and in England as to the fulfilment of the preceding conditions of this Condition 16(c); and (vi) the Issuer shall have given at least 14 days' prior notice of such substitution to the Noteholders in accordance with Condition 20 (*Notices*), stating that copies,

and pending execution, the agreed text, of all documents in relation to the substitution which are referred to above, or which might otherwise reasonably be regarded as material to Noteholders, will be available for inspection at the specified office of each of the Paying Agents. Conditions (i) to (vi) shall together constitute the "**Substitution Conditions**".

In the event that an entity will be substituted as a guarantor in place of Trafigura Beheer B.V., such entity shall (i) own directly or indirectly 100 per cent. of the issued and outstanding ordinary shares of the Issuer; (ii) have, pursuant to a voluntary corporate reorganisation of the Group (the "**Group**" for such purposes being Trafigura Beheer B.V. and its consolidated subsidiaries as at the date hereof), become the principal consolidating entity of the Group; and (iii) consolidate substantially all of the consolidated assets and liabilities which appeared on the balance sheet of Trafigura Beheer B.V. on the day immediately prior to the effective date of the voluntary corporate reorganisation. The Trustee shall be entitled to rely on a certificate from two Authorised Signatories of such Substituted Guarantor that such entity fulfils the requirement of this paragraph.

For the purposes of this Condition, "**Affiliate**" means a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the person specified.

The Issuer will notify the Trustee and Noteholders as soon as reasonably practicable following a substitution in accordance with Condition 20 (*Notices*) and such substitution shall become effective upon the publication of such notice.

In connection with any proposed substitution as aforesaid and in connection with the exercise of its trusts, powers, authorities and discretions (including but not limited to those referred to in this Condition 16(c) and the Trust Deed), the Trustee shall have regard to the general interests of the Noteholders as a class but shall not have regard to the consequences of any substitution or such exercise for individual Noteholders. In connection with any substitution or such exercise as aforesaid, no Noteholder shall be entitled to claim, whether from the Issuer, the Substituted Issuer, any Guarantor or any Substituted Guarantor or the Trustee or any other person, any indemnification or payment in respect of any tax consequence of any such substitution or any such exercise upon any individual Noteholders except to the extent already provided in Condition 16 and/or any undertaking given in addition thereto or in substitution therefor pursuant to the Trust Deed.

17.     Enforcement

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes and/or the Guarantee of the Notes, but it shall not be bound to do so unless:

(a)     it has been so requested in writing by the holders of at least one quarter in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(b)     it has been indemnified, prefunded or provided with security to its satisfaction.

No Noteholder may proceed directly against the Issuer or the Guarantors unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

18.     Financial Information Covenant

For so long as any Notes are outstanding the Issuer and the Guarantors will deliver to the Trustee and the Principal Paying Agent within 120 days of the end of each financial year a copy in the English language of the Group's audited consolidated annual financial statements and procure that copies of the same are made available (A) on the website of the Irish Stock Exchange and (B) for inspection by Noteholders and Couponholders at the Specified Offices of the Paying Agents as soon as practicable thereafter.

In addition, for so long as any Notes are outstanding, the Issuer and the Guarantors will deliver to the Trustee and the Principal Paying Agent within 120 days of the end of the first six months in each financial year, a copy in the English language of the Group's unaudited consolidated half year financial statements and procure that copies of the same are made available (A) on the website of the Irish Stock

Exchange and (B) for inspection by Noteholders and Couponholders at the Specified Offices of the Paying Agents as soon as practicable thereafter.

19.    Further Issues

The Issuer may from time to time, without the consent of the Noteholders or the Couponholders, create and issue further notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest) so as to form a single Series with the Notes.

20.    Notices

Notices to the Noteholders shall be valid if published in a leading English language daily newspaper published in London (which is expected to be the Financial Times) and, in the case of Notes which are listed on the Official List of the Irish Stock Exchange and admitted to trading on the Irish Stock Exchange's Main Securities Market, and for so long as the rules of that exchange so require, filed with the Companies Announcements Office of the Irish Stock Exchange and published on the website of the Irish Stock Exchange (*http://www.ise.ie*). If such publication is not practicable, publication will be made in a leading English language daily newspaper having general circulation in Europe. Any such notice shall be deemed to have been given on the date of first publication (or if required to be published in more than one newspaper, on the first date on which publication shall have been made in all the required newspapers). Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the Noteholders.

21.    Currency Indemnity

If any sum due from the Issuer in respect of the Notes or the Coupons or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions or such order or judgment into another currency (the "**second currency**") for the purpose of (a) making or filing a claim or proof against the Issuer, (b) obtaining an order or judgment in any court or other tribunal or (c) enforcing any order or judgment given or made in relation to the Notes, the Issuer shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Issuer and delivered to the Issuer or to the Specified Office of the Principal Paying Agent, against any loss suffered as a result of any discrepancy between (i) the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and (ii) the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.

This indemnity constitutes a separate and independent obligation of the Issuer and shall give rise to a separate and independent cause of action.

22.    Rounding

For the purposes of any calculations referred to in these Conditions (unless otherwise specified in these Conditions or the relevant Final Terms), (a) all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with 0.000005% being rounded up to 0.00001%), (b) all United States dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one half cent being rounded up), (c) all Japanese Yen amounts used in or resulting from such calculations will be rounded downwards to the next lower whole Japanese Yen amount, and (d) all amounts denominated in any other currency used in or resulting from such calculations will be rounded to the nearest two decimal places in such currency, with 0.005 being rounded upwards.

23.    Governing Law and Jurisdiction

(a)    ***Governing law***: The Notes, the Trust Deed and any non-contractual obligations arising out of, or in connection with them, are governed by, and shall be construed in accordance with, English law.

(b)    ***Jurisdiction***: Each of the Issuer and the Guarantors (i) agrees for the benefit of the Trustee, the Paying Agents, the Noteholders and the Couponholders that the courts of England shall have exclusive jurisdiction to settle any dispute (a "**Dispute**") arising out of or in connection with the

Notes (including any non-contractual obligation arising out of or in connection with the Notes); (ii) agrees that those courts are the most appropriate and convenient courts to settle any Dispute and, accordingly, that it will not argue that any other courts are more appropriate or convenient; and (iii) (in the case of the Issuer, Trafigura Beheer B.V., Trafigura Trading LLC and Trafigura Pte Ltd) designates a person in England to accept service of any process on its behalf. Nothing contained in this Condition shall limit the right of any of the Noteholders from taking proceedings relating to a Dispute ("**Proceedings**") in any other courts with jurisdiction and that, to the extent allowed by law, any of the Noteholders may take concurrent Proceedings in any number of jurisdictions.

(c)   ***Process Agent***:  Each of the Issuer, Trafigura Beheer B.V., Trafigura Trading LLC and Trafigura Pte Ltd agrees that the documents which start any Proceedings and any other documents required to be served in relation to those Proceedings may be served on any of them by being delivered to Trafigura Limited at its registered office (being Portman House, 2 Portman Street, London W1H 6DU, United Kingdom as of the Issue Date) or to such other person with an address in England or Wales and/or at such other address in England or Wales as the Issuer, Trafigura Beheer B.V., Trafigura Trading LLC and Trafigura Pte Ltd may specify by notice to the Noteholders in accordance with Condition 20 (*Notices*). Trafigura Derivatives Limited agrees that the documents which start any Proceedings and any other documents required to be served in relation to those Proceedings may be served on it by being delivered to it at its registered office (being Portman House, 2 Portman Street, London W1H 6DU, United Kingdom as of the Issue Date) or, if different, its registered office for the time being in Great Britain at which process may be served on it in accordance with the Companies Act 2006.

Nothing in this paragraph shall affect the right of any Noteholder to serve process in any other manner permitted by law.  This Condition applies to Proceedings in England and to Proceedings elsewhere.

(d)   ***Third Parties***: No person shall have any right to enforce any term or Condition of this Note, the Trust Deed or the Paying Agency Agreement under the Contracts (Rights of Third Parties) Act 1999.

**FORM OF FINAL TERMS**

*Set out below is the form of Final Terms which will be completed for each Tranche of Notes issued under the Programme.*

**Final Terms dated [•]**

**TRAFIGURA FUNDING S.A.**
**Issue of [Aggregate Nominal Amount of Tranche] [Title of Notes]**

**Guaranteed by TRAFIGURA BEHEER B.V., TRAFIGURA TRADING LLC, TRAFIGURA PTE LTD AND TRAFIGURA DERIVATIVES LIMITED**
**under the EUR 2,000,000,000**

**Euro Medium Term Note Programme**

**PART A – CONTRACTUAL TERMS**

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "**Conditions**") set forth in the Base Prospectus dated 18 March 2015 [and the supplemental base prospectus dated [●]] which [together] constitute[s] a base prospectus (the "**Base Prospectus**") for the purposes of the Prospectus Directive. [This document constitutes the Final Terms of the Notes described herein for the purposes of Article 5.4 of the Prospectus Directive and must be read in conjunction with the Base Prospectus.][1]]

[Terms used herein shall be deemed to be defined as such for the purposes of the Conditions (the "**Conditions**") set forth in the base prospectus dated 14 November 2013. These Final Terms contain the final terms of the Notes and must be read in conjunction with the base prospectus dated 18 March 2015 [and the supplemental base prospectus dated [●]] which [together] constitute[s] a base prospectus (the "**Base Prospectus**") for the purposes of the Prospectus Directive, save in respect of the Conditions which are set forth in the base prospectus dated 14 November 2013 and are incorporated by reference in the Base Prospectus. [This document constitutes the Final Terms relating to the issue of Notes described herein for the purposes of Article 5.4 of the Prospectus Directive.][2]]

Full information on the Issuer and the offer of the Notes is only available on the basis of the combination of these Final Terms and the Base Prospectus.  The Base Prospectus has been published on the website of the Irish Stock Exchange (*http://www.ise.ie*) and is also available for viewing, and copies may be obtained, during normal business hours at the offices of Trafigura Beheer B.V. at 20th Floor, Ito Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, the Netherlands.

[In accordance with the Prospectus Directive, no prospectus is required in connection with the issuance of the Notes described herein.][3]

The expression "**Prospectus Directive**" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive) and the expression "**2010 PD Amending Directive**" means Directive 2010/73/EU **provided**, **however**, **that** all references in this document to the "**Prospectus Directive**" in relation to any Member State of the European Economic Area refer to Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the relevant Member State), and include any relevant implementing measure in the relevant Member State.

[*Include whichever of the following apply or specify as "Not Applicable" (N/A).  Note that the numbering should remain as set out below, even if "Not Applicable" is indicated for individual paragraphs (in which case the*

---

[1]   Delete where the Notes are neither admitted to trading on a regulated market in the European Economic Area nor offered in the European Economic Area in circumstances where a prospectus is required to be published under the Prospectus Directive.

[2]   Delete where the Notes are neither admitted to trading on a regulated market in the European Economic Area nor offered in the European Economic Area in circumstances where a prospectus is required to be published under the Prospectus Directive.

[3]   Delete where the Notes are neither admitted to trading on a regulated market in the European Economic Area nor offered in the European Economic Area in circumstances where a prospectus is required to be published under the Prospectus Directive.

*sub-paragraphs of the paragraphs which are not applicable can be deleted).  Italics denote guidance for completing the Final Terms.*]

| | | | |
|---|---|---|---|
| 1. | (i) | Issuer: | Trafigura Funding S.A. |
| | (ii) | Guarantors: | Trafigura Beheer B.V., Trafigura Trading LLC, Trafigura Pte Ltd and Trafigura Derivatives Limited |
| 2. | [(i) | Series Number:] | [•] |
| | [(ii) | Tranche Number: | [•] |
| | [(iii) | Date on which the Notes become fungible: | [Not Applicable/The Notes shall be consolidated, form a single series and be interchangeable for trading purposes with the [•] on [[•]/the Issue Date/exchange of the Temporary Global Note for interests in the Permanent Global Note, as referred to in paragraph 22 below [which is expected to occur on or about [•]].] |
| 3. | | Specified Currency or Currencies: | [•] |
| 4. | | Aggregate Nominal Amount: | [•] |
| | [(i)] | [Series]: | [•] |
| | [(ii) | Tranche: | [•]] |
| 5. | | Issue Price: | [[•] per cent. of the Aggregate Nominal Amount [plus accrued interest from [•]]] |
| 6. | (i) | Specified Denominations: | [•] |
| | | | *(N.B. Where multiple denominations above EUR 100,000 or equivalent are being used the following sample wording should be followed:* |
| | | | *"EUR 100,000 and integral multiples of EUR 1,000 in excess thereof up to EUR 199,000. No Notes in definitive form will be issued with a denomination above EUR 199,000).*[4] |
| | (ii) | Calculation Amount: | [•] |
| 7. | (i) | Issue Date: | [•] |
| | (ii) | Interest Commencement Date: | [[•]/Issue Date/Not Applicable] |
| 8. | | Maturity Date: | [•] |
| | | | *[If the Maturity Date is less than one year from the Issue Date and either (a) the issue proceeds are received by the Issuer in the United Kingdom, or (b) the activity of issuing the Notes is carried on from an establishment* |

---

[4]   Note that the Specified Denomination plus integral multiples option should not be utilised in respect of Notes where item 22 specifies "Temporary Global Note exchangeable for Definitive Notes" or "Permanent Global Note exchangeable for Definitive Notes".

*maintained by the Issuer in the United Kingdom, (i) the Notes must have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be sold only to "professional investors" or (ii) another applicable exemption from section 19 of the FSMA must be available].*

| 9. | Interest Basis: | [[•] per cent. Fixed Rate] |
| | | [•]  [EURIBOR/LIBOR]+/– [•] per cent. Floating Rate] |
| | | [Zero Coupon] |
| | | (further particulars specified below) |
| 10. | Redemption/Payment Basis: | Subject to any purchase and cancellation or early redemption, the Notes will be redeemed on the Maturity Date at [100] per cent. of their nominal amount. |
| 11. | Change of Interest or Redemption/Payment Basis: | [Applicable/Not Applicable] |
| 12. | Put/Call Options: | [Investor Put] |
| | | [Issuer Call] |
| | | [(further particulars specified below)] |
| 13. | [Date [Board] approval for issuance of Notes [and Guarantee] [respectively]] obtained: | [•] [and [•], respectively |

**PROVISIONS RELATING TO INTEREST (IF ANY) PAYABLE**

| 14. | **Fixed Rate Note Provisions** | | [Applicable/Not Applicable] |
| | (i) | Rate[(s)] of Interest: | [•] per cent. per annum payable in arrear on each Interest Payment Date |
| | (ii) | Interest Payment Date(s): | [•] in each year |
| | (iii) | Fixed Coupon Amount[(s)]: | [•] per Calculation Amount |
| | (iv) | Broken Amount(s): | [•] per Calculation Amount, payable on the Interest Payment Date falling [in/on] [•] |
| | (v) | Day Count Fraction: | [30/360 / 30E/360 / 30E/360 (ISDA) / Actual/Actual (ICMA) / Actual/Actual (ISDA) / Actual/Actual / Actual/360 / Actual/365 / Actual/365 (Fixed) / Eurobond basis] |
| | (vi) | ISDA Definitions | [2000/2006] |
| 15. | **Floating Rate Note Provisions** | | [Applicable/Not Applicable] |
| | (i) | Interest Period(s): | [•] |

| (ii) | Specified Period: | [•] |
|---|---|---|
| | | *(Specified Period and Specified Interest Payment Dates are alternatives. A Specified Period, rather than Specified Interest Payment Dates, will only be relevant if the Business Day Convention is the FRN Convention, Floating Rate Convention or Eurodollar Convention. Otherwise, insert "Not Applicable")* |
| (iii) | Specified Interest Payment Dates: | [Not Applicable/[•], subject to adjustment in accordance with the Business Day Convention set out in (v) below] |
| | | *(Specified Period and Specified Interest Payment Dates are alternatives. If the Business Day Convention is the FRN Convention, Floating Rate Convention, or Eurodollar Convention, insert "Not Applicable")* |
| (iv) | [First Interest Payment Date]: | [•] |
| (v) | Business Day Convention: | [Following Business Day Convention/ Modified Following Business Day Convention/Modified Business Day Convention/Preceding Business Day Convention/FRN Convention/Floating Rate Convention/Eurodollar Convention/No Adjustment] |
| (vi) | Additional Business Centre(s): | [Not Applicable/[•]] |
| (vii) | Manner in which the Rate(s) of Interest is/are to be determined: | [Screen Rate Determination/ISDA Determination] |
| (viii) | Party responsible for calculating the Rate(s) of Interest and/or Interest Amount(s) (if not the Principal Paying Agent): | [•] shall be the Calculation Agent |
| (ix) | Screen Rate Determination: | [Applicable/Not Applicable] |
| | • Reference Rate: | [•] [EURIBOR/ LIBOR] |
| | • Interest Determination Date(s): | [•] |
| | • Relevant Screen Page: | [•] |
| | • Relevant Time: | [•] |

- 64 -

|  |  | • | Relevant Financial Centre: | [•] |
|---|---|---|---|---|
|  | (x) | | ISDA Determination: | [Applicable/Not Applicable] |
|  |  | • | Floating Rate Option: | [•] |
|  |  | • | Designated Maturity: | [•] |
|  |  | • | Reset Date: | [•] |
|  |  | • | ISDA Definitions: | [2000/2006] |
|  | (xi) | | Linear Interpolation: | [Not Applicable / Applicable – the Rate of Interest for the [long/short] [first/last] Interest Period shall be calculated using Linear Interpolation (*specify for each short or long interest period*)] |
|  | (xii) | | Margin(s): | [[+/-][•] per cent. per annum/Not Applicable] |
|  | (xiii) | | Minimum Rate of Interest: | [[•] per cent. per annum/Not Applicable] |
|  | (xiv) | | Maximum Rate of Interest: | [[•] per cent. per annum/Not Applicable] |
|  | (xv) | | Day Count Fraction: | [30/360 / 30E/360 / 30E/360 (ISDA) / Actual/Actual (ICMA) / Actual/Actual (ISDA) / Actual/Actual / Actual/360 / Actual/365 / Actual/365 (Fixed) / Eurobond basis] |
| 16. | | | **Zero Coupon Note Provisions** | [Applicable/Not Applicable] |
|  | (i) | | Accrual Yield: | [•] per cent. per annum |
|  | (ii) | | Reference Price: | [•] |
|  | (iii) | | Day Count Fraction: | [30/360 / 30E/360 / 30E/360 (ISDA) / Actual/Actual (ICMA) / Actual/Actual (ISDA) / Actual/Actual / Actual/360 / Actual/365 / Actual/365 (Fixed) / Eurobond basis] |
|  | (iv) | | ISDA Definitions | [2000/2006] |

## PROVISIONS RELATING TO REDEMPTION

|  |  |  |  |  |
|---|---|---|---|---|
| 17. | | | Call Option | [Applicable/Not Applicable] |
|  | (i) | | Optional Redemption Date(s): | [•] |
|  | (ii) | | Optional Redemption Amount(s): | [•] per Calculation Amount |
|  | (iii) | | If redeemable in part: | |
|  |  | (a) | Minimum Redemption Amount: | [•] per Calculation Amount |
|  |  | (b) | Maximum | [•] per Calculation Amount |

Redemption Amount

|     | (iv)   | Notice period: | [•] |
| --- | --- | --- | --- |
| 18. | Put Option | | [Applicable/Not Applicable] |
|     | (i)    | Optional Redemption Date(s): | [•] |
|     | (ii)   | Optional Redemption Amount(s): | [•] per Calculation Amount |
|     | (iii)  | Notice period: | [•] |
| 19. | Change of Control Put Option | | [Applicable/Not Applicable] |
| 20. | Final Redemption Amount | | [•] per Calculation Amount |
| 21. | Early Redemption Amount (Tax) | | [Not Applicable / [•] per Calculation Amount] |

**GENERAL PROVISIONS APPLICABLE TO THE NOTES**

| 22. | Form of Notes: | Bearer Notes: |
| --- | --- | --- |
|     |     | [Temporary Global Note exchangeable for a Permanent Global Note which is exchangeable for Definitive Notes in the limited circumstances specified in the Permanent Global Note] |
|     |     | [Temporary Global Note exchangeable for Definitive Notes on [•] days' notice] |
|     |     | [Permanent Global Note exchangeable for Definitive Notes in the limited circumstances specified in the Permanent Global Note] |
| 23. | Additional Financial Centre(s): | [Not Applicable/*give details.*] |
| 24. | Talons for future Coupons or Receipts to be attached to Definitive Notes (and dates on which such Talons mature): | [Yes/No. As the Notes have more than 27 coupon payments, talons may be required if, on exchange into definitive form, more than 27 coupon payments are left.] |

The Issuer and each Guarantor accepts responsibility for the information contained in these Final Terms. [[•] has been extracted from [•].  The Issuer confirms that such information has been accurately reproduced and that, so far as it is aware and is able to ascertain from information published by [*specify source*], no facts have been omitted which would render the reproduced information inaccurate or misleading.]

Signed on behalf of **TRAFIGURA FUNDING S.A.**:

By:      ..........................................
         Duly authorised

By:      ..........................................
         Duly authorised

Signed on behalf of **TRAFIGURA BEHEER B.V.**:

By:      .............................................
         Duly authorised

By:      .............................................
         Duly authorised


Signed on behalf of **TRAFIGURA TRADING LLC**:

By:      .............................................
         Duly authorised

By:      .............................................
         Duly authorised


Signed on behalf of **TRAFIGURA DERIVATIVES LIMITED**:

By:      .............................................
         Duly authorised

By:      .............................................
         Duly authorised

Signed on behalf of **TRAFIGURA PTE LTD**:

By:      .............................................
         Duly authorised

By:      .............................................
         Duly authorised

## PART B – OTHER INFORMATION

| | | |
|---|---|---|
| 25. | **LISTING AND ADMISSION TO TRADING** | [Application has been made by the Issuer (or on its behalf) for the Notes to be admitted to trading on the regulated market of the Irish Stock Exchange/[•] with effect from [•].] [Not Applicable.] |
| | | The total expenses related to admission to trading are estimated to be EUR500/[•]. |

26. **[*Fixed Rate Notes only* – YIELD**

Indication of yield:    [•]

27. **[*Floating Rate Notes only* - HISTORIC INTEREST RATES**

Details of historic [LIBOR/EURIBOR] rates can be obtained from [Reuters].]

28. **OPERATIONAL INFORMATION**

ISIN Code:    [•]

Common Code:    [•]

29. **DISTRIBUTION**

U.S. Selling Restrictions:    [TEFRA   C/TEFRA   D/TEFRA   Not Applicable]

30. **INTERESTS OF NATURAL AND LEGAL PERSONS INVOLVED IN THE ISSUE/OFFER**

(i)    Method of distribution:    [Syndicated/Non-syndicated]

(ii)    If syndicated:    [Not Applicable]

    (a)    Names and addresses of Managers and underwriting commitments:    [•]

    (b)    Stabilising Manager(s) (if any):    [Not Applicable/[•]]

(iii)    If non-syndicated, name and address of Dealer:    [Not Applicable/[•]]

(iv)    [Save for any fees payable to the [Managers/Dealers], so far as the Issuer is aware, no person involved in the issue of the Notes has an interest material to the offer.  The [Managers/Dealers] and their affiliates have engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and may perform other services for, the Issuer [and the Guarantors] and [its/their] affiliates in the ordinary course of business / Amend as appropriate if there are other interests.]

[(When adding any other description, consideration should be given as to whether such matters described constitute "significant new factors" and consequently trigger the need for a supplement to the Base Prospectus under Article 16 of the Prospectus Directive.)]

## SUMMARY OF PROVISIONS RELATING TO THE NOTES WHILE IN GLOBAL FORM

**Clearing System Accountholders**

Each Global Note will be in bearer form.  Consequently, in relation to any Tranche of Notes represented by a Global Note, references in the Conditions to "Noteholder" are references to the bearer of the relevant Global Note which, for so long as the Global Note is held by a depositary or a common depositary, will be that depositary or common depositary.

Each of the persons shown in the records of Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system as being entitled to an interest in a Global Note (each an "**Accountholder**") must look solely to Euroclear and/or Clearstream, Luxembourg and/or such other relevant clearing system (as the case may be) for such Accountholder's share of each payment made by the Issuer or the Guarantors to the bearer of such Global Note and in relation to all other rights arising under the Global Note.  The extent to which, and the manner in which, Accountholders may exercise any rights arising under the Global Note will be determined by the respective rules and procedures of Euroclear and Clearstream, Luxembourg and any other relevant clearing system from time to time.  For so long as the relevant Notes are represented by the Global Note, Accountholders shall have no claim directly against the Issuer or the Guarantors in respect of payments due under the Notes and such obligations of the Issuer and the Guarantors will be discharged by payment to the bearer of the Global Note.

**Conditions applicable to Global Notes**

Each Global Note will contain provisions which modify the Conditions as they apply to the Global Note.  The following is a summary of certain of those provisions:

*Payments:*  All payments in respect of the Global Note will be made against presentation and (in the case of payment of principal in full with all interest accrued thereon) surrender of the Global Note to or to the order of any Paying Agent and will be effective to satisfy and discharge the corresponding liabilities of the Issuer in respect of the Notes.  On each occasion on which a payment of principal or interest is made in respect of the Global Note, the Issuer shall procure that the payment is noted in a schedule thereto.

*Payment Business Day:*  In the case of a Global Note, shall be:  if the currency of payment is euro, any day which is a TARGET Settlement Day and a day on which dealings in foreign currencies may be carried on in each (if any) Additional Financial Centre; or, if the currency of payment is not euro, any day which is a day on which dealings in foreign currencies may be carried on in the Principal Financial Centre of the currency of payment and in each (if any) Additional Financial Centre.

*Exercise of put option:*  In order to exercise the option contained in Condition 9(e) (*Redemption at the option of Noteholders*) the bearer of the Permanent Global Note must, within the period specified in the Conditions for the deposit of the relevant Note and put notice, give written notice of such exercise to the Principal Paying Agent specifying the principal amount of Notes in respect of which such option is being exercised.  Any such notice will be irrevocable and may not be withdrawn.

*Partial exercise of call option:*  In connection with an exercise of the option contained in Condition 9(c) (*Redemption at the option of the Issuer*) in relation to some only of the Notes, the Permanent Global Note may be redeemed in part in the principal amount specified by the Issuer in accordance with the Conditions and the Notes to be redeemed will not be selected as provided in the Conditions but in accordance with the rules and procedures of Euroclear and Clearstream, Luxembourg (to be reflected in the records of Euroclear and Clearstream, Luxembourg as either a pool factor or a reduction in principal amount, at their discretion).

*Notices:*  Notwithstanding Condition 20 (*Notices*), while all the Notes are represented by a Permanent Global Note (or by a Permanent Global Note and/or a Temporary Global Note) and the Permanent Global Note is (or the Permanent Global Note and/or the Temporary Global Note are) deposited with a depositary or a common depositary for Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system, notices to Noteholders may be given by delivery of the relevant notice to Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system and, in any case, such notices shall be deemed to have been given to the Noteholders in accordance with Condition 20 (*Notices*) on the date of delivery to Euroclear and/or Clearstream, Luxembourg and/or any other relevant clearing system, except that (i) for so long as the Notes are listed on the Official List of the Irish Stock Exchange and its rules so require, all notices to holders will also be published by the Issuer by delivery to the Companies Announcement Office in Dublin and on the website of the Irish Stock Exchange (*http://www.ise.ie*); and

(ii) in the case of Notes listed, traded or quoted on any other listing authority, stock exchange and/or quotation system, the requirements of such other listing authority, stock exchange or quotation system are complied with.

**USE OF PROCEEDS**

The net proceeds of the issue of each Tranche of Notes will be applied by the Issuer and/or each Guarantor for general corporate purposes.

## DESCRIPTION OF THE COMPANY

The Company is a private limited liability company (*besloten vennootschap met beperkte aansprakelijkheid*) incorporated and existing under the laws of the Netherlands under the name Trafigura Beheer B.V. The Company was incorporated on 14 January 1983. The Company is registered in the Netherlands with the Commercial Register under number 33236939. The registered office of the Company is at 20th Floor, Ito Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, The Netherlands and its telephone number is number is +31 205 04 1850/+31 205 04 1855. The Company was incorporated for an indefinite duration and has no other commercial name. There have been no recent events particular to the Company which are relevant to the evaluation of the Company's solvency to any material extent.

### Competitive Strengths

The Company believes that the Group's success is built upon the following combination of key competitive strengths:

### *Leading market position in the commodity trading industry*

The Group is one of the leading traders in the segments in which it operates.

The global competitive environment for physical commodities traders has evolved over the last few years. Trafigura operates today in a marketplace previously dominated by the major producers, whose operations in recent years have increasingly focused on upstream exploration and production and less on distribution. The move by major producers towards these core activities has created significant business opportunities for global independent players such as Trafigura, particularly at a time when demand centres are shifting to high growth emerging markets. These changes, supported by the Group's portfolio of fixed assets, provide significant scope for growth in its core commodity activities.

While the opportunity for independent traders is significant and continues to grow, barriers to entry limit the threat of potential new market participants. These barriers to entry include in particular the need for significant seed capital, access to liquidity, scale and global footprint, well established relationships with suppliers and customers, sophisticated IT and risk management systems and a limited pool of experienced management, traders and back office staff.

Long-term competitiveness in the industry is achieved through volume and market share dominance. The Group's scale presents a significant advantage over product-focused niche traders, who profit more from regional logistics than global arbitrage. During 2014, Trafigura traded approximately 120 million metric tons of oil and petroleum products and approximately 49 million metric tons of metals and minerals. Although there is no published market share information, Trafigura believes that it is the third largest independent trader of crude and refined products, with approximately two per cent. market share in a highly fragmented market, and approximately five per cent. market share in the "tradable market"[5]. Based on market knowledge, the Group also believes that it is the second largest independent trader of non-ferrous metals in the "tradable market" with estimated market shares in the tradable market ranging from five per cent. to 40 per cent. depending on the product.

### *Extensive global network*

Trafigura's operations are geographically diversified with exposure to high growth supply and demand regions. The Group has an extensive global network and manages its activities via 65 offices in over 36 countries organised across six regions: Asia Pacific, Africa, Europe, North America, Latin America, and the Middle East.

The Group believes that its scale and global footprint represent a key strength allowing it to improve its access to constantly evolving global commodity trade flows while helping to mitigate its exposure to regional risks. The Group's local presence, knowledge and relationships in different regions provide it with first-hand market intelligence and information to enable it to identify and execute arbitrage opportunities. Furthermore, its local presence provides insight into macro-drivers such as foreign exchange fluctuations, government policies, upstream commodity operations, and transport.

---

[5]     Defined as volumes which are not distributed by producers directly to consumers

*Highly diversified business model*

Trafigura's business activities are focused on three main areas, namely trading, industrial assets and asset management. These activities are complementary to each other and help smooth income volatility resulting from the natural cycles of the commodities trading industry. Within its trading and industrial assets businesses, Trafigura's activities are diversified in terms of products traded and handled as well as geographical presence and types of supplier/customer base. Its asset management arm, while completely separate from the physical trading business, provides Trafigura with an insight into the significant paper commodity derivatives market.

