# EXHIBIT 21

**Department of State: Division of Corporations**

Allowable Characters

HOME

| Entity Details |
|---|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | **4165591** | Incorporation Date / Formation Date: | **5/26/2006** (mm/dd/yyyy) |
|---|---|---|---|

Entity Name: **NYRSTAR TENNESSEE MINES - STRAWBERRY PLAINS LLC**

| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
|---|---|---|---|

| Residency: | **Domestic** | State: | **DELAWARE** |
|---|---|---|---|

**REGISTERED AGENT INFORMATION**

| Name: | **NATIONAL REGISTERED AGENTS, INC.** | | |
|---|---|---|---|
| Address: | **1209 ORANGE STREET** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.
Would you like ○ Status  ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT 22

# Phillips 66 and Trafigura form joint venture to develop deepwater port

Houston, February 28, 2020 – Phillips 66 (NYSE:PSX) and Trafigura Group Pte. Ltd announce they have formed a 50/50 joint venture, Bluewater Texas Terminal LLC ("Bluewater Texas"), to develop an offshore deepwater port project located approximately 21 nautical miles east of the entrance to the Port of Corpus Christi.

The proposed project, to be constructed by Phillips 66, will consist of up to two single point mooring buoys capable of fully loading Very Large Crude Carriers (VLCCs) to export crude oil. The project is currently in the permitting stage. The joint venture owners expect to make a final investment decision later this year, pending permit approval and customer volume commitments that support the project meeting the owners' economic return thresholds.

Trafigura has withdrawn its application to develop the Texas Gulf Terminals deepwater port facility that was submitted to the United States Maritime Administration (MARAD) in July 2018.

The Bluewater Texas joint venture combines the unique market position that Trafigura has built in the United States as a leading exporter and marketer of crude oil with Phillips 66's commercial expertise, existing infrastructure network on the U.S. Gulf Coast, and proven operating experience, including the safe operation of a single port mooring buoy in the United Kingdom since 1971.

The Bluewater Texas joint venture is working with the Port of Corpus Christi Authority to provide a safe and environmentally sustainable infrastructure for the export of crude oil to global markets while benefitting the regional economy.

For additional information regarding commercial services at Bluewater Texas Terminal, please contact bluewatertexasterminal@p66.com.

## About Phillips 66

Phillips 66 is a diversified energy manufacturing and logistics company. With a portfolio of Midstream, Chemicals, Refining, and Marketing and Specialties businesses, the company processes, transports, stores and markets fuels and products globally. Phillips 66 Partners, the company's master limited partnership, is integral to the portfolio. Headquartered in Houston, the company has 14,500 employees committed to safety and operating excellence. Phillips 66 had $59 billion of assets as of December 31, 2019.

For more information, visit www.phillips66.com
Follow us on Twitter @Phillips66Co

## About Trafigura

Founded in 1993, Trafigura is one of the largest physical commodities trading groups in the world. Trafigura sources, stores, transports and delivers a range of raw materials (including oil and refined products and metals and minerals) to clients around the world. The trading business is supported by industrial and financial assets, including 49.3 percent owned global oil products storage and distribution company Puma Energy; global terminals, warehousing and logistics operator Impala Terminals; Trafigura's Mining Group; and Galena Asset Management. The Company is owned by over 700 of its 8,000 employees who work in 80 offices in 41 countries around the world. Trafigura

has achieved substantial growth over recent years, growing revenue from USD12 billion in 2003 to USD 171.5 billion in 2019. The Group has been connecting its customers to the global economy for more than two decades, growing prosperity by advancing trade.

For more information, visit: www.trafigura.com
Follow us on Twitter @Trafigura

CAUTIONARY STATEMENT FOR THE PURPOSES OF THE "SAFE HARBOR" PROVISIONS OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

*This news release contains certain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended, which are intended to be covered by the safe harbors created thereby. Words and phrases such as "continues," "expects," "will," "pursue," "propose," and similar expressions are used to identify such forward-looking statements. However, the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements relating to Phillips 66's operations (including joint venture operations) are based on management's expectations, estimates and projections about the company, its interests and the energy industry in general on the date this news release was prepared. These statements are not guarantees of future performance and involve certain risks, uncertainties and assumptions that are difficult to predict. Therefore, actual outcomes and results may differ materially from what is expressed or forecast in such forward-looking statements. Factors that could cause actual results or events to differ materially from those described in the forward-looking statements include fluctuations in crude oil and crude oil transportation or terminalling prices and refining margins; unexpected changes in costs for constructing, modifying or operating our facilities (including joint venture facilities); unexpected difficulties in, lack of, or disruptions in, adequate and reliable refining, transporting, or terminalling of crude oil; weather interference with project construction, including the impact of extreme weather events or conditions; potential liability from litigation or for remedial actions, including removal and reclamation obligations under environmental regulations; limited access to capital or significantly higher cost of capital related to illiquidity or uncertainty in the domestic or international financial markets; the impact of adverse market conditions, capacity overbuild, permitting delays, permitting denials, or other similar risks to those identified herein affecting Phillips 66, as well as the ability of Phillips 66 to successfully execute its growth plans; and other economic, business, competitive and/or regulatory factors affecting Phillips 66's businesses generally as set forth in our filings with the Securities and Exchange Commission. Phillips 66 is under no obligation (and expressly disclaims any such obligation) to update or alter its forward-looking statements, whether as a result of new information, future events or otherwise.*

**Phillips 66**

**Trafigura**

+41 22 592 45 28
media@trafigura.com

# EXHIBIT 23

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **5037140** | Incorporation Date / Formation Date: | **9/13/2011** (mm/dd/yyyy) |
| Entity Name: | **SAWTOOTH CAVERNS, LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **THE CORPORATION TRUST COMPANY** | | |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status   ○ Status,Tax & History Information

[Submit]

[View Search Results]          [New Entity Search]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# EXHIBIT 24

## Spotlight on Trafigura in the United States



Trafigura is one of the largest and most active commodity traders in the US, present across oil, metals and bulk minerals, with a rapidly growing footprint in the US renewable energy space.

Oil and Petroleum Products Trading regional hub Metals and Minerals Trading regional hub Shipping and Chartering regional hub Power and Renewables regional hub Other offices/operations

### Midland, U.S.A

Other offices/operations

### Houston, U.S.A.

Shipping and Chartering regional hubOil and Petroleum Products Trading regional hubPower and Renewables regional hub

Regional offices Other offices



## Oil & petroleum products

With more than a decade of investment in local infrastructure and logistics, Trafigura has developed a unique and leading market position in the export of US crude oil, natural gas liquids and natural gas.

Since the change of US crude oil export policy in late 2015, Trafigura has helped drive the country's export growth, expanding domestic outlets for national crude production and partnering with local producers to find international markets for their output.

Key to the Group's US oil operations is its substantial footprint in the south, where we gather over 350,000 barrels per day of crude oil from the Permian and Eagle Ford Basins and transport these volumes via rail, road and pipeline to our main export terminals in Corpus Christi, Houston and Beaumont in Texas and St James in Louisiana.

We have full commercial rights to four major facilities in Corpus Christi with over five million barrels of storage capacity, six deep-water berths and two condensate splitters that can process around 100,000 barrels of domestic US crude oil per day.

In addition to our commitment to domestic crude oil exports, we work closely with refiners across the US to bring their gasoline, diesel and other key refined products to international markets.

In liquefied natural gas, a series of strategic offtake deals, including a 15-year sale and purchase agreement with Cheniere Energy also make us one of the key exporters of this product from the US.

### Assets and investments

#### Bluewater Texas Terminal

In 2020, Trafigura and Phillips 66 formed Bluewater Texas Terminal, a 50-50 joint venture to develop an offshore deep-water port project located close to the entrance of the Port of Corpus Christi. The project is aimed at delivering two single-point mooring buoys capable of fully loading Very Large Crude Carriers to export crude oil. Once operational this will provide US producers with the additional infrastructure required for increasing US crude oil supplies.

www.bwtxterminal.com

#### Sawtooth Caverns

In 2021, Trafigura and Haddington Ventures purchased Sawtooth Caverns located near Delta, Utah. Sawtooth Caverns is the largest natural gas liquids storage facility in western US, with storage capacity in its deep-well salt caverns of approximately seven million barrels of natural gas liquids and refined products. The facility is strategically located at an important transport crossroads that includes access to the Union Pacific rail system and interstate highways, giving it direct access to key markets in western US, Canada and Mexico.

www.sawtoothcaverns.com



*Sawtooth Caverns in Delta, Utah, the largest natural gas liquids storage facility in the Western United States*

## Non-ferrous metals and bulk commodities

In the US, Trafigura has a number of non-ferrous concentrates offtake agreements with US mines for copper, nickel, lead and zinc as well as supply agreements for these products with domestic and international smelters. We also supply a full spectrum of refined metals to industrial manufacturers and retailers.

Trafigura is also active in the US bulk minerals market trading coal and iron ore both domestically and internationally.

### Assets and investments

*Nyrstar mining and smelting operations, Tennessee*

Through our majority investment in Nyrstar, we operate two major mining complexes and a smelter at three locations in Tennessee.

The East Tennessee complex near Knoxville consists of three underground zinc mines and a processing plant that produces over 110,000 metric tonnes of zinc concentrates annually.

The Middle Tennessee complex comprises two underground zinc mines and a processing plant that produces 50,000 metric tonnes of zinc concentrates, containing over 20 metric tonnes of germanium and 25 metric tonnes of gallium, annually.

The Clarksville zinc refinery has a 125,000 metric tonne refined zinc and a 480 metric tonne cadmium production capacity.

## Burnside Terminal

*Impala Terminals Burnside, Louisiana*

Burnside terminal in Louisiana is one of the leading bulk exporting facilities in the US and has been managed by our subsidiary Impala Terminals since 2011. This status is thanks to our commitment to developing the site and investing in its improvement.

Located on the East Bank of the Mississippi River, the 1,100 acre state-of-the-art terminal provides an integrated and efficient supply chain route from the US to international markets through the Gulf of Mexico for our customers in the coal and pet coke producing heartland of the US. The facility includes a deep-water berth and ship loading and unloading equipment. It is capable of loading Capesize class bulk vessels with coal, bauxite and alumina.

Burnside is one of the only coal terminals on the Mississippi River with the capability to handle ocean vessels, barges and rail, allowing it to offer rail-to-vessel and barge-to-vessel capabilities.

## Power and renewables

Since 2020, Trafigura has been building its presence in the fast-evolving power and renewables sector through a series of strategic, targeted engagements.

We have established power trading teams in the US, Europe and Asia Pacific where we trade key power contracts, interconnector capacities as well as flexibility contracts, and environmental and carbon offset products.

Through our renewable energy investment and development platform, Nala Renewables, we have close to 1GW of US-based renewable projects in the development pipeline comprising solar, wind and battery energy storage systems.

The Group has also invested in a number of early-stage disruptive renewable technology businesses including North Carolina-based OneH2, which provides scalable hydrogen fuel production systems and delivers hydrogen fuel for use in transportation markets across a growing network in North America; and Houston-based geomechanical-pumped, long duration energy storage provider Quidnet.

## Trafigura leadership in the US



**Corey Prologo**

**Director of Oil Trading North America and Head of Houston Branch Office**

**Trafigura Trading LLC, Houston, Texas**

Corey is the Director of North America for Trafigura, Head of Oil Trading and Head of the Houston branch office at Trafigura Trading LLC.

In this role, Corey leads the Group's North American oil and petroleum products trading business, which involves managing overall unit

performance and defining and executing the region's trading strategy. He also manages the associated business functions within the Trafigura Houston office and the Group's 240 US-based employees who handle transactions in markets around the world.

Under Corey's leadership, Trafigura's North American oil trading business has achieved significant growth, propelling the company to its current position as one of the largest oil exporters in the US. He has helped facilitate the growth of Corpus Christi as a hub for US energy exports, orchestrating a series of long-term investments, including USD1 billion on a marine export terminal and condensate splitter.

Corey joined Trafigura in 2011, serving as a trader and then as Head of Gasoline Trading in the Geneva office. Prior to joining Trafigura, Corey worked at BP for nearly a decade in its gasoline team, where he held regional leadership roles in offices in Chicago, Los Angeles, London and Singapore.



**TJ Tedla**

**Chief Financial Officer, North America**

**Trafigura Trading LLC, Houston, Texas**

TJ is Chief Financial Officer for North America, having joined Trafigura Trading LLC in April 2021.

Based in Houston, he has over 20 years' experience in investment banking, with significant expertise in commodity-linked financing and risk management products, corporate and project finance, and mergers and acquisitions.

TJ was previously a managing director in the Commodities and Financial Markets Division at Macquarie Bank. Before this, he was at Barclays Capital where he held several leadership roles, accessing US capital markets for term loans, high-yield bonds and commodity-linked structured finance solutions for clients in the upstream, midstream and power space.

# EXHIBIT 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | 14 Cr. _____ |
| BNP PARIBAS, S.A., | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - -- - - - - x

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Federal Information, the allegations in Counts One and Two of the New York State Superior Court Information, and the following facts are true and correct, and that had the matter gone to trial, the United States and New York State would have proved them beyond a reasonable doubt:

1.      BNP Paribas S.A. ("BNPP"), the defendant, is the largest bank in France and one of the five largest banks in the world in terms of total assets. It has approximately 190,000 employees and more than 34 million customers around the world. BNPP's headquarters are located in Paris, France ("BNPP Paris"), and BNPP has subsidiaries, affiliates and branches in many countries throughout the world, including branch offices in the United States headquartered in New York, New York ("BNPP New York"), and a subsidiary based in Geneva, Switzerland, incorporated as BNPP Paribas (Suisse) S.A. ("BNPP Geneva"). One of BNPP's core businesses is its Corporate and Investment Bank ("CIB"). Among other activities, CIB provides clients with financing in the form of letters of credit and syndicated loans. A significant part of this financing occurs within a CIB business line formerly called Energy Commodities Export Project ("ECEP") that focuses on, among other things, providing financing related to oil, petroleum gas and other commodities.

1

## U.S. Sanctions Laws

2.        Pursuant to U.S. law, financial institutions, including BNPP, are prohibited from participating in certain financial transactions involving persons, entities and countries subject to U.S. economic sanctions.  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") promulgates regulations to administer and enforce U.S. laws governing economic sanctions, including regulations for sanctions related to specific countries, as well as sanctions related to Specially Designated Nationals ("SDNs").  SDNs are individuals and companies specifically designated as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under sanctions programs that are not country-specific.

*Sudan Sanctions*

3.        In November 1997, President Clinton, invoking the authority, *inter alia*, of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701 et seq., issued Executive Order 13067, which declared a national emergency with respect to the policies and actions of the Government of Sudan, "including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom." Exec. Order No. 13067 (Nov. 3, 1997).  Executive Order 13067 imposed trade sanctions with respect to Sudan and blocked all property, and interests in property, of the Government of Sudan in the United States or within the possession or control of U.S. persons.[1]

---

[1] The international community also recognized the threat posed by the policies and actions of the Government of Sudan.  In 2005, the United Nations Security Council recognized "the dire consequences of the prolonged conflict for the civilian population in the Darfur region as well as throughout Sudan," the "violations of human rights and

4.      In October 2006, President Bush, also pursuant to IEEPA, issued Executive Order 13412, which further strengthened the sanctions against Sudan.  Executive Order 13412 cited the "continuation of the threat to the national security and foreign policy of the United States created by certain policies and actions of the Government of Sudan that violate human rights, in particular with respect to the conflict in Darfur, where the Government of Sudan exercises administrative and legal authority and pervasive practical influence, and due to the threat to the national security and foreign policy of the United States posed by the pervasive role played by the Government of Sudan in the petroleum and petrochemical industries in Sudan . . . ."  Exec. Order No. 13412 (Oct. 13, 2006).

5.      Under Executive Orders 13067 and 13412 and related regulations promulgated by OFAC pursuant to IEEPA, it is unlawful to export goods and services from the United States, including U.S. financial services, to Sudan without a license from OFAC.  Under these Executive Orders and regulations, virtually all trade and investment activities involving the U.S. financial system, including the processing of U.S. dollar transactions through the United States, were prohibited.

6.      Pursuant to Title 50, United States Code, Section 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of regulations issued pursuant to IEEPA, including the U.S. sanctions against Sudan.

7.      Pursuant to New York State Penal Law section 175.10, it is a felony to Falsify Business Records, pursuant to New York State Penal Law section 175.05, when it is done with the intent to commit another crime or to aid or conceal the commission of a crime.

---

international humanitarian law in the Darfur region," and the "failure of the Government of Sudan to disarm Janjaweed militiamen and apprehend and bring to justice Janjaweed leaders and their associates who have carried out human rights and international humanitarian law violations and other atrocities."  U.N. Security Council Resolution 1591 (Mar. 29, 2005).

*Iran Sanctions*

8.      In March 1995, President Clinton, pursuant to IEEPA,  issued Executive Order 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and "declare[d] a national emergency to deal with that threat."  United States economic sanctions against Iran were strengthened in May 1995 and August 1997 pursuant to Executive Orders 12959 and 13059.  These Executive Orders and related regulations promulgated by OFAC prohibited virtually all trade and investment activities between the United States and Iran.  With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Iranian sanctions generally prohibited the export of services to Iran from the United States.  One such exemption, which was in effect until November 2008, permitted U.S. banks to act as an intermediary bank for U.S. dollar transactions related to Iran between two non-U.S., non-Iranian banks (the "U-Turn" exemption).  The U-Turn exemption applied only to sanctions regarding Iran, and not to sanctions against Sudan, Cuba or other countries or entities.

9.      Pursuant to Title 50, United States Code, Section 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of regulations issued pursuant to IEEPA, including the U.S. sanctions against Iran.

10.      Pursuant to New York State Penal Law section 175.10, it is a felony to Falsify Business Records, pursuant to New York State Penal Law section 175.05, when it is done with the intent to commit another crime or to aid or conceal the commission of a crime.

*Cuba Sanctions*

11.      Beginning with Executive Orders issued in 1960 and 1962, which found that the actions of the Government of Cuba threatened U.S. national and hemispheric security, the United States has maintained an economic embargo against Cuba through the enactment of various laws

and regulations.  Pursuant to the Trading with the Enemy Act ("TWEA"), 12 U.S.C. § 95a

et seq., OFAC has promulgated a series of regulations that prohibit virtually all financial and

commercial dealings with Cuba, Cuban businesses, and Cuban assets.

12.     Pursuant to Title 31, Code of Federal Regulations, Section 501.701, it is a crime

to willfully violate regulations issued under TWEA.

13.     Pursuant to New York State Penal Law section 175.10, it is a felony to Falsify

Business Records, pursuant to New York State Penal Law section 175.05, when it is done with

the intent to commit another crime or to aid or conceal the commission of a crime.

## Overview of the Conspiracy

14.     From at least 2004 up through and including 2012, BNPP, the defendant,

conspired with banks and other entities located in or controlled by countries subject to U.S.

sanctions, including Sudan, Iran and Cuba ("Sanctioned Entities"), other financial institutions

located in countries not subject to U.S. sanctions, and others known and unknown, to knowingly,

intentionally and willfully move at least $8,833,600,000 through the U.S. financial system on

behalf of Sanctioned Entities in violation of U.S. sanctions laws, including transactions totaling

at least $4.3 billion that involved SDNs.

15.     In carrying out these illicit transactions, BNPP's agents and employees were

acting within the scope of their duties which were intended, at least in part, to benefit BNPP.

## Means and Methods of the Conspiracy

16.     Among the means and methods by which BNPP and its co-conspirators carried

out the conspiracy were the following:

a.     BNPP intentionally used a non-transparent method of payment messages,

known as cover payments, to conceal the involvement of Sanctioned Entities in U.S. dollar

transactions processed through BNPP New York and other financial institutions in the United States.

b.      BNPP worked with other financial institutions to structure payments in highly complicated ways, with no legitimate business purpose, to conceal the involvement of Sanctioned Entities in order to prevent the illicit transactions from being blocked when transmitted through the United States.

c.      BNPP instructed other co-conspirator financial institutions not to mention the names of Sanctioned Entities in U.S. dollar payment messages sent to BNPP New York and other financial institutions in the United States.

d.      BNPP followed instructions from co-conspirator Sanctioned Entities not to mention their names in U.S. dollar payment messages sent to BNPP New York and other financial institutions in the United States.

e.      BNPP removed information identifying Sanctioned Entities from U.S. dollar payment messages in order to conceal the involvement of Sanctioned Entities from BNPP New York and other financial institutions in the United States.

### Violations of the Sudanese Sanctions

*Overview*

17.      From 2002 up through and including 2007, BNPP, predominantly through its Swiss-based subsidiary, BNPP Geneva, conspired with numerous Sudanese banks and entities as well as financial institutions outside of Sudan to violate the U.S. embargo by providing Sudanese banks and entities access to the U.S. financial system.  During the course of its illicit conduct, BNPP processed thousands of U.S. dollar denominated financial transactions with Sanctioned Entities, with a total value well in excess of $6 billion, including transactions involving 18 Sudanese SDNs, six of which were BNPP clients.  The Sudanese SDN transactions processed by

BNPP had a value of approximately $4 billion, and the vast majority of these SDN transactions involved a financial institution owned by the Government of Sudan ("Sudanese Government Bank 1"), despite the Government of Sudan's role in supporting international terrorism and committing human rights abuses during this time period.

18.      BNPP carried out transactions with Sanctioned Entities and evaded the U.S. embargo through several means.  One such method, which enabled BNPP to manage or finance billions of dollars' worth of U.S. dollar denominated letters of credit for Sudanese entities, involved deliberately modifying and omitting references to Sudan in the payment messages accompanying these transactions to prevent the transactions from being blocked when they entered the United States.  Another method, described more fully below, entailed moving illicit transactions through unaffiliated "satellite banks" in a way that enabled BNPP to disguise the involvement of Sanctioned Entities in U.S. dollar transactions.  As a result of BNPP's conduct, the Government of Sudan and numerous banks connected to the Government of Sudan, including SDNs, were able to access the U.S. financial system and engage in billions of dollars' worth of U.S. dollar-based financial transactions, significantly undermining the U.S. embargo.

*BNPP's Critical Role in the Sudanese Economy and in Providing Sudan Access to the U.S. Financial System*

19.      In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for Sudanese Government Bank 1, which, as noted above, was designated by OFAC as an SDN.  Sudanese Government Bank 1 then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe.  As a result, all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva.  In addition to processing U.S. dollar transactions, in 2000, BNPP Geneva also developed a business in letters of credit for the Sudanese banks.  Due

to its role in financing Sudan's export of oil, BNPP Geneva took on a central role in Sudan's

foreign commerce market.  By 2006, letters of credit managed by BNPP Geneva represented

approximately a quarter of all exports and a fifth of all imports for Sudan.  Over 90% of these

letters of credit were denominated in U.S. dollars.  In addition, the deposits of Sudanese

Government Bank 1 at BNPP Geneva represented about 50% of Sudan's foreign currency assets

during this time period.

