**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RICHARD SIERRA, VERONICA GOOCH, ROLAND SIERRA, LUCIA LLERAS DE LABRADA, PRISCILLA LLERAS-BUSH, in her personal capacity and as Personal Representative of the ESTATE OF OLGA ROMAGOSA, and SUZETTE NICOLE NEYRA HENRICK in her capacity as Independent Executor of of the ESTATE OF ANGELA ROMAGOSA FERNANDEZ, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 22-366-JLH-CJB CONSOLIDATED |
| TRAFIGURA TRADING LLC and TRAFIGURA GROUP PTE LTD, | ) ) ) | |
| Defendants. | ) | |

Michael L. Vild, CROSS & SIMON, LLC, Wilmington, DE; David A. Baron, Melvin White, Laina C. Lopez and Jared R. Butcher (argued), BERLINER CORCORAN & ROWE LLP, Washington, DC; Richard W. Fields, Martin F. Cunniff and Edward Han (argued), FIELDS HAN CUNNIFF PLLC, Washington, DC, Attorneys for Plaintiffs.

Jack B. Blumenfeld and Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Alex J. Brackett (argued), Caroline Schmidt Burton, Andrew P. Thornton-Dibb and Juliet B. Clark, MCGUIRE WOODS LLP, Richmond, VA, Attorneys for Defendants.

**<u>MEMORANDUM OPINION</u>**

August 14, 2024
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

In this case, Plaintiffs Richard Sierra, Veronica Gooch, Roland Sierra, Lucia Lleras de Labrada, Priscilla Lleras-Bush (in her personal capacity and as Personal Representative of the Estate of Olga Romagosa) and Suzette Nicole Neyra Hendrick (as Temporary Administrator of the Estate of Angela Romagosa Fernandez) (collectively, "Plaintiffs") bring claims under Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, codified at 22 U.S.C. §§ 6081-86 (the "Helms-Burton Act" or "HBA") against Defendants Trafigura Group Pte. Ltd. ("TGPL") and Trafigura Trading, LLC ("TTL" and collectively with TGPL, "Defendants").  (*See* D.I. 42 at 1; D.I. 46 at 1)  Plaintiffs seek to recover damages and interest under the Helms-Burton Act against Defendants for allegedly trafficking in Plaintiffs' property that was wrongfully confiscated by the Cuban Government in 1960.  (D.I. 37 at ¶¶ 1, 95)  Presently pending before the Court are: (1) TGPL's "Motion to Dismiss the Consolidated Amended Complaint" ("CAC"), filed pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(2) and 12(b)(6) ("TGPL's Motion"), (D.I. 41); and (2) Plaintiffs' "Motion for Jurisdictional Discovery" ("Plaintiffs' Motion"), (D.I. 43).[1]  For the reasons set forth below, the Court GRANTS TGPL's Motion and DENIES Plaintiffs' Motion.

## I.   BACKGROUND

### A.   Factual Background

Plaintiffs Richard Sierra, Veronica Gooch, Roland Sierra, Lucia Lleras de Labrada and

---

[1]   TTL has also filed a motion to dismiss the CAC pursuant to Rules 12(b)(1) and 12(b)(6) ("TTL's Motion"), (D.I. 39), and Defendants have filed a "Supplemental Motion to Dismiss Plaintiff Suzette Nicole Hendrick's Consolidated Claims" pursuant to Rule 12(b)(6) ("Defendants' Supplemental Motion"), (D.I. 54).  These motions will be addressed in forthcoming opinion(s).

Priscilla Lleras-Bush are naturalized citizens of the United States.  (D.I. 37 at ¶¶ 13-17)  Olga Romagosa was a naturalized citizen of the United States prior to her death; her claims are being prosecuted by Plaintiff Pricilla Lleras-Bush in her capacity as Personal Representative of Olga Romagosa's estate.  (*Id.* at ¶ 18)  Angela Romagosa Fernandez was a naturalized citizen of the United States prior to her death; her claims are being prosecuted by Plaintiff Suzette Nicole Neyra Hendrick, in her capacity as Independent Executor of Angela Romagosa Fernandez's estate.  (*Id.* at ¶¶ 20(a)-(b))

Plaintiffs' claims arise from their ownership in stock (as well as inherited ownership interests) in:  (1) a mining operation run by Minas de Matahambre, S.A. (the "Mining Company") that owned, *inter alia*, ranches, mines, a power plant and an airport; (2) the Mining Company's assets, which include Terminal Maritima de Santa Lucia ("Terminal"), the Port of Santa Lucia ("Port") and related interests; and (3) an affiliated company called Compañia Operadora Rometales, S.A. ("Rometales") that operated a sulfuric acid plant next to the Port (the Mining Company, its assets and Rometales are hereinafter referred to as the "Property").  (*Id.* at ¶ 77, 81, 90)  The CAC alleges that the Cuban government completed the forced confiscation of the Property in 1961.  (*Id.* at ¶ 95)  At the time of the confiscation, there were 54 shareholders of the Property, almost all of whom were successors of Manuel Luciano Diaz.  (*Id.* at ¶ 97)  Plaintiffs inherited their claims to the Property from Amparo Diaz y Martinez (one of Manuel Luciano Diaz's daughters) and her husband Ernesto Romagosa y Sanchez, who both died prior to March 12, 1996.  (*Id.*)

The CAC alleges that TGPL is an employee-owned physical trading and logistics business specializing in energy, metals and minerals, and that it (or, at least, it along with its group of affiliated companies) has 88 offices in 48 countries around the world, including three

offices in the United States.  (*Id.* at ¶ 21)  TGPL was incorporated in August 2010 under the laws of Singapore, and its registered office is located in Singapore.  (*Id.*)

TTL is a wholly owned subsidiary of TGPL and a Delaware limited liability company. (*Id.* at ¶¶ 22, 29)  TTL's principal place of business is located in Houston, Texas.  (*Id.* at ¶ 22) The CAC alleges that TTL has "primary responsibility" for TGPL's United States operations, which include the Trafigura Mining Group (the "Mining Group").  (*Id.*; *see also id.* at ¶¶ 30-31) TTL has been registered in Texas and other states since 1995 to conduct the following activities on behalf of TGPL, including the Mining Group:

> (i) management, administration, financing and support for industrial and technical services; (ii) trade especially in raw materials with companies which are [TGPL] members, including Mining Group members, and with third parties; (iii) investment in and administration of moneys, goods and claims; (iv) guarantee of securities for debt liabilities of [TGPL] members, including Mining Group members, and their companies; (v) acquisition and disposition of real property; and (vi) administration and exploitation of intangible rights and know how.

