**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

RICHARD SIERRA, VERONICA GOOCH, ROLAND SIERRA, LUCIA LLERAS DE LABRADA, PRISCILLA LLERAS-BUSH, in her personal capacity and as Personal Representative of the ESTATE OF OLGA ROMAGOSA, and SUZETTE NICOLE NEYRA HENDRICK in her capacity as Independent Executor of of the ESTATE OF ANGELA ROMAGOSA FERNANDEZ,

Plaintiffs,

v.

TRAFIGURA TRADING LLC and TRAFIGURA GROUP PTE LTD,

Defendants.

Civil Action No. 22-366-JLH-CJB
CONSOLIDATED

---

Michael L. Vild, CROSS & SIMON, LLC, Wilmington, DE; David A. Baron, Melvin White, Laina C. Lopez and Jared R. Butcher (argued), BERLINER CORCORAN & ROWE LLP, Washington, DC; Richard W. Fields, Martin F. Cunniff and Edward Han (argued), FIELDS HAN CUNNIFF PLLC, Washington, DC, Attorneys for Plaintiffs.

Jack B. Blumenfeld and Michael J. Flynn, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; Alex J. Brackett (argued), Caroline Schmidt Burton, Andrew P. Thornton-Dibb and Juliet B. Clark, MCGUIRE WOODS LLP, Richmond, VA, Attorneys for Defendants.

---

**MEMORANDUM OPINION**

September 6, 2024
Wilmington, Delaware

Christopher J. Burke
**BURKE, United States Magistrate Judge**

In this case, Plaintiffs Richard Sierra, Veronica Gooch, Roland Sierra, Lucia Lleras de Labrada, Priscilla Lleras-Bush (in her personal capacity and as personal representative of the Estate of Olga Romagosa) and Suzette Nicole Neyra Hendrick (as independent executor of the Estate of Angela Romagosa Fernandez) (collectively, "Plaintiffs") bring claims under Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, codified at 22 U.S.C. §§ 6081-86 (the "Helms-Burton Act" or "HBA") against Defendants Trafigura Group Pte. Ltd. ("TGPL") and Trafigura Trading, LLC ("TTL" and collectively with TGPL, "Defendants"). (*See* D.I. 42 at 1; D.I. 46 at 1) Plaintiffs seek to recover damages and interest under the Helms-Burton Act against Defendants for allegedly trafficking in Plaintiffs' property that was wrongfully confiscated by the Cuban Government in 1960. (D.I. 37 at ¶¶ 1, 95) Presently pending before the Court is TTL's motion to dismiss the operative Consolidated Amended Complaint ("CAC"), filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) ( the "Motion"). (D.I. 39)[1] For the reasons set forth below, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion.

## I. BACKGROUND

### A. Factual Background

The Court hereby incorporates its summary of the general factual background of this case, which it set out in its August 14, 2024 Memorandum Opinion regarding TGPL's motion to

---

[1] Defendants have also filed a supplemental motion to dismiss Plaintiff Suzette Nicole Neyra Hendrick's Consolidated Claims pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Defendants' Supplemental Motion"), (D.I. 54); the Court will address that motion in a forthcoming opinion.

dismiss (the "TGPL opinion"). (D.I. 85) Further information about these subjects relevant to the pending Motion will be discussed below in Section III.

**B. Procedural History**

Plaintiffs Richard Sierra, Veronica Gooch, Roland Sierra, Lucia Lleras de Labrada, Priscilla Lleras-Bush (in her personal capacity and as personal representative of the Estate of Olga Romagosa), Suzette Nicole Neyra Hendrick (as independent executor of the Estate of Angela Romagosa Fernandez), Márian Maria de los Angeles Romagosa and Lisette Romagosa Smyrnios filed this action on March 22, 2022.[2] (D.I. 1) This action was then consolidated with an action filed by Angela Romagosa Fernandez against TTL in November 2021 (Civil Action No. 21-1606). (D.I. 36)[3] On February 24, 2023, Plaintiffs filed the operative CAC. (D.I. 37) The CAC asserts a single cause of action against Defendants under the HBA. (*Id.* at ¶¶ 118-27)

On March 1, 2023, TTL filed its Motion. (D.I. 39) The Motion was initially fully briefed on March 6, 2023, (D.I. 47), though Plaintiffs subsequently filed a sur-reply brief on April 8, 2024, (D.I. 77). The parties also have filed numerous Notices of Supplemental Authority, (D.I. 51; D.I. 57; D.I. 59; D.I. 60; D.I. 76), some of which are related to the instant Motion. The Court[4] heard argument on the Motion (as well as on other then-pending motions) on April 11, 2024. (D.I. 84 (hereinafter, "Tr."))

---

[2] Márian Maria de los Angeles Romagosa and Lisette Romagosa Smyrnios subsequently filed notices of dismissal with respect to their claims and are thus no longer parties to this action. (D.I. 13; D.I. 14)

[3] Angela Romagosa Fernandez died on February 16, 2022, and her claims are now being prosecuted by Plaintiff Suzette Nicole Neyra Hendrick, in her capacity as independent executor of Angela Romagosa Fernandez's estate. (D.I. 37 at ¶¶ 20(a)-(b))

[4] On January 25, 2024, United States District Judge Jennifer L. Hall referred this case to the Court to hear and resolve all pre-trial matters up to the pre-trial conference. (D.I. 61) On February 5, 2024, the parties jointly consented to the Court's jurisdiction to decide the

## II. LEGAL STANDARD

As noted above, the Motion implicates Rule 12(b)(1) (as to a standing challenge) and Rule 12(b)(6). Below, the Court sets out the relevant legal standards relating to such motions.

### A. Federal Rule of Civil Procedure 12(b)(1)

"Standing is a constitutional requirement pursuant to Article III and it is a threshold jurisdictional issue." *Abraxis Biosci., Inc. v. Navinta LLC*, 625 F.3d 1359, 1363 (Fed. Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020). The plaintiff bears the burden of establishing its standing under Article III. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006); *Puma Biotech., Inc. v. AstraZeneca Pharms. LP*, Case No. 21 C 1338, 2024 WL 1157120, at *2 (D. Del. Mar. 18, 2024). "Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim." *Samsung Elecs. Co., Ltd. v. ON Semiconductor Corp.*, 541 F. Supp. 2d 645, 648 (D. Del. 2008); *see also Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) ("A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.").

Motions under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction and/or standing to hear a case. *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge is based "purely on the sufficiency of the allegations in the complaint" and is reviewed under the same standard as a Rule 12(b)(6) motion—i.e., "the Court must accept well-pled factual allegations as true and may consider only the complaint and any documents referenced therein or attached thereto." *Arneault v.*

---

Motion, TGPL's then-pending motion to dismiss and Defendants' Supplemental Motion. (D.I. 64)

*Diamondhead Casino Corp.*, 277 F. Supp. 3d 671, 675 (D. Del. 2017).[5] On the other hand, a factual challenge to standing attaches no presumption of truthfulness "to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

**B. Federal Rule of Civil Procedure 12(b)(6)**

When presented with a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court conducts a two-part analysis. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the court separates the factual and legal elements of a claim, accepting all of the complaint's well-pleaded facts as true, but disregarding any legal conclusions. *Id.* at 210-11. Second, the court determines whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).[6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In assessing the plausibility of a claim, the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff

---

[5] *See also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) ("In reviewing facial challenges to standing, we apply the same standards as on review of a motion to dismiss under Rule 12(b)(6). . . . Consequently, [as to a facial challenge] we accept the Plaintiffs' well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the Plaintiffs' favor.") (internal citation omitted).