Trafigura is one of the most diverse global commodities firms in terms of products, geographies, suppliers and customers and one of few physical commodities firms with such breadth. It focuses predominantly on two asset classes: oil and petroleum products, and minerals and metals. It covers the main product categories within these fields, including: crude oil, gasoline, distillates, alumina, non-ferrous concentrates, aluminium, copper, zinc and coal.

The Group has a diverse customer base with no single client representing more than five per cent. of turnover for the oil and petroleum products business, and three per cent. for the metals and minerals business. In the oil and petroleum products business, Trafigura transacts with a diverse customer base located around the globe, including electricity utilities, oil refiners, major distributors and state-owned oil companies. In the metals and minerals business, Trafigura's broad customer base ranges from mining companies to smelters, and refined metals retailers. The ten main customers in each business make up less than 30 per cent. of its respective total revenues.

The diversity of the Group's trading portfolio contributes to a reduced risk profile, both in terms of markets and in terms of spreading credit risk among a wider base of counterparties.

*Solid industrial asset base*

Trafigura's business model is focused on balancing global supply and commodity trade flows and exploiting natural, low risk physical arbitrage opportunities.

The key to creating arbitrage opportunities is through increasing trading volumes by securing supply and off-take contracts, as well as controlling logistical instruments (e.g. time charters and storage facilities). Trafigura's investments, whether in the oil or metals and minerals sector are focused on opportunities that provide complementary volume flow to the trading business, open up new markets and create recurrent, sustainable income sources.

The Group's trading activities are supported by a solid base of fixed industrial assets. Through its selected asset investments, the Group has an established global presence throughout the value chain. Through its industrial asset subsidiaries Impala Terminals and the Mining Group, Trafigura has access to 11 owned and operated port assets, in excess of 50 metals terminals, a fully operational mining facility located in Spain as well as over 1,900 fuel retail stations and 5.6 million m3 of storage capacity for oil and oil products through its Puma Energy Group affiliate. The portion of Trafigura's fixed assets attributable to industrial assets and investments totalled U.S.$6.7 billion as at September 2014.

In addition to trading synergies, the cash flows generated by Trafigura's industrial assets portfolio have been growing significantly, contributing positively to the Group's profitability.

*Conservative risk management and strong governance standards*

Trafigura has put in place and adheres to comprehensive and clear compliance and risk management procedures which are monitored on a daily basis.

Prudent risk management is integral to the Group's business model and has been entrenched since its foundation. Risk management is a core function of Trafigura's non-executive Supervisory Board (the "**Supervisory Board**") and a crucial consideration in the Group's overall trading strategy. Trafigura operates a policy of hedging all its physical positions for price risk. All trading positions are monitored on a daily basis through various metrics, including a VaR soft limit target of less than one per cent. of equity. Operational risk is proactively managed through comprehensive vetting and due diligence procedures, which are continuously reviewed and updated to reflect the evolving nature of the regulatory environment. For further information on the Group's risk management policies and procedures please refer to "*Risk Management*".

Trafigura also has strict compliance policies in place, operating an overarching code of business conduct, which enforces a zero tolerance approach to bribery and corruption, promotes honest and ethical conduct and serves as a guide for all employees on how to comply with laws and regulations and exercise good business judgement. The Group also operates a strict know your counterparty ("**KYC**") process necessitating the successful completion of credit and compliance checks before transacting with a new counterparty. For further information on corporate governance and compliance policies and procedures please refer to "*Management Structure and Corporate Governance*".

The Group's risk management framework is supported by its proprietary IT systems which record transactions from the point of trade capture through to accounting entries and provide maximum transparency and control by ensuring different levels of access and automatic dissemination of key information to all concerned parties.

The Group believes that its sound risk management policies have contributed to its positive performance through the volatile market environment over the last few years and helped to mitigate earnings volatility.

### Strong leadership and ownership by management and key employees

Trafigura's management team has substantial experience in the commodity sector and a proven track record in the development of the business. The Company's Management Board (the "**Management Board**") has an average of 24 years of experience in the commodities industry, and an average of 14 years of experience with Trafigura. Since the foundation of the Group in 1993, the management team has overseen the consolidation and expansion of its trading activities across various commodity products and geographies. Trafigura is exclusively owned by its management and employees. The sole remaining founder holds less than 20 per cent., with the remainder owned by over 600 senior employees. This shareholding structure aligns individual aspirations with the long term interests of the Group. By virtue of having its own capital at risk, senior management is motivated to take a long-term view of Trafigura's overall performance and to protect its capital.

### Track record of sustainable profitable growth and financial strength

Trafigura has been profitable every year since inception in 1993, demonstrating the strength of its business model. The resilience of the Group's business model has been demonstrated by its steady growth and strong performance through various commodity cycles and periods of price volatility as well as during periods of economic, financial, and sovereign debt crises. On a like-for-like basis, the Group's net profit increased by 9.7 per cent. in 2014 compared to 2013[6].

Trafigura believes that its robust and highly diversified funding model and access to liquidity have contributed to the Group's strong financial performance and flexibility. The Group's solid financials have supported its NAIC-2 designation by the Securities Valuation Office of the National Association of Insurance Commissioners, which has been reaffirmed every year since it was assigned in 2006. NAIC-2 designation is equivalent to an investment grade rating from internationally recognised rating agencies.

The Group has a three-pillar funding model based on short-term transactional facilities, securitisation, and corporate credit facilities. Trafigura sources funds from over 135 banks in various markets including Europe, Asia and the US, providing significant diversification benefits both in terms of funding sources and geographies. Since December 2012, the Group has increased its available total credit facilities by 20 per cent., from U.S.$38.2 billion to U.S.$46.2 as of 30 September 2014.

The significant expansion of Trafigura's sources of financing over the years has been achieved on the basis of maintaining an acceptable and sustainable credit standing in the absence of a corporate rating.

## Future Growth Strategy

Trafigura's business model is based on physical arbitrage. The key to creating arbitrage opportunities is through increasing trading volumes by securing supply and off-take contracts, as well as maintaining control of logistical assets (e.g. time charters and storage facilities). Trafigura's investments, whether in the oil and petroleum products

---

[6]   The like-for-like comparison reflects Puma Energy as an associate and includes only Trafigura's share of the profit in the share of income of associates for 2014 and 2013. Intercompany transactions from 2013 are treated as external transaction for this purpose. It also excludes in both years significant divestments of previously consolidated subsidiaries and the related revaluation gains following their deconsolidation. Specifically, these divestments related to Puma Energy and the Condestable mine in 2013 and to two events in 2014: the sale of an 80 percent interest in our oil storage terminal in Corpus Christi, South Texas, and the sale of Trafigura's bitumen business to Puma Energy Holdings in March, 2014.

or the metals and minerals sector, are focused on identifying and harnessing opportunities that provide complementary volume flow to its trading business, open up new markets and create recurrent, sustainable income sources.

Going forward Trafigura will continue to focus on three main areas to deliver sustainable growth.

### Selective geographic expansion

The Group has a well-established global footprint with a presence in 36 countries, employing over 5,300 people. The Group has a proven track record of successfully expanding into new markets.  In 2014, a number of significant transactions and investments were completed which further developed the Group's geographic footprint. Perhaps the most prominent of these was the announcement of a joint venture between Impala Terminals and Mubadala Development Company to purchase a majority stake in Porto Sudeste, an iron ore terminal in Brazil. Impala also inaugurated the Callao Terminal in Peru which handles mineral concentrates and is expected to drive a significant increase in productivity at the terminal. Elsewhere within the Group, Trafigura's Mining Group inaugurated a new mine in Spain, known as the Magdalena mine which is located just 8 km from its existing MATSA mining asset and represents a significant metals find in Spain in recent years. Within its oil trading business, Trafigura began liquefied natural gas ("**LNG**") operations in 2014 and estimates that it has established itself as the world's largest independent LNG trader, with 1.7 million metric tons of LNG traded in the financial year ended 30 September 2014. Within its metals trading business, Trafigura was able to maintain its leading position in copper concentrates and its refined metals trading business saw a 42 per cent. increase in volumes. Within its bulk business, Trafigura saw a rapid increase in its thermal coal trading flows, allowing the Group to become one of the top three players in the global trading market by the end of the year.

In 2015, the Group intends to target continued expansion of trading volumes in its oil and petroleum products trading business, with a particular focus on the development of its crude and LNG trading books. The Group will also seek to take advantage of the current contango market structure thanks to its access to a wide network of storage facilities including those operated by its affiliate Puma Energy, providing the Group with valuable optionality.

Within its metals and minerals business, the Group plans to consolidate its market position in its core commodities and focus on securing long-term supply flows. The Group will also continue to seek to build market presence by entering into more long-term off-take or marketing contracts with independent producers, broadening trading activities into complementary and associated products and building closer synergies with its non-ferrous concentrates business to increase trading opportunities.

### Targeted asset growth

Going forward, the Group plans to continue to search for investment opportunities that offer synergies with its trading activities.  Trafigura has access to a pipeline of investment opportunities along the value chain through its extensive storage and logistics network.  On a targeted basis, the Group intends to pursue certain acquisitions that are profitable on both a standalone basis and that also complement and maximise arbitrage opportunities.

The Group also pursues a strategy of organic growth with select investments vis-à-vis the expansion of its logistics operations, particularly the Impala Terminals Group and Puma Energy.  All growth capex programmes are discretionary infrastructure projects and are executed in accordance with investment decision benchmarks including standalone project profitability, deferability, impact on earnings before interest, taxes, depreciation and amortisation (EBITDA) and compliance with financing covenants.

This targeted asset growth strategy enables the Group to enhance its control over the value chain, to create scope for increased economies of scale, to create a platform for potential expansion of trading activities into new regions after establishing supplier and/or customer relations and provide a complementary source of income.

### Maintenance of prudent financial profile and risk management

The Group maintains a diversified funding model, both in terms of the type of financing available and the geographic location of its banks.  This broad funding base helps to increase the Group's access to liquidity and provides funding flexibility.  Trafigura has demonstrated its ability through various market conditions to raise ample and appropriate types of financing to meet the business funding requirements and to tap various investor bases, maturities and geographies.  The Group has successfully managed its liquidity positions throughout commodity, economic, financial, and banking cycles and crises.  The Group's strategy is to continue to focus on maintaining such a prudent financial policy, and to sustain its liquidity buffer allowing it to be ready to capitalise on opportunities when they arise.

Prudent risk management is an integral part of Trafigura's business model.  As part of its corporate strategy, the Group will continue to focus on promoting and maintaining robust risk management framework to mitigate daily risks and focus on long-term profitability and the success of the Group.

**Description of the Group**

*Business Overview*

With a turnover of approximately U.S.$128 billion in the financial year ended 30 September 2014, Trafigura is one of the largest physical commodities trading groups in the world.  The Group estimates itself to be the world's third largest independent oil trader and the second largest trader in non-ferrous metals.  Trafigura sources, stores, transports and delivers a range of raw materials (including oil and petroleum products and non-ferrous metals, iron ore and coal) to clients globally.  Trafigura performs the economic role of sourcing and delivering commodities from one location or customer to another using its global network and infrastructure.  The impact on the global economy is a more efficient balancing of global supply and demand for raw materials.

In addition to its trading activity, Trafigura has invested in industrial assets and affiliates which increase its market penetration and complement its trading activities both on the supply and the sale side.  These industrial assets and affiliates are consolidated and operate as four independent industrial groups: Puma Energy Group, a 49 per cent. owned affiliate (as at 30 September 2014) which is engaged in mid- and downstream oil storage and distribution, the Impala Terminals Group to manage Trafigura's metals and minerals terminals, warehousing and logistics activities, Urion Holdings (Malta) Limited (together with its subsidiaries, the "**Mining Group**") to manage Trafigura's existing mining operations as well as mining exploration opportunities and DT Group, a logistics and trading company active in the markets of Africa and Asia.  Over recent years, these industrial assets have generated significant profits in their own right and specific strategies for each portfolio (oil, metals and minerals warehousing and logistics and mining activities) have been developed.

Trafigura is also active in the asset management business through its wholly-owned subsidiary, Galena Asset Management.  Galena acts as an investment manager to a number of commodity-focused investment funds and is regulated by the Swiss Financial Market Supervisory Authority (FINMA).

*History of the Group*

Trafigura was established in 1993 as a private group of companies owned by its core founding shareholders, and today remains exclusively owned by its management and key senior employees.  Over the years, it has transformed from a niche trader into a worldwide player, one of the few independent global trading houses.  At inception, the Group focused on three markets in which it had extensive expertise:  oil and minerals in South America, metals in Eastern Europe and oil in Africa.  The Group rapidly expanded its activities geographically through internal growth, marginal acquisitions and strategic alliances to create a globally diversified company.

Trafigura has been profitable every year since inception in 1993 and profits are growing steadily.  Trafigura has performed well throughout various commodity cycles and periods of high price volatility as well as during the economic, banking and financial crisis, with all key metrics improving.

Today, the Group operates in the market space previously dominated by the major producers which in recent years have increasingly focused on upstream exploration and production and reduced their involvement in distribution.  As a consequence of these changes, only a handful of global players remain (including Trafigura), providing the Group with significant scope for growth in its core commodity portfolio.  Since Trafigura is exclusively owned by its management and employees, it is focused on the long-term success of the business, promoting management depth and stability, and encouraging prudent risk management.

*Principles*

Trafigura sources, buys, stores, blends, transports and delivers products to customer's specifications.  Trafigura systematically hedges all index price exposure related to its physical business and consequently movements in the index price do not impact profitability.

Trafigura's business model is built on four pillars:

- Diversification in terms of product range, geography and clients which balances revenues and absorbs volatility in cycles;

- Non-speculative arbitrage-based model whereby the embedded price risk in the physical flows is systematically hedged;

- Private ownership structure which promotes management depth and stability and ensures business continuity as employee shareholders' long term interest is fully aligned with the sustained performance of Trafigura; and

- Strong risk management philosophy which has been institutionalised since Trafigura's foundation.

### Physical Arbitrage-Based Model

Unlike the derivatives markets where transactions (and arbitrage positions) are closed within seconds, capitalising on physical arbitrage opportunities requires delivery of the commodity over time and therefore value can only be extracted by those who have access to physical commodities and an extensive logistics network. While increased market volatility can generate a larger number of opportunities, Trafigura remains profitable during periods of lower volatility due to its global presence and diversification of geographical markets, customers and products.

Arbitrage opportunities can be related to geography, product, timing and optionality of contract.

### Geographical Arbitrage

Trafigura's global reach means it sources and sells products across the world. The combination of the expertise of its traders and knowledge of the global freight markets allows it to constantly optimise the geographical location of its supply and demand, so reducing logistical costs. This allows Trafigura to provide products to its customers quickly and at a competitive price, underlining the effectiveness of its business model.

### Technical Arbitrage

Due to Trafigura's extensive logistical and storage networks, the Group is able to blend products in order to meet individual customer's specifications. This allows Trafigura the flexibility to offer tailor-made products to its customers and obtain on-specification products at the lowest possible cost. Trafigura is able to capitalise on such opportunities by the virtue of its deep understanding of both market requirements for specific products and thanks to its technical comprehension and ability to blend products to required specifications.

### Time Arbitrage

Trafigura's cost efficient storage network also affords it the opportunity to take advantage of changes in market conditions over a period of time. In a "contango" market, where forward prices are higher than current spot prices, Trafigura is able to buy and place cargoes in storage whilst selling the equivalent forward contract. As long as the cost of storage and the transaction doesn't exceed the price differential between the forward and spot rates, Trafigura is able to lock in profit with very little risk.

Importantly, Trafigura can benefit from such arbitrages in a variety of ways by combining physical, product, and time arbitrages according to each specific market opportunity. Trafigura's strength lies in being able to resort to its extensive logistics and warehousing network, Trafigura's experience with blending material to customers' required specifications and the Group's strong local network that provides a key advantage in accessing first-hand market intelligence.

### Contractual Arbitrage

Contractual arbitrage is linked to pricing options provided in the contract between Trafigura and the buying or selling party in a transaction. For some customers, Trafigura can choose the pricing period for a given contract. This can include, for example, pricing based on an average price of month before or after the loading of a cargo. Such flexibility in pricing provides an extra level of optionality.

### Company Structure

The Group's parent company, TBBV, is a company incorporated under the laws of the Netherlands.

The Group is composed of a number of trading companies and asset-based businesses related to its core trading activities. TPTE is the entity through which the majority of trades are booked. In addition, the Group directly or

indirectly owns stakes in different assets (from storage and warehousing to mining) that allow Trafigura to improve logistics, increase volumes, reduce costs or add a new revenue-generating activity to its trading portfolio.

The Group structure is summarised below:



**Simplified Group structure.**
**All entities are 100% owned unless otherwise stated.**

Trafigura trades globally, so to consider the trading volumes and related financial statements of individual regionally-focused subsidiaries is less important because these depend on the structure of the global market itself and as such, Trafigura believes it is best considered as a consolidated entity.  For example, the financial statements of TTL will depend on the oil market demand and arbitrage opportunities available in the United States.  As a result, the profitability and cash flow generation of individual subsidiaries can vary considerably year on year.

Within the consolidated Group, the principal entities are as follows:

| TBBV | • Corporate head office |
| | • Management support functions |
| **Trafigura Funding S.A. ("TFSA")** | • Wholly-owned indirect subsidiary of TBBV |
| | • Engaged in capital market transactions and private placements for the Group |
| **TPTE** | • Wholly-owned indirect subsidiary of TBBV |
| | • Engaged in buying and selling commodities (TPTE is the Group's main trading company), operating through key offices in Singapore and Geneva (Switzerland) |
| **TTL** | • Wholly-owned indirect subsidiary of TBBV |
| | • Engaged in buying and selling commodities |
| | • Responsible for conducting trading business in the US |
| **TDL** | • Wholly-owned indirect subsidiary of TPTE |

| | • Booking centre for all derivative transactions within the Group |
|---|---|
| **IWL Holding BV (Netherlands) (together with its subsidiaries, the Impala Terminals Group)** | • Wholly-owned indirect subsidiary of TBBV<br>• Consolidates the metals and minerals terminals, warehousing and logistics activities |
| **Urion Holdings (Malta) Limited (together with its subsidiaries, the Mining Group)** | • Wholly-owned indirect subsidiary of TBBV<br>• Managing the Group's mining related investments |

*Key Global Locations*



**Office Network**

Trafigura's network of 65 offices, located in 36 countries, employs local marketing representatives who are the main day-to-day contacts with the customers in their given regions.  This network provides traders with "hands-on" market knowledge (trading conditions and characteristics) and valuable contacts in every jurisdiction.  Relationships with suppliers and customers are also enhanced by this close proximity generating significant benefits for Trafigura's sourcing and distribution capabilities.  These field offices and agencies liaise directly with the main offices and trade under the supervision of the main trading centres, although all contracts are executed centrally.  They report regularly to the entire Group as well as on an ad-hoc basis by telephone and videoconference.  This organisation gives access to expertise and promotes flexibility so that Trafigura can benefit from market opportunities while efficiently controlling risk.

The finance, liquidity management, risk management and legal functions are centralised in Geneva with local representatives in the main trading offices.  This centralisation enables Trafigura to maintain strict control over its financial position and its risk exposure.

**Business Operations**

*Oil and Petroleum Products*

The Group's petroleum-related trading activities are conducted through its offices in Geneva, Houston and Singapore and its network of branch offices and agencies.

Oil and petroleum product trading constitutes the majority of Group turnover, representing 74 per cent. in 2014, 76 per cent. in 2013 and 76 per cent. in 2012 of Group turnover, or a total sales value of U.S.$94 billion in 2014, U.S.$101 billion in 2013 and U.S.$92 billion in 2012. The Group is primarily active in physical oil trading including transportation by vessel, pipeline or railcar and is correspondingly active in the futures, swaps, and options markets, predominantly for hedging purposes.

The Group trades crude and refined products with a diverse customer base including electric utilities, oil refiners, distributors and state monopolies.  Clients include BP, Shell, Total, PPMC, Exxon Mobil and ENI amongst others and key suppliers include BP, Shell, PPMC and SK Innovation amongst others.

The majority of Trafigura's oil business is conducted on shorter term contracts or on a spot basis.  In this market, however, it is important to note that due to control over the logistical chain and assets, spot purchases/sales are often recurring and can be viewed as stable long-term positions.  Hence whilst the contracts are short term and on a revolving basis, they can be understood as de facto recurring.

Trafigura's ten main debtors in oil made up 26 per cent. of overall oil revenue in 2014 (2013:  28 per cent.).  No single debtor accounted for more than five per cent. of overall oil and petroleum products revenue.

Trafigura's oil volumes have increased significantly and consistently in recent years along with its corresponding market share.  In the financial year ended 30 September 2014, Trafigura traded approximately 2.5 million barrels of physical oil per day compared to circa 2.4 million barrels and 2.1 million barrels in the financial years ended 30 September 2013 and 2012, respectively.  Trafigura estimates its current oil volumes amount to circa two per cent. of the world oil market or around five per cent. of the "tradable market"[7].

Trafigura estimates that it trades the third largest volume in oil and petroleum products for an independent trading company after Vitol Group of Companies ("**Vitol**") and Glencore plc ("**Glencore**").  The entire market remains very fragmented with no company representing more than 10 per cent. of total physical trading market volume.

*Metals and Minerals*

Centralised in Geneva, Switzerland, Trafigura's metals activities comprise 10 main trading books consisting of copper, lead and zinc concentrate, alumina (an aluminium oxide commonly used in the production of aluminium), refined metals of copper, lead, zinc and aluminium. Trafigura's minerals activities include the iron ore and coal trading books. Trafigura also trades by-products (e.g. silver and gold) and non-ferrous scrap.  As with the oil business, no price-risk is taken on the physical business and the hedging of the physical trades occurs through TDL, which acts as an internal broker. Other than Geneva, key trading offices for the metals and minerals commodities business include Johannesburg, Lima, Mexico City, Montevideo, Mumbai, Shanghai, Singapore and Stamford.

Revenues generated by the metals and minerals trading and related industrial activities represented 26 per cent. of trading turnover in 2014, as compared to 24 per cent. in 2013 and 24 per cent. in 2012, or a total of U.S.$33 billion in 2014, as compared to U.S.$32 billion in 2013 and U.S.$29 billion in 2012. Historically this proportion has been circa 20 per cent. of total turnover, but varies depending on commodity price movements. In terms of profitability, the Group considers that the metals and minerals division has become increasingly significant. The development and expansion of this division has also increased its contribution to the Group's profit.

Metals and minerals are traded with a diversified client base ranging from mining and integrated mining companies to smelters and refined metals retailers. Major clients include Aurubis, Wuxi City Ling Feng Copper Co. Ltd, Korea Zinc and Boliden Group, amongst others. Suppliers on the buy side include Aurubis, Freeport-McMoRan Sales Company Inc, Codelco Chile and Beijing Jindu Materials Trading Co, Ltd amongst others.

The growth of Asian metals consumption, driven by significant smelting and refining capacity in China and India can be seen in Trafigura's metals and minerals revenue breakdown.  The growth of the proportion of Trafigura's revenue generated in Asia is a reflection of the global market rather than the build-up of a niche trading geography. Trafigura's bulk-commodity revenue remains very diverse on a customer-basis.

Approximately half of the Group's refined metals contracts are on a one year basis, with contracts typically agreed around October or November for the coming year. Other contracts are traded on a spot basis.

In the concentrates business around half of contracts are annual or multi-year including evergreen (i.e. indefinite) with negotiated pricing for up to three years ahead.  Other contracts are traded on a spot basis.

In 2014, Trafigura's ten main customers in the metals business made up approximately 16 per cent. of overall turnover (2013:  15 per cent.).  No single customer accounted for more than three per cent. of overall minerals and metals turnover.

On an annualised basis, Trafigura traded 49 million metric tonnes of metal concentrates, associated refined metals, iron ore and coal during 2014.  Total metals and minerals volumes in 2013 and 2012 amounted to 33 million and 35 million metric tons per annum, respectively. The increase in volumes from 2013 to 2014 was the result of new investments and commercial contracts that had been agreed; in particular, coal volumes saw a significant increase

---

7       Defined as volumes which are not distributed by producers directly to consumers.

and Trafigura considers that it ranks as one of the top three coal trading companies globally. The slight decrease in volumes in 2013 as compared to 2012 was attributable to the global slowdown in economic growth during 2013, as well as the slower than anticipated growth in China in the early part of 2013. The majority of the decrease in volumes was attributable to decreased iron ore volumes. Trafigura expects volumes to follow the trajectory of 2014 and continue to increase during 2015.

In the metals and minerals sector, similarly to the energy sector, market share statistics are not freely available. Based on market knowledge, Trafigura estimates that its share of the freely traded market for copper, lead and zinc metal roughly represents 26 percent. Based on market knowledge, Trafigura estimates that its volume and market shares as a percentage of freely traded volumes (i.e. that part of the market where producers do not transact directly with end users), which typically fluctuate from year to year, are between 40 and 50 per cent. for copper and lead concentrates and are 26 per cent. for copper metal and zinc concentrates.

Trafigura considers that in the metals sector it ranks as the second largest independent trader behind Glencore, with Glencore acting increasingly as a marketer of its own captive production.  Trafigura is active in all main producing areas such as South and Central America, the Far East and Eastern Europe and sells worldwide to industrial customers.

### Industrial Assets and Affiliates

The principal driver behind Trafigura's investment strategy is its arbitrage-based business model which relies on (amongst other things) the control of storage and logistics to generate or enhance arbitrage opportunities and create long term recurring income making the Group's business more sustainable.  The Group seeks investment opportunities that can offer synergies with its core trading activities through the provision of recurrent supplies and outlets, whilst having their own industrial rationale.  These assets bring optionality and flexibility to the trading books and are barriers to entry if they are not available to competitors.  In this respect the Group has taken ownership or interests in companies or assets which have "stand-alone" capacity but largely remain within the same commodities industry as its core trading business.

Trafigura has established four industrial groups.  Puma Energy Group to manage Trafigura's oil logistical assets, Impala Terminals Group to manage Trafigura's metals and minerals terminals, warehousing and logistics, the Mining Group to manage Trafigura's existing mining operations as well as mining exploration opportunities and DT Group, a joint venture with Cochan Singapore PTE Ltd, with investments primarily in Angola. The four industrial groups are structured as independent companies with their own dedicated management teams and resources, transacting with Trafigura on an arm's length basis, with service level agreements in place where appropriate.

The financials of three of the four industrial subsidiaries: Impala Terminals Group, Trafigura's Mining Group and the DT Group are consolidated into TBBV's financial statements. Trafigura's fourth industrial asset, Puma Energy, is minority owned by TBBV, following a sale of Trafigura's stake to existing shareholders in the financial year ended 30 September 2013 and capital increase of Puma Energy. Its results are therefore no longer consolidated into the Group's accounts, but rather are represented as an equity-accounted investee in the Group accounts.

Trafigura's portfolio of industrial assets has grown significantly in recent years following a process of continued investment. Trafigura's industrial assets generate substantial profit in their own right, either through recurring income generation or profit on disposals, further diversifying Trafigura's sources of income. Total industrial assets amounted to U.S$6.7 billion as at 30 September 2014.

### Puma Energy

Puma Energy is a vertically and horizontally integrated midstream and downstream oil group active in the emerging markets of Africa, Latin America, North Eastern Europe, the Middle East and Asia.  As at 31 December 2014, Puma Energy operates in 45 countries worldwide, directly employing over 7,000 people. Puma Energy owns and operates approximately 5.6 million m3 of storage capacity and operates a network of over 1,900 retail service stations in Latin America, Africa and Australia. In 2014, Puma Energy handled sales volumes of approximately 14.8 million m3 of oil products and its facilities handled approximately 19.8 million m3 of petroleum products.

Formed in 1997 in Central America to develop a comprehensive network of oil storage and distribution facilities, Puma Energy has since expanded its activities worldwide achieving rapid growth, diversification and product line development to become one of the largest independent global downstream companies.  In 2000, Puma Energy came under the direct ownership and management of the Company, one of its original founding partners.  In 2008, Puma Energy was reorganised as a separate division of Trafigura. Since its acquisition, Puma Energy has been at the

- 81 -

forefront of the Group's fixed assets development strategy. In order to support the growth of Puma, Trafigura opened up capital investment in Puma to selected investors a few years ago. In the second quarter of the financial year ended 30 September 2013, Trafigura further reduced its ownership in Puma by selling a portion of its stake to existing minority shareholders, including Sonangol Holdings Lda (**"Sonangol"**) and Cochan Holdings LLC (**"Cochan"**). During Trafigura's financial year ended 30 September 2013, Puma also benefitted from a capital contribution of U.S.\$500 million from Sonangol. As a result of the sale and the capital contribution, Trafigura's stake in Puma Energy has reduced to 49 per cent. (as at 30 September 2014), leading to the deconsolidation of Puma Energy from the Group financial statements. Puma Energy's financial year ends on 31 December.

Puma Energy's core business activities can be categorised as follows:

*Downstream activities*

Downstream refers to the distribution, retail and wholesale of refined products within national markets. In the downstream sector Puma Energy is active in all aspects of the business both as marketer of the petroleum products and owner/operator of the related infrastructure. By vertically integrating its midstream assets with its downstream business, Puma seeks to capture the full value made available by its investments; internalising the strong distribution, wholesale and retail margins achievable within these emerging markets.

Puma Energy supplies refined products and lubricants into high growth emerging markets with a focus on (i) domestic wholesale distribution to industrial consumers (such as distributors, mining companies, airlines, shipping companies and offshore operations) and (ii) retail distribution including Puma branded service stations either owned or operated on a franchise basis. Puma Energy has set up a line of business dedicated to ensuring reliable supply to its customers as well as ensuring that supply is managed efficiently. Trafigura is the preferred supplier to Puma Energy's supply group of companies; however, the Puma Energy supply department also has the ability to source products from third parties and all contracts with Trafigura are on a strict arm's length basis. The role of the supply function seeks to ensure that:

- Puma Energy's requirements are managed at regional rather than country level ensuring that economies of scale can be generated and dead freight avoided;

- Puma Energy has developed expertise in inland logistics to optimise supply costs;

- price exposure is controlled using sophisticated price risk management instruments (Puma Energy does not take outright price risk and fully hedges all of its positions); and

- products are sourced at the most competitive price levels available in the market including access to arbitrage cargoes coming from outside the region.

*Midstream activities*

Midstream refers to the refining, storage and pipe transportation of petroleum products within the international marketplace. Within the midstream market, Puma Energy's business is to own and operate infrastructure which supports the trade flows. This typically includes bulk storage depots, offshore mooring systems to store and transport refined oil products internationally, linking the supply side of the market for refined oil products with the demand side. Puma Energy targets opportunities where the (re)development and effective management of infrastructure can de-bottleneck supply-chain systems and provide essential trading liquidity within regional and national markets. In doing so, Puma Energy unlocks value by seeking to capture this both as an asset owner and downstream marketer.

*Recent Merger and Acquisition ("**M&A**") and Capital Markets Activities*

As a consequence of its defined growth strategy Puma Energy has capitalised on opportunities over the last 12 months with the M&A and capital markets activities below.