20.      BNPP's central role in providing Sudanese financial institutions access to the U.S.

financial system, despite the Government of Sudan's role in supporting terrorism and committing

human rights abuses, was recognized by BNPP employees.  For example, in 2004, a manager at

BNPP Geneva described in an email the political environment in Sudan as "dominated by the

Darfur crisis" and called it a "humanitarian catastrophe."  In April 2006, a senior BNPP Paris

compliance officer stated in a memorandum that "[t]he growth of revenue from oil is unlikely to

help end the conflict [in Darfur], and it is probable that Sudan will remain torn up by

insurrections and resulting repressive measures for a long time."  In March 2007, another senior

BNPP Paris compliance officer reminded other high-level BNPP compliance and legal

employees that certain Sudanese banks with which BNPP dealt "play a pivotal part in the support

of the Sudanese government which . . . has hosted Osama Bin Laden and refuses the United

Nations intervention in Darfur."  A few months later, in May 2007, a BNPP Paris executive with

responsibilities for compliance across all BNPP branches warned in a memorandum that:  "In a

context where the International Community puts pressure to bring an end to the dramatic

situation in Darfur, no one would understand why BNP Paribas persists [in Sudan] which could

be interpreted as supporting the leaders in place."

*BNPP's Methods of Evading U.S. Sanctions Against Sudan*

21.     Financial institutions in the United States that process U.S. dollar transactions from overseas, including BNPP New York, utilize sophisticated filters designed to identify and block any transactions involving Sanctioned Entities.  The filters generally work by screening wire transfer messages for any reference to (a) countries under U.S. embargo such as Sudan, Iran and Cuba; (b) all entities and individuals identified by OFAC as SDNs; and (c) any words or numbers in wire messages that would indicate that the transaction being processed through the United States involved Sanctioned Entities.

22.     In order to avoid having transactions identified and blocked by filters at banks in the United States, beginning at least as early as 2002 and continuing through 2007, BNPP agreed with Sanctioned Entities in Sudan not to mention their names in U.S. dollar transactions processed through the United States.  For example, when conducting U.S. dollar business with BNPP, the Sanctioned Entities frequently instructed BNPP not to mention the names of the Sanctioned Entities in wire transfer messages, which BNPP then agreed to do.  In many instances, the instructions specifically referenced the U.S. embargo.  For example: "due to the US embargo on Sudan, please [debit our U.S. dollar account] without mentioning our name in your payment order" and "transfer the sum of USD 900,000 . . . without mentioning our name – repeat without mentioning our name under swift confirmation to US."  Such payment messages frequently bore stamps from BNPP employees stating: "ATTENTION:  US EMBARGO."  At times, BNPP front office employees directed BNPP back office employees processing transactions with Sudanese Sanctioned Entities to omit any reference to Sudan:  "! Payment in $ to [French Bank 1] without mentioning Sudan to N.Y. !!!"  Indeed, until 2004, BNPP's internally published policy for processing U.S. dollar payments involving Sudan stated:  "Do not list in any

case the name of Sudanese entities on messages transmitted to American banks or to foreign

banks installed in the U.S."

23.      In addition to omitting references to Sudan in U.S. dollar payment messages,

another method used by BNPP Geneva to evade the U.S. embargo against Sudan involved, as

noted above, the use of unaffiliated, non-Sudanese, non-U.S. banks (referred to internally at

BNPP Geneva as "satellite banks") to help disguise the true nature of transactions with

sanctioned Sudanese banks.  BNPP Geneva began its relationship with many of these satellite

banks shortly after the imposition of U.S. sanctions against Sudan in 1997, and the vast majority

of the satellite banks' business with BNPP Geneva involved facilitating U.S. dollar payments for

sanctioned Sudanese banks.

24.      Specifically, BNPP Geneva utilized the satellite banks in a two-step process

designed to enable BNPP Geneva's Sudanese clients to evade U.S. sanctions.  In the first step, a

Sudanese bank seeking to move U.S. dollars out of Sudan transferred funds internally within

BNPP Geneva to a BNPP Geneva account specifically maintained by a satellite bank to facilitate

U.S. dollar transfers from Sudan.  In the second step, the satellite bank transferred the money to

the Sudanese bank's intended beneficiary through a U.S. bank without reference to the Sudanese

bank.  As a result, to the U.S. bank, it appeared that the transaction was coming from the satellite

bank rather than a Sudanese bank.  A similar process enabled sanctioned Sudanese banks to

receive U.S. dollars without being detected:  the originator of the transaction sent a wire transfer

through the United States to the satellite bank's account at BNPP Geneva without reference to

Sudan, and the satellite bank then transferred the money to the Sudanese bank via internal

transfer at BNPP Geneva.  Moreover, in order to further disguise the true nature of the satellite

bank transactions, employees at BNPP Geneva frequently worked with the satellite banks to wait

between one and two days after the internal transfer before making a dollar-for-dollar, transaction-by-transaction clear of funds through the United States, artificially delinking the U.S. transfer of funds from the prior transfer involving the satellite banks so that financial institutions in the United States and U.S. authorities would be unable to link the payments to the involved Sanctioned Entity.  In fact, BNPP employees internally proposed getting the satellite banks "accustom[ed] . . . to spacing out the gap between covers they execute with their U.S. correspondents to the extent possible."  Ultimately, BNPP Geneva successfully used the satellite bank structure – which had no business purpose other than to help BNPP's Sudanese clients evade the U.S. embargo – to process thousands of U.S. dollar transactions, worth billions of dollars in total, for Sudanese Sanctioned Entities without having the transactions identified and blocked in the United States.

25.     The use of satellite banks to facilitate U.S. dollar transactions with Sudanese Sanctioned Entities was widely known within BNPP Geneva.  For example, in a 2004 email to a BNPP Geneva employee, a satellite bank requested "to open an account at BNP Paribas Genev[a] to be used mainly for the USD Transfers to and from Sudanese Banks."  This e-mail was forwarded to another BNPP Geneva employee who recommended opening the account, as "the opening of this account fits in the framework of our activity in Sudan."  Referencing this exchange, another BNPP Geneva employee commented that:  "we have advised [this satellite bank] for a long time to open a VOSTRO account to facilitate the transactions which this institution has with countries with which we are also active."

26.     BNPP's compliance personnel were also aware of BNPP's use of satellite banks to process transactions with Sanctioned Entities.  For example, a 2005 compliance report described the scheme as follows:

The main activity of certain BNPP customers is to domicile cash flows in USD on our books on behalf of Sudanese banks. These arrangements were put in place in the context of the U.S. embargo against Sudan. . . . The accounts of these banks were therefore opened with the aim of "facilitating transfers of funds in USD for Sudanese banks." This comment was made on the account opening application forms of these banks. The funds in question were then transferred, on the same day, or at the latest D+1 or 2 by the [satellite banks] to [U.S. correspondent banks].

*Involvement of Senior Officials at BNPP Geneva and BNPP Paris*

27.     BNPP Geneva's methods of evading U.S. sanctions against Sudan – including the omission of references to Sudan from wire messages involving Sanctioned Entities and the use of satellite banks to process transactions for sanctioned Sudanese banks – were known to and condoned by senior compliance and business managers at both BNPP Geneva and BNPP Paris. As early as 2003, for example, after a visit to Geneva, a senior BNPP Paris compliance officer conveyed to BNPP CIB executives in Paris that BNPP Geneva was routinely employing a cover payment method that omitted the names of Sanctioned Entities from U.S. dollar payment messages to prevent the transactions from being discovered in the United States. The senior compliance officer observed that "in practice, in all kinds of ways, the headers of messages seem to have been amended in Geneva." In fact, an analysis of the payment messages during the relevant time period shows that BNPP Geneva processed payments involving Sanctioned Entities differently than those involving non-sanctioned entities in order to hide the Sanctioned Entity's identity.

28.     In 2004, the Federal Reserve Bank of New York ("FRB-NY") and the New York State Banking Department (now known as the New York State Department of Financial Services) ("DFS") identified systemic failures in BNPP's compliance with the Bank Secrecy Act, and specifically highlighted deficiencies in BNPP New York's monitoring of transactions with overseas clients, including the processing of U.S. dollar transactions for overseas clients. In

response to the regulatory inquiries, in September 2004, BNPP agreed to enter into a Memorandum of Understanding (the "MOU") with the FRB-NY and DFS that required, among other things, that BNPP New York improve its systems for compliance with U.S. bank secrecy and sanctions laws.

29.     Shortly after BNPP entered into the MOU, two senior BNPP Paris executives and BNPP Geneva executives met in Geneva to discuss how "embargoes against sensitive countries (Sudan, Libya, Syria . . . )" affected BNPP's business and operational issues with respect to sensitive countries.  At that meeting, the executives decided to switch to an unaffiliated bank in the United States ("U.S. Bank 1") to process payments for countries subject to U.S. sanctions. Following that meeting, BNPP Geneva employees were instructed to have U.S. dollar payments involving Sanctioned Entities cleared through U.S. Bank 1 instead of BNPP New York.

30.     The decision to switch dollar clearing involving Sanctioned Entities to U.S. Bank 1 was at least in part an attempt to decrease BNPP New York's exposure to enforcement actions by U.S. authorities, as indicated in meeting minutes outlining the new policy for U.S. dollar payments involving sanctioned countries: "the cover payments are to be executed via [U.S. Bank 1], such following problems BNP NY encountered with the U.S. authorities."  In implementing the switch to U.S. Bank 1, BNPP relied on incorrect advice that outside counsel ("U.S. Law Firm 1") provided, which suggested that BNPP may have been able to protect itself from being penalized by U.S. authorities if it conducted these prohibited transactions through another U.S. bank.   This was memorialized in a legal memorandum in October 2004.  From 2004 through 2007, the vast majority of BNPP Geneva's transactions involving Sudanese Sanctioned Entities were cleared through U.S. Bank 1 using a payment method that concealed from U.S. Bank 1 the involvement of Sanctioned Entities in the transactions.  Thus, as evidenced in a January 2006

email, "the problem" of clearing U.S. dollar transactions involving Sanctioned Entities was "in some ways shifted onto [U.S. Bank 1] Switzerland, which has the advantage of being a U.S. Bank."

31.     In the months and years that followed the decision to use U.S. Bank 1 as BNPP Geneva's principal means for clearing U.S. dollar transactions with Sanctioned Entities, senior BNPP compliance and legal personnel repeatedly recognized BNPP's role in circumventing U.S. sanctions against Sudan, and yet allowed these transactions to continue in part because of their importance to BNPP's business relationships and "goodwill" in Sudan.  In July 2005, for example, a BNPP Geneva employee noted how high-level business managers at BNPP were aware of and supported the transactions involving Sudan:  "the general management of CIB has encouraged us to follow this [the satellite bank] model . . . . The working of this whole mechanism is coordinated with CIB/ECEP Compliance. . . .  I consider it most advisable to maintain these accounts which support our vision and our position regarding our goodwill in the Sudan."  In late 2005, a Paris compliance officer drafted a memo that highlighted BNPP Geneva's business with Sudan:  "It seemed necessary to us to harmonize the practices and circuits of Geneva and Paris, particularly given [BNPP Geneva's] exposure to embargoes, in particular due to:

- The privileged and historical relationship maintained with institutions in countries under total US trade embargo (Sudan).

-  The practices for circumventing embargoes of some groups, in particular US groups."

With respect to the U.S. embargo of Sudan, the Paris compliance officer concluded that "Client managers have, however, been made aware of the embargoes and are supposed to turn to Compliance when they have a problem of interpretation."

32.    On certain occasions, senior compliance and legal personnel expressed concerns about BNPP's continued business with Sudanese Sanctioned Entities, but were rebuffed.  In August 2005, for example, a senior compliance officer at BNPP Geneva expressed concern about the use of satellite banks and emphasized the unusual nature of these operations given the fact that BNPP Geneva was not typically in the business of providing correspondent banking services.  In an email sent to legal, business and compliance personnel at BNPP Geneva, the senior compliance officer warned:  "As I understand it, we have a number of Arab Banks (nine identified) on our books that only carry out clearing transactions for Sudanese banks in dollars. . . .  This practice effectively means that we are circumventing the US embargo on transactions in USD by Sudan."  In response to another e-mail voicing the same concern, a high-level Geneva employee explained that these transactions had the "full support" of management at BNPP Paris:

> I see that certain questions are coming back to the surface on the way in which we
> are processing these transactions.  I remember when you . . . made me meet the
> Minister of Finance of Sudan and the President of the [Sudanese Government
> Bank 1], it had been specified that all business activity – meaning in passing – the
> Minister and the President had shown themselves to be very satisfied – and it had
> received the full support of our General Management in Paris.

33.    In September 2005, senior compliance officers at BNPP Geneva arranged a meeting of BNPP executives "to express, to the highest level of the bank, the reservations of the Swiss Compliance office concerning the transactions executed with and for Sudanese customers."  The meeting was attended by several senior BNPP Paris and Geneva executives.  At

the meeting, a senior BNPP Paris executive dismissed the concerns of the compliance officials and requested that no minutes of the meeting be taken.

*BNPP's Knowledge of Its Illicit Conduct*

34.    In interviews with outside counsel for BNPP, several BNPP employees who were involved in or had knowledge of BNPP's business with Sudan claimed that they did not believe that U.S. sanctions laws applied or could be applied to foreign banks, particularly if transactions involving Sanctioned Entities were processed through an unaffiliated U.S. bank, as opposed to BNPP New York.  This view of the reach of U.S. sanctions, while incorrect, was supported in part by a legal memorandum from U.S. Law Firm 1 received by BNPP in October 2004 regarding the general applicability of U.S. sanctions (the "2004 Legal Opinion").  The 2004 Legal Opinion made it clear that U.S. sanctions laws did, in fact, apply to all U.S. dollar transactions cleared in the United States, including those initiated by foreign banks.  However, the opinion also suggested that U.S. authorities might not be able to penalize BNPP itself for participating in prohibited transactions if no U.S. branch of BNPP was involved.  Specifically, the opinion stated that "transactions between non-U.S. parties cleared by U.S. banking institutions (including BNPP's New York branch) are subject to the provisions in OFAC's sanctions regimes against Cuba, Iran, Syria and Sudan, and to penalties for any violations of these regulations."  However, "[i]f a non-U.S. BNPP entity were to initiate a U.S. dollar payment to a payee domiciled in Cuba, Sudan or Iran through a U.S. bank not affiliated with BNPP, U.S. sanctions should not apply to BNPP (assuming no involvement by any U.S. person of BNPP), but U.S. sanctions would call for the payment to be frozen or blocked by the U.S. bank."  Senior legal and business officials at BNPP have claimed that, pursuant to this legal opinion, they believed that BNPP would not face penalties under U.S. sanctions laws so long as transactions

with Sanctioned Entities cleared through U.S. Bank 1 or another unaffiliated bank, and not through BNPP New York.

35.     However, to the extent that BNPP employees relied on this 2004 legal opinion to justify BNPP's conduct regarding Sudan, by the summer of 2006, it became clear that BNPP could not, in fact, escape the reach of U.S. sanctions simply by having transactions cleared through an unaffiliated U.S. bank. In May 2006, BNPP received an additional legal opinion from a U.S. law firm ("U.S. Law Firm 2"), which specifically warned BNPP that if the bank were to omit relevant identifying information in U.S. dollar payments sent to the United States, with the objective of avoiding U.S. economic sanctions, BNPP could be subjecting itself to various U.S. criminal laws.  In March and June 2006, BNPP received two additional legal opinions from U.S. Law Firm 1, which informed BNPP that (a) U.S. sanctions could apply to BNPP even when the transactions were processed by U.S. Bank 1 instead of BNPP New York, and (b) U.S. authorities had become especially sensitive to the use of "cover payments" by foreign banks that omitted underlying descriptive details about the nature of transactions, and advised BNPP to "ensure that they have adequate procedures in place to guard against any abuses of cover payment messages that could cause their U.S. operations to engage in prohibited transactions under U.S. sanctions." In July 2006, BNPP issued a policy across all its subsidiaries and branches that acknowledged the applicability of U.S. sanctions to non-U.S. banks.  The policy stated that "if a transaction is denominated in USD, financial institutions outside the United States must take American sanctions into account when processing their transactions."

36.     Accordingly, by July 2006 at the latest, it was clear that BNPP could no longer justify its transactions with Sanctioned Entities based upon an incorrect assertion that U.S. sanctions law did not apply to banks located outside the United States.  Nevertheless, BNPP

continued to willfully process thousands of transactions with Sanctioned Entities through the United States for nearly another year, with a total value in excess of $6 billion – while taking steps to hide the true nature of these transactions from both BNPP New York and other U.S. correspondent banks.

37.     BNPP continued to process transactions involving Sudanese Sanctioned Entities – despite being well aware that its conduct violated U.S. law – because the business was profitable and because BNPP Geneva did not want to risk its longstanding relationships with Sudanese clients.  For example, in a July 2006 Credit Committee Meeting of BNPP's general management, despite expressing a concern about BNPP's role in processing U.S. dollar transactions with Sudanese Sanctioned Entities BNPP's senior compliance personnel signed off on the continuation of the transactions.  An email summarizing that meeting explained that "[t]he relationship with this body of counterparties is a historical one and the commercial stakes are significant.  For these reasons, Compliance does not want to stand in the way of maintaining this activity for ECEP and [BNPP Geneva] . . . . Compliance has also issued the following recommendations: . . . Strictly respect the U.S. embargo, the protection of 'US. citizens' and the E.U. embargo.  Do not tolerate any favor or arrangement within these rules."  Compliance's recommendations were not followed.

38.     In November 2006, three BNPP Geneva employees drafted a memorandum that explained: "the 'clearing' activity of USD correspondents . . . is of real significance in relation to our activity in Sudan. . . .  The fundamental importance of these [satellite bank] accounts lies in the fact that they allow us to receive incoming funds from Sudanese banks as cover for their commercial transactions on our books . . . .  Moreover . . . we maintain commercial relations with these [satellite] banks which offer significant commercial potential, not only in connection

with Sudan." In February 2007, a senior BNPP Paris compliance officer specifically recognized the significance of the Sudanese business for BNPP Geneva:

> For many years, the Sudan has traditionally generated a major source of business for BNPP Geneva including transactions such as investment held on deposit. The existence of a dedicated desk for this region, GC8, for which the Sudan is one of the largest customers, relationships developed with directors of Sudanese financial institutions and traditional practices have over the years led to a major source of income, which is now recurring income.

39.     At the same time that compliance and business personnel within BNPP were emphasizing the importance of the Sudanese business to BNPP Geneva's operations, certain senior compliance officers at BNPP Paris made appeals to BNPP Geneva to discontinue the U.S. dollar business with Sudan. In February 2007, for example, a senior BNPP Paris compliance officer told business managers at BNPP Geneva that U.S. dollar transactions cleared through unaffiliated U.S. banks could be viewed as a "serious breach." Similarly a BNPP Geneva compliance officer wrote to BNPP Paris and BNPP Geneva executives that the use of U.S. Bank 1 to process transactions with Sanctioned Entities could be interpreted as a "grave violation." Despite these warnings, the transactions continued.

40.     In May 2007, senior officials at OFAC met with executives at BNPP New York and expressed concern that BNPP Geneva was conducting U.S. dollar business with Sudan in violation of U.S. sanctions. Shortly after this meeting, OFAC requested that BNPP conduct an internal investigation into transactions with Sudan initiated by BNPP Geneva that may have violated U.S. sanctions, and asked that BNPP report its findings to OFAC. It was not until this intervention by OFAC that BNPP made the decision, in June 2007, to stop its U.S. dollar business with Sudan.

41.     BNPP's willingness to engage in U.S. dollar transactions involving Sudan significantly undermined the U.S. embargo and provided the Sudanese government and

Sudanese banks with access to the U.S. financial system that they otherwise would not have had. Even after July 2006, when it became clear to BNPP that its U.S. dollar transactions with Sudanese Sanctioned Entities were illegal, and that U.S. law did in fact apply to BNPP's conduct, BNPP continued to process U.S. dollar transactions with Sudanese Sanctioned Entities for nearly another year. Only after OFAC launched an inquiry into the Sudanese transactions in the spring of 2007 did BNPP cease this activity. From July 2006 until BNPP ended its Sudanese business in June 2007, BNPP knowingly, intentionally and willfully processed a total of approximately $6.4 billion in illicit U.S. dollar transactions involving Sudan.

### Violations of the Iranian Sanctions

42.    From 2006 to 2012, BNPP Paris processed payments on behalf of a client ("Iranian Controlled Company 1") in connection with three letters of credit that facilitated the provision of liquefied petroleum gas ("LPG") to an entity in Iraq.

43.    While Iranian Controlled Company 1 was registered as a corporation in Dubai, it was controlled by an Iranian energy group based in Tehran, Iran ("Iranian Energy Group 1"). BNPP's "know your customer" ("KYC") documentation on Iranian Controlled Company 1 showed that it was 100% owned by Iranian Energy Group 1. BNPP's documentation also showed that Iranian Energy Group 1, and in turn Iranian Controlled Company 1, was 100% owned by an Iranian citizen.

44.    The transactions involving Iranian Controlled Company 1 began in approximately December 2006, at a time when the U-Turn Exemption permitted certain transactions involving Iranian entities so long as those transactions were between two non-U.S., non-Iranian banks. BNPP's transactions involving Iranian Controlled Company 1 initially complied with the U-Turn Exemption. BNPP issued its "Revised Group Policy on Iran" on September 24, 2007, and OFAC revoked the U-Turn Exemption in November 2008. Despite this new bank policy and the

revocation, BNPP continued to process U.S. dollar transactions involving Iranian Controlled Company 1 through November 2012.

45.     In early 2010, the New York County District Attorney's Office and the U.S. Department of Justice jointly approached BNPP regarding its involvement in transactions with sanctioned entities.  Despite agreeing to commence an internal investigation into its compliance with U.S. sanctions and cooperate fully with U.S. and New York authorities, BNPP continued to process these transactions on behalf of Iranian Controlled Company 1.

46.     Prior to December 2011, BNPP employees who were involved in the transactions may not have been fully aware of the extent to which Iranian Controlled Company 1 was controlled by, and effectively a front for, an Iranian entity.  In December 2011, however, a U.K. Bank ("U.K. Bank 1") blocked a payment involving Iranian Controlled Company 1 and informed BNPP that it would no longer do business with Iranian Controlled Company 1 because of its ties to Iran – thus putting BNPP on notice, to the extent that it was not before, that transactions with Iranian Controlled Company 1 were impermissible.  Moreover, in January 2012, a U.S. branch of a German bank ("German Bank 1") rejected a payment made by BNPP on Iranian Controlled Company 1's behalf because German Bank 1's research showed that Iranian Controlled Company 1 was "controlled from Iran."  And in June 2012, a BNPP Paris compliance officer noted that Iranian Controlled Company 1 was sending payments from its account at BNPP Paris to its account at an Indian bank ("Indian Bank 1") with "known links to Iran."  Nevertheless, despite these warnings – and despite claiming to be cooperating fully with the Government's investigation into sanctions violations – BNPP continued to process U.S. dollar transactions for Iranian Controlled Company 1 until November 2012.

47.    From December 2011, when U.K. Bank 1 blocked the payment involving Iranian Controlled Company 1 and in doing so put BNPP on notice of the impermissibility of the transactions, through November 2012, when the transactions ended, BNPP knowingly, intentionally and willfully processed a total of approximately $586.1 million in transactions with Iranian Controlled Company 1, in violation of U.S. sanctions against Iran.

48.    In addition to the transactions with Iranian Controlled Company 1, in 2009, BNPP knowingly, intentionally and willfully processed approximately $100.5 million in U.S. dollar payments involving an Iranian oil company following the revocation of the U-Turn Exemption, in violation of U.S. sanctions.  The payments were in connection with six letters of credit issued by BNPP that financed Iranian petroleum and oil exports – and the payments were made even after compliance personnel at BNPP Paris alerted ECEP employees that the U.S. dollar payments associated with these letters of credit "are no longer allowed by American authorities."