(*Id.* at ¶¶ 22, 29)

The CAC alleges that TGPL and its wholly owned subsidiaries in the Mining Group, which includes Trafigura Caribbean Mining B.V. ("Trafigura Caribbean Mining"), with the support of TTL, have trafficked in the Property through the investment in Empresa Minera del Caribe, S.A. ("EMINCAR").  (*Id.* at ¶¶ 9, 101)  EMINCAR is a joint venture between Trafigura Caribbean Mining and the Cuban government to develop mining operations (known as the Castellanos lead and zinc mine) in Cuba.  (*Id.* at ¶¶ 9, 101-03)  The Cuban operations of TGPL and its Mining Group occupy and use a substantial portion of the Property, but the Cuban government and the Defendants have not obtained authorization from, nor paid compensation to, Plaintiffs or their predecessors for using the Property.  (*Id.* at ¶¶ 107, 109)

The HBA was enacted in 1996 to provide U.S. nationals who own claims to property that was confiscated by the Cuban government with a private cause of action against persons who have "trafficked" in such property, under certain conditions. *See* 22 U.S.C. § 6082(a); (D.I. 37 at ¶¶ 2, 54).  In February 2022, Plaintiffs sent Defendants letters notifying them that they are trafficking in confiscated property as defined by the HBA.  (D.I. 37 at ¶ 111)  The CAC alleges that Defendants have not responded to Plaintiffs' notice letters, and that they continue to traffic in the Property.  (*Id.* at ¶¶ 112-13)

Additional facts relevant to resolution of the instant Motion will be discussed in Section III.

### B.    Procedural History

Plaintiffs Richard Sierra, Veronica Gooch, Roland Sierra, Lucia Lleras de Labrada, Priscilla Lleras-Bush (in her personal capacity and as Personal Representative of the Estate of Olga Romagosa), Márian Maria de los Angeles Romagosa and Lisette Romagosa Smyrnios filed this action on March 22, 2022.[2]  (D.I. 1)  This action was then consolidated with an action that had been filed in November 2021 by Angela Romagosa Fernandez against TTL, Civil Action No. 21-1606.  (D.I. 36)[3]

On February 24, 2023, Plaintiffs filed the operative CAC.  (D.I. 37)  The CAC asserts a single cause of action against Defendants under the HBA.  (*Id.* at ¶¶ 118-27)

---

[2]    Márian Maria de los Angeles Romagosa and Lisette Romagosa Smyrnios subsequently filed notices of dismissal with respect to their claims and are thus no longer parties to this action.  (D.I. 13; D.I. 14)

[3]    As was referenced above, Angela Romagosa Fernandez died on February 16, 2022, and her claims are now being prosecuted by Plaintiff Suzette Nicole Neyra Hendrick, in her capacity as Independent Executor of Angela Romagosa Fernandez's estate.  (D.I. 37 at ¶¶ 20(a)-(b))

On March 1, 2023, TPGL filed its Motion.  (D.I. 41)  On March 3, 2023, Plaintiffs filed

their Motion.  (D.I. 43)  These Motions were fully briefed by March 8, 2023.  (D.I. 48; D.I. 52)

The parties have subsequently filed numerous Notices of Supplemental Authority, (D.I. 51; D.I.

57; D.I. 59; D.I. 60; D.I. 76), some of which are related to the instant Motions.  The Court[4] heard

argument on the Motions (as well as on TTL's Motion) on April 11, 2024.  (D.I. 84 (hereinafter,

"Tr."))

## II.    LEGAL STANDARDS

Rule 12(b)(2) requires the Court to dismiss any case in which it lacks personal

jurisdiction.  Fed. R. Civ. P. 12(b)(2); *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F.

Supp. 3d 498, 502 (D. Del. 2017).  When a defendant moves to dismiss a lawsuit for lack of

personal jurisdiction, the plaintiff bears the burden of showing the basis for jurisdiction; in a

situation like this, where no evidentiary hearing has been held, the plaintiff must only make a

*prima facie* showing that personal jurisdiction exists.  *See Nespresso*, 263 F. Supp. 3d at 502;

*Hardwire, LLC v. Zero Int'l, Inc*., Civil Action No. 14-54-LPS-CJB, 2014 WL 5144610, at *5

(D. Del. Oct. 14, 2014) (citing cases); *Power Integrations, Inc. v. BCD Semiconductor Corp.*,

547 F. Supp. 2d 365, 369 (D. Del. 2008).  To make out this *prima facie* showing, the plaintiff

must "'establish[] with reasonable particularity sufficient contacts between the defendant and the

forum state.'"  *Mellon Bank (E.) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir.

1992) (citations omitted); *see also bioMérieux, S.A. v. Hologic, Inc*., C.A. No. 18-21-LPS, 2018

WL 4647483, at *2 (D. Del. Sept. 26, 2018).  In reviewing a motion to dismiss for lack of

---

[4]        On January 25, 2024, United States District Judge Jennifer L. Hall referred this
case to the Court to hear and resolve all pre-trial matters up to the pre-trial conference.  (D.I. 61)
On February 5, 2024, the parties jointly consented to the Court's jurisdiction to decide TTL's
Motion, TGPL's Motion and Defendants' Supplemental Motion.  (D.I. 64)

personal jurisdiction, the Court may consider the pleadings, affidavits, declarations and exhibits, and must construe all disputed facts in the plaintiff's favor. *Round Rock Rsch. LLC v. ASUSTeK Comput. Inc.*, 967 F. Supp. 2d 969, 972 (D. Del. 2013); *Power Integrations*, 547 F. Supp. 2d at 369; *see also Hardwire*, 2014 WL 5144610, at *5.

The Supreme Court of the United States has recognized two classifications of personal jurisdiction:  "general jurisdiction" and "specific jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  The Supreme Court distinguished between these concepts in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), which remains the "'canonical opinion'" in the area of personal jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 126 (2014) (citation omitted).  "Specific jurisdiction" encompasses causes of action that "'aris[e] out of or relate[] to the defendant's contacts with the forum.'" *Goodyear*, 564 U.S. at 923-24 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). "General jurisdiction" encompasses complaints arising from dealings that are distinct from the defendant's activities in the state. *Id.* at 924 (citing *Int'l Shoe*, 326 U.S. at 318); *see also Daimler*, 571 U.S. at 127.  A court may exercise "'general jurisdiction over foreign (sister-state or foreign-country) corporations'" only when the corporation's "'affiliations with the State [in which suit is brought] are so continuous and systematic as to render [it] essentially at home in the forum State.'" *Daimler*, 571 U.S. at 127 (certain internal quotation marks and citations omitted).

In order to establish personal jurisdiction, a plaintiff must typically adduce facts sufficient to satisfy two requirements—one statutory and one constitutional. *Hardwire*, 2014 WL 5144610, at *6.  In the typical analysis of the statutory prong, courts consider whether the defendant's actions fall within the scope of a state's long-arm statute. *Id.* at *6; *Power Integrations*, 547 F. Supp. 2d at 369.  In analyzing the constitutional prong, courts determine

whether the exercise of jurisdiction comports with the defendant's right to due process.
*Hardwire*, 2014 WL 5144610, at *6; *Power Integrations*, 547 F. Supp. 2d at 369 (citing *Int'l Shoe*, 326 U.S. at 316). Due process is satisfied if the Court finds the existence of "'minimum contacts' between the non-resident defendant and the forum state, 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Power Integrations*, 547 F. Supp. 2d at 369 (quoting *Int'l Shoe.*, 326 U.S. at 316).

However, certain disputes over personal jurisdiction take a different form and instead implicate Federal Rule of Civil Procedure 4(k)(2), which serves as a federal long-arm statute. *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 455 (3d Cir. 2003); *Ocimum Biosols. (India) Ltd., Tr. of Ocimum Biosols. Inc. v. LG Chem. Ltd.*, Civil Action No. 19-2227-MN, 2022 WL 3354708, at *16 (D. Del. July 31, 2022). To establish personal jurisdiction under Rule 4(k)(2), there must be:

> (1) a claim arising under federal law; (2) the defendant must be beyond the jurisdictional reach of any state court of general jurisdiction; and (3) the defendant must have sufficient contacts with the United States so that the court's exercise of personal jurisdiction over the defendant comports with the due process requirements of the Constitution or other federal law.