[6] In resolving a motion to dismiss, a court typically only considers the allegations in the complaint, the exhibits attached thereto, documents or facts that are incorporated by reference into the complaint or that are otherwise integral to the complaint's allegations, matters of public record and items for which the court can take judicial notice. *See Siwulec v. J.M. Adjustment Servs., LLC*, 465 F. App'x 200, 202 (3d Cir. 2012); *ING Bank, fsb v. PNC Fin. Servs. Grp., Inc.*, 629 F. Supp. 2d 351, 354 (D. Del. 2009).

may be entitled to relief.'" *Fowler*, 578 F.3d at 210 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)).

## III. DISCUSSION

With its Motion, TTL argues that Plaintiffs' claims against it should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction and under Rule 12(b)(6) for failure to state a claim. (D.I. 40 at 2-3) The Court will address each of these bases for dismissal below.

### A. Rule 12(b)(1) Arguments/Article III Standing

TTL first challenges, pursuant to Rule 12(b)(1), whether Plaintiffs have Article III standing to bring their HBA claim. (*Id*. at 9-11; D.I. 47 at 2-8) Article III standing has three elements. *Lujan*, 504 U.S. at 560; *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 322 (D. Del. 2021). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Glen*, 529 F. Supp. 3d at 322.

TTL asserts that Plaintiffs do not have Article III standing because they have (1) failed to plausibly allege a concrete injury (2) that is fairly traceable to TTL's conduct (with this latter assertion seeming to be TTL's main argument). (D.I. 40 at 9-11; D.I. 47 at 2-3 ("TTL is asserting that the trafficking alleged in is not fairly traceable to TTL[.]")). The Court will take up these arguments in turn.

#### 1. Injury In Fact

The "[f]irst and foremost" of standing's three elements is "injury in fact[.]" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at

339 (quoting *Lujan*, 504 U.S. at 560). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice[.]" *Lujan*, 504 U.S. at 561; *see also Falcone v. Dickstein*, 92 F.4th 193, 203 (3d Cir. 2024) ("In the context of a motion to dismiss, the [i]njury-in-fact element is not Mount Everest, and [the plaintiff] need only allege some specific, identifiable trifle of injury.") (internal quotation marks and citation omitted).

TTL's challenge to this element was not fulsomely set out in its briefing. Its argument was made only in one half-page of its opening brief, and it did not address the argument again in its reply brief. (D.I. 40 at 10; D.I. 47) As a result, its assertions here were somewhat difficult to understand (and thus were not particularly persuasive).

As best as the Court can tell, TTL is putting forward two reasons as to why Plaintiffs have not sufficiently alleged injury in fact. (D.I. 40 at 10) First, TTL contends that: (1) Plaintiffs' asserted injury is "based upon TTL allegedly participating in or profiting from unauthorized mining operations without compensating Plaintiffs[;]" (2) pursuant to Cuban law, all mineral rights belong to Cuba and can only be exploited under a mining concession; (3) but the CAC does not allege that the Mining Company (the mining operation that owned the relevant mines at issue prior to their alleged confiscation by the Cuban government) had any such concessions that would give it the right to mine where EMINCAR (the joint venture via which Defendants allegedly traffic in Plaintiffs' mining-related property) now operates; and (4) this means that Plaintiffs cannot plead injury, because any ownership interests they hold in the relevant Property would not give them the right to mine on the Property. (*Id.* (citing D.I. 37 at ¶ 101)) Second, TTL argues that Plaintiffs fail to demonstrate that any profit that Defendants obtained from the use of other facilities originally owned by Plaintiffs, such as the port of Santa Lucia, invades any legally-protected interest of Plaintiffs. (*Id.* (citing D.I. 37 at ¶¶ 82-89))

Another District Court examining a similar standing challenge in an HBA case involving TTL explained that "[a] Title III plaintiff's allegation that she has an interest in confiscated properties and was harmed by the defendant trafficking in said properties is sufficient to satisfy the injury-in-fact requirement." *Escalon v. Trafigura Trading LLC*, CIVIL ACTION NO. 4:21-CV-00659, 2022 WL 19691178, at *2 (S.D. Tex. Mar. 16, 2022), *aff'd*, 2023 WL 7295177 (5th Cir. Nov. 3, 2023). And to that end, the CAC alleges that: (1) Plaintiffs have claims to the Property, including to the mines at issue and to the port of Santa Lucia; (2) Plaintiffs have been injured by the loss of their rights in that Property, which was confiscated by Cuba; and (3) unlawful trafficking in the Property by others, without Plaintiffs' authorization and without compensation to Plaintiffs, has caused this injury. (D.I. 37 at ¶¶ 77, 95, 97, 101, 115-16; *see also* D.I. 45 at 1, 6) At this early stage of the case, these allegations seem sufficient to plausibly allege an injury in fact.[7] *See, e.g.*, *Escalon*, 2022 WL 19691178, at *2 (concluding that the

---

[7] Because TTL did not really well explain its theories as to why Plaintiffs' ownership-related allegations as to the Property were insufficient, it is difficult to address those theories in great detail. By way of example, TTL's argument about why Plaintiffs cannot show injury in fact relating to the mining operations seems to turn on TTL's assertion that the Mining Company lacked a "mining concession" and that this prevents Plaintiffs from having suffered injury from Defendants' use of the mines. (D.I. 40 at 10) As an initial matter, the Court notes that Plaintiffs did plead that they owned not just the Cuban mining operations at issue, but also "mining concessions[.]" (D.I. 37 at ¶ 77) Moreover, if TTL meant to challenge this assertion, then it would at least need to articulate that challenge in a clear, understandable way. But it did not do so. By way of just one example, in attempting to support its assertion that a "mining concession" from the Cuban government was needed in order to exploit natural resources from Cuban mines, TTL simply appended a generic footnote to its opening brief that cited to four documents; those four documents, in turn, relate in some way to Cuban law and together total hundreds of pages of exhibits. (D.I. 40 at 10 n.13) And yet: (1) the footnote contains no parentheticals with any explanation as to *why* the cited documents support the proposition at issue; (2) the footnote contains almost no pin cites to any of the documents; and (3) no portion of the four exhibits were highlighted for the Court. (*Id.* & exs. 10-13) As a result, the Court simply does not know what to make of this footnote, nor does it have a good explanation from TTL about: (1) exactly how the documents cited therein are said to support its argument here; and (2) why, even if TTL is right about the mining concessions issue, Plaintiffs did not articulate other viable forms of injury due to TTL's incursion onto their Property. (*See* D.I. 37 at ¶ 116

plaintiffs' allegations were sufficient to meet the injury-in-fact requirement where they allege that: "(1) they have stock ownership and inherited ownership interests in the Confiscated Property; (2) '[t]hrough their partnership with the Cuban government, Defendants profit from the exploration, extraction, and exportation of minerals, such as lead and zinc, from the Confiscated Property, which they use to supply customers worldwide and to support their commodities trading activities'; and (3) '[n]otwithstanding their ongoing and substantial profits from the Confiscated Property, neither Defendants nor the Cuban government has ever obtained authorization from, or paid compensation to, the rightful owners'") (internal citation omitted); *see also, e.g.*, *N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, CASE NO.: 20-cv-22471-GAYLES/OTAZO-REYES, 2021 WL 3741647, at *4 (S.D. Fla. Aug. 24, 2021) (finding that allegations that plaintiffs were harmed when defendants used the confiscated property "for their own profit and without authorization from, or 'a speck of compensation'" to plaintiffs were sufficient to allege a concrete harm); *Havana Docks Corp. v. MSC Cruises SA Co*., 484 F. Supp. 3d 1177, 1191 (S.D. Fla. 2020) (finding that the plaintiff plausibly alleged a legally protected interest where "Havana Docks alleges it has a Certified Claim to the Subject Property, and that MSC trafficked in the Subject Property without authorization" because pursuant to the HBA, "trafficking in confiscated property is an invasion of a legally protected interest—i.e. a statutorily constructed property interest in the Subject Property, which conveys a *right* to prevent third-party use of the same") (emphasis in original).