- January 2014: Puma Energy made its first capital market offering of 6.75 per cent. senior notes of U.S.\$750 million aggregate principal due 2021. This operation has substantially extended the debt maturity profile and reduced substantially the tangible assets pledged as collateral.

- May 2014: refinanced its revolving credit facility, following strong global demand from a range of international banks. The facility grew significantly from U.S.\$270 million in 2012 to U.S.\$705 million in 2014.

- May 2014: opened newly constructed Mackay terminal in Queensland, Australia. The terminal has six storage tanks with 56 million litres of storage capacity and is connected to the port by a dedicated over-ground pipeline of 1.6 kilometres.

- June 2014: acquired InterOil Corporation subsidiary companies that own refining and fuels marketing businesses in Papua New Guinea for U.S.$526 million. Under the terms of the deal, which represents Puma Energy's first investment in Papua New Guinea, Puma Energy acquired InterOil's refining business, an extensive network of fuel terminals, retail service stations and aviation facilities, becoming Papua New Guinea's major supplier of fuel.

- July 2014: Puma Energy re-tapped the bond market and successfully priced an additional U.S.$250 million of senior unsecured notes which are fully fungible with its existing U.S.$750 million 6.75 per cent. Senior Notes offering due 2021, bringing the total size of the issue to U.S.$1.0 billion.

- October 2014: Puma International Financing S.A., a subsidiary of Puma Energy Holdings Pte Ltd. issued EUR200 million of 4.50 per cent. Senior Notes due 2022 under a private placement. This further underlines the support Puma Energy is receiving in the capital markets.

- November 2014: Puma Energy announced the opening of its Langsat Bitumen Terminal in Malaysia. The state of the art bitumen processing, blending, and distribution facility has a capacity of 74,000 metric tons and is the largest privately owned bitumen terminal in South East Asia and the Pacific.

*Financial Highlights*

Puma Energy's ongoing investment programme has generated significant growth in size and profitability.  For the financial year ended 31 December 2013, Puma generated sales of U.S.$12.0 billion, as compared to U.S.$8.7 billion and U.S.$5.1 billion for the financial years ended 31 December 2012 and 2011, respectively.

*Global Presence*

Puma Energy Group has assets worldwide, organised into five key regions:

- Europe

- Americas

- Africa

- Middle East

- Asia, Pacific

*Organisational Structure*

Puma Energy is coordinated from its global support centre in Geneva, Switzerland, and currently directly employs over 7,000 people in 44 countries.  Puma Energy is managed as an independent industrial group, with its own dedicated management, which transacts with the Group on an arm's length basis.

Puma Energy operates a two-tier management structure comprising a Board of Directors and an Executive Committee. The Board of Directors manages the business and affairs of Puma Energy, providing oversight and management, but delegates the day-to-day management of the company to the Executive Committee. Following the deconsolidation of Puma Energy from the Group in 2013, the Board of Directors underwent certain changes and is now comprised of eight members: one independent director and Chairman, three representatives of Trafigura, two representatives of Sonangol and one representative of Cochan as well as Puma Energy CEO, Pierre Eladari. The Puma Energy Group executive committee comprises seven members of Puma Energy's senior management and is focused on the strategic issues facing Puma Energy and on the day-to-day management of the group. It also implements the strategy which is formulated at the level of the Board of Directors.

**The Impala Terminals Group:  Trafigura's Metals and Minerals Terminals, Warehousing and Logistics Assets**

Trafigura consolidated all of its metals and minerals terminals, warehousing and logistics activities around the world under the IWL Holding B.V. entity.  The Impala Terminals Group currently has 11 owned and operated port assets

globally and in excess of 50 terminal locations, in 30 countries across Europe, Middle East, Asia, USA, South America and Africa, with a further 25 projects under review or development and employs more than 1,200 people worldwide. The current total storage space is over 1.3 million m3. Impala Terminals Group focuses on non-ferrous concentrates and refined metal activities and provides multimodal logistics, terminal, port and value added warehousing services. Key metals and minerals terminals, warehousing and logistics facilities are outlined below.

*Impala Latin America*

Impala Latin America originated from the Impala Terminals Group's Peruvian non-ferrous concentrates warehousing and blending operation in Callao, with additional operations in Chile, Mexico, Bolivia and Brazil. Impala Latin America specialises in handling the logistics of concentrates from across Latin America, blending it to specific customer requirements, and exporting them to worldwide destinations. Furthermore, Impala Latin America manages the coal logistics development projects in Colombia.

In Peru, the Callao warehousing and blending operation is one of Peru's largest sites for copper, zinc and lead concentrates. Callao is Peru's main commercial port and an expansion project to add 36,000 m2 of covered warehousing space was completed in December 2013. The operation at Callao, together with operations in Nazca, Salaverry and conveyor belt projects in Callao and Salaverry have made Peru one of Impala's largest countries of investment.

Colombia is a major coal exporter and has seen a significant increase in oil production in recent years. As one of the world's fastest growing economies, many resources are imported to support growth. Improving the efficiency of the transportation along the river system is regarded as strategic. The Impala Terminals Group is aiming to quickly become a significant warehousing and logistics provider along the Magdalena River corridor. To support this goal, investments are being made in Colombia to develop a multi-modal transportation system on the Magdalena River.

*Impala Africa*

The strong growth forecast for the export of copper, cobalt, metals and concentrates from the Democratic Republic of Congo (the "**DRC**") and Zambia have underlined the urgent need for a consistent transport and logistics system. Impala Africa focuses on providing transportation and storage services by rail and road for copper, cobalt metals and concentrates between the DRC, Zambia and key Southern Africa ports to global export markets. Impala Africa now provides versatile, multi-modal logistics with large and secure storage areas, covered warehouses and fully calibrated weighbridges for road, rail and individual package weighing.

*Impala China*

Impala's business in Asia has undergone a significant review of the potential risks associated with domestic third party "operational control". Following this review, the Impala Terminals Group is exiting all business with third party warehouse providers in China, save that it will remain active in four locations where it leases or owns a site directly and employs its own staff. This does not indicate a reduction in appetite for business in China however. In October 2014, Impala announced a Memorandum of Understanding between Impala and CITIC investment bank, which will see it enter in to a joint venture to become one of the market leading metal storage companies in China.

*Burnside Terminal*

In June 2011, the Impala Terminals Group acquired the Burnside terminal in Louisiana, USA. Located on the east bank of the Mississippi River at Mile 169.9, the terminal consists of a site of about 1,100 acres, with a deep water berth and ship loading/unloading equipment. The Impala Terminals Group has refurbished and expanded the facility into a state-of-the-art major bulk terminal for coal, bauxite and alumina. Expansion options at Burnside are currently being considered, including rail connectivity and liquids storage.

In June 2013, TTL issued a U.S.$200 million long-term tax-exempt bond in order to further support the development of the terminal.

*Porto Sudeste*

In 2014, the Impala Terminals Group entered into a U.S.$2 billion joint venture investment with Mubadala in the Porto Sudeste iron ore project located just outside of Rio de Janeiro. The project is currently in the final phase of pre-operation commissioning and is expected to commence handling shipments within the second half of the 2015 fiscal year.

*Mining Group*

Trafigura's Mining Group invests in mining assets that are closely related to and have strong synergies with the Group's core metals and minerals trading business. Encompassing operations in Latin America, Europe and Africa, its investments include wholly-owned subsidiaries in addition to cornerstone shareholdings in both private and publicly traded entities. Trafigura's Mining Group currently employs around 1,300 people worldwide, including highly skilled personnel such as geologists and engineers. 2012 saw the consolidation of the Mining Group's activities in the Johannesburg and Geneva offices, with a strong emphasis on integrating experienced mining professionals into the Group.

The focus of the Group remains the participation in and development of mining projects worldwide. The Group recently embarked on a major expansion project at its Minas Aguas Tenidas mine in Spain. It has also completed the successful divestment of a number of previously held investments, such as Anvil Mining Ltd and the Compañia Minera Condestable SA (CMC).

*Iberian Minerals*

Iberian Minerals Corp ("**Iberian**"), a consolidated subsidiary of the Company, is the cornerstone of Trafigura's mining operations. In February 2012, Trafigura purchased the majority of the outstanding shares in Iberian through the Toronto Stock Exchange, increasing Trafigura's shareholding. Trafigura now holds 100 per cent. following a squeeze-out process.

Iberian owns and operates a producing mine in Spain known as Minas Aguas Tenidas ("**MATSA**"), which started production in 2009. Trafigura retains a 100 per cent. life-of-mine off-take agreement for MATSA. In addition to operating MATSA, in 2014 Trafigura increased to 19 per cent. its stake in EMED Mining (as at 30 September 2014), the mining company developing the former Rio Tinto assets in the same region of Spain.

Going forward, Trafigura will work closely with Iberian to develop its existing asset base and expand Iberian through strategic acquisitions with the intention of creating a stand-alone, mid-sized and diversified mining company.

*Cadillac Ventures*

Cadillac Ventures is a Canadian listed base metals exploration and mining company with projects ranging from exploration to resource development. As of September 2014, Trafigura had a fully diluted holding of 24 per cent.. Cadillac's main asset is the Thierry project in Canada and is continuing to delineate further resources as well as developing the project. Other exploration projects are located in Quebec, New Brunswick and Spain.

*Other Mining Assets*

Trafigura has two private investments including full ownership of Peruvian copper mine Catalina Huanca.

*Divestments*

In 2012, Trafigura completed the divestment of two of its mining assets, Anvil Mining, a copper miner and Tiger Resources Ltd., a copper and cobalt exploration development company, both with assets in the DRC. The total gain on the two transactions was U.S.$344 million. Trafigura retains a 100 per cent. life-of-mine off-take agreement with Tiger Resources, in order to provide a long-term supply to Trafigura's trading activity. In 2013, Trafigura completed the divestment of one mining asset, Condestable, a copper and zinc miner in Peru. The total gain of the transaction was U.S.$35 million. Trafigura has retained a 100 percent life-of mine off-take agreement with Condestable, in order to provide a long-term supply to Trafigura's trading activity.

*DT Group*

DT Group is a fully consolidated, 50/50 joint venture between TPTE and Cochan Ltd, a leading Angolan management and investment firm. It applies local and specialist knowledge to selected markets and operates through a network of subsidiaries in Angola and internationally. DT Group is active in the markets of Africa and Asia, employing over 200 people in five countries.

As part of its trading activities, DT Group trades crude oil, fuel oil, gasoline, jet, naphtha, gasoil, bunker and bitumen mainly from and into Angola.

*Angofret*

Angofret is a wholly-owned subsidiary of the DT Group.  The company was established to provide rail and road freight services, as well as warehousing for industrial and agricultural companies.  Angofret is currently constructing two new multifunctional logistics platforms at stations along the Caminho de Ferro de Benguela (CFB) railway line at the border of Angola and the Democratic Republic of Congo. These projects will increase the efficiency of Angola's transportation system and help to activate the railway as part of a multimodal transport network.

*Angorecycling*

Angorecycling focuses on the collection and treatment of domestic and industrial recyclable waste. The company offers consultancy and resourcing on all aspects of collection, treatment, recycling and cleaning services. It owns and operates vehicles, equipment and recycling facilities in the cities of Luanda, Lobito and Namibe.

*DT Shipping*

The DT Group's shipping operation owns four bunkering vessels which transport gasoil from a storage facility Lobito to Angola's offshore platforms.  DT Shipping also has a number of vessels on time charter around the West African coast.

*DT Imobiliaria*

DT Imobiliara's prime function is the acquisition of land and infrastructure for DT Group businesses.  It owns several real estate projects in Angola, including a large office complex, an apartment building and a large logistics and procurement facility in Luanda.

*DT Agro*

DT Group invests in agricultural projects in Angola through DT Agro.  The company is furthering local development by creating jobs, transferring knowledge and diversifying the economy.  It currently manages two farms and is developing additional projects in Catumbela and Malanje.

*DT Servicos*

DTS Servicos specialises in providing first-class support services to the various DT Group and Puma Energy Group companies in Angola. These include construction, procurement, legal advice, finance, treasury, IT, facilities management, human resources and aviation.

***Asset Management Business***

Galena Asset Management ("**Galena**"), a wholly-owned subsidiary of Trafigura is an investment manager of a number of commodity-focused investment funds and has over U.S.$2.2 billion under management as at September 2014.  The funds focus on investment in the energy, metals and minerals sectors, but through paper trading, rather than physical trading.

Galena is regulated by the Swiss Financial Market Supervisory Authority (FINMA) and is carefully monitored by its own dedicated internal compliance department and supported by an external compliance consultant. It has a single risk committee for each fund and is subject to audit every year.

Galena's investment management activities are independent from the trading activities of the rest of the Group. Trafigura provides valuable market analysis from its physical trading, but there is no exchange of detailed positions or transactions with the Group.

*Galena Metals Fund*

In June 2004, Trafigura established a metals derivatives hedge fund, Galena Fund Ltd. which invests in base and precious metals using futures, options and other derivatives.  Trafigura seeded the fund which was subscribed to by around 40 institutional investors and is currently closed to new investors.

*Galena Malachite Fund*

Galena Malachite Ltd. is a long only metals derivatives fund.  The fund was established in May 2007 and invests in base, platinum group and precious metals, with performance benchmarked to a bespoke metals index.  It is also now closed to new investors.

*Galena Commodity Trade Finance Fund (CTFF)*

In September 2010, Galena launched a Commodity Trade Finance Fund for which the Group provided seed capital. The Galena CTFF offers investors access to debt assets linked to the commodities trade flows and assets not readily available in the markets.  The majority of the transactions are syndicated from top tier commodity trade finance banks, providing investors with access to a "hard asset" class historically reserved for banks and a select group of trading houses and allowing banks to sub-participate their exposure on commodity names.  The fund provides stable returns which are not correlated to other asset classes.  Additionally, all transactions are secured on underlying assets or commodity flows.

For Trafigura's relationship banks, the CTFF offers a number of opportunities including the sale of trade finance assets on a first loss basis to the fund and distribution of the fund to institutional investors and private banking customers.

*Galena Private Equity Resources Fund*

The Galena Private Equity Resources Fund leverages Trafigura's expertise and track record in investing in small to medium sized resource companies in the metals and mining sectors. The fund announced final close in October 2014 with a total of U.S.$400 million committed and invested assets. Trafigura has committed U.S.$100 million to the Galena Private Equity Resources Fund. In 2013, the fund invested approximately U.S.$104 million with US-based Bowie Resources LLC and created Bowie Resource Partners LLC, which owns and operates coal mines in Colorado and Utah. The strategy of Galena Private Equity Resources Fund is focused on quality small to medium sized resource companies that have a potential for growth. In the current environment, Galena expects to see growth in opportunities and M&A activities as demand for strategic commodities such as base metals and energy is likely to continue to grow, with emerging economies expected to stimulate further demand. With a general contraction in institutional financing, this fund will help financing junior companies that may otherwise find it difficult to secure financing prior to first production.

**Trafigura's Capital Expenditure ("capex") Programme**

Trafigura's capex programme is largely of a discretionary nature and mostly related to infrastructure projects within the Group's industrial asset divisions (i.e. Impala Terminals Group, Mining Group and DT Group).

Trafigura's capex decisions are made only after a favourable assessment of the standalone profitability of each investment opportunity, meeting internal return requirements on investment hurdles.  In addition, beyond a baseline maintenance capex, certain other elements of planned capex are flexible and can be deferred if necessary, in order to smooth the Group's liquidity requirements.  Trafigura management ensures that the impact of capex spending would not compromise compliance with financial covenants and strives to maintain an acceptable and sustainable credit standing for its unsecured lenders

The Group's capex in any given year needs to be broken down into its component parts of maintenance, development and acquisition capex, which have different levels of certainty and commitment.  The majority of the planned expenditure is development capex which, until construction has actually begun, can be delayed if required. Maintenance capex, which has a high certainty of disbursement and can be considered as committed makes up only a small proportion of the total amount.  Acquisition capex is largely at the discretion of Trafigura's management and the company has the ability to withdraw from investments quickly, should deteriorating circumstances deem such a decision necessary.

**Industry Overview**

*Oil Market*

*Market Structure – Supply Side*

Crude oil is a major commodity traded on the international markets.  Refined products are used in a variety of ways, but motor fuel represents the most significant product derived from crude.

The crude oil market is driven by supply and demand as well as geopolitical events which can produce sharp impacts on price.

Crude oil is extracted or produced by exploration and production independents or integrated energy companies (e.g. BP, Shell, Exxon) or national energy companies such as PDVSA or Saudi Aramco.

Producers are split between OPEC and non-OPEC producers.  In 2013, OPEC countries had around 72 per cent. of the world's proven oil reserves, but they produced less than 43 per cent. of the oil and possessed less than 50 per cent. of the refining capacity.

Although there is no consolidated data available regarding total volumes handled by traders, Trafigura's market experience indicates that about 30 million barrels per day are freely traded, which equates to a third of the total market.  These are volumes on the "tradable market", i.e. volumes that are not handled by producers directly to consumers.  The tradable market creates significant opportunities for companies engaged in the physical trading of oil, such as Trafigura, Vitol and Glencore.

In spite of the different varieties and grades of crude, buying and selling is done by reference to a limited number of benchmark crude oils.  Examples include Brent crude oil ("**Brent**"), which is estimated to price two thirds of internationally traded crude oil supplies; Dubai crude, which is used as a benchmark to price sales from the Gulf into Asia, and West Texas Intermediate ("**WTI**"), which is the benchmark for sales into the US. OPEC produces its own benchmark price based on a basket of members' crudes as well as Mexico's Isthmus crude, reflecting the importance of non–OPEC producers.

The vast majority of crude oil is refined into various fuel products, and a small fraction is used to produce chemicals, which are the basis for the petrochemical industry, which includes plastics, pharmaceuticals and cosmetics.

*Market Structure – Demand Side*

Global oil demand tends to closely follow global economic growth and for many years global oil demand increased in line with the expansion in the global gross domestic product ("**GDP**") growth.  Demand fell in both 2008 and 2009 as the global economic recession led to a marked downturn in consumption of energy, but this has since recovered, with a sharp rebound in consumption in recent years.  Oil consumption in 2014 grew modestly to 91.4Mbbls/day. However, demand is expected to rise by only 0.9 Mbbl/day to 92.3 Mbbl/day in 2015 as current economic forecasts expect disappointing growth for the global economy this year.

There has been a continued change in the importance of different markets, in particular with the growth of emerging market demand.  Between 2004 and 2013, oil consumption in the "Old Economies" of North America, Western Europe and Japan has actually declined, falling from 49.7Mbbls/day to 45.6 Mbbls/day over this period (-0.87 per cent. compounded annual decline rate).

By contrast, oil consumption in non-OECD countries has steadily increased rising from 33.3Mbbls/day to 45.8Mbbls/day (+3.22 per cent. compounded annual growth rate).  Chinese consumption has increased by over 4.0 Mbbls/day to 10.8Mbbls/day, (although this is still dwarfed by the 18.9Mbbls/day consumed each day in the U.S.). By 2013, China accounted for for 12.1 per cent. of global oil demand, up from 8.1 per cent. in 2004.

As a result of these trends the share of global consumption accounted for by OECD countries has fallen from 59.9 per cent. to 49.9 per cent. while the share of demand accounted for by non-OECD countries has increased from 40.1 per cent. to 50.1 per cent.

Over the last 10 years the increase in global oil demand has lagged the growth in global GDP, reflecting the increased usage of other fuel types and greater efficiencies. Oil consumption increased by 1.1 per cent. (compounded annual growth rate) between 2004 and 2013 (compared with a purchasing power parity (PPP) weighted increase in global GDP of 5.9 per cent. compounded annual growth rate).  Since then there has been a sharp increase in oil consumption, increasing by 5.6 per cent. to a new record in 2012 of 89.7 Mbbls.  Over recent years, a one per cent. increase in global GDP has resulted in oil consumption of circa 200,000 bbls/day.

*Market Fundamentals*

The market for trading crude and refined products is driven by several factors and variables, primarily supply, demand and geopolitical scenarios as mentioned earlier.  Another key factor is refining capacity, which becomes a

bottleneck when crude supply is sufficient but demand outstrips production capacity.  Refining capacity is reflected in refining margins, which are priced directly into product prices.

Additional factors include environmental seasonality and the geographic locations of consumers and producers.  For example, consumers located in cold weather regions push up demand for heating products, and producers and shipping routes located in regions susceptible to hurricanes can affect the stability of supply, pushing up prices and costs for players in the market.  On a different scale, factors such as the United States Strategic Petroleum Reserve increasing or releasing stockpiles can influence the market within the North American region and beyond.

Although the market for producers and refiners is consolidated, the range of consumers is wide and fragmented.  Consumers of products vary from car users to large petrochemical companies, which turn crude and refined products into sophisticated derivatives such as cosmetics.  The oil market is also unique in that the versatility of uses for and characteristics of primary refined products means that industrial users can differentiate between their usage of crude and refined products mainly in terms of price and/or availability to produce further refined products.

Trafigura benefits from this highly volatile environment by being able to make trading plays using its arbitrage expertise, geographical reach, storage blending capabilities and freight options.  In addition, the use of financial derivatives provides Trafigura with the means to enhance opportunities in the market while hedging against outright price risk.

*Current Market Developments*

Crude oil prices were quite volatile in 2012.  Prices rallied strongly through the first quarter, partly as a result of stronger economic growth but also due to worries of oversupply.  In particular, the possibility of the closure of the Straits of Hormuz by Iran and/or possible military action against Iran triggered renewed long position building in the crude market.  Worries over the health of the Chinese economy also led some speculators to raise oil exposure at the expense of copper and other industrial metals, given the latter's greater dependence on emerging market growth.  Brent prices rallied to a high of U.S.$128/bbl in March while WTI traded through U.S.$110/bbl.  However, the lack of military conflict in the Gulf and a downgrading of economic expectations as macro data worsened saw prices aggressively sold lower in the second quarter, with Brent prices falling to U.S.$92/bbl and WTI prices back below U.S.$80/bbl by June.  Into the second half of the year prices recovered, helped by positive policy actions, most notably the European Central Bank President Draghi's "whatever it takes" speech and renewed quantitative easing by the United States Federal Reserve in September and December boosted asset prices across the board.  Brent crude was trading at U.S.$108/bbl in December.

Having been stable for the final few months of 2012, Brent crude oil prices rose to a 12-month high of almost U.S.$120/bbl in February 2013 reflecting expectations that stronger global economic growth would lead to a tightening in the physical market.  This also encouraged the rebuilding of fund long positions.  However prices eased through the second quarter as global growth, particularly in emerging markets, disappointed.  Commodity prices in general were under pressure due to the resurgent strength of the U.S. dollar, in turn a function of expectations that the United States Federal Reserve's quantitative easing programme would be scaled back later this year and ended in 2014, with Brent crude oil prices lowering towards U.S.$100/bbl at the end of the first half of 2013.  Prices then recovered as global economic indicators improved and worries over a Chinese hard landing abated.  At the end of 2013, Brent prices had recovered to U.S.$110/bbl while WTI was trading just under U.S.$100/bbl.

Other structural changes have been important. Increased shale gas production has had an obvious effect on natural gas market development. In previous years, the natural gas market had been regionally isolated as global transportation of gas proved both difficult and expensive. However, the natural gas production boom from shale exploration has spurred recent infrastructure developments, quickly making the economics of global LNG trading increasingly attractive. Trafigura considers that it is the largest physical global LNG trader in the world, and is well placed to take advantage of these opportunities as the US and other producing nations use their large reserves of shale gas to produce more liquefied products for export purposes.

As one of the main structural changes over the past decade, the increase in natural gas production capacity has received much attention as an alternative fuel source in supplementing world energy demands. However, Trafigura continues to believe that coal is likely to remain essential to worldwide energy consumption for the next decade. This is especially driven by the fact that drilling costs and associated capex expenditures for shale gas wells in China for example, currently the world's largest coal consumer, are too high to justify a quick move away from coal.

Taken together these developments suggest energy based commodity markets will remain dynamic going in the near future.

While crude oil prices had been relatively stable for the first half of 2014, a notable decline ensued after June. Brent fell from around U.S.$115/bbl in June to around U.S.$55/bbl in December. Lost production in Libya and Iran concealed the production growth in North America and other regional gains for some time. Between mid-June 2014 and February 2015, oil prices have declined by over 50 percent and the Bloomberg commodities price index has seen its biggest decline since 2009, falling by 24 percent over the same period.

When oil prices hit a trough, history has shown that the energy industry's response is a flurry of mergers and acquisitions. Price crashes in the early 1980s and late 1990s sparked a wave of deal-making that reshaped the industry. A decline in the mid-2000s led the majors to pick up smaller producing companies. Previous consolidations took place after a prolonged slump in crude prices and often during a period of weak energy-stock market valuations. In contrast, the crude oil price decline in 2014 was a sharp decline in a relatively short period of time (the six months between June and December).

Low prices are likely to put some small and medium-size companies into a distressed situation where their inability to meet their cost of production might force them to either dispose of assets to raise cash or to divest completely. However, Trafigura is not active in oil exploration and production.

### Impact of Declining Oil Prices on Trafigura

Historically, declines in commodities prices have had a limited impact on the way Trafigura conducts its day-to-day business. The Group's track record has proven that even in the event of an extended cycle of depressed prices Trafigura has continued to find opportunities to add value across its trading books. In addition, pronounced and sudden energy price declines, such as the 2008 crisis when Brent oil prices fell from U.S.$145/bbl to just above U.S.$35/bbl, have had a positive effect on Trafigura's performance.

Trafigura systematically hedges the price risk embedded within its physical trading business, so it does not follow that a fall in commodity prices has a negative impact on the Group's performance. Trafigura's profitability is based on its ability to capture arbitrage opportunities irrespective of the direction of price fluctuations. The recent movement in oil prices signals the return of volatility, which provides trading opportunities and reduces the Group's required level of working capital, as more volume can be financed dollar-for-dollar. Trafigura's diversification across the commodities sector, coupled with the information advantage it has access to as a global physical trader, provides the Group with the ability to exploit the large price differentials created through market volatility. Recently, the market has shifted into contango for both Brent and WTI, and Trafigura views this as an opportunity to generate increased returns with low risk levels.

### Impact of Declining Oil Prices on Trafigura's Suppliers

Many of Trafigura's suppliers are active in the exploration, production, and exporting sectors of the oil industry. By their nature, businesses in these sectors have historically been affected by price declines. Although these suppliers seek to protect themselves from short-term price shifts through financial hedging, they use long-term pricing forecasts to make business decisions. As such, a weakening oil price environment can have major effects on their operations and may negatively affect their ability to perform and fulfil certain contractual obligations. However, in the majority of cases, cargoes are paid for on behalf of Trafigura by trade finance banks using what is known as a "Documentary Letter of Credit" which is only redeemable upon presentation of shipping documents by the supplier to the financing bank. Therefore money is not paid if delivery does not occur.

Certain of Trafigura's supplier contracts are prepayment transactions, whereby a loan has been granted to a supplier in exchange for future delivery of specified quantities of goods. Repayment of such a loan is made periodically via the delivery of goods or payment in cash by the supplier. Prepayment contracts typically contain specific protections for the lenders (in this context, Trafigura) which require over-collateralisation of the outstanding debt allowing the Group to manage supplier credit and performance risk even in a declining pricing environment.

Finally, Trafigura's experience in this industry shows that in major oil producing countries, oil producing assets perform even during difficult financial situations (e.g. in Egypt since the Arab Spring).

Purchasers of oil products generally tend to benefit from increased purchasing power in a declining oil price environment. Therefore lower oil prices do not create specific credit risk on Trafigura's customers (oil purchasers).

In the oil industry, purchasers of oil products typically do not breach contractual obligations in order to take advantage of lower spot prices. Other than in a distressed situation, a purchaser's failure to fulfil obligations to lift an oil cargo would be damaging to its reputation within the commodity trading industry and related sectors, and may lead to difficulty for it to source oil cargoes in the future.

Trafigura mitigates customer credit and performance risk through the use of:

- Insurance: Trafigura obtains substantial cover for credit and performance risk through the Lloyds insurance market.

- Letters of Credit: in case the issuing bank is rated lower than A-, Trafigura obtains confirmation from at least an A- rated bank.

- Silent Risk Confirmation from banks: Trafigura obtains a guarantee from an A-rated bank for the payment risk of its counterparties.

### Metals and Minerals

#### Market Structure – Supply Side

The main non-ferrous metals group consists of aluminium, copper, lead, nickel and zinc.  Concentrates of these metals are mined ores which have been processed to "concentrate" the metal content as well as alumina which is refined bauxite ore from which aluminium metal is produced.  Concentrates are not traded on international exchanges but directly between counterparties.

Producers are essentially mining companies which operate or control mines.  Consumers are usually smelters and refiners.  Smelters process the concentrates to further separate the metal from other metals or impurities.  The resulting blisters are then passed on to refineries for further processing.

The refined metals which are produced are then sold to manufacturing companies as the raw material inputs.

The main minerals group consists of bulk commodities such as iron ore and coal, the latter being divided into thermal coal (for use in electricity production) and coking coal (for use in steel production).  In contrast to the non-ferrous markets, production of bulk commodities is generally much lower cost, but with much higher tonnages.  The seaborne iron ore market, for example, is around 1.2 billion tonnes of material, which compares with under 50 million tonnes for aluminium and 20 million tonnes for copper.  Not surprisingly, transport costs are a significant factor in trading bulk commodities and as a result there is less of a global market than with non-ferrous, with some regional markets (internal US coal market for example) only loosely connected to the global market.

#### Market Structure – Demand Side

Refined metals and steel have a variety of end-uses although the most important of these are construction (including infrastructure building), transportation and consumer products.  As a result there is a close correlation between metal usage and the global industrial cycle.

Metals consumption increased rapidly between 2003 and 2008, reflecting the continued economic expansion, but slumped during the global financial crisis as lower end-use demand was exacerbated by aggressive end-user and producer de-stocking.  Demand recovered strongly in 2009 and 2010, helped by the global economic recovery and in particular the Chinese stimulus programme that was very metals intensive.  Consumption growth has been slower since 2011 as global economic growth has eased, particularly in emerging markets where growth tends to be more commodities intensive.

Over recent years there has been a marked change in the structure of the demand side for non-ferrous metals, in particular demand in OECD countries including  North America, Western Europe and Japan has changed very little while consumption in emerging markets has grown significantly.  Much of the strength in emerging markets has been due to the industrialisation and urbanisation of China, although off-take has also increased in other emerging markets.  The net effect is that emerging markets now account for over two thirds of consumption, up from just one third in 1992.  Between 1992 and 2014, aggregate non-ferrous base metals consumption in  OECD countries was little changed while growth in emerging markets has more than quadrupled (a CAGR of +7.7 per cent. per annum).  Total non-ferrous metals consumption over this period increased by 140 per cent. (a CAGR of +4.1 per cent. per annum).

*Market Fundamentals*

The non-ferrous concentrates, bulk commodity and metals market as a whole is composed of vertically integrated metal groups (BHP Billiton, Rio Tinto, etc.), industrial companies (Umicore, Arcelor, Korea Zinc etc.) and in the case of thermal coal power utilities. As such, this market tends to be fairly conservative with counterparts that maintain stable long-term relationships with their suppliers and customers. Most contracts tend to be over annual or multiple years including evergreen (i.e. indefinite) on the concentrate side and annual on the metals side. Such activity therefore offers longer term visibility with regard to the book composition and profitability when compared to oil trading.