### Violations of the Cuban Sanctions

*Overview*

49.    From at least 2000 up through and including 2010, BNPP, through its Paris headquarters, conspired with numerous Cuban banks and entities as well as financial institutions outside of Cuba to provide U.S. dollar financing to Cuban entities in violation of the U.S. embargo against Cuba.  During the course of its illicit conduct, BNPP processed thousands of U.S. dollar denominated financial transactions with Sanctioned Entities located in Cuba, with a total value in excess of $1.747 billion, including transactions involving a Cuban SDN with a value in excess of $300 million.

50.    BNPP carried out transactions with Cuban Sanctioned Entities and evaded the U.S. embargo principally through BNPP's participation in several U.S. dollar-denominated credit facilities designed to provide financing to various Cuban entities (the "Cuban Credit Facilities").

Similar to BNPP's means of circumventing the U.S. embargo against Sudan, BNPP employees directed that transactions involving Cuba omit references to Cuba in payment messages to prevent the transactions from being blocked when they entered the United States.  On the occasions when payments were identified and blocked when they entered the United States, BNPP at times stripped them of any mention of Cuba and then resubmitted the payments through an unaffiliated U.S. bank without that bank's knowledge of the resubmittal.  BNPP also employed a complicated "fronting" structure to disguise from U.S. banks the true nature of the transactions with Cuban parties, similar in some respects to BNPP's use of satellite banks to disguise the true nature of transactions with BNPP Geneva's Sudanese clients.

51.      BNPP's efforts to evade the U.S. embargo against Cuba continued long after the illicit nature of the transactions was made clear to numerous compliance, legal and business personnel at BNPP Paris.  Indeed, high-level business managers at BNPP Paris overruled explicit concerns from compliance personnel in order to allow the Cuban business to continue, valuing the bank's profits and business relationships over adherence to U.S. law.

*BNPP's Methods of Evading U.S. Sanctions Against Cuba*

52.      Beginning at least as early as 2000 and continuing through 2010, BNPP participated in eight Cuban Credit Facilities that involved U.S. dollar clearing and that were not licensed by OFAC.  The Cuban Credit Facilities were managed out of BNPP Paris, and each facility processed hundreds (and in some cases thousands) of U.S. dollar transactions in violation of U.S. sanctions.  The purpose of the credit facilities was to provide financing for Cuban entities and for businesses seeking to do U.S. dollar business with Cuban entities.  One such facility, for example, involved U.S. dollar loans to a Dutch company to finance the purchase of crude oil products destined to be refined in and sold to Cuba.  Another credit facility involved U.S. dollar

loans for one of Cuba's largest state-owned commercial companies ("Cuban Corporation 1"),

which was designated by OFAC as an SDN.

53.     The Cuban Credit Facilities were structured in highly complicated ways in order

to conceal the involvement of the Cuban parties.  In a April 2000 credit application for one of the

Cuban Credit Facilities, for example, two BNPP Paris employees acknowledged the "[l]egal risk

linked to the American embargo" and explained that the risk had been "resolved" through the use

of a "fronting" structure that layered the U.S. dollar transactions using accounts at a different

French bank ("French Bank 1") and concealed the involvement of Cuban entities.  In a similar

structure used for another Cuban Credit Facility, payments from a Cuban entity to BNPP Paris

were not made directly but instead passed through several layers or steps.  First, the payment

from the Cuban entity would be made from its account at French Bank 1 to a BNPP Paris bank

account at French Bank 1.  As a book-to-book transfer – *i.e.*, a transfer from one account to

another within the same financial institution – no U.S. dollar clearing would occur.  Second,

BNPP Paris would transfer the money from its account at French Bank 1 to a transit account held

at BNPP Paris itself.  This bank-to-bank transfer would result in U.S. dollar clearing, with the

payment typically being transferred through BNPP NY or on occasion by U.S. Bank 1.  In order

to prevent BNPP NY's OFAC filters from blocking the transactions, BNPP Paris would make no

mention of Cuba or the Cuban entities involved.  Third, BNPP Paris would conduct a book-to-

book transfer from its own BNPP Paris account to an account held by the Cuban entity at BNPP

Paris.  Although BNPP Paris would list its own transit account as the beneficiary of the

transaction passing through the United States, most of these payments bypassed the transit

account and were credited directly to the Cuban entity's account at BNPP Paris.  In interviews

with the Government, ECEP employees at BNPP Paris acknowledged that this complex structure

of payment transfers had no business purpose other than to conceal the connection to Cuba in the payments processed through the United States.

54.     For these fronting structures to work as intended – *i.e.*, to ensure that U.S. authorities and U.S.-based banks, including BNPP New York, did not learn of the Cuban involvement in the transactions – it was essential that the wire transfer messages that were transmitted through New York did not contain any reference to Cuba or a Cuban entity. Accordingly, BNPP agreed with Sanctioned Entities in Cuba, and with other banks involved in the credit facilities, not to mention the Sanctioned Entities' names in U.S. dollar transactions processed through the United States. Indeed, BNPP gave Cuban clients and other participants in the credit facilities careful instructions as to how to tailor payment messages to evade the U.S. embargo. For example, in January 2006, an ECEP employee at BNPP Paris wrote to two other ECEP employees in relation to one of the Cuban Credit Facilities: "I think we need to point out to [French Bank 1] that they should not mention CUBA in their transfer order." One of the ECEP employees responded: "[French Bank 1] knows very well that Cuba or any other Cuban theme must not be mentioned in the transfer orders and I reminded them about this over the phone this morning." The first ECEP employee then responded: "Even if [French Bank 1] 'knows very well,' I prefer for us to write this down each time we ask for a transfer concerning our Cuban transactions." Similarly, in an email exchange in 2007, a BNPP Paris employee counseled an employee of a Cuban Sanctioned Entity not to mention the name of a Cuban bank on a payment message, or else "these[] funds risk to be stopped by United State[s] further to the embargo." In response, the employee of the Cuban Sanctioned Entity stated that the entity would cancel the already-prepared wire instruction, and instead would execute the transaction "following your instructions."

55.     Despite BNPP's careful instructions as to how to tailor wire transfer messages without mentioning Cuba, in February 2006, three payments involving Cuban Credit Facility 1 were identified and blocked by banks in the United States because back office employees had inadvertently made reference to Cuban entities in the wire transfer messages.  Two of the payments were blocked by BNPP New York and one was blocked by U.S. Bank 1.

56.     BNPP's handling of these blocked payments was indicative of the bank's cavalier – and criminal – approach to compliance with U.S. sanctions laws and regulations.  Rather than use the blocking of these payments as an impetus to come into compliance with U.S. sanctions, BNPP decided to strip the wire messages of references to Cuban entities and resubmit them as a lump sum through U.S. Bank 1, in order to conceal from U.S. Bank 1 not only the Cuban involvement in the transactions, but also the fact that the resubmitted payment was comprised of a payment U.S. Bank 1 had already blocked.  BNPP took these steps out of fear that if OFAC learned of the blocked payments, BNPP's entire history with the Cuban Credit Facilities could have been exposed and could have resulted in BNPP facing sanctions by U.S. authorities.

57.     Shortly after the payments were blocked but before they were resubmitted, in early March 2006, a senior attorney at BNPP Paris (the "Senior BNPP Paris Attorney") reached out to U.S. Law Firm 1 for advice on the blocked payments and explained:  "My concern comes from the fact that we cannot rule out that we would have to explain to OFAC that this is part of a long standing facility with Cuban entities.  Could that trigger a retroactive investigation of all prior payments so that OFAC would check that all payments cleared through the US dollar system relate to licensed transactions?"  On March 6, 2006, U.S. Law Firm 1 responded with a memorandum that not only indicated that the transactions violated U.S. sanctions – regardless of whether they had been processed by BNPP New York or U.S. Bank 1 – but also stated:  "The

risk of serious regulatory sanction . . . is such that BNP Paribas should consider discontinuing participation in any such U.S. dollar facility." An attorney at BNPP Paris who reported to the Senior BNPP Paris Attorney (the "Junior BNPP Paris Attorney") forwarded this memorandum to a compliance officer at CIB, only to be reprimanded by the Senior BNPP Paris Attorney, who insisted that "[i]t was a draft memo and should not have been distributed to just anyone.  We now no longer have control over its status.  Do not do anything more on this file without talking to me about it."  The Junior BNPP Paris Attorney responded that the compliance officer would "delete the e-mail."  The Senior BNPP Paris Attorney then wrote to U.S. Law Firm 1 and instructed it to "please suspend any further work on this file."

58.     Almost immediately after the three blocked payments were stripped and resubmitted, BNPP decided to process the U.S. dollar transactions for this facility through U.S. Bank 1, instead of BNPP New York.  A compliance officer at BNPP Paris, referring to the blocked transactions, explained in an internal email that "[t]o prevent this problem, and as a lesser evil, CIB Compliance advocates standardizing all this clearing to a bank other than BNPP NY (U.S. Bank 1, in this case)."  BNPP Paris ultimately directed 188 payments for this facility, totaling approximately $37 million, to U.S. Bank 1 as its U.S. dollar clearer, without informing U.S. Bank 1 that the transactions involved Cuban Sanctioned Entities.  BNPP made the same decision to process transactions through U.S. Bank 1 for several other U.S. dollar denominated Cuban Credit Facilities.

*BNPP's Knowledge of Its Illicit Conduct*

59.     In the same way that BNPP employees involved in the transactions with Sudanese Sanctioned Entities claimed that they did not believe that U.S. sanctions laws applied or could be applied to foreign banks, several BNPP employees who were involved in or had knowledge of the Cuban Credit Facilities claimed in interviews with the Government and with outside counsel

for BNPP that they did not appreciate that U.S. sanctions law applied to transactions run out of

BNPP Paris.  Several of these employees further stated that, in their view, the instructions to

omit references to Cuban entities from wire transfer messages were not intended to evade U.S.

law, but rather were based on a non-criminal desire to have the transactions processed through

the United States without incident, as they would otherwise likely be blocked even if they were

ultimately permissible.

60.    To the extent that BNPP employees genuinely held this incorrect view of the

reach of U.S. sanctions, by October 2004, BNPP and the individuals principally responsible for

the Cuban Credit Facilities were on clear notice that U.S. sanctions did, in fact, apply to all U.S.

dollar transactions involving Sanctioned Entities cleared in the United States, even if the

transactions were directed from a non-U.S. bank such as BNPP Paris.  As described above, in

October 2004, BNPP received the 2004 Legal Opinion from U.S. Law Firm 1, which was

disseminated widely among executives at BNPP Paris and within ECEP.  The 2004 Legal

Opinion explicitly stated that U.S. sanctions laws did, in fact, apply to all U.S. dollar

transactions, including those initiated by foreign banks.  Specifically, the opinion stated, with

regard to the U.S. sanctions against Cuba, that, "U.S. dollar transactions of non-U.S. banking

institutions with Cuban counterparties cleared inside the United States would be subject to the

Cuba regulations and blocked . . . .  [A]ny BNPP transaction with a Cuban counterparty cleared

inside the United States by any bank . . . would fall within the scope of the Cuba sanctions."

Thus, the opinion made perfectly clear that the Cuban Credit Facilities – which involved "U.S.

dollar transactions of non-U.S. banking institutions with Cuban counterparties cleared inside the

United States" – violated U.S. sanctions.  Moreover, while the 2004 Legal Opinion left some

ambiguity as to whether BNPP could face criminal liability if its transactions with Sanctioned

Entities were cleared through an unaffiliated financial institution, as opposed to BNPP New York, the Cuban Credit Facilities were cleared almost exclusively through BNPP New York. Indeed, from 2002 through 2010, more than 96% of the transactions related to the Cuban Credit Facilities were cleared through BNPP New York.

61.     Following the receipt of the 2004 Legal Opinion, BNPP Paris compliance, legal and business personnel acknowledged in numerous discussions that the Cuban Credit Facilities did not comply with the U.S. embargo against Cuba, or with BNPP's stated policy that it did not conduct U.S. dollar business with Cuba.  A January 2005 e-mail from a BNPP New York compliance officer to a senior BNPP Paris compliance officer stated:  "US OFAC laws state that a US entity cannot send or receive funds to/from Cuba.  It does not matter that the traders are overseas . . . no USD denominated anything can be transacted with OFAC prohibited entities."  In February 2005, BNPP's standardized instructions for the processing of payments related to Cuba stated:  "COUNTRY SUBJECT TO A U.S. EMBARGO.  The U.S. and foreign banks established on U.S. territory are notably required to proceed with the blocking of assets concerning countries or individuals under U.S. embargo.  Any transfer in USD is subject to this regulation.  One should thus take care not to proceed with such transactions."

62.     In December 2005, ABN AMRO Bank, N.V. ("ABN AMRO"), a Dutch bank, was fined by U.S. regulators for violations of U.S. sanctions laws.  Specifically, ABN AMRO's branch in New York had processed non-transparent payment messages sent by ABN AMRO's global branch network for customers in sanctioned countries.  On December 19, 2005, as a result of this conduct, ABN AMRO entered into a consent cease and desist order with regulators, including FRB-NY and DFS, and paid a combined civil monetary penalty of $80 million to the regulators, OFAC, and the Financial Crimes Enforcement Network.

63.     In January 2006, a compliance officer at BNPP Paris analyzed BNPP's

compliance with U.S. sanctions in light of the ABN AMRO settlement and wrote the following

to a group of senior BNPP Paris compliance and business personnel:

> Does ECEP run the risk of an allegation for circumventing the embargo? A
> practice does exist which consists in omitting the Beneficiaries'/Ordering party's
> contact information for USD transactions regarding clients from countries that are
> under U.S. embargo:  Sudan, Cuba, Iran.  This avoids putting BNPP NY in a
> position to uncover these transactions, to block them, and to submit reports to the
> regulator.  This monitoring is practiced especially by the Operational Center in
> Paris, but it also exists in other centers.  However, the fact that SWIFT messages
> are not referencing the final Beneficiary or the Initiating Party for the movement
> of funds does not protect the bank totally, because the investigative capacities of
> U.S. banks . . . are more and more sophisticated. . . . *Concerning Cuba – It is true*
> *that we are not completely in line with the text of the U.S. regulations.*

(Emphasis added).  Also in January 2006, an ECEP employee at BNPP Paris asked a compliance

officer at BNPP Paris, "when we lend money to the Cubans, the loans are generally made out in

Dollars, except in a few exceptional cases.  Could we be reprimanded, and if so, based on what?"

The compliance officer responded to the ECEP employee and several other senior ECEP

employees at BNPP Paris with a clear warning:

> These processing transactions obliges us to obscure information regarding the
> USD (BNPP NY) Clearer, and it is a position which BNPP is not comfortable
> with, and which, of course, offers a risk to its image and, potentially, a risk for
> reprisals from US authorities if this behavior was discovered, even if such could
> not occur directly . . . . In a way, a risk which we thought was non-existent is
> becoming a little less so.

64.     In May 2006, the executive at BNPP New York responsible for ethics and

compliance expressed his concern about the use of cover payments to conceal the involvement of

Sanctioned Entities in transactions processed by BNPP New York.  In response, a CIB Paris

compliance officer wrote an e-mail to several senior BNPP Paris compliance officers that stated:

> If [the New York head of ethics and compliance] only offers the choice between
> abandoning the [cover payment] for movements in favor of clientele or promising
> BNPP NY we do not wire transfer in USD concerning Cuba, Iran, Sudan or Syria,
> I only see the solution of going through another bank than BNPP NY for all

transactions to these destinations. The other, less gratifying alternatives are to stop working in USD in these zones or to disguise the reality with the no win situation between telling stories to BNPP NY or to [U.S. Bank 1].

65.     In January 2007, a compliance officer at BNPP Paris sent a memo to the head of compliance at BNPP Paris entitled "Respect of Cuban Embargo," that noted that BNPP had been bypassing the U.S. embargo against Cuba to the extent that the bank was holding U.S. dollar accounts with Cuban banks and permitting Cuban entities to borrow in U.S. dollars. The compliance officer concluded that "[t]otal transparency is not currently possible" with respect to Cuba because Cuban Credit Facilities still remained U.S. dollar denominated, and "[c]hanging the payment currency during the process with a pool of participants would be long and costly."

*BNPP's Decision To Continue the Credit Facilities Regardless of U.S. Sanctions*

66.     Beginning in late 2006, compliance personnel at BNPP Paris sought to convince employees in the ECEP business line to convert the U.S. dollar Cuban Credit Facilities to Euros or another currency. Despite these efforts, certain of the Cuban Credit Facilities remained denominated in U.S. dollars for several more years, and U.S. dollar transactions in one Cuban Credit Facility continued routinely into 2010. Senior employees at BNPP Paris, including the Global Head of ECEP, allowed these credit facilities to remain in U.S. dollars, despite the fact that they violated U.S. law, due to BNPP's longstanding relationships with Cuban entities and the perceived cost to BNPP of converting the facilities into Euros. In May 2007, a compliance officer at BNPP Paris sent a memo to senior BNPP Paris compliance and ECEP personnel entitled "Compliance with the Cuba embargo." The memo addressed the fact that while several of the Cuban Credit Facilities had been successfully converted to Euros, one credit facility, involving hundreds of millions of dollars, remained denominated in U.S. dollars. The memo laid out two solutions for dealing with that facility: (1) "[s]et this facility aside from the official inventory with regard to the US so long as it cannot be converted into Euros or another

currency;" or (2) "[i]f Group Compliance needs to be totally transparent with regard to the US authorities, the facility currency will have to be modified. . . . [T]his option would trigger off an onerous process of negotiations with the banks and the borrowers, and ECEP will not have total control over the outcome: our decision to be OFAC compliant is a minor concern for the other parties." The memo concluded that "[g]iven its marginal character, we suggest that this facility should be kept silent, it is totally discreet and is reimbursed via internal wire transfers." The memo included a handwritten note on top of the first page indicating a decision was made by the Head of Compliance on June 7, 2007 in which he selected "option B," which noted that if the Cuban transactions were to be totally transparent "the facility currency will have to be modified."

67.     By 2008, compliance officers at BNPP increasingly expressed frustration with ECEP's failure to convert the remaining Cuban Credit Facility to Euros or another non-U.S. dollar currency in order to comply with U.S. sanctions. On February 11, 2008, BNPP implemented a policy that prohibited all new business with Cuba. Despite this policy, two Cuban facilities remained U.S. dollar denominated after May 2008.

68.     In September 2008, a compliance officer at BNPP Paris wrote to several senior compliance officers at BNPP: "[The Cuban Credit Facility], for which we have for two years now been putting pressure on ECEP to have the USD reference abandoned, is more or less at a dead-end, and we know it will be impossible to modify without giving up something in exchange. . . . [T]he subsistence of [the Cuban Credit Facility] in USD [] prevents [BNPP's] situation on Cuba from being totally 'compliant.'"

69.     Despite the pressure from compliance personnel to convert the remaining Cuban Credit Facility into Euros, BNPP continued to receive U.S. dollar payments related to the facility

until early 2010.  The choice by ECEP to continue violating U.S. sanctions laws with regard to this facility was due in part to BNPP's desire to continue to do business in Cuba.  In a December 2009 internal memorandum, an ECEP employee at BNPP Paris wrote that one of the Cuban companies involved in the remaining credit facility was "a historic client of BNPP Paribas and a major player in the Cuban economy . . . [and] a strategic customer with whom we intend to arrange new financing secured by offshore flows."

70.     As a result of BNPP's desire to conduct U.S. dollar business with Cuban Sanctioned Entities, from October 2004 – when the 2004 Legal Opinion was disseminated throughout BNPP Paris – until BNPP's final U.S. dollar transactions with Cuban entities in early 2010, BNPP knowingly, intentionally and willfully processed illicit U.S. dollar transactions involving Cuba with a total of value of approximately $1.747 billion.

### BNPP's Failure To Timely Provide Relevant Information to the Government

71.     BNPP was on notice of law enforcement concerns regarding its potential sanctions violative conduct in as early as December 2009, when it was contacted by the New York County District Attorney's Office.  In a subsequent meeting, in early 2010 between BNPP and the U.S. Department of Justice and the New York County District Attorney's Office, BNPP agreed to conduct an internal investigation into business conducted with countries subject to U.S. sanctions at a number of its subsidiaries and branches and covering the time period January 1, 2002 through December 31, 2009, including in Paris, London, Milan, Rome and Geneva.  The review was expanded after BNPP discovered instances in which its illicit conduct continued past the original agreed-upon review period.

72.     Despite receiving legal opinions in 2006 that identified potential sanctions-violative conduct, receiving notice of the same from law enforcement in late 2009, and beginning its internal investigation in early 2010, BNPP failed to provide the Government with meaningful

materials from BNPP Geneva until May 2013, and the materials were heavily redacted due to bank secrecy laws in Switzerland. BNPP's delay in producing these materials significantly impacted the Government's ability to bring charges against responsible individuals, Sudanese Sanctioned Entities, and the satellite banks.

73.     Furthermore, in 2006, a BNPP whistleblower in London raised concerns internally about a U.S. citizen who served as a BNPP executive and was facilitating transactions with the government of Iran, in direct contravention of IEEPA. This illegal conduct stopped in April 2006. BNPP did not disclose any information to the Government about the whistleblower or the executive until December 2011, almost two years after BNPP began its internal investigation and eight months after the statute of limitations against this individual expired.

74.     In other respects, BNPP has provided substantial cooperation to the Government by conducting an extensive transaction review; identifying potentially violative transactions; responding to numerous inquiries and multiple requests for information; providing voluminous relevant records from foreign jurisdictions; signing tolling agreements with the Government and agreeing to extend such tolling agreements on multiple occasions; conducting interviews with dozens of current and former employees in Paris, London, New York, Geneva, Rome and Milan; and working with the Government to obtain assistance via a Mutual Legal Assistance Treaty ("MLAT") with France, among other things. BNPP also has now taken several corrective measures to enhance its sanctions compliance.

Dated: New York, New York
        June 30 , 2014


PREET BHARARA                           LESLIE CALDWELL
United States Attorney                  Assistant Attorney General
                                        Criminal Division

                                        JAIKUMAR RAMASWAMY
                                        Chief, Asset Forfeiture and Money
                                        Laundering Section

By: _____           By: _____
    Andrew D. Goldstein                      Craig Timm
    Martin S. Bell                           Jennifer E. Ambuehl
    Christine I. Magdo                       Trial Attorneys
    Micah W. J. Smith                        Asset Forfeiture and Money Laundering
    Assistant United States Attorneys        Section, Criminal Division
    (212) 637-2200                           (202) 514-1263

AGREED AND CONSENTED TO:

After consulting with its attorney and pursuant to the plea agreement entered into this day between the defendant, BNPP, and the United States, I, the designated corporate representative authorized by the Board of Directors of BNPP, hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____          _____
BNP Paribas S.A.                                      June 28, 2014
by _GEORGES DIRANI_                                  DATE


APPROVED:

We are counsel for BNPP in this case. We have carefully reviewed the above Statement of Facts with the Board of Directors of BNPP. To our knowledge, the Board of Directors' decision to stipulate to these facts is an informed and voluntary one.

_____          _____
Karen Patton Seymour, Esq.                          June 28, 2014
Sullivan & Cromwell LLP                              DATE
Attorneys for BNP Paribas S.A.