*Saudi v. Acomarit Maritimes Servs., S.A.*, 114 F. App'x 449, 455 (3d Cir. 2004); *see also Ocimum Biosols. (India) Ltd.*, 2022 WL 3354708, at *16. "'The third requirement under Rule 4(k)(2)—the due process analysis—contemplates a defendant's contacts with the entire United States, as opposed to the state in which the district court sits.'" *Mallinckrodt PLC v. Airgas Therapeutics LLC*, Civil Action No. 22-1648-RGA, 2024 WL 1251260, at *2 (D. Del. Mar. 22, 2024) (citation omitted). Rule 4(k)(2) was enacted by the 1993 amendments to the Federal Rules of Civil Procedure in order to "close[] a loophole" that existed when a foreign defendant had sufficient contacts with the United States to justify the exercise of jurisdiction, but lacked

sufficient contacts with any single state to satisfy a state's long-arm statute or meet the requirements of the Fourteenth Amendment limitation on state court territorial jurisdiction. *Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1295-96 (Fed. Cir. 2009). The Rule is thus meant to allow a district court to exercise personal jurisdiction over a foreign defendant whose contacts with the United States, but not with the forum state, satisfy due process. *TriDiNetworks Ltd. v. NXP USA, Inc.*, Civil Action No. 19-1062-CFC-CJB, 2020 WL 2220152, at *3 (D. Del. May 7, 2020).[5]

## III.    DISCUSSION

The HBA provides that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages[.]" 22 U.S.C. § 6082(a)(1)(A). With respect to property confiscated before March 12, 1996, a claim is only viable if the United States national acquired ownership of the claim before March 12, 1996. 22 U.S.C. § 6082(a)(4)(B). A person "traffics" in confiscated property if that person "knowingly and intentionally[,]" *inter alia*: (1) "engages in a commercial activity using or otherwise benefiting from confiscated property" or (2) "causes, directs, participates in, or profits from, trafficking . . . by another person, or otherwise engages in trafficking . . . through another person[.]" 22 U.S.C. § 6023(13)(A).

With its Motion, TGPL argues that Plaintiffs' claims against it should be dismissed under Rule 12(b)(2) for lack of personal jurisdiction, under Rule 12(b)(1) for lack of subject matter

---

[5]    Courts have noted that it is a "rare occurrence[]" when jurisdiction is established pursuant to Rule 4(k)(2). *Singh v. Royal Caribbean Cruises Ltd.*, 576 F. Supp. 3d 1166, 1181 (S.D. Fla. 2021); *see also N2 Packaging Sys., LLC v. N2 Pack Can. Inc.*, No. CV-19-02351-PHX-NVW, 2020 WL 2512786, at *6 (D. Ariz. May 15, 2020); *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1086 n.6 (C.D. Cal. 2010).

jurisdiction and under Rule 12(b)(6) for failure to state a claim.  (D.I. 42 at 1-2)  For the reasons set out below, the Court concludes that personal jurisdiction over TGPL is lacking; it therefore need not and should not take up TGPL's additional arguments.  *See, e.g.*, *Mallinckrodt PLC*, 2024 WL 1251260, at *5.

With regard to the personal jurisdiction question, TGPL contends that it has no direct contacts with the United States, as it is a non-operating holding company incorporated in Singapore that is without any employees, business operations or physical presence in this country.  (D.I. 42 at 5-6)  Plaintiffs, meanwhile, allege that TGPL is subject to both specific jurisdiction and general jurisdiction pursuant to Rule 4(k)(2).  (D.I. 37 at ¶ 26; D.I. 46 at 2-9; Tr. at 7, 55-56)  The Court will first assess Plaintiffs' arguments as to specific jurisdiction, and will then turn to its assertions regarding general jurisdiction.

## A.    Specific Jurisdiction

There is no dispute that Plaintiffs could satisfy the first two prongs of the Rule 4(k)(2) analysis; the dispute here is only as to the Rule's third prong—i.e., whether TGPL has sufficient contacts with the United States as a whole to support jurisdiction.  (D.I. 42 at 5-6; D.I. 46 at 2; Tr. at 55)

As noted above, this third prong analyzes a foreign defendant's contacts with the United States at large, and whether the exercise of jurisdiction comports with due process.  *Bos. Sci. Corp. v. Micro-Tech Endoscopy USA Inc.*, Civil Action No. 18-1869-CFC-CJB, 2020 WL 229993, at *6 (D. Del. Jan. 15, 2020).  In that regard, Plaintiffs first focus on a specific jurisdiction-type analysis, which (in the Rule 4(k)(2) context), asks whether: (1) the defendant purposefully directed its activities at residents of the United States, (2) the claim arises out of or relates to the defendant's activities with the United States, and (3) assertion of personal

jurisdiction is reasonable and fair. *Id.*; *TriDiNetworks Ltd.*, 2020 WL 2220152, at *4. Plaintiffs

bear the burden to demonstrate that the first two of these elements have been satisfied; if they do,

then the burden shifts to TGPL to show (as to the third element) the presence of some

considerations that would render jurisdiction unreasonable. *TriDiNetworks Ltd.*, 2020 WL

2220152, at *4.

      In attempting to meet their burden as to the first two elements here, Plaintiffs put forward

two theories. (*See* D.I. 46 at 2-6; Plaintiffs' Motion to Dismiss Slide Presentation at Slides 7, 31)

The Court will address these in turn, and will explain why Plaintiffs have not met their burden as

to either one.

          **1.**      **Specific Personal Jurisdiction Based on Financing**

      Plaintiffs' first theory is that TGPL is subject to specific personal jurisdiction because:

(1) TGPL engages in financing activities that directly target United States investors and markets;

and (2) it has done so in order to finance Defendants' mining operations in Cuba that give rise to

Plaintiffs' trafficking claims. (D.I. 46 at 4 ("This litigation arises from and relates to TGPL's

financing activities because U.S. funds have been used to facilitate trafficking activities in Cuba

through the EMINCAR joint venture."); *see also id*. at 2-5; Tr. at 62, 69) As for the first element

of the Rule 4(k)(2) specific-jurisdiction test (i.e., that "the defendant purposefully directed its

activities at residents of the United States"), Plaintiffs cite to evidence that beginning in March

2013, a wholly owned subsidiary of TGPL known as Trafigura Funding SA ("Trafigura

Funding") conducted numerous United States private placements, raising hundreds of millions of

U.S. dollars; these included a $145 private placement in March 2013. (D.I. 46 at 2-3 (citing D.I.