**2. Traceability**

(asserting, *inter alia*, that Plaintiffs lost the ability to obtain economic rent for the Property due to TTL's unauthorized use))

The Court turns next to traceability, which is where things get tricky as to this Rule 12(b)(1) standing challenge. "Traceability means that the injury was caused by the challenged action of the defendant as opposed to an independent action of a third party." *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 158 (3d Cir. 2022) (citing *Lujan*, 504 U.S. at 560). The United States Court of Appeals for the Third Circuit has explained that traceability "is akin to 'but for' causation in tort and may be satisfied even where the conduct in question might not have been a proximate cause of the harm." *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 481 (3d Cir. 2018) (internal quotation marks and citations omitted). As a result, traceability can be established even if a defendant's conduct caused only a small part of the alleged injury. *See Pub. Int. Rsch. Grp. of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 n.8 (3d Cir. 1990) (citation omitted).

Plaintiffs allege that TTL participates in the alleged trafficking "through its trading activities and involvement in procuring financing" for EMINCAR. (D.I. 45 at 2 (citing D.I. 37 at ¶ 108)) For its part, TTL responds that Plaintiffs have failed to allege plausible facts establishing a causal connection between the actions of TTL and Plaintiffs' alleged injury—in other words, "TTL is asserting that the trafficking alleged in is not fairly traceable to TTL[.]" (D.I. 47 at 2-3; *see also* D.I. 40 at 10-11; D.I. 47 at 2-8)

In support of its position here, TTL mounts a strong factual attack to subject matter jurisdiction. (Tr. at 26, 30) In doing so, it points to declarations stating that:

- "TTL has not funded or facilitated in any way the funding of EMINCAR, nor of any EMINCAR-related business activities." (D.I. 40, ex. 1 at ¶ 4);

- "TTL has not financed, nor has it in any way facilitated the financing of, investments or business activities relating to Cuba or EMINCAR." (*Id.* at ¶ 6).

- "None of Trafigura's funding of EMINCAR or EMINCAR-related business activities has: (i) been in U.S. dollars, (ii) been paid using U.S. banks or other U.S. financial institutions, (iii) involved U.S. persons or (iv) involved U.S. operations of Trafigura such as . . . TTL[.]" (*Id.*, ex. 4 at ¶ 5);

- "Trafigura has not funded any EMINCAR-related payment via financing guaranteed by . . . TTL or in which TTL is otherwise involved, including the financing Plaintiffs refer to in [the CAC]. This includes no use of financing from any financing vehicle for which TTL has served as a guarantor, originator or in which TTL has in any way otherwise been involved." (*Id.* at ¶ 7);

- "None of Trafigura's TTL-related financing transactions is specifically designed to facilitate financing for the Mining Group [a group of Trafigura-related companies who are alleged to have invested in and participate in the Cuban mining operations at issue] or EMINCAR. None has been designed, implemented or used to fund, finance or facilitate any operations in or relating to EMINCAR or Cuba, nor do they have any other connection to or role in any activities in or relating to EMINCAR or Cuba." (*Id.* at ¶ 8).

(D.I. 40 at 11); *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) ("Here, because it submitted a signed declaration disputing Davis's factual allegations, Assurant has mounted a factual challenge to subject matter jurisdiction.").

Despite this, and in light of controlling precedent from the Third Circuit, the Court concludes that it is not appropriate for it to consider TTL's argument as an issue of standing. (D.I. 45 at 5-8) The Third Circuit has explained that "a district court must take care not to reach the merits of a case when deciding a Rule 12(b)(1) motion." *CNA v. United States*, 535 F.3d 132, 144 (3d Cir. 2008); *see also Falcone*, 92 F.4th at 202-03 ("Our standing inquiry is separate from any assessment of his claims' merits. . . . All we ask is whether Falcone plausibly alleges he was injured under his theory of the underlying legal claims."); *Davis*, 824 F.3d at 348 ("The standing requirement is analytically distinct from the merits of the underlying dispute."). This is so because of the different standards governing Rule 12(b)(1) and Rule 12(b)(6), with the latter

rule providing "greater procedural safeguards for plaintiffs[.]" *Davis*, 824 F.3d at 348-49. In bringing a motion under Rule 12(b)(6), the defendant bears the burden of demonstrating that the plaintiff has not stated a claim, and the defendant is not permitted to contest the plaintiff's well-pleaded factual allegations. *Id.* at 349. But when proceeding under Rule 12(b)(1), the plaintiff bears the burden of proving subject matter jurisdiction, and a defendant may contest the allegations in the complaint and submit its own evidence to show that the court lacks jurisdiction. *Id.* Because Rule 12(b)(6) grants greater protections to plaintiff, that rule (not Rule 12(b)(1)) is the proper vehicle for the early testing of a plaintiff's claims. *Id.*

In *Davis v. Wells Fargo*, 824 F.3d 333 (3d Cir. 2016), the Third Circuit further explained that "standing is generally an inquiry about the plaintiff: is this the right person to bring this claim"—"[i]t is generally not an inquiry into whether the plaintiff has got the right defendant." 824 F.3d at 348.[8] Instead, a dispute between parties about whether or not the defendant may be held responsible for the conduct in question is a "merits question." *Id.* And that is precisely the dispute that TTL raises in connection with the Rule 12(b)(1) portion of its motion. That is, TTL is asserting that *it* should not be held responsible for the alleged trafficking—i.e., that Plaintiffs have not alleged a sufficient connection between *TTL* and any trafficking in Cuba, and that it therefore cannot be held "accountable for the unrelated actions of sister entities in the same family." (D.I. 40 at 7, 10-11; *see also* D.I. 47 at 3-4 (asserting that none of the CAC's allegations "plausibly link Plaintiffs' asserted injuries *to any alleged conduct of TTL*") (emphasis added)) Under the reasoning of *Davis*, then, TTL's argument is clearly a merits-based challenge

[8] The Third Circuit noted that the traceability requirement of the test for standing was not "meant to transform ordinary merits arguments about who is legally responsible for an injury into questions of jurisdiction." *Davis*, 824 F.3d at 347 n.16. Instead, traceability is a "question of causation" that looks to whether a plaintiff has alleged sufficient facts to support a causal connection between the plaintiff's injury and the defendant's conduct. *Id.*

to Plaintiffs' claims, and thus simply cannot be considered via the Rule 12(b)(1) portion of TTL's Motion. *See Davis*, 824 F.3d at 349-50 (vacating the district court's grant of the defendant's Rule 12(b)(1) motion, where the defendant "does not contend that [the plaintiff] is the wrong person to bring his claims [but instead] argues that he has filed suit against the wrong party, that his claims against [the defendant] are without merit because [the defendant] has done nothing wrong"); *see also Dettmering v. VBit Techs. Corp.*, Civil Action No. 22-1482-CFC-SRF, 2023 WL 4824955, at *3 (D. Del. July 27, 2023) (recommending denial of the defendant's Rule 12(b)(1) motion where "Vo's focus on the lack of pleaded allegations *specifically tied to her own individual conduct* improperly attempts 'to transform ordinary merits arguments about who is legally responsible for an injury into questions of jurisdiction'") (emphasis added) (quoting *Davis*, 824 F.3d at 347 n.16), *report and recommendation adopted*, 2023 WL 6211243 (D. Del. Sept. 25, 2023).[9]

---

[9] TTL attempts to distinguish *Davis* as a case in which "the plaintiff alleged a tenable theory of liability, just against the wrong party, making the challenge more properly a merits issue rather than a standing one"; in contrast, TTL says that here, it is asserting that "Plaintiffs cannot plausibly allege a tenable theory of liability against [it] because Plaintiffs' alleged injury is not sufficiently traceable to TTL's mere participation in and general support of the Trafigura Group or even its Mining Group" and instead that Plaintiffs' injury, if any, "can trace only to the independent action *of third parties other than TTL*." (D.I. 47 at 4 (emphasis added); *see also* Tr. at 27-30 (TTL's counsel asserting that *Davis* is a "'right plaintiff, wrong defendant' case[,]" whereas this is somehow not such a case)) In *Davis*, the plaintiff had sued an insurance company ("Assurant") and alleged that Assurant was the entity responsible for placing certain insurance coverage relating to the dispute; Assurant, through its Rule 12(b)(1) standing challenge, argued that the actual entity that placed the coverage was not itself but another entity—its subsidiary, ASIC. 824 F.3d at 339.