As with the oil market, the non-ferrous concentrates and metals markets and the bulk commodity markets are driven by global supply and demand and available refining capacity.

With respect to metal concentrates, even though concentrates are not exchange-traded, the metal content is still hedgeable. The price of a ton of concentrate is determined by the metal content value less the treatment charge and refining charge ("**TC/RCs**") representing the fee paid to the smelters and refiners to first smelt and then refine the concentrate into metal. TC/RCs are effectively related to the level of utilisation of the smelters/refiners at any time in a geographical region, when compared with mine production and industrial user consumption.

Any combination of the two main drivers (overall supply/demand and smelting/refining capacity) can have an opposite impact for, on the one hand, concentrate value and, on the other, refined metal value. Indeed, it is possible to be in an environment of high demand for and/or low supply of metal linked to a lack of refining capacity driving prices high while concentrates are oversupplied compared to the same refining capacity, driving the value of concentrates lower (TC/RCs higher). It is therefore crucial to understand and follow closely the evolution of (i) mine production, (ii) available refining capacity, and (iii) global demand, in order to anticipate price movements and negotiate effectively long-term contracts.

Trafigura's advantage in these markets arises from stable, long-term relationships with producers, smelters and consumers complemented by its arbitrage (freight, geographical, etc.) and risk management expertise.

*Current Market Developments*

Industrial metal prices are traditionally volatile, reflecting the swings in the global economic cycle, often exacerbated by stocking and destocking cycles, supply-side changes and inflows and outflows of short-term and long-term speculative and investment flows. The key driver, however, remains the economic cycle and price movements in recent years have reflected changes in actual and expected global growth. Current trends in some of the metals and minerals markets in which Trafigura is active are as follows:

*Aluminium*

LME three-month forward aluminium prices have fluctuated from a low of U.S.\$1,790 in March 2014 to a high of U.S.\$2,150 in September 2014 on the back of a globally tight market. Warehousing issues and regulatory changes were the main drivers dictating trading flows in 2014, and Trafigura expects these themes to continue into 2015.

The market reacted strongly to the Qingdao port investigation and dispute in June 2014, since China accounts for over 40 per cent. of aluminium consumption globally. The direct effect on Trafigura was not material, but market participants have become much more cautious in their aluminium trading within China.

In response to warehousing issues, including extended queues at current LME warehouses, across the aluminium market, the LME has announced new warehousing rules from the beginning of 2015. These rules will change the market dynamics by subjecting warehouses with queues of over 50 days to strict load-in load-out requirements.

From a supply and demand side, the market currently looks quite tight as aluminium demand has continued its steady growth globally. The demand growth has been driven by industrial projects, increased end user consumption, and urbanisation. Over the long term, the market is expected to remain relatively balanced with the long term skewed towards a small surplus. In the short term, stock accumulation is expected to continue.

*Copper*

Throughout 2014, LME copper prices have fluctuated from a high at the beginning of the year of U.S.\$7,393 to a low by the end of November 2014 of U.S.\$6,351. They have continued to fall in early 2015. Much of the change in

price levels can be attributed to market expectations of increased supply in the near future and the expectation of slowing Chinese demand.

However, market expectations may be misleading. Global copper stocks are currently at their lowest levels since 2008, and forecasted growth in 2015 supply may be overly optimistic. On the copper concentrates side, much of the new production that came online in 2014 has been of inferior quality. In order for these supplies to move through the refining process they need to either be blended or roasted. These processes not only require time but also are constrained by blending capabilities and roasting capacity. In 2014, refiners and especially smelters also faced considerable challenges because of power constraints and other unpredictable market events. Over 2014 the demand for copper remained robust. Although headlines would indicate a slowdown in Chinese demand, the reality is demand for copper within China remains strong. Simply put, many of the headline fears of a slowing Chinese demand should be reinterpreted as Chinese demand growing at a slightly slower rate. Chinese consumption increased steadily in 2014, and Trafigura considers it reasonable to expect a similar uptick in consumption for 2015. Much of this new demand will need to be met by an increase in copper cathode production or a further drawdown of stocks, as Chinese scrap usage has fallen substantially over the last year.

With mixed market expectations and increased supply uncertainty, prices remained highly unpredictable going into 2015. All market participants should be prepared for sustained price changes as market events unfold.

*Lead*

In the second half of 2014, the lead market saw a decline in prices with a high of U.S.$2,287 on 28 July 2014 and a low of U.S.$1,824 on 30 December 2014. The drop in prices was due to two main factors: the appreciation of the U.S. dollar and the rapid decline of oil prices. Over the period, the lead market remained relatively balanced, but Trafigura expects the market to shift into deficit in the near future as global demand growth will continue to outpace supply growth.

In lead concentrates, the market transitioned from a tight market at the start of 2014 to a better supplied market by the end of 2014. This resulted from the closure at the La Oroya smelter in Peru, which reduced competition for concentrate demand. Trafigura expects that the demand for lead concentrates, as with refined lead, will continue to broadly track global growth projections. Production will adjust slowly, but in the medium to longer term, new mine projects should increase global supply to meet demand with the closure of other less productive mines expected.

In 2015, Trafigura foresees the credit crunch in China to be a key factor in the lead market, with clients particularly reliant on bank funding being forced to scale down operations. Furthermore, market participants should pay close attention to impending environmental regulations, such as China's newly issued National Climate Change Programme.

*Zinc*

The zinc market performance over 2014 has been relatively stable with prices increasing by just over four per cent. to U.S.$2,171 since the beginning of 2014. Market fundamentals continue to improve, and the market remains in a structural deficit. From a technical perspective, 2014 marked a considerable increase in the zinc consumption ratio. Historical data shows that zinc market prices are strongly correlated to the zinc stock consumption ratio.

In order to meet incremental increases in consumption and demand, based on market expectations, Trafigura estimates that approximately three million metric tons of new concentrates will be needed to be added to balance the market in the next five years. 2014 has also shown that the market expects the increased demand to be met by increased Chinese production as very few new viable pure zinc mines exist and new mining prospects have proven to be highly capital intensive.

Recently, China's credit crunch and fall-out from the Qingdao port investigation and dispute has led domestic Chinese companies to increase exports of zinc stocks to raise cash. In effect, this should decrease the global deficit currently expected and keep downward pressure on LME prices in the short term. However, by the second half of 2015 into the first part of 2016 a fundamental deficit could take hold and a rally in global prices remains possible.

*Nickel*

Over 2014, Nickel prices were extremely volatile, trading in a range from U.S.$13,413 in early January to U.S.$21,000 in mid-May. Since May prices have come off substantially, trading at just under U.S.$16,500 in December 2014 but still up over 20 per cent. as compared to the beginning of 2014.

The increase price volatility in 2014 was attributable mainly to the Indonesian ban on nickel ore exports instituted in January 2014. The ban has constrained the market supply, especially in China, of high quality nickel ore with no natural market substitute readily available. As such, over 2014 LME nickel inventory decreased markedly and prices have endured significant bouts of volatility.

Looking at supply and demand, the market currently remains in surplus. However, the market could shift into deficit in 2015 as estimated nickel demand is set to increase steadily in the foreseeable future and the supply outlook is quite weak under the Indonesian export ban. Broadly speaking, these facts support Trafigura's expectation that nickel prices will continue to be quite volatile.

*Iron ore*

The iron ore market has experienced a low price environment in 2014. By the end of 2014, prices were off by almost 50 per cent. compared to levels at the beginning of 2014, with current prices around U.S.$60 per tonne. The market has been driven lower by slowing Chinese demand and surplus mine production from producing countries.

A slowdown in Chinese demand in 2014, coupled with a 180 million metric ton supply increase, mainly out of Australia, in the past year has sent the market on a downward trend. Despite the depressed prices, the major producers have indicated that they will continue their ramp up stages in 2015, in an attempt to cut per tonne production costs and maintain revenue streams. However, smaller producers and mines cannot cut costs as easily, and the uneconomical mines may shut down if prices remain low.

Fundamentals are changing quickly, the steepness of the iron ore cost curve, combined with a more volatile macro environment, means that this trend will likely continue in 2015. It remains to be seen if enough uneconomical supply will leave the market to offset the extra production from the major producers. Chinese ferrous policy, domestic steel consumption and general economic conditions will also play a major role in 2015. Weakening Chinese demand fears are particularly important as over the last decade Chinese steel consumption has seen an unprecedented growth, and now accounts for roughly two-thirds of seaborne iron ore demand.

The knock on effects of these market events has significantly changed the iron ore outlook. Noting the 2014 signals, in 2015 Trafigura expects that it and other market participants will focus closely on production costs, along with any significant policy changes in and around the Chinese market.

*Coal*

Over 2014 the coal market has been dominated by five major themes: a lower price environment, strong Australian supply, the withdrawal of China, depreciating producer currencies, and the beginning of producers curtailing supplies, particularly in the US and Indonesia.

Most of the supply has been generated in Australia, as producers look to improve cost efficiency by maximising throughput. Australian supply has been supported by a weaker Australian Dollar and a search for cost efficiencies. Russian supply has also been strong, helped by a plunging Russian Ruble. Elsewhere, supply growth has been more muted. South Africa remains limited by infrastructure bottlenecks. Colombia has failed to grow substantially from 2013 levels and US exports have slowed as legacy hedge programmes have been exited. Indonesian supplies also appear to have slowed, hampered by a number of regulatory issues and by market conditions.

Very strong Australian supplies have coincided with a fundamentally weak China which has changed the recent flow of material around the world. Since the mid-2000s, coal flows have moved increasingly to the east, with up to one third of South African material flowing in to the Far East, as well as periods where both Colombian and US tonnes have moved out of the Atlantic and into the Pacific market. Now, there are almost no South African tonnes moving past India and there are more Australian tonnes having to flow west. There have even been some Australian thermal coal shipments moving into Europe for the first time in almost a decade.

While there are a number of upside risks emerging as supply growth continues to slow, we expect the market to remain relatively weak in the short term. Nevertheless, financial distress among suppliers and changing trade flows continue to present trading opportunities to those with a solid balance sheet, a global reach, and expertise in logistics and physical execution.

*Competition*

Trafigura's three main sources of competition are:

- Producers or integrated companies such as the oil majors or integrated giants;

- Global traders (Trafigura's peer group); and

- Small(er) independent traders focused on niche markets defined either geographically or by individual commodities.  For example, in the oil sector some companies are more competitive in a particular region or commodity in which they are specialised.

Trafigura sees its two main competitors as Vitol and Glencore.  Vitol is mainly focused on large and liquid markets whereas Trafigura's trading activities are spread more globally, resulting in more diversified profit generation. Glencore focuses primarily on non-ferrous metals and concentrates and energy.  With the recent merger between Glencore International and Xstrata plc, the commodities world has witnessed a major change in that Glencore will increasingly act as a mining corporation, with the company marketing its own production.

Over the 20 years that Trafigura has been in operation, it has seen competition in the global commodities market alter as a result of a number of structural changes in the industry.  These changes have created challenges, but have also opened opportunities for trading companies large enough to take advantage of them.  They have included:

- the mergers of large integrated producers (e.g. Total, Exxon Mobil, ConocoPhillips), which has often resulted in reduced trading activity by the merged company, providing opportunities for commodities traders in balancing global demand and supply;

- a move away from vertically integrated business models by some of the majors, which has resulted in the disposal of some infrastructure and logistical assets and which has enabled some commodity traders to build up their capabilities in logistics;

- regulatory changes in the banking sector, which have led to more stringent restrictions enforced on the lending activities of banks.  This has also increased the cost of lending and has reduced the liquidity available to some smaller competitors who, unlike Trafigura, might not have strong bank group support. This has led to the disappearance or contraction of mid-sized companies, creating opportunities for larger traders such as Trafigura;

- increased operating costs and the inability of smaller players to integrate the supply chain; and

- the erosion of physical traders' superior price information, as a result of increased transparency in pricing and the sophistication of commodity producers in the commercialisation of their products.  This has opened opportunities for traders such as Trafigura, which has been steadily growing its industrial fixed asset base and reducing its reliance on pure trading activities as well as offering integrated logistical services yielding higher margins.

**The Role of Commodity Traders in the Financial System**

It has been suggested by commentators that global physical commodity trading companies should be considered as systemically important to the world economy as they could pose a threat to global financial stability similar to that created by the "shadow" banking system during the global financial crisis of 2007-2009.

A recent study commissioned by the Global Financial Markets Association, an organisation representing the interests of the world's leading financial institutions, into the "shadow" banking system and systemically important financial institutions, found that although global commodity trading companies do indeed compete with certain banks active in the physical commodities trading space, they do not pose a systemic threat to the system as a whole.

The report had been aimed at the Financial Stability Board, a group of global regulators, which has recently been discussing stricter regulation and capital requirements of commodity trading companies and was widely seen as a tactic by some banks active in the commodity trading space as a way of creating more equality between market participants by seeking to usher in further restrictions on pure commodity trading companies.

The main arguments supporting the claim that commodity traders engage in shadow banking stem from the fact that commodity trading companies (i) extend credit and working capital to their customers, as well as (ii) use securitisation programmes.

In response to the first argument, Trafigura believes that trading firms provide funding to producers through prepayment agreements and other financing arrangements.  Traders would typically fund volumes of yet-to-be-produced commodities in exchange for receiving the products when produced or extracted.  The products are essentially collateral for the financing provided to purchase the future production.  The performance and credit risks of the producers are covered in most instances by insurance policies limiting the exposure of the commodity firm extending the credit.  Moreover, such financing arrangements typically rely on specialised commodity finance banks which will carefully assess the prepayment transaction before putting their own capital at risk.

In response to the second argument, Trafigura believes that the securitisation structures used by physical commodity traders such as Trafigura are very different to the financial structures that were the root cause of the global financial crisis in 2007-2009.

Commodity traders' securitisation platforms do not involve the kind of maturity mismatch that was the Achilles heel of arbitrage securitisation vehicles like structured investment vehicles ("**SIVs**") or collateralised debt obligations (CDOs).  Indeed, to the extent there is maturity transformation involved in the commodity securitisation platforms, it is the opposite of the type that proved problematic in the crisis.  The underlying assets are very short dated (such as receivables) and/or very liquid (like inventories of aluminium in LME warehouses).  The assets typically have shorter maturities than the liabilities issued to fund them.  Traditional SIVs had to rollover their liabilities.  Commodity receivables securitisation programmes need to replenish their assets.  The former is far more problematic than the latter because the run-risk is far greater.

Furthermore, default rates on securitised trade receivables are very low and the Group believes that in one respect, the development of securitisation programmes such as Trafigura's, have helped free the capital demanded of commodity trade finance banks, since risk is transferred to the capital markets instead.

Since the main role of commodities traders is not to provide financial intermediation, but rather to provide logistical services and due to the fact their assets could be quickly re-deployed if needed, it is difficult to see how stricter regulations and capital requirements would be of benefit to the wider financial system.

Following recent developments in the banking market over 2014, which caused banks to retreat from lending in the commodity trading sector, large commodity traders, which have been able to maintain sound access to the banking market by virtue of their size, are increasingly seeing their ability to extend prepayment financing options to smaller counterparties as a key differentiator and a way of developing their access to new markets and increased volumes. With this factor in mind, more stringent regulation on commodity trading companies would likely have the knock-on effect of disrupting the global trade that commodity traders facilitate.

In 2014, as a direct result of these developments, Trafigura took a pre-emptive decision to inform all stakeholders about the business model, inherent risks and financing of the firms operating in the commodities trading industry. To do so, the company commissioned two white papers including The Economics of Commodity Trading Firms and Foundations for Growth – Infrastructure Investment in Emerging Markets. The papers were independently written by Craig Pirrong, Professor of Finance at the Bauer College of Business at the University of Houston and by Russell Jones and Camille Viros at Llewellyn Consulting to shed light on the differences between commodity trading firms and financial institutions. They have been presented to and referenced by regulators, politicians, and competitors alike.

**Operational Organisation and Procedure**

The main trading hubs are based in Beijing, Calgary, Geneva, Houston, Johannesburg, Lima, Mexico City, Montevideo, Singapore, Shanghai and Stamford.  Those offices have trading and operations departments and most have a finance function to support local trading activities.  Most other middle office and back office functions are centralised in Geneva or, with respect to Asia, in Singapore, with shared service centres established in Mumbai and Montevideo.  The Shanghai office manages all China related activities.

All of Trafigura's operational responsibilities are subdivided into three main category groups:  The front, middle and back office.  The front office consists of traders on the different trading desks.  The middle office provides a broad range of necessary support functions to the front office.  The back office provides diversified services to Trafigura's operations as well as to the Group.

As trades are executed, information flows through this operational structure. The segregation of duties found between the front, middle and back offices, and in between the departments, is a key to the effective management of data collection and accuracy and therefore of operational risk. Each department has its own clearly defined set of responsibilities and accountabilities.

**Operational Departments**

*Front Office*

*Traders*

Traders initiate any sale or purchase transaction, either directly with a customer or through a commodity broker. In both cases, the contracts are negotiated directly with the contracting party. Trafigura's trading operations are organised by product desk. The main desks are:

Aromatics, crude oil, fuel oil, biodiesel, middle distillates, gasoline, naphtha, LPG, LNG, natural gas and condensates for the oil trading business; and copper, lead, alumina and zinc as concentrates; copper, lead, zinc and aluminium together with by-products (gold and silver) as refined metals; and the more recently established desks in iron-ore and coal within the minerals trading business.

Trading positions are not established individually by each trader but managed on a book basis. Each book generates its profitability by exploiting natural/physical arbitrages in the market place.

For all trades (whether sale or purchase), the trader must verify the financial conditions, check the credit authorisations and request risk cover if needed. In the case of an existing customer, risk limits and acceptable credit terms are available on Trafigura's IT systems. Any transaction involving a new customer will trigger Trafigura's KYC procedure. The finance department has a final veto on any transaction.

There are established risk control procedures in place for the traders. For example, once a trader has entered into a transaction, he is required to enter a deal ticket into the system within 24 hours. Failure to do so will be discovered through:

- Reconciliation of broker confirmation for derivatives transactions;

- Receipt of supply contract with no corresponding deal ticket in the case of a physical purchase;

- Protest from the contractual counterparty for non-receipt of a contract for physical sale;

- Failure to issue a letter of credit on time; and

- Failure to nominate a vessel on time for the contracted cargo.

*Middle Office*

*Deals Desks*

The Group's deals desks ("**Deals Desk**") ensure that trading profits and exposure are correctly reported. Deals Desk professionals verify that the results are accurate and reflect the true profit and loss of the trading activities. This data is also used to compile Trafigura's statutory accounts. The Deals Desk's organisational structure mirrors that of the trading book structure, with the Deals Desk staff physically sitting on each trading desk and assigned to specific product books. It is important to underline that the Deals Desk individuals are independent from the trading departments and that they report directly to the head of department who in turn reports to the Group's chief operating officer ("**COO**").

The Deals Desks are mainly responsible for the following areas:

- Preparation of provisional profit and loss ("P&L") statements. Monitoring daily variance in trading P&L, volumetric as well as economic exposure to price quotes. Production of a written commentary on variances;

- Ensuring that all market price risks are captured and hedge actions are executed as well as the timely allocation of physical, swap and futures trades;

- Daily mark-to-market of P&L, initially based on cost estimates, and later adjusted for actual costs as they become available; and

- Monitoring of derivatives trading.  For all open positions, Trafigura has a very strict, two pronged risk policy that sets both a stop-loss position and VaR limits.

*Traffic/Operations Department*

The traffic/operations department role is to accurately follow each given transaction from inception to completion by focusing on the overall shipment-procedure and the related upstream and downstream sub-processes.  Its organisational structure mirrors that of the book structure.  This means that individuals from the traffic/operations department are located on each trading desk and have a portfolio of transactions within a specific product book.  The traffic/operations department is also responsible for the safety of the operational transactions and the compliance with relevant regulations.

*Chartering Department*

Physical trading of commodities involves the port-to-port shipment of cargoes under charter-parties.  The chartering department's major objective is to find the best possible transportation solution for the underlying cargo by effectively using the market and timing circumstances to obtain the most competitive rates.  The chartering department consists of specialised professionals based in Trafigura's main trading offices as well as Trafigura Maritime Logistics PTE Ltd., a Maltese company, which provides specialist advice on chartering issues.  Chartering staff maintain a close liaison and good relations with traders, the traffic/operations department and tanker brokers as well as with ship owners.  Chartering staff report to the head of the traffic/operations department.

*Contracts Administration*

The contracts administration department's main function is to draft all physical sales agreements and to review all physical purchase agreements to ensure that Trafigura is fully and legally protected.  The contracts administration department works closely with the traffic and operations staff.  Furthermore, they advise traders and other staff in the middle office about potential problems that may arise as a result of the contracts.  The contracts administration staff seek authorisation from the traffic and operations department and the insurance and trade finance teams on each trade prior to completing the documentation.  Trafigura ensures that the contracts for each trade are either sent or received (depending on whether Trafigura is acting as the buyer or the seller) within 48 hours after a deal ticket is entered into the system.  A standard template is adapted to reflect the terms of every trade.

*Finance Department*

The finance department supports the activities of the whole Group and is involved at the earliest stage of transactions and projects.  The finance department is responsible for the financial risk assessment and has the capacity to veto any transaction.

*Credit Department*

Trafigura's credit department performs fundamental credit analysis and is based in Geneva, Singapore, Shanghai, Stamford, Houston and Mumbai.  The credit department's key role is to safeguard the balance sheet.  It assesses the credit risk associated with the Company's counterparts, sets appropriate internal limits, monitors exposures and ensures that relevant related documentation is completed and maintained.  The credit department establishes credit limits for all counterparties and reviews them at least once a year.  Any exposure above the credit limits is covered on the insurance or financial market.  The credit department has the role of final approval as to whether a transaction can be entered into with a new trading counterparty.

*Insurance Department*

The insurance department is responsible for arranging adequate cover for all types of operational risks and liabilities of the Group.  As such, the insurance department sets up and monitors:

- Marine cargo in respect of Trafigura's physical cargo/stock cover for various risks, including, but not limited to:  fire, contamination, loss, pollution, environmental damage, leakage, etc;

- Third party insurance cover for liabilities associated with stocks, industrial assets and employees;

- Property insurance and directors and officers liability insurance; and

- Country risk insurance cover, depending on specific characteristics of a single transaction in collaboration with the structured finance and/or the trade finance department.

Aside from arranging insurance cover, the insurance department is also responsible, in the event that an insured risk occurs, for handling the resulting claim.  When a cargo accident occurs (e.g. contamination, damaged cargo, collision etc.) or a legal claim is made against a Group company, the insurance department will handle the claim from the outset and manage the recovery of proceeds under the appropriate insurance policy.

### Back Office

#### Trafigura Global Services

Trafigura Global Services Private Limited ("**TGS**") is the Group's fully owned shared service centre ("**SSC**"), established in July 2011 with the intention of centralising the Group's operations, yielding efficiency gains, driving process consistencies and providing support to front offices roles.  TGS houses an array of teams carrying out middle and back office functions.  Main support teams include accounting operations, deals desk, treasury, trade finance, compliance, insurance and operations settlement and provide critical support to other teams located in offices around the world.

Furthermore, TGS supports various Group functions, including IT (on application, infrastructure support) as well as HR.

TGS takes advantage of time zones, to enable a "follow-the-sun" approach to business operations, supporting main offices in Singapore, Geneva,  the US and South America.  TGS teams communicate with banks, brokers, vendors, counterparties, inspection companies etc.  In addition, TGS maintains a culture and work environment that is on par with the other commercial functions of the Group, despite being a relatively new addition.  This helps facilitate a culture of innovation, growth and ownership in the business.

#### Accounting Department

The accounting department is present in a number of offices, but mainly based in Geneva, Amsterdam and Mumbai.  The department's main objectives are the maintenance of accounting ledgers, balance sheet management, legal entity management overhead reporting and the production of the resulting reports.  Its responsibilities include producing annual statutory accounts, debtors, creditors and intercompany accounts as well as completing the normal day-to-day accounting tasks.  In addition to these regular accounting functions, the department acts as an important second entity of control, after the middle office, mitigating the risk of inaccurate and incomplete deal capture.  Structurally, the accounting department is subdivided into three areas of responsibilities; Group accounting, oil and energy accounting and metals and minerals accounting.  Within the accounting department there is also a Group cost management ("**GCM**") team which is based in Mumbai and deals with central overheads such as office costs and expense claims.

#### Legal Department

The legal department has lawyers based in Geneva, Singapore, Shanghai, Johannesburg, Lima and Houston.  It is staffed by experienced lawyers who are primarily lateral hires from law firms, investment banks and industry as well as by secondees from law firms.  The department relies on a limited number of leading law firms to provide additional resource and expertise.

The department provides legal support covering all of Trafigura's businesses and activities.  It manages all contentious matters, any investigations or inquiries as well as Trafigura's commercial transactions – for instance, M&A, joint ventures, significant transactions, financings, anti-trust and regulatory matters.

#### Compliance Department

The compliance department is based in Geneva, Johannesburg and Montevideo and manages Trafigura's global compliance activities.  The compliance department has assigned compliance representatives in Trafigura's trading offices in Houston, Lima, Mumbai,  Shanghai, Singapore and Stamford.  The compliance representatives provide support to the compliance department in order that it can meet its objectives on a global basis.  Its main function is to provide guidance; training and advice on compliance issues to all Trafigura's employees as well as to develop and monitor Trafigura's code of business conduct (the "**Business Conduct Code**").  The compliance department is

involved in Trafigura's KYC procedure and works closely with traders and the credit department.  Besides its involvement in the KYC procedure, the compliance department acts as an internal advisor and provides training to all employees on any Business Conduct Code related matters including the application of, or compliance with, the code in specific circumstances.

*IT Department*

The IT department's main responsibilities centre on the development, support and maintenance of business supporting applications, and underpinning the IT infrastructure.

In order to support the growing business, Trafigura continues to enhance its enterprise systems adding new modules and enhancing the existing functionality.  The core business is captured and managed by Trafigura's two key bespoke information systems "Pluto" for the oil business, and "Mercury" for the bulk-commodities business.  Both of these systems offer a fully integrated approach to the Group's needs and enable each department to use or complete the information related to each transaction.  As such, every step in the life of a transaction is generated, executed, monitored and controlled through the related information system; from the time the trader enters the details of the trade, to the allocation of funds received from the customer.

*Corporate Affairs Department*

The corporate affairs department ("**Corporate Affairs**") has representatives in Geneva and Houston.  The responsibility of the team is twofold:  to create and sustain frameworks for an ever more responsible and effective company, and to protect and promote the business interests and reputation of Trafigura and its subsidiaries globally. In addition, Corporate Affairs is instrumental in continuing to improve and implement the groups HSEC business principles.

**Risk Management**

***Risk Management and Corporate Responsibility***

Prudent risk management is an integral element of Trafigura's business and has been institutionalised since the Group's foundation.  Guidelines are established at senior management level and the credit and finance teams retain an absolute veto right on any transaction.

The various risks are managed through a combination of internal procedures, such as strict control mechanisms and policies, as well as external third parties such as the derivative, insurance and bank markets.

***Price Risk and Basis Risk***

*Fundamental principles*

The Group's policy is to hedge all price exposure related to physical transactions on a deal by deal basis.  The purpose of the Group's physical hedging activities is to protect the Group against the risk of physical transactions being adversely affected by changes in (commodity) prices.  The Group systematically enters into hedging contracts to cover price exposures in its physical trading activities.  In particular, 100 per cent. of stock is at all times either pre-sold or the commodity index price risk is hedged.  Hedges are performed by TDL through either futures markets and/or a variety of traded derivatives instruments (e.g. swaps, options).

Beyond that, basis risk cannot be mitigated perfectly.  Basis risk meaning, in this context, the risk that offsetting investments in a hedging strategy will not experience price changes in entirely opposite directions from each other. This imperfect correlation between the two investments creates the potential for excess gains or losses in a hedging strategy, thus adding risk to the position.  Trafigura, therefore, carefully monitors all its hedging positions on a daily basis, thus avoiding excessive basis risk.

*Price Risk Management*

There are two formal committees responsible for different aspects of Trafigura's market risk management process. The risk committee reports to the Company's board of directors (the "**Board of Directors**") and is tasked with ensuring that Trafigura is technically and operationally prepared to deal with the risk issues it faces.  The derivatives trading committee also reports to the Board and is responsible for applying Trafigura's risk management capabilities to improving the overall performance of the group.

Trafigura's chief risk officer (**"CRO"**) and the risk team work proactively with the trading teams to make Trafigura's risk management forward looking, by analysing new opportunities and changing market conditions. This team develops computationally intensive non-linear risk simulations and advanced statistical models that incorporate the non-normal market price dynamics that are an important feature of commodity markets. The advanced statistical models developed by the risk team are continuously and automatically calibrated and back-tested to ensure that their out-of-sample performance adheres to well defined targets. In addition, these models are regularly updated to ensure they reflect the current observed dynamics of the markets where Trafigura is active.

The risk team's models drive Trafigura's risk reporting system, which automatically distributes customised risk reports throughout the firm on a daily basis. These reports provide up-to-date information on each team's risk using industry standard measures such as 95 per cent. and 99 per cent. VaR and performance indicators such as "Sharpe Ratios". All books have well defined VaR risk limits and management is automatically notified whenever a book nears its risk limit, as well as whenever a VaR overage occurs. In addition, Trafigura's deals desk management team is automatically notified whenever statistically anomalous changes occur in the profit and loss of any deal.

For senior management, the daily reports provide a comprehensive view of Trafigura's risk, classified according to various risk factors. These reports emphasise the risk diversification created by the group's varied activities and highlight any excessive risk concentrations. Numerous indicators detail how the Group is performing relative to a wide range of benchmarks.

*Energy*

All futures markets are cash markets meaning that price differences are settled in cash on a daily basis (**"margin calls"**) after the payment of an initial margin the day of the trade. Swaps or options are usually traded OTC.

Hedges are executed through a number of brokers. Trafigura works with ten main clearing brokers. The staff involved perform the equivalent functions as the operations department on the physical side: they receive or issue contracts, receive or issue invoices, control and order payment as well as following receipt of proceeds. The accounts department is also involved in swap administration as the department is responsible for the reconciliation of positions on a daily basis.

Hedges are performed through a central execution desk with TDL. Each hedge is individually monitored by the Deals Desk. Most oil contracts become fixed price around the shipment's loading date. Typically one or two days before such date, the Deals Desk liaises with the operations representative in charge in order to estimate the loading (i.e. price fixing) date and start hedging on time. The same applies for other instruments including as swaps and geographical spreads (for example Brent versus WTI).

As soon as a hedge has been put in place, a deal ticket is created and input into the system. The ticket is either attached to an existing physical deal or a new deal will be created if no such physical deal exists already. All positions are reconciled daily with the brokers' positions by the accounts department. Cash is settled daily by the treasury department.