# EXHIBIT 26

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

**Department of State: Division of Corporations**

Allowable Characters

**HOME**

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | **7599078** | Incorporation Date / Formation Date: | **9/9/2019** (mm/dd/yyyy) |
| Entity Name: | **SWIFT CURRENT ENERGY, LLC** | | |
| Entity Kind: | **Limited Liability Company** | Entity Type: | **General** |
| Residency: | **Domestic** | State: | **DELAWARE** |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | **COGENCY GLOBAL INC.** | | |
| Address: | **850 NEW BURTON ROAD SUITE 201** | | |
| City: | **DOVER** | County: | **Kent** |
| State: | **DE** | Postal Code: | **19904** |
| Phone: | **800-483-1140** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

View Search Results          New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

# EXHIBIT 27

Registre de Commerce et des Sociétés
**B173718** - L140172844
déposé le 01/10/2014

## MENTION DE DEPOT

**Trafigura Funding S.A.**
Société anonyme
Siège social : 7, rue Robert Stümper, L-2557 Luxembourg
R.C.S. Luxembourg : B 173 718

Les comptes annuels arrêtés au 30 septembre 2013 ont été déposés au registre de commerce et des sociétés de Luxembourg.

Pour mention aux fins de la publication au Mémorial, Recueil des Sociétés et Associations.

Luxembourg, le 30 septembre 2014.

_____
Le mandataire

**Document émis électroniquement**

Registre de Commerce et des Sociétés

**B173718** - L140172844

enregistré et déposé le 01/10/2014

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## BALANCE SHEET

**Financial year from**  $_{01}$  13/12/2012  **to**  $_{02}$  30/09/2013 *(in*  $_{03}$  USD  *)*

Trafigura Funding S.A.

7, rue Robert Stümper
L-2557 Luxembourg

| ASSETS |
|---|

| | | Reference(s) | | Financial year | | Previous financial year |
|---|---|---|---|---|---|---|
| **A.** | **Subscribed capital unpaid** | 1101 | 101 | | 102 | |
| I. | Subscribed capital not called | 1103 | 103 | | 104 | |
| II. | Subscribed capital called but not paid | 1105 | 105 | | 106 | |
| **B.** | **Formation expenses** | 1107 | 107 | | 108 | |
| **C.** | **Fixed assets** | 1109 | 109 | 402.072.000,00 | 110 | |
| I. | Intangible assets | 1111 | 111 | | 112 | |
| | 1. Costs of research and development | 1113 | 113 | | 114 | |
| | 2. Concessions, patents, licences, trade marks and similar rights and assets, if they were | 1115 | 115 | | 116 | |
| |    a) acquired for valuable consideration and need not be shown under C.I.3 | 1117 | 117 | | 118 | |
| |    b) created by the undertaking itself | 1119 | 119 | | 120 | |
| | 3. Goodwill, to the extent that it was acquired for valuable consideration | 1121 | 121 | | 122 | |
| | 4. Payments on account and intangible fixed assets under development | 1123 | 123 | | 124 | |
| II. | Tangible assets | 1125 | 125 | | 126 | |
| | 1. Land and buildings | 1127 | 127 | | 128 | |
| | 2. Plant and machinery | 1129 | 129 | | 130 | |

| The notes in the annex form an integral part of the annual accounts |
|---|

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | | Reference(s) | | Financial year | | Previous financial year |
|---|---|---|---|---|---|---|
| | 3. Other fixtures and fittings, tools and equipment | 1131 | 131 | | 132 | |
| | 4. Payments on account and tangible assets in course of construction | 1133 | 133 | | 134 | |
| III. | Financial assets | 1135 _____ 3 | 135 | 402.072.000,00 | 136 | |
| | 1. Shares in affiliated undertakings | 1137 | 137 | | 138 | |
| | 2. Loans to affiliated undertakings | 1139 | 139 | 402.072.000,00 | 140 | |
| | 3. Shares in undertakings with which the company is linked by virtue of participating interests | 1141 | 141 | | 142 | |
| | 4. Loans to undertakings with which the company is linked by virtue of participating interests | 1143 | 143 | | 144 | |
| | 5. Investments held as fixed assets | 1145 | 145 | | 146 | |
| | 6. Loans and claims held as fixed assets | 1147 | 147 | | 148 | |
| | 7. Own shares or own corporate units | 1149 | 149 | | 150 | |
| **D. Current assets** | | 1151 | 151 | 9.662.190,53 | 152 | |
| I. | Stocks | 1153 | 153 | | 154 | |
| | 1. Raw materials and consumables | 1155 | 155 | | 156 | |
| | 2. Work and contracts in progress | 1157 | 157 | | 158 | |
| | 3. Finished goods and goods for resale | 1159 | 159 | | 160 | |
| | 4. Payments on account | 1161 | 161 | | 162 | |
| II. | Debtors | 1163 _____ 4 | 163 | 9.162.020,23 | 164 | |
| | 1. Trade debtors | 1165 | 165 | | 166 | |
| | a) becoming due and payable after less than one year | 1167 | 167 | | 168 | |
| | b) becoming due and payable after more than one year | 1169 | 169 | | 170 | |
| | 2. Amounts owed by affiliated undertakings | 1171 | 171 | 9.144.153,36 | 172 | |
| | a) becoming due and payable after less than one year | 1173 | 173 | 9.144.153,36 | 174 | |
| | b) becoming due and payable after more than one year | 1175 | 175 | | 176 | |
| | 3. Amounts owed by undertakings with which the company is linked by virtue of participating interests | 1177 | 177 | | 178 | |
| | a) becoming due and payable after less than one year | 1179 | 179 | | 180 | |
| | b) becoming due and payable after more than one year | 1181 | 181 | | 182 | |
| | 4. Other debtors | 1183 | 183 | 17.866,87 | 184 | |
| | a) becoming due and payable after less than one year | 1185 | 185 | 17.866,87 | 186 | |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | Reference(s) | Financial year | Previous financial year |
|---|---|---|---|
| b)  becoming due and payable after more than one year | 1187 _____ | 187 _____ | 188 _____ |
| III.  Investments | 1189 _____ | 189 _____ | 190 _____ |
| 1.  Shares in affiliated undertakings and in undertakings with which the company is linked by virtue of participating interests | 1191 _____ | 191 _____ | 192 _____ |
| 2.  Own shares or own corporate units | 1193 _____ | 193 _____ | 194 _____ |
| 3.  Other investments | 1195 _____ | 195 _____ | 196 _____ |
| IV.  Cash at bank and in hand | 1197 _____5 | 197 _____500.170,30 | 198 _____ |
| E.  Prepayments | 1199 _____ | 199 _____ | 200 _____ |
| TOTAL (ASSETS) | | 201 \_\_\_\_\_411.734.190,53 | 202 _____0,00 |

| The notes in the annex form an integral part of the annual accounts |
|---|

Document émis électroniquement

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## LIABILITIES

| | Reference(s) | Financial year | Previous financial year |
|---|---|---|---|
| **A.  Capital and reserves** | 1301 _____ 6 | 301 ___ 2.956.595,70 | 302 _____ |
| I.   Subscribed capital | 1303 _____ | 303 ___ 2.840.610,00 | 304 _____ |
| II.   Share premium and similar premiums | 1305 _____ | 305 _____ | 306 _____ |
| III.   Revaluation reserves | 1307 _____ | 307 _____ | 308 _____ |
| IV.   Reserves | 1309 _____ | 309 _____ | 310 _____ |
| 1.   Legal reserve | 1311 _____ | 311 _____ | 312 _____ |
| 2.   Reserve for own shares | 1313 _____ | 313 _____ | 314 _____ |
| 3.   Reserves provided for by the articles of association | 1315 _____ | 315 _____ | 316 _____ |
| 4.   Other reserves | 1317 _____ | 317 _____ | 318 _____ |
| V.   Profit or loss brought forward | 1319 _____ | 319 _____ | 320 _____ |
| VI.   Result for the financial year | 1321 _____ | 321 ___ 115.985,70 | 322 _____ |
| VII.   Interim dividends | 1323 _____ | 323 _____ | 324 _____ |
| VIII.   Investment subsidies | 1325 _____ | 325 _____ | 326 _____ |
| IX.   Immunised appreciation | 1327 _____ | 327 _____ | 328 _____ |
| **B.  Subordinated creditors** | 1329 _____ | 329 _____ | 330 _____ |
| **C.  Provisions** | 1331 _____ 7 | 331 ___ 84.642,97 | 332 _____ |
| 1.   Provisions for pensions and similar obligations | 1333 _____ | 333 _____ | 334 _____ |
| 2.   Provisions for taxation | 1335 _____ | 335 ___ 44.083,27 | 336 _____ |
| 3.   Other provisions | 1337 _____ | 337 ___ 40.559,70 | 338 _____ |
| **D.  Non subordinated debts** | 1339 _____ 8 | 339 ___ 408.692.951,86 | 340 _____ |
| 1.   Debenture loans | 1341 _____ | 341 _____ | 342 _____ |
| a)   Convertible loans | 1343 _____ | 343 _____ | 344 _____ |
| i)   becoming due and payable after less than one year | 1345 _____ | 345 _____ | 346 _____ |
| ii)   becoming due and payable after more than one year | 1347 _____ | 347 _____ | 348 _____ |
| b)   Non convertible loans | 1349 _____ | 349 _____ | 350 _____ |
| i)   becoming due and payable after less than one year | 1351 _____ | 351 _____ | 352 _____ |
| ii)   becoming due and payable after more than one year | 1353 _____ | 353 _____ | 354 _____ |
| 2.   Amounts owed to credit institutions | 1355 _____ | 355 ___ 408.689.848,47 | 356 _____ |
| a)   becoming due and payable after less than one year | 1357 _____ | 357 ___ 7.494.668,63 | 358 _____ |
| b)   becoming due and payable after more than one year | 1359 _____ | 359 ___ 401.195.179,84 | 360 _____ |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | Reference(s) | Financial year | Previous financial year |
|---|---|---|---|
| 3. Payments received on account of orders in so far as they are not shown separately as deductions from stocks | 1361 | 361 | 362 |
|    a) becoming due and payable after less than one year | 1363 | 363 | 364 |
|    b) becoming due and payable after more than one year | 1365 | 365 | 366 |
| 4. Trade creditors | 1367 | 367      3.103,39 | 368 |
|    a) becoming due and payable after less than one year | 1369 | 369      3.103,39 | 370 |
|    b) becoming due and payable after more than one year | 1371 | 371 | 372 |
| 5. Bills of exchange payable | 1373 | 373 | 374 |
|    a) becoming due and payable after less than one year | 1375 | 375 | 376 |
|    b) becoming due and payable after more than one year | 1377 | 377 | 378 |
| 6. Amounts owed to affiliated undertakings | 1379 | 379 | 380 |
|    a) becoming due and payable after less than one year | 1381 | 381 | 382 |
|    b) becoming due and payable after more than one year | 1383 | 383 | 384 |
| 7. Amounts owed to undertakings with which the company is linked by virtue of participating interests | 1385 | 385 | 386 |
|    a) becoming due and payable after less than one year | 1387 | 387 | 388 |
|    b) becoming due and payable after more than one year | 1389 | 389 | 390 |
| 8. Tax and social security | 1391 | 391 | 392 |
|    a) Tax | 1393 | 393 | 394 |
|    b) Social security | 1395 | 395 | 396 |
| 9. Other creditors | 1397 | 397 | 398 |
|    a) becoming due and payable after less than one year | 1399 | 399 | 400 |
|    b) becoming due and payable after more than one year | 1401 | 401 | 402 |
| **E. Deferred income** | 1403 | 403 | 404 |
| **TOTAL (LIABILITIES)** | | 405    411.734.190,53 | 406      0,00 |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## PROFIT AND LOSS ACCOUNT

**Financial year from** 01 13/12/2012 **to** 02 30/09/2013 *(in* 03 USD )

Trafigura Funding S.A.

7, rue Robert Stümper
L-2557 Luxembourg

| A. CHARGES | | | |
|---|---|---|---|

| | Reference(s) | Financial year | Previous financial year |
|---|---|---|---|
| **1. Raw materials and consumables** | 1601 | 601 | 602 |
| **2. Other external charges** | 1603 | 603 | 604 |
| **3. Staff costs** | 1605 | 605 | 606 |
| a) Wages and salaries | 1607 | 607 | 608 |
| b) Social security costs | 1609 | 609 | 610 |
| c) Social security costs relating to pensions | 1611 | 611 | 612 |
| d) Other social security costs | 1613 | 613 | 614 |
| **4. Value adjustments** | 1615 | 615 | 616 |
| a) on formation expenses and on tangible and intangible fixed assets | 1617 | 617 | 618 |
| b) on elements of current assets | 1619 | 619 | 620 |
| **5. Other operating charges** | 1621 _____9 | 621 _____199.719,91 | 622 |
| **6. Value adjustments and fair value adjustments on financial fixed assets** | 1623 | 623 | 624 |
| **7. Value adjustments and fair value adjustments on financial current assets. Loss on disposal of transferable securities** | 1625 | 625 | 626 |
| **8. Interest payable and similar charges** | 1627 _____10 | 627 _____7.589.277,08 | 628 |
| a) concerning affiliated undertakings | 1629 | 629 | 630 |
| b) other interest payable and similar charges | 1631 | 631 _____7.589.277,08 | 632 |
| **9. Extraordinary charges** | 1633 | 633 | 634 |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

|  | Reference(s) | Financial year | Previous financial year |
|---|---|---|---|
| **10. Tax on profit or loss** | 1635 _____ | 635 _____ 46.915,56 | 636 _____ |
| **11. Other taxes not included in the previous caption** | 1637 _____ | 637 _____ | 638 _____ |
| **12. Profit for the financial year** | 1639 _____ | 639 _____ 115.985,70 | 640 _____ |
| **TOTAL CHARGES** |  | 641 _____ 7.951.898,25 | 642 _____ 0,00 |

| The notes in the annex form an integral part of the annual accounts |
|---|

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## B. INCOME

| | | Reference(s) | | Financial year | | Previous financial year |
|---|---|---|---|---|---|---|
| 1. | Net turnover | 1701 | 701 | | 702 | |
| 2. | Change in inventories of finished goods and of work and contracts in progress | 1703 | 703 | | 704 | |
| 3. | Fixed assets under development | 1705 | 705 | | 706 | |
| 4. | Reversal of value adjustments | 1707 | 707 | | 708 | |
| | a) on formation expenses and on tangible and intangible fixed assets | 1709 | 709 | | 710 | |
| | b) on elements of current assets | 1711 | 711 | | 712 | |
| 5. | Other operating income | 1713 | 713 | 187.850,69 | 714 | |
| 6. | Income from financial fixed assets | 1715 | 715 | 7.764.047,56 | 716 | |
| | a) derived from affiliated undertakings | 1717 | 4 | 717 | 7.764.047,56 | 718 | |
| | b) other income from participating interests | 1719 | 719 | | 720 | |
| 7. | Income from financial current assets | 1721 | 721 | | 722 | |
| | a) derived from affiliated undertakings | 1723 | 723 | | 724 | |
| | b) other income | 1725 | 725 | | 726 | |
| 8. | Other interests and other financial income | 1727 | 727 | | 728 | |
| | a) derived from affiliated undertakings | 1729 | 729 | | 730 | |
| | b) other interest receivable and similar income | 1731 | 731 | | 732 | |
| 9. | Extraordinary income | 1733 | 733 | | 734 | |
| 10. | Loss for the financial year | 1735 | 735 | 0,00 | 736 | |
| | **TOTAL INCOME** | | 737 | 7.951.898,25 | 738 | 0,00 |

The notes in the annex form an integral part of the annual accounts

# Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2013

### 1 General

Trafigura Funding S.A. (the "Company") is a public limited liability company which was incorporated on December 13, 2012 within the definition of the Luxembourg Law of August 10, 1915, as amended, on commercial companies for an unlimited period of time.

The principal activity of the Company is to operate as a financing company for Trafigura Group, raising funds through bond issuances, loans and other facilities and on turn lending the so raised funds to the companies belonging to the Group.

The Company is a wholly-owned subsidiary of Trafigura Group Pte. Ltd., having its registered office at 1, Marina Boulevard 28-00, 018989 Singapore and registered with the Singapore commercial register under number 201017488D.

The registered office of the Company is located at 7, rue Robert Stümper, L-2557 Luxembourg.

The financial statements of the Company for the period 13 December 2012 to 30 September 2013 were authorised for issue in accordance with a resolution of the Directors on 27 January 2014.

The Company's financial information is included into consolidated financial statements of Trafigura Beheer BV, a company registered in Netherlands with principal business office at Ito Tower, Gustav Mahlerplein 102, 1082 MA Amsterdam, the Netherlands. The consolidated financial statements of Trafigura Beheer BV can be obtained online at www.trafigura.com/financials.

Farringford NV, registered in Curaçao, is the ultimate parent company of the Company.

### 2 Summary of significant accounting policies

### 2.1 Basis of preparation

The financial statements of the Company have been prepared in accordance with Luxembourg legal and regulatory requirements under the historical cost convention.

The Company's first financial period started on 13 December 2012 (date of incorporation) and ended on 30 September 2013.

Accounting policies and valuation rules set out below are, besides the ones laid down by the Law of 19 December 2002, as amended, determined and applied by the Board of Directors.

### 2.2 Significant accounting policies

#### Foreign currency translation

The Company maintains its accounting records in United States Dollar (USD) and the annual accounts are prepared in this currency. The transactions made in another currency than USD are translated into USD at the exchange rate prevailing at the transaction date.

*As at year-end:*

- Financial fixed assets expressed in another currency than USD have been translated at the historical exchange rate;
- Cash at bank is valued at the exchange rate applicable as at year-end of the annual accounts. Consequently realized and unrealized losses and realized gains are taken into account in the profit and loss account;
- All other current assets and liabilities expressed in another currency than USD are valued individually respectively at the lower or at the higher of the value determined using the historical exchange rate or the value determined using the exchange rate prevailing at the balance sheet date. The realized and unrealized exchange losses are recorded in the profit and loss account. The unrealised exchange gains are recorded in the profit and loss account at the moment of their realisation.

Income and expenses expressed in currencies other than USD are converted at the exchange rate applicable at the date of the transactions.

# Trafigura Funding S.A.

## Notes to the financial statements (cont'd)
## 30 September 2013

### Debtors

The debtors are valued at their nominal value. They are subject to value adjustments where their recovery is compromised. These value adjustments are not continued if the reasons for which the value adjustments were made have ceased to apply.

### Debts

Debts are recorded at their reimbursement value. Where the amount repayable on account is greater than the amount received, the difference is shown as an asset and is written off over the period of the debt based on a linear method.

### Provisions

Provisions are intended to cover losses or debts, the nature of which is clearly defined and which, at the date of the balance sheet, are either likely to be occurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

Provisions may also be created to cover charges which originate in the financial year under review or in a previous financial year, the nature of which is clearly defined and which at the date of the balance sheet are either likely to be incurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

### Financial assets

Financial assets are valued individually at the lower of their acquisition cost or their value estimated by the Board of Directors without netting-off unrealized gains and losses. The Board of Directors relies on the financial statements of the companies and/or other information and documents available for its valuation.

Loans, defined as financial assets, are stated at their nominal value.

A value adjustment is recorded at the end of each year in case the recoverable value is estimated to be lower than the nominal value, or in case the diminution in value is considered as permanent by the Board of Directors.

### Prepayments

This asset item includes expenditures incurred during the financial year but relating to a subsequent financial year.

# Trafigura Funding S.A.

Notes to the financial statements (cont'd)
30 September 2013

## 3    Financial assets

|  | 2013 USD |
|---|---|
| Loans to Trafigura Group Pte Ltd | 402,072,000.00 |

Financial assets include USD denominated loans to related parties that are held to maturity and generate a fixed or variable income for the Company.

These loans receivable bear interest at a fixed rate plus a margin agreed between the parties. Terms and conditions of loans per 30 September 2013 were as follows:

|  | Principal | Interest rate | Maturity | Floating/ Fixed rate debt | <1 year USD | 1-5 years USD | > 5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| Loans to Trafigura Pte Ltd |  |  |  |  |  |  |  |  |
| USD | 36,000,000.00 | 4.49% | 2018- March | Fixed | -- | 36,000,000.00 | -- | 36,000,000.00 |
| USD | 51,500,000.00 | 5.00% | 2020 - March | Fixed | -- | -- | 51,500,000.00 | 51,500,000.00 |
| USD | 57,500,000.00 | 5.64% | 2023- March | Fixed | -- | -- | 57,500,000.00 | 57,500,000.00 |
| USD | 257,072,000.00 | 7.23% | 2020 - July | Fixed | -- | -- | 257,072,000.00 | 257,072,000.00 |
| **Total** |  |  |  |  | -- | 36,000,000.00 | 366,072,000.00 | 402,072,000.00 |

## 4    Debtors

|  | 2013 USD |
|---|---|
| Accrued interest due from related parties | 7,764,047.56 |
| Amounts owed by affiliated undertakings | 1,380,105.80 |
| Other receivables | 17,866.87 |
| **Total** | 9,162,020.23 |

Related parties represent associated companies, major shareholders, directors and key management personnel of the Company, and companies of which they are principal owners. Pricing policies and terms of these transactions are approved by the Company's management.

The amounts due from related companies are unsecured, interest-free and repayable on demand. It include the re-imbursement of expenses and the service fee earned.

Debtors are mainly denominated in USD.

## Trafigura Funding S.A.

### Notes to the financial statements (cont'd)
### 30 September 2013

#### 5    Cash at bank and in Hand

Cash and cash equivalents comprise the following balance sheet amounts:

|  | 2013 USD |
| --- | --- |
| Cash at bank | 500,170.30 |

#### 6    Capital & Reserves

|  | 2013 Number of shares | USD |
| --- | --- | --- |
| **Issued and fully paid ordinary shares** | | |
| Issuance of shares at incorporation of the company | 40,610 | 40,610.00 |
| Issuance of additional shares | 2,800,000 | 2,800,000.00 |
| **Balance at the end of the year** | **2,840,610** | **2,840,610.00** |

#### Subscribed capital

The Company was incorporated on 13 December 2012 with an issued capital of EUR 31,000 represented by 31,000 shares of a nominal value of EUR 1 each.

On 30 May 2013 the sole Shareholder decided to convert the Company share capital from Euro to US Dollars at the fixed rate of USD 1.31 and issued additional 2,800,000 shares with a par value of USD1 each.

As at 30 September 2013 the subscribed and fully paid up capital amounting to USD 2,840,610 is represented by 2,840,610 shares of a nominal value of USD 1 each. The issued and fully paid up share capital of USD 2,840,610 is fully owned by Trafigura Group Pte. Ltd.

#### Legal reserve

In accordance with the Luxembourg Law of August 10, 1915, as amended, on commercial companies, the Company is required to transfer a minimum of 5% of its annual net income to a legal reserve. This requirement ceases to be necessary once the balance of the legal reserve reaches 10% of the issued share capital. The legal reserve is not available for distribution to the sole Shareholder.

#### 7    Provisions

|  | 2013 USD |
| --- | --- |
| Provisions for taxation | 44,083.27 |
| Other provisions | 40,559.70 |
| **Total** | **84,642.97** |

Other provisions are related to accrued fees for the audit and tax for the financial year ended 30 September 2013.

The Company is fully taxable at an effective corporation tax rate amounting to 28.80%. It is also subject to a net wealth tax amounting to 0.5% based on the net asset value of the Company at the beginning of the calendar year.