82, ex. 17 at 106; *id.*, ex. 27 at 9, 13; *id.*, ex. 29 at 2); *see also* D.I. 37 at ¶ 51) And with regard

to the second element of the test ("the claim arises out of or relates to the defendant's activities

with the United States"), Plaintiffs then suggest that the March 2013 private placement was used to finance EMINCAR.  They assert this is so because in the same year (i.e., 2013), Trafigura Caribbean Mining obtained a $140 million credit facility from an unidentified "Group Company," which it then made available to EMINCAR.  (D.I. 46 at 3 (citing D.I. 82, ex. 32 at 6-7; *id.*, ex. 27 at 13); D.I. 37 at ¶ 52)  Plaintiffs are suggesting that this $140 million credit facility must have been funded in some way via TGPL/Trafigura Funding's $145 million U.S. private placement.  The following allegations in the CAC relate to this theory:

> 52.  Funding raised by Trafigura Group companies appears to have been used to finance its trafficking activity, namely, its investment in the Castellanos lead and zinc mine in Cuba.  For example, in 2013, Trafigura Caribbean Mining obtained a $140 million credit facility from an unidentified "Group Company," and then made a $140 million credit facility available to EMINCAR.  This coincided with a $145 million capital raise through a U.S. private placement in March 2013.  This raise was conducted by Trafigura Funding, the entity responsible for making loans to other Trafigura Group companies.  Both Trafigura Group and Trafigura Trading routinely guarantee the financing raised by Trafigura Funding.; and

> 103.  The mining operation—referred to as the Castellanos lead and zinc mine—is conducted through EMINCAR, a joint venture between Trafigura Caribbean Mining (which owns a 49 percent interest) and Cuban state agency Geominera (which owns a 51 percent interest).  With a capital outlay equivalent to $230 million, construction was completed in 18 months from start to finish.  According to financial reports, the Trafigura Group and its Mining Group invested at least $230 million in the venture through a loan from Trafigura Caribbean Mining to EMINCAR.

(D.I. 37 at ¶¶ 52, 103; *see also id.* at ¶ 108)

Defendants, however, have submitted sworn declarations that clearly and specifically refute Plaintiffs' theory.  Those declarations flatly deny that the $145 million U.S. private placement was used in any way to finance EMINCAR.  (D.I. 42 at 11-12; D.I. 48 at 9; Tr. at 8)  For example, Dan Peters, the Regional Controller for TTL, avers the following:

- "TTL has not funded or facilitated in any way the funding of EMINCAR, nor of any EMINCAR-related business activities." (D.I. 83, ex. 1 at ¶ 4);

- "TTL has not financed, nor has it in any way facilitated the financing of, investments or business activities relating to Cuba or EMINCAR."  (*Id.* at ¶ 6).

Additionally, in his own declaration (the "McLaughlin Declaration"), Chris McLaughlin, Global Head of Group Treasury for Trafigura Holding GmbH (and the employee responsible for all foreign exchange, operational treasury and corporate funding matters within the overall group of Trafigura companies), (*id.*, ex. 4 at ¶¶ 1-3), avers that:

- "None of Trafigura's[6] funding of EMINCAR or EMINCAR-related business activities has:  (i) been in U.S. dollars, (ii) been paid using U.S. banks or other U.S. financial institutions, (iii) involved U.S. persons or (iv) involved U.S. operations of Trafigura such as . . . TTL[.]" (*Id.* at ¶ 5);

- "Trafigura has made a limited number of Euro-denominated payments to EMINCAR from an investment account maintained outside the United States that is funded from general cash pools of one or more non-U.S. Trafigura entities. Trafigura has funded the overwhelming majority of its investment in EMINCAR through a segregated Euro account maintained outside the United States consisting of retained earnings from non-U.S. company operations and proceeds from sales of corporate assets outside the United States." (*Id.* at ¶ 6)

- "Trafigura has not funded any EMINCAR-related payment via financing guaranteed by . . . TTL or in which TTL is otherwise involved, including the financing Plaintiffs refer to in [the CAC].  This includes no use of financing from any financing vehicle for which TTL has served as a guarantor, originator or in which TTL has in any way otherwise been involved. *Specifically, the $145 million U.S. private placement referred to in [the CAC] at paragraph 52 was not used to fund anything relating to EMINCAR, and had no relation whatsoever to the $140 million credit facility referred to in that paragraph*."  (*Id.* at ¶ 7 (emphasis added));

---

[6]    When Mr. McLaughlin refers to "Trafigura" in the declaration, he is referring to the overall Trafigura "Group" of companies, including TGPL.  (D.I. 83, ex. 4 at ¶ 3)

- "None of Trafigura's TTL-related financing transactions is specifically designed to facilitate financing for the Mining Group or EMINCAR.  None has been designed, implemented or used to fund, finance or facilitate any operations in or relating to EMINCAR or Cuba, nor do they have any other connection to or role in any activities in or relating to EMINCAR or Cuba."  (*Id.* at ¶ 8);

- Trafigura has not otherwise established any special purpose vehicles, issued any debt instruments or sought any financing or access to capital markets (in the United States or otherwise) in order to fund its investment in EMINCAR, *including the $140 million credit facilities and the $145 million capital raise referred to in the [CAC]*."  (*Id.* at ¶ 9 (emphasis added))

In the briefing, Plaintiffs' only rejoinder to this evidence was that TGPL "provides no supporting documents, fails to identify the Group Company responsible for the $140 million credit facility to EMINCAR, and fails to explain the use of the March 2013 private placement, if not for EMINCAR."  (D.I. 46 at 4)  And that is true; TGPL did not include supporting documents along with the declarations, nor did the declarations explain what the $145 million capital raise *was* used for.

But Plaintiffs cite to no caselaw that stands for the proposition that a declaration setting out such facts must include "supporting documents" in order to further bolster the assertions made therein, or that it must include reference to every possible fact that could be relevant to the matter.  (*Id.*; Tr. at 34)  Indeed, the law does not seem to require that.  As even Plaintiffs acknowledge, relevant precedent indicates that once a defendant has put forward a sworn declaration controverting the plaintiff's jurisdictional allegations, it is then up to *the plaintiff* to respond with similar evidence in support of jurisdiction.[7]  (Tr. at 34-36, 74); *see also, e.g.*,

---

[7]        It is not as if a declaration like the McLaughlin Declaration is without evidentiary force.  After all, the declarant has stated under penalty of perjury, pursuant to the laws of the United States, that what is being asserted in the document is true and correct to the best of his

*McClung v. 3M Co.*, Civil Action No. 2:16-CV-2301-ES-SCM, 2018 WL 4522076, at *6-7 (D.N.J. July 6, 2018) (noting that the defendant had provided a supporting declaration contradicting the plaintiff's allegations in a complaint regarding personal jurisdiction, and that "once a defendant contradicts a plaintiff's allegations by an opposing affidavit, . . . plaintiffs must present similar evidence in support of personal jurisdiction") (internal quotation marks and citation omitted), *report and recommendation adopted as modified*, 2019 WL 4668053 (D.N.J. Sept. 25, 2019); *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 381-82 (M.D. Pa. 2009) (explaining that at the preliminary stages of litigation, "plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person" and "[o]nce these allegations are contradicted by an opposing affidavit . . . plaintiffs must present similar evidence in support of personal jurisdiction") (citing *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330-31 (3d Cir. 2009)).