The Court does not see the distinction that TTL is trying to make here. As noted above, TTL's argument is that Plaintiffs have the wrong defendant—i.e., that Plaintiffs wrongly charge TTL with a violation of the HBA, when instead, they should be looking to "third parties other than TTL." So just like in *Davis*, TTL's challenge is a merits challenge—one asserting that the allegations against the defendant are substantively wrong, that some other third party is to blame (if anyone is), and that when a court figures this out, the court will determine that the defendant

For these reasons, the Court is obligated to deny the Rule 12(b)(1) portion of TTL's Motion. The Court does so even though (as it will explain below), when it comes to the merits-based Rule 12(b)(6) portion of that same Motion, it will conclude that Plaintiffs have not set out plausible claims of HBA-related trafficking as to TTL. Nevertheless, the Court understands the Third Circuit's jurisprudence here to mean that in all but the rarest of cases,[10] it should deny a Rule 12(b)(1) motion filed in a situation like this, and instead simply move on to assess TTL's Rule 12(b)(6) challenge on the merits. *See, e.g.*, *Falcone*, 92 F.4th at 204 (rejecting the defendants' argument that an issuance of a summons was not fairly traceable to them, where the plaintiff alleged that those defendants conspired or cooperated with the police to issue the summons, and noting that "[a]lthough that claim may not survive a Rule 12(b)(6) motion to dismiss, it suffices for purposes of our standing inquiry"); *Labertew v. WinRed, Inc.*, Case No. 2:21-cv-555-TC, 2022 WL 1568924, at *4-5 (D. Utah May 18, 2022) (citing and relying on *Davis*, and concluding that where a defendant's Rule 12(b)(1) challenge amounts to an allegation

---

cannot be held liable as to the legal claim at issue. Therefore, the rationale of *Davis*' holding should apply just as well in this case.

[10] *Davis* does suggest that a court could "sparingly" dismiss pursuant to Rule 12(b)(1) on traceability grounds "for wholly insubstantial claims to jurisdiction" such as, for example, in a case where a plaintiff sues "Corporation X on a claim that it is responsible for a civil war somewhere on the other side of the planet." 824 F.3d at 350 & n.19; *see also Adam v. Barone*, 41 F.4th 230, 234 (3d Cir. 2022) (noting that the Rule 12(b)(1) screening mechanism at issue here is limited to screening for "mere frivolity"); *Salas v. Acuity-CHS, LLC*, Civil Action No. 22-317-RGA, 2023 WL 2710180, at *3 (D. Del. Mar. 30, 2023) (same). We do not have that type of allegation here (i.e., where here, TTL is a subsidiary in a group of companies, at least some of which are credibly alleged to be involved in a joint venture that is trafficking in the confiscated Cuban property at issue).

that the plaintiff sued the wrong party, the "court may not decide that issue on a [Rule] 12(b)(1) motion").[11] It will do so below.

For these reasons, the Court DENIES the Rule 12(b)(1) portion of the Motion.

### B. Rule 12(b)(6) Arguments

The HBA provides that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages[.]" 22 U.S.C. § 6082(a)(1)(A). With respect to property confiscated before March 12, 1996, a claim is only viable if the United States national acquired ownership of the claim before March 12, 1996. 22 U.S.C. § 6082(a)(4)(B). A person "traffics" in confiscated property if that person "knowingly and intentionally[,]" *inter alia*: (1) "engages in a commercial activity using or otherwise benefiting from confiscated property" or (2) "causes, directs, participates in, or profits from, trafficking . . . by another person, or otherwise engages in trafficking . . . through another person[.]" 22 U.S.C. § 6023(13)(A). TTL makes several Rule 12(b)(6)-related arguments that the Court will take up below.

#### 1. Whether Plaintiffs Plausibly Plead Knowing and Intentional Trafficking

TTL's first Rule 12(b)(6)-related argument is that the CAC fails to plausibly allege that TTL knowingly and intentionally trafficked in the Property. (D.I. 40 at 12-14) TTL asserts that Plaintiffs' allegations are deficient for three reasons: (1) they do not plausibly tie TTL's actions

---

[11] *See also Hunsinger v. Dynata LLC*, Case No. 3:22-cv-00136-G-BT, 2023 WL 2377481, at *4 (N.D. Tex. Feb. 7, 2023) (explaining that where the Rule 12(b)(1) standing challenge at issue "intertwines inquiries of . . . traceability required for standing and a central aspect of a [statutory] claim, the Court should assume jurisdiction and treat the attack as one on the merits of the claim under Rule 12(b)(6)"), *report and recommendation adopted*, 2023 WL 2386710 (N.D. Tex. Mar. 4, 2023).

to the alleged trafficking of other Trafigura entities; (2) they do not plausibly show that TTL itself engaged in trafficking, as TTL's alleged conduct lacks "any specific connection to the trafficking alleged to be occurring in Cuba"; and (3) they fail to suggest that TTL "knowingly and intentionally" undertook any wrongful activity. (D.I. 40 at 12-13) Overall, according to TTL, Plaintiffs are trying to assert an "enterprise theory" or "vicarious trafficking theory" of liability—by contending that TTL is part of TGPL's group of companies, that *other members* of the group are engaging in the trafficking at issue, and that TTL can be held liable for the acts of those other members because it "generally benefits from and contributes to those activities simply by being part of the group." (*Id.* at 13-14 (internal quotation marks omitted)) TTL argues that this type of theory is not viable because the separateness of the various companies at issue must be respected. (*Id.* at 14)

As a starting point for its analysis, the Court notes that the HBA's statutory language is very broad when it comes to what qualifies as violative "trafficking" activity. That is, the Act allows for liability not only for direct traffickers, but also for persons who, *inter alia*, knowingly and intentionally profit from *trafficking engaged in by another*. (D.I. 45 at 10 (citing 22 U.S.C. § 6023(13)(A)(iii)) So, for example, if a plaintiff plausibly alleged that company A knowingly and intentionally profited from trafficking that was directly undertaken by related company B, then company A could still be held liable under the plain language of the statute (provided that the other elements of a trafficking claim were also met).