The credit team is responsible for monitoring counterparty exposures across the OTC swaps and options portfolios. On a daily basis, the mark-to-market positions are cross-referenced against pre-agreed credit thresholds set by the credit team at a counterparty level. Excesses are covered by collateral called in the form of cash or standby letters of credit. The credit team works with the treasury trade finance teams to manage the collateral requirements, issued and received.

Another important aspect of the work undertaken by the credit team is the negotiation of standard Master agreements such as International Swaps and Derivatives Association (**"ISDA"**) and Master Netting Agreements these provide a framework for the execution of OTC transactions and are negotiated with each counterparty with the assistance of Trafigura's legal counsel. As a short-term measure, long form confirmations referencing ISDA are used to initiate trading relationships; these incorporate the majority of the netting and termination provisions defined in Trafigura's standard ISDA Master Agreement.

Trafigura has two principal methods for mitigating the credit risk associated with its hedges:

Each ISDA includes a credit margin threshold, which are conservatively set on a case-by-case basis by Trafigura's credit department and regularly reviewed. Typical credit thresholds are in the range U.S.$0-5 million, with daily margining of the OTC position. More recently, in light of the turbulences in the banking market, Trafigura has reduced its ISDA credit thresholds across the board and in particular with US broker dealers.

At the onset of the financial crisis, Trafigura moved a large number of counterparties to CME Clearport due to general credit concerns and sentiment.[8] The remaining counterparties with which it continues to trade OTC are only the highest quality counterparties. Even so, Trafigura continues with its policies of using ISDA documentation and setting conservative margin thresholds as described above.

*Metals*

In Europe, the main futures market for metals, the London Metals Exchange, is not a cash market. The consequence is that brokers negotiate credit limits with their customers to cover initial and variation margins above which cash is required. In the same manner, customers run a credit exposure on their broker when positions are generating a positive balance.

Hedges are executed by Trafigura Derivatives metals desk in Geneva within TDL at the request of the operations staff when transactions are priced. Hedges are also followed on a transaction-by-transaction basis in the system. However, because pricing periods in metals are typically longer than in oil (one month), the quantity per contract to be hedged on a daily basis is small. This means that the derivative team hedges as a pool on the market, the system splitting such hedges back to each contract. Positions are reconciled by Trafigura Derivatives metals desk with brokers on a daily basis.

This reconciliation shows daily credit exposures Trafigura has on its brokers as a result of its margin position. Contracts can be moved from one broker to another, if necessary, to reduce such risks.

Metal contracts often contain pricing options which allow the trader to decide on which month pricing will happen (i.e. when the "quotation period" is defined). Such options are sold by the physical department to Trafigura Derivatives at market price in order to provide more transparency in the management and results of such options.

**Credit Risk**

To manage its credit exposure Trafigura uses internal credit limits set up by the credit department. Credit limits reflect Trafigura's own appetite for risk and are based on a credit analysis of the client as well as the respective size of the transaction when compared to Trafigura's balance sheet. Exposures in excess of a credit limit would be covered through the insurance or bank markets. Typically these covers are arranged by the Trade Finance/Structured Trade Finance teams.

The credit department consists of 17 professional staff based in Geneva, Mumbai, Singapore, Shanghai, Houston and Stamford who are entirely independent from the trading business. Credit reviews follow a formal process as described in Trafigura's Credit Policy and Process document. Credit research is undertaken at least annually in local offices with smaller credit limits (up to a specified maximum) also being set locally. Larger credit limits are generally approved in Geneva, ultimately by credit committee if required – credit committee sits on an ad-hoc basis and consists of a minimum of four senior finance managers, including Trafigura's global head of credit and a chief financial officer ("**CFO**"). Files will also be reviewed on an ad hoc basis in the case of risk trigger breaches such as ratings agency downgrades, share price declines, adverse publicity etc. Credit limits are always set and monitored on an aggregate basis of Trafigura's worldwide exposure. As a result of Trafigura's conservative approach to credit risk, Trafigura has had less than 10 final credit loss events since inception in 1993.

**Performance and Country Risk**

Performance risks are evaluated on a counterparty and country basis. As such, there are no fixed limits and deals are considered on a case by case basis, and performance risks laid off where the exposure is above the Group's appetite. Typically, any transaction with a counterparty in a country rated below Dun & Bradstreet ("**DB**") rating DB3d will be covered for political risk (this is for all types of risk including performance, payment and storage risk). Any exposure between DB3a and DB3d is reviewed on a case by case basis. Anything above such rating is not normally covered for country risk except in very rare situations.

Risks covered can include counterparty credit risk and/or country risk. Risks coverage is provided by insurance companies and banks.

---

[8]   CME Clearport provides clearing services to OTC energy and metals markets participants. The service is designed to mitigate counterparty credit risk.

*Freight Risk*

The hedging of freight costs is managed systematically by the chartering department.  In a time charter scenario, Trafigura hedges its price risk using a combination of Forward Freight Agreements ("**FFAs**") and fuel oil swaps. When the chartering department chooses the vessel, Trafigura looks to sell FFAs and buy fuel oil swaps.  This way, if spot charter rates for the vessels fall, Trafigura is covered as such a fluctuation in price is offset by the difference on the FFAs.  Furthermore, the chartering department enters into fuel oil swap contracts to hedge the bunker fuel consumed by the vessels.  The fuel oil swaps are entered with a view to safeguard Trafigura's price exposure under a scenario of increasing fuel oil prices.   The procedure between the oil and bulk/non-ferrous handling of vessel chartering and the respective risk management strategies are very similar.  A combination of FFAs is used to hedge forward freight commitments.  Fuel oil swaps cover forward freight commitments in addition to locking prices for fuel oil levels which are required on re-delivery of the vessel at the end of the charter.  When a vessel is fixed on the spot market with cargoes, the chartering department unwinds both legs of the hedge for the period that the boat is going to be occupied.

*Operational Risk*

The operations department has representatives in key locations around the world and is responsible for a number of tasks including contract issuance and booking of vessels.  Operators are also responsible for ensuring that industry, environmental, safety and internal policies and procedures are complied with at all times.  Detailed procedure manuals are implemented throughout the Group and all operators receive regular training on operational matters and additional training covering subjects such as contracts, charter-parties and clauses, environmental policies and legislation, insurance declarations, reviewing due diligence reports, dealing with claims, and demurrage handling. This ensures that operators are kept up to date with procedural, legal, regulatory and industry changes.

Trafigura continues to move towards using a younger fleet of vessels, both in terms of time charters and voyage charters, and as such applies a strict vessel vetting procedure which complements insurers' requirements and focuses on the vessel age, classification, protection and indemnity club and pollution insurance cover.  A similar procedure has also been introduced for both railcar and truck movements.  Trafigura also has a storage procedure which involves full due diligence being undertaken of every proposed storage location including a site visit to the storage location, the tanks or warehouse and its financial position and management.  Regular stock analysis is undertaken to avoid losses such as theft and contamination, and each approved location is checked annually to evaluate the on-going situation.

*Third Party Asset and Liability and Charterers Liability Risk*

Trafigura maintains a level of inventories for supply efficiency purposes, and to benefit from cash and carry opportunities.  The Group's total inventories were U.S.$7.9 billion as at 30 September 2014 (30 September 2013: U.S.$7.9 billion).  As at the end of the financial year ended 30 September 2014, stocks were allocated 50 per cent. oil and petroleum products and 50 per cent. metals and minerals (30 September 2013: 57 per cent. oil and petroleum products and 43 per cent. metals and minerals), although it can vary substantially due to seasonal trading plays in energy as well as forward price structure (contango, backwardation and overall price levels) in both energy and metal.  For instance, on a volumetric level over the three month period from 30 June 2014 to 30 September 2014, total metals and minerals storage positions increased by 5 per cent. and total oil and petroleum products storage positions increased by 11 per cent. Please note that inventories reported in the Group's financials can be higher as cargoes in transit for which title transfers at discharge port are also considered to be inventories for accounting purposes.

With regards to stock value, inspection reports are regularly received detailing the quality and the quantity stored.

Third party and asset liability risks are covered by various global insurance policies:  the marine and non-marine Liability Insurance.  These are described below:

- marine cargo open cover (oil and metals);

- charterers legal liability oil policy;

- charterers legal liability metals policy; and

- general liability policy.

These policies are designed to provide broad and comprehensive third party liability cover for all activities. Coverage includes protection for product liability, bodily injury, personal injury and pollution (land based).  They are summarised below.

The marine cargo open cover (oil and metals) covers goods while subject to transport, shipment or storage.  Limit of U.S.$350 million for any one conveyance or location.

The charterers legal liability oil policy covers legal and contractual liability for property damage and bodily injury (main risks covered:  liability for damage to the vessel, bodily injury, damage to property of third parties, damage caused by the cargo, stevedoring, pollution of the environment, general average).  Limit of U.S.$1 billion for any one accident or occurrence.

The charterers legal liability metals policy covers legal and contractual liability for property damage and bodily injury (main risks covered:  liability for damage to the vessel, bodily injury, damage to property of third parties, damage caused by the cargo, stevedoring, pollution of the environment, general average).  Limit of U.S.$1 billion for any one accident or occurrence.

The general liability policy covers bodily injury and property damage incurred by third parties (the policy covers both legal and contractual liability and applies to general liability, employer's liability and product liability). Limit of U.S.$500 million for any one occurrence with an annual aggregate of U.S.$250 million for product liability only.

*Risk Limits*

On the physical side, each transaction has its own profit and loss record, which is established at the inception of the transaction and remains open over the entire life of the trade.  Physical deals are continuously monitored by Deals Desk which acts entirely independently from the trading business.  Each P&L is individually marked-to-market on a daily basis and updated with the actual transaction costs such as purchasing costs, hedging, insurance and financing as these costs become known.  On any day, changes of U.S.$25,000 (in either direction) are reported and explained to senior management, allowing Trafigura to closely monitor its basis risk.

In addition, within the physical trading business:

- no specific limits are set outside any credit requirements; and

- the head trader on each desk speaks to the oil trading management steering committee ("G9") or metals and minerals management steering committee ("M12") on a daily basis to highlight current issues new business.

Within the speculative trading business:

In addition to its physical trading business, Trafigura enters into managed speculative positions which involve spread risk when it identifies price or time differentials between markets and products related to its physical flows. Such speculative positions are continuously monitored and subject to VaR and stop-loss limits per position.  As a rule, the Group maintains conservative consolidated risk limits and ensures that its overall risk exposure remains well within these limits.  Strategies are also given specific stop losses (e.g. U.S.$1 to 2/bbl), which are monitored by the Deals Desk and positions are marked-to-market on a daily basis (during volatile periods positions are marked to market multiple times during the day).  If a stop loss is hit, senior management is notified immediately.  A decision is then taken to liquidate or keep the position and set a new stop loss limit.

*Market Risk Management Reporting*

Trafigura's CRO is responsible for ensuring that there is a full and accurate awareness of risk throughout Trafigura and that these risks are professionally analysed and managed.  The CRO works closely with the trading teams to make Trafigura's risk analysis forward looking, particularly by proactively analysing new opportunities and changing market conditions.  The CRO ensures that Trafigura's Management and Supervisory Boards are aware of these evolving risks and their financial implications.  The CRO also sets the priorities of the risk systems development team so that Trafigura is able to systematically manage its risks through industry standard measures such as VaR, in conjunction with computationally intensive nonlinear risk simulations and advanced statistical analysis.  Aggregate global VaR limits amount to less than once per cent. of Trafigura's equity.

Trafigura's CRO reports to Trafigura's chief operating officer.  Trafigura's chief risk officer has extensive industry experience.

*Mark-to-market*

Mark-to-market reports are regularly produced for traders and management.  The reports aim to show transaction profitability based on the aggregate mark-to-market of all outstanding transactions.  Variations are carefully analysed.

*Market Risk and Stress Testing*

During the financial year ending 30 September 2014, average 95 per cent. one day VaR for speculative positions was U.S.$10.3 million (2013: U.S.$11.7 million).

All trading books have well defined VaR risk limits and management is automatically notified whenever a book nears its risk limit, as well as whenever a VaR overage occurs.  In addition, Trafigura's deals desk management team is automatically notified whenever statistically anomalous changes occur in the profit and loss of any deal.

Trafigura's policy is that basis risk should be kept to a minimum.  If a trader wants to take on a specific position, he has to report in a speculative book where VaR and associated stop losses can more easily be monitored.

### Internal Control Systems and the COSO and COBIT frameworks

The internal controls department implemented and maintains the internal controls system ("**ICS**") in Trafigura, covering the trading division globally.

The ICS is based on a framework that details the risks and controls for all material business processes of the trading division.  The ICS is based on a framework that details the risks and controls for all material business processes of the trading division and was designed using generally known and accepted audit guidance such as COSO business process and entity level controls and IT general controls references.  The Trafigura framework requires going through the following process since 2009:

- annually, management identifies and measures the inherent business risks (financial, operational, and compliance risks);

- annually, management identifies and adapts the necessary controls to cover risk considering business changes;

- quarterly, the key controls are tested to ensure operational effectiveness and the residual risk is assessed and reported to management; and

- continuously, possible opportunities for improvement identified during the previous steps are followed up to monitor progress.

The work developed in these phases is managed using BWise – the Trafigura governance risk and compliance tool.  From BWise, residual risk is calculated and reported to all process owners, the Management Board, the Company's Board of Directors and the Supervisory Board.

The Internal Controls department also assists local management in improving control over local risks, and to promote increased standardisation of procedures across the Group.

The Internal Controls department, thanks to its accumulated knowledge on the business processes, plays a crucial role in assisting management and maintaining an effective control environment.

### Group Financing

*Funding Model*

A key reason for Trafigura's leading competitive position is its access to capital and liquidity.  The Group sources funds from a number of markets including the syndicated bank loan market, securitisation markets, US private placements, corporate bond markets and through trade finance lines.  The strength of Trafigura's liquidity and access to capital is derived from its unique financing model which is based on three main pillars:

- long term corporate credit facilities:  revolving credit and term loan facilities that are used to meet liquidity requirements outside of day to day activities;

- shorter term transactional facilities:  uncommitted, secured bilateral trade finance lines are used to finance the day to day activities of Trafigura; and

- securitisation:  the programme allows Trafigura to fund its receivables once an invoice has been issued and all Trafigura's obligations under the contract have been performed.

The main advantage of this financing model is that short-term uncommitted transactional facilities (which finance the daily trading activities) and securitisation (which finances trade receivables on a non-recourse basis) are self-liquidating.

The Group sources funds from various markets including Europe, Asia and the US and maintains relationships with over 135 banks.  Currently Trafigura's top 10 banks provide circa 57 per cent. of the Group's funding, which is six per cent. lower than in 2013, when 63 per cent of the Group's funding was provided by the top 10 banks.

In line with growth plans, Trafigura aims to continue increasing and diversifying its funding sources in order to ensure:

- unhindered growth of its trading divisions and industrial assets; and

- investment activities and maximisation of liquidity.

Bilateral trade finance lines, borrowing bases and revolving credit facilities make up the majority of the Group's funding; Trafigura also operates the largest trade receivables securitisation program in Europe, established in 2004.

The weighted average maturity of Trafigura's corporate credit facilities as at 30 September 2014 was approximately 2.5 years.  To mitigate refinancing risk Trafigura has diversified its long term funding base to reach different investor groups.  Under its revolving credit facilities Trafigura has extension options in place.  The majority of Trafigura's corporate credit facilities are denominated in U.S. dollars.

Trafigura maintains two main revolving credit facilities ("**RCFs**"), an Asian RCF and a European RCF.  These are generally refinanced annually.

As of September 2014, the Group had around U.S.$46.2 billion of available credit facilities.

*Long Term Financing*

Trafigura's liquidity requirements outside of day-to-day trading activities are financed by committed corporate credit facilities including Trafigura's revolving credit and term loan facilities.  The corporate facilities finance items such as initial margin deposits with hedge brokers and bridge financing of capital expenditure.  The majority of Trafigura's corporate credit facilities are denominated in U.S. dollars because this is the functional currency of Trafigura's business, however under the European RCF, Trafigura has previously introduced a smaller Euro-denominated tranche.

Historically, Trafigura has been pro-active in tapping new markets to diversify its funding sources and extend the terms of its debt profile.  Additionally, under its revolving credit facilities, Trafigura has extension options in place.  Some facilities which have been closed in recent years are outside of Trafigura's usual corporate facilities are outlined below.

*Capital Markets, Capital Issues and Private Placements*

In March 2013, Trafigura issued U.S.$145 million US Private Placement Notes (NAIC-2 designation) in the United States, in addition to the U.S.$230 million US Private Placement Notes issued in April 2011.  In addition to bringing new investors to the Trafigura name, all key investors rolled and/or increased their participation.  Trafigura first accessed the US private placement market in 2006.

In April 2013, Trafigura launched a 7.625 per cent. perpetual, resettable, step-up, subordinated bond.  The transaction was upsized to U.S.$500 million from its launch amount of U.S.$300 million following very strong interest and an order book that was more than five times oversubscribed, supported by strong demand from 170 Asian and European investors.  A key feature of the bond is its equity-like treatment under IFRS accounting standards, improving the balance sheet ratios of the Group.  It also extends the maturity of the Group's debt and brought many entirely new investors to Trafigura, particularly in the Asian market.  The bond is listed on the Singapore Stock Exchange.

In June 2013 Trafigura closed a U.S.$200 million long-term bond financing to support further development of the Burnside Terminal in Louisiana which is operated by its wholly-owned subsidiary Impala Warehousing (US) LLC.

In July 2013, Trafigura Funding S.A. issued EUR 200,000,000 in aggregate principal amount of 5.50 per cent. Guaranteed Notes due 2020.  The Group had first tapped the bond markets when in March 2010, Trafigura issued EUR 400 million unrated and unsecured Notes, after receiving around EUR 1 billion of demand from over 120 accounts across Europe.

In November 2013, Trafigura issued a EUR 500 million 5.25 percent senior fixed rate bond due 2018, the first issuance from its EUR 2 billion euro medium term note ("**EMTN**") programme. The final order book was more than three times oversubscribed with over 219 accounts participating in the final allocations. Of these allocations, over half were allocated to fund managers and banks with the next highest subscribers taking 32 per cent. of the book.

In February 2014, Trafigura issued a SGD 200 million 7.500 percent perpetual, resettable, step-up, subordinated bond. A key feature of the bond is its equity-like treatment under IFRS accounting standards, improving the balance sheet ratios of the Group. It also extends the maturity of the Group's debt and brought many entirely new investors to Trafigura, particularly in the Asian market. The bond is listed on the Singapore Stock Exchange.

In June 2014, Trafigura completed a liability management exercise where EUR 109 million of Eurobond notes with a maturity of 2015 were exchanged for a tap of EUR 107 million 5.25 percent senior fixed rate bond due 2018 issued under the EMTN programme. The purpose of this liability management was to extend the duration of a portion of our long-term debt in attractive market conditions.

*Syndicated Bank Facilities*

Over the last nine years, Trafigura has maintained two revolving credit facilities, an Asian RCF and a European RCF.

Trafigura refinanced both the one-year tranche and three-year tranche of its 2013 European RCF in March 2014. This was initially launched at U.S.$4,000 million, but was closed at an oversubscribed amount of U.S.$4,735 million, comprising a U.S.$1.412 million one-year tranche and a U.S.$3,323 million three-year tranche. 51 banks participated in the transaction, including four new lenders to the Group.

The Asian RCF was also refinanced post financial year end and closed at U.S.$1,730 million in October 2014, The 2013 one-year U.S.$ and one-year CNH tranches were both refinanced, along with the maturing three-year tranche from 2011. The one-year tranche totalled U.S.$1,080 million, the one-year CNH tranche stood at U.S.$215 million, and the new three-year tranche totalled U.S.$435 million. 29 banks participated in the transaction of which five were new lenders under the facility.

In January 2014, Trafigura launched a 25.5 billion Japanese Yen denominated syndicated three year loan with domestic banks and refinanced the inaugural eight billion Japanese Yen denominated 3-year facility that was closed in 2012. This transaction increased the diversification of Trafigura's funding base and strengthened its banking presence in Asia.

*Securitisation*

Trafigura's securitisation programme was launched in November 2004 and enables the Group to fund its receivables once an invoice has been issued and all Trafigura's obligations under the contract have been performed.  The program currently has seven bank-sponsored conduits.  Since currently most transactions are financed on a transactional basis with letters of credit or loans outstanding under existing lines, the securitisation of Trafigura's receivables accelerates the rotation of existing credit lines, as secured bilateral loans are repaid faster with the programme proceeds upon the sale of the receivables.  This frees financial resources, enabling Trafigura to grow existing activities and develop new businesses.

The implementation of the securitisation programme achieved the following objectives:

- diversify and increase borrowing sources;

- maximise borrowing base and amount of net financing;

- benefit from attractive funding costs;

- 107 -

- create a scalable funding program that can grow in size as Trafigura's volume of receivables increases; and

- extend borrowing maturity.

Since launch, the programme has increased the maximum amount of external funding.  The total maximum external funding in the programme as at September 2014 amounted to U.S.$2,753 million.

As a result of Trafigura's stringent risk management philosophy, the programme's issuing vehicle, Trafigura Securitisation Finance PLC ("**TSF**") has not suffered any write-offs since its inception in November 2004.

In May 2012, TSF, successfully priced the Series TSF 2012-1 Notes, raising a total of U.S.$430 million from 14 US and European investors.  The issuance consisted of U.S.$400 million of AAA rated and U.S.$30 million of BBB rated public notes.  It was the first time Trafigura simultaneously tapped the US 144A and Reg S markets.  TSF 2012-1 was the first trade receivables securitisation successfully priced in the public asset-backed securities ("**ABS**") markets since the financial crisis began in 2007.  The transaction was considerably oversubscribed from its launch amount of U.S.$250 million, demonstrating the attractiveness of trade receivables as an underlying asset class and serving as a testament to the success of the programme and the quality of TSF's assets and issuance structure.

In October 2014, TSF issued the Series TSF 2014-1 Notes, a new series of public notes totalling U.S.$300 million on the asset backed securities  ("**ABS**") market. The new notes comprised U.S.$279m AAA/Aaa rated notes and U.S.$21 million BBB/Baa2 rated notes placed with US and European investors. Despite challenging market conditions, these notes were oversubscribed by 1.7 times and 2.9 times for the AAA/Aaa rated notes and BBB/Baa2 rated notes, respectively. In this transaction, the third since the programme's inception in 2004, Trafigura was able to further diversify its investor base in the ABS market with the addition of six new investors, further demonstrating the attractiveness of TSF's assets and issuance structure.

These transactions follows Trafigura's strategy of not relying on any single funding market and reaching out to alternative investors compared to the Group's traditional sources of funding.  The TSF 2012-1 and TSF 2014-1 series issuances are an illustration of the successful implementation of this strategy, and have been instrumental in attracting new investors such as pension funds, insurance companies and specialised ABS investors to make TSF the largest securitisation programme of trade receivables in Europe.

*Rosneft Pre-Payment Facility*

On 21 June 2013, Trafigura signed a long-term export contract with Rosneft for the delivery of 10 million metric tonnes of crude oil and petroleum oil products over a period of five years. As part of the export contract, Trafigura also arranged a U.S.$1.5 billion five-year prepayment facility in favour of Rosneft. The facility was syndicated with a pool of international banks and fully disbursed on 30 September 2013. The facility was the first of its kind to be entered into by Trafigura and has helped Trafigura develop its presence in the Russian market.

*Short Term Transactional Financing*

A large proportion of the Group's financing is derived from trade related transactional financing arrangements which finance day-to-day activities.  This involves the financing of individual physical commodity transactions with uncommitted secured bilateral bank lines.  The debt created in these transactions is secured on the commodity that is being purchased and subsequent receivable.

In their most simple form, bilateral trade finance lines are a means of financing physical trading activity whereby a single trade finance bank initially opens up a letter of credit in favour of a commodity trader, followed by a loan to the commodity trader once the purchase invoice has been paid, to finance a specific single physical transaction.  The loan is repaid by the commodity trader using cash received from the sale of the specific stock being financed.  It is important to note that these transactions are self-liquidating in that the debt is repaid from the proceeds of the sale of the commodities (or by the sale of a related receivable).

A key feature of these financial arrangements is that financing is generally provided at 100 per cent. of the value of the underlying assets and adjusted on a weekly basis.  In the event of rising prices, Trafigura marks-to-market the collateral held by the banks, who in turn provide additional liquidity to Trafigura on a weekly basis or more often if requested by Trafigura (or vice versa in case of declining prices).  Given that Trafigura hedges its physical trading books, the cash flows on the hedging positions can be matched with the change in value of collateral which are marked-to-market under the corresponding loans.  Without bilateral lines, such liquidity could only be realised at the time of the payment under the final sales contract by the client.  These transactions therefore provide a significant source of liquidity that Trafigura's key competitors do not have access to.

The main advantages of bilateral trade finance lines are as follows:

- *Self-liquidating nature*: Lenders initially retain security over the stock, then over the associated receivable. As cash from the receivable is received, the bilateral loan is repaid. It can therefore be seen that bilateral lines are not repaid from cash flow, but rather from the transaction itself.

- *Flexibility*: Bilateral lines are also a very flexible form of financing and can be drawn for funding or the issue of credit instruments such as letters of credit and can be easily increased in case of high commodity prices.

- *Reliability*: Banks view bilateral financing favourably and are more generally more willing to lend under bilateral lines than other forms of financing. This ensures bilateral lines are a reliable form of financing even in distressed credit markets. Since September 2010 Trafigura has grown its bilateral lines by more than U.S.$11 billion, with total lines amounting to circa U.S.$33 billion as of 30 September 2014.

- *Strong liquidity tool*: As transactions are generally 100 per cent. financed and the level of such financings is adjusted on a weekly basis margin calls can be recovered more quickly.

- *Mark-to-market*: Ability to make weekly drawdowns in transactional secured loan to reflect change in value of the underlying collateral; this provides liquidity to balance out margin call requirements on futures positions.

- *Scalability*: Ability to grow lines and to increase/decrease usage according to market conditions and price environment helps Trafigura react quickly to changing developments in the market.

These financing arrangements on an individual transaction basis are only possible with Trafigura's highly developed and integrated IT systems. Various stages of these transactions need to be monitored and reported to the bilateral banks. The banks involved also need to be able to monitor the transactions and ensure proper management.

Today, Trafigura is unique among its principal peer group in the way it finances its business activities. It provides Trafigura with a competitive advantage and has proven to be resilient even during highly volatile market conditions:

The utilisation of the bilateral trade finance lines tends to follow the underlying oil price and accordingly there was a high net utilisation of transactional lines seen in June 2008 due to the corresponding peak in oil market prices around this period. Despite a subsequent (price driven) fall in utilisation, Trafigura has been able to continually maintain the level of its bilateral lines. Moreover, the divergence between the short-term transactional lines and net utilisation is testament to the ability of the group to not only diversify its sources of funding, but also to expand its banking group leading to increasing capacity in short-term transactional lines.

### Transactional Finance vs. Unsecured Lenders

Trafigura's use of bilateral trade finance lines does not negatively impact the position of unsecured lenders. As financing is generally provided at 100 per cent. of the value of the underlying assets and adjusted on a weekly basis, there is no issue of over-collateralisation. This means that no cash (flow), working capital, or equity is trapped under the bilateral facilities. In the event of an unforeseen problem with Trafigura, the bilateral lenders would simply liquidate the underlying transaction and as they are financing at a 100 per cent. of the value, the current asset and short term debt would simply cancel out; i.e. the balance sheet would shrink without any impact on the net working capital (almost U.S.$4.5 billion as at 30 September 2014) that is available to the unsecured creditors.

### Trafigura and the Banking Environment

As a privately owned company, Trafigura funds itself primarily from the banking and debt capital markets. Whilst Trafigura (in common with the rest of the commodity sector) has not been completely insulated from the turbulence in the banking environment, the consequences for the Group have been limited due to its diversified sources of funding and a pro-active approach with its core banks.

The issues following the economic and sovereign crises experienced since 2008 have clearly had an impact on the balance sheets of European banks, in spite of the funding operations carried out by the European Central Bank with the intention of supporting markets. In the course of 2012, Europe-wide concerns over bank liquidity, access to U.S. dollar liquidity and deteriorating confidence in the European economic outlook led to a drop of almost 50 per cent. in activity on the Western Europe loan market. Bank deleveraging as part of the management of capital ratios following new regulations, including standards for bank capital and liquidity requirements published by the Basel

Committee ("**Basel III**"), is also cited as one of the causes of reduced activity along with the increasing appeal of the corporate bond market as an alternative avenue to raise finance.

Since 2012, steps to restore liquidity (e.g. quantitative easing) and create a stronger banking environment resulted in improved loan volumes in 2013. With the lenders' caution seen in 2013 being increasingly replaced with confidence, this trend was also evident in 2014 in the trade and commodity finance markets with borrowers able to finance and re-finance their facilities at lower pricing, with the increased liquidity resulting in significant oversubscription, enabling borrowers to increase facility sizes and often scale back commitments. Trafigura has maintained healthy levels of committed and uncommitted facilities throughout this period with strong and continued support from its banking relationships.

### Track record of building strong relationships

Throughout various commodity cycles and financial market environments, Trafigura has cemented strong relationships with its lending banks. Financial institutions conduct regular due diligence visits and in-depth risk review on the Group where they raise detailed questions to senior managers of the finance, credit, risk, compliance, operations and insurance teams of the Group.

Trafigura's transparent and pro-active communication policy with its lenders on various topics including (but not limited to) its business model, strategy and risk management practices has facilitated the expansion of its banking pool as well as the size of lines provided by lenders to the Group. As a result, Trafigura was able to add over 20 new banks to its lending pool in 2014 and saw a growth of over 20 per cent. in its total lines (to reach USD 46.2 billion) between December 2012 and September 2014.

### Diversification of Trafigura funding sources

Diversification is a key pillar of Trafigura's funding strategy.  For many years, Trafigura has actively sought to diversify its banking pool, which now consists of over 135 banks across the world.  The Group has developed strong banking relationships in regions which have been spared some of the consequences of the European sovereign debt crisis (e.g. North America, Japan, Australia and South East Asia).  Historically, European banks have been prominent in commodity trade financing and are therefore an important part of Trafigura's bank group.  In the unforeseen case that available credit lines from certain European banks were reduced, Trafigura would be in a position to mitigate the effects of such a reduction through corresponding increases of its banking lines in other regions.

Additionally, Trafigura has developed its trade receivables securitisation programme into the largest of the commodities trading industry.  Since this programme is funded from the U.S. dollar capital markets (whether directly or indirectly via conduits) this significantly reduces the amount of U.S. dollar liquidity required from its banks in the form of traditional lending.

Finally, Trafigura has successfully tapped various markets for long term unsecured funding such as the Eurobond market (2010, 2013 and 2014) and the US private placement markets (2006, 2011 and 2013) and the hybrid debt market (2013 and 2014). Additionally, Trafigura refinanced a three-year JPY 8 billion term loan facility in March 2014, and increased the overall size of the facility to JPY 25.5 billion.

### Basel III and trade finance

The implementation of Basel III will have an impact on various types of lending, including trade finance.  In most cases this is simply a matter of re-pricing, taking into consideration the higher capital requirements which, since they impact the industry as a whole, will be passed on to the end-user.  In any case, Trafigura is convinced that its funding model, which combines uncommitted trade finance, securitisation and corporate facilities remains optimal under Basel III (as it is under the publication by the Basel Committee on the International convergence of capital measures and capital standards: a revised framework today).