## Trafigura Funding S.A.

### Notes to the financial statements (cont'd)
### 30 September 2013

**8     Non subordinated debts**

|  | 2013 USD |
|---|---|
| **Current** | |
| Other creditors | 3,103.39 |
| **TOTAL Non-Current** | **3,103.39** |

This note provides information about the contractual terms of the interest bearing loans and borrowings which are recorded at their reimbursement value.

|  | 2013 USD |
|---|---|
| **Amounts owed to credit institutions** | |
| Becoming due and payable after more than one year | |
| Private placements | 144,742,906.99 |
| Eurobond | 256,452,272.85 |
|  | 401,195,179.84 |
| Becoming due and payable within one year | |
| Accrued interest expenses on loans and borrowings | 7,494,668.63 |
| **TOTAL** | **408,689,848.47** |

Terms and conditions of outstanding loans per 30 September 2013 were as follows:

|  | 2013 Principal | Interest rate | Maturity | Fixed rate | <1 year USD | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| **US private placement** | | | | | | | | |
| USD | 36,000,000 | 4.38% | 2018-March | Fixed | - | 35,936,170.01 | - | 35,936,170.01 |
| USD | 51,500,000 | 4.89% | 2020-March | Fixed | - | - | 51,408,687.66 | 51,408,687.66 |
| USD | 57,500,000 | 5.53% | 2023-March | Fixed | - | - | 57,398,049.32 | 57,398,049.32 |
| **Eurobond** | | | | | | | | |
| EUR | 200,000,000 | 5.5% | 2020-July | Fixed | - | - | 256,452,272.85 | 256,452,272.85 |
| **Total** | | | | | **-** | **35,936,170.01** | **365,259,009.83** | **401,195,179.84** |

The Company was in compliance with all its corporate and financial covenants as at 30 September 2013.

13

## Trafigura Funding S.A.

### Notes to the financial statements (cont'd)
### 30 September 2013

**9      Other operating charges**

|  | 2013 USD |
|---|---|
| Legal and professional fees | 196,379.47 |
| Bank charges | 3,340.44 |
| **Total** | 199,719.91 |

**10     Interest payable and similar charges**

|  | 2013 USD |
|---|---|
| Interest expense on loans and borrowings | 7,494,668.62 |
| Set up fees | 94,608.46 |
| **Total** | 7,589,277.08 |

**11     Off-balance sheet commitments**

The Company borrows money from external counterparties in EUR and lends money to affiliated companies in USD. To hedge the foreign currency exposure arising from these transactions, the Company enters into foreign currency swaps. Given the hedge relationship, the loans are not revalued for foreign currency movements and the foreign currency swaps remain off balance sheet until the hedged coupon or principal transactions occur, at which point the fair value gains or losses on the off balance sheet foreign currency swaps are recognised in the profit and loss account.

**12     Subsequent events**

On November 27, 2013, the Company launched the first instalment of a new programme of European Medium-Term Notes (EMTN) with a value of EUR500 million. The bond will be listed on the Dublin Stock Exchange and has a coupon of 5.25 percent and a term of five years.

**Document émis électroniquement**



**Building a better working world**

Ernst & Young
Société anonyme

7, rue Gabriel Lippmann
Parc d'Activité Syrdall 2
L-5365 Munsbach

Tel: +352 42 124 1

www.ey.com/luxembourg

B.P. 780
L-2017 Luxembourg

R.C.S. Luxembourg B 47 771
TVA LU 16063074

## Independent auditor's report

To the Shareholders of
Trafigura Funding S.A.
7, rue Robert Stümper
L-2557 Luxembourg

Following our appointment by the General Meeting of the Shareholders, we have audited the accompanying annual accounts of Trafigura Funding S.A. which comprise the balance sheet as at 30 September 2013 and the profit and loss account for the year then ended, and a summary of significant accounting policies and other explanatory information.

*Board of Directors' responsibility for the annual accounts*

The Board of Directors is responsible for the preparation and fair presentation of these annual accounts in accordance with Luxembourg legal and regulatory requirements relating to the preparation and presentation of the annual accounts and for such internal control as the Board of Directors determines is necessary to enable the preparation and presentation of annual accounts that are free from material misstatement, whether due to fraud or error.

*Responsibility of the "réviseur d'entreprises agréé"*

Our responsibility is to express an opinion on these annual accounts based on our audit. We conducted our audit in accordance with International Standards on Auditing as adopted for Luxembourg by the "Commission de Surveillance du Secteur Financier". Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance about whether the annual accounts are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the annual accounts. The procedures selected depend on the judgment of the "réviseur d'entreprises agréé", including the assessment of the risks of material misstatement of the annual accounts, whether due to fraud or error. In making those risk assessments, the "réviseur d'entreprises agréé" considers internal control relevant to the entity's preparation and fair presentation of the annual accounts in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of accounting estimates made by the Board of Directors, as well as evaluating the overall presentation of the annual accounts.

A member firm of Ernst & Young Global Limited



**Building a better working world**

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the annual accounts give a true and fair view of the financial position of Trafigura Funding S.A. as of 30 September 2013, and of the results of its operations for the year then ended in accordance with Luxembourg legal and regulatory requirements relating to the preparation and presentation of the annual accounts.

Ernst & Young
Société anonyme
Cabinet de révision agréé

Yves EVEN

Luxembourg, 27 January 2014

- 2 -

Document émis électroniquement

Trafigura Funding S.A.
*Société anonyme*

7, rue Robert Stümper, L-2557 Luxembourg
R.C.S. Luxembourg : B173718

**Allocation of the result :**

The profit for the financial period ended September 30, 2013 amounting to USD 115,985.70 will be allocated as follows:

| | | |
|---|---|---|
| Profit for the financial year | USD | 115,985.70 |
| Allocation to the legal reserve | USD | 5,799.28 |
| Results brought forward | USD | 110,186.42 |

# EXHIBIT 28

Registre de Commerce et des Sociétés

Numéro RCS : B173718
Référence de dépôt : L160094412
Déposé et enregistré le 03/06/2016

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## BALANCE SHEET

**Financial year from**  01  01/10/2014  **to**  02  30/09/2015  (*in*  03  USD  )

Trafigura Funding S.A.

21, rue du Puits Romain
L-8070 Bertrange

---

### ASSETS

| | Reference(s) | Current year | Previous year |
|---|---|---|---|
| **A. Subscribed capital unpaid** | 1101 | 101 | 102 |
| I. Subscribed capital not called | 1103 | 103 | 104 |
| II. Subscribed capital called but unpaid | 1105 | 105 | 106 |
| **B. Formation expenses** | 1107 | 107 | 108 |
| **C. Fixed assets** | 1109 | 109  2.097.418.654,00 | 110  1.174.837.036,91 |
| I. Intangible fixed assets | 1111 | 111 | 112 |
| 1. Research and development costs | 1113 | 113 | 114 |
| 2. Concessions, patents, licences, trade marks and similar rights and assets, if they were | 1115 | 115 | 116 |
| a) acquired for valuable consideration and need not be shown under C.I.3 | 1117 | 117 | 118 |
| b) created by the undertaking itself | 1119 | 119 | 120 |
| 3. Goodwill, to the extent that it was acquired for valuable consideration | 1121 | 121 | 122 |
| 4. Payments on account and intangible fixed assets under development | 1123 | 123 | 124 |
| II. Tangible fixed assets | 1125 | 125 | 126 |
| 1. Land and buildings | 1127 | 127 | 128 |
| 2. Plant and machinery | 1129 | 129 | 130 |

---

The notes in the annex form an integral part of the annual accounts

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | | Reference(s) | Current year | Previous year |
|---|---|---|---|---|
| | 3. Other fixtures and fittings, tools and equipment | 1131 _____ | 131 _____ | 132 _____ |
| | 4. Payments on account and tangible fixed assets under development | 1133 _____ | 133 _____ | 134 _____ |
| III. | Financial fixed assets | 1135 _____ 3 | 135 2.097.418.654,00 | 136 1.174.837.036,91 |
| | 1. Shares in affiliated undertakings | 1137 _____ | 137 _____ | 138 _____ |
| | 2. Amounts owed by affiliated undertakings | 1139 _____ | 139 2.097.418.654,00 | 140 1.174.837.036,91 |
| | 3. Shares in undertakings with which the undertaking is linked by virtue of participating interests | 1141 _____ | 141 _____ | 142 _____ |
| | 4. Amounts owed by undertakings with which the undertaking is linked by virtue of participating interests | 1143 _____ | 143 _____ | 144 _____ |
| | 5. Securities and other financial instruments held as fixed assets | 1145 _____ | 145 _____ | 146 _____ |
| | 6. Loans and claims held as fixed assets | 1147 _____ | 147 _____ | 148 _____ |
| | 7. Own shares or own corporate units | 1149 _____ | 149 _____ | 150 _____ |
| **D. Current assets** | | 1151 _____ | 151 99.613.562,00 | 152 38.785.666,74 |
| I. | Inventories | 1153 _____ | 153 _____ | 154 _____ |
| | 1. Raw materials and consumables | 1155 _____ | 155 _____ | 156 _____ |
| | 2. Work and contracts in progress | 1157 _____ | 157 _____ | 158 _____ |
| | 3. Finished goods and merchandise | 1159 _____ | 159 _____ | 160 _____ |
| | 4. Payments on account | 1161 _____ | 161 _____ | 162 _____ |
| II. | Debtors | 1163 _____ 4 | 163 99.056.462,00 | 164 38.185.052,97 |
| | 1. Trade receivables | 1165 _____ | 165 _____ | 166 _____ |
| | a) becoming due and payable within one year | 1167 _____ | 167 _____ | 168 _____ |
| | b) becoming due and payable after more than one year | 1169 _____ | 169 _____ | 170 _____ |
| | 2. Amounts owed by affiliated undertakings | 1171 _____ | 171 99.018.251,00 | 172 38.144.518,56 |
| | a) becoming due and payable within one year | 1173 _____ | 173 99.018.251,00 | 174 38.144.518,56 |
| | b) becoming due and payable after more than one year | 1175 _____ | 175 _____ | 176 _____ |
| | 3. Amounts owed by undertakings with which the undertaking is linked by virtue of participating interests | 1177 _____ | 177 _____ | 178 _____ |
| | a) becoming due and payable within one year | 1179 _____ | 179 _____ | 180 _____ |
| | b) becoming due and payable after more than one year | 1181 _____ | 181 _____ | 182 _____ |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

|  | Reference(s) | Current year | Previous year |
|---|---|---|---|
| 4.  Other receivables | 1183 | 183  38.211,00 | 184  40.534,41 |
| a)  becoming due and payable within one year | 1185 | 185  38.211,00 | 186  40.534,41 |
| b)  becoming due and payable after more than one year | 1187 | 187 | 188 |
| III.  Transferable securities and other financial instruments | 1189 | 189 | 190 |
| 1.  Shares in affiliated undertakings and in undertakings with which the undertaking is linked by of participating interests | 1191 | 191 | 192 |
| 2.  Own shares or own corporate units | 1193 | 193 | 194 |
| 3.  Other transferable securities and other financial instruments | 1195 | 195 | 196 |
| IV.  Cash at bank, cash in postal cheque accounts, cheques and cash in hand | 1197  5 | 197  557.100,00 | 198  600.613,77 |
| **E.  Prepayments** | 1199 | 199 | 200 |
| **TOTAL (ASSETS)** | 201  2.197.032.216,00 | 202  1.213.622.703,65 | |

| The notes in the annex form an integral part of the annual accounts |
|---|

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

---

## LIABILITIES

| | Reference(s) | Current year | Previous year |
|---|---|---|---|
| **A. Capital and reserves** | 1301    6 | 301    5.064.028,00 | 302    3.738.397,34 |
| I.   Subscribed capital | 1303 | 303    2.840.610,00 | 304    2.840.610,00 |
| II.   Share premium and similar premiums | 1305 | 305 | 306 |
| III.   Revaluation reserves | 1307 | 307 | 308 |
| IV.   Reserves | 1309 | 309    44.889,00 | 310    5.799,28 |
|    1.   Legal reserve | 1311 | 311    44.889,00 | 312    5.799,28 |
|    2.   Reserve for own shares or own corporate units | 1313 | 313 | 314 |
|    3.   Reserves provided for by the articles of association | 1315 | 315 | 316 |
|    4.   Other reserves | 1317 | 317 | 318 |
| V.   Profit or loss brought forward | 1319 | 319    852.898,00 | 320    110.186,42 |
| VI.   Profit or loss for the financial year | 1321 | 321    1.325.631,00 | 322    781.801,64 |
| VII.   Interim dividends | 1323 | 323 | 324 |
| VIII.   Capital investment subsidies | 1325 | 325 | 326 |
| IX.   Temporarily not taxable capital gains | 1327 | 327 | 328 |
| **B. Subordinated debts** | 1329 | 329 | 330 |
|    1.   Convertible loans | 1413 | 413 | 414 |
|      a)   becoming due and payable within one year | 1415 | 415 | 416 |
|      b)   becoming due and payable after more than one year | 1417 | 417 | 418 |
|    2.   Non convertible loans | 1419 | 419 | 420 |
|      a)   becoming due and payable within one year | 1421 | 421 | 422 |
|      b)   becoming due and payable after more than one year | 1423 | 423 | 424 |
| **C. Provisions** | 1331    7 | 331    908.174,00 | 332    431.035,15 |
|    1.   Provisions for pensions and similar obligations | 1333 | 333 | 334 |
|    2.   Provisions for taxation | 1335 | 335    886.950,00 | 336    356.442,74 |
|    3.   Other provisions | 1337 | 337    21.224,00 | 338    74.592,41 |
| **D. Non subordinated debts** | 1339 | 339    2.191.060.014,00 | 340    1.209.453.271,16 |
|    1.   Debenture loans | 1341 | 341 | 342 |
|      a)   Convertible loans | 1343 | 343 | 344 |
|        i)   becoming due and payable within one year | 1345 | 345 | 346 |
|        ii)   becoming due and payable after more than one year | 1347 | 347 | 348 |

---

The notes in the annex form an integral part of the annual accounts

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

|  | | Reference(s) | | Current year | | Previous year |
|---|---|---|---|---|---|---|
| b) Non convertible loans | 1349 | | 349 | | 350 | |
| i) becoming due and payable within one year | 1351 | | 351 | | 352 | |
| ii) becoming due and payable after more than one year | 1353 | | 353 | | 354 | |
| 2. Amounts owed to credit institutions | 1355 | | 355 | 2.191.060.014,00 | 356 | 1.209.453.271,16 |
| a) becoming due and payable within one year | 1357 | | 357 | 101.438.562,00 | 358 | 39.374.985,58 |
| b) becoming due and payable after more than one year | 1359 | | 359 | 2.089.621.452,00 | 360 | 1.170.078.285,58 |
| 3. Payments received on account of orders as far as they are not deducted distinctly from inventories | 1361 | | 361 | | 362 | |
| a) becoming due and payable within one year | 1363 | | 363 | | 364 | |
| b) becoming due and payable after more than one year | 1365 | | 365 | | 366 | |
| 4. Trade creditors | 1367 | | 367 | | 368 | |
| a) becoming due and payable within one year | 1369 | | 369 | | 370 | |
| b) becoming due and payable after more than one year | 1371 | | 371 | | 372 | |
| 5. Bills of exchange payable | 1373 | | 373 | | 374 | |
| a) becoming due and payable within one year | 1375 | | 375 | | 376 | |
| b) becoming due and payable after more than one year | 1377 | | 377 | | 378 | |
| 6. Amounts owed to affiliated undertakings | 1379 | | 379 | | 380 | |
| a) becoming due and payable within one year | 1381 | | 381 | | 382 | |
| b) becoming due and payable after more than one year | 1383 | | 383 | | 384 | |
| 7. Amounts owed to undertakings with which the undertaking is linked by virtue of participating interests | 1385 | | 385 | | 386 | |
| a) becoming due and payable within one year | 1387 | | 387 | | 388 | |
| b) becoming due and payable after more than one year | 1389 | | 389 | | 390 | |
| 8. Tax and social security debts | 1391 | | 391 | | 392 | |
| a) Tax debts | 1393 | | 393 | | 394 | |
| b) Social security debts | 1395 | | 395 | | 396 | |

| The notes in the annex form an integral part of the annual accounts |
|---|

Case 1:22-cv-00366-GBW   Document 25-3   Filed 10/28/24   Page 78 of 120 PageID #: ...

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

|  | Reference(s) | Current year | Previous year |
|---|---|---|---|
| 9.  Other creditors | 1397 _____ | 397 _____ | 398 _____ |
|    a)  becoming due and payable within one year | 1399 _____ | 399 _____ | 400 _____ |
|    b)  becoming due and payable after more than one year | 1401 _____ | 401 _____ | 402 _____ |
| **E.  Deferred income** | 1403 _____ | 403 _____ | 404 _____ |
| **TOTAL (LIABILITIES)** | | 405 ___ 2.197.032.216,00 | 406 ___ 1.213.622.703,65 |

The notes in the annex form an integral part of the annual accounts

**Document émis électroniquement**

Registre de Commerce et des Sociétés
Numéro RCS : B173718
Référence de dépôt : L160094412
Déposé le 03/06/2016

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## PROFIT AND LOSS ACCOUNT

**Financial year from** 01 _01/10/2014_ **to** 02 _30/09/2015_ (in 03 _USD_ )

Trafigura Funding S.A.

21, rue du Puits Romain
L-8070 Bertrange

## A. CHARGES

| | Reference(s) | Current year | Previous year |
|---|---|---|---|
| 1. Use of merchandise, raw materials and consumable materials | 1601 _____ | 601 _____ | 602 _____ |
| 2. Other external charges | 1603 _____ | 603 _____ | 604 _____ |
| 3. Staff costs | 1605 _____ | 605 _____ | 606 _____ |
|    a) Salaries and wages | 1607 _____ | 607 _____ | 608 _____ |
|    b) Social security on salaries and wages | 1609 _____ | 609 _____ | 610 _____ |
|    c) Supplementary pension costs | 1611 _____ | 611 _____ | 612 _____ |
|    d) Other social costs | 1613 _____ | 613 _____ | 614 _____ |
| 4. Value adjustments | 1615 _____ | 615 _____ | 616 _____ |
|    a) on formation expenses and on tangible and intangible fixed assets | 1617 _____ | 617 _____ | 618 _____ |
|    b) on current assets | 1619 _____ | 619 _____ | 620 _____ |
| 5. Other operating charges | 1621 _____ 9 | 621 _100.732,00_ | 622 _365.405,20_ |
| 6. Value adjustments and fair value adjustments on financial fixed assets | 1623 _____ | 623 _____ | 624 _____ |
| 7. Value adjustments and fair value adjustments on financial current assets. Loss on disposal of transferable securities | 1625 _____ | 625 _____ | 626 _____ |
| 8. Interest and other financial charges | 1627 _____ | 627 _75.646.551,00_ | 628 _58.463.959,78_ |
|    a) concerning affiliated undertakings | 1629 _____ | 629 _____ | 630 _____ |
|    b) other interest and similar financial charges | 1631 _____ 10 | 631 _75.646.551,00_ | 632 _58.463.959,78_ |

| The notes in the annex form an integral part of the annual accounts |
|---|

Case 1:22-cv-00366-GBW   Document 25-3   Filed 10/28/24   Page 80 of 120   PageID #: ...

**Document émis électroniquement**

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | Reference(s) | Current year | Previous year |
|---|---|---|---|
| **9. Share of losses of undertakings accounted for under the equity method** | 1649 _____ | 649 _____ | 650 _____ |
| **10. Extraordinary charges** | 1633 _____ | 633 _____ | 634 _____ |
| **11. Income tax** | 1635 _____ | 635  527.799,00 | 636  321.958,89 |
| **12. Other taxes not included in the previous caption** | 1637 _____ | 637 _____ | 638 _____ |
| **13. Profit for the financial year** | 1639 _____ | 639  1.325.631,00 | 640  781.801,64 |
| **TOTAL CHARGES** | | 641  77.600.713,00 | 642  59.933.125,51 |

| The notes in the annex form an integral part of the annual accounts |
|---|

Document émis électroniquement

| RCSL Nr. : B173718 | Matricule : 2012 2223 818 |
|---|---|

## B. INCOME

|  | | Reference(s) | | Current year | | Previous year |
|---|---|---|---|---|---|---|
| 1. Net turnover | 1701 | _____ | 701 | _____ | 702 | _____ |
| 2. Change in inventories of finished goods and of work and contracts in progress | 1703 | _____ | 703 | _____ | 704 | _____ |
| 3. Fixed assets under development | 1705 | _____ | 705 | _____ | 706 | _____ |
| 4. Reversal of value adjustments | 1707 | _____ | 707 | _____ | 708 | _____ |
| a) on formation expenses and on tangible and intangible fixed assets | 1709 | _____ | 709 | _____ | 710 | _____ |
| b) on current assets | 1711 | _____ | 711 | _____ | 712 | _____ |
| 5. Other operating income | 1713 | _____ | 713 | _____ | 714 | _____ |
| 6. Income from financial fixed assets | 1715 | _____ | 715 | 77.600.713,00 | 716 | 59.933.125,51 |
| a) derived from affiliated undertakings | 1717 | _____ | 717 | 77.600.713,00 | 718 | 59.933.125,51 |
| b) other income from participating interests | 1719 | _____ | 719 | _____ | 720 | _____ |
| 7. Income from financial current assets | 1721 | _____ | 721 | _____ | 722 | _____ |
| a) derived from affiliated undertakings | 1723 | _____ | 723 | _____ | 724 | _____ |
| b) other income from financial current assets | 1725 | _____ | 725 | _____ | 726 | _____ |
| 8. Other interest and other financial income | 1727 | _____ | 727 | _____ | 728 | _____ |
| a) derived from affiliated undertakings | 1729 | _____ | 729 | _____ | 730 | _____ |
| b) other interest and similar financial income | 1731 | _____ | 731 | _____ | 732 | _____ |
| 9. Share of profits of undertakings accounted for under the equity method | 1745 | _____ | 745 | _____ | 746 | _____ |
| 10. Extraordinary income | 1733 | _____ | 733 | _____ | 734 | _____ |
| 13. Loss for the financial year | 1735 | _____ | 735 | 0,00 | 736 | 0,00 |
| TOTAL INCOME | | | 737 | 77.600.713,00 | 738 | 59.933.125,51 |

| The notes in the annex form an integral part of the annual accounts |
|---|

Document émis électroniquement

Registre de Commerce et des Sociétés
Numéro RCS : B173718
Référence de dépôt : L160094412
Déposé le 03/06/2016

## Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

**1        Corporate information**

Trafigura Funding S.A. (the "Company") is a public limited liability company which was incorporated on December 13, 2012 within the definition of the Luxembourg Law of August 10, 1915, as amended, on commercial companies for an unlimited period of time.

The principal activity of the Company is to operate as a financing company for Trafigura Group, raising funds through bond issuances, loans and other facilities and on turn lending the so raised funds to the companies belonging to the Group.

The Company is a wholly-owned subsidiary of Trafigura Group Pte. Ltd., having its registered office at 10 Collyer Quay, #29-00 Ocean Financial Centre, Singapore 049315 and registered with the Singapore commercial register under number 201017488D.

The registered office of the Company was located at 7, rue Robert Stümper, L-2557, Luxembourg upto 21 May 2015. Effective 21 May 2015, the Company's registered office was transferred to 39, rue du Puits Romain, L-8070 Bertrange, Luxembourg.