Then during the hearing on TGPL's Motion, Plaintiffs seemed to shift their argument a bit regarding these declarations.  There, Plaintiffs seemed to be saying that while the declarations "come very close" to establishing that EMINCAR was not funded by a U.S. private placement, they leave "enough room" on the question for Plaintiffs to want to see more details regarding "the actual finances"—since it could be that money from the $145 million U.S. private placement was taken from the United States and then "run[] through some intermediar[y]"

---

knowledge.  (D.I. 83, ex. 4 at 3; Tr. at 35); *see also, e.g.*, *Buckley v. Universal Sewing Supply, Inc.*, Civil Action No. 1:19-CV-794-SHR, 2019 WL 5260365, at *1 n.1 (M.D. Pa. Oct. 17, 2019) (explaining that a statement made under penalty of perjury that the foregoing is true and correct "constitutes a valid declaration under [28 U.S.C.] § 1746 and can be relied upon by the court in 'any matter' requiring an evidentiary basis") (citing 28 U.S.C. § 1746(2)).  Moreover, there could be good reasons why a corporation like TGPL would not want to publicly share otherwise confidential information (like exactly what projects the $145 million capital raise *did* go to fund) in an adversarial litigation, unless it was required to do so.  (Tr. at 34)

companies affiliated with TGPL, "and now [Defendants] say the money didn't come from the United States."  (Tr. at 72-73, 76, 78 (Plaintiffs' counsel contending that Mr. McLaughlin's declaration could be "worded to give the initial impression that [TTL] had nothing to do with [funding EMINCAR, but] if you read carefully, there's enough wiggle room for intermediate transactions to have occurred that would meet this requirement that the funding was at some level used for something else before it ever got to EMINCAR"))  In this sense, it is almost as if Plaintiffs are "asking [the Court] to make a determination . . . that . . . the declarant[s have] essentially committed a fraud on the Court" or, at minimum, that they are grievously misleading the Court—even though TGPL's counsel has expressly represented, as an officer of the Court, that this is not the case (and that no such "intermediate" transactions occurred here).  (*Id.* at 78; *see also id.* at 34-35, 78-80)

In the Court's view, Mr. Peters and Mr. McLaughlin's declarations unequivocally convey that the $145 million U.S. private placement had nothing to do (directly or indirectly) with funding EMINCAR, nor was EMINCAR otherwise funded by any United States operations.[8] The Court has no basis to conclude that the declarants are being untruthful with respect to these facts.  Given this record then, Plaintiffs have not met their burden of establishing a *prima facie* case that TGPL purposefully directed relevant activities at residents of the United States, or that their claims arise out of or relate to TGPL's activities with the United States, with respect to this first theory.

### 2.    Specific Personal Jurisdiction Based on the Benefit to TTL from EMINCAR Production

---

[8]        (*See, e.g.*, D.I. 83, ex. 4 at ¶ 7 (Mr. McLaughlin declaring that "the $145 million U.S. private placement . . . was not used to fund anything relating to EMINCAR"); *id.* at ¶ 9 (Mr. McLaughlin declaring that "Trafigura . . . [did not seek] any financing or access to capital markets (in the United States or otherwise) in order to fund its investment in EMINCAR, including the . . . $145 million capital raise referred to in the [CAC]"))

Plaintiffs' second theory is that TGPL is subject to specific personal jurisdiction pursuant to Rule 4(k)(2) because:  (1) Defendants' global zinc trading business encompasses zinc produced in both the United States and in Cuba; (2) even if zinc-related commodities from EMINCAR are not actually sold or imported into the United States, zinc mining in Cuba still, in some way, could be said to broadly benefit the entire TGPL trading business (including TTL's U.S. business); and (3) TGPL's zinc trading, some of which occurs in the United States, thus gives rise to the claims at issue because it amounts to commercial activity "'using or otherwise benefiting from'" the Property.  (D.I. 46 at 6 (quoting 22 U.S.C. § 6023(13)(A)(ii)); Tr. at 80-81)  In support of the notion that TGPL's zinc mining in Cuba benefits TGPL's business conducted in and from the United States, Plaintiffs cite only to one page of a 2020 Base Prospectus regarding TGPL and its subsidiaries.  That page states that the Trafigura Group's "mining assets . . . are closely related to and have strong synergies with the Group's core metals and minerals trading business."  (D.I. 42, ex. A at 111 (*cited in* D.I. 46 at 6))

Plaintiffs have not met their burden with respect to this theory of jurisdiction either.

As an initial matter, this theory does not appear to have been pleaded in the CAC.  Unlike in the section of Plaintiffs' brief where they discuss their first theory of specific personal jurisdiction, Plaintiffs fail to cite to any allegations in the CAC relating to this second theory.  (D.I. 46 at 5-6)  The Court has scoured the CAC independently to glean where this theory may be alleged, but just does not see it.  For that reason alone, TGPL cannot be subject to personal jurisdiction pursuant to the theory.  *See, e.g.*, *Value Drug Co. v. Takeda Pharms., U.S.A., Inc.*, CIVIL ACTION NO. 21-3500, 2021 WL 6200907, at *20 & n.168 (E.D. Pa. Dec. 29, 2021) (explaining that a plaintiff cannot "rest on an unple[d] theory for personal jurisdiction merely by providing evidence of its unple[d] theory once jurisdiction is challenged").

17

But even were this theory pleaded, Plaintiffs have not demonstrated that it is viable, in light of the record evidence here.  As precedent for the theory, Plaintiffs rely on the "stream of commerce" theory of personal jurisdiction that is referenced in *Wise v. Williams*, No. 1-10-CV-02094, 2011 WL 2446303 (M.D. Pa. May 18, 2011).  (D.I. 46 at 6; *see also* D.I. 48 at 9)  This stream-of-commerce test (via which specific personal jurisdiction can be found if the defendant deliberately chose to market its product in the forum state and then placed its product in the "stream of commerce"), requires the plaintiff to show that the defendant:  (1) designed the product for the forum state; (2) advertised the product in the forum state; (3) "established communication channels within the state"; or (4) "marketed its product through a distributor who served as the defendant's sales agent for that state." *Wise*, 2011 WL 2446303, at *4 (citation omitted), *report and recommendation adopted*, 2011 WL 2436524 (M.D. Pa. June 15, 2011).

Plaintiffs have not made this showing, or anything like it.  In fact, the evidence demonstrates that "[t]he offtake from EMINCAR mining operations is not and has not been sold or imported by any Trafigura entity into U.S. markets or to U.S. counterparties."  (D.I. 83, ex. 3 at ¶ 5; *see also id.*, ex. 2 at ¶ 3 ("TTL does not purchase or import any mineral offtake from Cuba, including from [EMINCAR]."))  And there is no evidence that the offtake from EMINCAR is designed for, advertised or marketed in the United States.  (D.I. 48 at 10)

Rather than putting forward evidence that would actually satisfy the stream of commerce test, Plaintiffs are really trying to do something else.  That is, they are arguing that because benefits from TGPL's zinc mining in Cuba could be said to *flow in some amorphous way* to TGPL's (or its affiliates') entire trading business—including TTL's business in the United States—then the Court can exercise personal jurisdiction over TGPL.

As an initial matter, Plaintiffs point to no caselaw embracing that type of (incredibly expansive) personal jurisdiction theory.  (*Id.*; Tr. at 120-21 (Defendants' counsel noting that if Plaintiffs' "idea of . . . liability were endorsed, any multinational company producing a commodity inside the United States and producing a commodity outside the United States would be susceptible to being hailed into a U.S. court based on conduct occurring entirely outside the United States with no connection other than the fact that maybe [the non-U.S. activity is] generally beneficial" to the company's U.S. operations))  And even if such a theory *were* legally cognizable, the evidence does not support it.  (Tr. at 120-21; D.I. 83, ex. 4 at ¶ 11 ("TTL has not received any revenues, profits or benefits from EMINCAR-related activities.  TTL derives revenue from its own business activities, which activities have no connection to Mining Group activities outside the United States, including no connection to EMINCAR or Cuba."))  For these reasons, Plaintiffs have not met their burden of establishing that TGPL purposefully directed relevant activities at residents of the United States, or that their claims arise of or relate to TGPL's activities with the United States, as relating to this second theory.