Even still, TTL retorts that Plaintiffs' theory of "vicarious trafficking" is untenable because it would eliminate the HBA's "knowing and intentional" requirement. More specifically, TTL says that Plaintiffs' position would allow TTL to be held liable "not for engaging in knowing and intentional acts of trafficking" but only for "being part of and generally

contributing to a group of companies that includes members allegedly engaging in such trafficking[,]" which would "dramatically expand the scope of trafficking to companies, such as TTL, that make no use of and have no connection to confiscated property." (D.I. 47 at 6-7; *see also id.* at 4-5 (contending that Plaintiffs' "claims rise and fall on the ability to hold TTL generally accountable for the actions of non-U.S. sibling entities within the Trafigura Group of companies merely because TTL is part of the corporate family"))

If that really were Plaintiffs' theory of liability, then perhaps TTL would have a point. But the Court notes that *TTL's articulation* of Plaintiffs' position does not seem to gibe with the type of claim that *Plaintiffs actually say* that they are making. Rather, Plaintiffs' claim (at least as they further explain it in their briefing) is that TTL itself *does* knowingly and intentionally participate in and profit from trafficking by other members of TGPL "through its trading activities and involvement in procuring financing for the mining operations that currently use the" Property. (D.I. 45 at 9; *see also id.* at 2) In other words, Plaintiffs do not seem to be claiming that TTL is liable for trafficking in the Property simply because it is a part of TGPL's group of companies and one of those other companies in the group happens to traffic in the Property. To the contrary, Plaintiffs' position is that TTL itself knowingly and intentionally *has something "to do with* the mining operations in Cuba[.]" (*Id.* at 2 (emphasis added))

So the big question, then, is whether the CAC plausibly alleges this theory of liability. Plaintiffs' key allegation in this regard—the one that Plaintiffs highlight repeatedly in their briefing—comes in paragraph 108 of the CAC. That paragraph reads as follows:

> 108. [TTL] manages the Trafigura Group and its Mining Group's operations, including its operations in Cuba using the Confiscated Property. Since 2017, [TTL] has guaranteed over a billion dollars' worth of financing obtained through the issuance of various debt instruments by special purpose vehicles. Some of this financing has been obtained through public notes and private placements

> issued to U.S. investors. Upon information and belief, some of this financing has been used for the Trafigura Group's and its Mining Group's operations in Cuba using the Confiscated Property.

(D.I. 37 at ¶ 108 (*cited in* D.I. 45 at 2, 9); *see also id.* at ¶ 52 (alleging that TTL "routinely guarantee[s] the financing raised by Trafigura Funding [the entity responsible for making loans to other Trafigura Group companies]"); Tr. at 109, 111) Plaintiffs then allege that "Defendants have trafficked and are trafficking in the Confiscated Property by participating in or profiting from the commercial activities of [TGPL] and/or its Mining Group which use or otherwise benefit from the Confiscated Property." (D.I. 37 at ¶ 114 (*cited in* D.I. 45 at 9))

In the Court's view, however, paragraph 108 is insufficient to plausibly set out a claim of liability here. Below, it will articulate a number of reasons why this is so.

An initial problem is that some of the trafficking allegations Plaintiffs describe in their *briefing* are nowhere to be found in *paragraph 108*. For example, in their briefing, Plaintiffs say their allegations suffice because they establish that "TTL participates in this trafficking through its trading activities and involvement in procuring financing for the mining operations" at the Property. (D.I. 45 at 9) But paragraph 108 says nothing about TTL's "trading activities" or about how those "trading activities" might amount to participating in and profiting from TGPL-related trafficking. Additionally, in explaining why they have plausible allegations, Plaintiffs' answering brief cites to other purported facts about TTL's trafficking—including that the Mining Group "generates equity value for the Trafigura Group and traded volumes for [its] metals trading books and provides advisory and support services to the rest of the Group." (*Id*. at 11 (citing D.I. 40 at ECF page 245))[12] To the extent that this is also a reference to facts relating to

[12] At times when citing to the exhibits in D.I. 40, Plaintiffs reference the ECF page number of the document at issue, as opposed to the page number of the original document. When they do so, the Court will do the same herein.

TTL's trading activity, again, none of this material is actually pleaded in the CAC. And so the Court cannot consider it here.

Next, the Court addresses paragraph 108's allegation that TTL guarantees financing for the Trafigura Group, and that "[u]pon information and belief" some of this "financing has been used for the Trafigura Group and its Mining Group's operations in Cuba[.]" (D.I. 37 at ¶ 108) This allegation cannot win the day for Plaintiffs because it is simply a bald assertion that is unduly vague and speculative. (Tr. at 23, 25)[13] Put differently, Plaintiffs do not plead any *actual underlying facts* that would help render it plausible that this assertion is correct. *Cf. McDermott v. Clondalkin Grp., Inc.*, 649 F. App'x 263, 268 (3d Cir. 2016) (explaining that even when a plaintiff relies on allegations made "on information and belief" the plaintiff may not simply put forward "boilerplate and conclusory allegations") (internal quotation marks and citations omitted); *see also Sucesores de Don Carlos Nuñez y Doña Pura Galvez, Inc. v. Société Générale, S.A.*, 1:20-cv-851 (MKV), 2023 WL 2712505, at *3-4 (S.D.N.Y. Mar. 30, 2023) (finding that "on information and belief" allegations were too conclusory to set out an HBA claim). For example, paragraph 108 (or the CAC's other paragraphs) include no facts about any particular Cuba-related trafficking activities that TTL is said to have financed in or after 2017, nor about when such financing activity purportedly took place (which, in the Court's view, is also relevant to the requirement that trafficking be knowing and intentional).[14]

---

[13] As mentioned above, in connection with their Rule 12(b)(1) traceability argument, TTL cites to several declarations that it contends firmly establish to the contrary that, *inter alia*, TTL has absolutely no involvement in the funding of EMINCAR. (D.I. 40 at 11) Yet because these declarations present matters outside of the pleadings, the Court cannot consider them in assessing the merits of the Rule 12(b)(6) portion of the Motion. *See, e.g.*, *In re Chemours Co. Sec. Litig.*, 587 F. Supp. 3d 143, 159 (D. Del. 2022); (D.I. 45 at 11-12).

[14] Plaintiffs allege that TTL was put on notice of the alleged trafficking when they were sued in 2021 by different claimants for trafficking in the same Property that is at issue here,

Indeed, Plaintiffs' briefing confirms the speculative nature of this allegation. In order to bolster their assertion that TTL-guaranteed financing was somehow connected with the Cuban mining operations at issue, Plaintiffs' answering brief cites to a statement in a TTL financing prospectus; the prospectus states that any proceeds from the issuances described therein "will be applied by the Group for general corporate purposes" and also that the Mining Group's "mining assets are closely related to and have strong synergies with the Group's core metals and trading business." (D.I. 40 at ECF pages 103, 131 (*cited in* D.I. 45 at 11)) Plaintiffs suggest that these statements indicate that one of the "general corporate purposes" that these funds were to be used for was Cuban mining activities. (D.I. 45 at 11) Once again, however, none of this material regarding the prospectus is actually pleaded in the CAC, and so the Court cannot consider it. Even if it had been pleaded, the cited portion of the prospectus that references mining assets (and how they are "core" to the Group's trading business) does not seem to be making reference to where the issuance's funding was meant to be directed. In order to have successfully pleaded trafficking as to TTL, Plaintiffs would need to plead facts that plausibly indicate a link between TTL-related funds and the Property. Paragraph 108 fails to do so.

Lastly, paragraph 108's other assertion—i.e., that "TTL manages Trafigura Group and its Mining Group's operations, including its operations in Cuba using the [] Property"—is also of no help to Plaintiffs. (D.I. 37 at ¶ 108) It is, again, a bald assertion-type allegation accompanied by no additional pleaded underlying facts in support thereof. Moreover, an organizational chart

---

and when they received notice letters in February 2022; Plaintiffs assert that nevertheless, TTL has "continued to traffic" in the Property thereafter. (D.I. 37 at ¶¶ 110-13) While these allegations may be sufficient to have alerted TTL that the Property at issue was confiscated by the Cuban government decades ago, they do not speak to or plausibly establish that TTL knowingly and intentionally *engaged in trafficking* involving that Property. *See, e.g.*, *Sucesores de Don Carlos Nuñez*, 2023 WL 2712505, at *3.

attached to the CAC shows TTL to be in a completely different corporate hierarchy from TGPL's Mining Group (which in turn is comprised of Urion Mining Int'l B.V. and Trafigura Caribbean Mining B.V., both located in the Netherlands, and EMINCAR in Cuba). (D.I. 37, ex. 1; *see also* D.I. 40 at 12; Tr. at 20) Based on the record before the Court, it is implausible that TTL—a U.S. subsidiary that engages in trading—would be managing the Trafigura Group's Cuban mining operations.[15]

So for all of these reasons, the Court agrees with TTL that the CAC fails to state a plausible claim of trafficking against it. *See, e.g, Pujol Moreira v. Société Générale, S.A.*, 20-CV-9380 (JMF), 2023 WL 2051169, at *2 (S.D.N.Y. Feb. 16, 2023) (finding that an allegation that the defendant delivered U.S. dollars to an entity in Switzerland did not support a plausible inference that the defendant engaged in trafficking under the HBA, where the complaint did not include "any facts concerning the amount of currency provided; the frequency of the deliveries; or, most significantly, what, if anything, BNC did with the currency and whether BNC gave anything to Paribas in exchange for it").[16]

**2. Whether Plaintiffs Plausibly Allege Acquisition of Claims**

TTL's next Rule 12(b)(6) argument is that three Plaintiffs fail to timely plead ownership of actionable claims; these Plaintiffs fall into two categories that the Court will assess in turn.