### Financial Discipline

Although unrated by an international rating agency, Trafigura aims to manage its business and financial profile in a manner consistent with an investment grade profile.  The Group has a demonstrated track record of raising financing from multiple sources on an unrated basis even in the most volatile and challenging market conditions.

Financial discipline is critical to Trafigura's business model due to its reliance on debt markets for capital and liquidity.  Trafigura's significant expansion of its sources of financing over the years has been achieved on the basis

that the Group can maintain an acceptable and sustainable credit standing consistent with an investment grade profile.

As a private company, Trafigura values long-term relationships with all its financial stakeholders and provides access to all information necessary to reach an independent view on Trafigura's creditworthiness.  Trafigura has always strived to disclose to its financial stakeholders information necessary to understand its business model and financial performance.  Trafigura believes its stakeholder's scrutiny and continuous involvement provide a strong oversight and control on the Group's financial health and is consistent with Trafigura's strategy to build value in the long run, which is reinforced by its ownership model.

Such discipline is reinforced by the financial covenants that are currently provided to all of the Group's unsecured lenders and were offered as part of its private placement.

**Legal Proceedings**

In the ordinary course of its business, Trafigura is from time to time involved in legal proceedings.  Certain legal actions, other claims and unresolved disputes are pending against Trafigura.  Whilst Trafigura cannot predict the results of any litigation, it believes that it has meritorious defences against those actions or claims.  Trafigura believes the likelihood of any liability, if any, resulting from any litigation will not have a material adverse effect on its consolidated income, financial position or cash flows.

*Ivory Coast Situation*

In 2006, Trafigura time chartered the Probo Koala, a tanker, for the transportation of oil products.  The vessel carried out a procedure for caustic washing on several cargoes of one such product, coker naphtha, and needed to discharge a relatively small amount of residual waste (referred to as "slops").  Subsequently at the port of Abidjan, in the Ivory Coast, Trafigura appointed Compagnie Tommy, a contractor licensed to handle the discharged slops.  The discharge was conducted in accordance with local and international regulations, with the approval of the port authorities and in the presence of both the police and customs officials.  However, in breach of both its operator's license and contractual undertakings to Trafigura, Compagnie Tommy subsequently dumped the slops illegally at sites around the city.

Investigations and court cases into this series of events were conducted in the Ivory Coast, the UK and the Netherlands.  Neither Trafigura nor Puma Energy Côte D'Ivoire nor any of their staff were involved in the criminal proceedings in the Ivory Coast; and no indictments were brought against any of them because the Prosecutor declared that there was no evidence of any illegality or misconduct by any Trafigura company or staff.  There are on-going civil cases in the Ivory Coast.  So far only one case has been finally decided by the Supreme Court and it concluded that Trafigura and Puma Energy Côte D'Ivoire had no further obligation to pay compensation.

Following the proceedings in the English courts, it was accepted, on the basis of the findings of 20 scientific experts, that the slops could at worst have caused "low level flu-like symptoms and anxiety".

In the Netherlands:

(1)     The Dutch Prosecution Service and TBBV agreed a settlement in November 2012 whereby appeals to the Dutch Supreme Court regarding the handling of the Probo Koala slops within the port of Amsterdam in 2006 were all withdrawn.  In addition, all the remaining cases regarding the company and its executives in relation to this incident were also settled.  None of Trafigura's executives accepted any conviction, or made any admission of liability or guilt as part of these settlements.

(2)     Recently a civil action has been brought by a Dutch foundation acting for an Abidjan association acting for a class of alleged potential claimants of the illegal dumping by Compagnie Tommy.  Trafigura is reviewing this claim but given the findings in the other court cases believes it to be without merit.

**Ownership Structure**

Trafigura is exclusively owned by its management and employees, who are therefore focused on the long-term success of the business, promoting management depth and stability, and encouraging prudent risk management.  The decision as to which employees may become shareholders is discretionary based upon management's evaluation of the individual's performance, seniority and future potential.

The sole remaining founding shareholder owns less than 20 per cent. of the Company, with the remainder owned by around 600 senior employees. The proportion of founding partners and senior employees changes each year with the annual share issue diluting existing shareholdings by on average 3-5 per cent.. Outside of the original founders, no single shareholder holds more than five per cent. of the Company. As enshrined in the articles of the Company, shares are issued and purchased based on the net asset value ("**NAV**") as per the Company's last audited consolidated annual financial statements.

Upon departure, an employee is obliged to sell back his/her shares to the Company and the Company has the right, but not the obligation, to acquire such shares. In the case of shareholdings in excess of U.S.$1 million, an employee's shares are bought back in five separate instalments (first one at departure and then at the end of each of the following four years) with the NAV as per the last audited consolidated annual financial statements prior to departure.

Trafigura has also introduced a limited optional share buy-back programme for non-departing employees in order to provide liquidity in the shares and ensure that employees hold shareholding positions commensurate to their overall contribution to the business.

However, all share buy-backs (for both departing and non-departing employees) are at the strict discretion (but not the obligation) of the Company and can be deferred indefinitely. Buy-backs are strictly subject to the Company maintaining its financial covenants.

**Management Structure and Corporate Governance**

In 2009, Trafigura formed a two tier management structure in accordance with the guidelines set out in the Dutch corporate governance code. In October 2012, Trafigura restructured its corporate governance functions in order to acknowledge the increasing importance of its business in Asia, along with consolidating its commercial operations under the Singaporean entity, TPTE. Under this new structure, TBBV's role has reduced from an active holding and trading company into one that performs the functions typically associated with a headquarters. As a consequence, business functions have been pushed down into the structure:  trading activities, for example, have now been consolidated under TPTE. This decision was commercially driven and reflects Trafigura's commitment to the strategically important and rapidly growing Asian market. The second phase of this reorganisation will involve converting TBBV into a 'true' holding company and making Trafigura Group PTE ("**TGPTE**") the consolidating entity for the Group

Also in 2012 and following this restructuring, Trafigura introduced an additional governing body, the Management Board, to support its existing two-tier structure. The Management Board functions under the Supervisory Board and Board of Directors and allows the Group to be more efficiently managed, whilst maintaining the same strong corporate governance as before.

*Supervisory Board*

The Supervisory Board supervises Trafigura's overall performance including review of strategy, policies, compliance and achievements of the Board of Directors. In addition, the Supervisory Board also appoints members to the Audit and Risk, Remuneration and Selection and Appointment committees. The Supervisory Board is accountable for these objectives to the shareholders and other stakeholders. Formal Supervisory Board meetings take place a minimum of four times a year. In 2014, the Supervisory Board was focused on Asia and Africa. In 2015, the Board expects to switch to the Americas.

The Supervisory Board currently consists of two former members of the Board of Directors and two independent directors. The members of the Supervisory Board are as follows:

| Name | Position | Other Principal Activities (outside Trafigura) |
|---|---|---|
| Eric de Turckheim | Founding partner and former CFO | Mr. de Turckheim is a member of the board of Ecore B.V. (a recycling services provider) |
| Christopher Cox | Former Head of metals and minerals trading and former member of the Trafigura Management Board | None |

| Name | Position | Other Principal Activities (outside Trafigura) |
|---|---|---|
| Andrew Vickerman | Former member of the Operating and Executive Committees of Rio Tinto and former Global Head of Communication & External Relations of Rio Tinto | Mr. Vickerman is the chairman of Alva (a UK based firm specialising in analysing corporate reputation and reputational risk) |
| Lord Thomas Strathclyde | Lord Strathclyde was the Leader of the House of Lords and a member of the UK Cabinet until January 2013 and has held senior ministerial positions in the departments of Employment, Environment and Trade and Industry in addition to a number of non-executive positions in financial services businesses | Lord Stratclyde is an adviser to JCB, URS Corporation and the Battersea Power Station Development Company |

The business address of each member of the Company's Supervisory Board is Gustav Mahlerplein 102, Ito Tower, 1082 MA Amsterdam, Netherlands.

*Board of Directors*

The Board of Directors is responsible for managing the Group's relations with shareholders, the setting of strategy for and oversight of the Group and management of the Group's service companies in India, the UK as well as various Group and staffing functions in Amsterdam.  The members of the Board of Directors are as follows:

| Name | Position | Other Principal Activities (outside Trafigura) |
|---|---|---|
| Claude Dauphin | Chairman and founding partner | Mr. Dauphin is a member of the board of Ecore B.V. |
| Pierre Lorinet | Chief Financial Officer ("**CFO**") and Head of Asia-Pacific | Mr. Lorinet is a member of the supervisory board of African Development Corporation (a financial services group focusing on investments in sub-Saharan Africa). |
| Mike Wainwright | Chief Operational Officer | None |
| Jeremy Weir | Chief Executive Officer | None |
| Mark Irwin | Former Financial Controller | Mr. Irwin is a member of the board of Ecore B.V. |
| Mariano Marcondes Ferraz | Board member responsible for business development and Chief Executive Officer of DT Group | Mr. Marcondes Ferraz is a member of the boards of Puma Energy Group and Porto Sudeste do Brasil SA (both affiliates of the Trafigura Group) |

The business address of each member of the Board of Directors is Gustav Mahlerplein 102, Ito Tower, 1082 MA Amsterdam, Netherlands.

On 16 March 2015, Trafigura announced that Pierre Lorinet, its CFO and Managing Director Asia-Pacific, is to step down from the roles at the end of Trafigura's financial year (30 September 2015). He will be succeeded as CFO by Christophe Salmon, currently CFO for Europe, the Middle East and Africa.

*Management Board*

The newly formed Management Board is responsible for the management of the Company and the realisation of its strategic and other objectives and is accountable for these objectives to the Board of Directors.

Its function is the executive management of the Group's core trading activities and its interrelations with the industrial assets division in accordance with the strategy set by the Board of Directors.

Formal Management Board meetings are required to take place a minimum of four times a year, but typically take place every six weeks.  The Management Board meetings are used to discuss fundamental strategic issues of Trafigura's business, such as Trafigura's financial situation, market developments, major investments, field office network, share ownership program and compensation scheme.  In addition to the Management Board meetings, senior managers communicate regularly and informally to keep each other informed of their activities and to discuss major transactions and developments.

The members of the Management Board are as follows:

| Name | Position | Other Principal Activities (outside Trafigura) |
|---|---|---|
| Claude Dauphin | Chairman and founding partner | See above |
| Jose Larocca | Head of Oil Trading | Mr. Larocca is a director of Langsat Terminals (bulk cargo port facilities in Johor, Malaysia) |
| Pierre Lorinet | Chief Financial Officer and Head of Asia-Pacific | See above |
| Simon Collins | Head of metals and minerals trading | None |
| Mike Wainwright | Chief Operational Officer | See above |
| Jeremy Weir | Chief Executive Officer | See above |
| Mariano Marcondes Ferraz | Board member responsible for business development and Chief Executive Officer of DT Group | See above |
| Duncan Letchford | CEO Galena and Head of Derivatives Trading | None |

The business address of each member of the Company's Management Board is Gustav Mahlerplein 102, Ito Tower, 1082 MA Amsterdam, Netherlands.

As at the date of this Base Prospectus, to the best of the Company's knowledge, no potential conflicts of interest exist between the duties to the Company of any member of the Company's Management Board, Board of Directors or Supervisory Board, and its private interests and/or other duties.

***Management steering committees***

Underneath the Management Board a number of management steering committees coordinate the day-to-day management of Trafigura.  Each of the management steering committees is in regular contact with the Company's Management Board.

Management steering committees include:

- G9 (oil trading):  Executive Chairman and senior oil traders;

- M12 (Metals and Minerals Steering Committee):  Executive Chairman and senior metals and minerals traders;

- Finance Committee:  Group CFO, Europe, the Middle East and Africa, CFO, Global Head of Structured and Trade Finance and Global Head of Corporate Finance and Funding;

- Accounting Steering Committee:  CFO, COO, Financial Controller;

- IT Steering Committee: chief information officer, COO, CFO, Board Member (former Financial Controller), Controller, IT expert; and

- Market Risk Management Committee:  COO, Head of Derivatives and Galena Asset Management, Head of Derivatives Trading, Head of Refined Metals and Alumina Trading, Head of Proprietary Trading, Head of Gasoline Trading, Head of Crude Oil Trading.

## Corporate Responsibility

Trafigura's business strategy is concerned with responsible and sustainable growth.  It requires the Group to deliver financial returns while addressing stakeholder interests in a transparent, open and efficient manner.  By its very nature, Trafigura's business model is long-term.  It is Trafigura's responsibility today to ensure that the Group's activities tomorrow contribute positively to the livelihoods of both present and future generations.  Addressing matters associated with sustainability and corporate responsibility means enhancing Trafigura's relationships with host governments, project partners and local communities.  It also means building stakeholder confidence in the Company's business.

The following key themes illustrate Trafigura's practices and focus.

### Corporate governance

In April 2009 Trafigura amended its corporate governance structure in accordance with the guidelines set out in the Dutch corporate governance code.  Whilst compliance with the Dutch corporate governance code is required for all Dutch listed companies, it was not obligatory for Trafigura as a private company.  However, Trafigura proactively chose to review the guidance set out in the Dutch corporate governance code and adopted those elements which it believed were, firstly, beneficial to the good corporate governance of the Group and secondly, relevant for a privately owned company.  As a result, Trafigura amended its Articles of Association to replace the previously existing one tier Management Board with a two tier structure comprising a Management Board and a separate Supervisory Board.

### Ownership model

Significantly, Trafigura is exclusively owned by its management and key senior employees.  The sole remaining founding shareholder owns less than 20 per cent., with the remainder owned by over 600 senior employees.  This shareholding arrangements lead to an alignment of the long term interests of the Group.  By virtue of having its own capital and reputation at risk, senior management is motivated to act responsibly and to take a long-term view of Trafigura's overall performance.

### The Code of Business Conduct

Established in 2006, the Code of Business Conduct defines what is expected of Trafigura's business and its employees.  It embeds compliance with relevant laws and regulations and promotes good business judgment.  The Code of Business Conduct is a key element of Trafigura's employee contracts and all staff are provided with mandatory training on the code.

### Compliance

The compliance department, formed in 2007, manages Trafigura's global compliance activities.  Its main function is to provide guidance, training and advice on all compliance issues to all Group employees and to develop and monitor Trafigura's Code of Business Conduct.  The compliance department is involved in Trafigura's KYC procedure and works closely with traders and credit teams.

It has assigned compliance representatives in the main trading offices around the world, who provide support to the compliance department in order that it can meet its objectives on a global basis.

### Know Your Counterparty Process

Trafigura is dedicated to forming strong, enduring and mutually beneficial relationships with all its customers.  Therefore, Trafigura takes great care in selecting its business partners, a commitment that is clearly articulated within the Company's 'Know Your Counterparty' programme.  Before transactions can proceed, a prospective new counterparty must provide extensive information about its operations, directors and financial status.  After these details are analysed by Trafigura's internal compliance team, the data is verified by authoritative external agencies

including Complinet and Dun & Bradstreet.  Following that, the credit department verifies the credit status of the counter party.  Only after these checks are successfully undertaken can Trafigura enter into transactions with a new counterparty.  These responsibilities are shared by a comprehensive compliance plan, monitoring programme and involvement of senior management through compliance committees.

### Operations Continuous Review Process

Trafigura's continuous review process incorporates regular policy audits, awareness building and a review of external developments.  Trafigura has established operational procedures to minimise risks evolving from Trafigura's business.  Key procedures include, for example, those on vessel screening, cargo assurance and communication, selection of vessel agents, superintendents and third party service providers, storage facilities and incident reporting.  In the case of vessel screening, Trafigura goes beyond the industry norms, specifying among many other requirements for tankers, that they must be double-hulled and less than 25 years of age.  Trafigura is an active member of Oil Spill Response Ltd. (OSRL).  Through utilising the renowned expertise of OSRL the Group has established an Oil Spill Contingency Plan in order to guide its emergency response team.

Trafigura's dialogue with the international community has, since 2006, included significant work with the European Commission and the European Maritime Safety Agency on EU legislation governing the management of ship-generated and cargo residue waste.  Work has included, for example, the submission of information relating to regulatory deficiencies and also input to assist with the Commission's planned review of the Marpol 73/78-derived legislation that governs the disposal of slops.

From March 2012, Trafigura is committed to the Ten Principles of the United Nations Global Compact, (the "**Compact**") the world's largest voluntary Corporate Social Responsibility ("**CSR**") initiative.  Trafigura already knows that it complies broadly with the ten principles but will develop more robust and more comprehensive policies, protocols, initiatives and activities to enhance the Group's CSR performance.  Trafigura will formally apply to join the Compact only at a point when these elements are in place and that the Group have the ability to meet the reporting requirements for the Global Compact.

### Transparency to Stakeholders

Although the Group is private, its philosophy is to communicate in an open and transparent way with all stakeholders, in particular its:

- more than 135 banks – many of them on a daily basis under bilateral lines;

- US private placement investors;

- insurance underwriters;

- capital markets (senior and perpetual bonds and ABS programme);

- counterparties for both physical and derivative business;

- auditors; and

- tax and other authorities.

### Health, Safety, Environment and Community

Trafigura is committed to operating and growing its business in a responsible, sustainable way.  Trafigura aims to conduct activities in a manner that is safe and ethical and that protects the Group's employees, the environment and the communities where Trafigura operates.  The Group is guided by the principles of the Compact, the world's largest voluntary Corporate Social Responsibility initiative.  The Group is also supported by the work of the Trafigura Foundation.

In 2012, Trafigura launched a Group-wide framework to manage its health, safety, environment and community ("**HSEC**") responsibilities.  This included a suite of policies that set out the standards and principles that Trafigura seeks to uphold.  The framework applies to all Trafigura's divisions and subsidiaries and provides high-level guidance to members of the Group on HSEC-related issues.

For a copy of Trafigura's HSEC policy and business principles (the "Policy and Business Principles") please refer to the following link: http://www.trafigura.com/about-us/responsibility/our-approach/.

Individual managers across the business are accountable for leading and promoting good HSEC practice and providing resources and training for their staff. They are also required to measure and report on HSEC performance on a regular basis.

Each constituent entity within the Group is encouraged to supplement Trafigura's HSEC policy and Guiding Principles with relevant sector-specific standards and supporting policies and procedures for their day-to-day operations. The Trafigura Code of Business Conduct, in use since 2006, sets out ethical business practices expected of all employees.

*HSEC Oversight*

In 2011, Trafigura's Management Board appointed an HSEC steering group (the "**Steering Group**") to advise the business on HSEC matters.

The Steering Group comprises a member of Trafigura's Supervisory Board, Trafigura's CEO and senior representatives from each Trafigura division, subsidiary and affiliate. Additional senior members of staff have been co-opted to ensure that the interests of the Group are fully represented and aligned.

Trafigura's internal controls and compliance department provides input and advice to the Steering Group on risk management, regulatory compliance and adherence to the Group's ethical policies.

The mandate of the HSEC Steering Group includes:

*Policy and compliance*

- To oversee compliance of group companies with the commitments presented in Trafigura's HSEC Policy and Business Principles.

- To refine Trafigura's HSEC Policy and Business Principles in accordance with changes in the Group's portfolio of assets and risk profile and with external trends.

*Analysis and measurement*

- To ensure consistency in the setting of, and reporting against, key HSEC performance metrics and targets.

- To establish, maintain and review the material HSEC risk register for Trafigura.

*Reporting and assurance*

- To establish and manage an HSEC assurance process to assist group companies in evaluating their performance against the Policy and Business Principles.

- To manage the HSEC information management, data and reporting system.

- To review reports related to significant incidents and accidents.

- To report regularly to the Management Board on Group HSEC performance.

- To co-ordinate external reporting with regard to Group HSEC policy and performance.

The HSEC Steering Group meets at least four times each year and has a standing agenda which includes:

- Review of HSEC material risks and performance, including progress on agreed actions (standard report to be issued one week prior to meeting date).

- Review of significant incidents (standard report to be issued one week prior to meeting date).

- Review of HSEC working group activities.

- Update on emerging issues and stakeholder requirements.

### Membership of the Extractive Industries Transparency ("EITI")

Trafigura's payments to governments policy reflects the Company's commitment to transparency and accountability, as core components of responsible trade, better-governed natural resources markets and the positive development effects associated with these.

As a major facilitator of global trade, Trafigura believes it has a role in disclosing how much it pays to governments and their National Oil Companies and those governments, in turn, have an important role to play in disclosing how they use the funds.

The Group's policy on payments to governments commits Trafigura to voluntarily publish details of payments to governments in countries which have signed up to the EITI. Trafigura's policy is rooted in international good practice in that it follows reporting guidelines set out under the EITI.

Trafigura is an EITI Supporting Company. The Group believes that the EITI's multi-stakeholder approach which includes governments, non-governmental organisations, regulators, the public and companies is the most effective way to develop transparency standards associated with government revenues from economic activities in the extractive industries value chain.

As an EITI supporting company, Trafigura supports the principles of the EITI, which attest broad acceptance and support of revenue transparency.

Trafigura is committed to working with the EITI though its multi-stakeholder forum, EITI multi-stakeholder groups in EITI implementing countries, as well as with other trading houses that wish to contribute towards the development of a voluntary trading industry disclosure standard within the EITI framework.

### Corporate Affairs Department

Trafigura understands that as a leading organisation which is often in the public eye, its business interests and corporate practices will frequently be questioned by stakeholders.  In the majority of cases, issues raised by external parties are done so in a constructive manner and result in progressive change to the collective benefit of those concerned.  In a minority of cases, however, Trafigura has faced negative publicity based on nothing other than hearsay or conjecture.

In 2010, Trafigura established a corporate affairs department with two specific objectives:

- To create and sustain the frameworks for an ever more responsible and effective company; and

- To protect and promote the business interests and reputation of Trafigura, its subsidiaries and business partners globally.

Corporate Affairs activities include brand and reputation, external communications, internal communications, stakeholder engagement, health safety and environment, corporate responsibility and crisis and issues management.

Trafigura's intentions in respect of Corporate Affairs are tempered by the fact that the owners of the Company wish to remain private and are at pains to stress that communications be managed at a level appropriate to this private status.  Notwithstanding this, it is recognised that certain parts of Trafigura, including Puma Energy, have a consumer-facing business that requires significantly higher levels and different types of communications than the trading and mining businesses.

### Trafigura Foundation

The Trafigura Foundation (the "**Foundation**") is the vehicle for the Group's community investment programme and ensures that the benefits of Trafigura's community initiatives are maximised, captured and reported.

Trafigura works closely with the Foundation to enhance its community investment program.  Through the Foundation the Group ensures that the benefits of its community initiatives are maximised, captured and reported.  The Foundation aims at making a real difference by having a genuine impact in the societies and projects it supports, in most cases under multi-year funding agreements with its partners.  The vast majority of its offices are actively

involved in helping their communities, with the help of, for the bigger offices, structured charity committees gathering volunteering employees.

Since 2008, the Group granted a total of approximately U.S.$38 million to charitable and philanthropic initiatives across the world.

**Financial Year**

The financial year of the Company ends on 30 September.

**Auditors**

The auditors of the Company, who have audited the Company's consolidated financial statements for the financial years ended 30 September 2013 and 30 September 2014, are Ernst & Young Accountants LLP, whose principal place of business is at Boompjes 258, 3011 XZ Rotterdam, the Netherlands. Ernst & Young Accountants LLP are registered at the Chamber of Commerce Rotterdam in the Netherlands under number 24432944.   The "registeraccountants" of Ernst & Young Accountants LLP are registered as chartered accountants at the Nederlandse Beroepsorganisatie van Accountants, the auditor's institute of the Netherlands.

# DESCRIPTION OF THE ISSUER

**Business overview**

The Issuer is a wholly-owned subsidiary of the Company. The Issuer is a special purpose financing entity. The corporate objects of the Issuer as set out in its Articles of Incorporation include the taking and maintaining of any participating interests, the granting of assistance to other Group companies or companies in which the Issuer has an interest, the issue of notes, bonds, debentures and any kind of debt and/or equity securities in any form and the granting of security interests over all or some of the Issuer's assets. The Issuer has no material business operations, no direct subsidiaries and no employees.

The Issuer is a limited liability company (*société anonyme*) incorporated and existing under the laws of the Grand Duchy of Luxembourg under the name Trafigura Funding S.A.  The Issuer was incorporated on 13 December 2012. The Issuer is registered in Luxembourg with the Registre de Commerce et des Sociétés under number B 173718. The registered office of the Issuer is at 7, rue Robert Stümper, L-2557, Grand Duchy of Luxembourg and its telephone number is +352 (26) 73 021.  The Issuer was incorporated for an indefinite duration and has no other commercial name.  There have been no recent events particular to the Issuer which are relevant to the evaluation of the Issuer's solvency to any material extent.

**Members of the Board of Directors**

The directors of the Issuer as at the date of this Base Prospectus are as follows:

| Name | Position | Other Principal Activities (outside the Group) |
|---|---|---|
| Mark Irwin | Class A Director | None |
| Pierre André Jacques Lorinet | Class A Director | Mr. Lorinet is a member of the supervisory board of African Development Corporation (a financial services group focusing on investments in sub-Saharan Africa) |
| Robbert Maas | Class A Director | None |
| Constance Collette | Class B Director | Ms. Collette holds a number of non-executive directorships in a variety of companies |
| Christophe Gaul | Class B Director | Mr. Gaul holds a number of non-executive directorships in a variety of companies |

The business address of each of the Issuer's directors is 7, rue Robert Stümper, L-2557, Grand Duchy of Luxembourg.

As at the date of this Base Prospectus, to the best of the Issuer's knowledge, no potential conflicts of interest exist between the duties to the Issuer of any director, and its private interests and/or other duties.

**Financial Year**

The financial year of the Issuer ends on 30 September.

**Auditors**

The auditors of the Issuer, who have audited the Issuer's financial statements for the financial years ended 30 September 2013 and 30 September 2014, are Ernst & Young S.A., whose registered office is at 7, Rue Gabriel Lippman, Parc d'activité Syrdall 2, L-5365 Munsbach. Ernst & Young S.A. (*cabinet de révision agréé*) is registered as a corporate body within the official table of company auditors drawn up by the Luxembourg Ministry of Justice and is a member of the Institute of Auditors (Institut des Réviseurs d'Entreprises).

## DESCRIPTION OF TRAFIGURA TRADING LLC

**Business overview**

TTL is a wholly-owned subsidiary of the Company.  TTL is engaged in buying and selling commodities, with its principal office in Houston (Texas) and another branch office in Stamford (Connecticut).  TTL is the member of the Group responsible for conducting business in the United States.

TTL is a limited liability company incorporated under the laws of the State of Delaware under the name Trafigura Trading LLC.  TTL was incorporated on 31 January 2015.  TTL is registered in the State of Delaware with Federal Identification Number 06-1436098.  The registered office of TTL is at 1209 Orange Street, Wilmington, New Castle County, Delaware 19801 and its telephone number is +1 832 2036400 .  The principal place of business of TTL is at 5 Houston Centre, 1401 McKinney, Suite 1500, Houston, Texas 77010. TTL was incorporated for an indefinite duration and has no other commercial name.  There have been no recent events particular to TTL which are relevant to the evaluation of TTL's solvency to any material extent.

TTL was previously incorporated on 14 July 1995 as a limited liability company existing under the laws of Switzerland under the name Trafigura AG. On 31 January 2015, TTL re-domesticated as a Delaware corporation under the name of Trafigura Inc. and subsequently converted to a limited liability company incorporated under the laws of the State of Delaware and changed its name to Trafigura Trading LLC (the "**Re-domestication**").

**Management**

The management of TTL as at the date of this Base Prospectus are as follows:

| Name | Position | Other Principal Activities (outside the Group) |
|------|----------|------------------------------------------------|
| Trafigura US, Inc. | Managing Member | None |
| Jeffrey Kopp | Officer/Director | None |
| Douglas Pratt | Officer/Director | None |

The business address of each of TTL's directors is Houston Center, 1401 McKinney, Suite 1500, Houston, TX 77010, USA and One Stamford Plaza, 263 Tresser Boulevard, 16th Floor, Stamford CT06901, USA respectively.

As at the date of this Base Prospectus, to the best of TTL's knowledge, no potential conflicts of interest exist between the duties to TTL of any director, and its private interests and/or other duties.

**Financial Year**

The financial year of TTL ends on 30 September.

**Auditors**

Prior to the Re-domestication, the auditors of TTL were Ernst & Young Ltd, whose registered office is at Bleicherweg 21, P.O. Box, CH-8002 Zürich. Ernst & Young Ltd is a Member of the Swiss Institute of Certified accountants and Tax Consultants. Following the Re-domestication, TTL intends to appoint new auditors in the United States.

## DESCRIPTION OF TRAFIGURA DERIVATIVES LIMITED

**Business overview**

TDL is a wholly-owned subsidiary of the Company.  TDL is based in London where all derivative transactions performed within the Group are booked.  This facilitates the monitoring, control and optimisation of derivative transactions by having them centralised in an entity distinct from all the physical transactions.

TDL is a private limited liability company incorporated and existing under the laws of England and Wales under the name Trafigura Derivatives Limited.  TDL was incorporated on 26 August 1998.  TDL is registered in England with the Registrar of Companies under number 03621790.  The registered office and principal place of business of TDL is at Portman House, 2 Portman Street, London W1H 6DU, United Kingdom and its telephone number is +44 (0)207 173 2200.  TDL was incorporated for an indefinite duration and has no other commercial name.  There have been no recent events particular to TDL which are relevant to the evaluation of TDL's solvency to any material extent.

**Members of the Board of Directors**

The directors of TDL as at the date of this Base Prospectus are as follows:

| Name | Position | Other Principal Activities (outside the Group) |
|---|---|---|
| Nicolas Jorge Konialidis | Director | None |
| Duncan Neil Letchford | Director | None |
| Jonathan David Pegler | Director | None |

The business address of each of TDL's directors is Portman House, 2 Portman Street, London W1H 6DU, United Kingdom.

As at the date of this Base Prospectus, to the best of TDL's knowledge, no potential conflicts of interest exist between the duties to TDL of any director, and its private interests and/or other duties.

**Financial Year**

The financial year of TDL ends on 30 September.

**Auditors**

The auditors of TDL are Ernst & Young LLP, whose registered office is at 1 More London Place, London SE1 2AF. Ernst & Young LLP are registered as chartered accountants with the Institute of Chartered Accountants in England.

## DESCRIPTION OF TRAFIGURA PTE LTD

**Business overview**

TPTE is a wholly-owned subsidiary of the Company and is a Singaporean corporation engaged in buying and selling oil commodities in the Far East. TPTE was established in Singapore as the regional headquarters for the Group's oil trading activities, is the focal point for Trafigura's Asian branch network which includes offices in Beijing, Brisbane, Delhi, Jakarta, Mumbai, Seoul, Shanghai, Singapore and Tokyo and is the principal entity through which the Group's trading transactions are booked.