The financial statements of the Company for the financial year ended 30 September 2015 were authorised for issue in accordance with a resolution of the Directors on 28 January 2016.

The Company's financial information is included into the consolidated financial statements of its indirect holding company, Trafigura Beheer B.V., a company incorporated in The Netherlands, which prepares consolidated financial statements for public use. The registered address of Trafigura Beheer B.V. is located at ITO Tower, 20th floor, Gustav Mahlerplein 102, 1082 MA Amsterdam, the Netherlands.

Farringford NV, registered in Curaçao, is the ultimate parent company of the Company.

**2        Summary of significant accounting policies**

**2.1        Basis of preparation**

The financial statements of the Company have been prepared in accordance with Luxembourg legal and regulatory requirements under the historical cost convention.

Accounting policies and valuation rules set out below are, besides the ones laid down by the Law of 19 December 2002, as amended, determined and applied by the Board of Directors.

Certain reclassifications have been made to the prior year presentation to conform to that of the current year. Changes on the classification of the balance sheet and of the profit and loss account have been made to increase the clarity of the presentation.

**2.2        Significant accounting policies**

**Foreign currency translation**

The Company maintains its accounting records in United States Dollar (USD) and the annual accounts are prepared in this currency.  The transactions made in another currency than USD are translated into USD at the exchange rate prevailing at the transaction date.

*As at year-end:*

-        Financial fixed assets expressed in another currency than USD unless hedged have been translated at the exchange rate applicable as at year-end;
-        Cash at bank is valued at the exchange rate applicable as at year-end of the annual accounts. Consequently realized and unrealized losses and realized gains are taken into account in the profit and loss account;

## Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

- All other current assets and liabilities expressed in another currency than USD are valued individually respectively at the lower or at the higher of the value determined using the historical exchange rate or the value determined using the exchange rate prevailing at the balance sheet date. The realized and unrealized exchange losses are recorded in the profit and loss account. The unrealised exchange gains are recorded in the profit and loss account at the moment of their realisation.

Income and expenses expressed in currencies other than USD are converted at the exchange rate applicable at the date of the transaction.

### Debtors

The debtors are valued at their nominal value. They are subject to value adjustments where their recovery is compromised. These value adjustments are not continued if the reasons for which the value adjustments were made have ceased to apply.

### Non subordinated debts

Debts are recorded at their reimbursement value. Where the amount repayable on account is greater than the amount received, the difference is written off over the period of the debt based on a linear method.

### Provisions

Provisions are intended to cover losses or debts, the nature of which is clearly defined and which, at the date of the balance sheet, are either likely to be incurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

Provisions may also be created to cover charges which originate in the financial year under review or in a previous financial year, the nature of which is clearly defined and which at the date of the balance sheet are either likely to be incurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

### Financial assets

Financial assets are valued individually at the lower of their acquisition cost or their value estimated by the Board of Directors without netting-off unrealized gains and losses. The Board of Directors relies on the financial statements of the companies and/or other information and documents available for its valuation.

Loans, defined as financial assets, are stated at their nominal value.

A value adjustment is recorded at the end of each year in case the recoverable value is estimated to be lower than the nominal value, or in case the diminution in value is considered as permanent by the Board of Directors.

### Prepayments

This asset item includes expenditures relating to subsequent financial years.

### Interest income

Interest income on loans given is recognized on an accrual basis.

### Interest expense

Interest expense on loans borrowed is recognized on an accrual basis.

**Document émis électroniquement**

## Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

**3      Financial assets**

|  | 2015 | 2014 |
|---|---|---|
|  | USD | USD |
| Loans to Trafigura Pte Ltd | 2,097,418,654 | 1,174,837,037 |
| **Total** | **2,097,418,654** | **1,174,837,037** |

These loans receivable bear interest at a fixed/floating rate plus a margin agreed between the parties. Terms and conditions of loans per 30 September 2015 were as follows:

| Currency | Principal | Interest rate* | Maturity | Floating/ Fixed rate debt | 1-5 years USD | > 5 years USD | Total USD |
|---|---|---|---|---|---|---|---|
| Loans to Trafigura Pte Ltd | | | | | | | |
| USD | 36,000,000 | 4.49% | 2018-March | Fixed | 36,000,000 | - | **36,000,000** |
| USD | 51,500,000 | 5.00% | 2020 - March | Fixed | 51,500,000 | - | **51,500,000** |
| USD | 57,500,000 | 5.64% | 2023-March | Fixed | - | 57,500,000 | **57,500,000** |
| USD | 88,000,000 | 6.70% | 2018-April | Fixed | 88,000,000 | - | **88,000,000** |
| USD | 98,000,000 | 7.31% | 2021-April | Fixed | - | 98,000,000 | **98,000,000** |
| JPY | 25,500,000,000 | Libor + 1.70% | 2017-March | Floating | 212,712,712 | - | **212,712,712** |
| USD | 257,072,000 | 7.23% | 2020 - July | Fixed | 257,072,000 | - | **257,072,000** |
| EUR | 550,000,000 | 5.20% | 2020 - April | Fixed | 614,735,000 | - | **614,735,000** |
| EUR | 606,686,000 | 5.37% | 2018 - November | Fixed | 681,898,942 | - | **681,898,942** |
| **Total** | | | | | **1,941,918,654** | **155,500,000** | **2,097,418,654** |

*The loan setup fees/costs have been agreed to be recovered from the lender, to this extent, the actual effective interest rates charged may vary.

**4      Debtors**

|  | 2015 | 2014 |
|---|---|---|
|  | USD | USD |
| Amounts owed by affiliated undertakings | 55,018,251 | 38,144,519 |
| Short term portion of loans receivable | 44,000,000 | - |
| Other receivables | 38,211 | 40,534 |
| **Total** | **99,056,462** | **38,185,053** |

**Document émis électroniquement**

# Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

Affiliated undertakings represent associated companies, major shareholders, directors and key management personnel of the Company, and companies of which they are principal owners. Pricing policies and terms of these transactions are approved by the Company's management.

Other receivables majorly relate to amounts receivables from local VAT authorities.

Below is the break-up of Short term portion of loans receivable.

| Principal | | Interest rate* | Maturity | Floating/<br>Fixed rate<br>debt | Total<br>USD |
|---|---|---|---|---|---|
| Short term portion of loans receivable from Trafigura Pte. Ltd. | | | | | |
| USD | 44,000,000 | 6.00% | 2016-April | Fixed | 44,000,000 |
| **Total** | | | | | **44,000,000** |

*The loan setup fees/costs have been agreed to be recovered from the lender, to this extent, the actual effective interest rates charged may vary.

### 5    Cash at bank and in Hand

Cash and cash equivalents comprise the following balance sheet amounts:

| | 2015<br>USD | 2014<br>USD |
|---|---|---|
| Cash at bank | 557,100 | 600,614 |
| **Total** | **557,100** | **600,614** |

### 6    Share capital & Reserves

| | Share capital<br>USD | Retained Earnings<br>USD | Legal Reserve<br>USD | Profit /<br>(Loss) for<br>the year<br>USD | Total<br>Shareholder's<br>equity<br>USD |
|---|---|---|---|---|---|
| Balance at 30 September 2014 | 2,840,610 | 110,186 | 5,799 | 781,802 | 3,738,397 |
| Transfer of prior year results | - | 781,802 | - | (781,802) | - |
| Net profit for the financial year | - | - | - | 1,325,631 | 1,325,631 |
| Appropriation to legal reserve | - | (39,090) | 39,090 | - | - |
| **Balance at 30 September 2015** | **2,840,610** | **852,898** | **44,889** | **1,325,631** | **5,064,028** |

The company was incorporated on 13 December 2012 with an issued capital of EUR 31,000 represented by 31,000 shares of a nominal value of EUR 1 each.

**Document émis électroniquement**

## Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

On 30 May 2013 the sole Shareholder decided to convert the Company share capital from Euro to US Dollars at the fixed rate of USD 1.31 and issued additional 2,800,000 shares with a par value of USD 1 each.

As at 30 September 2015 the subscribed and fully paid up capital amounting to USD 2,840,610 is represented by 2,840,610 shares of a nominal value of USD 1 each. The issued and fully paid up share capital of USD 2,840,610 is fully owned by Trafigura Group Pte. Ltd.

**Legal Reserve**

In accordance with the Luxembourg Law of August 10, 1915, as amended, on commercial companies, the Company is required to transfer a minimum of 5% of its annual net income to a legal reserve. This requirement ceases to be necessary once the balance of the legal reserve reaches 10% of the issued share capital. The legal reserve is not available for distribution to the sole Shareholder.

### 7        Provisions

|  | 2015 USD | 2014 USD |
|---|---|---|
| Provisions for taxation | 886,950 | 356,443 |
| Other provisions and accruals | 21,224 | 74,592 |
| **Total** | **908,174** | **431,035** |

Other provisions include accruals for audit fees and tax advice.

The Company is fully taxable at an effective corporation tax rate of 29.20 % amounting to USD 527,799. It is also subject to a net wealth tax amounting to 0.5% based on the net asset value of the Company at the beginning of the calendar year.

### 8        Non subordinated debts

This note provides information about the contractual terms of the interest bearing loans and borrowings which are measured at amortised cost.

| Carrying value of loans and borrowings | 2015 USD | 2014 USD |
|---|---|---|
| Non-Current |  |  |
| Private placements | 330,318,367 | 144,490,136 |
| Euro Medium term notes | 1,290,386,526 | 769,044,066 |
| Other loans | 468,916,559 | 256,544,084 |
|  | 2,089,621,452 | 1,170,078,286 |
| Becoming due and payable after less than one year |  |  |
| Accrued interest expenses on loans and borrowings | 57,514,313 | 39,374,986 |
| Short term part of above loans | 43,924,248 | * |
|  | 101,438,562 | 39,374,986 |
| **Total** | **2,191,060,014** | **1,209,453,272** |

## Trafigura Funding S.A.

### Notes to the financial statements
### 30 September 2015

Terms and conditions of outstanding loans per 30 September 2015 were as follows:

| | 2015 Principal | Interest rate | Maturity | Floating / Fixed rate | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|
| Private placements | | | | | | | |
| USD | 36,000,000 | 4.38% | 2018-March | Fixed | 35,909,564 | - | 35,909,564 |
| USD | 51,500,000 | 4.89% | 2020-March | Fixed | 51,370,626 | - | 51,370,626 |
| USD | 57,500,000 | 5.53% | 2023-March | Fixed | | 57,358,399 | 57,358,399 |
| USD | 88,000,000 | 6.50% | 2018-April | Fixed | 87,848,497 | - | 87,848,497 |
| USD | 98,000,000 | 7.11% | 2021-April | Fixed | - | 97,831,281 | 97,831,281 |
| | Euro Medium term notes | | | | | | |
| EUR | 606,686,000 | 5.25% | 2018 - November | Fixed | 679,141,489 | - | 679,141,489 |
| EUR | 550,000,000 | 5.00% | 2020 - April | Fixed | 611,245,037 | - | 611,245,037 |
| Other loans | | | | | | | |
| EUR | 200,000,000 | 5.50% | 2020-July | Fixed | 256,635,392 | - | 256,635,392 |
| JPY | 25,500,000,000 | Libor + 1.50% | 2017-March | Floating | 212,281,167 | | 212,281,167 |
| **Total** | | | | | **1,934,431,772** | **155,189,680** | **2,089,621,452** |

The Company was in compliance with all its corporate and financial covenants as at 30 September 2015.

Refer below the break-up of Short term part of loans and borrowings:

| | 2015 Principal | Interest rate | Maturity | Floating/ Fixed rate | <1 year USD |
|---|---|---|---|---|---|
| Private placements | | | | | |
| USD | 44,000,000 | 5.80% | 2016-April | Fixed | 43,924,248 |
| **Total** | | | | | **43,924,248** |

### 9    Other operating charges

| | 2015 USD | 2014 USD |
|---|---|---|
| Legal and professional fees | 33,295 | 327,863 |
| Bank charges | 11,839 | 10,747 |
| Foreign exchange loss | 55,600 | 26,795 |
| **Total** | **100,734** | **365,405** |

# Trafigura Funding S.A.

## Notes to the financial statements
## 30 September 2015

**10      Interest expense and similar charges**

|  | 2015 USD | 2014 USD |
|---|---|---|
| Interest expense on loans and borrowings | 74,104,423 | 57,598,052 |
| Set up fees amortization | 1,542,128 | 865,908 |
| **Total** | **75,646,551** | **58,463,960** |

**11      Off-balance sheet commitments**

The Company has borrowed money from external counterparties in EUR and lent money to affiliated companies in USD. To hedge the foreign currency exposure arising from these transactions, the Company enters into foreign currency swaps. Given the hedge relationship, the loans are not revalued and the foreign currency swaps are not separately recognised on the balance sheet or in the profit and loss until the hedged coupon or principal transactions occur, at which point the fair value gains or losses on the off balance sheet foreign currency swaps are recognised in the profit and loss account.

The Company together with the other subsidiaries of Trafigura Beheer B.V. is a guarantor in a USD 5.3 billion revolving credit facility with a maturity date of 30 March 2018. The outstanding amount as on 30 September 2015 was USD 3.2 billion and was drawn by other subsidiaries of Trafigura Beheer B.V.

**12      Employees' benefits**

The Company did not employ any personnel during the year.

**13      Subsequent events**

There are no material events that have occurred after the balance sheet date that require disclosure.

Document émis électroniquement

Trafigura Funding S.A.
*Société anonyme*
21, rue du Puits Romain, L-8070 Bertrange
R.C.S. Luxembourg : B173718

**Allocation of the result :**

The profit for the financial year ended September 30, 2015 amounting to USD 1,325,631.00 will be allocated as follows:

| | | |
|---|---|---|
| Profit for the financial year | USD | 1,325,631.00 |
| Allocation to the legal reserve | USD | (66,281.55) |
| Results brought forward | USD | 1,259,349.45 |

# EXHIBIT 29

**Registre de Commerce et des Sociétés**

Numéro RCS : B173718

Référence de dépôt : L220020031

Déposé et enregistré le 31/01/2022

GEWSFIP20220128T08184001_002

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|
| | eCDF entry date :        28/01/2022 |

## BALANCE SHEET

**Financial year from** 01 _01/10/2020_ **to** 02 _30/09/2021_ *(in* 03 _USD_ *)*

Trafigura Funding S.A.

21, rue du Puits Romain
L-8070 Bertrange

| ASSETS |
|---|

| | | Reference(s) | | Current year | | Previous year |
|---|---|---|---|---|---|---|
| **A.** | **Subscribed capital unpaid** | 1101 | 101 | | 102 | |
| I. | Subscribed capital not called | 1103 | 103 | | 104 | |
| II. | Subscribed capital called but unpaid | 1105 | 105 | | 106 | |
| **B.** | **Formation expenses** | 1107 | 107 | | 108 | |
| **C.** | **Fixed assets** | 1109 | 109 | 3.164.115.682,00 | 110 | 2.250.989.469,00 |
| I. | Intangible assets | 1111 | 111 | | 112 | |
| | 1. Costs of development | 1113 | 113 | | 114 | |
| | 2. Concessions, patents, licences, trade marks and similar rights and assets, if they were | 1115 | 115 | | 116 | |
| |    a) acquired for valuable consideration and need not be shown under C.I.3 | 1117 | 117 | | 118 | |
| |    b) created by the undertaking itself | 1119 | 119 | | 120 | |
| | 3. Goodwill, to the extent that it was acquired for valuable consideration | 1121 | 121 | | 122 | |
| | 4. Payments on account and intangible assets under development | 1123 | 123 | | 124 | |
| II. | Tangible assets | 1125 | 125 | | 126 | |
| | 1. Land and buildings | 1127 | 127 | | 128 | |
| | 2. Plant and machinery | 1129 | 129 | | 130 | |

| The notes in the annex form an integral part of the annual accounts |
|---|

GEWSFIP20220128T08184001_002

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | | Reference(s) | Current year | Previous year |
|---|---|---|---|---|
| | 3. Other fixtures and fittings, tools and equipment | 1131 _____ | 131 _____ | 132 _____ |
| | 4. Payments on account and tangible assets in the course of construction | 1133 _____ | 133 _____ | 134 _____ |
| III. | Financial assets | 1135 _____ | 135  3.164.115.682,00 | 136  2.250.989.469,00 |
| | 1. Shares in affiliated undertakings | 1137 _____ | 137 _____ | 138 _____ |
| | 2. Loans to affiliated undertakings | 1139 _____ 3 | 139  3.164.115.682,00 | 140  2.250.989.469,00 |
| | 3. Participating interests | 1141 _____ | 141 _____ | 142 _____ |
| | 4. Loans to undertakings with which the undertaking is linked by virtue of participating interests | 1143 _____ | 143 _____ | 144 _____ |
| | 5. Investments held as fixed assets | 1145 _____ | 145 _____ | 146 _____ |
| | 6. Other loans | 1147 _____ | 147 _____ | 148 _____ |
| **D.** | **Current assets** | 1151 _____ | 151  194.960.655,00 | 152  134.608.823,00 |
| I. | Stocks | 1153 _____ | 153 _____ | 154 _____ |
| | 1. Raw materials and consumables | 1155 _____ | 155 _____ | 156 _____ |
| | 2. Work in progress | 1157 _____ | 157 _____ | 158 _____ |
| | 3. Finished goods and goods for resale | 1159 _____ | 159 _____ | 160 _____ |
| | 4. Payments on account | 1161 _____ | 161 _____ | 162 _____ |
| II. | Debtors | 1163 _____ 4 | 163  193.371.869,00 | 164  133.521.325,00 |
| | 1. Trade debtors | 1165 _____ | 165 _____ | 166 _____ |
| | a) becoming due and payable within one year | 1167 _____ | 167 _____ | 168 _____ |
| | b) becoming due and payable after more than one year | 1169 _____ | 169 _____ | 170 _____ |
| | 2. Amounts owed by affiliated undertakings | 1171 _____ | 171  193.104.571,00 | 172  133.153.213,00 |
| | a) becoming due and payable within one year | 1173 _____ 4 | 173  193.104.571,00 | 174  133.153.213,00 |
| | b) becoming due and payable after more than one year | 1175 _____ | 175 _____ | 176 _____ |
| | 3. Amounts owed by undertakings with which the undertaking is linked by virtue of participating interests | 1177 _____ | 177 _____ | 178 _____ |
| | a) becoming due and payable within one year | 1179 _____ | 179 _____ | 180 _____ |
| | b) becoming due and payable after more than one year | 1181 _____ | 181 _____ | 182 _____ |
| | 4. Other debtors | 1183 _____ | 183  267.298,00 | 184  368.112,00 |
| | a) becoming due and payable within one year | 1185 _____ 4 | 185  267.298,00 | 186  368.112,00 |
| | b) becoming due and payable after more than one year | 1187 _____ | 187 _____ | 188 _____ |

| The notes in the annex form an integral part of the annual accounts |
|---|

GEWSFIP20220128T08184001_002

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

|  | Reference(s) | Current year | Previous year |
|---|---|---|---|
| III.  Investments | 1189 _____ | 189 _____ | 190 _____ |
| 1.  Shares in affiliated undertakings | 1191 _____ | 191 _____ | 192 _____ |
| 2.  Own shares | 1209 _____ | 209 _____ | 210 _____ |
| 3.  Other investments | 1195 _____ | 195 _____ | 196 _____ |
| IV.  Cash at bank and in hand | 1197 _____ | 197 _____1.588.786,00 | 198 _____1.087.498,00 |
| **E.  Prepayments** | 1199 _____ | 199 _____8.612.952,00 | 200 _____7.074.119,00 |
| **TOTAL (ASSETS)** | | 201 ____3.367.689.289,00 | 202 ____2.392.672.411,00 |

The notes in the annex form an integral part of the annual accounts

GEWSFIP20220128T08184001_002

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

## CAPITAL, RESERVES AND LIABILITIES

| | | Reference(s) | | Current year | | Previous year |
|---|---|---|---|---|---|---|
| **A.** | **Capital and reserves** | 1301 | 301 | 11.456.672,00 | 302 | 10.621.527,00 |
| I. | Subscribed capital | 1303 __5__ | 303 | 2.840.610,00 | 304 | 2.840.610,00 |
| II. | Share premium account | 1305 | 305 | | 306 | |
| III. | Revaluation reserve | 1307 | 307 | | 308 | |
| IV. | Reserves | 1309 | 309 | 1.517.305,00 | 310 | 1.230.888,00 |
| | 1. Legal reserve | 1311 __5__ | 311 | 284.061,00 | 312 | 284.061,00 |
| | 2. Reserve for own shares | 1313 | 313 | | 314 | |
| | 3. Reserves provided for by the articles of association | 1315 | 315 | | 316 | |
| | 4. Other reserves, including the fair value reserve | 1429 | 429 | 1.233.244,00 | 430 | 946.827,00 |
| | a) other available reserves | 1431 | 431 | | 432 | |
| | b) other non available reserves | 1433 | 433 | 1.233.244,00 | 434 | 946.827,00 |
| V. | Profit or loss brought forward | 1319 __5__ | 319 | 6.263.612,00 | 320 | 5.868.366,00 |
| VI. | Profit or loss for the financial year | 1321 __5__ | 321 | 835.145,00 | 322 | 681.663,00 |
| VII. | Interim dividends | 1323 | 323 | | 324 | |
| VIII. | Capital investment subsidies | 1325 | 325 | | 326 | |
| **B.** | **Provisions** | 1331 | 331 | | 332 | |
| | 1. Provisions for pensions and similar obligations | 1333 | 333 | | 334 | |
| | 2. Provisions for taxation | 1335 | 335 | | 336 | |
| | 3. Other provisions | 1337 | 337 | | 338 | |
| **C.** | **Creditors** | 1435 | 435 | 3.356.232.617,00 | 436 | 2.382.050.884,00 |
| | 1. Debenture loans | 1437 | 437 | 2.666.987.397,00 | 438 | 1.654.012.434,00 |
| | a) Convertible loans | 1439 | 439 | | 440 | |
| | i) becoming due and payable within one year | 1441 | 441 | | 442 | |
| | ii) becoming due and payable after more than one year | 1443 | 443 | | 444 | |
| | b) Non convertible loans | 1445 __6__ | 445 | 2.666.987.397,00 | 446 | 1.654.012.434,00 |
| | i) becoming due and payable within one year | 1447 | 447 | 192.031.802,00 | 448 | 130.778.106,00 |
| | ii) becoming due and payable after more than one year | 1449 | 449 | 2.474.955.595,00 | 450 | 1.523.234.328,00 |
| | 2. Amounts owed to credit institutions | 1355 __7__ | 355 | 689.211.430,00 | 356 | 727.996.808,00 |
| | a) becoming due and payable within one year | 1357 | 357 | 51.344,00 | 358 | 241.667,00 |
| | b) becoming due and payable after more than one year | 1359 | 359 | 689.160.086,00 | 360 | 727.755.141,00 |

The notes in the annex form an integral part of the annual accounts

GEWSFIP20220128T08184001_002

| RCSL Nr. :  B173718 | Matricule :  2012 2223 818 |
|---|---|

| | Reference(s) | Current year | Previous year |
|---|---|---|---|
| 3. Payments received on account of orders in so far as they are not shown separately as deductions from stocks | 1361 | 361 | 362  41.642,00 |
| a) becoming due and payable within one year | 1363 | 363 | 364  41.642,00 |
| b) becoming due and payable after more than one year | 1365 | 365 | 366 |
| 4. Trade creditors | 1367 | 367  33.173,00 | 368 |
| a) becoming due and payable within one year | 1369 | 369  33.173,00 | 370 |
| b) becoming due and payable after more than one year | 1371 | 371 | 372 |
| 5. Bills of exchange payable | 1373 | 373 | 374 |
| a) becoming due and payable within one year | 1375 | 375 | 376 |
| b) becoming due and payable after more than one year | 1377 | 377 | 378 |
| 6. Amounts owed to affiliated undertakings | 1379 | 379 | 380 |
| a) becoming due and payable within one year | 1381 | 381 | 382 |
| b) becoming due and payable after more than one year | 1383 | 383 | 384 |
| 7. Amounts owed to undertakings with which the undertaking is linked by virtue of participating interests | 1385 | 385 | 386 |
| a) becoming due and payable within one year | 1387 | 387 | 388 |
| b) becoming due and payable after more than one year | 1389 | 389 | 390 |
| 8. Other creditors | 1451 | 451  617,00 | 452 |
| a) Tax authorities | 1393 | 393  617,00 | 394 |
| b) Social security authorities | 1395 | 395 | 396 |
| c) Other creditors | 1397 | 397 | 398 |
| i) becoming due and payable within one year | 1399 | 399 | 400 |
| ii) becoming due and payable after more than one year | 1401 | 401 | 402 |
| **D. Deferred income** | 1403 | 403 | 404 |
| **TOTAL (CAPITAL, RESERVES AND LIABILITIES)** | | 405  3.367.689.289,00 | 406  2.392.672.411,00 |

The notes in the annex form an integral part of the annual accounts

**Registre de Commerce et des Sociétés**
Numéro RCS : B173718
Référence de dépôt : L220020031
Déposé le 31/01/2022

Trafigura Funding S.A.
*Société anonyme*
21, rue du Puits Romain, L-8070 Bertrange
R.C.S. Luxembourg : B173718

**Allocation of the result** :

The profit for the financial year ended September 30, 2021 amounting to USD 835,145.00 will be allocated as follows:

| | | |
|---|---|---|
| Net worth tax reserve | USD | 286,417.00 |
| Results brought forward | USD | 548,728.00 |

**Board of directors:**

Category A directors:

- Mr. Robbert Maas
- Mr. Christophe Salmon

Category B directors:

- Mr. Rémy Cornet
- Mr. François Cottong

☒ **Director's & Audit report**

**Trafigura Funding S.A. (Société Anonyme)**

Annual Accounts as of 30 September 2021

21, rue du Puits Romain,
L-8070 Bertrange,
R.C.S. Luxembourg B 173.718

# Trafigura Funding S.A.

## General Information
## 30 September 2021

**Registration**

R.C.S. Luxembourg B 173.718

**Board of Directors**

Maas, Robbert Alexander
Salmon, Christophe Thierry Marie
Cottong, François (appointed on 21 October 2021)
Collette, Constance (resigned on 21 October 2021)
Cornet Remy
Riley, Edward (until 1 October, 2020)

**Auditors**
PricewaterhouseCoopers, Société Coopérative
2 Rue Gerhard Mercator, B.P. 1443,
L-1014, Luxembourg.

**Registered office**

21, rue du Puits Romain,
L-8070 Bertrange,
Luxembourg

1

# Trafigura Funding S.A.

## Directors Report
## 30 September 2021

**Directors' Report**

The Board of Trafigura Funding S.A. ("the Company") takes pleasure in presenting their annual report together with the annual accounts of the Company for the year ended 30 September 2021.