Thus, the Court turns next to Plaintiffs' arguments regarding general jurisdiction.

**B.      General Jurisdiction**

Plaintiffs contend that TGPL's continuous and systematic operations in the United States render it "at home" here for purposes of general jurisdiction.  (D.I. 46 at 6-9)  Plaintiffs have a few lines of argument with respect to their position on general jurisdiction.  The Court will assess these in turn, after first providing more context about the relevant law.

As was previously noted above, the inquiry with respect to general jurisdiction (as modified for a Rule 4(k)(2) inquiry) is whether the "corporation's affiliations with the [United] State[s] are so continuous and systematic as to render [it] essentially at home in" the United

States. *Daimler*, 571 U.S. at 138-39 (internal quotation marks and citation omitted). The Supreme Court has explained that while general jurisdiction extends to "'any and all claims'" brought against a defendant, "that breadth imposes a correlative limit: [o]nly a select 'set of affiliations with a forum' will expose a defendant to such sweeping jurisdiction." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Daimler*, 571 U.S. at 137). In the "paradigm" case, a corporation is subject to general jurisdiction in its place of incorporation and principal place of business; only in an "exceptional case" would a corporation's operations in a place other than its place of incorporation or principal place of business be "so substantial and of such a nature as to render the corporation" at home there. *Daimler*, 571 U.S. at 137, 139 n.19. Understandably, then, the United States Court of Appeals for the Third Circuit has observed that it is "incredibly difficult" to make out this type of an "exceptional" case. *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (internal quotation marks and citation omitted).

Plaintiffs first seem to briefly argue that TGPL is subject to general jurisdiction because it directly solicits or conducts business in the United States in a substantial, continuous and systematic manner "through its financing activities and its presence as 'one of the largest and most active commodity traders in the US.'" (D.I. 46 at 6 (quoting D.I. 82, ex. 24)) But in the "Jurisdiction" section of the CAC, the following is all that is alleged as to TGPL's direct U.S.-based presence: (1) TGPL formed a "joint venture" with Phillips 66 for the construction of a deepwater port east of Texas; (2) TGPL guaranteed TTL's obligations under a prepayment agreement for crude oil; (3) TGPL's charity is "active" in the United States; (4) TGPL "routinely guarantee[s]" financing raised by one of its subsidiaries, Trafigura Funding; and (5) one U.S.

Attorney's Office appears to believe that TGPL is subject to criminal jurisdiction in the United States.  (D.I. 37 at ¶¶ 43-45, 52-53)

These contacts with the United States, either individually or collectively, fail to meet the very high threshold that *Daimler* requires.  In the Court's view, having a joint venture in Texas with another company, guaranteeing financing raised by U.S. subsidiaries, having a charity active in the country and being the subject of a U.S. criminal investigation fail to come anywhere close to a *prima facie* showing that a holding company incorporated in Singapore is essentially "at home" in the United States.  *See, e.g.*, *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1141-42 (S.D. Cal. 2018) (finding at the pleading stage that a corporation's activities did not rise to an exceptional case in which general jurisdiction would be applicable where even though the corporation had an office in the United States, drew two-thirds of its capital from United States investors and had a portfolio of United States-based companies, its operations in the United Kingdom were greater than those in the United States and it controlled its investments from the United Kingdom).  Plaintiffs' arguments to the contrary also fail to grapple with or even acknowledge TGPL's "activities in their entirety, nationwide and worldwide"—as is required by the general jurisdiction analysis.  *Daimler*, 571 U.S. at 139 n.20 ("A corporation that operates in many places can scarcely be deemed at home in all of them.").[9] Indeed, even Plaintiffs acknowledge in their briefing that TGPL has an "extensive global presence[.]"  (D.I. 46 at 7 (citing D.I. 82, ex. 35))

---

[9]      *See also In re Packaged Seafood Prods.*, 338 F. Supp. 3d at 1141-42 ("*Daimler* teaches that it is appropriate to compare business operations in the forum state with an entity's worldwide business activities."); *Giordano v. UBS, AG*, 134 F. Supp. 3d 697, 707 (S.D.N.Y. 2015) ("Plaintiff offers nothing to show that UBS AG's alleged New York contacts are such a substantial portion of its total global operations that it should be deemed to be 'at home' here.").

Next, Plaintiffs argue that even though TGPL is a Sinagporean non-operating holding company, it is nevertheless subject to general jurisdiction based on the presence and activities of its subsidiaries.  That is, Plaintiffs assert that TGPL exercises "sufficient control over its subsidiaries to render them *agents or alter egos*" of TGPL.  (*Id.* (emphasis added))

"[M]ere ownership of a subsidiary does not subject the parent corporation to personal jurisdiction in the state of the subsidiary."  *Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515, 522 (D. Del. 2016) (internal quotation marks and citations omitted).  A parent corporation may only be subject to jurisdiction based on the contacts of its subsidiary under an agency theory or alter ego theory.  *Id.*  Under the agency theory, a court "may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction."  *Tigo Energy Inc. v. SMA Solar Tech. Am. LLS*, Civil Action No. 22-915-GBW, 2023 WL 6990896, at *8 (D. Del. Oct. 23, 2023) (internal quotation marks and citation omitted).[10]  Under the alter ego theory, the contacts of an entity with sufficient ties to a particular forum can be attributed to another entity if the entity with the requisite forum contacts is the mere "alter ego" of the other; this requires a showing similar to piercing the corporate veil. *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 365 (3d Cir. 2018).[11]  These

_____

[10]      In assessing whether a subsidiary is an agent of its parent pursuant to this test, a court may consider several factors, such as the extent of overlap of officers and directors between the companies, methods of financing, the division of responsibility for day-to-day management, and the process by which each corporation obtains its business.  *Tigo Energy*, 2023 WL 6990896, at *8.

[11]      In order to determine whether a subsidiary is the alter ego of its parent, a court in part assesses certain corporate separateness factors, such as gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of the subsidiary corporation, siphoning of funds from the subsidiary corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a façade for the operations of the dominant stockholder.  *Trinity Indus.*, 903 F.3d at 365.

theories are applicable to situations "in which a parent company abuses its position to the point where the subsidiary had no separate mind, will or existence of its own." *Nespresso*, 263 F. Supp. 3d at 508.  In other words, corporate formalities should be disregarded in only "exceptional circumstances." *Id.* (internal quotation marks and citation omitted).

One problem for Plaintiffs again here is that neither the agency or alter ego theory of personal jurisdiction is facially or fairly pleaded in the CAC.  (*See* D.I. 48 at 2-3; Tr. at 52-53, 84-86)  The CAC never once mentions the term "agent" in the context of this theory of liability, and it never mentions the term "alter ego" at all.  (D.I. 37 at ¶¶ 8, 34, 86)[12]  A party may not amend a pleading through arguments made in a brief in opposition to a motion to dismiss. *Arunachalam v. Int'l Bus. Machs. Corp.*, Civ. No. 20-1020-LPS, 2021 WL 7209362, at *10 (D. Del. Dec. 29, 2021); *see also M2M Sols. LLC v. Telit Commc'ns PLC*, Civil Action No. 14-1103-RGA, 2015 WL 4640400, at *3 (D. Del. Aug. 5, 2015) (declining to consider factual allegations regarding a parent corporation's control over its subsidiary, where such allegations were not included in the complaint); *see also Value Drug Co.*, 2021 WL 6200907, at *20 & n.168.