**a. Plaintiffs Priscilla Lleras-Bush and Lucia Lleras de Labrada**

---

15 Indeed, in their briefing, Plaintiffs did not seem to highlight this particular allegation at all in asserting why they had sufficiently pleaded trafficking by TTL. (*See* D.I. 45 at 9-12)

16 Although all of the claims against TTL cannot survive for this reason, for completeness (and to provide guidance as to any efforts to re-plead), below the Court will address the other bases for dismissal raised by TTL.

The Court first takes up TTL's assertion that Plaintiffs Priscilla Lleras-Bush and Lucia Lleras de Labrada fail to plead timely ownership of actionable claims. (D.I. 40 at 14-16; D.I. 47 at 8) The CAC alleges that these Plaintiffs inherited their claims from their mother Olga Romagosa, who died on September 17, 1998. (D.I. 37 at ¶¶ 18, 97, 99) As was noted above, the HBA provides that with regard to property confiscated before March 12, 1996 (i.e., the Property at issue here), a U.S. national cannot bring a claim under the HBA "*unless such national acquires ownership of the claim* before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B) (emphasis added). As one court explained, this means that "the United States citizen filing suit must already own the interest in the confiscated property on March 12, 1996 when the [HBA] was passed"—a requirement primarily intended by Congress to "prevent foreigners from 'relocat[ing] to the United States for the purpose of using this remedy' [and] 'eliminate any incentive that might otherwise exist to transfer claims to confiscated property to U.S. nationals in order to take advantage of the remedy created by [the Act].'" *Gonzalez v. Amazon.com, Inc.*, Civil Action No. 19-23988-Civ-Scola, 2020 WL 2323032, at *2 (S.D. Fla. May 11, 2020) (citation omitted), *aff'd*, 835 F. App'x 1011 (11th Cir. 2021).

TTL asserts that the earliest that these two Plaintiffs could have acquired a claim to the Property was in September 1998 when their mother died—over two years after the HBA's cutoff date. (D.I. 40 at 15-16; D.I. 47 at 8) Plaintiffs retort that an heir can "acquire" an HBA claim through inheritance after March 12, 1996 and still prosecute such a claim, as "[n]othing in the language of Section 6082(a)(4)(B) refers to inheritances or bars these Plaintiffs from pursuing claims as heirs." (D.I. 45 at 16) And Plaintiffs add that construing the statute otherwise would lead to an absurd result, which would penalize claimholders who died during the period of March

1996 to May 2019 (a period of time in which the right to bring a private cause of action for Title III violations under the HBA was suspended). (*Id.*; *see also* D.I. 37 at ¶ 57)

Plaintiffs do not point to a single case that interprets the HBA in the same way that they do. (*See* D.I. 45 at 15-17) Indeed, other courts considering this issue have held that "Congress's plain words" would "bar the recovery of any U.S. national who inherited a family member's claim on or after March 12, 1996[.]" *Del Valle v. Trivago GMBH*, Civil Action No. 19-22619-Civ-Scola, 2023 WL 5141699, at *3 (S.D. Fla. Aug. 10, 2023); *see also, e.g.*, *Gonzalez v. Amazon.com, Inc.*, 835 F. App'x 1011, 1012 (11th Cir. 2021) (finding that where the plaintiff's amended complaint alleged that he inherited the confiscated property from his mother in November 2016, the plaintiff "did not possess a claim to confiscated property until twenty years after the Helms-Burton Act's cutoff date"). That includes a decision by another Judge of this Court in *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316 (D. Del. 2021), wherein this Court rejected a plaintiff's contention that he had a viable HBA claim because he inherited ownership of the claim as to the properties at issue in 1999 and 2011. 529 F. Supp. 3d at 321, 328-31, *aff'd*, No. 21-1842, 2022 WL 3538221 (3d Cir. Aug. 18, 2022). The *Glen* Court explained that:

> Glen's contention that acquiring a claim by inheritance is an exception to the statute's requirement that actionable claims must be acquired before March 12, 1996 is inconsistent with the unambiguous language of the statute. On its face, the statute is clear that no United States national may bring an action unless he acquired ownership of the claim before March 12, 1996. The statute makes no distinctions with respect to the method of acquiring the claim. The statute is also clear that the United States national who acquired the ownership of the claim must be the same United States national who brings the action, not the predecessor of the United States national who brings the action. 22 U.S.C. § 6082(a)(4)(B) (". . . unless ***such*** national acquires ownership . . . ") (emphasis added). Thus, since Glen did not acquire the ownership of the claim before March 12, 1996, by inheritance or any other manner, he falls within the category of "United States nationals"

> who "may *not* bring an action under this section." *Id.* (emphasis added).

*Id.* at 328-29. The *Glen* Court observed that its conclusion was "consistent with every other court that has considered the issue[.]" *Id.* at 330-31 (citing cases).

The Court reaches the same conclusion as did the *Glen* Court (and the same conclusion reached by all of the other courts cited in *Glen*). When the plain meaning of the words used in a federal statute is clear, then a federal court must recognize and give effect to that plain meaning; the court cannot entertain arguments about what a party wishes the statute said, nor about why it would have been better from a policy perspective if the statute read differently. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 674-75 (2020) ("This Court has explained many times over many years that, when the meaning of the statute's terms is plain, our job is at an end.") (citing cases). So too here.[17] Plaintiffs Priscilla Lleras-Bush and Lucia Lleras de Labrada's claims are therefore dismissed for failure to plausibly plead timely acquisition of their claims, as is required by the HBA.

**b. Plaintiff Priscilla Lleras-Bush's Claim in her Capacity as Personal Representative of Olga Romagosa's Estate**

Plaintiff Priscilla Lleras-Bush also brings a claim in her capacity as personal representative of Olga Romagosa's estate, (D.I. 37 at ¶ 18); TTL challenges this claim too. TTL

[17] Plaintiffs argue the Court should interpret the word "acquire" in the HBA to require active conduct (which would purportedly not include passive inheritance). (D.I. 45 at 16-17 (citing *Webster's New Universal Unabridged Dictionary* 18 (deluxe 2d ed. 1983) (purportedly defining acquire to mean "'to get or gain by one's own efforts or actions'")) However, that is not the only definition of "acquire"; as other courts have explained in rejecting similar arguments, the plain meaning of "acquire(s)" is "'[t]o gain possession or control of; to get or obtain[]'" which "includes inheritance[.]" *Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 336 (5th Cir. 2021) (quoting *Black's Law Dictionary* 29 (11th ed. 2019); *Webster's Third New Int's Dictionary* 18 (1993)).