TPTE is a private limited company incorporated and existing under the laws of Singapore under the name Trafigura Pte Ltd. TPTE was incorporated on 7 March 1996. TPTE is registered in Singapore with the Accounting and Corporate Regulatory Authority (ACRA) under number 199601595D. Its registered office is at 1 Marina Boulevard, #28-00, One Marina Boulevard, Singapore 018989, its principal place of business is at 10 Collyer Quay, Level 29 Ocean Financial Centre, Singapore 049315 and its telephone number is +65 6319 2960. TPTE was incorporated for an indefinite duration and has no other commercial name. There have been no recent events particular to TPTE which are relevant to the evaluation of TPTE's solvency to any material extent.

**Members of the Board of Directors**

The directors of TPTE as at the date of this Base Prospectus are as follows:

| Name | Position | Other Principal Activities (outside the Group) |
|---|---|---|
| Simon Matthew Collins | Director | None |
| José Maria Larocca | Director | Mr. Larocca is a director of Langsat Terminals (bulk cargo port facilities in Johor, Malaysia) |
| Pierre André Jacques Lorinet | Director | Mr. Lorinet is a member of the supervisory board of African Development Corporation (a financial services group focusing on investments in sub-Saharan Africa) |
| Gary Julien Le-Men | Director | None |
| Jonathan David Pegler | Director | None |
| Nicolas Simian | Director | None |
| Edmundo Abdon Vidal Cornelio | Director | None |
| Raymond Jonathan Eyles | Director | None |

The business address of each of TPTE's directors is 10 Collyer Quay, Level 29 Ocean Financial Centre, Singapore 049315. As at the date of this Base Prospectus, to the best of TPTE's knowledge, no potential conflicts of interest exist between the duties to TPTE of any director, and its private interests and/or other duties.

**Financial Year**

The financial year of TPTE ends on 30 September.

**Auditors**

The auditors of TPTE are Ernst & Young LLP, whose registered office is at One Raffles Quay, North Tower, Level 18, Singapore 048583. Ernst & Young LLP are registered as Public Accountants and Certified Public Accountants with the Singapore Accounting and Corporate Regulatory Authority in Singapore.

**TAXATION**

The following is a general description of certain tax considerations relating to the Notes.  It does not purport to be a complete analysis of all tax considerations relating to the Notes, whether in those countries or elsewhere. Prospective purchasers of Notes should consult their own tax advisers as to which countries' tax laws could be relevant to acquiring, holding and disposing of Notes and receiving payments of interest, principal and/or other amounts under the Notes and the consequences of such actions under the tax laws of those countries.  This summary is based upon the law as in effect on the date of this Base Prospectus and is subject to any change in law that may take effect after such date.

**EU Savings Directive**

Under the EU Savings Directive, each Member State of the European Union (each a "**Member State**") is required to provide to the tax authorities of another Member State details of payments of interest (or similar income) made by a person within its jurisdiction to, or collected by such a person for, an individual resident in that other Member State or certain limited types of entities established in that other Member State.  However, for a transitional period, Austria may instead (unless during that period Austria elects otherwise) operate a withholding system in relation to such payments, deducting tax at the rate of 35 per cent.  The transitional period is to terminate at the end of the first full fiscal year following agreement by certain non-European Union countries to the exchange of information relating to such payments.

On 25 November 2014, Luxembourg finally adopted a law, amending the Luxembourg laws of 21 June 2005, putting an end to the withholding tax regime under the EU Savings Directive as from 1 January 2015 and implementing the automatic exchange of information as from that date.

A number of non-EU countries, including Switzerland, and certain dependent or associated territories of certain Member States, have adopted similar measures (either provision of information or transitional withholding) in relation to payments made by a person within its jurisdiction to, or collected by such a person for, an individual resident or certain limited types of entity established in a Member State.  In addition, the Member States have entered into provision of information or transitional withholding arrangements with certain of those dependent or associated territories in relation to payments made by a person in a Member State to, or collected by such a person for, an individual resident or certain limited types of entity established in one of those territories.

The Council of the European Union formally adopted a Council Directive amending the EU Savings Directive on 24 March 2014 (the "**Amending Directive**"). The Amending Directive broadens the scope of the requirements described above.  Member States have until 1 January 2016 to adopt the national legislation necessary to comply with the Amending Directive and are required to apply these new requirements from 1 January 2017. The changes made under the Amending Directive include extending the scope of the Directive to payments made to, or collected for, certain other entities and legal arrangements. They also broaden the definition of "interest payment" to cover income that is equivalent to interest.

Investors who are in any doubt as to their position should consult their professional advisers.

**Luxembourg Taxation**

*Luxembourg tax residency of Noteholders*

A Luxembourg non-resident Noteholder will not become resident, nor be deemed to be resident, in Luxembourg, by reason only of its holding of Notes, or the execution, performance, delivery and/or enforcement of its entitlements thereunder.

*Withholding tax*

In principle, Luxembourg does not levy a withholding tax on at-arm's-length interest, except for interest on certain profit sharing bonds or similar instruments and interest paid as a profit share under certain silent partnership type arrangements, subject to the application of the Luxembourg law dated 23 December 2005, as amended (the "**Law**").

*Luxembourg non-resident individuals*

Pursuant to the law dated 25 November 2014 amending the Laws implementing the EU Savings Directive and ratifying the treaties entered into by Luxembourg and certain dependent and associated territories of European

Union member states (the "**Territories**"), Luxembourg adopted the automatic exchange of information as foreseen under the EU Savings Directive (see the above section "*EU Savings Directive*").

Consequently, no withholding tax will be levied under the Laws on interest payments made after 31 December 2014 by a paying agent established in Luxembourg to or for the immediate benefit of an individual beneficial owner or a residual entity, as defined by the Laws, which is a resident of, or established in, a Member State (other than Luxembourg) or one of the Territories.

*Luxembourg resident individuals*

Under the Law, payments of interest or similar income made or ascribed by a paying agent established in Luxembourg to or for the immediate benefit of an individual beneficial owner who is a resident of Luxembourg or a foreign residual entity, as defined by the Law, that secures interest payments on behalf of such individuals (unless such entity has opted to be treated as an undertaking for collective investments in transferable securities (UCITS) recognized in accordance with the Council Directive 85/611/EEC, as replaced by the European Council Directive 2009/65/EC (as amended), or for the exchange of information regime) will be subject to a withholding tax of 10 per cent. Such withholding tax will be in full discharge of income tax if the beneficial owner is an individual acting in the course of the management of his/her/its private wealth. Responsibility for the withholding of the tax will be assumed by the Luxembourg paying agent.

Pursuant to the Law, Luxembourg resident individuals, acting in the course of their private wealth, can opt to self-declare and pay a 10 per cent. tax on interest payments made by paying agents (defined in the EU Savings Directive) located in a Member State other than Luxembourg, a member state of the European Economic Area other than an EU member state or in one of the Territories.

*Taxation of Noteholders*

*Taxation of Luxembourg resident individuals*

Luxembourg resident individual Noteholders acting in the course of managing their private wealth are subject to Luxembourg income tax at progressive rates in respect of payments received under the Notes, except if a final withholding tax has been levied on such payments or, where available, the Noteholder opts to self-declare and pay a 10 per cent. tax (see the above section "*Withholding tax – Luxembourg resident individuals*"). A gain realised by a Luxembourg resident individual Noteholder acting in the course of managing its private wealth, upon the sale or disposal of the Notes is not subject to Luxembourg income taxes provided that the sale or disposal took place more than six months after the Notes were acquired.

Luxembourg resident individual Noteholders acting in the course of managing a professional or business undertaking to which the holding of Notes is connected are required to include any remuneration received, as well as any gain realised on the sale or disposal of the Notes, in their taxable income for Luxembourg income tax assessment purposes (including income tax levied at progressive rates and municipal business tax). For Luxembourg resident individuals receiving payments under the Notes as income from assets held in a professional capacity, the 10 per cent. withholding tax levied is credited against their final tax liability. The same tax treatment applies to non-resident Noteholders who have a permanent establishment or a permanent representative in Luxembourg to which the holding of Notes is connected.

*Taxation of Luxembourg corporate residents*

Luxembourg corporate Noteholders must include any payments received in connection with their holding of Notes and any gain realised on the sale or disposal of the Notes in their taxable income for Luxembourg income tax assessment purposes (including corporate income tax and municipal business tax).

*Taxation of Luxembourg corporate residents benefiting from a special tax regime*

Luxembourg corporate resident Noteholders that benefit from a special tax regime, including but not limited to (i) undertakings for collective investment subject to the law dated 17 December 2010 (as amended), (ii) specialised investment funds subject to the law dated 13 February 2007 (as amended) and (iii) family wealth management companies subject to the law dated 11 May 2007 (as amended), are exempt from income tax in Luxembourg and thus income derived from the Notes, as well as any gains realised thereon, are not subject to Luxembourg income tax.

*Taxation of non-resident Noteholders*

Noteholders who are non-residents of Luxembourg and who have neither a permanent establishment nor a permanent representative in Luxembourg to which the holding of Notes is connected are not liable for any Luxembourg income tax, whether they receive payments of principal or other payments or realise capital gains upon the redemption, sale or exchange of any Notes.  Noteholders who are non-residents of Luxembourg and who have a permanent establishment or a permanent representative in Luxembourg to which the holding of Notes is connected are required to include any capital gain realised on the sale or disposal of the Notes in their taxable income for Luxembourg income tax assessment purposes.

### Net Wealth Tax

*Individuals*

Net wealth tax will not be levied on an individual Noteholder in respect of its holding of Notes, whether or not he/she is resident of Luxembourg.

*Corporations*

Corporate Luxembourg resident Noteholders or non-resident Noteholders which maintain a permanent establishment, fixed place of business or a permanent representative in Luxembourg to which the holding of Notes or any resulting income is connected, are subject to an annual Luxembourg net wealth tax on such Notes levied at a rate of 0.5 per cent. of their value, except if the Noteholder is (i) a resident or non-resident individual taxpayer, (ii) an undertaking for collective investment subject to the law dated 17 December 2010 (as amended), (iii) a securitisation vehicle governed by the law dated 22 March 2004 on securitisation (as amended), (iv) a company governed by the law dated 15 June 2004 on venture capital vehicles (as amended), (v) a specialised investment fund subject to the law dated 13 February 2007 (as amended) or (vi) a family wealth management company subject to the law dated 11 May 2007 (as amended).

### Other taxes

*Registration taxes and stamp duties*

There is no Luxembourg registration tax, stamp duty or any other similar tax or duty payable in Luxembourg by the Noteholders as a consequence of the issuance of the Notes, nor will any such taxes be payable as a consequence of a subsequent transfer, redemption or repurchase of the Notes.  There is no obligation to register the Notes in Luxembourg.  However, a registration duty may apply (i) upon voluntary registration of the Notes in Luxembourg, (ii) in the case of legal proceedings before Luxembourg courts, or (iii) if documents relating to the issuance of Notes must be produced before an official Luxembourg authority (*autorité constituée*).

*Value added tax*

There is no Luxembourg value added tax payable in respect of payments in consideration for the issuance of the Notes or in respect of payments made under the Notes or the transfer of the Notes.  Luxembourg value added tax may, however, be payable in respect of fees charged for certain services rendered to the Issuer, if for Luxembourg value added tax purposes such services are rendered or are deemed to be rendered in Luxembourg and an exemption from Luxembourg value added tax does not apply with respect to such services.  Due to the activity of the Issuer, this value added tax could be a final cost.  Foreign value added tax that might be payable in respect of fees charged for certain services rendered to the Issuer may also be a final cost.

*Inheritance tax and gift tax*

No estate or inheritance taxes are levied on the transfer of the Notes upon death of a Noteholder in cases where the deceased was not a resident of Luxembourg at the time of his death for inheritance tax purposes.  Gift tax may be due on a gift or donation of Notes if embodied in a Luxembourg notarial deed or otherwise recorded in Luxembourg.

### The proposed financial transactions tax ("FTT")

On 14 February 2013, the European Commission published a proposal (the **"Commission's proposal"**) for a Directive for a common FTT in Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the **"participating Member States"**).

The Commission's proposal has very broad scope and could, if introduced, apply to certain dealings in the Notes (including secondary market transactions) in certain circumstances. The issuance and subscription of Notes should, however, be exempt.

Under the Commission's proposal, the FTT could apply in certain circumstances to persons both within and outside of the participating Member States. Generally, it would apply to certain dealings in the Notes where at least one party is a financial institution, and at least one party is established in a participating Member State. A financial institution may be, or be deemed to be, "established" in a participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a participating Member State or (b) where the financial instrument which is subject to the dealings is issued in a participating Member State.

Joint statements issued by participating Member States indicate an intention to implement the FTT by 1 January 2016.

However, the FTT proposal remains subject to negotiation between the participating Member States and the scope of any such tax is uncertain. Additional EU Member States may decide to participate.

Prospective holders of the Notes are advised to seek their own professional advice in relation to the FTT.

**FATCA Withholding**

Pursuant to the foreign account tax compliance provisions of the Hiring Incentives to Restore Employment Act of 2010 ("**FATCA**"), non-U.S. financial institutions that enter into agreements with the Internal Revenue Service ("**IRS Agreements**") or become subject to provisions of local law intended to implement an intergovernmental agreement ("**IGA legislation**") entered into pursuant to FATCA, may be required to identify "financial accounts" held by U.S. persons or entities with substantial U.S. ownership, as well as accounts of other financial institutions that are not themselves participating in (or otherwise exempt from) the FATCA reporting regime. In order (a) to obtain an exemption from FATCA withholding on payments it receives and/or (b) to comply with any applicable laws in its jurisdiction, a financial institution that enters into an IRS Agreement or is subject to IGA legislation may be required to (i) report certain information on its U.S. account holders to the government of the United States or another relevant jurisdiction and (ii) withhold 30 per cent. from all, or a portion of, certain payments made to persons that fail to provide the financial institution information and forms or other documentation that may be necessary for such financial institution to determine whether such person is compliant with FATCA or otherwise exempt from FATCA withholding.

Under FATCA, withholding is required currently with respect to certain U.S. source payments (including U.S. source interest and dividends) to persons that are not compliant with FATCA or that do not provide the necessary information or documentation. FATCA withholding may also apply to payments made on or after 1 January 2017 in respect of (i) gross proceeds (including principal repayments) on certain assets that produce U.S. source interest or dividends and (ii) "foreign passthru payments". With respect to "obligations" that are not treated as equity for U.S. federal income tax purposes and that are not (a) issued or materially modified after 1 July 2014, in the case of an obligation that makes U.S. source payments, or (b) issued or materially modified on or after the date that is six months after the date on which the final regulations applicable to "foreign passthru payments" are filed in the Federal Register, no FATCA withholding is required.

Notwithstanding the foregoing, the governments of Luxembourg and the United States have entered into an intergovernment agreement to implement FATCA (the "**Luxembourg IGA**") and under the Luxembourg IGA, as currently drafted, the Issuer does not expect payments made on or with respect to the Notes to be subject to withholding under FATCA.

Whilst the Notes are in global form and held within the ICSDs, it is expected that FATCA will not affect the amount of any payments made under, or in respect of, the Notes by the Issuer, the Guarantors, any paying agent and the Common Depositary, given that each of the entities in the payment chain between the Issuer or any Guarantor, as the case may be, and the participants in the ICSDs is a major financial institution whose business is dependent on compliance with FATCA and that any alternative approach introduced under an intergovernmental agreement will be unlikely to affect the Notes. The underlying documentation expressly contemplates the possibility that the Notes may be exchanged into definitive form and therefore that they may be taken out of the ICSDs. If this were to happen, then a non-FATCA compliant holder could be subject to withholding. However, Definitive Notes will only be printed in remote circumstances.

## SUBSCRIPTION AND SALE

Notes may be sold from time to time by the Issuer to any one or more of Citigroup Global Markets Limited, Credit Suisse Securities (Europe) Limited, Deutsche Bank AG, London Branch, ING Bank N.V., Lloyds Bank plc, The Royal Bank of Scotland plc and Société Générale (the "**Dealers**").  The arrangements under which Notes may from time to time be agreed to be sold by the Issuer to, and subscribed by, the Dealers are set out in a dealer agreement dated 14 November 2013, as amended and restated on or about 18 March 2015 (the "**Dealer Agreement**") and made between the Issuer, the Guarantors and the Dealers.  If in the case of any Tranche of Notes the method of distribution is an agreement between the Issuer, the Guarantors and a single Dealer for that Tranche to be issued by the Issuer and subscribed by that Dealer, the method of distribution will be described in the relevant Final Terms as "Non-syndicated" and the name of that Dealer and any other interest of that Dealer which is material to the issue of that Tranche beyond the fact of the appointment of that Dealer will be set out in the relevant Final Terms.  If in the case of any Tranche of Notes the method of distribution is an agreement between the Issuer, the Guarantors and more than one Dealer for that Tranche to be issued by the Issuer and subscribed by those Dealers, the method of distribution will be described in the relevant Final Terms as "Syndicated", the obligations of those Dealers to subscribe the relevant Notes will be joint and several and the names and addresses of those Dealers and any other interests of any of those Dealers which is material to the issue of that Tranche beyond the fact of the appointment of those Dealers (including whether any of those Dealers has also been appointed to act as stabilising manager in relation to that Tranche) will be set out in the relevant Final Terms.

Any such agreement will, *inter alia*, make provision for the form and terms and conditions of the relevant Notes, the price at which such Notes will be subscribed by the Dealer(s) and the commissions or other agreed deductibles (if any) payable or allowable by the Issuer in respect of such subscription.  The Dealer Agreement makes provision for the resignation or termination of appointment of existing Dealers and for the appointment of additional or other Dealers either generally in respect of the Programme or in relation to a particular Tranche of Notes.

Certain of the Dealers and their affiliates have engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and may perform services for, the Issuer and their affiliates in the ordinary course of business. In addition, in the ordinary course of their business activities, the Dealers and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers.  Such investments and securities activities may involve securities and/or instruments of the Issuer or Issuer's affiliates. Certain of the Dealers or their affiliates that have a lending relationship with the Issuer routinely hedge their credit exposure to the Issuer consistent with their customary risk management policies.  Typically, such Dealers and their affiliates would hedge such exposure by entering into transactions which consist of either the purchase of credit default swaps or the creation of short positions in securities, including potentially the Notes issued under the Programme. Any such short positions could adversely affect future trading prices of Notes issued under the Programme. The Dealers and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**United States of America**:  *Regulation S Category 2; TEFRA D or TEFRA C as specified in the relevant Final Terms or neither if TEFRA is specified as not applicable in the relevant Final Terms.*

The Notes have not been and will not be registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except in certain transactions exempt from the registration requirements of the Securities Act.  Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act.

The Notes are subject to U.S. tax law requirements and may not be offered, sold or delivered within the United States or its possessions or to a United States person, except in certain transactions permitted by U.S. tax regulations.  Terms used in this paragraph have the meanings given to them by the United States Internal Revenue Code and regulations thereunder.

Each Dealer has agreed that, except as permitted by the Dealer Agreement, it will not offer, sell or deliver Notes, (i) as part of their distribution at any time or (ii) otherwise until 40 days after the completion of the distribution of the Notes comprising the relevant Tranche, as certified to the Principal Paying Agent or the Issuer by such Dealer (or, in the case of a sale of a Tranche of Notes to or through more than one Dealer, by each of such Dealers as to the Notes of such Tranche purchased by or through it, in which case the Principal Paying Agent or the Issuer shall notify each such Dealer when all such Dealers have so certified) within the United States or to, or for the account or benefit of, U.S. persons, and such Dealer will have sent to each dealer to which it sells Notes during the distribution

compliance period relating thereto a confirmation or other notice setting forth the restrictions on offers and sales of the Notes within the United States or to, or for the account or benefit of, U.S. persons.

In addition, until 40 days after the commencement of the offering of Notes comprising any Tranche, any offer or sale of Notes within the United States by any dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act.

**Public Offer Selling Restriction Under the Prospectus Directive**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), each Dealer has represented, warranted and agreed, and each further Dealer appointed under the Programme will be required to represent, warrant and agree, that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "**Relevant Implementation Date**") it has not made and will not make an offer of Notes which are the subject of the offering contemplated by the Base Prospectus as completed by the Final Terms in relation thereto (or are the subject of the offering contemplated by a Drawdown Prospectus, as the case may be) to the public in that Relevant Member State except that it may, with effect from and including the Relevant Implementation Date, make an offer of such Notes to the public in that Relevant Member State:

(a)     *Qualified investors:* at any time to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)     *Fewer than 150 offerees:* at any time to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive), subject to obtaining the prior consent of the relevant Dealer or Dealers nominated by the Issuer for any such offer; or

(c)     *Other exempt offers:* at any time in any other circumstances falling within Article 3(2) of the Prospectus Directive,

**provided that** no such offer of Notes referred to in (a) to (c) above shall require the Issuer or any Dealer to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer of Notes to the public**" in relation to any Notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Notes to be offered so as to enable an investor to decide to purchase or subscribe the Notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, and the expression "**Prospectus Directive**" means Directive 2003/71/EC (as amended, including by Directive 2010/73/EU) and includes any relevant implementing measure in the Relevant Member State.

**Selling Restrictions Addressing Additional Securities Laws**

**United Kingdom**

Each Dealer has represented, warranted and agreed that:

(a)     *No deposit-taking:* in relation to any Notes having a maturity of less than one year:

    (i)     it is a person whose ordinary activities involve it in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of its business; and:

    (ii)    it has not offered or sold and will not offer or sell any Notes other than to persons:

        (A)     whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses; or

        (B)     who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses,

    where the issue of the Notes would otherwise constitute a contravention of Section 19 of the FSMA by the Issuer;

(b)   **Financial promotion:**  it has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA) received by it in connection with the issue or sale of any Notes in circumstances in which section 21(1) of the FSMA does not apply to the Issuer or the Guarantors; and

(c)   **General compliance**:  it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to any Notes in, from or otherwise involving the United Kingdom.

**Japan**

The Notes have not been and will not be registered under the Financial Instruments and Exchange Act of Japan (Act No. 25 of 1948), as amended (the "**FIEA**"). Accordingly, each Dealer has represented and agreed, and each further Dealer appointed under the Programme will be required to represent and agree, that it has not, directly or indirectly, offered or sold and will not, directly or indirectly, offer to sell any Notes in Japan or to, or for the benefit of, a resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organised under the laws of Japan) or to others for re-offering or resale, directly or indirectly, in Japan or to, or for the benefit of, any resident in Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, FIEA and other relevant laws and regulations of Japan.

**Grand Duchy of Luxembourg**

The Notes may not be offered, sold or resold to the public - within the meaning of the Luxembourg law of 10 July 2005 relating to prospectus for securities, as amended from time to time (the "**Luxembourg Prospectus Law**") and implementing Directive 2003/71/EC of the European Parliament and of the Council of 4 November 2003 on the prospectus to be published when securities are offered to the public or admitted to trading as amended by Directive 2010/73/EU of the European Parliament and of the Council of 24 November 2010 (the "**Prospectus Directive**") - in the territory of the Grand Duchy of Luxembourg ("**Luxembourg**"), directly or indirectly, unless:

(a)   a prospectus has been published and duly approved by the Commission de Surveillance du Secteur Financier (the "**CSSF**") if Luxembourg is the home Member State (as this term is defined in the Luxembourg Prospectus Law); or

(b)   if Luxembourg is not the home Member State, the CSSF has been notified by the competent authority in the home Member State that the prospectus has been duly approved; or

(c)   the offer benefits from an exemption to, or constitutes a transaction not subject to, the requirement to publish a prospectus.

Each Dealer has represented and agreed accordingly that it has not offered, sold or resold and will not offer, sell or resell or cause the offering, sale or resale of the Notes to the public in Luxembourg, unless such offering, sale or resale occur in full compliance with the Luxembourg Prospectus Law and other related regulations.

**The Netherlands**

In relation to the Netherlands, each Dealer has represented, warranted and agreed that it has not made and will not make any offer of Notes which are the subject of the offering in the Netherlands, unless such offer is made exclusively to persons which are qualified investors (as defined in Article 2(1)(e) of the Prospectus Directive) in the Netherlands.

Each Dealer has represented and agreed that it has complied and will comply with the requirement under the Dutch Savings Certificates Act (*Wet inzake spaarbewijzen*) that Zero Coupon Notes (as defined below) in definitive form may only be transferred and accepted, directly or indirectly, within, from or into the Netherlands through the intermediary of either the Issuer or a member firm of Euronext Amsterdam N.V.  No such intermediary services are required:  (a) in respect of the transfer and acceptance of rights representing an interest in a Zero Coupon Note in global form, (b) in respect of the initial issue of Zero Coupon Notes in definitive form to the first holders thereof, (c) in respect of the transfer and acceptance of Zero Coupon Notes in definitive form between individuals not acting in the conduct of a business or profession or (d) in respect of the transfer and acceptance of such Zero Coupon Notes within, from or into the Netherlands if all Zero Coupon Notes (either in definitive form or as rights representing an interest in a Zero Coupon Note in global form) of any particular Series are issued outside the Netherlands and are not distributed into the Netherlands in the course of initial distribution or immediately thereafter.  As used in this paragraph "Zero Coupon Notes" are Notes that are in bearer form and that constitute a claim for a fixed sum against

the Issuer and on which interest does not become due during the tenor of the Notes or on which no interest is due whatsoever.

## Switzerland

Each Dealer has undertaken and agreed that it has not publicly offered, sold or advertised and will not publicly offer, sell or advertise any Notes, directly or indirectly, in, into or from Switzerland and acknowledges that any offering or marketing material relating to the Notes does not constitute a prospectus as such term is understood pursuant to article 652a or article 1156 of the Swiss Code of Obligations or a listing prospectus within the meaning of the listing rules of the SIX Swiss Exchange or any other regulated trading facility in Switzerland, and that any offering or marketing material relating to the Notes may not be publicly distributed or otherwise made publicly available in Switzerland.

## Singapore

Each Dealer has represented, warranted and undertaken to the Issuer and the Guarantors that the Notes may not be offered or sold, nor may the Notes be the subject of an invitation for subscription or purchase, nor may any document or material in connection with the offer or sale, or invitation for subscription or purchase of the Notes be circulated or distributed, whether directly or indirectly, to any person in Singapore other than (a) to an institutional investor (as defined in Section 4A of the Securities and Futures Act, Cap. 289 of Singapore (the "**SFA**")) pursuant to Section 274 of the SFA, (b) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to an offer referred to in Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA or (c) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Notes are acquired by persons who are relevant persons specified in Section 276 of the SFA, namely:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

the, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the Notes pursuant to an offer made under Section 275 of the SFA except:

(a)     to an institutional investor (under Section 274 of the SFA) or to a relevant person as defined in Section 275(2) of the SFA, or any person pursuant to an offer that is made on terms that such shares, debentures and units of shares and debentures of that corporation or such rights or interest in that trust are acquired at a consideration of not less than S$200,000 (or its equivalent in a foreign currency) for each transaction, whether such amount is to be paid for in cash or by exchange of securities or other assets and further for corporations, in accordance with the conditions specified in Section 275(1A) of the SFA;

(b)     where no consideration is or will be given for the transfer;

(c)     where the transfer is by operation of law; or

(d)     as specified in Section 276(7) of the SFA.

## General

Each Dealer has represented, warranted and agreed that it has complied and will comply with all applicable laws and regulations in each country or jurisdiction in or from which it purchases, offers, sells or delivers Notes or possesses, distributes or publishes this Base Prospectus, any Final Terms, any Drawdown Prospectus or any related offering material, in all cases at its own expense.  Other persons into whose hands this Base Prospectus, any Final Terms or any Drawdown Prospectus comes are required by the Issuer, the Guarantors and the Dealers to comply with all applicable laws and regulations in each country or jurisdiction in or from which they purchase, offer, sell or deliver Notes or possess, distribute or publish this Base Prospectus, any Final Terms, any Drawdown Prospectus or any related offering material, in all cases at their own expense.

The Dealer Agreement provides that the Dealers shall not be bound by any of the restrictions relating to any specific jurisdiction (set out above) to the extent that such restrictions shall, as a result of change(s) or change(s) in official interpretation, after the date hereof, of applicable laws and regulations, no longer be applicable but without prejudice to the obligations of the Dealers described in the paragraph headed "*General*" above.

Selling restrictions may be supplemented or modified with the agreement of the Issuer.

## GENERAL INFORMATION

**Authorisation**

1. The establishment of the Programme was authorised by written resolution of the board of directors of the Issuer passed on 11 November 2013. The giving of the Guarantee by the Guarantors has been authorised pursuant to the authority of the respective directors of the Guarantors under resolution of their respective boards of directors dated 6 November 2013 (in the case of TBBV, TDL and TTL) and 7 November 2013 (in the case of TPTE). The updating of the Programme was authorised by written resolution of the board of directors of the Issuer passed on 13 March 2015. The updating of the Programme was duly authorised by the respective directors of the Guarantors under the resolutions of their respective boards of directors dated 10 March 2015 (in the case of TPTE), 11 March 2015 (in the case of TTL) and 13 March 2015 (in the case of TBBV and TDL). Each of the Issuer and the Guarantors has obtained or will obtain from time to time all necessary consents, approvals and authorisations in connection with the issue and performance of the Notes and the giving of the guarantee relating to them.

**Listing Agent**

2. Walkers Listing & Support Services Limited is acting solely in its capacity as listing agent for the Issuer in relation to the Notes and is not itself seeking admission of the Notes to the Official List or to trading on the Main Securities Market.

**Legal and Arbitration Proceedings**

3. There are no governmental, legal or arbitration proceedings, (including any such proceedings which are pending or threatened, of which the Issuer or the Guarantors are aware), which may have, or have had during the 12 months prior to the date of this Base Prospectus, a significant effect on the financial position or profitability of the Issuer or the Guarantors or their subsidiaries.

**Material Change in Prospects**

4. Save as disclosed in this Base Prospectus, since 30 September 2014 there has been no material adverse change in the prospects of the Issuer, the Guarantors or any of their subsidiaries.

**Significant Change in Financial or Trading Position**

5. Save as disclosed in this Base Prospectus, since 31 December 2014 there has been no significant change in the financial or trading position of the Issuer, the Guarantors or any of their subsidiaries.

**Auditors**

6. The consolidated financial statements of the Group have been audited without qualification for the years ended 2014 and 2013 by Ernst & Young Accountants LLP, Boompjes 258, 3011 XZ Rotterdam, the Netherlands, chartered accountants, who have given, and have not withdrawn, their consent to the inclusion of their report in this Base Prospectus in the form and context in which it is included.

**Documents on Display**

7. Copies of the following documents (together, if necessary, with English translations thereof) may be inspected in physical form during normal business hours at the offices of Trafigura Beheer B.V. at 20th Floor, Ito Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, the Netherlands for 12 months from the date of this Base Prospectus:

   (a)   the constitutive documents of the Issuer;

   (b)   the constitutive documents of the Guarantors;

   (c)   the Group Financial Statements;

   (d)   the Issuer Financial Statements;

   (e)   the unaudited consolidated financial statements of the Group for the three months ended 31 December 2014;

      (f)      the Paying Agency Agreement;

      (g)      the Trust Deed; and

      (h)      the Dealer Agreement.