<u>Overview</u>

Trafigura Funding S.A. is a public limited liability company which was incorporated on 13 December 2012 within the definition of the Luxembourg Law of 10 August 1915, as amended, on commercial companies for an unlimited period of time.

**1. Principal activity**

The principal activity of the Company is to operate as a financing company for Trafigura Group Pte. Ltd. and its subsidiaries ("Trafigura Group"), raising funds through bond issuances, loans and other facilities and on turn lending the so raised funds to the companies belonging to the Group.

**2.   Review of business development and financial position**

<u>Profit and Loss account</u>

Trafigura Funding S.A. generated net income of USD 835,145 in the financial year 2021 (2020: USD 681,663).

<u>Net Results</u>

|  | FY 2021 | FY 2020 |
|---|---|---|
|  | In USD | In USD |
| Interest Income | 117,230,080 | 100,084,823 |
| Interest expense | (116,032,847) | (98,986,354) |
| Other operating expense | (115,109) | (222,888) |
| Tax expense | (246,979) | (193,918) |
| **Net Income** | **835,145** | **681,663** |

The Company has fixed margin on the loans given to the Group companies. Hence, its net income is majorly driven by the loans outstanding and the margin charged.

During the year, the increase in interest expense is because of the issue of USD 500 million bond (USD 400 million of which was issued on 23 September 2020), EMTN bonds of EUR 450 million, private placements of USD 203.5 million and other loans of EUR 110 million partially offset by the repayment of an EMTN for a nominal amount of EUR 550 million, Generali bond of EUR 200 million during the financial year 2020 and private placement of USD 98 million during the financial year 2021. Correspondingly, there is an increase in interest income as well.

<u>Balance sheet</u>

Non-convertible loans have increased by 41%, following the issue of USD 100 million bond (USD 400m of which was issued on 23 September 2020), EMTN bond of EUR 450 million, private placements of USD 203.5 million, other loans for EUR 110 million and commercial papers by USD 152 million partially offset by the repayment of private placement of USD 98 million. This also had a similar impact on the loans granted to the companies belonging to the Group.

**3.   Research and development**

There were no research and development expenses incurred.

**4.   Derivatives instruments**

There were no derivative instruments entered into by the Company during the financial year ended 30 September 2021.

**5.   Acquisition by the Company of his own shares**

The Company has not repurchased any of its own shares during the year and does not hold any own shares at this time.

2

# Trafigura Funding S.A.

## Directors Report
## 30 September 2021

**Branch offices**
The Company does not have any branch offices.

### 6. Subsequent events

There are no significant events subsequent to the balance sheet date that need to be disclosed or need adjustment in the annual accounts.

### 7. Proposal for result appropriation

We propose that you approve the annual accounts as presented to you.

The General meeting of Shareholders will be asked to approve the following appropriation of the 2021 result after tax: a net profit of USD 835,145 to be allocated for an amount of USD 286,417 to the net worth reserve, respectively USD 548,728 to be allocated to the profit or loss brought forward.

### Outlook for FY 2022

The Board of Directors is not expecting any major changes in the business for Trafigura Funding S.A. in near future.

### Corporate governance statement

The sole shareholder of the Company is Trafigura Holdings Pte Ltd., a company incorporated in Singapore, with registered office at 10 Collyer Quay, #29-01/05 Ocean Financial Centre, Singapore 049315 and registered with the Singapore commercial register under number 201539314D.

No holder of any securities has special control rights.

There are no restrictions on voting rights, such as limitations of the voting rights of holders of a given percentage or number of votes, deadlines for exercising voting rights, or systems whereby, with the company's cooperation, the financial rights attached to securities are separated from the holding of securities.

The Board of Directors was appointed at a general meeting of the shareholders for an unlimited period. The Company pays no remuneration to the Directors.

The Board of Directors has the power to represent the Company as set out in the articles of the company. The Directors of the Company are shown on page 1. During the year, effective 1 October 2020, Edward Riley has resigned as Director. Effective 21 October 2021, Constance Collette has resigned as Director and in her place, François Cottong has been appointed Director. Apart from this, there have been no changes in the board during the year and the respective members of the board have considerable experience in the industry as well as extensive experience as Directors within similar enterprises.

The Board of Directors meet regularly in-order to deliberate matters that are of significance to the Company in-order to achieve the objectives of the Company.

The Board of Directors is responsible for establishing and maintaining adequate internal control over financial reporting. The Company's internal control over financial reporting is intended to provide reasonable assurance regarding the reliability of financial reporting and the preparation of the annual accounts.

Future projections and estimates are subject to the risk that controls may become inadequate due to changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

The Board of Directors of the Company assessed the effectiveness of the company's internal controls over financial reporting as of 30 September 2021. Based on this assessment, the Board determined that, as of 30 September 2021, the Company maintained effective internal control over financial reporting.

3

# Trafigura Funding S.A.

## Directors Report
## 30 September 2021

The assessment of the Board of Directors of the Company was aimed at avoiding significant deficiencies or material weaknesses in the structure or functioning of internal controls over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information, and the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

### Business policy as well as risk and capital management strategy

As an indirect subsidiary of Trafigura Group Pte Ltd, the company operates within the framework of Trafigura's Group-wide business strategy.

The Company operates as a financing company for Trafigura Group, i.e. raising funds through external facilities and in turn lending the so raised funds to the companies belonging to the Group. This means that the Company manages its capital and risks on the basis of a framework of risk policies, organisational structures and processes which are standardised throughout the Group, closely aligned with the activities of the corporate divisions, and which incorporate regulatory requirements. Accordingly, all defined risks have been adequately taken into account.

The markets in which the Company operates may be affected by numerous factors, many of which are beyond the Company's control and the exact effect of which cannot be accurately predicted.

In accordance with the Transparency (Directive 2004/109/EC) Regulations 2007, the Directors note that the principal risks and uncertainties facing the Company include the following areas:

- *Interest rate risk*

The Company provides back to back financing only, so that, there is a natural hedge on interest rates. The Board of Directors believes that there is no interest rate risk.

- *Foreign Currency risk*

The Company provides back to back financing only, so that, there is a natural hedge on exchange rates. The Board of Directors believes that there is no foreign currency risk.

- *Credit risk*

The Company has a formalised credit process with credit officers in the key locations around the world. Strict credit limits are set up for each counterparty, on the basis of detailed financial and business analysis. These limits are constantly monitored and revised in light of counterparty or market developments and the amount of exposure relative to the size of the Company's balance sheet. Presently, the Company has loan receivables from only one counterparty i.e. Trafigura Pte. Ltd., which is a part of Trafigura Group.

### Provision of Services and Employees

The Company did not have any employees during the year.

### Auditor of the Company

PricewaterhouseCoopers Société Cooperative was the auditor of the Company for the year ended 30 September 2021.

4

## Trafigura Funding S.A.

Directors Report
30 September 2021

_Policies and Codes_

The purpose of the Group's key policies and procedures is to protect the integrity of the Company and the Group and its decision-making processes. The Group operates policies that are ethical and the key policies are listed below:

_Related Parties_

The Company grants loans to related parties in line with best market practices on an arms-length basis and discloses such arrangements in the notes to the annual accounts.

_Gifts and Public Official_

The Company is committed to conducting business in accordance with applicable laws and regulations that is designed to maintain and enhance the Company's reputation. The Company always strives to behave in a professional, honest and responsible manner and avoids any conduct, which may be considered to be corrupt or contrary to good corporate ethics. Any activity that seeks to bribe, corrupt or otherwise improperly influence a public official or third party in any country, is strictly prohibited by the Trafigura Group.

The Board of Directors

Luxembourg, 25 January 2022

5



**Audit report**

To the Shareholder of
**Trafigura Funding S.A.**

## Report on the audit of the annual accounts

### Our opinion

In our opinion, the accompanying annual accounts give a true and fair view of the financial position of Trafigura Funding S.A. (the "Company") as at 30 September 2021, and of the results of its operations for the year then ended in accordance with Luxembourg legal and regulatory requirements relating to the preparation and presentation of the annual accounts.

Our opinion is consistent with our additional report to the Audit Committee or equivalent.

*What we have audited*

The Company's annual accounts comprise:

- the balance sheet as at 30 September 2021;
- the profit and loss account for the year then ended; and
- the notes to the annual accounts, which include a summary of significant accounting policies.

### Basis for opinion

We conducted our audit in accordance with the EU Regulation No 537/2014, the Law of 23 July 2016 on the audit profession (Law of 23 July 2016) and with International Standards on Auditing (ISAs) as adopted for Luxembourg by the "Commission de Surveillance du Secteur Financier" (CSSF). Our responsibilities under the EU Regulation No 537/2014, the Law of 23 July 2016 and ISAs as adopted for Luxembourg by the CSSF are further described in the "Responsibilities of the "Réviseur d'entreprises agréé" for the audit of the annual accounts" section of our report.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

We are independent of the Company in accordance with the International Code of Ethics for Professional Accountants, including International Independence Standards, issued by the International Ethics Standards Board for Accountants (IESBA Code) as adopted for Luxembourg by the CSSF together with the ethical requirements that are relevant to our audit of the annual accounts. We have fulfilled our other ethical responsibilities under those ethical requirements.

To the best of our knowledge and belief, we declare that we have not provided non-audit services that are prohibited under Article 5(1) of the EU Regulation No 537/2014.

### Key audit matters

Key audit matters are those matters that, in our professional judgment, were of most significance in our audit of the annual accounts of the current period.

*PricewaterhouseCoopers, Société coopérative, 2 rue Gerhard Mercator, B.P. 1443, L-1014 Luxembourg*
*T : +352 494848 1, F : +352 494848 2900, www.pwc.lu*

*Cabinet de révision agréé. Expert-comptable (autorisation gouvernementale n°10028256)*
*R.C.S. Luxembourg B 65 477 - TVA LU25482518*



These matters were addressed in the context of our audit of the annual accounts as a whole, and in forming our opinion thereon, and we do not provide a separate opinion on these matters.

| Key audit matter | How our audit addressed the key audit matter |
|---|---|
| *Credit risk towards affiliated undertakings*<br><br>As disclosed in Notes 3 and 4 to the annual accounts, the Company has granted loans to Trafigura Pte Ltd as at 30 September 2021, which represents 99% of the total assets of the Company.<br><br>As disclosed in Note 11 to the annual accounts, the Company, together with Trafigura Group Pte Ltd and some other subsidiaries of Trafigura Group Pte Ltd, are guarantor of 7.9 billion USD revolving credit facilities in aggregate, with maturity dates ranging from October 2021 to March 2024, which have been granted to two subsidiaries of Trafigura Group Pte Ltd. The amount drawn down as of 30 September 2021 amounted to 5.6 billion USD.<br><br>In preparing the annual accounts, Management has considered that no value adjustment was required on the loans granted to Trafigura Pte Ltd, and that no provision was to be recorded as at 30 September 2021 in relation to the guarantees issued, on the basis of its assessment of the capability of those affiliated undertakings to reimburse their respective credits.<br><br>This assessment requires significant judgement to determine if the affiliated undertakings have the capability to reimburse their respective credits.<br><br>If the estimates or assumptions used would significantly change, the resulting differences could materially affect the amount of financial assets and of the provisions to be recorded for the financial year. | With respect to the credit risk exposure of the Company towards some affiliated undertakings, our procedures included, but were not limited to, the following:<br><br>• We gained an understanding of and evaluated Management's process for the controls over credit risk;<br><br>• We obtained the financial statements of Trafigura Pte Ltd as of 30 September 2021, and considered in particular the amount of cash and cash equivalents, the ratio current assets/current liabilities, the net equity, the cash flow statement and the note on the compliance with applicable covenants, in order to assess its capability to reimburse the loans outstanding as at 30 September 2021.<br><br>Additionally, we put procedures in place to address the fact that no provision has been recorded in relation to the guarantees issued on the revolving credit facilities granted to subsidiaries of Trafigura Group Pte Ltd. These procedures included:<br><br>• The review of the revolving credit facility agreements; and<br><br>• We obtained the financial statements of the subsidiaries of Trafigura Group Pte Ltd as of 30 September 2021, and considered in particular the amount of cash and cash equivalents, the ratio current assets/current liabilities, the net equity, the cash flow statement and the note on the compliance with applicable covenants, in order to assess their capability to reimburse their respective credits. |

7



## Other information

The Board of Directors is responsible for the other information. The other information comprises the information stated in the directors' report and the Corporate Governance Statement but does not include the annual accounts and our audit report thereon.

Our opinion on the annual accounts does not cover the other information and we do not express any form of assurance conclusion thereon.

In connection with our audit of the annual accounts, our responsibility is to read the other information identified above and, in doing so, consider whether the other information is materially inconsistent with the annual accounts or our knowledge obtained in the audit, or otherwise appears to be materially misstated. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

## Responsibilities of the Board of Directors for the annual accounts

The Board of Directors is responsible for the preparation and fair presentation of the annual accounts in accordance with Luxembourg legal and regulatory requirements relating to the preparation and presentation of the annual accounts, and for such internal control as the Board of Directors determines is necessary to enable the preparation of annual accounts that are free from material misstatement, whether due to fraud or error.

In preparing the annual accounts, the Board of Directors is responsible for assessing the Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the Board of Directors either intends to liquidate the Company or to cease operations, or has no realistic alternative but to do so.

## Responsibilities of the "Réviseur d'entreprises agréé" for the audit of the annual accounts

The objectives of our audit are to obtain reasonable assurance about whether the annual accounts as a whole are free from material misstatement, whether due to fraud or error, and to issue an audit report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with the EU Regulation No 537/2014, the Law of 23 July 2016 and with ISAs as adopted for Luxembourg by the CSSF will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these annual accounts.

As part of an audit in accordance with the EU Regulation No 537/2014, the Law of 23 July 2016 and with ISAs as adopted for Luxembourg by the CSSF, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- identify and assess the risks of material misstatement of the annual accounts, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control;

8



- obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control;

- evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by the Board of Directors;

- conclude on the appropriateness of the Board of Directors' use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Company's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our audit report to the related disclosures in the annual accounts or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our audit report. However, future events or conditions may cause the Company to cease to continue as a going concern;

- evaluate the overall presentation, structure and content of the annual accounts, including the disclosures, and whether the annual accounts represent the underlying transactions and events in a manner that achieves fair presentation.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and communicate to them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, actions taken to eliminate threats or safeguards applied.

From the matters communicated with those charged with governance, we determine those matters that were of most significance in the audit of the annual accounts of the current period and are therefore the key audit matters. We describe these matters in our audit report unless law or regulation precludes public disclosure about the matter.

## Report on other legal and regulatory requirements

The directors' report is consistent with the annual accounts and has been prepared in accordance with applicable legal requirements.

The Corporate Governance Statement is included in the directors' report. The information required by Article 68ter Paragraph (1) Letters c) and d) of the Law of 19 December 2002 on the commercial and companies register and on the accounting records and annual accounts of undertakings, as amended, is consistent with the annual accounts and has been prepared in accordance with applicable legal requirements.



We have been appointed as "Réviseur d'Entreprises Agréé" by the General Meeting of the Shareholders on 5 February 2018 and the duration of our uninterrupted engagement, including previous renewals and reappointments, is 4 years.

PricewaterhouseCoopers, Société coopérative
Represented by

Electronically signed by:
Thierry Salagnac

Thierry Salagnac

Luxembourg, 25 January 2022

# Trafigura Funding S.A.

## Notes to the annual accounts
## 30 September 2021

**1      Corporate information**

Trafigura Funding S.A. (the "Company") is a public limited liability company, which was incorporated on 13 December 2012 within the definition of the Luxembourg Law of 10 August 1915, as amended, on commercial companies for an unlimited period of time.

The principal activity of the Company is to operate as a financing company for Trafigura Group Pte. Ltd. and its subsidiaries ("the Group"), raising funds through bond issuances, loans and other facilities and in turn, lending the so raised funds to the companies belonging to the Group.

The registered office of the Company is located at 21, rue du Puits Romain, L-8070 Bertrange, Luxembourg,

The annual accounts of the Company for the financial year ended 30 September 2021 were authorised for issue in accordance with a resolution of the Directors on 25 January 2022.

The Company's financial information is included into the consolidated financial statements of its indirect holding company, Trafigura Group Pte. Ltd., a company incorporated in Singapore, which prepares consolidated financial statements for public use which are available on the site www.trafigura.com.

Farringford Foundation which is established under the laws of Panama, ultimately controls the Company.

**2      Summary of significant accounting policies**

**2.1      Basis of preparation**

The annual accounts of the Company have been prepared in accordance with Luxembourg legal and regulatory requirements under the historical cost convention.

Accounting policies and valuation rules set out below are, besides the ones laid down by the Law of 19 December 2002, as amended, determined and applied by the Board of Directors.

**Going Concern**

The Company assessed the going-concern assumptions during the preparation of the Company's annual accounts. The Company believes that no events or conditions, including those related to the COVID-19 pandemic, give rise to doubt about the ability of the Company to continue to operate in the next reporting period. This conclusion is drawn based on the knowledge of the Company and of the Group, the estimated economic outlook and identified risks and uncertainties in relation thereto. Furthermore, this conclusion is based on review of the current cash balance and expected developments in liquidity and capital both at the level of the Company and at the level of the Group. The Company has sufficient cash and headroom in its credit facilities. Therefore, it expects that it will be able to meet contractual and expected maturities. Consequently, it has been concluded that it is reasonable to apply the going-concern concept as the underlying assumption for the annual accounts.

## Trafigura Funding S.A.

### Notes to the annual accounts
### 30 September 2021

**2**        **Summary of significant accounting policies (continued)**

**2.2**        **Significant accounting policies (continued)**

**Foreign currency translation**

The Company maintains its accounting records in United States Dollar (USD) and the annual accounts are prepared in this currency. The transactions made in another currency than USD are translated into USD at the exchange rate prevailing at the transaction date.

<u>As at year-end:</u>

- Financial fixed assets and the related debenture loans ("back to back financing") expressed in another currency than USD, unless hedged, have been translated at the exchange rate applicable as at year-end;
- Cash at bank is valued at the exchange rate applicable as at year-end of the annual accounts. Consequently, exchange losses and gains are recorded in the profit and loss accounts of the year;
- Other assets and liabilities are converted at the exchange rates effective at the balance sheet. The exchange gains and losses are recorded in the profit and loss account.

**Debtors**

The debtors are valued at their nominal value. They are subject to value adjustments where their recovery is compromised. These value adjustments are not continued if the reasons for which the value adjustments were made have ceased to apply.

**Creditors**

Debts are recorded at their reimbursement value. Where the amount repayable on account is greater than the amount received, the difference is written off over the period of the debt using a linear method.

**Prepayments**

Prepayments includes unamortized set up cost on loans and borrowings.

**Provisions**

Provisions are intended to cover losses or debts, the nature of which is clearly defined and which, at the date of the balance sheet, are either likely to be incurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

Provisions may also be created to cover charges which originate in the financial year under review or in a previous financial year, the nature of which is clearly defined and which at the date of the balance sheet are either likely to be incurred or certain to be incurred but uncertain as to their amount or the date on which they will arise.

Provisions for taxation correspond to the tax liability estimated by the Company and are recorded under the caption "other creditors – tax authorities".

**Financial assets**

Loans, defined as financial assets, are stated at their historical cost.

In the case of durable depreciation in value according to the opinion of the Board of Directors, value adjustments are made in respect of financial fixed assets, so that they are valued at the lower figure to be attributed to them at the balance sheet date. These value adjustments are not continued if the reasons for which the value adjustments were made have ceased to apply.

18

# Trafigura Funding S.A.

## Notes to the annual accounts
## 30 September 2021

**2      Summary of significant accounting policies (continued)**

**2.2      Significant accounting policies (continued)**

**Derivative financial instruments**

The company may enter into derivative such as foreign currency swaps.

Given the hedge relationship, the underlying loans and related debenture loans ("back to back financing") are not revalued and the foreign currency swaps are not separately recognised on the balance sheet or in the profit and loss until the hedged coupon or principal transactions occur, at which point the fair value gains or losses on the off-balance sheet foreign currency swaps are recognised in the profit and loss account.

**Interest income**

Interest income on loans given is recognized on an accrual basis.

**Interest expense**

Interest expense on loans borrowed is recognized on an accrual basis.

**3      Financial assets**

| | FY 2021 | | | FY 2020 | | |
|---|---|---|---|---|---|---|
| | **Non-Current** | **Current** | **Total** | **Non-Current** | **Current** | **Total** |
| | **USD** | **USD** | **USD** | **USD** | **USD** | **USD** |
| **Loans to Trafigura Pte Ltd:** | | | | | | |
| Opening balance | 2,250,989,469 | 107,991,237 | **2,358,980,706** | 1,617,355,073 | 951,217,000 | **2,568,572,073** |
| Additions | 985,931,703 | 452,933,690 | **1,438,865,393** | 716,875,361 | 123,191,237 | **840,066,598** |
| Loan Revaluations | (72,677,863) | - | **(72,677,863)** | 14,759,036 | 6,970,047 | **21,729,083** |
| Deletions | (127,627) | (408,991,211) | **(409,118,838)** | - | (1,071,387,047) | **(1,071,387,047)** |
| Reclassification to short term | | | **-** | (98,000,000) | 98,000,000 | **-** |
| **Closing balance** | **3,164,115,682** | **151,933,716** | **3,316,049,398** | **2,250,989,469** | **107,991,237** | **2,358,980,706** |

These loans receivable bear interest at a fixed/floating rate plus a margin agreed between the parties.

# Trafigura Funding S.A.

## Notes to the annual accounts
## 30 September 2021

Terms and conditions of loans per 30 September 2021 were as follows:

| Currency | Principal | Interest rate | Maturity | Floating/Fixed rate | Less than 1 year | 1-5 years | >5 years | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | USD | USD | USD | USD |
| Loans to Trafigura Pte. Ltd. | | | | | | | | |
| USD | 57,500,000 | 5.58% | Mar-23 | Fixed | - | 57,500,000 | - | 57,500,000 |
| USD | 400,000,000 | 5.30% | Mar-23 | Fixed | - | 400,000,000 | - | 400,000,000 |
| USD | 88,134,000 | 5.25% | Mar-23 | Fixed | - | 85,506,492 | - | 85,506,492 |
| JPY | 67,800,000,000 | Jibor+ 0.95% | Mar-23 | Floating | - | 608,399,138 | - | 608,399,138 |
| CHF | 165,000,000 | 2.30% | May-23 | Fixed | - | 176,640,617 | - | 176,640,617 |
| USD | 53,000,000 | 5.60% | May-23 | Fixed | - | 53,000,000 | - | 53,000,000 |
| EUR | 101,500,000 | 3.55% | Feb-24 | Fixed | - | 117,445,650 | - | 117,445,650 |
| CHF | 55,000,000 | 3.30% | Sep-24 | Fixed | - | 58,880,211 | - | 58,880,211 |
| JPY | 9,000,000,000 | Jibor+ 1.05% | Mar-25 | Floating | - | 80,760,948 | - | 80,760,948 |
| USD | 35,000,000 | 4.06% | Mar-25 | Fixed | - | 35,000,000 | - | 35,000,000 |
| USD | 67,000,000 | 5.77% | May-25 | Fixed | - | 67,000,000 | - | 67,000,000 |
| USD | 500,000,000 | 5.93% | Sep-25 | Fixed | - | 501,952,276 | - | 501,952,276 |
| EUR | 450,000,000 | 3.925% | Feb-26 | Fixed | - | 520,695,000 | - | 520,695,000 |
| EUR | 8,500,000 | 4.05% | Feb-26 | Fixed | - | 9,835,350 | - | 9,835,350 |
| USD | 37,500,000 | 3.92% | Apr-26 | Fixed | - | 37,500,000 | - | 37,500,000 |
| USD | 83,000,000 | 4.22% | Mar-27 | Fixed | - | - | 83,000,000 | 83,000,000 |
| USD | 48,500,000 | 4.46% | Apr-28 | Fixed | - | - | 48,500,000 | 48,500,000 |
| USD | 20,000,000 | 5.91% | May-28 | Fixed | - | - | 20,000,000 | 20,000,000 |
| USD | 85,000,000 | 4.65% | Mar-30 | Fixed | - | - | 85,000,000 | 85,000,000 |
| USD | 117,500,000 | 4.94% | Apr-31 | Fixed | - | - | 117,500,000 | 117,500,000 |
| USD | 152,000,000 | various | Various | Fixed | 151,933,716 | - | - | 151,933,716 |
| **Total** | | | | | 151,933,716 | 2,810,115,682 | 354,000,000 | 3,316,049,398 |

Terms and conditions of loans per 30 September 2020 were as follows:

| Currency | Principal | Interest rate | Maturity | Floating/ Fixed Rate | Less than 1 year | 1-5 years | >5 years | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | USD | USD | USD | USD |
| Loans to Trafigura Pte. Ltd. | | | | | | | | |
| USD | 10,000,000 | 0.74% | Nov-20 | Fixed | 9,991,237 | - | - | 9,991,237 |
| USD | 98,000,000 | 7.16% | Apr-21 | Fixed | 98,000,000 | - | - | 98,000,000 |
| USD | 57,500,000 | 5.58% | Mar-23 | Fixed | - | 57,500,000 | - | 57,500,000 |
| JPY | 67,800,000,000 | Jibor+ 0.95% | Mar-23 | Floating | - | 642,471,335 | - | 642,471,335 |
| USD | 88,134,000 | 5.25% | Mar-23 | Fixed | - | 83,967,235 | - | 83,967,235 |
| USD | 400,000,000 | 5.30% | Mar-23 | Fixed | - | 400,000,000 | - | 400,000,000 |
| USD | 53,000,000 | 5.60% | May-23 | Fixed | - | 53,000,000 | - | 53,000,000 |
| CHF | 165,000,000 | 2.30% | May-23 | Fixed | - | 179,075,320 | - | 179,075,320 |
| CHF | 55,000,000 | 3.30% | Sep-24 | Fixed | - | 59,691,773 | - | 59,691,773 |
| USD | 35,000,000 | 4.06% | Mar-25 | Fixed | - | 35,000,000 | - | 35,000,000 |
| JPY | 9,000,000,000 | Jibor+ 1.05% | Mar-25 | Floating | - | 85,283,806 | - | 85,283,806 |
| USD | 67,000,000 | 5.77% | May-25 | Fixed | - | 67,000,000 | - | 67,000,000 |
| USD | 400,000,000 | 5.93% | Sep-25 | Fixed | - | 400,000,000 | - | 400,000,000 |
| USD | 83,000,000 | 4.22% | Mar-27 | Fixed | - | - | 83,000,000 | 83,000,000 |
| USD | 20,000,000 | 5.91% | May-28 | Fixed | - | - | 20,000,000 | 20,000,000 |
| USD | 85,000,000 | 4.65% | Mar-30 | Fixed | - | - | 85,000,000 | 85,000,000 |
| **Total** | | | | | 107,991,237 | 2,062,989,469 | 188,000,000 | 2,358,980,706 |

## Trafigura Funding S.A.

### Notes to the annual accounts
### 30 September 2021

**4**      **Debtors**

|  | 2021 USD | 2020 USD |
|---|---|---|
| Amounts owed by affiliated undertakings: |  |  |
| - Short term portion of loans receivable (Refer note 3) | 151,933,716 | 107,991,237 |
| - Interest receivable on loans | 41,170,855 | 25,161,976 |
| Other debtors* | 267,298 | 26,825 |
| **Total** | **193,371,869** | **133,180,038** |

*Other debtors mainly relate to amounts receivable from tax authorities.

**5**      **Share capital & Reserves**

|  | Share capital USD | Retained Earnings USD | Legal Reserve USD | Net worth reserve USD | Profit / (Loss) for the year USD | Total Shareholder's equity USD |
|---|---|---|---|---|---|---|
| Balance at 30 September 2020 | 2,840,610 | 5,868,366 | 284,061 | 946,827 | 681,663 | 10,621,527 |
| Transfer of prior year results | - | 681,663 | - | - | (681,663) | - |
| Net profit / (loss) for the financial year | - | - |  |  | 835,145 | 835,145 |
| Appropriation to net worth reserve | - | (286,417) |  | 286,417 |  | - |
| **Balance at 30 Sep 2021** | **2,840,610** | **6,263,612** | **284,061** | **1,233,244** | **812,145** | **11,456,672** |

|  | Share capital USD | Retained Earnings USD | Legal Reserve USD | Net worth reserve USD | Profit / (Loss) for the year USD | Total Shareholder's equity USD |
|---|---|---|---|---|---|---|
| Balance at 30 September 2019 | 2,840,610 | 5,416,623 | 284,061 | 681,289 | 717,281 | 9,939,864 |
| Transfer of prior year results | - | 717,281 | - | - | (717,281) | - |
| Net profit / (loss) for the financial year | - | - |  |  | 681,663 | 681,663 |
| Appropriation to net worth reserve | - | (265,538) |  | 265,538 |  | - |
| **Balance at 30 Sep 2020** | **2,840,610** | **5,868,366** | **284,061** | **946,827** | **681,663** | **10,621,527** |

The Company was incorporated on 13 December 2012 with an issued capital of EUR 31,000 represented by 31,000 shares of a nominal value of EUR 1 each.

On 30 May 2013 the sole Shareholder decided to convert the Company's share capital from Euro to US Dollars at the fixed rate of USD 1.31 and issued additional 2,800,000 shares with a par value of USD 1 each.

As at 30 September 2021 and 2020, the subscribed and fully paid up capital amounting to USD 2,840,610 is represented by 2,840,610 shares of a nominal value of USD 1 each. The issued and fully paid up share capital of USD 2,840,610 is fully owned by Trafigura Holdings Pte. Ltd.

21

# Trafigura Funding S.A.

## Notes to the annual accounts
## 30 September 2021

**Legal Reserve**

In accordance with the Luxembourg Law of 10 August 1915, as amended, on commercial companies, the Company is required to transfer a minimum of 5% of its annual net income to a legal reserve. This requirement ceases to be necessary once the balance of the legal reserve reaches 10% of the issued share capital. The legal reserve is not available for distribution to the sole Shareholder.

**Net Worth Reserve**

As per Luxembourg tax rules, tax payable on Net worth can be reduced by constitution of non-distributable five years specific reserve from previous year profits in succeeding year annual accounts by passing a shareholders' resolution for same. Hence, net worth reserve of USD 1,233,244 has been created in aggregate, split as follows:

| For the year ended 30 September | Amount |
|---|---|
| 2017 | 199,175 |
| 2018 | 233,617 |
| 2019 | 248,497 |
| 2020 | 265,538 |
| 2021 | 286,417 |

## 6        Debenture Loans

This note provides information about the contractual terms of the interest-bearing loans and borrowings.

| Carrying value of the Loans and borrowings | 2021 USD | 2020 USD |
|---|---|---|
| **Non-current** | | |
| Private placements | 604,000,000 | 400,500,000 |
| Euro medium term notes | 1,508,153,773 | 883,967,235 |
| Other loans | 362,801,822 | 238,767,094 |
| **Total (a)** | 2,474,955,595 | 1,523,234,329 |
| | | |
| **Becoming due and payable within one year** | | |
| Accrued interest expenses on loans and borrowings | 40,098,112 | 22,786,869 |
| Short term part of above loans | 151,933,690 | 107,991,237 |
| **Total (b)** | 192,031,802 | 130,778,106 |
| | | |
| **Total (a+b)** | **2,666,987,397** | **1,654,012,434** |

# Trafigura Funding S.A.

## Notes to the annual accounts
## 30 September 2021

### 6        Debenture Loans (continued)

Terms and conditions of outstanding loans per 30 September 2021 were as follows:

| Currency | Principal | Interest rate | Maturity | Float ing/ fixed rate | Less than 1 year USD | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| **Private placements** | | | | | - | 250,000,000 | 354,000,000 | 604,000,000 |
| USD | 57,500,000 | 5.53% | Mar-23 | Fixed | - | 57,500,000 | - | 57,500,000 |
| USD | 53,000,000 | 5.55% | May-23 | Fixed | - | 53,000,000 | - | 53,000,000 |
| USD | 35,000,000 | 4.01% | Mar-25 | Fixed | - | 35,000,000 | - | 35,000,000 |
| USD | 67,000,000 | 5.72% | May-25 | Fixed | - | 67,000,000 | - | 67,000,000 |
| USD | 37,500,000 | 3.87% | Apr-26 | Fixed | - | 37,500,000 | - | 37,500,000 |
| USD | 83,000,000 | 4.17% | Mar-27 | Fixed | - | - | 83,000,000 | 83,000,000 |
| USD | 48,500,000 | 4.41% | Apr-28 | Fixed | - | - | 48,500,000 | 48,500,000 |
| USD | 20,000,000 | 5.86% | May-28 | Fixed | - | - | 20,000,000 | 20,000,000 |
| USD | 85,000,000 | 4.60% | Mar-30 | Fixed | - | - | 85,000,000 | 85,000,000 |
| USD | 117,500,000 | 4.89% | Apr-31 | Fixed | - | - | 117,500,000 | 117,500,000 |
| **Euro medium term notes (Listed on Irish Stock Exchange)** | | | | | - | 1,508,153,773 | - | 1,508,153,773 |
| USD(ISIN:XS1793296465) | 400,000,000 | 5.25% | Mar-23 | Fixed | - | 400,000,000 | - | 400,000,000 |
| USD(ISIN:XS2036118540) | 88,134,000 | 5.25% | Mar-23 | Fixed | - | 85,506,497 | - | 85,506,497 |
| USD (ISIN:XS2232101803) | 500,000,000 | 5.88% | Sep-25 | Fixed | - | 501,952,276 | - | 501,952,276 |
| EUR (ISIN: XS2293733825) | 450,000,000 | 3.875% | Feb-26 | Fixed | - | 520,695,000 | - | 520,695,000 |
| **CHF Bonds (Listed on Swiss Stock Exchange)** | | | | | - | 235,520,823 | - | 235,520,823 |
| CHF(ISIN:CH0416445333) | 165,000,000 | 2.25% | May-23 | Fixed | - | 176,640,617 | - | 176,640,617 |
| CHF(ISIN:CH0498589016) | 55,000,000 | 3.35% | Sep-24 | Fixed | - | 58,880,206 | - | 58,880,206 |
| **Other loans** | | | | | 151,933,690 | 127,281,000 | - | 279,214,690 |
| EUR | 101,500,000 | 3.50% | Feb-24 | Fixed | - | 117,445,650 | - | 117,445,650 |
| EUR | 8,500,000 | 4.00% | Feb-26 | Fixed | - | 9,835,350 | - | 9,835,350 |
| USD | 152,000,000 | various | various | Fixed | 151,933,690 | - | - | 151,933,690 |
| **Total** | | | | | 151,933,690 | 2,120,955,596 | 354,000,000 | 2,626,889,286 |

23

## Trafigura Funding S.A.

Notes to the annual accounts
30 September 2021

6        Debenture Loans (continued)

Terms and conditions of outstanding loans per 30 September 2020 were as follows:

| Currency | Principal | Interest rate | Maturity | Floating/ fixed rate | Less than 1 year USD | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| **Private placements** | | | | | 98,000,000 | 212,500,000 | 188,000,000 | 498,500,000 |
| | | | | | | | | |
| USD | 98,000,000 | 7.11% | Apr-21 | Fixed | 98,000,000 | | | 98,000,000 |
| USD | 57,500,000 | 5.53% | Mar-23 | Fixed | - | 57,500,000 | - | 57,500,000 |
| USD | 53,000,000 | 5.55% | May-23 | Fixed | | 53,000,000 | | 53,000,000 |
| USD | 35,000,000 | 4.01% | Mar-25 | Fixed | | 35,000,000 | | 35,000,000 |
| USD | 67,000,000 | 5.72% | May-25 | Fixed | | 67,000,000 | | 67,000,000 |
| USD | 83,000,000 | 4.17% | Mar-27 | Fixed | | | 83,000,000 | 83,000,000 |
| USD | 20,000,000 | 5.86% | May-28 | Fixed | | | 20,000,000 | 20,000,000 |
| USD | 85,000,000 | 4.60% | Mar-30 | Fixed | | | 85,000,000 | 85,000,000 |
| | | | | | | | | |
| **Euro medium term notes (Listed on Irish Stock Exchange)** | | | | | - | 883,967,235 | - | 883,967,235 |
| | | | | | | | | |
| USD (ISIN:XS1793296465) | 400,000,000 | 5.25% | Mar-23 | Fixed | | 400,000,000 | | 400,000,000 |
| USD (ISIN:XS2036118540) | 88,134,000 | 5.25% | Mar-23 | Fixed | | 83,967,235 | | 83,967,235 |
| USD (ISIN:XS2232101803) | 400,000,000 | 5.88% | Sep-25 | Fixed | | 400,000,000 | | 400,000,000 |
| | | | | | | | | |
| **CHF Bonds (Listed on Swiss Stock Exchange)** | | | | | - | 238,767,093 | - | 238,767,093 |
| | | | | | | | | |
| CHF (ISIN:CH0416445333) | 165,000,000 | 2.25% | May-23 | Fixed | | 179,075,320 | | 179,075,320 |
| CHF (ISIN:CH0498589016) | 55,000,000 | 3.35% | Sep-24 | Fixed | | 59,691,773 | | 59,691,773 |
| **Other loans** | | | | | 9,991,237 | | - | 9,991,237 |
| USD | 10,000,000 | various | various | Fixed | 9,991,237 | - | - | 9,991,237 |
| **Total** | | | | | **107,991,237** | **1,335,234,328** | **188,000,000** | **1,631,225,565** |

24

## Trafigura Funding S.A.

Notes to the annual accounts
30 September 2021

**7        Amounts owed to credit institutions**

The amounts owed to credit institutions consist of the following:

**As at 30 September 2021**

| Currency | Principal | Interest rate | Maturity | Floating/ fixed rate | Less than 1 year USD | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| JPY | 67,800,000,000 | 0.90% + JIBOR | Mar-23 | Fixed | - | 608,399,138 | - | 608,399,138 |
| JPY | 9,000,000,000 | 1% + JIBOR | Mar-25 | Fixed | - | 80,760,948 | - | 80,760,948 |
| Total | | | | | - | 689,160,086 | - | 689,160,086 |

**As at 30 September 2020**

| Currency | Principal | Interest rate | Maturity | Floating/ fixed rate | Less than 1 year USD | 1-5 years USD | >5 years USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| JPY | 67,800,000,000 | 0.90% + JIBOR | Mar-23 | Fixed | - | 642,471,335 | - | 642,471,335 |
| JPY | 9,000,000,000 | 1% + JIBOR | Mar-25 | Fixed | - | 85,283,806 | - | 85,283,806 |
| Total | | | | | - | 727,755,141 | - | 727,755,141 |

During the previous year in March 2020, the Company raised JPY 76.8 billion via a Japanese yen denominated term loan (the Samurai loan) in the Japanese domestic syndicated bank loan market. In addition to the three-year tranche which the Company has refinanced every two years since 2012, the Company has introduced an inaugural five-year tranche. This transaction refinances the 2018 Samurai loan.

An amount of USD 51,344 (2020: USD 241,667) is accrued as interest on the above borrowing.

**8        Other operating expenses**

| | 2021 USD | 2020 USD |
|---|---|---|
| Legal and professional fees | 63,970 | 122,605 |
| Bank charges | 15,316 | 24,986 |
| Foreign exchange loss | 35,823 | 75,297 |
| Total | 115,109 | 222,888 |

The total auditor's fees for the year amounted to USD 34,347 (FY 2020: USD 32,685). There are no audit-related, tax related or other fees due to the auditors.

**9        Income from other investments and loans forming part of the fixed assets**

| | 2021 USD | 2020 USD |
|---|---|---|
| Interest income from loans to affiliated undertakings | 114,178,235 | 97,515,523 |
| Amortisation of set-up fees, recharged to affiliated undertakings | 3,051,845 | 2,569,300 |
| | 117,230,080 | 100,084,823 |

25

## Trafigura Funding S.A.

Notes to the annual accounts
30 September 2021

### 10    Interest payable and similar expenses

|  | 2021 USD | 2020 USD |
|---|---|---|
| Interest expense on loans, borrowings and swap | 112,981,002 | 96,417,054 |
| Set up fees amortisation | 3,051,845 | 2,569,300 |
|  | 116,032,847 | 98,986,354 |

### 11.    Off-balance sheet commitments

The Company, together with Trafigura Group Pte. Ltd. and some other subsidiaries of Trafigura Group Pte. Ltd., is a guarantor in revolving credit facilities aggregating USD 7.9 billion in FY 2021 (FY 2020: USD 8.2 billion) with maturity dates ranging from October 2021 to March 2024 (FY 2020: maturity dates ranging from October 2020 to March 2023). The outstanding amount as at 30 September 2021 was USD 5.6 billion (as at 30 September 2020: USD 4.3 billion) and was drawn by other subsidiaries of Trafigura Group Pte. Ltd.

### 12.    Subsequent events

There were no material facts or circumstances that have occurred between the accounting date and the date of approval of these annual accounts that require disclosure in or adjustment to the annual accounts.

# EXHIBIT 30

# Trafigura acquires majority stake in power trading platform Energy Renaissance LLC

*Houston, 2 December 2021* – Trafigura US Holdings, Inc, a wholly-owned, U.S. indirect subsidiary of Trafigura Group Pte Ltd, one of the world's leading independent commodity trading companies, has acquired a majority share in power trading platform Energy Renaissance LLC.

Energy Renaissance was established by privately held company Denver Energy Group LLC (DEG), a technology-driven power trading business. DEG's team of highly skilled trading personnel utilises a suite of proprietary technology to focus on short term US power markets. Trafigura Group's stake in the Energy Renaissance platform advances current trading capabilities with the addition of predictive technology, specialized custom applications, and refined proprietary processes to collect data, analyse information, identify trading strategies, and execute trades.

The new joint venture will accelerate Trafigura's entry in North American ISO (independent system operator) markets and contribute to the growth of the Group's power and renewables division, complementing existing trading capabilities in the US and European markets. The business is developing services that will help the electricity market as it shifts rapidly from reliance on fossil fuels to renewable energy sources such as wind and solar power. Trafigura's expertise in risk and price management will help utilities and renewable power producers adapt to a new world of fluctuating supply.

**ENDS**

**For further information, please contact:**
Trafigura Press Office: +41 (0) 22 592 45 28 or media@trafigura.com

**About Trafigura**
Founded in 1993, Trafigura is one of the largest physical commodities trading groups in the world. Trafigura sources, stores, transports and delivers a range of raw materials (including oil and refined products and metals and minerals) to clients around the world and has recently established a power and renewables business division.

The trading business is supported by industrial and financial assets, including a majority ownership of global zinc and lead producer Nyrstar which has mining, smelting and other operations located in Europe, Americas and Australia; a significant shareholding in global oil products storage and distribution company Puma Energy; global terminals, warehousing and logistics operator Impala Terminals; Trafigura's Mining Group; and Galena Asset Management.

With circa. 850 shareholders, Trafigura is owned by its employees. Over 8,500 employees work in 48 countries around the world. Trafigura has achieved substantial growth over recent years, growing revenue from USD12 billion in 2003 to USD147 billion in 2020. The Group has been connecting its customers to the global economy for more than two decades, growing prosperity by advancing trade.

Visit: www.trafigura.com