However, even if the Court *were* to consider these agency or alter ego arguments, the outcome would be no different.  With regard to evidence that TGPL exercises sufficient control over one or more of its subsidiaries such that they are TGPL's agents or alter egos, Plaintiffs first

---

[12]        When asked about this issue during oral argument, Plaintiffs' counsel pointed to paragraph 32 of the CAC, (Tr. at 85), which states generally that the Court "has personal jurisdiction over Trafigura Group because, directly or through its wholly owned subsidiaries, Trafigura Group has sufficient contacts with the United States as a whole to comport with constitutional notions of due process[,]" (D.I. 37 at ¶ 32).  Plaintiffs' counsel also pointed to allegations following this paragraph that largely describe certain subsidiaries' connections to the United States.  (Tr. at 85; *see* D.I. 37 at ¶¶ 33-53)  These allegations fall short of sufficiently pleading the agency and alter ego tests, as they fail to speak to the elements required by these tests or give anything resembling proper notice to Defendants as to what theory of personal jurisdiction is actually being asserted (and on what basis it is being asserted).  (Tr. at 93)

point to the fact that TGPL's United States subsidiary TTL is a "'principal entit[y]'" of the consolidated Trafigura Group; Plaintiffs also assert that because TGPL and TTL are "two arms of the same business group[,]" TTL's contacts are imputed to TGPL. (D.I. 46 at 7 (internal quotation marks and citation omitted)) This vague and conclusory claim does not come anywhere close to establishing that TGPL dominates TTL, such that the latter has no separate will of its own.[13] And indeed, the evidence that Defendants put forward establishes that TTL is *not* controlled by TGPL. (D.I. 83, ex. 1 at ¶ 5 (TTL's Regional Controller averring that "TTL is a well-capitalized independent operating entity within the Trafigura Group of companies. TTL . . . . trades for its own account."); *id.*, ex. 2 at ¶ 5 (TTL's Compliance Manager averring that "TTL does not act as an agent" for TGPL or for any other Trafigura entity))

Plaintiffs then assert that a few other "indicia of control" have been sufficiently identified. (D.I. 46 at 7; *see also* D.I. 48 at 3-4) First, they note that: (1) TGPL owns a substantial majority of the shares of many of its United States subsidiaries; (2) TGPL is owned by approximately 1,000 employees, including managers of its subsidiaries, which (3) gives "subsidiaries control over the Group[.]" (D.I. 46 at 7) Second, Plaintiffs state that TGPL "presents a unified marketing image[,]" which tells the world that its subsidiaries "act in a seamless, coordinated manner" for the benefit of TGPL's customers and partners. (*Id.*) But with respect to the first point, it is well-settled that "[a] corporation does not become an agent [or an

---

[13]        In support of the notion that being "two arms of the same business group" means that one corporation's contacts should be imputed to the other, Plaintiffs cite to a case that, unsurprisingly, does not stand for that broad proposition. (D.I. 46 at 7 (citing *Pfizer Inc. v. Mylan Inc.*, 201 F. Supp 3d 483, 489 (D. Del. 2016)) Instead, the case makes the simple point that the agency theory applies not just to parents and subsidiaries, but also to companies that are two arms of the same business group—*provided that* the plaintiff show that the defendant exercises sufficient control over the activities of the other company. *Pfizer*, 201 F. Supp. 3d at 489.

alter ego] of another corporation merely because a majority of its voting shares is held by the

other." *Rovi Corp. v. Haier Grp. Corp.*, Civil Action No. 11-1140 (KAJ), 2013 WL 4534641, at

*3 n.8 (D. Del. Aug. 23, 2013) (internal quotation marks and citation omitted); *see also Japan

Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978) (same).

As for the second point, to the extent that Plaintiffs' exhibits even can be said to show that TGPL

presents a "unified marketing image" with its subsidiaries, that could not itself amount to a

sufficient showing that TGPL exercises *substantial control* over these unnamed subsidiaries.

*Mallinckrodt PLC*, 2024 WL 1251260, at *4 (concluding that plaintiffs failed to sufficiently

plead that one defendant ("ALSA") had an agency relationship with other defendants where,

*inter alia*, statements that the "Group is organized and based on a consistent Group strategy . . .

do not indicate that ALSA has substantial authority over the other Defendants") (internal

quotation marks and citations omitted); *cf. Nespresso*, 263 F. Supp. 3d at 505 (concluding that

the fact that a subsidiary publicly attributed its successes to the parent was insufficient to help

make out a *prima facie* case of agency).  Indeed, as Defendants retort, several of the documents

to which Plaintiffs cite convey that TGPL and its subsidiaries are in fact "separate and distinct"

entities.  (D.I. 48 at 4-5 (citing D.I. 82, ex. 1 at 2))[14]

In the end, courts are instructed to consider a combination of factors in determining

whether an agency or alter ego relationship exists between a parent and its subsidiaries.  *See*

---

[14]    In Plaintiffs' Motion, they highlight the (unpleaded) fact that TTL's Chief
Financial Officer is also listed as a member of TGPL's Financial Leadership.  (D.I. 44 at 10
(citing *id.*, exs. 39-40))  Even if this were pleaded in the CAC, this would not be sufficient to
demonstrate a *prima facie* showing of alter ego or agency status.  *Cf. Bristol-Myers Squibb Co. v.
Aurobindo Pharma USA Inc.*, C.A. No. 17-374-LPS (CONSOLIDATED), C.A. No. 17-379-LPS,
2018 WL 5109836, at *4 (D. Del. Oct. 18, 2018) (noting with respect to a motion to dismiss for
improper venue, where the plaintiff asserted that the defendants were alter egos, that "the fact
that MPI and Mylan Securitization share one overlapping director does not demonstrate that
corporate formalities have been ignored").

*supra* nn.10-11.  And here, Plaintiffs' pleading and associated evidence do not well address most or all of those factors.  (D.I. 48 at 4)  Plaintiffs simply have not come close to meeting their burden of demonstrating the possible existence of an agency or alter ego relationship between TGPL and any of its United States subsidiaries.

Plaintiffs' final argument was that a finding that TGPL is the alter ego of one of its U.S.-based subsidiaries is "not necessary" in order for the Court to exercise personal jurisdiction over TGPL—because courts will disregard the corporate form "in the interest of justice, when such matters of fraud, contravention of law or contract, [or] public wrong . . . are involved."  (D.I. 46 at 8) (citing *Fid. Nat'l Info. Servs., Inc. v. Plano Encryption Techs., LLC*, Civil Action No. 15-777-LPS-CJB, 2016 WL 1650763, at *4 (D. Del. Apr. 25, 2016))  The Court is uncertain as to what Plaintiffs were attempting to convey here.  The opinion Plaintiffs cited for this proposition (one written by the undersigned Judge) does not stand for the proposition that Plaintiffs assert.  In that case—*Fid. Nat'l Info. Servs., Inc. v. Plano Encryption Techs., LLC*, Civil Action No. 15-777-LPS-CJB, 2016 WL 1650763 (D. Del. Apr. 25, 2016)—the plaintiff was attempting to show that the corporate form could be disregarded because one corporate defendant was the alter ego of the other corporate defendant.  2016 WL 1650763, at *3-5.  And in the quoted portion of the opinion that Plaintiffs utilize in their brief (cited above), the Court was simply explaining that under Delaware law (which applied in that case), it is necessary for a plaintiff seeking to make an alter ego showing to demonstrate that there has been an element of fraud or inequity in the misuse of the corporate form.  *Id.*  So the opinion was not about explaining why an alter ego finding is "not necessary"; to the contrary, the opinion explained *what one needs to do* (under Delaware law) *to make a showing of* alter ego liability.  (Tr. at 94-95)

Federal common law regarding the alter ego analysis (which would apply here) similarly requires a showing not only of the lack of corporate separateness between two entities, *see supra* n.11, but also that there is an element of injustice or fundamental unfairness (if not actual fraud) at play in the misuse of the corporate form. *See Trs. of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003). It could be that, in this portion of their briefing, Plaintiffs were attempting to argue that such a showing could be made here, because "TGPL invokes its corporate structure to avoid liability for violations of the HBA." (D.I. 46 at 8) But if that is what Plaintiffs were arguing, the argument fails. In support of this assertion, Plaintiffs only vaguely suggest that: (1) in June 2014, TGPL tried to evade United States sanctions regarding Cuba in a separate matter; and (2) in moving TTL from Switzerland to Delaware in January 2015, TGPL was attempting to erect some sort of "jurisdictional shield." (*Id.* at 8-9) The Court does not understand how these speculations are supposed to indicate how TGPL is the alter ego of one of its subsidiaries or that, if it is, this indicates that an injustice is at hand. (*See* D.I. 48 at 7); *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392 (D. Del. 2012).[15]

---

[15]     In their brief in support of their motion for jurisdictional discovery, Plaintiffs posit that personal jurisdiction is also proper under the *Calder* effects test. This test permits a court to exercise personal jurisdiction over a nonresident defendant who acts outside the forum state to cause an effect upon the plaintiff within the forum state. (D.I. 44 at 19 (citing *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 148 (3d Cir. 1992)) The test is met when: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm suffered by the plaintiff; and (3) the defendant *expressly aimed* his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1998).

The Court is not persuaded that personal jurisdiction over TGPL is proper under the *Calder* effects test, for multiple reasons. As an initial matter, as was the case with several of Plaintiffs' other theories, Plaintiffs fail to point to any allegations in the CAC relating to this theory. (D.I. 44 at 19-20) Beyond that, while it may be true that Plaintiffs currently reside in the United States (and thus could be said to feel harm here), there has been no showing that Defendants *expressly aimed* their alleged tortious conduct *at the United States*. *See, e.g.*, *N. Am.*

**C.    Conclusion as to TGPL's Motion**

For these reasons, the Court concludes that Plaintiffs have not sufficiently established a basis for this Court to assert specific or general jurisdiction over TGPL.

**D.    Plaintiffs' Motion for Jurisdictional Discovery**

With their Motion, Plaintiffs request that, if the Court finds the evidence cited in connection with TGPL's Motion is insufficient to support a finding of personal jurisdiction over TGPL, the Court should nevertheless grant Plaintiffs leave to conduct limited jurisdictional discovery.  (D.I. 44 at 2)  The Third Circuit has stated that "[i]f a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state,' . . . the plaintiff's right to conduct jurisdictional discovery should be sustained."  *Toys "R" Us, Inc.*, 318 F.3d at 456 (citation omitted).

For the reasons explained above, the Court has determined that Plaintiffs have not made out a *prima facie* showing—that is, they have not established with "reasonable particularity" the existence of sufficient contacts between TGPL and the United States.  And in a prior decision, the Court has explained why—pursuant to the applicable law of the Third Circuit—if a party

---

*Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 645 F. Supp. 3d 1352, 1368-69 (S.D. Fla. 2022) (finding that plaintiffs did not establish that jurisdiction was proper under the *Calder* effects test, where "Plaintiff has not alleged that it experienced any injury in Florida, let alone that the 'effects' of Defendants' conduct were felt in Florida.  Indeed, given that Plaintiff's claims hinge on the alleged trafficking that occurred in Cuba, Florida was neither the 'focal point [of] the story [nor] of the harm suffered.'") (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1348 (S.D. Fla. 2002) (same, where "[p]laintiff merely states that because the actions of Altadis, S.A. have had 'illegal effects within the United States,' Altadis, S.A. may be brought before this Court in Florida.  The minimum contacts requirement of the Due Process Clause would be worthless if foreign defendants could be brought before a court in Florida merely by alleging "illegal effects within the United States."), *aff'd sub nom.*, *Gen. Cigar Holdings v. Altadis, S.A.*, 54 F. App'x 492 (11th Cir. 2002).

fails to make out a *prima facie* showing of personal jurisdiction, then the party is not entitled to take jurisdictional discovery. *See 3G Licensing, S.A. v. Lenovo Grp. Ltd.*, Civil Action No. 17-84-LPS, 2019 WL 3974539, at *8-9 (D. Del. Aug. 22, 2019) (citing cases), *report and recommendation adopted*, 2019 WL 7635823 (D. Del. Sept. 19, 2019); *see also Zausner Foods Corp. v. ECB USA, Inc.*, Civil Action No. 20-1769-RGA-CJB, 2022 WL 609110, at *11 n.16 (D. Del. Jan. 31, 2022), *report and recommendation adopted*, 2022 WL 884235 (D. Del. Mar. 25, 2022). Put differently, as even Plaintiffs seem to acknowledge, (Tr. at 74-75), the relevant law does not allow for a scenario where a party has failed to make out a *prima facie* showing of personal jurisdiction, but still somehow has made out a sufficient showing in order to warrant obtaining jurisdictional discovery. *Cf. Ctr. for Gestalt Dev., Inc. v. Bowman*, Case No. 2:22-CV-02058-JDW, 2022 WL 11398356, at *4 (E.D. Pa. Oct. 19, 2022); *Schrotberger v. Doe*, 21-cv-0364-JMY, 2022 WL 4072962, at *7 (E.D. Pa. Sept. 1, 2022); *Vinco Ventures, Inc. v. Milam Knecht & Warner, LLP*, No. 5:20-cv-6577, 2021 WL 4399682, at *8 (E.D. Pa. Sept. 27, 2021).

Therefore, the Court DENIES Plaintiffs' Motion.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS TGPL's Motion and DENIES Plaintiffs' Motion.

As was noted above, Plaintiffs did not come close to demonstrating a *prima facie* case of personal jurisdiction under any of the theories they presented here. And so the Court is very skeptical that they could do so in the future if given another chance. But in part because this is the first time that a judge has found Plaintiffs' jurisdictional pleading wanting, *see Illumina, Inc. v. Guardant Health, Inc.*, Civil Action No. 22-334-GBW-CJB, 2023 WL 1407716, at *17 (D. Del. Jan. 31, 2023), and because leave to amend should be "freely" given "when justice so

requires[,]" Fed. R. Civ. P. 15(a)(2), the Court will give Plaintiffs one further opportunity to attempt to address these jurisdictional hurdles as to TGPL.  It ORDERS that dismissal here will be without prejudice, and that after the Court resolves the remaining pending motions, it will address a schedule for Plaintiffs to be permitted to file a motion for leave to further amend the CAC in this regard.

      An appropriate Order will issue.