asserts that the earliest that Olga Romagosa's estate could have acquired a claim to the Property was in 1998 when Olga Romagosa died—again, over two years after the cutoff date provided for in the HBA. (D.I. 40 at 15-16; D.I. 47 at 8 ("The relevant question is whether the estate—acting through its personal representative—acquired ownership of the claims to confiscated property *before* March 12, 1996. It simply did not.") (emphasis in original)) TTL points out that while Ms. Lleras-Bush may not have sought to open probate estate proceedings until 2022, (D.I. 37 at ¶ 18), pursuant to Florida law, ownership of any Title III claim would have "automatically vested" in Olga Romagosa's descendants when she died in 1998, (D.I. 40 at 15 (citing Fla. Stat. § 732.514 (2002) (providing that "[t]he death of the testator is the event that vests the right to devises" unless the will contains language to the contrary); *Rice v. Greene*, 941 So. 2d 1230, 1231 (Fla. Dist. Ct. App. 2006))).[18] Thus, according to TTL, the estate did not acquire ownership of the claim before March 12, 1996, and so it cannot bring a cause of action under the HBA. (D.I. 40 at 15-16; D.I. 47 at 8)

The Court agrees with TTL. The survival of a federal claim is a question of federal common law. *See Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 109 (3d Cir. 2017); *see also de Fernandez v. Seaboard Marine, Ltd.*, Case No. 20-cv-25176-BLOOM/Otazo-Reyes, 2021 WL 3173213, at *9 (S.D. Fla. July 27, 2021) (concluding the same, and then looking to Florida state estate law to resolve the issue). As explained above, the HBA makes clear that with respect to property confiscated before March 12, 1996, a claim cannot be brought under the HBA unless the United States national acquires ownership of the claim before March 12, 1996. 22 U.S.C. § 6082(a)(4)(B). Under Florida law, upon Olga Romagosa's death in 1998, her assets

---

[18] Olga Romagosa resided in Miami-Dade County, Florida prior to her death. (D.I. 37 at ¶ 18)

"became property of [her] estate[] and no longer belonged to [her] individually." *Seaboard Marine, Ltd.*, 2021 WL 3173213, at *9 (citing *Depriest v. Greeson*, 213 So. 3d 1022, 1025 (Fla. Dist. Ct. App. 2017); *Sharps v. Sharps*, 214 So. 2d 737, 738 (Fla. Dist. Ct. App. 1982); Fla. Stat. § 732.101(2); Fla. Stat. § 732.514). "Thus, because the ability to bring a Title III action is contingent upon acquiring a claim to confiscated property by a date certain, the Estate[] had to acquire [its] interest in the Confiscated Property before March 12, 1996, which [it] did not. [As a result], the Estate[] cannot maintain a cause of action under Title III." *Id.*; *see also Fernandez v. CMA CGM S.A.*, 683 F. Supp. 3d 1309, 1321-23 (S.D. Fla. 2023) ("Under Florida law . . . . the claims of the Blanco Rosell Siblings ceased to be vested in them at the moment of their deaths, and the Estate Plaintiffs' claims must be dismissed because they are new claims acquired after the statutory cutoff.").[19]

---

[19] Plaintiffs retort that the Florida probate court authorized Priscilla Lleras-Bush as personal representative to administer the estate of Olga Romagosa, the only asset of which is the HBA claim—and that this somehow shows that Ms. Lleras-Bush can properly bring a claim here as the estate representative, pursuant to the HBA. (D.I. 45 at 13-14) In this portion of their answering brief, Plaintiffs appear to be making three arguments: (1) Florida probate law authorizes the personal representative of an estate to perform numerous administrative activities that would be difficult (or impossible) to carry out if the estate was automatically divested of the decedent's property upon death; (2) Florida's probate code expressly authorizes a personal representative to prosecute claims for the protection of the decedent's property; and (3) an estate is not a legal entity—it is just the property of the decedent—and thus Olga Romagosa's estate was not capable of "acquiring" her claim upon her death in 1998. (*Id.* at 13-15 (citing Fla. Stat. § 731.201(14))

Plaintiffs' first two arguments are not persuasive because they fail to consider that "[p]robating a will has no impact on the vesting of property rights conveyed therein. . . . And appointing a representative is simply a means of administering the distribution of the estate's assets, which must be done consistent with the will's text, where applicable, and the relevant law." *Escalon v. Trafigura Trading L.L.C.*, No. 23-20191, 2023 WL 7295177, at *2 (5th Cir. Nov. 3, 2023).

As for Plaintiffs' third argument, in making it, they seem to suggest that the claim still belongs to Olga Romagosa (i.e., the deceased) instead of her estate (acting as a separate legal entity) or to her successors. (D.I. 45 at 15) However, another Florida court has already

Accordingly, Plaintiff Priscilla Lleras-Bush's claim in her capacity as personal representative of the Estate of Olga Romagosa is dismissed because the Estate did not acquire its interest in the Property until Olga Romagosa's death in 1998, after the March 12, 1996 HBA cutoff.

**3. Whether Plaintiffs Plausibly Allege Ownership of Property**

TTL's next contention is that Plaintiffs have failed to plead sufficient non-conclusory facts establishing ownership of an interest in property that would entitle them to an HBA claim. It asserts this is so for two main reasons. The Court will address them in turn.

**a. FCSC-Related Pleading Requirements**

In 1964, Congress enacted Title V of the International Claims Settlement Act of 1949; Title V establishes a procedure for the Foreign Claims Settlement Commission ("FCSC") to determine and certify the amount and validity of claims by United States nationals against the Cuban government for losses resulting from, *inter alia*, the confiscation of property by the Cuban government. 22 U.S.C. § 1643b(a). The HBA allows United States nationals to file lawsuits based on certified or uncertified claims; the claims at issue here are uncertified. (D.I. 40 at 17) The HBA requires that for uncertified claims, a plaintiff must establish that the interest in property that is the subject of the lawsuit is not the subject of another person's certified claim. 22 U.S.C. § 6082(a)(5)(D). It also provides that U.S. nationals that were eligible to file a claim

---

considered and rejected this same argument, explaining why it could not be a winning one. The court noted that whether the property at issue became vested in the estate itself at the time of the owner's death or became vested in the person who inherits it, either way, "both would have gained the claims to the property after the statutory cutoff"; it also pointed out that "the Estate Plaintiffs provide no authority establishing the property within an estate is still vested in the decedent." *Fernandez*, 683 F. Supp. 3d at 1322. Similarly, here Plaintiffs have pointed the Court to no authority suggesting that Olga Romagosa's property is still vested in her, decades after she passed away. And otherwise the claim cannot stand.

with the FCSC but did not do so may not bring an HBA lawsuit based on that claim. 22 U.S.C. § 6082(a)(5)(A). TTL asserts that the CAC wrongfully fails to allege that the Property is not the subject of a certified claim, or that Plaintiffs' predecessors were ineligible to file a claim with the FCSC. (D.I. 40 at 17)

The Court is not persuaded that this is a basis to dismiss the CAC. TTL does not cite to any caselaw establishing that a plaintiff pleading an HBA claim must include allegations regarding these matters. (*Id.*) Indeed, in their responsive brief, Plaintiffs argue to the contrary that: (1) they are not required to allege whether their claims were certified by the FCSC because that is not an element of an HBA claim; and (2) Plaintiffs were not eligible to bring their claims to the FCSC because they were not "national[s] of the United States on the date of the loss[,]" so the provision of the HBA relating to seeking FCSC certification does not apply to Plaintiffs. (D.I. 45 at 17 (citing 22 U.S.C. § 6082(a)(5)(A)) Plaintiffs also contend that TTL must raise any FCSC-related attack on their legal right to bring this action as affirmative defenses. (*Id.* at 17-18) TTL does not respond to Plaintiffs' rejoinder in its reply brief. (D.I. 47 at 9) Plaintiffs' arguments seem correct to the Court, and in the absence of any argument or caselaw to the contrary, the Court has no basis to dismiss the CAC for failure to plead anything relating to the FCSC.

**b. Allegations of Ownership of a Claim**

TTL next argues that Plaintiffs must plead adequate, specific facts that plausibly demonstrate that they own an actionable mining interest, but the CAC does not meet this standard. (D.I. 40 at 17-19) In support of this argument, TTL points to "FCSC precedents" as instructive with respect to the amount of facts that Plaintiffs must plead in order to survive a motion to dismiss; it notes that as to the ownership of Cuban mining companies, the FCSC

regularly certifies claims only when a party not only puts forward evidence of ownership like "stock certificates, correspondence, mining reports, assays, maps and other data" but also establishes "ownership of the mining concessions needed to exploit the minerals at issue." (*Id.* at 18) From there, TTL seems to have two specific complaints regarding the CAC's ownership allegations: (1) the CAC "contains no allegations that property interests were ever specifically devised or otherwise conveyed *to any* Plaintiff[;]'" and (2) the CAC fails to "indicate what, if any, level of ownership Plaintiffs' predecessors may have held or inherited in the confiscated property" and is "simply speculative as to what interests, if any, Plaintiffs' predecessors owned at the time of confiscation and whether EMINCAR is in any way encroaching on those alleged holdings." (*Id.* at 18-19 (emphasis in original); *see also* D.I. 47 at 9)

But again, TTL cites to "no authority . . . finding the FCSC claims certification process to be an appropriate proxy for evaluating the sufficiency of pleadings on a Rule 12 motion to dismiss" or that otherwise requires the level of detail that TTL desires for an HBA claim. (D.I. 45 at 18-19) Plaintiffs say this is because there is no such authority; instead, they assert that federal courts simply apply the "usual plausibility standard" in assessing challenges to this aspect of HBA claims. (*Id.* (citing cases))

In the Court's view, Plaintiffs' allegations meet that standard, establishing that:

- Plaintiffs' claims arise from their stock ownership, as well as inherited ownership interests in the Property, the bounds of which are detailed in the CAC, (D.I. 37 at ¶ 77);

- Plaintiffs' great grandfather Manual Luciano Diaz joined a venture in 1913 to obtain mines and land titles on certain ranches and develop a copper mine, with Diaz furnishing the necessary capital, (*id.* at ¶¶ 78-79);

- The successors of that partnership sold certain shares in 1921 and bought them back in 1944, and at the time that the Property was confiscated in 1960, there were 54

shareholders of 92,000 shares of stock, almost all of whom were descendants of Manual Luciano Diaz, (*id.* at ¶¶ 80, 97); and

- Plaintiffs traced their inheritance of ownership from Manual Luciano Diaz to one such shareholder—his daughter Amparo Diaz y Martinez—who in turn passed on her interest to her four children, who in turn passed their interests to their children (i.e., Plaintiffs), (*id.* at ¶¶ 97-99).

The CAC also includes over five pages of allegations that describe what constitutes the Property, and it alleges the current overlap in Defendants' operations in Cuba and use of the Property. (*Id.* at ¶¶ 77-94, 107) These allegations allow the Court to draw the reasonable inference that Plaintiffs have ownership interests in the Property at issue. *Cf. Seaboard Marine, Ltd.*, 2021 WL 3173213, at *7 n.5 (noting that defendant's challenge of the plaintiffs' ownership interest to the confiscated property necessarily "involves factual determinations that go well beyond the four corners of the Amended Complaint" and concluding that "[a]t this stage of the proceedings . . . [p]laintiffs have sufficiently pled an ownership interest in the Confiscated Property").

**4. Domestic Takings Doctrine**

Lastly, TTL contends that the domestic takings doctrine bars Plaintiffs' claims. (D.I. 40 at 20; D.I. 47 at 9-10) "[U]nder the international law of property a foreign sovereign's taking of its own nationals' property remains a domestic affair. This 'domestic takings rule' assumes that what a country does to property belonging to its own citizens within its own borders is not the subject of international law." *Fed. Republic of Germany v. Philipp*, 592 U.S. 169, 176 (2021) (citations omitted). In its opening brief, TTL argues that: (1) Congress enacted Title III of the HBA against the "backdrop" of the domestic takings doctrine; (2) the HBA incorporates this

doctrine since it explicitly abrogates the act of state doctrine,[20] *see* 22 U.S.C. § 6082(a)(6), but is silent with respect to the separate domestic takings doctrine; (3) at the time that the Property in Cuba was confiscated by the Cuban government, all relevant parties were Cuban nationals, and so the claims at issue are not cognizable under the domestic takings doctrine. (D.I. 40 at 20)

The Court is not persuaded by TTL's argument. TTL does not cite to any law supporting the notion that "Congress . . . incorporate[s] doctrines into statutes by silence." (D.I. 45 at 20) Indeed, the more logical view seems to be that "Congress did not mention [the domestic takings doctrine in the HBA] because it does not apply" to the HBA. (*Id.*); *see also, e.g.*, *Fernandez*, 683 F. Supp. 3d at 1330 ("If Congress meant for this limitation to apply to § 6082 claims, it clearly knew how to say so."). Thus, the domestic takings doctrine does not supply a basis to grant the Motion.[21]

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS-IN-PART and DENIES-IN-PART the Motion. Specifically, the Court GRANTS the Rule 12(b)(6) portion of the Motion asserting that the CAC fails to state a claim of trafficking against TTL. It also GRANTS the Rule 12(b)(6) portion of the Motion seeking dismissal of the claims of Plaintiffs Priscilla Lleras-Bush and

---

[20] The act of state doctrine "prevents United States courts from determining the validity of the public acts of a foreign sovereign." *Philipp*, 592 U.S. at 178-79.

[21] In its reply brief, TTL advanced a new argument as to why the text of the HBA is fatal to Plaintiffs' claims. There, TTL asserted that the HBA's text is limited to addressing property that was confiscated from United States nationals, whereas the Property at issue here was confiscated from non-U.S. nationals; in support, it cites to several new cases that had been issued at the time of TTL's opening brief. (D.I. 47 at 9-10) The Court will not consider such arguments here, as parties are "not permitted to save for their reply brief arguments that they should have [] clearly made in their opening brief." *In re Horsehead Holding Corp. Sec. Litig.*, Civil Action No. 16-292-LPS-CJB, 2018 WL 4838234, at *17 (D. Del. Oct. 4, 2018) (citing cases), *report and recommendation adopted*, 2019 WL 1409454 (D. Del. Mar. 28, 2019); *see also* (D.I. 77 at 2-3).

Lucia Lleras de Labrada, as well as Plaintiff Priscilla Lleras-Bush's claims in her capacity as personal representative of the Estate of Olga Romagosa, since these claims are time-barred. The remainder of the Motion is DENIED.

With regard to the claims of Plaintiffs Priscilla Lleras-Bush, the claims of Lucia Lleras de Labrada and Ms. Lleras-Bush's claims in her capacity as personal representative of the Estate of Olga Romagosa, those claims are dismissed with prejudice. In light of the rationale behind the dismissal, there is no way that these claims can be re-pleaded successfully.

As to the remaining Plaintiffs' claims against TTL, because this is the first time that a judge has found Plaintiffs' pleading wanting with respect to TTL's Rule 12(b)(6) arguments, and because leave to amend should be "freely" given "when justice so requires[,]" Fed. R. Civ. P. 15(a)(2), the Court will give these Plaintiffs one further opportunity to attempt to address the deficiencies. It ORDERS that dismissal here will be without prejudice, and that after the Court resolves the remaining pending motion, it will address a schedule for Plaintiffs to be permitted to file a motion for leave to further amend the CAC in this regard.

An appropriate Order will issue.