**Clearing of the Notes**

8.      The Notes have been accepted for clearance through Euroclear and Clearstream, Luxembourg.  The appropriate common code and the International Securities Identification Number in relation to the Notes of each Tranche will be specified in the relevant Final Terms.  The relevant Final Terms shall specify any other clearing system as shall have accepted the relevant Notes for clearance together with any further appropriate information.

**Notes Having a Maturity of Less Than One Year**

9.      Where Notes have a maturity of less than one year and either (a) the issue proceeds are received by the Issuer in the United Kingdom or (b) the activity of issuing the Notes is carried on from an establishment maintained by the Issuer in the United Kingdom, such Notes must:  (i) have a minimum redemption value of £100,000 (or its equivalent in other currencies) and be issued only to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their businesses or who it is reasonable to expect will acquire, hold, manage or dispose of investments (as principal or agent) for the purposes of their businesses; or (ii) be issued in other circumstances which do not constitute a contravention of section 19 of the FSMA by the Issuer.

**Issue Price and Yield**

10.      Notes may be issued at any price.  The issue price of each Tranche of Notes to be issued under the Programme will be determined by the Issuer, the Guarantors and the relevant Dealer(s) at the time of issue in accordance with prevailing market conditions and the issue price of the relevant Notes or the method of determining the price and the process for its disclosure will be set out in the applicable Final Terms.  In the case of different Tranches of a Series of Notes, the issue price may include accrued interest in respect of the period from the interest commencement date of the relevant Tranche (which may be the issue date of the first Tranche of the Series or, if interest payment dates have already passed, the most recent interest payment date in respect of the Series) to the issue date of the relevant Tranche.

The yield of each Tranche of Notes set out in the applicable Final Terms will be calculated as of the relevant issue date on an annual or semi-annual basis using the relevant issue price.  It is not an indication of future yield.

**FINANCIAL STATEMENTS**

TRAFIGURA BEHEER B.V.
Amsterdam, The Netherlands
Unaudited Consolidated Financial Statements, period ended 31 December 2014

## Consolidated Statement of Income Year to Date

**Period ended 31 December 2014**

| | 3 months 31 December 2014 USD'M (unaudited) | 12 months 30 September 2014 USD'M (audited) | 3 months 31 December 2013 USD'M (unaudited) |
|---|---|---|---|
| Revenue | 26,651.0 | 127,612.6 | 34,261.8 |
| Cost of sales | (25,917.2) | (125,567.5) | (33,822.9) |
| **Gross profit** | **733.8** | **2,045.1** | **438.9** |
| *Gross profit %* | *2.8%* | *1.6%* | *1.3%* |
| Other income/(expense) | (91.9) | 484.2 | 6.2 |
| General and administrative expenses | (258.2) | (1,004.7) | (222.6) |
| **Results from operating activities** | **383.7** | **1,524.6** | **222.5** |
| Finance income | 58.3 | 233.9 | 34.5 |
| Finance expense | (147.7) | (541.8) | (120.2) |
| Net Financing cost | (89.4) | (307.9) | (85.7) |
| Share of profit/(loss) of equity-accounted investees | 30.2 | 86.1 | 36.2 |
| **Profit before tax** | **324.5** | **1,302.8** | **173.0** |
| Income tax expense | (57.1) | (222.8) | (10.2) |
| **Profit for the period** | **267.4** | **1,080.0** | **162.7** |
| **Profit attributable to** | | | |
| Owners of the Company | 262.5 | 1,039.7 | 161.2 |
| Non-controlling interests | 4.9 | 40.3 | 1.5 |
| **Profit for the period** | **267.4** | **1,080.0** | **162.7** |

## Consolidated Balance Sheet
**31 December 2014**

| | 31 December 2014 USD'M (unaudited) | 30 September 2014 USD'M (audited) | 31 December 2013 USD'M (unaudited) |
|---|---|---|---|
| **Assets** | | | |
| Property, plant and equipment | 3,294.2 | 3,010.4 | 3,005.8 |
| Intangible assets | 521.1 | 533.6 | 519.3 |
| Equity-accounted investees | 2,547.2 | 2,562.5 | 2,147.8 |
| Loans receivable and advances | 606.2 | 724.1 | 1,990.1 |
| Other investments | 875.3 | 756.0 | 231.6 |
| Derivatives | 83.5 | 127.4 | - |
| Deferred tax assets | 169.8 | 166.2 | 172.6 |
| | | | |
| **Total non-current assets** | **8,097.3** | **7,880.2** | **8,067.2** |
| | | | |
| Inventories | 8,134.2 | 7,905.2 | 8,806.7 |
| Trade and other receivables | 16,146.7 | 15,526.0 | 19,799.6 |
| Derivatives | 4,205.0 | 1,660.3 | 1,820.1 |
| Prepayments | 3,053.5 | 2,300.8 | 1,539.3 |
| Income tax receivable | 145.6 | 138.1 | 148.5 |
| Deposits | 300.7 | 454.7 | - |
| Cash and cash equivalents | 3,241.6 | 3,709.5 | 5,754.4 |
| | | | |
| **Total current assets** | **35,227.3** | **31,694.6** | **37,868.6** |
| | | | |
| **Total assets** | **43,324.6** | **39,574.8** | **45,935.8** |
| | | | |
| **Equity** | | | |
| Share capital | 0.2 | 0.2 | 0.1 |
| Capital securities | 640.0 | 645.8 | 491.4 |
| Reserves | 1,701.0 | 1,718.6 | 1,578.7 |
| Retained earnings | 3,114.0 | 2,891.1 | 3,043.3 |
| | | | |
| **Equity attributable to the owners of the Company** | **5,455.2** | **5,255.7** | **5,113.5** |
| Non-controlling interests | 306.3 | 301.5 | 265.0 |
| | | | |
| **Total group equity** | **5,761.5** | **5,557.2** | **5,378.5** |
| | | | |
| **Liabilities** | | | |
| Loans and borrowings | 5,887.2 | 6,175.7 | 7,003.4 |
| Deferred revenue | 0.9 | 0.9 | 1.1 |
| Derivatives | 81.3 | 249.4 | 221.5 |
| Provisions | 22.7 | 24.0 | 36.2 |
| Deferred tax liabilities | 332.8 | 338.3 | 320.9 |
| | | | |
| **Total non-current liabilities** | **6,324.9** | **6,788.4** | **7,583.1** |
| | | | |
| Current tax liabilities | 266.5 | 344.2 | 220.5 |
| Loans and borrowings | 16,749.0 | 14,967.0 | 17,166.4 |
| Trade and other payables | 12,467.4 | 10,589.0 | 13,104.9 |
| Derivatives | 1,755.3 | 1,329.0 | 2,482.5 |
| | | | |
| **Total current liabilities** | **31,238.2** | **27,229.2** | **32,974.3** |
| | | | |
| **Total group equity and liabilities** | **43,324.6** | **39,574.8** | **45,935.8** |

**Cash Flow Statement Year to Date**
**Period ended 31 December 2014**

| | 3 months<br>31 December<br>2014<br>USD'M<br>(unaudited) | 12 months<br>30 September<br>2014<br>USD'M<br>(audited) | 3 months<br>31 December<br>2013<br>USD'M<br>(unaudited) |
|---|---:|---:|---:|
| Cash flows from operating activities | | | |
| Profit before tax | 324.5 | 1,302.8 | 173.0 |
| | | | |
| Adjustments for: | | | |
| | | | |
| Depreciation | 49.9 | 192.0 | 39.3 |
| Amortisation of intangible assets | 12.7 | 44.1 | 10.6 |
| Provisions | - | 6.0 | - |
| Gain on fair value through profit or loss instruments | (9.4) | (113.2) | |
| Impairment losses on financial fixed assets | - | 16.6 | (2.8) |
| Impairment losses on non-financial fixed assets | 9.5 | 168.2 | 0.0 |
| Impairment losses on equity-accounted investees | - | 3.9 | |
| Net finance costs | 89.4 | 307.9 | 85.7 |
| Share of profit of equity-accounted investees | (30.2) | (86.1) | (36.2) |
| Gain on sale of non-financial fixed assets | 0.6 | 3.1 | 0.6 |
| Gain on sale of equity accounted investees | - | - | (0.1) |
| Gain on sale of other investments | - | (12.2) | - |
| Gain on divestments of subsidiaries | (0.6) | (587.0) | - |
| Equity-settled share-based payment transactions | - | 42.2 | - |
| **Operating cashflow before working capital changes** | **446.4** | **1,288.3** | **270.1** |
| | | | |
| Changes in: | | | |
| Inventories | (228.9) | (57.3) | (950.5) |
| Trade and other receivables | (2,829.3) | 2,364.8 | (2,129.3) |
| Prepayments | (752.7) | (1,156.4) | (394.9) |
| Trade and other payables and dervatives | 2,029.2 | (3,008.6) | 503.0 |
| **Cash generated from/(used in) operating activities** | **(1,335.3)** | **(569.2)** | **(2,701.7)** |
| | | | |
| Interest paid | (147.7) | (541.8) | (120.2) |
| Interest received | 58.3 | 233.9 | 34.5 |
| Dividends (paid)/received | - | 0.5 | - |
| Tax (paid)/received | (149.4) | (78.1) | 5.8 |
| **Net cash from/(used in) operating activities** | **(1,574.1)** | **(954.7)** | **(2,781.6)** |
| | | | |
| Cash flows from investing activities | | | |
| Acquisition of property, plant and equipment | (333.5) | (1,351.3) | (370.5) |
| Proceeds from sale of property, plant and equipment | 46.2 | 52.6 | 8.5 |
| Acquisition of intangible assets | (16.7) | (120.5) | (32.3) |
| Proceeds from sale of intangible assets | - | - | 0.2 |
| Acquisition of equity accounted investees | (27.3) | (249.7) | (2.6) |
| Disposal of equity accounted investees | - | 50.9 | 9.2 |
| Acquisition of loans receivable and advances | (3.2) | (845.0) | (218.8) |
| Disposals of loans receivable and advances | 37.9 | 568.5 | 279.8 |
| Acquisition of other investments | (98.1) | (473.0) | (16.1) |
| Disposal of other investments | 3.4 | 15.7 | 6.4 |
| Acquisition of subsidiaries, net of cash acquired | (48.0) | (4.8) | - |
| Disposal of subsidiaries, net of cash disposed of | 1.2 | 872.1 | - |
| **Net cash from/(used in) investing activities** | **(438.1)** | **(1,484.5)** | **(336.2)** |
| | | | |
| Cash flows from financing activities | | | |
| Proceeds from the issue of capital securities | - | 154.0 | - |
| Payment of capital securities dividend | (26.7) | (44.1) | (17.2) |
| Redemption of shares | - | (885.3) | - |
| Proceeds from long-term loans and borrowings | (212.4) | 1,569.0 | 1,162.8 |
| Payment of finance lease liabilities | (2.3) | (15.8) | (2.8) |
| Increase of short-term bank financing | 1,785.7 | 2,158.6 | 3,994.5 |
| Acquisition of non-controlling interest | - | (0.3) | (0.8) |
| **Net cash from/(used in) financing activities** | **1,544.3** | **2,936.1** | **5,136.5** |
| | | | |
| **Net increase/(decrease) in cash and cash equivalents** | **(467.9)** | **496.9** | **2,018.7** |
| Cash and cash equivalents at 1 October | 3,709.5 | 3,212.6 | 3,735.7 |
| | | | |
| **Cash and cash equivalents at period end** | **3,241.6** | **3,709.5** | **5,754.4** |

## INDEX OF DEFINED TERMS

£ iv
2010 PD Amending Directive ....................... 61
30/360...................................................... 29, 30
30E/360 .................................................... 29, 30
30E/360 (ISDA) ............................................ 31
ABS .............................................................. 108
Accountholder ................................................ 69
Accrual Yield ................................................. 27
Actual/360 ................................................ 29, 30
Actual/365 ...................................................... 29
Actual/365 (Fixed) ................................... 29, 30
Actual/Actual ................................................. 29
Actual/Actual (ICMA)............................. 28, 29
Actual/Actual (ISDA)..................................... 29
Additional Business Centre(s)........................ 27
Additional Financial Centre(s) ...................... 27
Affiliate ......................................................... 58
Apportioned Amount...................................... 34
Base Prospectus.............................................. 61
Basel III ....................................................... 110
billions ............................................................ iv
Board of Directors ....................................... 100
Brent .............................................................. 88
Business Conduct Code .................................. 99
Business Day .................................................. 27
Business Day Convention............................... 27
Calculation Agent........................................... 28
Calculation Amount ....................................... 28
Calculation Period ......................................... 28
capex .............................................................. 87
CFO .............................................................. 102
Clearstream, Luxembourg ......................... 1, 28
Cochan ........................................................... 82
Compact ....................................................... 116
Company ........................................................... 1
Conditions ........................................... ii, 26, 61
Consolidated Net Earnings ............................ 28
Consolidated Net Worth ................................ 28
COO ............................................................... 97
Corporate Affairs......................................... 100
Coupon Sheet ................................................. 28
Couponholders ............................................... 26
Coupons.......................................................... 26
CRO .............................................................. 101
CSR .............................................................. 116
CSSF ............................................................ 130
Day Count Fraction ....................................... 28
DB ................................................................ 102
Dealer Agreement......................................... 128
Dealers......................................................... 128
Deals Desks ................................................... 97
Default ........................................................... 31
Definitive Notes ............................................ 23
Dispute ........................................................... 59
dollars ............................................................. iv
Drawdown Prospectus...................................... ii

DRC ............................................................... 84
Early Redemption Amount (Tax) ...................31
Early Termination Amount ............................31
EU ..................................................................14
EU Savings Directive.....................................18
EUR ................................................................iv
EURIBOR.......................................................43
euro .................................................................iv
Eurobond Basis .........................................29, 30
Euroclear.....................................................1, 31
Eurodollar Convention...................................27
Event of Default.............................................52
Extraordinary Resolution ..............................31
FATCA .................................................19, 127
FCA.................................................................76
FFAs .............................................................103
FIEA .............................................................130
Final Redemption Amount.............................31
Final Terms ..............................................ii, 26
Financial Indebtedness...................................31
first currency ..................................................59
Fixed Coupon Amount...................................32
Floating Rate Convention ..............................27
Following Business Day Convention.............27
Foundation ...................................................118
FRN Convention ............................................27
FSMA ...............................................................2
FTT ...............................................................126
G9 .................................................................104
GAAP .............................................................32
Galena ............................................................86
GCM ...............................................................99
GDP ................................................................88
GlencoreXstrata .............................................80
Global Note.....................................................23
Group .................................................ii, 32, 58
Group Member................................................32
Guarantee .................................................i, 32
Guarantee of the Notes...................................33
Guarantor ....................................................i, 26
Guarantors..................................................i, 26
Holding Company...........................................33
HSEC ............................................................116
Iberian ............................................................85
ICS ................................................................105
ICSDs ...............................................................1
IFRS ...............................................................33
IGA legislation.............................................127
Impala Terminals Group ................................11
Insignificant Subsidiary ................................33
Interest Amount .............................................33
Interest Commencement Date.........................33
Interest Determination Date ...........................33
Interest Payment Date....................................33
Interest Period ................................................33
Investment......................................................33

Investor's Currency .......................................... 17
Irish Stock Exchange ......................................... i
IRS Agreements ............................................ 127
ISDA ........................................................ 101
ISDA Definitions.............................................. 34
ISDA Rate .................................................... 45
Islamic Financing Transaction ..................... 34
Issue Date ................................................... 34
Issuer ........................................................ i, 26
KYC ............................................................ 74
Law........................................................... 124
LIBOR ........................................................ 43
Limited Group Member.................................. 34
Limited Recourse Trade Finance Indebtedness
    ........................................................... 34
LNG........................................................... 75
Luxembourg ............................................... 130
Luxembourg IGA ........................................ 127
Luxembourg Prospectus Law ...................... 130
M&A ............................................................ 82
M12 .......................................................... 104
Main Securities Market ..................................... i
Management Board ....................................... 74
Margin ........................................................ 34
margin calls ................................................ 101
Material ....................................................... 34
MATSA ........................................................ 85
Maturity Date ......................................... 34, 40
Maximum Redemption Amount................... 34
Measurement Period ..................................... 34
Meeting........................................................ 34
Member State ........................................ iv, 34
Minimum Redemption Amount ................... 34
Mining Group .............................................. 76
Modified Business Day Convention............. 27
Modified Following Business Day Convention
    ........................................................... 27
NAV ......................................................... 112
necessary information.................................... 22
No Adjustment ............................................ 28
Non-Recourse Group Member ..................... 35
Noteholders ................................................. 26
Notes ........................................................ i, 26
offer of Notes to the public.......................... 129
Official List .................................................... i
Optional Redemption Amount (Call) ........... 35
Optional Redemption Amount (Put).............. 35
Optional Redemption Date (Call).................. 35
Optional Redemption Date (Put) .................. 35
OTC............................................................. 9
outstanding .................................................. 41
P&L............................................................ 97
Parent.......................................................... 35
participating Member States........................ 126
Paying Agency Agreement............................ 26
Paying Agents ............................................. 26
Payment Business Day .................................. 35
Permanent Global Note ................................ 23
Permitted Indebtedness................................. 35
Permitted Securitisation ............................... 36

Permitted Security Interest............................ 36
Permitted Transaction ................................... 38
Person ......................................................... 38
Policy and Business Principles ................... 117
Pound Sterling............................................... iv
Preceding Business Day Convention ............. 27
Principal Financial Centre............................. 38
Principal Paying Agent .................................. 26
Proceedings.................................................. 60
Programme .............................................. i, 26
Project Company........................................... 38
Project Finance Indebtedness........................ 38
Prospectus Directive .............. i, 39, 61, 129, 130
Puma ........................................................... 11
Puma Energy ............................................... 11
Puma Energy Group...................................... 11
Put Option Notice ........................................ 39
Put Option Receipt........................................ 39
Rate of Interest............................................. 39
RCFs ......................................................... 106
Redemption Amount...................................... 39
Reference Banks ........................................... 39
Reference Price ............................................. 39
Reference Rate .............................................. 39
Regular Date ................................................ 40
Regular Period .............................................. 39
Relevant Coupons ......................................... 51
Relevant Date............................................... 40
Relevant Financial Centre.............................. 40
Relevant Implementation Date.................... 129
Relevant Member State ............................... 129
Relevant Screen Page.................................... 40
Reserved Matter............................................ 40
second currency ........................................... 59
Securities Act ................................................ iii
Security Interest ........................................... 40
Series........................................................... 26
SFA .......................................................... 131
Short-Term Trade Finance............................. 40
SIVs ........................................................... 96
Sonangol ..................................................... 82
SPE ............................................................ 41
Specified Currency ....................................... 41
Specified Denomination(s) ............................ 41
Specified Office ............................................ 41
Specified Period ........................................... 41
SSC ............................................................ 99
Steering Group ........................................... 117
sterling......................................................... iv
Subsidiary .................................................... 41
Substituted Guarantor ................................... 57
Substituted Issuer ......................................... 57
Substitution Conditions................................. 58
sub-unit ................................................ 43, 45
Supervisory Board ........................................ 73
Talon ........................................................... 41
TARGET Settlement Day .............................. 41
TARGET2..................................................... 41
TBBV........................................................... 1
TC/RCs ....................................................... 92

TDL ............................................................... 1
TEFRA C Rules............................................ 23
TEFRA D Rules ........................................... 23
Temporary Global Note................................ 23
Territories .................................................. 125
TGS .............................................................. 99
Third Party................................................... 34
TPTE ............................................................. 1
Trafigura......................................................... ii
Tranche......................................................... 26
Treaty ........................................................... 41

Trust Deed.................................................... 26
Trustee ......................................................... 26
TSF ............................................................ 108
TTL.................................................................. 1
U.S. dollars ..................................................iv
U.S.$ .............................................................iv
VaR .......................................................9, 104
Vitol ............................................................. 80
Wholly Owned Subsidiary ............................ 41
WTI............................................................... 88
Zero Coupon Note ........................................ 41

**REGISTERED OFFICE OF THE ISSUER**

**Trafigura Funding S.A.**
7 rue Robert Stümper
L-2557 Luxembourg City
Grand Duchy of Luxembourg

**REGISTERED OFFICES OF THE GUARANTORS**

| | |
|---|---|
| **Trafigura Beheer B.V.**<br>20th Floor, Ito Tower<br>Gustav Mahlerplein 102<br>1082 MA Amsterdam<br>The Netherlands | **Trafigura Trading LLC**<br>1209 Orange Street<br>Wilmington New Castle County<br>Delaware 19801<br>United States |
| **Trafigura Pte Ltd.**<br>One Marina Boulevard #28-00<br>Singapore 018989<br>Singapore | **Trafigura Derivatives Limited**<br>Portman House<br>2 Portman Street<br>London W1H 6DU<br>United Kingdom |

**ARRANGER**

ING Bank N.V.
Foppingadreef 7
1102 BD Amsterdam
The Netherlands

**DEALERS**

| | |
|---|---|
| **Citigroup Global Markets Limited**<br>Citigroup Centre<br>Canada Square<br>Canary Wharf<br>London E14 5LB<br>United Kingdom | **Credit Suisse Securities (Europe)<br>Limited**<br>One Cabot Square<br>London E14 4QJ<br>United Kingdom |

| | | |
|---|---|---|
| **Deutsche Bank AG,<br>London Branch**<br>Winchester House<br>1 Great Winchester Street<br>London EC2N 2DB<br>United Kingdom | **ING Bank N.V.**<br>Foppingadreef 7<br>1102 BD Amsterdam<br>The Netherlands | **Lloyds Bank plc**<br>10 Gresham Street<br>London EC2V 7AE<br>United Kingdom |

| | |
|---|---|
| **Société Générale**<br>29, boulevard Haussmann<br>75009 Paris<br>France | **The Royal Bank of Scotland plc**<br>135 Bishopsgate<br>London EC2M 3UR<br>United Kingdom |

**PRINCIPAL PAYING AGENT**

**Citibank N.A., London Branch**
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom

**TRUSTEE**

**Citicorp Trustee Company Limited**
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom

**LEGAL ADVISERS**

| *To the Issuer and the Guarantors as to English law:* | *To the Dealers as to English law:* | *To the Dealers as to Luxembourg law:* |
|---|---|---|
| **Jones Day**<br>21 Tudor Street<br>London EC4Y 0DJ<br>United Kingdom | **Clifford Chance LLP**<br>10 Upper Bank Street<br>London E14 5JJ<br>United Kingdom | **Clifford Chance Luxembourg**<br>2-4 Place de Paris<br>L-1011 Luxembourg<br>Grande-Duché de Luxembourg |
| *To the Dealers as to Dutch law:* | *To the Issuer and the Guarantors as to Dutch law:* | *To the Issuer and the Guarantors as to Luxembourg law:* |
| **Clifford Chance Amsterdam**<br>Droogbak 1A<br>1013 GE Amsterdam<br>The Netherlands | **Van Doorne N.V.**<br>Jachthavenweg 121<br>1081 KM Amsterdam<br>P.O. Box 75265<br>1070 AG Amsterdam<br>The Netherlands | **Wildgen**<br>69, Boulevard de la Pétrusse<br>L-2320 Luxembourg |
| *To the Issuer and the Guarantors as to Singapore law:* | *To the Issuer and the Guarantors as to Delaware law:* | *To the Trustee as to English law:* |
| **Allen & Gledhill**<br>One Marina Boulevard #28-00<br>Singapore 01898 | **Jones Day**<br>222 East 41st Street<br>New York, New York 10017-6702<br>United States of America | **Norton Rose Fulbright LLP**<br>3 More London Riverside<br>London SE1 2AQ<br>United Kingdom |

| **AUDITORS TO THE GROUP** | **LISTING AGENT** |
|---|---|
| **Ernst & Young Accountants LLP**<br>Boompjes 258<br>3011 XZ Rotterdam<br>The Netherlands | **Walkers Listing & Support Services Limited**<br>The Anchorage<br>17/19 Sir John Rogerson's Quay<br>Dublin 2<br>Ireland |

# EXHIBIT 18

Case 1:22-cv-00366-GBW   Document 25-1   Filed 10/25/22   Page 220 of 227 PageID #: 2598






TRAFIGURA

# Trafigura Group Pte Ltd closes USD1.9 billion European Syndicated Revolving credit facilities, JPY76.8 billion JPY denominated term loan, and issues USD203 million of notes in the US private placement market

*Singapore, 26 March 2020* – Trafigura Group Pte Ltd. ("**Trafigura**" or the "**Company**"), a market leader in the global commodities industry has successfully closed two major facilities in the international syndicated bank loan markets and issued long tenor notes in the US private placement market.

Trafigura refinanced its flagship 365-day European multi-currency syndicated revolving credit facility (the "**365-day ERCF**") totaling USD1.9 billion. The 365-day ERCF, initially launched at USD1.5 billion, was very well received by the bank market and closed substantially oversubscribed, allowing the Company to upsize the facility. The 365-day ERCF will be used to refinance the maturing USD2.05 billion 365-day facility dated 14 March 2019, as well as for general corporate purposes. The pricing of the facility was unchanged from last year. In addition, the Company decided to exercise the second extension option available on the 3-year tranche of its 2018 ERCF, thereby extending the facility by 365 days and maintaining a 3-year tenor.

In a separate transaction, Trafigura returned for the fifth time to the Japanese domestic syndicated bank loan market and raised JPY76.8 billion (circa USD720 million equivalent at spot rate) via a JPY denominated term loan (the "**Samurai Loan**"). In addition to the three-year tranche, which Trafigura has refinanced every two years since 2012, Trafigura introduced an inaugural five-year tranche. Twenty Japanese financial institutions supported the Samurai Loan, demonstrating the continued interest of domestic lenders in Trafigura's credit. Five new institutions joined the syndicate, while the majority of existing lenders continued to participate and increased their amount invested. This transaction refinances the 2018 Samurai Loan and will be used for general corporate purposes.

Finally, Trafigura Funding SA, a dedicated funding vehicle of the Company, issued on 25 March USD203 million of notes in the US Private Placement market with tenors of 5, 7 and 10 years. For its fifth issuance in the USPP market, Trafigura achieved its tightest ever all-in financing level. Proceeds will be used to refinance USD51.5m of maturing USPP notes and to support the refinancing of Trafigura's EUR550 million bond coming due in April 2020.

Christophe Salmon, Chief Financial Officer for Trafigura, commented: "*Given the unprecedented times that the global economy is undergoing, the simultaneous re-financing of two core credit facilities and the issuance of long tenor notes puts Trafigura in a position of strength to navigate through the uncertainties lying ahead and to seize upcoming opportunities. The timing of the execution of these financings was critical and impeccable. More than ever, we are grateful for the support and trust that the banking community and institutional investors have vested in Trafigura. They should feel very comfortable with Trafigura's financial model, which is designed to give us access to liquidity and capital at all times, even during periods of extreme volatility in the global economy and stress in*

*the financial system. The resilience of our model has been repeatedly tested during the many different liquidity and business cycles that we have been through for the last 27 years. It has proven its strength and will continue to do so."*

The 365-day ERCF was arranged by Mandated Lead Arrangers & Bookrunners Bank of China Limited, London Branch, ING Bank N.V. and UniCredit Bank AG acting as Active Bookrunners, along with Coöperatieve Rabobank U.A. and Société Générale Corporate & Investment Banking acting as Passive Bookrunners.

MUFG Bank, Ltd., Mizuho Bank Europe N.V., Sumitomo Mitsui Banking Corporation Europe Limited and Development Bank of Japan Inc. acted as Bookrunners and Mandated Lead Arrangers for the Samurai Loan.

SG Americas Securities, LLC and Coöperatieve Rabobank U.A. acted as joint lead placement agents in connection with Trafigura's US private placement.

**ENDS**

**For further information please contact:**

Trafigura's Global Press Office: +41 (0) 22 592 4528 or **media@trafigura.com**

**Notes to editors**

Founded in 1993, Trafigura is one of the largest physical commodities trading groups in the world. Trafigura sources, stores, transports and delivers a range of raw materials (including oil and refined products and metals and minerals) to clients around the world. The trading business is supported by industrial and financial assets, including 49.3 percent owned global oil products storage and distribution company Puma Energy; global terminals, warehousing and logistics operator Impala Terminals; Trafigura's Mining Group; and Galena Asset Management. The Company is owned by around 700 of its 8,000 employees who work in 80 offices in 41 countries around the world. Trafigura has achieved substantial growth over recent years, growing revenue from USD12 billion in 2003 to USD171.5 billion in 2019. The Group has been connecting its customers to the global economy for more than two decades, growing prosperity by advancing trade.

Visit: **www.trafigura.com**

Case 1:22-cv-00366-GBW   Document 25-2   Filed 10/25/22   Page 222 of 227 PageID #: 2600

# Read more

## Press releases

View all Group press releases



---

## Resource centre

Access our range of publications, animations and videos



Follow us

## Contact us

Fill the form to contact us or visit the locations page for the contact details

Contact form

Trafigura locations

## Global grievance hotline

Report grievances safely, securely, anonymously and with confidence

Global grievance hotline

## About us

Case 1:22-cv-00366-GBW Document 25-2 Filed 10/25/22 Page 223 of 227 PageID #: 2601

Sustainability

Products and services

Financials

Careers

Resource Centre

Employee area    Legal    Privacy notice    REACH

Copyright © 2022 Trafigura Group Pte. Ltd.

Trafigura in brief    Un vistazo a Trafigura    Um olhar breve sobre a Trafigura    Trafigura en bref    شركة ترافيجورا في لمحة

ГРУППА «ТРАФИГУРА» – КРАТКИЙ ОБЗОР    Trafigura ХОРМЫН ТӨДИЙД    托克一览    ひと目でわかるTrafigura

Trafigura 개요    Sekilas Trafigura    Thông tin sơ bộ về Trafigura    Trafigura lyhyesti    ТРАФІГУРА В УКРАЇНІ

Trafigura pe scurt    Trafigura in het kort

# EXHIBIT 19

## NYRSTAR CLARKSVILLE INC.: D00583724

**Department ID Number:**

D00583724

**Business Name:**

NYRSTAR CLARKSVILLE INC.

**Principal Office:** ⓘ

2405 YORK ROAD

SUITE 201

LUTHERVILLE TIMONIUM MD 21093-2264

**Resident Agent:** ⓘ

THE CORPORATION TRUST, INCORPORATED

2405 YORK ROAD

SUITE 201

LUTHERVILLE TIMONIUM MD 21093-2264

**Status:**

INCORPORATED

**Good Standing:**

THIS BUSINESS IS IN GOOD STANDING

**Business Type:**

CORPORATION

**Business Code:**

03 ORDINARY BUSINESS - STOCK

**Date of Formation/ Registration:**

07/17/1975

**State of Formation:**

MD

**Stock Status:**

STOCK

**Close Status:**

NO

# EXHIBIT 20

Delaware.gov                                                          Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

|  | Entity Details |
|---|---|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | **4679136** | Incorporation Date / Formation Date: | **4/22/2009** (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | **NYRSTAR TENNESSEE MINES-GORDONSVILLE LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| Name: | **NATIONAL REGISTERED AGENTS, INC.** | | |
|---|---|---|---|
| Address: | **1209 ORANGE STREET** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status  ○ Status,Tax & History Information

[Submit]

[View Search Results]                          [New Entity Search]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov